**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00053-RWS-CMC |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. and | ) | |
| CDW CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>**DEFENDANT CISCO SYSTEMS, INC.'S**</u>
<u>**MOTION TO DISMISS UNDER RULE 12(b)(6)**</u>

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

June 23, 2022

*Counsel for Cisco Systems, Inc.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................... 1

STATEMENT OF THE ISSUES............................................................................. 4

FACTUAL BACKGROUND .................................................................................. 5

    A.    Cisco's Network Equipment ..................................................................... 5

    B.    Procedural History ..................................................................................... 6

    C.    The Present Complaint.............................................................................. 8

LEGAL STANDARD............................................................................................. 10

ARGUMENT .......................................................................................................... 11

I.      THE RULE AGAINST CLAIM-SPLITTING BARS DEXON'S CLAIMS ................. 11

II.    DEXON'S CONSPIRACY CLAIMS (COUNTS I-II, VI) FAIL BECAUSE IT DOES NOT ALLEGE ANY ACTIONABLE AGREEMENT ....................................... 13

    A.    Dexon Has Not Properly Alleged Any Unlawful Agreement To Replace Dexon With CDW As A Seller Of Cisco Products................................ 14

    B.    Any Agreement Not To Sell To Dexon Cannot Affect Competition ................ 16

    C.    Dexon's Parallel State Law Claim Also Fails........................................ 17

III.   DEXON FAILS TO ALLEGE AN ACTIONABLE TYING CLAIM (COUNTS III & VI)............................................................................................................. 17

    A.    The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure................................................................................................. 17

    B.    Dexon's Parallel State Law Claim Also Fails........................................ 23

III.   DEXON'S MONOPOLIZATION CLAIMS FAIL (COUNTS IV-VI)........................... 23

    A.    Dexon Fails To Allege Any Exclusionary Conduct ............................. 23

    B.    Dexon's Parallel State Law Claim Also Fails........................................ 28

IV.   DEXON LACKS ANTITRUST INJURY (COUNTS I-VI) ........................................... 28

CONCLUSION....................................................................................................... 30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
    2022 WL 980791 (W.D. Tex. Mar. 31, 2022) .................................................. 17

*Anderson v. Wells Fargo Bank, N.A.*,
    953 F.3d 311 (5th Cir. 2020) .................................................................. 11

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) .............................................................. 23, 28

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................... 10, 20, 26

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985) ........................................................................... 27

*Atl. Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990) ......................................................................... 8, 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................... 10, 14, 26

*Blough v. Holland Realty, Inc.*,
    574 F.3d 1084 (9th Cir. 2009) ................................................................ 18

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ........................................................... 18, 23

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.*,
    21 F.3d 83 (5th Cir. 1994) ................................................................... 23

*Burdett Sound, Inc. v. Altec Corp.*,
    515 F.2d 1245 (5th Cir. 1975) .......................................................... 3, 15, 16

*Chawla v. Shell Oil Co.*,
    75 F. Supp. 2d 626 (S.D. Tex. 1999) ....................................................... 18, 22

*Cinel v. Connick*,
    15 F.3d 1338 (5th Cir. 1994) ................................................................. 11

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
    2022 WL 2222962 (N.D. Cal. June 21, 2022) .................................................. 8

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
    2021 WL 5848080 (N.D. Cal. Dec. 9, 2021) ...................... 1, 2, 7, 8, 18, 20, 21, 22, 24, 29

*Claunch v. Bank of Am. Corp.*,
    2014 WL 4101886 (S.D. Miss. Aug. 18, 2014),
    *aff'd*, 608 F. App'x 262 (5th Cir. 2015) ................................................................. 12

*Cont'l T.V., Inc. v. GTE Sylvania Inc.*,
    433 U.S. 36 (1977) ................................................................................................. 26

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) ................................................................................ 16

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
    123 F.3d 301 (5th Cir. 1997) .......................................................................... 15, 16

*Eldridge v. Kohls Dep't Stores, Inc.*,
    2020 WL 1528233 (W.D. Okla. Mar. 30, 2020) ................................................. 13

*Federated Dep't Stores, Inc. v. Moitie*,
    452 U.S. 394 (1981) ............................................................................................... 12

*FTC v. Qualcomm Inc.*,
    969 F.3d 974 (9th Cir. 2020) ................................................................................ 28

*Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*,
    789 F. Supp. 760 (S.D. Miss. 1992), *aff'd*, 986 F.2d 1418 (5th Cir. 1993) ............... 14, 15

*Hitt v. City of Pasadena*,
    561 F.2d 606 (5th Cir. 1977) ................................................................................ 13

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
    714 F.2d 1384 (5th Cir. 1983) .............................................................................. 25

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
    547 U.S. 28 (2006) ................................................................................................. 17

*Jebaco, Inc. v. Harrah's Operating Co.*,
    587 F.3d 314 (5th Cir. 2009) ................................................................................ 29

*Jefferson Par. Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984) ................................................................................................... 17

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
    677 F.2d 1045 (5th Cir. 1982) .............................................................................. 21

*Klo-Zik Co. v. Gen. Motors Corp.*,
    677 F. Supp. 499 (E.D. Tex. 1987) ...................................................................... 17

*Kutt v. Apple Inc.*,
    2020 WL 6803257 (E.D. Tex. Mar. 23, 2020) ................................................ 10

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ................................................................ 14, 17

*MetroNet Servs. Corp. v. Qwest Corp.*,
    383 F.3d 1124 (9th Cir. 2004) ..................................................................... 27

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ......................................................................................... 21

*Norris v. Hearst Tr.*,
    500 F.3d 454 (5th Cir. 2007) ................................................................. 28, 30

*Novell, Inc. v. Microsoft Corp.*,
    731 F.3d 1064 (10th Cir. 2013) ................................................................... 27

*Olympia Co. v. Celotex Corp.*,
    771 F.2d 888 (5th Cir. 1985) ....................................................................... 28

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ..................................................................................... 27

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007) ........................................................................ 28

*Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*,
    517 F.2d 117 (5th Cir. 1975) ....................................................................... 12

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
    615 F.3d 412 (5th Cir. 2010) ....................................................................... 30

*R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*,
    807 F.2d 1222 (5th Cir. 1987) ..................................................................... 25

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
    637 F.2d 1001 (5th Cir. 1981) ..................................................................... 15

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ................................................................. 24, 25

*Rick-Mik Enters. Inc. v. Equilon Enters., LLC*,
    532 F.3d 963 (9th Cir. 2008) ....................................................................... 22

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
    802 F. Supp. 1544 (S.D. Tex. 1991) ........................................................... 18

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
    28 F.3d 1379 (5th Cir. 1994) ................................................................ 19, 23

*Scott v. Galusha*,
    890 S.W.2d 945 (Tex. Ct. App. 1994), *writ denied* Oct. 5, 1995 ..................................... 28

*SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) ................................................................ 27

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................ 23

*Star Tobacco, Inc. v. Darilek*,
    298 F. Supp. 2d 436 (E.D. Tex. 2003) ................................................................ 21

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................ 26

*Stearns Airport Equip. Co. v. FMC Corp.*,
    170 F.3d 518 (5th Cir. 1999) ................................................................ 26

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*,
    200 F.3d 307 (5th Cir. 2000) ................................................................ 26

*Test Masters Educ. Servs., Inc. v. Singh*,
    428 F.3d 559 (5th Cir. 2005) ................................................................ 12, 13

*Transource Int'l, Inc. v. Trinity Indus., Inc.*,
    725 F.2d 274 (5th Cir. 1984) ................................................................ 24

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*,
    89 F.3d 233 (5th Cir. 1996) ................................................................ 22

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
    540 U.S. 398 (2004) ................................................................ 23, 25, 27

*Walker v. U-Haul Co.*,
    747 F.2d 1011 (5th Cir. 1984) ................................................................ 29

*Whitehurst v. Showtime Networks, Inc.*,
    2009 WL 3052663 (E.D. Tex. Sept. 22, 2009) ................................................................ 26

**STATUTES**

Sherman Act, 15 U.S.C. § 1 *et seq.*:

    15 U.S.C. § 1 ................................................................ 1, 3, 6, 9, 13, 14, 15, 17, 18, 19, 23, 28

    15 U.S.C. § 2 ................................................................ 1, 4, 6, 7, 9, 10, 13, 14, 17, 23, 24, 26, 28, 30

Texas Free Enterprise and Antitrust Act of 1983,
    Tex. Bus. & Com. Code Ann. § 15.01 *et. seq.*........................................... 3, 4, 9, 17, 23, 28

**RULE**

Fed. R. Civ. P. 12(b)(6)............................................................................................. 4, 10, 12, 13

**OTHER AUTHORITY**

X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (4th ed. 2020)................................. 21

TO COUNSEL AND THIS HONORABLE COURT:  Defendant Cisco Systems, Inc. ("Cisco") hereby brings this Motion To Dismiss Plaintiff Dexon Computer, Inc.'s ("Dexon") complaint.

## INTRODUCTION

Cisco sued Dexon in federal court in California, seeking "to hold Dexon accountable for . . . mass infringement and counterfeiting," having "uncovered a significant and willful infringement scheme by Dexon."  Ex. A (Cisco California Compl. ¶¶ 1, 2, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. July 22, 2020), Dkt. 1) (noting that Dexon "duped" customers "into thinking they are buying genuine Cisco-branded products").  Dexon filed counterclaims, including claims under Section 1 and Section 2 of the Sherman Act and California state antitrust law.  As here, Dexon asserted in its California counterclaims that "Cisco forces its customers to buy overpriced networking equipment they do not want by using its monopoly power in the aftermarkets for service and maintenance and foreclosing its network competitors in the process."  Ex. B (Dexon California Opp'n 7, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. Nov. 3, 2021), Dkt. 81); *cf.* [ECF 1] (Compl. ¶¶ 1-9).  And, as here, Dexon based its claims in part on a supposed conspiracy between Cisco and one of its distributors (there unnamed) not to sell Cisco equipment to Dexon.

The district court (Breyer, J.) dismissed Dexon's antitrust claims.  It held that Dexon had failed to allege "that the supposed tie had any adverse effect on competition" because, although Dexon asserted that "Cisco's competitors are impacted," the "alleged facts d[id] not support these conclusory assertions."  *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2021 WL 5848080, at *4 (N.D. Cal. Dec. 9, 2021).  The court also held that "the supposed tie makes no logical sense" because a customer buys SmartNet service contracts "for equipment she already has."  *Id.* at *5.

With regard to claims that Cisco "coerc[ed] purchases in the equipment markets; bull[ied] its customers to purchase through more expensive channels; [and] pressur[ed] a [distributor] not to deal with Dexon," the court found that "Dexon fail[ed] to plead that any of this alleged conduct, either singly or in the aggregate, was anticompetitive." *Id.* And the court further held that all of the antitrust claims fail "because Dexon has not pleaded antitrust injury." *Id.* at *6.

The district court gave Dexon leave to amend its counterclaims; it did so twice, but, although it continued to pursue other state and federal claims, it dropped its antitrust claims. On June 21, 2022, the district court dismissed Dexon's third amended counterclaims without leave to amend and denied Dexon's motion to file fourth amended counterclaims.

Rather than attempt to amend its antitrust claims in California, Dexon filed very similar antitrust claims in this Court. But the dismissal of Dexon's third amended counterclaims without leave to amend constitutes a final determination of those claims, which bars this suit under the doctrine of claim preclusion. Moreover, were the merits of Dexon's claims properly before this Court, they fail for the same reason that Judge Breyer dismissed Dexon's claims before. Dexon still has not pleaded facts to support its repeated but conclusory assertions that Cisco's conduct harmed competition in the relevant markets for equipment – switches, routers, and IP phones. In those markets, as Dexon concedes (Compl. ¶ 13), Cisco competes with rival manufacturers like Juniper, not with Dexon. Whatever the impact of the alleged conduct on Dexon – which claims it has lost sales of *Cisco* equipment – Dexon has not plausibly alleged any conduct that improperly interfered with rival equipment manufacturers' ability to compete for and win sales.

*First*, Dexon's conspiracy claims fail because Dexon challenges a purely vertical agreement – between Cisco and a single distributor, CDW Corporation ("CDW") – without alleging that the supposed agreement affected competition in the relevant markets. To begin, the

allegation that CDW, rather than Dexon, made sales to one customer does not imply an anticompetitive agreement between Cisco and CDW – a distributor has every reason to make profitable sales that its rivals would otherwise make.  Furthermore, any agreement between Cisco and CDW not to sell to Dexon is *per se* lawful since a manufacturer has every right to refuse to provide its products to a reseller (especially one that touts its efforts to divert sales *away* from Cisco, *see id.* ¶ 97).  *See Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975).  And even if such an agreement were subject to antitrust scrutiny under the rule of reason, Dexon alleges no facts to support any assertion that CDW's refusal to sell Cisco equipment to Dexon could conceivably affect competition between Cisco and rival manufacturers, particularly when Dexon makes no allegation that CDW has power in any market.  Thus, Dexon's conspiracy claims (Counts I and II) and its conspiracy-based claim under the Texas Free Enterprise and Antitrust Act (Count VI) fail.

*Second*, Dexon's effort to reassert its convoluted federal and state "tying" claims fails for the same reasons those claims failed before:  Dexon does not allege facts to support an assertion that the supposed tying arrangement forced a customer to buy equipment from Cisco that the customer would have preferred to purchase from a Cisco competitor (that is, a different manufacturer).  Absent any allegation that the tying arrangement foreclosed any *competitor's* sales, there is no antitrust claim.  The assertion that the long lifecycle of equipment means customers may be less likely to replace Cisco equipment with equipment from Cisco or any of its competitors for many years simply underscores the absence of required foreclosure and demonstrates that Dexon's assertions are conclusory speculation.  Accordingly, Dexon's claims brought under Section 1 of the Sherman Antitrust Act (Count III) and its tying-based claim under the Texas Free Enterprise and Antitrust Act (Count VI) fail.

*Third*, Dexon's "monopolization" and "attempted monopolization" claims fail because Dexon alleges no facts to show that Cisco's conduct excluded any competitor from the market. As noted above, and as Dexon alleges, in the supposedly monopolized markets for network equipment, Cisco's competitors are other manufacturers, such as Juniper – not Dexon.  And Dexon does not allege any facts to show that Cisco made it harder for rival equipment manufacturers to distribute their products, only that Cisco made it harder for *Dexon* to distribute *Cisco's* products.  Nor does Dexon allege facts suggesting that its success or failure as a Cisco reseller has any significance for competition in the relevant markets.  For each reason, Dexon's Section 2 claims (Counts IV and V) and its corresponding claim under the Texas Free Enterprise and Antitrust Act (Count VI) fail as a matter of law.

*Fourth*, the Court should dismiss all of Dexon's federal and state antitrust claims for failure to allege antitrust injury, consistent with the decision dismissing Dexon's California antitrust claims.  Dexon has at most alleged that Cisco's conduct harmed Dexon; Dexon does not allege, as it must, any injury flowing from reduced competition between Cisco and Cisco's competitors in the alleged relevant markets for network equipment.

For the foregoing reasons and those that follow, Dexon's claims should be dismissed in their entirety and with prejudice.

## STATEMENT OF THE ISSUES

Whether Dexon's complaint, if not transferred, should be dismissed for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## FACTUAL BACKGROUND

### A.      Cisco's Network Equipment

Dexon alleges (Compl. ¶ 42) that Cisco is a leading manufacturer of Internet "enterprise infrastructure[]" equipment.  Cisco manufactures network equipment "in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology."  *Id.* ¶ 23.  These products "are the fundamental building blocks" of critical Internet infrastructure.  *Id.* ¶ 31.  Cisco competes against other equipment "manufacturers with product portfolios that are worldwide in scope," *id.* ¶ 34, including Juniper (*id.* ¶ 13) and Hewlett Packard Enterprise (*see id.* ¶ 28).

Cisco also services the products it manufactures (but not other manufacturers' equipment), including by offering "a program called SmartNet."  *Id.* ¶ 3.  SmartNet provides access to proprietary "bug fixes, patches and updates" to Cisco's copyrighted software that enable safe operation of Cisco hardware by protecting purchasers of that critical infrastructure from "security vulnerabilities" and "operational risks."  *Id.* ¶¶ 26-27.  Cisco does not "require[]" Cisco equipment customers to purchase SmartNet.  *Id.* ¶ 27.  And as Dexon further alleges (*id.* ¶ 26), "third-party maintenance and service providers" can offer Cisco's hardware customers alternatives to receive services on Cisco equipment.  Cisco's hardware customers also can purchase SmartNet "at a different time" after purchasing Cisco equipment.  *Id.* ¶ 45.  And those customers need not purchase SmartNet from Cisco directly; companies other than Cisco "sell an extremely large volume of SmartNet service packages."  *Id.* ¶ 47.

Equipment manufacturers like Cisco sell "billions of dollars" of network equipment annually.  *Id.* ¶ 105.  According to Dexon (*id.* ¶ 11), Cisco sells its equipment hardware through

a "distribution channel," which is comprised of distributors and "VARs" or value-added resellers.  *See id.* ¶ 53.  Consumers seek "the best economic and performance deal for networking equipment" available.  *Id.* ¶ 45.  And, owing to the nature of networking equipment, purchases "are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products."  *Id.* ¶ 4.

### B.   Procedural History

**1.**      This is the second lawsuit Dexon has brought challenging Cisco's relationships with its resellers of networking equipment.  After Cisco sued Dexon in the Northern District of California for using counterfeit Cisco trademarks in violation of federal and state law, Dexon filed antitrust counterclaims under federal and California law, making effectively identical allegations to those at issue here.

Dexon's California counterclaims alleged that Cisco had violated Section 1 and Section 2 of the Sherman Act and California's parallel state law, the Cartwright Act, by "tying" the purchase of new Cisco routers and switches to the provision of SmartNet service.  Ex. C (Dexon California Counterclaims ¶¶ 37-45, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-cv-04926 (N.D. Cal. July 29, 2021), Dkt. 50).  Dexon alleged that the "tying" product is the service that Cisco provides to SmartNet purchasers, which Cisco supposedly uses to induce customers to purchase new Cisco equipment from resellers other than Dexon.  But Dexon failed to allege that any sales of Cisco equipment made under this supposed "tying" arrangement displaced sales by any other manufacturer.  *See*, *e.g.*, *id.* ¶ 42 (alleging a customer wanted to buy Cisco equipment and bought Cisco equipment).  Dexon also alleged that Cisco "[e]ngag[ed] in . . . pressure and bullying tactics" to dissuade several customers from doing business with Dexon.  *Id.* ¶ 71b.  And Dexon alleged that Cisco pressured an unidentified "VAR not to do business with Dexon."  *Id.*

¶ 52; *see also id.* ¶ 71c (claiming that Cisco violated Section 2 by "[p]ressuring at least one large volume VAR not to deal with Dexon").

      2.      The United States District Court for the Northern District of California (Breyer, J.) granted Cisco's motion to dismiss Dexon's antitrust counterclaims – and all of its other federal- and state-law counterclaims.  *See Cisco*, 2021 WL 5848080, at *4-6.

      a.      The court held that Dexon's tying claims failed "because Dexon does not allege that the supposed tie had any adverse effect on competition."  *Id.* at *4.  Dexon alleged only that customers wanting to buy Cisco equipment from Dexon ended up buying Cisco equipment from another reseller – not that Cisco had foreclosed any rival equipment manufacturer (e.g., Juniper or Hewlett Packard Enterprise) from making a sale.  *See id.*  The court also found that "the supposed tie makes no logical sense," because "SmartNet exists to maintain Cisco products," meaning that customers desiring SmartNet service necessarily desired Cisco equipment and at most had a contract claim against Cisco for failing to provide SmartNet service.  *Id.* at *5.

      b.      The district court also dismissed Dexon's monopolization claims, reasoning that the alleged "bullying" – "coercing purchases in the equipment markets; bullying its customers to purchase through more expensive channels; pressuring a VAR not to deal with Dexon; hurting Dexon by discontinuing its access to Cisco's service database; reversing a prior course of conduct toward Dexon" – also had not precluded rival equipment manufacturers from making sales.  *Id.*  Instead, "Cisco's conduct apparently led some customers to purchase Cisco equipment from suppliers other than Dexon."  *Id.*  For example, in one instance, Cisco's alleged conduct had "apparently <u>helped</u> its competitors:  shutting off Dexon's access to the service database led frustrated consumers to purchase products made by other manufacturers."  *Id.*; *cf.* Compl. ¶ 12 (referring to loss of access to "database . . . for maintenance services").

**c.**      Finally, Judge Breyer found that all of Dexon's antitrust counterclaims failed because "Dexon ha[d] not pleaded antitrust injury." *Id.* at *6.  Dexon alleged only that Cisco's conduct harmed Dexon's ability to sell Cisco equipment or deprived SmartNet customers of contracted-for service. *See id.*  Thus, "while the conduct may have violated consumers' contracts with Cisco, or it may have been unwarranted or arbitrary, any injury to Dexon was not 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,'" as is necessary for antitrust injury. *Id.* (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

**3.**      Judge Breyer gave Dexon leave to amend its counterclaims. *See Cisco*, 2021 WL 5848080, at *9.  Dexon submitted two subsequent amended federal- and state-law counterclaims, and sought leave to file yet another version of those counterclaims, but it did not re-assert its antitrust counterclaims.  On June 21, 2022, the district court dismissed the third amended counterclaims "without leave to amend" and denied Dexon's motion for leave to file its fourth amended counterclaims. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, at *9 (N.D. Cal. June 21, 2022).  Accordingly, Judge Breyer has conclusively resolved Dexon's counterclaims against Cisco.

**C.      The Present Complaint**

Rather than re-assert its antitrust counterclaims in the Northern District of California, Dexon refiled claims in this Court based on substantially the same facts and legal theories that Judge Breyer rejected.  In dismissing Dexon's third amended counterclaims, Judge Breyer wrote that Dexon's lawsuit here is "duplicative" and an "apparent attempt[] to seek repeated bites at the apple." *Id.* at *8 n.4.  We summarize those claims below:

8

*First*, Count I (Section 1 of the Sherman Act), Count II (Section 2 of the Sherman Act), and Count VI (Texas Free Enterprise and Antitrust Act) depend on allegations that Cisco entered into an unlawful agreement with CDW.  One aspect of the conspiracy involves CDW simply making sales of Cisco equipment to a customer who decided not to buy Cisco equipment from Dexon.  The complaint describes (Compl. ¶¶ 59-60) an example of a hospital system in Pennsylvania that supposedly cancelled an order it had placed with Dexon after Cisco allegedly warned it would not provide service on Cisco equipment purchased from Dexon (and would "cancel immediately all SmartNet service packages which the customer had in place").  Dexon alleges "[u]pon information and belief" that Cisco and CDW agreed that CDW would make the sale instead.  *Id.* ¶ 60.  This agreement supposedly affected inter-brand competition because Dexon is more likely than CDW to sell non-Cisco equipment (although Dexon affirmatively alleges that CDW sells hundreds of products manufactured by Cisco's competitors).  *Id.* ¶ 61.  Dexon also alleges, "[u]pon information and belief," that Cisco and CDW agreed that CDW would not sell Cisco equipment to Dexon.  *Id.* ¶ 62.

*Second*, Count III (Section 1 of the Sherman Act) and Count VI (Texas Free Enterprise and Antitrust Act) rest on the claim that Cisco threatens to refuse contracted-for SmartNet service on Cisco equipment unless Cisco customers purchase new Cisco equipment – conduct that Dexon labels "tying."  *See id.* ¶¶ 102, 124.  As in its California counterclaims, Dexon does not allege that any customer purchased Cisco equipment *instead of* some other manufacturer's equipment that the customer would have preferred.  Instead, Dexon asserts here that such non-Dexon sales of Cisco equipment make it less likely that a customer would purchase some other manufacturer's equipment at some later time because networking equipment has a long expected life.  *See id.* ¶ 4.  And, as it did in its California counterclaims, Dexon alleges that customers

have the option of paying for recertification of equipment to make it eligible for SmartNet service – which does not involve any sale of new equipment.  *See id.* ¶ 49.

*Third*, Counts IV and V (Section 2 of the Sherman Act) depend on the same allegations underlying Dexon's "tying" claims, as well as allegations that Cisco pressured customers not to deal with Dexon – including pressuring a school district in Texas to cancel an order for IP phones from Dexon.  *See id.* ¶¶ 12-13, 65, 111, 117.  Dexon asserts that this conduct allows Cisco to maintain (or attempt to acquire) a monopoly in alleged product markets for network equipment and IP phones, even though Dexon does not allege any facts to support the assertion that Cisco's conduct as to Dexon interferes with any competing manufacturer's ability to win business from Cisco.  *See id.* ¶ 13 (alleging that Cisco targeted Dexon's sales of *Cisco equipment* because Dexon also sold equipment from competing manufacturers, but failing to allege that the termination interfered with sales of that non-Cisco equipment).

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter, [if] accepted as true, to state a claim to relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted), and that rises "above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Kutt v. Apple Inc.*, 2020 WL 6803257, at *1 (E.D. Tex. Mar. 23, 2020) (Schroeder, J.) ("The complaint need not contain detailed factual allegations, but a plaintiff must plead sufficient factual allegations to show that he is plausibly entitled to relief.").  Conclusory assertions are insufficient to survive a motion to dismiss under Rule 12(b)(6).  *See Twombly*, 550 U.S. at 556 ("a bare assertion of conspiracy will not suffice").

**ARGUMENT**

Dexon's claims fail, first of all, because they are barred by the doctrine of claim

preclusion.  Having brought its antitrust counterclaims in one court, and having failed to pursue

the opportunity to amend those claims there, the doctrine of claim preclusion bars Dexon's

attempt to split its claims by filing in this Court instead.

In any event, those antitrust claims fail on the merits.  Dexon is not a consumer or a

competitor of Cisco but an unauthorized reseller, upset that Cisco has frustrated Dexon's

attempts to profit from sales of *Cisco's* products.  Having seen its antitrust claims dismissed once

before, Dexon has filed in a new forum and added window dressing in an unavailing attempt to

avoid transfer to the Northern District of California.[1]  But *Twombly* teaches that, where facts to

support an antitrust claim are lacking, conclusory assertions cannot suffice.  The facts alleged in

Dexon's complaint, if true, establish only that Dexon incurred losses because Cisco discouraged

customers from doing business with Dexon when selling Cisco equipment.  It does not establish

any harm to competition in the equipment markets where Cisco supposedly has market power,

much less any injury to Dexon flowing from any competition-harming conduct in the equipment

markets that Dexon alleges.  As before, Dexon's complaint should be dismissed.

**I.      The Rule Against Claim-Splitting Bars Dexon's Claims**

Dexon's claims do not make it out of the starting gate because the dismissal of its

counterclaims, without leave to amend, in the California action precludes its claims here.  *See*

*Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *see also Cinel v.*

*Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994).  Claim preclusion applies if "(1) the parties are

identical or in privity; (2) the judgment in the prior action was rendered by a court of competent

---

[1] As explained in Cisco's Motion To Transfer (filed contemporaneously herewith), this case should be transferred to the Northern District of California under the "first-to-file" rule.

jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005); *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 399 n.3 (1981).

Those requirements are met here. *First*, Dexon cannot split its claims merely by naming CDW as an additional defendant here, because its earlier suit included allegations related to CDW. As set out in Cisco's motion to transfer, Dexon included allegations regarding an unnamed authorized Cisco reseller in its California counterclaims; those allegations unmistakably relate to CDW. *See* Mot. To Transfer at 6 n.4. "[W]here plaintiff . . . had the initiative in a recognizably substantial litigation, and specifically chose to cite [defendant] as one of the alleged conspirators [in the earlier litigation], there is no suggestion of any failure of fairness in the original litigation, so as to render it unsupportive of an estoppel." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 122-23 (5th Cir. 1975).

*Second*, the United States District Court for the Northern District of California is of course a court of competent jurisdiction to adjudicate Dexon's claims. *See Claunch v. Bank of Am. Corp.*, 2014 WL 4101886, at *4 (S.D. Miss. Aug. 18, 2014) (affording preclusive effect to a prior action in the Northern District of California), *aff'd*, 608 F. App'x 262 (5th Cir. 2015).

*Third*, the dismissal of the California lawsuit is a final adjudication on the merits that has preclusive effect because Dexon does not have leave to amend its counterclaims (including the antitrust claims at issue). "[A] dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) is a judgment on the merits." *Federated Dep't Stores*, 452 U.S. at 399 n.3 (internal quotation marks omitted). A "dismissal with prejudice [under Rule 12(b)(6)] is res judicata" and bars those same claims from being raised in any court. *Shull v. Pilot Life Ins. Co.*,

313 F.2d 445, 446 (5th Cir. 1963).  Thus, the recent order finally dismissing Dexon's counterclaims without further leave to amend "essentially ends the plaintiff's lawsuit" and prevents Dexon from pursuing a claim in the same or another forum.  *Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam).  Further, even if the court had not entered a final order dismissing the counterclaims, Dexon's decision not to amend its California counterclaims to include the antitrust causes of action would have prohibited its refiling those claims here. Where, as here, a party was given leave to amend a particular claim but does not do so, the 12(b)(6) dismissal bars all dismissed claims.  *See Eldridge v. Kohls Dep't Stores, Inc*., 2020 WL 1528233, at *2 (W.D. Okla. Mar. 30, 2020).

*Fourth*, the claims Dexon asserts here are the same as those asserted in its counterclaims in the California action:  Dexon alleged that Cisco violated Section 1 of the Sherman Act through an illegal tying arrangement involving Cisco's SmartNet service contracts, Section 2 of the Sherman Act by maintaining an unlawful monopoly of the Relevant Product Markets (defined as the markets for Ethernet switches, routers in the California lawsuit, and Ethernet switches, routers, and IP phones in the Texas case), and it alleged violations of state antitrust laws in each state where it brought its federal antitrust claims.  When determining whether a subsequent suit involves the same claim as an earlier action, "a prior judgment's preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose."  *Test Masters Educ. Servs.*, 428 F.3d at 571. That test is plainly satisfied here.

## II.   Dexon's Conspiracy Claims (Counts I-II, VI) Fail Because It Does Not Allege Any Actionable Agreement

Dexon's claim (Compl. ¶ 57) that "Cisco and CDW conspired to exclude Dexon" from the Relevant Networking Equipment Market fails because Dexon does not plausibly allege any

13

competition-harming agreement between Cisco and CDW.  Whether under Section 1 or Section 2 of the Sherman Act, Dexon's claims require it to allege that Cisco and CDW reached an agreement that unreasonably restricted competition in a relevant market.  *See Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (affirming dismissal of Section 1 claim for failure to plausibly allege facts showing restraint of trade in relevant market); *Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 778 (S.D. Miss. 1992) (same, for Section 2), *aff'd*, 986 F.2d 1418 (5th Cir. 1993).  Dexon makes no such allegation.

### A.    Dexon Has Not Properly Alleged Any Unlawful Agreement To Replace Dexon With CDW As A Seller Of Cisco Products

Dexon's complaint about a supposed agreement between Cisco and CDW that CDW would replace Dexon as the seller of Cisco equipment to a hospital system in Pennsylvania fails for multiple reasons.

*First*, Dexon has not plausibly alleged any agreement between Cisco and CDW that had any effect on Dexon.  To plausibly plead an antitrust conspiracy, a plaintiff must allege "some factual context" excluding the possibility of "independent action."  *Twombly*, 550 U.S. at 549.  Dexon alleges no such context.  Dexon alleges (Compl. ¶ 60) that CDW sold Cisco products to a customer, but CDW has every incentive to make profitable sales of Cisco equipment; there is no factual allegation that such sales stemmed from an agreement between CDW and Cisco to target Dexon.  Dexon cannot explain how there is anything unlawful about CDW making profitable sales.

*Second*, even if Dexon plausibly alleged that Cisco discouraged the Pennsylvania hospital system from dealing with Dexon pursuant to an agreement with CDW, such an agreement would be *per se* lawful.  As the Fifth Circuit has long made clear, "it is simply not an antitrust violation

14

for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Burdett Sound*, 515 F.2d at 1249.  That is so "even when the new dealer and the manufacturer agree before the termination of the old dealer that the substitution will occur." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997).  More generally, it does not violate antitrust law for Cisco to encourage end-users to purchase Cisco equipment from one reseller rather than another.  In either event, the customer is purchasing *Cisco* equipment.  The alleged conduct therefore does not affect the market opportunities of other equipment manufacturers (the competitors in the markets that Dexon alleges).

*Third*, even if any supposed agreement were subject to antitrust scrutiny, the agreement is lawful because Dexon does not and cannot allege any facts to show that any agreement between CDW and Cisco could harm market-wide competition in the markets for network equipment (or IP phones).  The supposed agreement between Cisco and CDW is purely a vertical agreement between a manufacturer and a seller.  *See* Compl. ¶ 56 (calling CDW a "favored reseller[ ]").  Such an agreement is subject to scrutiny (if at all) under the antitrust rule of reason:  because there is nothing about such agreements that is inherently harmful to competition (unlike, say, price-fixing between horizontal competitors), the plaintiff must allege facts to show that the agreement actually harms competition.  *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir. 1981).  That, in turn, requires the plaintiff to show that the agreement affects sales in a substantial part of the relevant market.  *See, e.g., Futurevision*, 789 F. Supp. at 770 (dismissing vertical conspiracy claim under Section 1 of the Sherman Act because plaintiff "ha[d] not sufficiently pleaded substantial foreclosure of market alternatives as

a result of the . . . contracts at issue").  But Dexon does not meet that pleading burden here because it fails to allege *anything* about CDW's share of any market.  Accordingly, as alleged, a vertical agreement between Cisco and CDW cannot affect market-wide competition because CDW is one reseller among many.  And that is true even if Dexon has properly alleged that *Cisco* has power in the relevant equipment markets.  *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 208 (4th Cir. 2002) (agreements between upstream software company and two downstream PC manufacturers, "when considered individually, [we]re [not] capable of causing any substantial harm to competition" because the downstream market was "fiercely competitive").

### B.    Any Agreement Not To Sell To Dexon Cannot Affect Competition

For related reasons, any supposed agreement between Cisco and CDW that CDW would not sell Cisco equipment to Dexon is *per se* lawful under Fifth Circuit law.  *See Burdett Sound*, 515 F.2d at 1249; *Doctor's Hosp. of Jefferson*, 123 F.3d at 307.  But even if such an agreement were subject to antitrust scrutiny, the same rule-of-reason analysis would doom the claim: Dexon's failure to allege that an agreement between Cisco and CDW would affect a substantial share of sales in any market means that no vertical agreement between them can affect competition.

Dexon's argument that Cisco's conduct implicates inter-brand competition because Dexon is more likely than CDW to encourage customers to purchase networking equipment from non-Cisco manufacturers does not change this analysis.  Cisco has every right – and every incentive – to favor "reseller[s] that [are] more likely to aggressively market its products." Compl. ¶ 97.  Dexon's boast (*id.*) that it "convert[s] customers from Cisco products to their [sic] competitors' products" provides all the justification that any manufacturer would need to stop doing business with a reseller.  Even if Dexon alleged facts to suggest that its sales efforts matter

to market-wide competition – and it has not, as discussed below – Cisco would have no antitrust duty to promote the distribution efforts of its competitors by propping up Dexon.

### C.      Dexon's Parallel State Law Claim Also Fails

Because Dexon failed to plead a conspiracy claim under Section 1 or Section 2 of the Sherman Act, Dexon's conspiracy claim under the Texas Free Enterprise and Antitrust Act (Compl. ¶¶ 131-137) fails for the same reasons. *See Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) ("Because plaintiffs have not plausibly alleged § 1 or § 2 [conspiracy] claims under the Sherman Act, their [Texas Free Enterprise and Antitrust Act] claims must be dismissed as well.").

### III.      Dexon Fails To Allege An Actionable Tying Claim (Counts III & VI)

### A.      The Section 1 Claim Fails Because Dexon Does Not Allege Any Foreclosure

1.      Dexon's claim that Cisco engages in unlawful tying fails for multiple reasons, most fundamentally because Dexon never alleges any facts to support its conclusory assertions that Cisco used its supposed power in any market to foreclose sales of any competitor's equipment.  To plead a Section 1 tying claim, Dexon must allege that Cisco "exploit[ed]. . . its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984), *abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006).  Further, Dexon must show that the alleged tying foreclosed competitors' sales – because in the absence of foreclosure, there is no impact on competition.  *See Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499, 503 (E.D. Tex. 1987) (noting that the "underlying rationale for the rule prohibiting tying arrangements is to prevent foreclosure of competition on the merits in the tied product market").  Failure to allege foreclosure thus bars Dexon's tying claim.  *See*, *e.g.*, *Marucci Sports*, 751 F.3d at 376 (requiring

allegations that the defendant's conduct "actually harmed competition among . . . manufacturers"); *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 641-42 (S.D. Tex. 1999); *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1550 (S.D. Tex. 1991); *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199-1202 (9th Cir. 2012) (tying claim fails absent allegations supporting foreclosure, i.e., that consumers "would" have "purchased [other] services" in the tied market from a competitor but for the tie); *Blough v. Holland Realty, Inc*., 574 F.3d 1084, 1089 (9th Cir. 2009) (no valid Section 1 tying claim where no sales in the tied market are "foreclosed to competitors by the tie") (internal quotation marks omitted).

Accepting Dexon's allegations as true, they do not support any claim that Cisco foreclosed the sale of any *competitor's* equipment (switches, routers, or IP phones).  *See Cisco*, 2021 WL 5848080, at *4 (holding that Dexon's indistinguishable Section 1 tying claim failed because "Dexon does not allege that the supposed tie had any adverse effect on competition").  Here, the supposed tying product is not equipment or replacement parts, but service provided under SmartNet contracts.  *See* Compl. ¶¶ 1, 3, 43, 49, 51, 53.  Dexon alleges (*id*. ¶ 3) that Cisco warned a bank that Cisco would not renew service for Cisco equipment unless the bank purchased additional equipment.  Dexon also alleges that Cisco threatened to withhold service unless entities – an energy company (*id*. ¶ 7), a 911-center (*id*. ¶ 8), an auto dealership (*id*. ¶ 51),[2] a hospital (*id*. ¶ 59),[3] and a school district (*id*. ¶ 65) – purchased Cisco equipment from resellers

---

[2] Dexon alleges (Compl. ¶ 51) that this auto dealership was not interested in purchasing any network equipment – from Cisco or "a competing network equipment provider" – because "the customer could not afford new Ethernet switches."  Accordingly, Cisco's service-related conduct as to the auto dealership could not have foreclosed any competitive equipment sales in the Relevant Product Markets (or for IP phones).

[3] Dexon alleges (Compl. ¶ 58) that the hospital shopped between Cisco and other product "manufacturers," but ultimately selected Cisco's network equipment.  Cisco's after-the-fact conduct vis-à-vis Dexon's sales of Cisco equipment to the hospital therefore did not foreclose any sale of a competitor's equipment in the Relevant Product Markets (or for IP phones).

other than Dexon.  Dexon does not allege a single instance of Cisco threatening to withhold service from a customer that wanted to purchase *another manufacturer's* equipment.

These allegations fail to establish any foreclosure.  Dexon defines (*Id.* ¶¶ 31, 36) the Relevant Product Markets as markets for network equipment in which Cisco competes with other network-equipment manufacturers (*id.* ¶¶ 32, 39).  And Dexon does not allege that any customer was coerced to forgo a purchase of any competitors' routers or switches (or IP phones) in order to gain access to SmartNet service for Cisco equipment.  Even on the assumption that the alleged conduct posed an obstacle to *Dexon's* resale of *Cisco* equipment, it posed no impediment to *competition* in the Relevant Product Markets.

Dexon's failure to allege foreclosure of any competitor's sales is fatal to its tying claim. For example, in *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994), the Fifth Circuit reversed a judgment for a plaintiff-distributor claiming tying under Section 1 because the plaintiff could not prove "an actual adverse effect on competition." Instead, like Dexon, the plaintiff's "claim was, ironically, that it lost customers to competitors; that the consumer's response to the asserted high price of [the tied product] was to purchase [the tied product] elsewhere."  *Id.*  And while "this may have cost [the plaintiff-distributor] money," the theory "belies its claim of injury to competition" in the tied market.  *Id.*  Similarly here, Dexon alleges at most that Cisco's conduct dissuades customers from purchasing Cisco's products from Dexon.  But, as in *Roy B. Taylor Sales*, the predictable consequence of the alleged conduct would be that customers would either purchase products from a Cisco reseller other than Dexon or encourage those customers to purchase from a Cisco competitor.

In all cases, Dexon's allegations are insufficient because there is no claim "that the tie as it actually operated in the market harmed competition" in the Relevant Product Markets (i.e.,

harmed equipment manufacturers).  *Id.* (brackets, footnote, and internal quotation marks omitted).  Its tying allegations thus fail to state a claim.

2.      The district court in California dismissed Dexon's tying claims for just this reason:  Dexon failed to allege that "Cisco's competitors are impacted" despite Dexon's "conclusory assertions" to the contrary.  *Cisco*, 2021 WL 5848080, at *4.  Dexon apparently seeks to overcome this holding by claiming (Compl. ¶ 4) that Cisco "forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase."  But this allegation cannot save Dexon's tying claims because it underscores that the supposedly tied-in sales of equipment did not cause any customer to forgo a purchase from a different supplier – those customers either intended to purchase Cisco equipment all along (the hospital, *id.* ¶ 59); had no plans to purchase any equipment (the bank, *id.* ¶ 3); did not purchase any additional equipment (the 911 center, *id.* ¶ 8; and the auto dealership, *id.* ¶ 51); or are not alleged to have been required by Cisco to purchase any Cisco equipment, only to cancel an order from Dexon (the school district, *id.* ¶ 65).  Whether a customer might choose to purchase replacement equipment years later is entirely speculative.  In no instance does Dexon allege, as it must, both that (a) the customer intended to make a new equipment purchase and (b) non-Cisco manufacturers would have made those sales but for Cisco's conduct.

The conclusory assertion (*id.* ¶ 6) that Cisco attempted "to dissuade purchases from [unnamed] resellers of other manufacturers" – like the unexplained aside (*id.* ¶ 60) that Cisco and CDW together restricted "inter-brand competition" – is unsupported by any factual allegation in the complaint.  *See Iqbal*, 556 U.S. at 678 (requiring "factual content").  In every specific instance that Dexon alleges, no customer was seeking to purchase non-Cisco equipment from another equipment manufacturer.  Indeed, Dexon now makes the contradictory allegation

20

(Compl. ¶ 32) that "[t]ransitioning" from Cisco equipment to another manufacturer's equipment "is an expensive process" that customers prefer to avoid because switching would, independent of the alleged tying, "requir[e] the replacement of significant amounts of hardware and the retraining of personnel."  This is far from showing actual foreclosure of competition.

      **3.**      The tying claim fails for an additional reason:  Dexon has not plausibly alleged any tie between service and equipment.  To allege a tie, the plaintiff must allege "an agreement by [the seller] to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1048 n.5 (5th Cir. 1982) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958)); *see also Star Tobacco, Inc. v. Darilek*, 298 F. Supp. 2d 436, 441-42 (E.D. Tex. 2003).  Dexon alleges (Compl. ¶ 102) that Cisco's "SmartNet service packages" are the "tying product," but, by definition, customers purchase SmartNet to receive services for Cisco equipment.

      As the leading antitrust treatise has explained, it defies logic to complain that Cisco will not agree to provide service on Cisco equipment unless a customer buys Cisco equipment.  No consumer wants Cisco service unless it wants Cisco equipment in the first place.  *See* X Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1740c4 (4th ed. 2020) ("The only possible tying product is the machine.  Repair parts or service might be tied, but neither can be the tying product, for no customer could prefer the defendant's machine because of an unrequited desire for a part to repair that very machine.").  The Northern District of California agreed this "makes no logical sense" and dismissed Dexon's claim accordingly.  *Cisco*, 2021 WL 5848080, at \*5 ("More broadly, the supposed tie makes no logical sense.  SmartNet exists to maintain Cisco products. The maintenance service (the supposed tying product) is only desirable to consumers

21

as an add-on to the underlying equipment (the supposed tied product).  Because a consumer buys SmartNet for equipment she already has, Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment.").

In the face of that earlier dismissal, Dexon adds no factual allegations to its complaint that could overcome the illogic of its claim.  At most, the factual allegations of the complaint suggest that Cisco deprives SmartNet customers of service they have contracted to receive on Cisco equipment they already own.  Such a claim sounds in contract, not antitrust.  *See id.* ("It's true that, if Cisco improperly withheld SmartNet service from its customers, Cisco may have breached its contract.  But that is not an antitrust violation, nor would the claim be Dexon's.").  Either (a) any limitation on service was consistent with the SmartNet service contract (and the customer presumably knew about the limitation from the start, belying the allegation of after-the-fact coercion), or (b) it was not (as Dexon seems to allege).  *See* Compl. ¶ 59 (alleging Cisco will "cancel" SmartNet service agreements already "in place").  In the latter scenario, the customers Dexon identifies in its complaint – all businesses or government agencies – could simply enforce their contracts with Cisco.  Dexon never alleges any reason why the contractual remedy would be ineffective.  Thus, any condition in the service contract has nothing to do with *tying*.  *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (internal quotation marks omitted); *Chawla*, 75 F. Supp. 2d at 638-40 (similar); *see also Rick-Mik Enters. Inc. v. Equilon Enters., LLC*, 532 F.3d 963, 973 (9th Cir. 2008) (same).

**4.**     Finally, Dexon's allegations belie the claim that Cisco required customers to purchase new equipment as a condition of obtaining SmartNet service.  On the contrary, Dexon

alleges (Compl. ¶ 49) that Cisco's customers can receive SmartNet service for genuine Cisco equipment by paying a "re-certification" fee – meant to ensure the equipment is not counterfeit or vulnerable to security exploits – without purchasing new equipment.  That is not a tying claim. *See Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) (noting, in dicta, plaintiffs' agreement that the defendant "could have raised the rent," and stating that "[i]t is doubtful that [the defendant's] decision to seek similar gains by controlling the choice of mills violates the Sherman Act").  Even if this re-certification fee amounted to a price increase, "merely enhancing the price of the tying product" "does not," as a matter of law, "threaten an injury to competition."  *Brantley*, 675 F.3d at 1199 (internal quotation marks omitted).

## B. Dexon's Parallel State Law Claim Also Fails

Because Dexon failed to plead a tying claim under Section 1 of the Sherman Act, its tying claim under the Texas Free Enterprise and Antitrust Act (Compl. ¶¶ 124-130) also fails. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming dismissal of federal and state law antitrust claims; "Texas courts are statutorily instructed to interpret the [Texas Free Enterprise and Antitrust Act] in harmony with federal judicial interpretations of equivalent federal laws"); *Roy B. Taylor Sales*, 28 F.3d at 1388 (Texas Free Enterprise and Antitrust Act tying claim fails for the same reasons as the Section 1 claim).

## III. Dexon's Monopolization Claims Fail (Counts IV-VI)

### A. Dexon Fails To Allege Any Exclusionary Conduct

1.      Dexon does not allege actionable exclusionary conduct, as it must for a Section 2 monopolization (or attempted monopolization) claim.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*"); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("it is generally required that to

demonstrate attempted monopolization a plaintiff must prove . . . that the defendant has engaged in predatory or anticompetitive conduct").  Dexon's allegations (Compl. ¶¶ 111a, 117a) that Cisco unlawfully maintained a monopoly in (or attempted to monopolize) Relevant Product Markets (or for IP phones) "by withholding service in the Relevant Service Markets" – fails for the same reason that its tying claim fails:  Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's *equipment-manufacturing competitors* from making sales.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 891-92 (5th Cir. 2016) (anticompetitive conduct, that "which excludes competitors from a market," must "impair the opportunities of rivals").  Dexon instead alleges (Compl. ¶ 133; emphases added) the opposite: Cisco supposedly removes itself from Dexon's sales channel, in part because Dexon "has converted customers *from Cisco* products *to their competitors'* products."

    2.    None of the other conduct that Dexon alleges could plausibly amount to anticompetitive or exclusionary conduct under Section 2, in any event.

    a.    Dexon suggests (*id.* ¶¶ 13, 53) that Cisco restricts distribution of Cisco equipment to certain channels to maintain high prices, but even if accepted as true,[4] these restrictions have nothing to do with maintaining or attempting to acquire a *monopoly*.  For distribution restrictions to raise antitrust concerns, a monopolist must use its market power to foreclose a substantial share of distribution opportunities that its competitors would otherwise use.  *Cf. Transource Int'l, Inc. v. Trinity Indus., Inc.*, 725 F.2d 274, 283 (5th Cir. 1984) (manufacturer cannot violate

---

[4] Dexon's assertion (Compl. ¶ 13) that "resellers like Dexon" present "a competitive threat" to Cisco's success *in the equipment markets* is conclusory, unexplained, and illogical (Dexon's theory is that Cisco is *narrowing* its own sales channels, which, if true, would logically benefit competing equipment manufacturers like Juniper and Hewlett Packard Enterprise).  *See Cisco*, 2021 WL 5848080, at *5 ("In at least one case, Cisco's conduct apparently <u>helped</u> its competitors:  shutting off Dexon's access to the service database led frustrated consumers to purchase products made by other manufacturers.").

antitrust laws by maintaining a "monopoly over the distribution of its own products").  Dexon

does not allege that Cisco has denied (or even tried to deny) competitors the ability to distribute

products to end users.  *See Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1394

(5th Cir. 1983) (explaining that because a "reduction in intrabrand competition will not suffice to

demonstrate the requisite market impact," "[a]bsent proof of a diminution in interbrand market

power, . . . a manufacturer's termination of a single distributor does not contravene the antitrust

laws").

Even assuming that Dexon finds it hard to sell Cisco's network equipment, Dexon alleges

no facts that such conduct affects Dexon's ability to promote and sell other manufacturers'

equipment to customers.  *Cf. R.D. Imports Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*,

807 F.2d 1222, 1226-27 (5th Cir. 1987).  To the extent that Dexon claims it needs access to

Cisco products in order to attract customers to then "convert[ ]" to the products of Cisco's

competitors, Compl. ¶ 97, Cisco has no antitrust obligation to assist its competitors in this

manner.  *See Trinko*, 540 U.S. at 411 (recognizing that generally "there is no duty to aid

competitors"); *Retractable Techs.*, 842 F.3d at 892 ("This distinction between unfair conduct and

anticompetitive conduct is critical to maintain because the antitrust laws do not create a federal

law of unfair competition[.] . . .  Instead, the antitrust laws were designed to protect *competition*,

*not competitors*.") (internal quotation marks omitted).

Just as important, Dexon has made no factual allegations to support any suggestion that

*Dexon's* distribution capabilities have market-wide significance.  On the contrary, Dexon alleges

(Compl. ¶ 105) that the Relevant Product Markets entail "billions of dollars" in annual sales,

without alleging anything about the volume of its own sales.  Even crediting the conclusory

allegation that Cisco's conduct somehow made it harder for Dexon to distribute competitors' products, there is no allegation that Dexon's success or failure would affect competition.

Nor does Dexon's theory even begin to make economic sense as a monopolization claim. Cisco's incentive is to ensure that its distribution chain is competitive to keep distributors' margins low while ensuring that retail customers receive service that protects Cisco's brand.  *Cf. State Oil Co. v. Khan*, 522 U.S. 3, 17-18 (1997) (rejecting *per se* liability for vertical maximum price fixing, explaining that "business judgment" and self-interested maintenance of competitive distribution limit abusive conduct); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("when interbrand competition exists . . .  it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product").  If prices of Cisco equipment rise because of inefficient distribution, then that can only help Cisco's competitors and hurt Cisco.

The Fifth Circuit has repeatedly warned plaintiffs that antitrust claims must "make economic sense."  *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000); *see also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 528 (5th Cir. 1999).  Dexon's do not; such facial implausibility warrants dismissal.  *See Iqbal*, 556 U.S. at 679 (claims must be plausible in light of "judicial experience and common sense"); *Twombly*, 550 U.S. at 555-56, 558 ("a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed").

**b.** Because Dexon's claims depend on the assertion that Cisco had some duty under the antitrust laws to deal with Dexon, the Section 2 claims fail for the additional reason that Dexon has not come close to clearing the very high bar set for such refusal-to-deal claims.  *See Whitehurst v. Showtime Networks, Inc.*, 2009 WL 3052663, at *13-14 (E.D. Tex. Sept. 22, 2009)

26

(adopting report and recommendation) ("A refusal to deal does not, in itself, constitute an antitrust violation.").  Cisco is under no duty to grant Dexon access to Cisco's distribution network – the only conduct Dexon alleges that could plausibly affect Dexon's sales.  *See Trinko*, 540 U.S. at 409-11.  Cisco is free to structure its distribution network in the manner it deems most efficient and economically beneficial; even a dominant firm has every incentive to promote competitive downstream distribution.  Dexon's scant allegations that Cisco denied Dexon certain access are therefore "not cognizable under the Sherman Act in the absence of an antitrust duty to deal."  *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 450 (2009).

Dexon does not plead any element of any possible narrow exception to this doctrine.  *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 603-05 (1985).  Specifically, Dexon does not allege that Cisco terminated a "profitable course of dealing" by refusing to provide Dexon access to a product "already sold in a retail market to other customers," *MetroNet Servs. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1132-33 (9th Cir. 2004), nor does it allege that this conduct was "irrational but for its anticompetitive effect," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.).  On the contrary, Dexon alleges the opposite (Compl. ¶ 52):  denying Dexon access to the service database allowed Cisco to "pad Cisco's profits."  Indeed, Dexon expressly alleges (*id.* ¶ 53) that Cisco's conduct – supposedly disfavoring access to Dexon in favor of other "resellers" that charge more – did not entail any sacrifice of "profitability" because Cisco's "margins are far higher for sales made through channels that have higher resale prices."

The restrictions that Dexon challenges are permissible means for Cisco to ensure customers receive high-quality equipment and service.  *See SmileCare Dental Grp. v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 786 (9th Cir. 1996) (recognizing "efficiency" as a

legitimate business reason for a refusal to deal, and holding that this can be decided "as a matter of law"); *see also Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 125 (2d Cir. 2007) (affirming order granting motion to dismiss where "[t]he facts pleaded" can "suggest[ ] . . . the purpose of increasing efficiency" in a distribution channel).  Exerting control over its distribution channel is how Cisco "preserve[s] the integrity of customers' networks" – including both for equipment and service.  Compl. ¶ 83.  Dexon's claims that Cisco violated Section 2 by denying Dexon certain access to the distribution network therefore fail because Dexon itself *alleges* a "conceivable rationale" for the conduct other than "the exclusion of competition."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 993-94 (9th Cir. 2020).

### B.      Dexon's Parallel State Law Claim Also Fails

Dexon's failure to allege a Section 2 claim also forecloses the parallel Texas Free Enterprise and Antitrust Act claim insofar as it relies on similar monopolization (or attempted monopolization) theories.  *See Apani Sw.*, 300 F.3d at 628 (Section 1 and Section 2 claims); *see also Norris v. Hearst Tr.*, 500 F.3d 454, 463 n.13 (5th Cir. 2007) (similar).

## IV.    Dexon Lacks Antitrust Injury (Counts I-VI)

Dexon also cannot maintain its federal or Texas antitrust claims because it fails to allege antitrust injury from any supposed tying or refusal to deal.  *See* Compl. ¶ 18 ("Dexon brings this case under Section 4 of the Clayton Act[.]"); *Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 891 (5th Cir. 1985) (Antitrust "[i]njury is required in section 4 actions regardless of the nature of the underlying antitrust violation."); *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. Ct. App. 1994), *writ denied* Oct. 5, 1995 (affirming summary judgment for defendants on Texas Free Enterprise and Antitrust Act claim because plaintiff lacked antitrust injury).  To plead actionable injury, a plaintiff must allege "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  *Atl. Richfield*, 495 U.S. at 334.  But, as the

other federal court to address Dexon's claims held, Dexon lacks any such allegation.  *See Cisco*, 2021 WL 5848080, at *6 ("[a]lthough Dexon alleges that it was harmed by Cisco's conduct, it has not pleaded this harm was caused by anticompetitive conduct").

*First*, Dexon cannot plead antitrust injury from the alleged tying conduct because Dexon does not plead any injury resulting from reduced competition in the claimed Relevant Product Markets.  Tying is subject to antitrust scrutiny because it may threaten reduced competition in the market for the tied product.  Here, the tied products are networking equipment (and IP phones).  Accordingly, to establish antitrust injury, Dexon must plausibly allege that its injuries flow from reduced competition in the markets for manufacturing routers and switches (or IP phones).  But Dexon does not allege any injury from reduced competition in those markets.  Rather, Dexon repeatedly alleges (Compl. ¶¶ 3, 7, 8, 51, 58-60, 65-66, 68) that the purported tying decreased Dexon's sales of *Cisco equipment* – not other manufacturers' equipment.  Thus, none of Dexon's alleged injuries arises from the foreclosure of sales by Cisco of equipment competitors, depriving Dexon of any antitrust injury from the supposed tie.

*Second*, Dexon's additional monopolization allegations likewise fail to support any claim of antitrust injury.  The injury caused by unlawful monopolization is reduced competition in a relevant antitrust market, not mere harm to a competitor.  *See*, *e.g.*, *Walker v. U-Haul Co.*, 747 F.2d 1011, 1015 (5th Cir. 1984) (affirming summary judgment for defendant because plaintiff "made no mention in the lower court of how [the defendant's] termination of a single agent for its own services" affected inter-brand competition); *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 320 (5th Cir. 2009) ("The federal antitrust laws protect competition, not competitors.").  But all Dexon alleges is harm to itself.  True enough, Dexon claims that Cisco effectively terminated Dexon as a dealer of *Cisco equipment* when Cisco diverted Dexon's sales

29

to CDW.  But Dexon never pleads facts to connect *its* termination (as to Cisco's own equipment sales) on the one hand to reduced competition in the Relevant Product Markets on the other. Dexon's allegations therefore fail to establish antitrust injury for its Section 2 claims.  *See Norris*, 500 F.3d at 468 (affirming dismissal of antitrust claims because there was no "allegation that the termination of the plaintiffs had any adverse effect" on competitors); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010) (affirming dismissal of terminated dealer's antitrust claims because "nothing in [the] complaint plausibly allege[d] a harm to interbrand competition").

## CONCLUSION

If not transferred, the complaint should be dismissed with prejudice.

Dated: June 23, 2022

Respectfully submitted,

*/s/ Deron R. Dacus*

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ALEX A. PARKINSON (*pro hac vice*)
KYLIE C. KIM (*pro hac vice*)
RYAN M. FOLIO (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
aparkinson@kellogghansen.com
kkim@kellogghansen.com
rfolio@kellogghansen.com

*Counsel for Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on June 23, 2022, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus