UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| DEXON COMPUTER, INC., | |
| *Plaintiff,* | CASE NO.:  5:22-cv-00053-RWS-JBB |
| v. | |
| CISCO SYSTEMS, INC. and CDW CORPORATION, | JURY TRIAL DEMANDED |
| *Defendants.* | |

DEFENDANT CDW CORPORATION'S
MOTION TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(6)

# <u>TABLE OF CONTENTS</u>

**Page**

SUMMARY OF THE ARGUMENT ............................................................................ 1

STATEMENT OF THE ISSUES.................................................................................. 2

STANDARD OF REVIEW ......................................................................................... 3

FACTUAL BACKGROUND ....................................................................................... 3

      A.    CDW Distributes Products Manufactured by Third-Party OEMs, Including Cisco ................................................................................................................ 3

      B.    Cisco's Networking Equipment and Service Products .......................... 4

      C.    Dexon is a Networking Equipment Reseller Who Competes Directly With CDW ................................................................................................................ 6

      D.    The Complaint Describes Vigorous Competition Between CDW and Dexon ............................................................................................................... 6

      E.    Cisco's California Lawsuit Alleging Dexon Sold Counterfeit Cisco Products........................................................................................................... 7

ARGUMENT .................................................................................................................. 9

I.     COLLATERAL ESTOPPEL BARS DEXON FROM RE-ASSERTING ITS ANTITRUST CLAIMS HERE AGAINST CDW ............................................. 9

II.    DEXON'S SHERMAN ACT CLAIMS AGAINST CDW (COUNTS I, II) SHOULD BE DISMISSED ............................................................................... 12

      A.    Dexon Has Not Plausibly Alleged An Anticompetitive Agreement Between Cisco and CDW ................................................................................ 12

      B.    Dexon Fails to Allege Harm to Competition ......................................... 15

      C.    Dexon Fails to Allege Specific Intent by CDW to Monopolize ......................... 17

III.   DEXON FAILS TO ESTABLISH ANTITRUST INJURY ........................... 19

IV.   DEXON'S PARALLEL TFEAA CLAIM AGAINST CDW (COUNT VI) SHOULD BE DISMISSED ............................................................................... 20

V.    DEXON'S PRE-2018 CLAIMS ARE TIME-BARRED ................................. 20

CONCLUSION.............................................................................................................. 21

# TABLE OF AUTHORITIES

**Cases**                                                    **Page**

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
   300 F.3d 620 (5th Cir. 2002) ................................................................................................12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................................3, 16

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985).................................................................................................17

*Atlantic Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990).................................................................................................11, 19

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)................................................................................................. passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977).................................................................................................19

*Capstead Mortg. Corp. Sec. Litig.*,
   258 F. Supp. 2d 533 (N.D. Tex. 2003) ...................................................................4

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
   2021 WL 5848080 (N.D. Cal. Dec. 9, 2021) ................................................. passim

*Cisco Sys., Inc. v. Dexon Computer, Inc.*,
   2022 WL 2222962 (N.D. Cal. June 21, 2022) ................................................8, 11

*Clay v. Sunrise Breach Corp.*,
   2011 WL 13217901 (E.D. Tex. July 29, 2011) (Craven, M.J) .................................4

*Cornett v. Longois*,
   871 F. Supp. 918 (E.D. Tex. 1994) ........................................................................9

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ..................................................................................17

*Doctor's Hospital of Jefferson, Inc. v. Southwest Medical Alliance, Inc.*,
   123 F.3d 301 (5th Cir. 1997) ..................................................................................16

*Hicks v. Quaker Oats Co.*,
  662 F.2d 1158 (5th Cir. 1981) ...........................................................................9, 11

*Johnson v. Hosp. Corp. of Am.*,
  95 F.3d 383 (5th Cir. 1996) ....................................................................................12

*Johnson v. United States*,
  576 F.2d 606 (5th Cir. 1976) ...........................................................................9, 11

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)...............................................................................................15

*Marucci Sports, L.L.C. v. NCAA*,
  751 F.3d 368 (5th Cir. 2014) ...........................................................................13, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................18

*Metro Ford Truck Sales, Inc. v. Ford Motor Co.*,
  145 F.3d 320 (5th Cir. 1998) ..................................................................................13

*Microsoft Corp. Antitrust Litig.*,
  127 F. Supp. 2d 728 (D. Md. 2001) ........................................................................17

*N. Miss. Comm'ns v. Jones*,
  792 F.2d 1330 (5th Cir. 1986) ...................................................................3, 12, 17

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007) ..................................................................................19

*Rios v. City of Del Rio, Tex.*,
  444 F.3d 417 (5th Cir. 2006) ..................................................................................13

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*,
  28 F.3d 1379 (5th Cir. 1994) ..................................................................................16

*Rx.com v. Medco Health Sols., Inc.*,
  322 F. App'x 394 (5th Cir. 2009)............................................................................20

*Salts v. Moore*,
  107 F. Supp. 2d 732 (N.D. Miss. 2000)..................................................................12

*Shushan v. Allwaste, Inc.*,
  992 F.2d 517 (5th Cir. 1993) ..................................................................................21

*State Farm Fire & Cas. Co. v. Fullerton*,
  118 F.3d 374 (5th Cir. 1997) ...............................................................................10

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997).....................................................................................................6

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*,
  200 F.3d 307 (5th Cir. 2000) .............................................................................3, 12

*Test Masters Educational Serv., Inc. v. Singh*,
  428 F.3d 559 (5th Cir. 2005) ...................................................................................9

*Thomas v. Beaumont Indep. Sch. Dist.*,
  No. 1:15-cv-112, 2016 WL 922182 (E.D. Tex. Feb. 12, 2016), *report and
  recommendation adopted*, 2016 WL 899870 (E.D. Tex. Mar. 8, 2016)...................5

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
  964 F.2d 1022 (10th Cir. 1992) .............................................................................18

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*,
  540 U.S. 398 (2004)...............................................................................................14

*Wehling v. Columbia Broad. Sys.*,
  721 F.2d 506 (5th Cir. 1983) ...................................................................................9

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*,
  401 U.S. 321 (1971)...............................................................................................20

## Statutes

15 U.S.C. § 1 .............................................................................................3, 8, 10, 12

15 U.S.C. § 2.......................................................................................3, 10, 11, 12, 17

15 U.S.C. § 15b.............................................................................................................20

Tex. Bus. & Com. Code § 15.04...................................................................................20

Tex. Bus. & Com. Code § 15.25(a) ..............................................................................20

Defendant CDW Corporation ("CDW") submits this Motion to Dismiss the Complaint for failure to state a claim against CDW pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## SUMMARY OF THE ARGUMENT

CDW is a technology hardware and software distribution company that sells products produced by a wide variety of original equipment manufacturers ("OEMs"), including those made by Defendant Cisco Systems, Inc. ("Cisco"), to end-customers.  Dexon Computer, Inc. ("Dexon") is a rival reseller who also sells Cisco products to end-customers, in direct competition with CDW.

In recent years, Dexon has fallen out of favor with Cisco after Dexon allegedly sold "counterfeit," "bootleg," or otherwise non-genuine Cisco products to end-customers.  According to the Complaint, Cisco has warned customers that it would be unable to offer product and service warranties on Cisco equipment sold by Dexon, and has encouraged customers to purchase genuine Cisco products from its authorized distributors (like CDW) instead of from unauthorized resellers (like Dexon), to avoid malfunctions and other potential defects.

The principal basis of Dexon's claims against CDW is that CDW violated federal and state antitrust laws when it agreed to sell Cisco networking equipment to end-customers who might have otherwise purchased the same Cisco equipment from Dexon.  But under established Fifth Circuit precedent, Cisco is free to control the distribution of its own products, including working with a favored distributor (CDW) to replace a disfavored reseller (Dexon) for a specific customer.

This is not the first time Dexon has asserted these claims.  In July 2020, Cisco filed a lawsuit against Dexon in the Northern District of California seeking, among other things, to enjoin Dexon from selling counterfeit Cisco equipment to customers.  In response, Dexon asserted

---

[1] In filing this motion, CDW also joins in, and adopts as its own, the arguments and assertions made in Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt. No. 22) (hereinafter "Cisco MTD").  To avoid duplication, CDW files this separate brief to focus on the facts most relevant to the claims against it.

counterclaims against Cisco alleging, among other things, that Cisco violated federal and state antitrust laws when it coerced customers not to purchase from Dexon and agreed with an unnamed distributor—evidently, CDW—to replace Dexon for sales of Cisco products.

On December 9, 2021, Judge Breyer dismissed Dexon's antitrust counterclaims. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 5:22-cv-4926, 2021 WL 5848080 (N.D. Cal. Dec. 9, 2021). In his 15-page opinion, Judge Breyer found that Dexon failed to plausibly plead that any of Cisco's conduct was anticompetitive, and Dexon failed to plead it had suffered an antitrust injury. Judge Breyer gave Dexon 30 days to amend those claims, and while Dexon chose to pursue other counterclaims, it did not re-assert its antitrust claims.

Dexon had a different strategy in mind. Rather than re-litigating the same antitrust claims before Judge Breyer, Dexon let the 30-day deadline lapse and then filed this substantively-identical Complaint before this Court, apparently hoping for a different result. But like its California claims, Dexon's Complaint here fails to state a Sherman Act claim, for four reasons. *First*, Dexon is precluded by the doctrine of collateral estoppel from re-litigating issues that have already been decided by Judge Breyer. *Second*, Dexon fails to plausibly allege an anticompetitive agreement between CDW and Cisco, instead alleging conduct that is equally consistent with vigorous competition by CDW to capture sales from Dexon and other networking equipment resellers. Nor has Dexon plausibly alleged such an agreement harmed competition. *Third*, Dexon's claim that CDW conspired to monopolize a market in which it is not a competitor makes no sense. *Finally*, Dexon's claimed injuries—lost sales and opportunities to supply customers—reflect harm to a competitor, not competition, and thus are not injuries the antitrust laws were designed to prevent.

## STATEMENT OF THE ISSUES

The issues set forth for consideration are (1) whether the doctrine of collateral estoppel

precludes Dexon from re-litigating its antitrust claims against CDW before this Court; (2) whether under the standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the facts pled in the Complaint plausibly suggest a viable claim for an unreasonable restraint of trade in violation of Section 1 and Section 2 of the Sherman Act; and (3) whether the facts pled in the Complaint plausibly suggest that Dexon has suffered an antitrust injury to establish antitrust standing.

## STANDARD OF REVIEW

To state a Section 1 violation under the Sherman Act, a plaintiff must allege: (1) an agreement, conspiracy, or combination among two or more independent business entities; (2) that is intended to harm or unreasonably restrain competition; and (3) that actually causes injury to competition. *See* 15 U.S.C. § 1; *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs.*, 200 F.3d 307, 312 (5th Cir. 2000). To state a conspiracy to monopolize claim under Section 2 of the Sherman Act, a complaint must allege (1) the existence of a conspiracy; (2) an overt act in furtherance of that conspiracy; and (3) specific intent to monopolize. *See* 15 U.S.C. § 2; *N. Miss. Comm'ns v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

A complaint may not merely recite the elements of the cause of action. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555-56). "'Labels and conclusions' . . . will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertion[s]' devoid of 'further factual enhancement'" are no better. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## FACTUAL BACKGROUND

A.   CDW Distributes Products Manufactured by Third-Party OEMs, Including Cisco

CDW is a distributor of information technology ("IT") products and solutions to business, government, education, and healthcare customers located around the world. Compl. ¶¶ 56, 61.

CDW is a multi-brand provider, offering more than 100,000 products and services from over 1,000 leading and emerging brands, including hardware, software, services, and end-to-end IT solutions. CDW Corporation, Annual Report (Form 10-K) (Feb. 24, 2022).[2]  CDW does not itself make products but instead sells products and services produced by leading original equipment manufacturers ("OEMs"), including Cisco and many others, to end-customers.  Compl. ¶¶ 56, 61.

CDW competes with other distributors and resellers to sell this OEM-manufactured equipment to end-customers.  *Id.*  At times, CDW competes with these other distributors and resellers to supply the same networking equipment, manufactured by the same OEMs, to the same end-customers, for the same applications.  *Id.*  As a result, CDW must distinguish itself through premium service, competitive resale prices, and a robust multi-brand product portfolio.  *Id.*

B.     Cisco's Networking Equipment and Service Products

Cisco manufactures a range of networking equipment and related products, including products used for "home networking, IP telephony, optical networking, security, storage area networking, and wireless technology."  Compl. ¶ 23.  These products include routers, Ethernet switches, and IP phones, among many others.  *Id.* ¶¶ 35, 39, 69.  In each category, Cisco competes with a wide variety of other OEMs who offer similar products, including Juniper Networks, Hewlett Packard, and Dell.  *Id.* ¶ 13; Cisco MTD Ex. C ¶ 50 (Dexon's Amended Answer and Counterclaims in *Cisco v. Dexon* California litigation).[3]  Cisco sells equipment to end-customers

---

[2] Because the Complaint contains very few allegations relating to CDW, CDW offers additional information on its background from its Annual Report for the Court's edification, though none is necessary to resolve this Motion.  This Court may refer to matters of public record, including SEC filings, when deciding a motion to dismiss.  *Clay v. Sunrise Breach Corp*., No. 5:10-cv-224, 2011 WL 13217901, at *3 (E.D. Tex. July 29, 2011) (Craven, M.J); *In re Capstead Mortg. Corp. Sec. Litig*., 258 F. Supp. 2d 533, 543 (N.D. Tex. 2003).

[3] Dexon provided more details on Cisco's alleged conduct in the substantively-identical antitrust claims it previously filed against Cisco in the Northern District of California, discussed further below.  Dexon's Complaint here omits several allegations from its California complaint that provide helpful background on these markets and Cisco's alleged conduct.  As public filings, this Court may take judicial notice of Dexon's prior allegations.  *See Thomas v. Beaumont Indep. Sch. Dist.*, No. 1:15-cv-112, 2016 WL 922182, at *3 (E.D. Tex. Feb. 12, 2016), *report and recommendation adopted*, 2016 WL 899870 (E.D. Tex. Mar. 8, 2016).

through an Authorized Channel Network using a number of Authorized Resellers, like CDW, who in turn compete to sell networking equipment to end-customers.  Cisco MTD Ex. C ¶¶ 52, 95, 97.

In addition to networking equipment, Cisco offers to end-customers contracts for maintenance services to "ensure the proper functioning of their [Cisco] equipment."  Compl. ¶ 25. These services, known as SmartNet, are designed to repair malfunctions or defects in Cisco's software or to combat security vulnerabilities, and may include onsite visits from certified engineers, software updates, access to the technical assistance center, online resources, and hardware replacement services.  *Id.* ¶¶ 25, 27.  Cisco does not require customers to purchase SmartNet.  *Id.* ¶¶ 25, 26.  While Dexon alleges that end-customers are "effectively compelled to [purchase SmartNet]," it also concedes that "[c]ustomers can and do purchase Cisco networking equipment without maintenance services," and those same customers can rely on "third-party maintenance and support providers" instead of Cisco.  *Id.* ¶¶ 26, 30.

Before it will agree to the SmartNet service packages, Cisco "specifically approves the service package" with the precise serial numbers, part numbers, and products to be covered. Compl. ¶ 46.  Cisco maintains a policy of refusing to warranty or service products that Cisco cannot verify are genuine Cisco products.  Cisco MTD Ex. C ¶ 114.  If a customer attempts to purchase unverified Cisco products from "unfavored resellers" and add them to the customer's network, Cisco may not honor the SmartNet service and warranties on those products or other Cisco products on the network.  Compl. ¶¶ 6, 49.

Cisco may require customers to pay a re-certification fee so that it can verify the secondary products qualify for the SmartNet service package.  Compl. ¶¶ 49, 50; Cisco MTD Ex. C ¶ 114.

Distributors and resellers like CDW and Dexon may facilitate these SmartNet service agreements but are not themselves a party to the contract.  Cisco MTD Ex. C ¶ 40.  Thus, any

dispute over the scope and terms of SmartNet service packages would be between Cisco and the end-customers, not with distributors or resellers like CDW and Dexon.

C.    Dexon is a Networking Equipment Reseller Who Competes Directly With CDW

Dexon is not an authorized CDW distributor or reseller but instead is a "secondary market seller" of Cisco equipment.  Compl. ¶ 47.  Elsewhere, Dexon has explained that this means it purchases and resells new or refurbished equipment manufactured by Cisco, as well as new or refurbished equipment manufactured by Cisco's competitors, including Hewlett Packard, Dell, and Juniper Networks.  *See* Cisco MTD Ex. C ¶¶ 52, 95.  Dexon also resells Cisco SmartNet packages that it purchases from Cisco's "standard sellers or partners."  Compl. ¶ 47.

Cisco has raised issues with the quality of Cisco products being re-sold by Dexon, and has claimed to some customers that the products may include "malware."  *See, e.g.*, *id.* ¶ 68.  In fact, Dexon is currently engaged in a lawsuit with Cisco regarding Dexon's sales of "counterfeit" Cisco products.  *See* Cisco MTD Ex. A (Cisco's Complaint in *Cisco v. Dexon*).  Cisco has warned some customers that it cannot honor SmartNet service packages if customers purchase Cisco products from Dexon or other secondary market resellers.  Compl. ¶¶ 51, 59.  Instead, customers can either purchase verified Cisco products from Cisco's authorized distributors, *see id.* ¶ 8, or in some circumstances pay a "re-certification fee" to cover non-verified Cisco products, *see id.* ¶¶ 5, 49.

D.    The Complaint Describes Vigorous Competition Between CDW and Dexon

Dexon alleges it competes directly with CDW for sales of networking equipment to end-consumers, including products manufactured by Cisco and those manufactured by other OEMs.  Compl. ¶¶ 56, 61.  As one "example" of this competition, Dexon alleges that it and CDW competed to supply networking equipment to a hospital system in Pennsylvania.  *Id.* ¶ 58.  There, the hospital system "selected Cisco" routers and Ethernet switches, and then "awarded the order to Dexon."  *Id.* ¶ 59.  However, Cisco allegedly "threatened the customer" that if it purchased Cisco products

from Dexon, Cisco would not honor the new SmartNet service package or any other SmartNet service packages for the existing Cisco equipment used by the hospital system.  *Id.*  Instead, "upon information and belief," Dexon alleges that Cisco "agreed" with CDW that "CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment."  *Id.* ¶ 60.  Dexon further alleges that Cisco and CDW "agreed" that "Cisco would portray CDW as the 'savior' to the hospital system . . . , when in fact the intention and purpose of the scheme was to exclude . . . Dexon."  *Id.*  The hospital system is alleged to have eventually purchased the Cisco equipment from CDW, "at a higher price than had been negotiated with Dexon."  *Id.*

As additional evidence of the alleged conspiracy, Dexon claims that Cisco and CDW "agreed" that CDW would "stop selling networking equipment and associated services to Dexon." *Id.* ¶ 62.  Dexon alleges that "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021," though Dexon does not allege that it actually attempted to purchase Cisco products from CDW, either directly or via CDW's website, nor does Dexon state whether it has attempted to purchase non-Cisco products from CDW.  *Id.*  In addition, Dexon alleges "upon information and belief" that when the "CDW representative previously assigned to Dexon" continued to sell Cisco products to Dexon, the representative was "assigned . . . to a different region and account."  *Id.*

E.      Cisco's California Lawsuit Alleging Dexon Sold Counterfeit Cisco Products

This is not the first dispute between Cisco and Dexon.  On July 22, 2020, Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California, alleging Dexon sold counterfeit Cisco products in violation of the Lanham Act and California state antitrust law. *See* Cisco MTD Ex. A (Cisco's Complaint in *Cisco v. Dexon*).  On July 29, 2021, in response to Cisco's Complaint, Dexon filed its Answer including several counterclaims against Cisco.  *See*

Cisco MTD Ex. C (Dexon's Amended Answer and Counterclaims in *Cisco v. Dexon*).  These counterclaims included allegations that Cisco violated Section 1 and Section 2 of the Sherman Act and related state laws by engaging in "coercion of its customers who purchase its SmartNet service package" by threatening to cancel SmartNet service "unless they buy entirely new routers and/or Ethernet switches from a specified Cisco source at a far higher price than the original network equipment purchase."  *See generally* Cisco MTD Ex. C.

On October 13, 2021, Cisco filed a motion to dismiss Dexon's counterclaims in the California lawsuit, and on December 9, 2021, Judge Breyer granted Cisco's motion and dismissed all of Dexon's counterclaims, including all four of Dexon's antitrust counterclaims.  *Cisco Sys., Inc.*, 2021 WL 5848080.  Judge Breyer found, among other things, that "Dexon fail[ed] to allege that Cisco's coercion or 'bullying' of its consumers harmed Cisco's competitors in the equipment markets" and that Dexon did not suffer an antitrust injury.  *Id.* at *5.

Judge Breyer gave Dexon leave to amend its counterclaims, and Dexon filed two amended federal and state law counterclaims but never re-asserted its antitrust counterclaims.  On June 21, 2022, the district court dismissed Dexon's third amended counterclaims "without leave to amend."  *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962, at *9 (N.D. Cal. June 21, 2022).  As such, Dexon's antitrust counterclaims against Cisco have been conclusively considered and rejected.[4]

---

[4] On July 5, 2022, acting "out of an abundance of caution" and notwithstanding the "high standard" for such an order, Judge Breyer granted Dexon leave to file a motion to reconsider the court's order dismissing Dexon's third amended counterclaims and denying leave to file a fourth amended counterclaim.  *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926, Dkt. No. 132.  Dexon's motion for leave did not argue that Judge Breyer's ruling on the antitrust claims was incorrect, nor has Dexon made any effort to seek reconsideration of that ruling.  *See Cisco Sys. Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926, Dkt. No. 130.

**ARGUMENT**

**I.   COLLATERAL ESTOPPEL BARS DEXON FROM RE-ASSERTING ITS ANTITRUST CLAIMS HERE AGAINST CDW**

At the outset, this Court need not wade into the merits of Dexon's allegations because, under the doctrine of collateral estoppel, Judge Breyer's orders dismissing Dexon's antitrust claims in the California litigation bar Dexon from re-litigating those same claims here.  Collateral estoppel precludes re-litigation of issues that were already litigated in an earlier suit, "whether or not the second suit is based on the same cause of action."  *Johnson v. United States*, 576 F.2d 606, 611 (5th Cir. 1976); *see Cornett v. Longois*, 871 F. Supp. 918, 923 (E.D. Tex. 1994) ("Collateral estoppel prevents a plaintiff from re-litigating issues which he has previously lost in other suits.").  Collateral estoppel applies when (1) the issue at stake is identical to the issue in the prior litigation; (2) the issue at stake was actually litigated in the prior litigation; and (3) determination of the issue in the prior litigation was a critical and necessary part of the judgment.  *Test Masters Educational Serv., Inc. v. Singh*, 428 F.3d 559, 572 (5th Cir. 2005).[5]

Collateral estoppel applies equally in force when a plaintiff attempts to relitigate the same issues by merely "switching adversaries."  *Hicks v. Quaker Oats Co*., 662 F.2d 1158, 1171 (5th Cir. 1981) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 329-30 (1979)).  Complete identity of parties is not required.  *Wehling v. Columbia Broad. Sys*., 721 F.2d 506, 508 (5th Cir. 1983) (collateral estoppel precludes relitigation of an issue "regardless of whether his present adversary was a party to the previous lawsuit").

Collateral estoppel precludes Dexon's claims against CDW.  *First*, the issues in this litigation and the California matter are identical.  In both lawsuits, Dexon alleged:

---

[5] Collateral estoppel (or issue preclusion) is similar to res judicata (or claim preclusion) asserted by Cisco in the Cisco MTD.  Collateral estoppel goes further than res judicata to bar re-litigating identical claims by simply adding new parties, as Dexon attempts to do here.

- Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment from Cisco resellers other than Dexon (*e.g.*, Cisco MTD Ex. C ¶¶ 40, 41);[6]
- For one such customer (Pennsylvania Health System), Cisco threatened to "cancel immediately all SmartNet service packages which the customer had in place" if it purchased Cisco products from Dexon (Cisco MTD Ex. C ¶ 42);
- Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon (*e.g.*, Cisco MTD Ex. C ¶¶ 71, 77);
- Cisco pressured a "value added reseller" (*there* unnamed, *here* identified as CDW) to stop doing business with Dexon (Cisco MTD Ex. C ¶ 52);
- The same reseller (*i.e.*, CDW) reassigned a representative to a different region and account when the representative "refused to comply with the demand" (Cisco MTD Ex. C ¶ 52).

These are the same core allegations that Dexon now asserts against CDW (and Cisco) here. And in both lawsuits, Dexon claims this conduct was anticompetitive in violation of Section 1 and Section 2 of the Sherman Act. The issues in the two lawsuits are identical.

*Second*, Dexon's antitrust claims were plainly litigated in the California matter. *See State Farm Fire & Cas. Co. v. Fullerton*, 118 F.3d 374, 383 (5th Cir. 1997) (issues are litigated for purposes of collateral estoppel once they are properly raised, submitted for determination, and determined by the court). Dexon's antitrust counterclaims were briefed extensively by Dexon and considered by Judge Breyer on Cisco's motion to dismiss. And Judge Breyer's 15-page opinion dismissing those claims is detailed and reasoned. *See Cisco Sys., Inc.*, 2021 WL 5848080 at *4–5 (dismissing Section 1 claim because "Dexon does not allege that the supposed tie [of Cisco's SmartNet service package to new Cisco equipment] had any adverse effect on competition"), *5–6 (dismissing Section 2 claim because "Dexon fails to plead that any of this alleged conduct . . . was anticompetitive"), *6 (dismissing both Section 1 and Section 2 claims because "Dexon has not pleaded antitrust injury").

---

[6] In fact, the Pennsylvania Health System example in Dexon's Complaint is lifted almost word-for-word from the California complaint. *Compare* Compl. ¶¶ 59, 60 *with* Cisco MTD Ex. C ¶ 42 (Dexon California counterclaims).

*Third,* Dexon's antitrust allegations were plainly "necessary" to Judge Breyer's decision to dismiss Dexon's antitrust counterclaims in the California matter. Judge Breyer's extensive opinion determined that Dexon failed to plead that any of Cisco's alleged conduct—including "coercing purchases in the equipment market; bullying its customers to purchase through more expensive chances; [and] pressuring a [value-added reseller] not to deal with Dexon," among others—"was anticompetitive." *Cisco Sys., Inc.*, 2021 WL 5848080 at *5. Similarly, Judge Breyer determined that Dexon lacked antitrust standing because its injuries did not result from anticompetitive conduct, and thus were "not 'of the type the antitrust laws were intended to prevent.'" *Id.* at *6 (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).

The Complaint seemingly recognizes this bar, and tries to avoid the issue and claim preclusion by adding CDW as a defendant, adding new Sherman Act causes of action, and adding new examples of customers lost to other Cisco resellers. None succeed. Because the issues are the same in both matters, collateral estoppel still applies despite Dexon now asserting claims against CDW, *see Hicks*, 662 F.2d at 1171, and adding new Sherman Act claims against Cisco, *see Johnson*, 576 F.2d at 611. Likewise, any "new" factual allegations—such as lost Dexon sales to other Cisco resellers at five Texas customers—are still part of the same nucleus of facts considered and rejected by Judge Breyer; namely, that Dexon failed to state a Sherman Act claim relating to Cisco's ServiceNet contracts. Dexon cannot salvage its flawed claims by setting its sights on a new defendant who was, in any event, already identified in the prior lawsuit.

Dexon was afforded the opportunity to amend its claims against Cisco twice, and it failed to amend both times. Judge Breyer since dismissed Dexon's counterclaims with prejudice, and Dexon has not attempted to re-assert them. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 2022 WL 2222962 (N.D. Cal. June 21, 2022) (order dismissing third amended counterclaims). As Dexon

has now had multiple opportunities to amend its pleadings, Dexon should not yet have a fourth

time to relitigate those same issues that were already adjudicated in the Northern District of

California.  Dexon's gamesmanship is precisely what collateral estoppel is designed to prevent.

## II.   DEXON'S SHERMAN ACT CLAIMS AGAINST CDW (COUNTS I, II) SHOULD BE DISMISSED

### A.   Dexon Has Not Plausibly Alleged An Anticompetitive Agreement Between Cisco and CDW

A complaint alleging a conspiracy in violation of Section 1 of the Sherman Act must allege

that Defendants (1) engaged in a conspiracy, (2) that restrained trade, (3) in the relevant market.

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002).  Similarly, a

complaint alleging conspiracy to monopolize in violation of Section 2 must allege (1) the existence

of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) specific intent to

monopolize.  *N. Miss. Comm'ns*, 792 F.2d at 1335.  For both claims, Dexon must allege an

*agreement* to restrain trade, because "unilateral conduct is excluded from [Section 1's] purview."

*Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 392 (5th Cir. 1996); *see also Stewart Glass*, 200 F.3d

at 316 ("joint action" is required element for both Section 1 and Section 2 conspiracy to

monopolize claims).[7]

To survive a motion to dismiss, a "conclusory allegation of agreement at some unidentified

point" is not sufficient.  *Twombly*, 550 U.S. at 557.  Likewise, "an allegation of parallel conduct

and a bare assertion of conspiracy will not suffice."  *Id*. at 556.  Instead, Dexon must plead factual

allegations sufficient for this Court to draw a reasonable inference that CDW and Cisco made a

---

[7] Because Dexon's conspiracy to monopolize claim likewise requires Dexon to plausibly allege joint action by Cisco and CDW, this brief will combine the analyses for these two causes of action.  *See Stewart Glass*, 200 F.3d at 316 (granting summary judgment on Section 2 conspiracy claim for failure to offer facts showing joint action based on previous Section 1 analysis demonstrating the same); *see also Salts v. Moore*, 107 F. Supp. 2d 732, 743 (N.D. Miss. 2000) (same on motion to dismiss).

"conscious commitment to a common scheme designed to achieve an unlawful objective." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 373–74 (5th Cir. 2014) (quotation omitted); *see also Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 325 (5th Cir. 1998) ("Independent action is not proscribed.  Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence of a combination or agreement.").

Dexon fails to meet this burden.  At the outset, Dexon fails to plausibly allege any direct evidence of an anticompetitive agreement between CDW and Cisco.  *See Twombly*, 550 U.S. at 565.  Instead, Dexon asks this Court to *infer* a conspiracy to restrain trade based solely on circumstantial evidence and allegations Dexon made on "information and belief."  *E.g.*, Compl. ¶¶ 60, 61, 62, 63.  But speculative or conclusory assertions are not entitled to any presumption of truth on a motion to dismiss.  *Twombly*, 550 U.S. at 555; *see Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.").

Considered individually or as a whole, Dexon's allegations are more consistent with CDW's independent actions and its individual interests than with a conspiracy.  Indeed, Dexon's conspiracy allegations boil down to the unremarkable assertions that (1) Cisco unilaterally threatened to cancel certain customers' SmartNet service package if they purchased products from Dexon, because Dexon was allegedly selling "bootleg" or "unauthorized" Cisco products; (2) Cisco asked CDW to sell one customer (Pennsylvania Health System) certain Cisco networking equipment "*after* the hospital cancelled the equipment order with Dexon"[8]; (3) CDW has not sold any Cisco products to Dexon since March 2021; and (4) CDW advertises more Cisco Ethernet

---

[8] While Dexon also alleges "five examples…in Texas" where it lost out on sales of Cisco products, Dexon does not allege CDW had any involvement in any of them.

switches on its website than Ethernet switches made by other OEMs.

None of these allegations remotely suggests an unlawful agreement to restrain trade.  *First*, any allegations as to Cisco's unilateral conduct—including claims that "Cisco has coerced customers not to purchase from these customers' desired resellers" and "Cisco threatened the customer" that it would cancel their SmartNet packages—do not suggest any involvement by CDW whatsoever and cannot be used to infer a conspiracy between CDW and Cisco.

*Second*, the Complaint itself identifies the independent, non-conspiratorial reason CDW would sell Cisco products to Dexon's customers—*CDW and Dexon are competitors*.  At most, the Complaint alleges that Cisco threatened to cancel Pennsylvania Health System's SmartNet service packages if they purchased "bootleg" or "unauthorized" products from Dexon, and CDW stepped in to fill the competitive gap.  Even if true, this is precisely what CDW would be expected to do: compete for sales to end-customers.  *See Twombly*, 550 U.S. at 554 (conduct that is "just as much in line with a wide swath of rational and competitive business strategy" cannot be used to infer a conspiracy).  More, the Complaint admits CDW and Cisco did not "agree[]" that CDW would supply products to the customer until *after* the customer cancelled its order with Dexon (Compl. ¶ 60), a concession which belies any inference that CDW "agreed" to do anything other than supply Cisco products to an end-customer.

*Third,* Dexon's allegation that "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021" (Compl. ¶ 62) is equally unsurprising.  Dexon admits that it competes with CDW (*see* Compl. ¶ 56).  As such, CDW has clear unilateral incentives not to supply its rivals.  *See also Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398, 409-11 (2004) (under the Sherman Act, a firm has no duty to supply its rivals).  In addition, these allegations are wholly implausible to state a Sherman Act conspiracy, because (a) Dexon

never alleges that it actually attempted to purchase Cisco products from CDW and was repudiated, and (b) Dexon admits that CDW sells Cisco products directly from its website, which Dexon could have purchased at any time.  Compl. ¶ 61.

*Finally*, the fact that CDW displays Cisco products prominently on its website demonstrates CDW's efforts to compete with rival distributors (like Dexon), and does not suggest an anticompetitive agreement with Cisco to do anything, much less restrain trade.  In any event, Dexon admits that CDW advertises hundreds of non-Cisco Ethernet switches from multiple non-Cisco OEMs on its website, demonstrating CDW's active commitment to selling non-Cisco products.  This, too, is wholly inconsistent with an anticompetitive conspiracy.

At bottom, Dexon's conspiracy allegations rest not on facts but on conclusory statements strung together with antitrust jargon.  It is axiomatic, however, that merely reciting labels and conclusions "will not do." *Twombly*, 550 U.S. at 555.  Having failed to plausibly allege an anticompetitive agreement between Cisco and CDW, Dexon's Sherman Act claims fail.

      B.    <u>Dexon Fails to Allege Harm to Competition</u>

Dexon's Sherman Act claims also fail because Dexon fails to plausibly allege that the CDW/Cisco agreement harmed *competition*.  Under the Sherman Act, so-called vertical agreements—*i.e.*, agreements among firms at different levels of the distribution chain—must be evaluated under the "rule of reason," under which a restraint is unlawful only if "it has an anticompetitive impact on the relevant market."  *In re Pool Prods. Distrib. Market Antitrust Litig.*, 988 F. Supp. 2d 696, 708 (E.D. La. 2013).

Notably, the Supreme Court affords wide latitude to a manufacturer on how its products are sold across various distribution channels (*i.e.*, "<u>intra</u>brand" competition) so that it can protect and enhance the paramount competition between a seller and its competitors (*i.e.*, "<u>inter</u>brand" competition).  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007).

Accordingly, the antitrust laws permit a seller to harmonize its distribution networks to avoid "free-riding" and "undercutting" by discounters.  *Id.*; *see also Doctor's Hospital of Jefferson, Inc. v. Southwest Medical Alliance, Inc.*, 123 F.3d 301, 307 (5th Cir. 1997) (under the Sherman Act, a manufacturer is afforded the "virtual absolute right to choose to whom it sells its goods").  This includes circumstances where a manufacturer agrees with a new dealer to terminate an old dealer; even there, "there is no antitrust violation." *Doctor's Hospital*, 123 F.3d at 307.

The Complaint contains no well-pleaded allegations as to how Cisco's alleged agreement with CDW harmed competition for networking equipment.  Instead, according to the Complaint, the alleged conduct merely shifted sales of Cisco products from one Cisco reseller to another, a classic, lawful restriction on intrabrand competition to promote interbrand competition—"the primary purpose of the antitrust laws." *State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997).  If anything, the Complaint suggests the alleged agreement *increased* interbrand competition, because CDW "is more likely to aggressively market [Cisco's] products" compared to Dexon, who "does not prioritize any particular brand." Compl. ¶¶ 61, 97.

At best, the Complaint alleges that "Cisco's conduct . . . has a direct impact on its [OEM] competitors" because "customers are not free to make a product choice on the merits." Compl. ¶ 82.  But this allegation is entirely conclusory and afforded no weight at this stage. *Iqbal,* 556 U.S. at 678; *see Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects are not enough.").  Further, this speculative assertion is inconsistent with Dexon's admission that SmartNet is an *optional* service; customers can choose between Cisco's SmartNet or service contracts offered by other third-party maintenance and service providers.  Compl. ¶ 26.  At most, this descibes a contract interpretation issue between Cisco and its customers over the scope of Cisco's SmartNet service agreement.

Dexon is not the proper party to assert those claims, nor is CDW the proper party against whom those claims could be asserted.

      C.    <u>Dexon Fails to Allege Specific Intent by CDW to Monopolize</u>

Dexon's Section 2 claim fails for yet another reason:  the Complaint fails to plausibly allege specific intent by CDW to monopolize the relevant market.[9]  Specific intent is an essential element to a conspiracy to monopolize claim.  *See N. Miss. Commc'ns*, 792 F.2d at 1335.  Specific intent goes beyond "the mere intent to do the act."  *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985).  Instead, the defendant must have intended to achieve an illegal monopoly.

The Complaint alleges no such intent by CDW.  As a threshold matter, CDW cannot monopolize the Relevant Networking Equipment Market because it is not a participant in that market.  Instead, CDW—like Dexon—is merely a reseller of other manufacturers' equipment.  In other words, any claim related to monopolization of the Relevant Networking Equipment Market must be premised on *Cisco*'s purported monopoly.  But even if Dexon plausibly alleged that *Cisco* intended to monopolize this market—and it has not—there are no plausible, factual allegations suggesting *CDW* specifically intended the same.

Importantly, in this context, specific intent "signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct that [the monopolist] is alleged to have pursued."  *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002).  Instead, "[i]t means participating in that course of conduct for the specific, shared purpose of maintaining [the

---

[9] Count II asserts that "*Cisco* pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets."  Compl. ¶ 96.  It is silent as to CDW's intent, nor does it challenge CDW's conduct with respect to any other relevant market.

monopolist's] monopolies." *Id.* Thus, to state a Section 2 claim, Dexon must allege that CDW "stepped back and concluded that maintaining [Cisco's] monopol[y] was a goal that they themselves desired to accomplish." *Id.* On this, the Complaint falls woefully short.

Nowhere does the Complaint plausibly allege that CDW had specific intent to further Cisco's monopoly. Indeed, any assertion that CDW chose to further Cisco's monopoly should be rejected as facially implausible. Because Cisco is CDW's supplier, any attempt to expand Cisco's market power would give Cisco the "power and incentive to charge [CDW] supracompetitive prices" on Cisco's networking products. *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir. 1992).[10] As courts have recognized, middlemen like CDW "would have no rational motive to create such an environment." *Id.* (granting motion to dismiss based on lack of specific intent); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97 (1986) ("[I]f petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy."). In fact, the Complaint admits CDW actively promotes hundreds of Cisco's competitor's products on its website (Compl. ¶ 61), inconsistent with any inference CDW had specific intent to further Cisco's alleged monopoly.

Instead, the Complaint provides the "obvious alternative explanation" for CDW's actions: CDW was vigorously competing against other Cisco resellers to increase its own sales, not to maintain Cisco's alleged monopoly. *See Twombly*, 550 U.S. at 567. This is conduct encouraged by the Sherman Act, not prohibited by it.

---

[10] As discussed in Cisco's motion to dismiss, the Complaint does not make a plausible allegation that Cisco's conduct would further its monopoly because "[i]f prices of Cisco equipment rise because of inefficiency in distribution, then that can only help Cisco's manufacturing competitors and hurt Cisco." Cisco MTD at 33.

## III.    DEXON FAILS TO ESTABLISH ANTITRUST INJURY

Dexon's Sherman Act claims fail for yet another reason:  Dexon fails to establish it has suffered an antitrust injury.  To state a Sherman Act violation, Dexon must demonstrate that it suffered an antitrust injury, *i.e.*, "the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  This requires that Dexon trace its injury to the anticompetitive effects of the alleged antitrust violation. *Id.; see also Atlantic Richfield,* 495 U.S. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct.").

None of Dexon's allegations establish injury to *competition* in the relevant markets.  The Complaint alleges the purported conspiracy has "injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs." Compl. ¶¶ 92, 99.  But none of these alleged injuries resulted from harm to *competition*.  Dexon is not an end-customer of Cisco's products and is not a competing network equipment manufacturer. Any supposed harm to competition in the relevant markets would injure either end-customers— *i.e.*, those purchasing products from Dexon or CDW—or from rival OEMs who are allegedly foreclosed from selling their equipment.  Dexon is neither an end-customer nor a rival OEM, and thus cannot suffer an antitrust injury. *See Norris v. Hearst Trust*, 500 F.3d 454, 466 (5th Cir. 2007).[11]   Indeed, Dexon's predominant focus on its own lost sales to CDW and other Cisco resellers demonstrates why its antitrust claims are misguided:  "because antitrust laws are designed to protect competition, not competitors." *Marucci Sports*, 751 F.3d at 376.

---

[11] Dexon does not claim any injury—much less an *antitrust* injury—from the implausible allegation that CDW refused to sell Cisco products to Dexon.

## IV.   DEXON'S PARALLEL TFEAA CLAIM AGAINST CDW (COUNT VI) SHOULD BE DISMISSED

Since the Texas Free Enterprise & Antitrust Act ("TFEAA") is analyzed under the same standards as the Sherman Act, Dexon's TFEAA claim should be dismissed for the same reasons as Dexon's Sherman Act claims.  *See* Tex. Bus. & Com. Code § 15.04 (TFEAA "shall be construed in harmony with federal judicial interpretations" of the Sherman Act).

## V.   DEXON'S PRE-2018 CLAIMS ARE TIME-BARRED

A Sherman Act claim is subject to a four-year statute of limitations that runs from the date of injury.  *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971); *Rx.com v. Medco Health Sols., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009).  The TFEAA likewise contains a four-year statute of limitations.  Tex. Bus. & Com. Code § 15.25(a).  Because Dexon filed its Original Complaint on April 27, 2022, claims against CDW based on injuries allegedly incurred before April 27, 2018 (hereinafter "pre-2018 claims") are time-barred.[12]

Dexon does not argue that the statute of limitation should be tolled.  Nor could it.  The Complaint alleges a clear, and very public, pattern of conduct by Cisco, including "coerc[ing]" customers not to purchase Dexon equipment through a "fear, uncertainty and doubt" campaign, in which Cisco "wrongfully claim[ed] to customers that unfavored resellers sell 'bootleg,' 'unauthorized,' or goods with 'malware' or 'spyware'" to dissuade customers from purchasing from Dexon.  Compl. ¶ 6.  These allegations belie any notion that any part of Cisco's conduct was "secret."  There can be no plausible claim by Dexon that it could not have discovered that conduct through reasonable diligence to toll the statute of limitations.  *See, e.g., Pool Prods.*, 988 F. Supp.

---

[12] Dexon alleges that Cisco's "overall course of conduct" to "hold up" its SmartNet customers has been continuing "at least since 2015." Compl. ¶ 52.  The Complaint does not allege the date of any of the specific alleged acts by CDW, except that "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* ¶ 62.  Regardless, any pre-2018 claims against CDW are barred by the statute of limitations.

2d at 724; *see also Shushan v. Allwaste, Inc.*, 992 F.2d 517, 521 (5th Cir. 1993) ("allegations of fraud must meet a higher, or more strict, standard than the basic notice pleading required by Rule 8").  As such, Dexon's pre-2018 claims must be dismissed.

## CONCLUSION

For these reasons, CDW respectfully requests the Court dismiss Dexon's claims against CDW with prejudice.  In the alternative, Dexon's claims should be transferred back to the Northern District of California, as set forth in CDW's Notice of Joinder to Defendant Cisco Systems, Inc.'s Motion to Transfer Venue filed concurrently with this motion.

Respectfully submitted,

/s/ *Jennifer H. Doan*
Jennifer H. Doan
Texas Bar No. 08809050
Cole A. Riddell
Texas Bar No. 24105423
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800
Email:  jdoan@haltomdoan.com
Email:  criddell@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Fax:  (832) 239-3600
Email:  jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone:  (214) 969-4523
Fax:  (214) 969-5100
Email:  tdyork@jonesday.com

**ATTORNEYS FOR DEFENDANT
CDW CORPORATION**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing document has been served via the Court's ECF system on July 8, 2022.

/s/ *Jennifer H. Doan*
Jennifer H. Doan