# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TEXARKANA DIVISION

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| | § | |
| **v.** | § | **Case No. 5:22-cv-53-RWS-JBB** |
| | § | |
| **CISCO SYSTEMS, INC. and CDW** | § | |
| **CORPORATION** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following pending motions are before the Court:

> **Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt. No. 22); and**
>
> **Defendant CDW Corporation's Motion to Dismiss the Complaint Pursuant to FED. R. CIV. P. 12(b)(6) (Dkt. No. 28).**

The Court, after considering the relevant briefing and hearing arguments of counsel September 7, 2022, recommends Cisco's motion be **DENIED,** with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. The Court recommends CDW's motion be **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**.

# Contents

Contents .............................................................................................................. 2

I.   BACKGROUND ............................................................................................ 4

     A.   The current Texas Lawsuit ...................................................................... 4

     1.   Allegations, generally ............................................................................ 4

     2.   Allegations regarding the three antitrust claims against Cisco (Counts III, IV, and V) .. 6

     3.   Allegations regarding alleged conspiracy claims against Cisco and CDW (Counts I and II)....................................................................................................11

     4.   Allegations of antitrust injury ............................................................. 14

     B.   The California Lawsuit .......................................................................... 15

     C.   Defendants' current motions to dismiss................................................ 18

II.  LEGAL STANDARD ................................................................................... 19

III. MOTIONS TO DISMISS UNDER "RES JUDICATA"................................ 21

     A.   Cisco's motion to dismiss under true res judicata or claim preclusion................ 21

     1.   Parties' assertions ................................................................................ 21

     2.   Applicable law ...................................................................................... 21

     3.   Analysis ................................................................................................ 22

     B.   CDW's motion to dismiss under collateral estoppel or issue preclusion.............. 26

     1.   Parties' assertions ................................................................................ 26

     2.   Applicable law ...................................................................................... 27

     3.   Analysis ................................................................................................ 28

IV.  MOTIONS TO DISMISS UNDER RULE 12(b)(6) ..................................... 29

     A.   Dexon's antitrust claims ....................................................................... 30

     1.   Sherman Act § 1 claims ........................................................................ 30

     2.   Sherman Act § 2 claims ........................................................................ 30

     3.   Texas Free Enterprise and Antitrust Act claims.................................. 30

     B.   Applicable law ....................................................................................... 31

     1.   Sherman Act § 1 .................................................................................... 31

     2.   Sherman Act § 2 .................................................................................... 32

     C.   Conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)....................................................................................................33

     1.   Dexon plausibly alleges the existence of an agreement between Cisco and CDW ....... 34

2.    The alleged agreement is not *per se* lawful ................................................ 36

3.    Dexon plausibly alleges competitive harm ................................................ 38

4.    Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim ................................................ 42

D.      Tying claim against Cisco under Sherman Act § 1 (Count III) ............................ 44

1.    Dexon's allegations in the current Texas Lawsuit ........................................ 44

2.    Applicable law ................................................ 46

3.    Parties' assertions ................................................ 50

4.    Dexon's *Kodak* theory of *per se* tying liability ........................................ 52

E.      Monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V) ................................................ 66

1.    Parties' assertions ................................................ 66

2.    Applicable law ................................................ 66

3.    Discussion ................................................ 67

F.      Antitrust injury for Counts I-VI ................................................ 70

1.    Parties' assertions ................................................ 70

2.    Applicable law ................................................ 70

3.    Discussion ................................................ 71

G.      Texas Free Enterprise and Antitrust Act (Count VI) ................................ 77

H.      Statute of Limitations concerning Dexon's pre-2018 claims against CDW ......... 77

1.    Parties' assertions ................................................ 77

2.    Applicable law ................................................ 78

3.    Discussion ................................................ 79

V.    RECOMMENDATION ................................................ 81

# I.  BACKGROUND

**A.    The current Texas Lawsuit**

**1.      Allegations, generally**

On April 27, 2022, Plaintiff Dexon Computer, Inc. ("Plaintiff" or "Dexon") filed the above antitrust case in the U.S. District Court for the Eastern District of Texas, Texarkana Division (the "Texas Lawsuit"). Dexon alleges Defendant Cisco Systems, Inc. ("Cisco") is a monopolist in several Worldwide and U.S. markets related to networking equipment and services for Internet equipment. *See, e.g.*, Dkt. No. 1 (Original Complaint), ¶¶ 1-14. According to Dexon, Cisco locks in customers who require maintenance on such equipment with Cisco's SmartNet program, forcing customers to make supracompetitive purchases of routers and Ethernet switches. *Id.*, ¶¶ 23-49. In total, Dexon alleges separate and distinct markets for routers, Ethernet switches, IP phones, and the maintenance services for such products. *Id.*, ¶¶ 29-30.  Dexon alleges the Relevant Network Equipment Markets (ethernet switches and routers) and the Relevant IP Phone Market are referred to collectively as the "Relevant Product Markets." *Id.*, ¶ 44.

Dexon resells network equipment manufactured by Cisco and Cisco competitors in addition to providing maintenance services for network equipment. *Id.*, ¶¶ 7-8, 11-13. Dexon alleges its business model allowed customers to replace Cisco networking equipment with non-Cisco networking equipment and also "put pressure on Cisco to lower prices and improve its service" *Id.*, ¶ 13. Dexon alleges that by at least 2015, Cisco deemed multi-vendor resellers like Dexon a competitive threat. *Id.*

Dexon claims that Cisco thereafter engaged in a multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control. *Id.* "In the process, Cisco has constrained its network

equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets." *Id.* Specifically, Dexon claims that Cisco employed fear, uncertainty, and doubt ("FUD") tactics, especially in Texas, to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. *Id.*, ¶ 67.

According to Dexon, in carrying out its scheme, Cisco conspired with Defendant CDW Corporation ("CDW") to sell Cisco equipment in specific network equipment markets to exclude resellers like Dexon and maintain its network equipment monopolies in violation of federal and state antitrust laws. *Id.*, ¶¶ 56-57; *see also id.*, ¶ 13. CDW is a distributor of information technology ("IT") products and services produced by leading original equipment manufacturers, including Cisco and others, to end-customers. *Id.*, ¶¶ 56 (alleging reseller CDW sells Cisco equipment in the Relevant Networking Markets and had revenue of $18.47 billion in fiscal year 2020 compared with Cisco's $49.8 billion in the same time period), 61 (alleging a search for "Ethernet switches" on CDW's website pulls up 1,440 selections for Cisco with no other Ethernet switch competitor).

Dexon asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id.*, ¶¶ 87-100 (Counts I and II). Dexon also asserts claims against Cisco under § 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under § 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets, and under § 2 of the Sherman Act for unlawful attempted monopolization of the Relevant Product Markets (Counts III, IV, and V). Dexon asserts claims under the Texas Free Enterprise and Antitrust Act against Cisco and CDW (Count VI). *Id.*, ¶¶ 87-128. Dexon seeks injunctive relief, damages, and costs in connection with such violations. *See* Prayer for Relief.

2.      **Allegations regarding the three antitrust claims against Cisco (Counts III, IV, and V)**

In Count III, Dexon asserts a Sherman Act § 1 *per se* tying claim against Cisco, alleging Cisco, a monopolist in the Relevant Services Market,[1] has used its SmartNet services package in that Market as a tying product. Dkt. No. 1, ¶ 102. Dexon alleges Cisco locks in customers who require maintenance with SmartNet and then uses SmartNet as a "hammer to force supracompetitive purchases of routers and Ethernet switches," the tied products. *Id.* at 15 (emphasis removed). According to Dexon, "after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery." *Id.*, ¶ 102.

Dexon alleges the Relevant Service Market is distinct from the Relevant Product Markets because they are "fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently." *Id.*, ¶ 103 ("Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near-absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking

---

[1] Dexon alleges Cisco is a monopolist for after-market maintenance services on Cisco equipment. These services constitute a "Relevant After-Market for Maintenance Services on Cisco Equipment" (hereafter "Relevant Service Market") (both globally and limited to the U.S.) in which "Cisco is a monopolist, and no other competitive service provider has reached a double-digit share." Dkt. No. 1, ¶¶ 29, 44.

equipment on the other."). Dexon alleges a substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. *Id.*, ¶ 105; *see also id.*, ¶ 106 ("Cisco does not have a legitimate business purpose for its anticompetitive conduct. . . .").[2]

Dexon alleges it is aware of at least five examples, involving millions of dollars in equipment sales, "in Texas in order to keep networking prices high and to foreclose competition

---

[2] Dexon alleges the anticompetitive effects of Cisco's conduct are overwhelming. Dkt. No. 1 at 25. According to Dexon's complaint, Cisco engaged in "an overall effort to force customers to only be able to access networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors." *Id.*, ¶ 78. Specifically, Dexon alleges as follows:

> In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. There is no "business justification" to this, and Cisco practices are merely designed to shift economic welfare from customers to itself.

> The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

> Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics. There is no justification that can be advanced to accept this needless risk to human safety.

> Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather are forced to acquiesce to Cisco's pressure. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers cannot afford to risk the services it needs that only Cisco provides. In this environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

*Id.*, ¶¶ 79-82 (internal numbering omitted).

from competing providers of networking equipment." *Id*., ¶ 2. One example is "a Texas-based bank" that bought Ethernet switches and routers as well as SmartNet. *Id*., ¶ 3. According to Dexon, when the SmartNet service package came up for renewal, "the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal. The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed." *Id*.

Dexon alleges another "instance of Texas-based coercion illustrates Cisco's FUD strategy." *Id*., ¶ 7. "An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers."  *Id*. "After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service." *Id*. Dexon further alleges as follows:

> The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support the customer needed. As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

*Id*.

A third example of Cisco's alleged anticompetitive conduct is "a local Texas emergency 911-center which had purchased networking equipment from Dexon." *Id.*, ¶ 8. Regarding this example, Dexon alleges as follows:

> In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package. Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase. The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue. This FUD based strategy intends to and successfully: (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

*Id.*

Another example is a "Texas based automobile dealership purchased Ethernet switches through Dexon as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco." *Id.*, ¶ 51. "Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates. However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless. . . ." *Id.* Although Cisco first replaced the Ethernet switches pursuant to the SmartNet service package, "Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon." *Id.* According to Dexon, because "the customer could not afford new Ethernet switches, due to a limited IT budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider." *Id.* "Because the customer relied on Cisco's original assurance that

the customer would receive the service and maintenance for which it had paid, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller. Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, as well as Dexon because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy." *Id.*

As another example of FUD, Dexon alleges "Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from 'malware,' even though there is no software associated with the sale of line cards." *Id.*, ¶ 68 (further alleging "Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services").

In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for unlawful monopolization of the Relevant Network Equipment Markets (Dkt. No. 1, ¶¶ 109-14) and for unlawful attempted monopolization of the Relevant Product Markets (*id.*, ¶¶ 115-21). For both claims, Dexon alleges Cisco committed numerous acts, including (1) coercing purchases in the relevant markets by withholding service in the relevant service market; (2) engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and (3) engaging in related FUD tactics which resulted in additional revenue and goodwill losses and stunted overall competition in the relevant markets.

Specific to Count V, Dexon further alleges Cisco interfered "with the proper award of at least one major RFP to Dexon, and denigrat[ed] Dexon for the purpose of securing a direct sales relationship with an important Texas public entity." *Id.*, ¶ 117(c). Earlier in the complaint, Dexon alleges Cisco expanded its successful "FUD and coercion campaign" for the Relevant Networking

Equipment Markets into the IP Phone Market. *Id.*, ¶ 65. Dexon provides the following specific example:

> Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon. Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board. Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers. As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones. Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the District. Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and upon information and belief, the District paid more for the same exact equipment from another reseller.

> As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

*Id.*, ¶¶ 65-66 (internal numbering omitted).

### 3.    Allegations regarding alleged conspiracy claims against Cisco and CDW (Counts I and II)

Dexon alleges Cisco recruited CDW, one of its "favored resellers," to aid in its plan. *Id.*, ¶ 56. Dexon alleges CDW sells Cisco equipment in the Relevant Networking Markets. *Id.* Whereas "resellers like Dexon provide attractive service and pricing to customers that puts pressure on Cisco to charge lower prices to its favored resellers," "Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets." *Id.* Dexon alleges "[o]nce Cisco deemed Dexon a competitive threat, it also determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options for its customers." *Id.*, ¶ 57.

"To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers." *Id.*

According to Dexon, Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the alleged conspiracy works:

> For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital. The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service.
>
> Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which was already significant). Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.
>
> Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers). Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment. The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier. Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

*Id.*, ¶¶ 58-60 (internal numbering omitted).

Dexon alleges this Cisco-CDW conspiracy has "limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is to prevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers." *Id.*, ¶ 61. According to Dexon, the "conspiracy also had the dual effect of limiting inter-brand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way." *Id.* Specifically, Dexon alleges as follows:

> As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited. By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option. Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

*Id.*

Dexon alleges that as part of the conspiracy, which continues through the present day, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id.*, ¶ 62. "Confirming this agreement, upon information and belief, when the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* According to the complaint, "[p]ursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon alleges the conspiracy "has

foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy." *Id*., ¶ 63.

**4.    Allegations of antitrust injury**

Dexon further alleges "Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product." Dkt. No. 1, ¶ 83. Dexon alleges its antitrust injury "illustrates both of these phenomenon" as follows:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

> Cisco's conduct is designed to harm resellers like Dexon precisely because of the benefits to customers that Dexon has provided for decades, which run counter to Cisco's profit motives. Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive, exclusive channels. If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line. The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

> Dexon has also sustained loses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct. Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct and has attempted to shift the problem of its own creation to Dexon. Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better service or terms, Cisco has attempted

to portray Dexon as an unworthy sales partner who is the cause of the customers' problems. But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco. But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically. Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain, and no longer can do business with an energy company all because of Cisco's FUD and associated coercive tactics. Texans should be able to benefit from the competition options and service that Dexon can offer, but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

*Id.*, ¶¶ 83-86 (internal numbering omitted).

**B.**    **The California Lawsuit**

On July 22, 2020, almost two years before Dexon filed its current case, Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California. *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-4926 (the "California Lawsuit").[3] In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false designation of origin, and associated state law claims. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law.

On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Dkt. No. 50;

---

[3] The Court takes judicial notice of the docket entries and judicial documents filed in the California Lawsuit. *See Polnac v. City of Sulphur Springs*, 555 F. Supp. 3d 309, 327 (E.D. Tex. 2021) ("Documents in judicial actions and cases' dockets are public records of which any court can take judicial notice."(citations omitted)); *see also* FED. R. EVID. 201.

*see also* Texas Lawsuit, Dkt. No. 21-2. Dexon asserted various antitrust counterclaims[4] among other trademark and tort counterclaims.[5] On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc*. ("*Cisco I*"), No. 20-cv-04926-CRB, 2021 WL 5848080, at *1, *9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Dkt. No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Dkt. No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims. *See Cisco Sys., Inc. v. Dexon Computer, Inc*. ("*Cisco II*"), No. 20-cv-04926-CRB, 2022 WL 797015, at *1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at *4, *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Third Amended Counterclaims"). Once again, Dexon chose not to re-plead any antitrust claims. California Lawsuit, Dkt. No. 107; *see also* Texas Lawsuit, Dkt. No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule 12(b)(6). California Lawsuit, Dkt. No. 117; *see also*

---

[4] *See* California Lawsuit, Dkt. No. 50, ¶¶ 61-68 (tying), monopolizing (¶¶ 69-74), ¶¶ 75-81 (attempted monopolizing), ¶¶ 82-91 (violations of the California Cartwright Act), and ¶¶ 92-130 (violations of the California Unfair Competition Law).

[5] *See* California Lawsuit, Dkt. No. 50, ¶¶ 131-141 (declaratory judgment concerning the Lanham Act and state law), ¶¶142-148 (Lanham Act false advertising), ¶¶ 149-155 (intentional interference with contractual relations), ¶¶ 156-163 (intentional interference with prospective economic advantage), and ¶¶ 164-170 (trade libel).

Texas Lawsuit, Dkt. No. 21-7. That same day, Dexon filed its Original Complaint in this Court, asserting antitrust causes of action.[6]

Like it did in the California Lawsuit, Dexon brings against Cisco a *per se* tying claim under § 1 of the Sherman Act (Dkt. No. 1, Count III) and monopolization claims under § 2 of the Sherman Act (Dkt. No. 1, Counts IV, V). As explained at the hearing on the motions, and in the December 22, 2022 Order denying Cisco and CDW's transfer request,[7] this Court will not serve as a "super appellate" court to the California Court. Dkt. No. 94 at 14, n. 8. Accordingly, the following reasoning will not be revisited absent a highly compelling reason to do so, such as a difference in controlling law, citation to prior rulings of this Court, or substantive factual allegations not pleaded in the California Court:

That Dexon's tying counterclaims in the California Lawsuit fail because "Dexon does not allege that the supposed tie had any adverse effect on competition." *Cisco I*, 2021 WL 5848080, at *4 (specifically noting that the allegations concerning the hospital and 911 call center examples

---

[6] By way of further background, on May 11, 2022, before District Judge Breyer had ruled on Cisco's motion to dismiss Dexon's Third Amended Counterclaims, Dexon filed in the California Lawsuit a Motion for Leave to File Fourth Amended Counterclaims. Texas Lawsuit, Dkt. No. 21-8. On June 21, 2022, Judge Breyer entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.* ("*Cisco III*"), No. 20-CV-04926-CRB, 2022 WL 2222962, at *1 (N.D. Cal. June 21, 2022). In a footnote, the court noted that Dexon had filed this lawsuit in the Eastern District of Texas "asserting claims duplicative of those in this case—including some of the counterclaims that this Court has already dismissed—further inflating Cisco's costs." *Id.* at *8, n. 4 (citing *Dexon Computer, Inc. v. Cisco Systems, Inc. and CDW Corporation*, No. 5:22-CV-53 (E.D. Tex.)) (noting "Dexon's apparent attempts to seek repeated bites at the apple" and citing a case about forum-shopping).

According to Cisco's August 2, 2022 Notice of Supplemental Authority, on July 26, 2022, Judge Breyer denied Dexon's Motion for Leave To File a Motion For Reconsideration of the court's order dismissing its counterclaims against Cisco without leave to amend. Dkt. No. 40 (attaching Order 138, *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 3:20-cv-04926 (N.D. Cal. July 26, 2022) (Breyer, J.)).

[7] Cisco filed a motion to transfer this case to the Northern District of California pursuant to the first-to-file rule, and CDW joined Cisco's motion. Dkt. Nos. 21, 27. According to Cisco, "there is a pending action (the California lawsuit) in which the issues presented by Dexon can be resolved, and in fact where substantially similar antitrust claims have *already been* resolved." Dkt. No. 21 at 13 (emphasis original). On December 22, 2022, the Court denied Cisco's motion to transfer. *See* Dkt. No. 94. Defendants' objection to the December 22 Order denying Cisco's motion to transfer is pending before District Judge Schroeder. Dkt. No. 96.

showed those customers simply buying Cisco equipment from non-Dexon sources, leaving Cisco competitors, "such as Hewlett Packard, Dell, and Juniper Networks unaffected").

That the alleged tie in the California Lawsuit "makes no logical sense" because "Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment" since the customer "already has" the equipment in question. *Id.* at *5.

That Dexon's monopolization claims fail because Dexon did not plead the supposed conduct by Cisco (including "Cisco's coercion or 'bullying' of its consumers" and "pressure[ing] another VAR not to deal with Dexon") was *anticompetitive* due to Dexon's failure to allege the conduct "harmed Cisco's competitors in the equipment markets." *Id.*

That "Dexon's theory for why Cisco took action against Dexon makes little economic sense" because Dexon's unsupported assertion that "Cisco gets a higher margin out of more expensive distributors" is "implausible" without pleading "specific facts in support of this assertion." *Id.*

## C.    Defendants' current motions to dismiss

In its motion to dismiss, Cisco first asserts Dexon's present claims are precluded by the res judicata rule against claim splitting. Dkt. No. 22 at 12-13. Cisco further asserts Dexon's antitrust claims fail on the merits. Specifically, Cisco asserts as follows: (1) Dexon fails to allege an actionable conspiracy claim and parallel state law claim (Counts I-II, VI) because Dexon does not allege any actionable agreement; (2) Dexon fails to allege an actionable tying claim and parallel state law claim (Counts III, VI) because Dexon does not allege any foreclosure; (3) Dexon fails to allege an actionable monopolization claim and parallel state law claim (Counts IV-VI) because Dexon fails to allege any exclusionary conduct; and (4) Dexon lacks antitrust injury (Counts I-VI).

CDW filed its own motion to dismiss, in which it joins in and adopts as its own, the arguments and assertions made by Cisco and also focuses on the facts most relevant to Dexon's claims against it. Dkt. No. 28 at 1, n. 1. Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. *Id.* at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

On the merits, CDW contends Dexon's Sherman Act (and parallel state law) claims against CDW (Counts I, II) should be dismissed for the following reasons: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to allege specific intent by CDW to monopolize. CDW further asserts Dexon fails to establish antitrust injury. Finally, CDW argues Dexon's pre-2018 claims are time-barred.

## II.  LEGAL STANDARD

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### III. MOTIONS TO DISMISS UNDER "RES JUDICATA"

**A.    Cisco's motion to dismiss under true res judicata or claim preclusion**

**1.    Parties' assertions**

Cisco argues that claim preclusion[8] bars Dexon's claims in the Original Complaint because the following elements are met: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." Dkt. No. 22 at 11-13; *see also* Dkt. No. 32 at 1-3. Dexon challenges the finality element (3) and the same claim or cause of action element (4). Dkt. No. 24 at 9-14; Dkt. No. 34 at 1-4.

**2.    Applicable law**

True res judicata, or claim preclusion, is a "venerable legal canon" that "insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits." *Clyce v. Farley*, 836 Fed. Appx. 262, 267-68 (5th Cir. 2020) (quoting *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 (5th Cir. 2004) (internal quotation marks and citation omitted in *Clyce*)). As noted above, claim preclusion applies where (1) the parties to both actions are identical or are in privity; (2) the first judgment is rendered by a court of competent jurisdiction; (3) the first action resulted in a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Id.* at 268 (citing *Procter*, 376 F.3d at 499).

---

[8] Cisco frequently uses the term "claim splitting" (or similar) interchangeably with "claim preclusion." *See, e.g.*, Dkt. No. 22 at 11. The Court notes there are nuances between "traditional claim preclusion" and claim splitting. *See Hlavaty v. Integrated Prod. Servs., Inc.*, No. 5:16-CV-949-DAE, 2017 WL 10699610, at *2 (W.D. Tex. Jan. 27, 2017); *see also Katz v. Gerardi*, 655 F.3d 1212, 1218-19 (10th Cir. 2011). However, neither party addresses those distinctions in their briefing, which relies on argument and caselaw focused on the doctrine of claim preclusion. Accordingly, the Court will use the term claim preclusion in this order.

The Fifth Circuit uses the transactional test to determine whether two suits involve the same claim or cause of action as required by the fourth element above.[9] *Warren v. Mortg. Elec. Registration Sys., Inc*., 616 Fed. Appx. 735, 738 (5th Cir. 2015) (citing *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir.2007) (citation omitted in *Warren*)). This test requires the court to consider whether the two cases are based on "the same nucleus of operative facts." *Id.* (quoting *Davenport*, 484 F.3d at 326 (citation and quotations omitted in *Warren*)). "The nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted, defines the claim." *Id.* (citation omitted in *Warren*). If both cases are based on the same nucleus of operative facts, "the prior judgment's preclusive effect extends to all rights the original plaintiff had with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.* (citation and internal quotations omitted in *Warren*).

### 3.    Analysis

The Fifth Circuit Court of Appeals recently stated that "[a]lthough res judicata generally cannot be raised in a motion to dismiss and should instead 'be pleaded as an affirmative defense,' dismissal under Rule 12(b)(6) is appropriate if the res judicata bar is apparent from the complaint and judicially noticed facts and the plaintiff fails to challenge the defendant's failure to plead it as an affirmative defense." *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020) (citing *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005) (citations omitted in *Anderson*)). In *Anderson*, the court granted the motion to dismiss on res judicata grounds, in part, because the plaintiff did not raise such a challenge. *Id.*

---

[9] The Fifth Circuit Court of Appeals recently stated the transactional test is used only to determine which claims that *could have been brought* in the first suit are precluded by judgment in that suit. *Hammervold v. Blank*, 3 F.4th 803, 809 (5th Cir. 2021) (emphasis original).

Here, Dexon has challenged Cisco's raising its res judicata argument through a Rule 12(b)(6) motion rather than as an affirmative defense. Dkt. No. 24 at 14, n. 2. Given Dexon's challenge, the undersigned is not convinced it would be proper at this time for the Court to address the issue of true res judicata, taking judicial notice of the prior rulings of the California Court. The Court finds Cisco's res judicata arguments fail because they are premature. *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434-DAE-ML, 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021), *report and recommendation adopted as modified*, No. 1:20-CV-434-DAE, 2021 WL 8442028 (W.D. Tex. July 2, 2021); *see also Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018) (finding that "Plaintiffs have a plausible claim and res judicata would be better addressed at a later stage in the proceeding").

Even if the Court were to address the applicability of true res judicata at this stage, the Court would have serious concerns as to whether Cisco, on its current briefing, could show the third and fourth elements for true res judicata. Regarding the third element, the procedural posture must be considered. The California Court dismissed Dexon's initial set of counterclaims (which included its California antitrust counterclaims) with leave to amend. Dexon's next amended counterclaims did not include any antitrust allegations. The California Court eventually dismissed with prejudice Dexon's amended counterclaims. Cisco claims that final dismissal with prejudice meets the finality requirement of claim preclusion because Dexon could have, but chose not to, replead its initial set of antitrust counterclaims. Dkt. No. 32 at 1-2. To argue that "a dismissal 'without prejudice' takes on preclusive effect when 'Plaintiff did not seek leave to amend his petition,'" Cisco relies on *Eldridge v. Kohls Dep't Stores, Inc.*, No. CIV-20-158-R, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), an unpublished case involving application of federal common law.

23

In *Eldridge*, the court considered the defendant's motion to dismiss based on res judicata grounds in light of the court's previous dismissal without prejudice of the plaintiff's claims for failure to state a claim in a prior case. *Eldridge*, 2020 WL 1528233 at *1. The *pro se* plaintiff did not respond to the defendant's motion to dismiss. *Id*. However, the court "considered the merits of the motion" and dismissed the plaintiff's case on alternative grounds. *Id.* Concerning res judicata, the court found that its previous dismissal without prejudice "results in dismissal with prejudice" for res judicata purposes because the plaintiff failed to take any action in the prior action to resuscitate his claims. *Id.* at *2. Importantly, that holding was after the court explained that "[t]he undersigned previously dismissed Plaintiff's claims against First Premier Bank, finding he had failed to state a claim. The petition in this case is more bareboned than the petition in Plaintiff's prior action." *Id.* at *1. Just as importantly, the court further stated that "even if Plaintiff's claims were not barred, the Petition herein simply lacks sufficient factual allegations to state a claim against Defendant First Premier Bank." *Id.* at *2 (dismissing the case because "Plaintiff fails to identify any facts against Defendant First Premier from which the Court could discern that it violated either the Fair Credit Reporting Act or the Oklahoma Consumer Protection Act").

The above unique circumstances in *Eldridge*, specifically the fact that the court granted a motion on alternative grounds without any written opposition from the *pro se* plaintiff, limits its application to the instant dispute. Moreover, unlike the plaintiff in *Eldridge*, who filed a subsequent case with less factual allegations than the case that was initially dismissed for failure to state a claim, Dexon, as explained in more detail below, added new claims, legal theories, and non-trivial factual allegations in the Texas Lawsuit.

Regarding the fourth element, whether the same claim or cause of action is involved in both suits, the critical question in applying the transactional test is "whether the two actions were

based on the same nucleus of operative facts." *Bank of New York Mellon as Tr. of Registered Holders of CWABS, Inc., Asset-Backed Certificates, Series 2004-5 v. Riley*, No. 21-40383, 2022 WL 1773364, at *3 (5th Cir. June 1, 2022) (quoting *Eubanks v. F.D.I.C.*, 977 F.2d 166, 171 (5th Cir. 1992) (quotation marks and citations omitted in *Bank of New York Mellon*)). Although Cisco asserts Dexon alleges three of the same legal theories here as alleged in Dexon's California Counterclaims,[10] the Court evaluates the "factual predicate of the claims asserted, not the legal theories upon which the plaintiff relies." *Id.* (quoting *Eubanks*, 977 F.2d at 171). Importantly, there are new claims and facts in this lawsuit which were not alleged in California. *See, e.g.*, Dkt. No. 1, ¶ 61 (new allegations regarding the Cisco/CDW conspiracy); *see also id.*, ¶ 3 (new allegations regarding the Texas bank), ¶ 7 (new allegations regarding the Texas energy company), ¶ 51 (new allegations regarding the Texas automobile dealership), ¶¶ 65-67 (new allegations regarding the Texas school district); ¶¶ 69-77 (detailed allegations of global and U.S. IP phones); and ¶ 4 (more specific allegations regarding limited IP budgets). Given these new claims and facts, Cisco fails to show that the claims here arise out of the same nucleus of operative facts as its initial counterclaims in California. *See, e.g.*, *Hammervold v. Blank*, 3 F.4th 803, 809 (5th Cir. 2021) (holding that a denial of a motion for attorney's fees in a prior suit did not bar a subsequent suit for malicious prosecution and abuse of process because, even though the two suits "make essentially identical factual assertions," res judicata only applies when the claims of the second suit "might have been litigated in the first suit").

---

[10] At the hearing, Cisco's counsel referenced a redline comparison of Dexon's California Counterclaims and the present complaint, attached as Exhibit A to Cisco's motion to transfer under the first-to-file rule. *See* Dkt. No. 21-1. A review of the redline comparison reveals Count 1 of Dexon's California Counterclaim is the same as Count 3 of the complaint in this case (Sherman Act § 1: tying); Count 2 of Dexon's California Counterclaim is the same as Count 4 of the complaint in this case (Sherman Act § 2: unlawful monopolization); Count 3 of Dexon's California Counterclaim is the same as Count 5 of the complaint in this case (Sherman Act § 2: attempted monopolization).

Because Cisco's motion for dismissal based on res judicata grounds would fail on the merits but is also premature, the undersigned recommends denying the request without prejudice to refiling.

**B.      CDW's motion to dismiss under collateral estoppel or issue preclusion**

**1.      Parties' assertions**

CDW, who was not a party to the California Lawsuit, asserts collateral estoppel bars Dexon from re-asserting its antitrust claims here against CDW. According to CDW, in both lawsuits, Dexon alleged: (1) Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment from Cisco resellers other than Dexon (*e.g.*, Ex. C, ¶¶ 40, 41); (2) For one such customer (Pennsylvania Health System), Cisco threatened to "cancel immediately all SmartNet service packages which the customer had in place" if it purchased Cisco products from Dexon (*id.*, ¶ 42); (3) Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon (*id.*, ¶¶ 71, 77); (4) Cisco pressured a "value added reseller" (*there* unnamed, *here* identified as CDW) to stop doing business with Dexon (*id.*, ¶ 52); and (5) The same reseller (*i.e.*, CDW) reassigned a representative to a different region and account when the representative "refused to comply with the demand." (*id.*). Dkt. No. 28 at 9-10 (emphasis original). Asserting Dexon's Sherman Act § 1 claims were at issue in California, CDW argues the core issues in the two lawsuits are identical. *Id.* at 10.

In response, Dexon asserts CDW fails to mention that Dexon's California Counterclaims were for tying rather than an "inter-corporate conspiracy that gives rise to two new claims against CDW, separate and apart from Dexon's claims against Cisco for tying." Dkt. No. 37 at 19-20. Dexon points out the word "conspiracy" (or any similar derivation) does not appear in Dexon's California Counterclaims, "whereas the term appears thirty-six times in the Complaint" in the

Texas Lawsuit. *Id.* at 19. According to Dexon, in this case, a "host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy have been alleged under new causes of action." *Id*. Dexon asserts the issues in both cases are not identical, and collateral estoppel does not apply to Dexon's complaint here.

## 2.    Applicable law

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action" and thus "'prevent[s] repetitious litigation of what is essentially the same dispute,'" in addition to "'conserving judicial resources, [] maintaining consistency, and [] avoiding oppression or harassment of the adverse party.'" *Hacienda Records, L.P. v. Ramos*, 718 Fed. Appx. 223, 228 (5th Cir. 2018) (per curiam) (quoting *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 327 (1979); RESTATEMENT (SECOND) OF JUDGMENTS § 27, cmts. c, e. (1982)). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 788 F. Supp. 2d 523, 532 (S.D. Tex. 2011) (citing *Parklane Hosiery*, 439 U.S. at 328). This is a case of defensive non-mutual collateral estoppel.

Under Fifth Circuit law, collateral estoppel or issue preclusion requires that: (1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair. *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citing *State Farm Mut. Auto. Ins. Co. v.*

*LogistiCare Solutions*, 751 F.3d 684, 689 (5th Cir. 2014)). Courts do not consider special circumstances when "both parties were involved" in the prior suit. *ETC Sunoco Holdings, L.L.C. v. United States*, 36 F.4th 646, 649 (5th Cir. 2022) (citing *Bradberry v. Jefferson Cty.*, 732 F.3d 540, 549 (5th Cir. 2013); also citing *Kariuki v. Tarango*, 709 F.3d 495, 506 (5th Cir. 2013)).

**3.    Analysis**

Collateral estoppel "is limited to matters distinctly put in issue, litigated, and determined in the former action." *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 (5th Cir. 1991) (quoting *Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.*, 430 F.2d 38, 45 (5th Cir.1970)). An important aspect of determining whether a previously litigated matter has collateral estoppel effect is the identity of that matter with the issue currently before the court. *Id.* For an issue to be identical, both the facts and "legal standard used to assess them" must be identical. *Hammervold v. Blank*, 3 F.4th 803, 810–11 (5th Cir. 2021) (quoting *Brister*, 946 F.2d at 354 n.1).

This requirement is fatal to CDW's collateral estoppel defense. Dexon pleads factual allegations here, not found in the California Lawsuit, to allege CDW and Cisco entered into a conspiracy that violated §§ 1 and 2 of the Sherman Act. *See, e.g.*, Dkt. No. 1, ¶¶ 56-58, 60-63, 87-100. For example, while Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end. Dkt. No. 37 at 21 (comparing *Cisco Sys., Inc. & Cisco Tech., Inc. v. Dexon Comput., Inc.*, No. 3:29-cv-4926, Dkt. No. 50 at Counterclaim ¶ 42 with Dkt. No. 1, ¶¶ 56-62). As Dexon notes, the California Court's prior order could not have considered any of Dexon's allegations in the context of conspiracy claims, claims which are subject to "different standard in which allegations are not 'dismember[ed] and view[ed]

in its separate parts' as CDW implicitly suggests in its current motion." *Id.* (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699(1962)).

In its surreply, Dexon asserts not only are the facts here different from its California Counterclaims, but the legal standard to assess those facts is also different. Dkt. No. 48 at 9. Dexon reiterates the differences between a *per se* tying claim at issue in Dexon's California Counterclaims and a rule of reason conspiracy claim added here. *Id.* at 1-2; *see also id.* at 10. Dexon asserts this "is equally true with respect to Dexon's factual allegations regarding anticompetitive effect . . ., antitrust injury. . ., specific intent to monopolize. . ., and the statute of limitations. . . ." *Id.* at 10. According to Dexon, although "these concepts are regularly litigated in antitrust cases, the precise facts and alleged Markets can differ with each case, as is the case here." *Id.*

At oral argument, counsel for Dexon elaborated as follows:

> The circumstances of CDW, how it favored . . . Cisco, how it distributes its products, how it plays in the market for interbrand and intrabrand competition are all entirely different. Those are different facts. There's different law that applies to those facts. And, finally, there is no -- there is no law equating a *per se* tying claim with a Section 1 and Section 2 conspiracy claim because it's never been argued and that is because they are entirely different claims while under technically the same statute of the Sherman Act.

Dkt. No. 62 (Transcript) at 130:10-20.

The Court, having carefully considered the parties' arguments and the relevant case law, does not find the facts, and the legal standard used to assess the facts, identical in both lawsuits. For this reason, the undersigned recommends the Court deny CDW's motion to dismiss under collateral estoppel or issue preclusion.

## IV. MOTIONS TO DISMISS UNDER RULE 12(b)(6)
## FOR FAILURE TO STATE A CLAIM

Cisco and CDW separately argue (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon

fails to establish antitrust injury. The Court will address the first two arguments in the context of Dexon's Sherman Act § 1 claim (Count I) and will then address CDW's separate argument specific to Dexon's Sherman Act § 2 conspiracy claim (Count II), namely whether Dexon fails to allege specific intent by CDW to monopolize. Because Cisco asserts Dexon's failure to allege antitrust injury applies to Counts I-VI (all of which have been asserted against Cisco), the Court will address antitrust injury following the Court's discussion of Counts III, IV, and V against Cisco.

**A.    Dexon's antitrust claims**

**1.    Sherman Act § 1 claims**

In Count I, Dexon alleges a Sherman Act § 1 violation against Cisco and CDW for conspiring to restrain trade. In Count III, Dexon alleges a Sherman Act § 1 violation against Cisco for illegal *per se* tying.

**2.    Sherman Act § 2 claims**

In Count II, Dexon alleges a Sherman Act § 2 claim against Cisco and CDW for conspiracy to monopolize. In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for monopolization and attempted monopolization. Counts IV and V include the same allegations underlying Dexon's § 1 "tying" claim against Cisco, as well as allegations of Cisco's use of FUD (fear, uncertainty, and doubt) tactics to lock customers into purchases they do not want, foreclosing competitors in the process, and maintaining or enhancing Cisco's monopolies in each of the Relevant Product Markets. *See* Dkt. No. 24 at 25-27.

**3.    Texas Free Enterprise and Antitrust Act claims**

In Count VI, Plaintiff alleges state-law antitrust claims against Cisco and CDW under the Texas Free Enterprise and Antitrust Act ("TFEAA"). Because the TFEAA is modeled after the Sherman Act, Texas courts interpret its provisions "in harmony with federal judicial

interpretations of equivalent federal laws." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No. 5:17-CV-1295-RCL, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) (quoting *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620 (5th Cir. 2002); also citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) (interpreting § 15.05(a) in accordance with Sherman Act § 1); *Caller–Times Publ'g Co. v. Traid Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (interpreting Tex. Bus. & Comm. Code § 15.05(b) in tandem with Sherman Act § 2)).

**B.      Applicable law**

**1.      Sherman Act § 1**

Section 1 of the Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting 15 U.S.C. § 1). "Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints." *Id.* (citing *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877 (2007)). As opposed to § 2 of the Sherman Act, § 1 is only concerned with concerted conduct among separate economic actors rather than their independent or merely parallel action. *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015).

To establish a violation of § 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (quoting *Apani*, 300 F.3d at 627). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in

concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 373–74 (quoting *Golden Bridge Tech.,* 547 F.3d at 271 (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))). Concerted action requires "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc*., 496 F.3d 403, 409 (5th Cir. 2007) (quoting *Monsanto,* 465 U.S. at 768). In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." *Id*.; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.").

### 2.    Sherman Act § 2

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce. *Id.*

Section 2 of the Sherman Act bans attempts to monopolize or monopolization of "any part of the trade or commerce among the several States." *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr*., 49 F.4th 520, 528 (5th Cir. 2022) (quoting 15 U.S.C. § 2). Unlike § 1, § 2 "covers both concerted and independent action." *Id.* (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010)). Monopolization is harder to establish than the mere restraint

of trade that suffices in the § 1 context. *Id.* at 528-29.  That is because "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Id.* at 529 (quoting *Verizon Commc'ns Inc. v. Law Off. of Curtis v. Trinko, L.L.P.*, 540 U.S. 398, 407 (2004)).

## C.    Conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)

Both sides acknowledge that to establish its conspiracy clams, Dexon must sufficiently allege that Cisco and CDW reached an agreement that unreasonably restricted competition in a relevant market. *See* Dkt. No. 22 at 13-14; Dkt. No. 24 at 14-15, 20-21. Cisco argues that Dexon's conspiracy claims should be dismissed because the complaint fails to plead sufficient facts to allege an unlawful agreement between Cisco and CDW; that if there were such an agreement, it should not be analyzed because it is "per se" lawful to replace one distributor with another; and that if analyzed, it is not actionable because Dexon fails to allege the agreement had a market-wide effect harming competition. Dkt. No. 22 at 13-17; Dkt. No. 32 at 3-6.

As explained below, Dexon plainly sufficiently alleges an agreement between Cisco and CDW and the complaint does not allege a "mere unilateral change of distributors," so the alleged agreement is not *per se* legal. However, Dexon's allegations of competitive harm is closer. On the whole, Dexon's allegations, in combination with the specific examples provided in the complaint, survive a motion to dismiss (other than Dexon's allegation that CDW had specific intent to monopolize). CDW's similar arguments that Dexon does not plausibly allege an agreement that harms competition (*see, e.g.*, Dkt. No. 28 at 12-17, 19; Dkt. No. 44 at 4-6, 9) are unpersuasive for the same reasons as Cisco's.

1. **Dexon plausibly alleges the existence of an agreement between Cisco and CDW**

Dexon alleges Cisco conspired with one of its favored distributors, CDW, "to help it exclude resellers like Dexon and maintain its network equipment monopolies." Dkt. No. 1, ¶ 13. The complaint provides a specific example of the conspiracy involving a Pennsylvania hospital system. *Id.*, ¶¶ 58-63.[11] According to the complaint, when Cisco learned that the hospital system awarded the order to Dexon, Cisco threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics. . . ." *Id.*, ¶ 59 (emphasis original). "Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." *Id.*, ¶ 60. Dexon alleges the "sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system in that the customer would keep its service for all of its Networking Equipment." *Id.* Dexon alleges "Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon." *Id.*

Dexon further alleges that as part of the conspiracy, CDW agreed not to sell Networking Equipment to Dexon. *Id.*, ¶ 62. Specifically, Dexon claims that "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id*. According to Dexon, "when the CDW representative previously assigned to Dexon refused to comply with" Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, "CDW assigned the representative to a

---

[11] The complaint alleges several similar examples of Cisco "favor[ing]" certain resellers to the harm of Dexon and the end-customers (Dkt. No. 1, ¶¶ 64-82), but those do not contain any facts identifying CDW.

different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* Dexon alleges that, pursuant to the conspiracy, "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon claims that Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW's website for Ethernet switches, it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections. *Id.*, ¶ 61.

At this stage in the litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face." *Quest III*, 2022 WL 980791, at *6 (quoting *Twombly*, 550 U.S. at 570). Importantly, antitrust cases are not subject to a heightened pleading standard. *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *7 (E.D. Tex. Sept. 27, 2018) (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)). The factual allegations in the complaint, taken as true, sufficiently explain the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco.

Defendants' arguments to the contrary are not persuasive. Cisco characterizes the Pennsylvania hospital situation as "CDW simply making sales of Cisco equipment to a customer who decided not to buy Cisco equipment from Dexon." Dkt. No. 22 at 9 (citing Dkt. No. 1, ¶¶ 59-60); *see also id*. at 14 ("CDW has every incentive to make profitable sales of Cisco equipment; there is no factual allegation that such sales stemmed from an agreement between CDW and Cisco to target Dexon."). CDW similarly argues that "Dexon's allegations are more consistent with CDW's independent actions and its individual interest than with a conspiracy." Dkt. No. 28 at 13. Such arguments improperly ask the Court to interpret the factual allegations in their favor. Similarly, the Court finds any argument that Dexon's allegations rely too heavily on "information and belief" is insufficient. *See, e.g.*, Dkt. No. 28 at 7. At this stage, the Court finds Dexon has

sufficiently alleged the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)." *See* Dkt. No. 1, ¶¶ 56-63, 87-100.[12]

## 2.    The alleged agreement is not *per se* lawful

Defendants argue that under the law a manufacturer can choose who to use as distributor, therefore any agreement between Cisco and CDW is *per se* lawful. *See, e.g.*, Dkt. No. 22 at 14-15 (arguing it would be "per se lawful" for Cisco to enter into a distribution agreement with CDW to the exclusion of Dexon); Dkt. No. 44 at 1 (CDW arguing Cisco has a "right to control its distribution network"). Cisco cites two cases to support its argument that even if plausibly pled, the actions with the Pennsylvania hospital system do not show an agreement that would violate antitrust law. Dkt. No. 22 at 16 (citing *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975); also citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997)).

*Burdett Sound*, the first case relied upon by Cisco, stands for the proposition that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." *Burdett Sound*, 515 F.2d at 1249. As explained by the Fifth Circuit in that case, it is settled law that a manufacturer has the right to

---

[12] Since oral argument, the Fifth Circuit explained an agreement can be shown by a threat and accession theory, which appears to support Dexon. *See BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 526 (5th Cir. 2022) (explaining that threat-and-accession theory may show an actionable agreement when three things are plausibly plead: "first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat."). However, the parties did not address this case, which was issued after oral argument.

select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *Id.* at 1248 (citations omitted).

The problem for Defendants is that Dexon does not merely allege that Cisco substituted one distributor for another within the scope of *Burdett Sound* and other dealer termination cases. To start, Cisco never had a direct supply relationship with Dexon to terminate. *See* Dkt. No. 274 at 16. But even if it had, Dexon does not present claims based on a "mere unilateral change of distributors" *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *See Burdett Sound*, 515 F.2d at 1248. Instead, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). Dkt. No. 1, ¶¶ 56, 60-61, 90-91. The alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices and reduced technology choices for customers. *Id.*; *see also id.*, ¶¶ 63, 100.

Further, case law supports the view that a monopolist manufacturer who conspires with a large distributor to exclude a lower-priced distributor can survive a motion to dismiss. *See Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) ("A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold."). The court in *Graphic Prods*. explained that "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive

pressure on price" and in that scenario, vertical restraints "may enable a manufacturer to retain monopoly profits arising from an Interbrand competitive advantage." *Id.* Dexon alleges this precise scenario: a Cisco-CDW conspiracy enabling Cisco to maintain its monopoly profits. The Third Circuit Court of Appeals similarly found a well-pled conspiracy alleging a dominant insurer conspired with a dominant hospital to exclude a smaller rival due to allegations of increased prices and decreased competition for the co-conspirators' services. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010).

Neither Defendant shows that the alleged agreement was "per se" lawful or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network."

### 3.    Dexon plausibly alleges competitive harm

Cisco argues that Dexon fails to state a claim because it does not show that "any agreement between CDW and Cisco could harm market-wide competition in the markets for network equipment (or IP phones)." Dkt. No. 22 at 15. CDW similarly argues that "Dexon fails to plausibly allege that the CDW/Cisco agreement harmed *competition*." Dkt. No. 28 at 15 (emphasis by CDW). Defendants acknowledge that Dexon alleges harm to both inter- and intra-brand competition, though they argue that Dexon's claims are limited to interbrand competition. Dkt. No. 32 at 5, n. 4 (Cisco stating that "Dexon does not allege any *distributor*-level market for any product. It asserts only claims implicating *inter*brand competition among Cisco and its rival manufacturers. . . ." (emphasis by Cisco)); Dkt. No. 44 at 6, n. 1 (CDW stating that "Dexon does not allege a relevant distributor market"). Defendants further argue that the allegations of harm to interbrand competition fail because Dexon does not show any harm to Cisco's competitors (*i.e.*, other equipment manufacturers). *See* Dkt. No. 32 at 5; Dkt. No. 44 at 6 (CDW arguing that Dexon fails to identify "a single OEM who was harmed by the alleged conspiracy").

Dexon's complaint alleges that the Cisco-CDW conspiracy had the "dual effect" of "both inter-brand and intra-brand competition." Dkt. No. 1, ¶¶ 60-61, 90-91. Concerning intrabrand competition, the complaint alleges that the Cisco-CDW conspiracy required customers to pay more for Cisco equipment from CDW and limited customers' choices for the services for Cisco products. The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon." *Id.*, ¶ 61. As discussed above, Dexon provided an example of this conspiracy involving a Pennsylvania hospital system wherein the hospital bought equipment from CDW at a higher price than had been negotiated with Dexon. *Id.*, ¶ 60. This alleged conspiracy supposedly allows Cisco to maintain its monopoly position and its supra-competitive prices. *Id.*, ¶¶ 90-93. Not only do these inter- and intra-brand allegations (which were not pleaded with this level of specificity in the California Lawsuit) explain how the conspiracy harms competition, but the alleged facts also mirror those in *Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) and *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010), discussed above.

Defendants are correct that Dexon does not define the distributor market or squarely address the market size of CDW or itself. *See, e.g.*, Dkt. No. 22 at 16; *see also* Dkt. No. 62 (Transcript) at 82:4-16 (stating that for Dexon to allege "market-wide effect, they would have to say something about Dexon's position in the market to show that there's some market-wide impact from whatever happens to Dexon. They never said that."). And as CDW points out, Dexon's example of the Pennsylvania hospital system does not actually show harm to a Cisco competitor, rather it shows a customer buying Cisco products from CDW rather than Dexon. Dkt. No. 44 at 6 (further stating Dexon's complaint does not identify a single OEM who was harmed by the alleged

conspiracy or facts as to how that OEM was harmed). Further, Dexon's factual support for its allegation that it "does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products" (*see* Dkt. No. 1, ¶ 90) is based on isolated examples of encouraging customers to switch manufacturers (*see*, *e.g.*, *id.*, ¶¶ 58, 65; *see also id.* at ¶¶ 13, 90, 97) and the allegation that CDW's website portrays Cisco's competitors as having more limited equipment options than Cisco. *Id.*, ¶ 61. This support is not particularly compelling given that other distributors also sell non-Cisco products and CDW's website might simply reflect the fact that Cisco has more products given its dominant position in that market.

However, the Court is considering a motion to dismiss, and "[a]t the pleading stage, a plaintiff may satisfy the unreasonable-restraint element by alleging that the conspiracy produced anticompetitive effects in the alleged relevant markets." Dkt. No. 24 at 17 (quoting *West Penn*, 627 F.3d at 100).[13] Given the state of litigation, Dexon's factual allegations are sufficient.

In arguing otherwise, Cisco cites *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001 (5th Cir. 1981). Dkt. No. 22 at 15. But that case evaluated the record following a jury trial, not a motion to dismiss. *Red Diamond*, 637 F.2d at 1006. Instead, *In re Pool Prod. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013) is more analogous. In that case, the court found the plaintiffs' allegations sufficient to state a plausible Sherman Act § 1 claim against Pool Defendant, the country's largest distributor of Pool Products, and the Manufacturer

---

[13] In *West Penn*, the defendants made a "half-hearted argument" that the Sherman Act § 1 claim did not allege that the conspiracy unreasonably restrained trade. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010). The court held the complaint plausibly suggested "that by denying West Penn capital, the conspiracy caused West Penn to cut back on its services (including specialized hospital services) and to abandon projects to expand and improve its services and facilities" and also plausibly suggested "that by shielding Highmark from competition, the conspiracy resulted in increased premiums and reduced output in the market for health insurance." *Id.* at 100-01. According to the court, these allegations were sufficient to suggest that the conspiracy produced anticompetitive effects in the relevant markets. *Id.* at 101.

Defendants, the three largest manufacturers of Pool Products in the country, even though the complaint did not allege that Pool Defendants possessed any specific share of the Pool Products Distribution Market. *Id.* at 373, 383, 399.

Although the complaint did not allege that Pool Defendants possessed any specific share of the Pool Products Distribution Market, *id.* at 383, the allegations that the Manufacturer Defendants had "substantial market clout" combined with the "market power" of the distributor "allow[ed] the Court to draw the reasonable inference" that the conspiracy was "capable of causing substantial harm to competition." *Id.* at 398. Notably, the court pointed out the Fifth Circuit has stated that the reason for looking at market power is to determine "whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market." *Id.* (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001); also citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)).

Similarly here, Dexon has alleged facts sufficient to create a reasonable inference of Cisco's market power in the relevant markets. *See, e.g.*, Dkt. No. 1, ¶¶ 1 ("Cisco is a monopolist. . . ."); 24 ("On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry. . . . Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceed 40% or more with its closest competitors half its size, in markets with high barriers to entry."); 29 ("Upon information and belief, Cisco consistently possessed a share of the Relevant Service Market in excess of 90%. . . ."). Dexon has also pleaded factual content that allows the Court to draw the reasonable inference that CDW has "substantial clout in the industry." *In re Pool*

*Prod.*, 940 F. Supp. 2d at 398; *see* Dkt. No. 1, ¶ 56 (alleging CDW's 2020 annual revenue was $18.47 billion compared to Cisco's $49.8 billion in the same time period); *see also Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) ("At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." (quoting *Scooter Store, Inc. v. Spinlife.Com.*, 777 F.Supp.2d 1102, 1117 (S.D. Ohio 2011))). Considering the allegations regarding CDW, combined with Dexon's allegations regarding Cisco as a monopolist, the complaint allows the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition.

The Court recommends this part of Defendants' motions be denied.

### 4. Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim

CDW additionally argues that Dexon "fails to plausibly allege specific intent by CDW to monopolize the relevant market" to support Dexon's § 2 conspiracy to monopolize claim against it. Dkt. No. 28 at 17. Dexon responds that it need not plead CDW (as opposed to Cisco) had the requisite specific intent to monopolize, but that the complaint contains sufficient allegations even if Dexon was required to so plead. Dkt. No. 37 at 14-16.

The elements of a Sherman Act § 2 conspiracy to monopolize claim are "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

Based on the arguments in the briefing, and the facts of this case, the Court disagrees with Dexon's contention that it need only plausibly allege Cisco had intent to monopolize. Dexon

primarily relies on a case from the District of New Jersey that stated "Defendants do not cite, nor could this Court find, any case law requiring that Plaintiffs prove a specific intent as to each individual member of the conspiracy." Dkt. No. 37 at 15 (citing *Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 287 (D.N.J. 2003)). However, *Carpet Group* concerned different facts. There, the plaintiff alleged, among other claims, that three members of an oriental rug trade association conspired to restrain trade and to monopolize the importing and wholesale distribution of oriental rugs in the United States. *Carpet Group*, 256 F. Supp. 2d at 260. The alleged co-conspirator Etessami moved for summary judgment that plaintiff failed to show he knowingly participated in the conspiracy and that he had the specific intent to monopolize. *Id.* at 279, 284-87. The court rejected Etessami's argument that the plaintiffs were required to show each member of the trade association had the specific intent to monopolize by relying on (1) a Third Circuit ruling that the district court interpreted as a finding that the trade association had specific intent to monopolize and (2) that the court already ruled there was a genuine dispute of fact as to Etessami's knowing participation in the ORIA conspiracy. *Id.* at 287.

Unlike the co-conspirators in *Carpet Group*, CDW is a reseller of Cisco network equipment, not a co-member with Cisco of a wholesale trade association whose specific intent was already found. Dexon also argues that Fifth Circuit law is "in accord with" *Carpet Group*, but offers cases that are even more attenuated than *Carpet Group* without addressing the factual differences between this conspiracy and the one at issue in *Carpet Group*. *See* Dkt. No. 37 at 15-16. This reasoning in *In re Microsoft* is more instructive to this situation. *In re Microsoft Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001). There, the court concluded that for a plaintiff to aver OEM computer manufacturers conspired with Microsoft to maintain Microsoft's monopolies in various markets, the plaintiffs would need to show that the OEM defendants

"stepped back and concluded that maintaining Microsoft's monopolies was a goal that they themselves desired to accomplish." *Id.* at 731.

Finding this case is more similar to *In re Microsoft* than *Carpet Group*, Dexon must show CDW intended to maintain Cisco's monopolies in the Relevant Networking Equipment Markets. Dexon fails to do so. Dexon argues that it can be "inferred that CDW had no issue with or otherwise supported Cisco's monopoly power" from Dexon's allegations that Cisco's supra-competitive pricing benefited CDW (Dkt. No. 37 at 17) and that CDW "used the conspiracy to foreclose intra-brand competition." Dkt. No. 48 at 7. Neither of these allegations plausibly shows CDW's intent for Cisco to maintain its monopoly position against other network equipment manufacturers.

Although the Court does not find Dexon has plausibly alleged specific intent by CDW to monopolize for purposes of its Sherman Act § 2 conspiracy to monopolize claim against CDW, the undersigned does not recommend the Court dismiss this claim without allowing Dexon an opportunity to amend its original complaint. The Court is not convinced such an opportunity would be futile. Accordingly, the Court recommends this part of CDW's motion be denied without prejudice to refiling. If this portion of the Report and Recommendation is ultimately adopted by the District Judge, Dexon shall replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised herein regarding CDW's specific intent to monopolize. This shall be done within thirty days from the date of the Order Adopting this Report and Recommendation, if one is entered.

**D.    Tying claim against Cisco under Sherman Act § 1 (Count III)**

**1.    Dexon's allegations in the current Texas Lawsuit**

In its complaint, Dexon alleges "Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over

customers, especially small and medium businesses" with limited IT budgets for networking products "that have no choice but to give into Cisco's demands." Dkt. No. 1, ¶¶ 1, 4. According to Dexon's theory, "after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process." *Id.*, ¶ 1.

Dexon alleges "purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products." *Id.*, ¶ 4. "As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase." *Id.* Additionally, Cisco has "forced customers to pay a higher price for networking equipment they had already purchased through a 're-certification fee,' by threatening not to service that equipment unless customers pay the additional equipment fees." *Id.*, ¶ 5. Dexon alleges that "customers' limited budgets are restrained further" when they pay that re-certification fee. *Id.*

Dexon alleges Cisco is a monopolist for after-market maintenance services on Cisco equipment. According to Dexon, only Cisco can provide full maintenance and support on its router and Ethernet switch products, and without such maintenance services, "customers cannot address critical performance issues and address service problems that can be catastrophic to their businesses." *Id.*, ¶ 25. Dexon alleges customers without the budget to justify maintenance services provided by Cisco rely on third-party maintenance and service providers to provide hardware maintenance and support, "but because of Cisco's policies . . . cannot provide software maintenance and support. Thus, Cisco is able to maintain a price premium for its maintenance

services, including its SmartNet service packages." *Id.*, ¶ 26. Although "end users are not required to purchase SmartNet service packages for their Cisco products," Dexon alleges "they are effectively compelled to do so, because the service packages offered are integral to the products' functionality." *Id.*, ¶ 27 (alleging that customers who do not update the software on their Cisco products are potentially exposed to security and operational risks, and without the software updates, "their Cisco products may not function properly").

Dexon alleges Cisco locks in customers who require maintenance with SmartNet and then uses SmartNet as a "hammer to force supracompetitive purchases of routers and Ethernet switches." Dkt. No. 1 at 15 (emphasis removed). Specifically, "since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches." *Id.* "Alternatively, Cisco forced customers to pay a 're-certification' fee for previously purchased networking equipment so that SmartNet service would not be withheld, as Cisco threatened." *Id.* Dexon alleges "Cisco changed its course of conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service." *Id.*, ¶ 50.

## 2.    Applicable law

### a.    Tying restraints

Two types of restrictions on competition may be challenged: tying restraints and exclusive dealing arrangements. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) (citing *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974)). Tying restraints occur when a seller agrees to sell one product on the condition that

the buyer also agree to purchase a different, or tied product, or the buyer agrees that he will not purchase the same product from another supplier. *Id*. (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc*., 677 F.2d 1045, 1048 n. 5 (5th Cir.1982)). Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization. *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354, 397 (3d Cir. 2016) (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 17.01, at 17–13 (4th ed. Supp. 2015); also citing 15 U.S.C. §§ 1–2).

Not all tying arrangements are illegal. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises L.L.C.*, 532 F.3d 963, 971 (9th Cir. 2008). Rather, ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer of a tying product into purchasing a tied product. *Id*. (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink*, 547 U.S. 28 (2006)). The injury is reduced competition in the market for the tied product. *Id*. (citing *Jefferson Parish*, 466 U.S. at 12 ("When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.")). As the Supreme Court reiterated in *Illinois Tool Works*, "the justification for the challenge [against ties] rested on either an assumption or a showing that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product." *Id*. (quoting *Illinois Tool Works*, 547 U.S. at 34). Thus, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id*. (quoting *Illinois Tool Works*, 547 U.S. at 46).

In *Kodak*, the Supreme Court expressed a "lock-in" tying arrangement in this way:

> "[A]n agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461–62 (1992). Although the majority opinion did not mention either *per se* or rule of reason in the analysis, *Kodak* was apparently decided under the *per se* rule.[14] *Id.* at 503 (Scalia, J., dissenting).

Courts in this circuit have also noted that while tying arrangements are often included in the list of *per se* violations of the Sherman Act, not all tying arrangements are *per se* unlawful.[15] *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *18 (N.D. Tex. Aug. 1, 2019) (citing *N. Texas Specialty Physicians v. F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008); also citing *Arizona v. Maricopa Cnty. Med. Soc.*, 457 U.S. 332, 344 n. 15, 102 S. Ct. 2466, 2473, 73 L. Ed. 2d 48 (1982)). To state a claim for *per se* tying, a plaintiff must plausibly allege facts showing:

> (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

---

[14] According to the Sixth Circuit Court of Appeals, the *per se* and rule of reason analysis for tying arrangements have, in effect, merged in recent years, with market power in the tying product market being an indispensable requirement under either *per se* or rule of reason analysis. *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 n. 2 (6th Cir. 1997) (further noting the "merger of these two theories is apparent in the majority opinion in *Kodak*, which does not even mention the terms 'per se' or 'rule of reason,' even though *Kodak* was technically a per se case").

[15] The Fifth Circuit Court of Appeals has noted this odd use of the term "per se" is descriptive of a rule located between a *per se* and a rule of reason inquiry. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994). According to the court, the best that can be said for it is that it reflects the intermediate danger tying arrangements pose to the market: unlike other *per se* illegal arrangements, "not every refusal to sell two products separately can be said to restrain competition." *Id.* (citation omitted). Rather, there must be proof "as a threshold matter . . . [of] a substantial potential for impact on competition in order to justify *per se* condemnation" of a tie." *Id.* (citation omitted).

*Id.* (quoting *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (citation omitted in *EuroTec*)).

Tying arrangements that do not meet the criteria for *per se* illegality are evaluated under the rule of reason. *Honeywell Int'l Inc. v. MEK Chem. Corp.*, No. 3:17-CV-1390-M, 2018 WL 6737514, at *6 (N.D. Tex. July 5, 2018) (citing *United Farmers*, 89 F.3d at 235 n. 2). To state a claim for a tying arrangement that is illegal under a rule of reason analysis, a plaintiff must plausibly allege that the "tying arrangement had an actual adverse effect on competition in the tied product market." *Id.* (quoting *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 954 (E.D. La. 1996); also citing *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 88 (5th Cir. 1994)).

**b.    Exclusive dealing arrangements**

Exclusive dealing, in contrast, occurs when a seller agrees to sell its output of a commodity to a particular buyer, or when a buyer agrees to purchase its requirements of a commodity exclusively from a particular seller. *Apani*, 300 F.3d at 625 (citation omitted). When assessing whether an exclusive dealing arrangement has the probable effect of substantially lessening competition, the Supreme Court has identified a three-part inquiry. *Id.* (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327-28 (1961)). First, the relevant product market must be identified by considering interchangeability and cross-elasticity of demand. *Id.* Second, the relevant geographic market must be identified, "by careful selection of the market area in which the seller operates and to which the purchaser can practicably turn for supplies." *Id.* (quoting *Tampa Elec. Co.*, 365 U.S. at 327–28). Finally, a plaintiff must show that the "competition foreclosed by the arrangement constitutes a 'substantial share of the relevant market.'" *Id*. That is, "the opportunities for other traders to enter into or remain in that market must be significantly limited." *Id.*

In addressing a Sherman Act § 2 claim for actual and/or attempted monopolization, the Fifth Circuit recently stated that substantial foreclosure is a prerequisite for every exclusive dealing § 2 claim. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022) (citing *Denison Mattress Factory v. Spring-Air Co.*, 308 F.2d 403, 410 (5th Cir. 1962) (citing *Tampa Elec. Co.*, 365 U.S. at 329; also citing *OJ Com., L.L.C. v. KidKraft, Inc.*, 34 F.4th 1232, 1249-50 (11th Cir. 2022) (applying the substantial-foreclosure requirement to a § 2 claim and rejecting the argument that substantial foreclosure sometimes is not required))).

### 3.    Parties' assertions

Cisco asserts Dexon's tying claim fails for three reasons, two of which relate to the California Court's earlier dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 22 at 17-23. Cisco first asserts Dexon never alleges any facts to support its conclusory allegations that Cisco used its market power to foreclose sales of any competitor's equipment, and cites the California Court's dismissal of Dexon's tying claim for failure to allege "Cisco's competitors are impacted." Dkt. No. 22 at 17-21 (citing *Cisco I*, 2021 WL 5848080, at *4). Cisco next asserts Dexon has not plausibly alleged any tie between service and equipment. *Id.* at 21-22. Again, Cisco references the California Court's decision, noting District Judge Breyer found the supposed tie "makes no logical sense." *Id.* at 21 (citing *Cisco I*, 2021 WL 5848080, at *5). Finally, unrelated to the California Court's decision, Cisco argues Dexon's allegations state that customers can pay a "'re-certification fee" to forego the purchase of new equipment as a condition of obtaining SmartNet service, and that is not a tying claim. *Id.* at 22-23.

Dexon makes at least two arguments in response to Cisco's motion, both of which would distinguish the reasoning provided by Judge Breyer based on the factual allegations contained in Dexon's California Counterclaims. First, Dexon disputes that it is required to plead "substantial

foreclosure" in the tied product market. Dkt. No. 24 at 17. Dexon asserts Cisco improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this *per se* tying claim. *Id.*

Second, unlike in the California Lawsuit, here Dexon says "lock-in" is key to its *per se* tying claim. Apparently relying on a *Kodak* "lock-in" theory of tying, Dexon states it alleges Cisco has threatened to withhold service on an entire installed base of products "to extract supra-competitive purchases of specific tied products." Dkt. No. 34 at 8. Pursuant to this theory, Dexon states it has sufficiently alleged anticompetitive effects in the tied product markets by providing "detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding considering of competitive alternatives." Dkt. No. 24 at 23; *see also id.* at 22-23 (further stating Cisco "takes advantage" of "locked-in customers" who had been assured they would receive maintenance and service without purchasing anything else, "forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process"). According to Dexon, as in *Kodak,* it is the timing of the withholding service that makes Cisco's conduct anticompetitive. *Id.* at 22.

In its reply, Cisco states Dexon's opposition confirms Dexon has no allegation of foreclosure. Dkt. No. 32 at 6 ("It highlights (at 6-7) a bank that bought equipment "it did not need" (from any manufacturer), a school district that had to "*cancel*" an order (of Cisco equipment), an energy company that wanted Cisco equipment and bought Cisco equipment ("from a vendor other than Dexon"), and an auto dealer that "could not buy" any new equipment (so it never did).") (emphasis original). Regarding Dexon's argument that the "substantial foreclosure" requirement

applies to exclusive dealing claims which are not at issue in this case, Cisco asserts Dexon focuses on coercion, a separate element from foreclosure. *Id.* (citations omitted). Cisco further asserts this case is nothing like *Kodak*, the Supreme Court case involving "lock-in." *Id.* at 7.

The parties' arguments reflect differences in how the parties view Dexon's tying claim. Dexon alleges a *Kodak* "lock-in" theory of tying liability, arguing it does not need to allege substantial foreclosure to competitors because that is only applicable to exclusive dealing claims. The Court first considers whether Dexon plausibly states a *Kodak* theory (or other alternative theory) of *per se* tying liability.

### 4.    Dexon's *Kodak* theory of *per se* tying liability

During oral argument, counsel for Dexon focused on the four new examples of customers detailed in the complaint, making it clear that the tying claim in this case is about "lock-in," something that it did not allege in the California Lawsuit. Dkt. No. 62 (Transcript) at 90:2-92:13. Specifically, counsel argued as follows:

> Lock-in means a customer needs switches, and it's going out and wants to make sure that it has money and has options after it buys its initial round of Cisco switches. And so they say, I'm going to buy from you, Cisco, your switches, and I'm going to buy from you service, but I want to make sure that I can continue to get service on those switches I'm going to buy, and I can also buy from a competitor for less money down the road. They are -- customers are critically relying -- and we detailed this in the complaint. Cisco's representations that it will receive service on the switches for which it bought SmartNet, for which it bought services. When Cisco changes that policy, . . . and it threatens withholding that service, you're stuck. You're stuck as the customer. You are not able to then redo your original switch purchase. You're out of money. This is where IT budgets is a really important concept for lock-in and this claim.
>
> I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in. It was not about how once you've sunk your IT budget on original switches, you then -- it may be a multi-year period before you have an opportunity to buy from a competitor.

> So once you have an installed base of Cisco switches, which as you can imagine would occur for hundreds of thousands of customers across this country, you then can't get your service, and your only option for getting the service you need is to buy more Cisco's switches, that means Cisco's competitors have been foreclosed.
>
> And there are four new examples, and this is Slide 5 under "Tying Boxed Out Cisco's Competition." If the Court will indulge me, I'd like to walk through these four examples nowhere found in the California counterclaims.

*Id.* at 90:3-91:13. Those four examples are a Texas (1) bank, (2) automotive dealership, (3) energy company, and (4) school district. Dexon hearing slides at 5.

Not only were the four examples not alleged in Dexon's California Counterclaims, but the "IT budget phenomenon" is also absent from the California Lawsuit. Dkt. No. 62 (Transcript) at 102:9-15. According to Dexon's counsel, the "lock-in combined with the limited IT budget really brings that to the fore as to . . . why this is *Kodak*." *Id.* at 102:18-20.

Generally speaking, an impermissible "tie-in" occurs if a seller enjoys either a monopoly or "appreciable economic power" ("AEP") in the "tying" product (or service) market, and uses its considerable market leverage to "coerce" a buyer—already intent on purchasing the tying product from the seller—into buying a second, "tied" product that the buyer would not have bought based solely on the quality or price of the tied product itself. *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 16 (1st Cir. 1994) (citing *Fortner Enters., Inc. v. United States Steel Corp.*, 394 U.S. 495, 503 (1969)). As noted above, in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992), the Supreme Court explained a theory of "lock-in" tying. *See also Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016).

In *Kodak*, Kodak sold photocopier equipment, as well as maintenance service and replacement parts. *Avaya*, 838 F.3d at 398 (citing *Kodak*, 504 U.S. at 455). The parts were of proprietary design and were not interchangeable with other manufacturers' parts. *Id.* (citing *Kodak*, 504 U.S. at 456–57). Kodak sold both parts and service, using different contract arrangements to

charge different prices to different customers. *Id.* (citing *Kodak*, 504 U.S. at 457). The dispute concerned Kodak's policy of selling machines and parts only to purchasers who would also use Kodak to service their machines. *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distribution Co.*, 520 F.3d 393, 405 (5th Cir. 2008) (citing *Kodak*, 504 U.S. at 458). Kodak agreed with original equipment manufacturers that parts fitting Kodak equipment would only be sold to the Kodak company, limited the availability of used Kodak machines, and pressured companies not to sell Kodak parts to independent service providers. *Id.* The result of Kodak's efforts was that customers were forced to obtain service and repairs from Kodak because the independent service providers were unable to obtain parts. *Id.*

Independent service providers sued Kodak, alleging that Kodak had violated §§ 1 and 2 of the Sherman Act by tying the sales of parts and service together for Kodak machines. *Avaya*, 838 F.3d at 398-99 (citing *Kodak*, 504 U.S. at 458-59). The district court's grant of summary judgment to Kodak was appealed to the Supreme Court. In ultimately concluding that the plaintiffs had put forward a strong enough case to proceed to trial, the Court expounded a theory whereby high information and switching costs would allow the seller to exploit customers who had already purchased the equipment and were then "locked in" to the aftermarkets. *Id.* at 399 (citing *Kodak*, 504 U.S. at 476). It explained that "[l]ifecycle pricing of complex, durable equipment is difficult and costly," and that the information needed for such lifecycle pricing "is difficult—some of it impossible—to acquire at the time of purchase." *Id.* (quoting *Kodak*, 504 U.S. at 473). Because "[a]cquiring the information is expensive[, i]f the costs of service are small relative to the equipment price, . . . [consumers] may not find it cost efficient to compile the information." *Id.* (quoting *Kodak*, 504 U.S. at 474–75). Additionally, competitors may not provide that information, either because they do not have it themselves or because they may wish to

collusively engage in the same behavior with their own customers so that "their interests would [not] be advanced by providing such information to consumers." *Id.* (quoting *Kodak*, 504 U.S. at 474 & n.21 (citation omitted in *Avaya*)). In other words, tying liability may exist in an aftermarket where the seller can exploit customers who have already purchased the equipment and cannot easily shift to another brand. *Id.*

Not only was that theory sufficient to support § 1 liability, but the Supreme Court also held it could support § 2 liability for unlawful monopolization. *Kodak*, 504 U.S. at 480–86. In that analysis, the Court incorporated the § 1 analysis but explained that a § 2 claim additionally requires showing the use of that monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Avaya*, 838 F.3d at 400 (quoting *Kodak*, 504 U.S. at 482–83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948))). Therefore, in defending against a § 2 claim, the seller has the opportunity to justify its actions so that "[l]iability turns. . . on whether 'valid business reasons' can explain [its] actions." *Id.* (quoting *Kodak*, 504 U.S. at 483 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985))). The Court did not consider the record in *Kodak* as sufficient to warrant summary judgment. *Id.* (citing *Kodak*, 504 U.S. at 483–86).

Here, Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying. As the First Circuit Court of Appeals explained, *Kodak* involved three types of products: the purchased Kodak copiers (the "lock-in" product), Kodak copier replacement parts (the tying product), and Kodak copier servicing and repair (the tied product). *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 17 (1st Cir. 1994). Dexon's complaint contains similar allegations: the installed networking equipment already purchased (the "lock-in" product), SmartNet service (the tying product), and new networking equipment in the Relevant Product Markets (the tied product). Dkt.

No. 1, ¶¶ 45-46, 67 (regarding installed base of networking equipment), 102 (alleging the tying product is Cisco's SmartNet services package in the Relevant Services Market, and the tied products are new networking equipment in the Relevant Product Markets); *see also id.* at 15 ("Cisco locks in customers who required maintenance with SmartNet, and then uses SmartNet as a hammer to force supracompetitive purchases of routers and ethernet switches.") (emphasis removed).

In line with a "lock-in" tying claim under *Kodak*, Dexon alleges a change in policy. Dkt. No. 1, ¶ 1 ("after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process"); *see also id.*, ¶ 102 ("after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco").

Other factors courts consider in assessing "lock-in" claims include "evidence of (1) supracompetitive pricing, (2) [the seller's] dominant share of the relevant aftermarket, (3) significant information costs that prevent[ ] lifecycle pricing, and (4) high 'switching costs' that serve[ ] to 'lock in' [the seller's] aftermarket customers." *Avaya*, 838 F.3d at 402 (quoting *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005)). Dexon has allegations regarding these factors as well. According to the Third Circuit, "it is possible that those factors may support a theory of antitrust liability that is not necessarily predicated on lock-in exploitation." *Id.* at 404. However, any such alternative theory must satisfy the more general rule that an antitrust

56

theory needs to "make[ ] . . . economic sense" and be supported by the evidence.[16] *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

Dexon's allegations further comport with the Fifth Circuit's requirements to state a *per se* tying claim,[17] which require a plaintiff to plausibly allege facts showing the following:

> (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

*EuroTec*, 2019 WL 3503240, at *18 (quoting *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) (citation omitted in *EuroTec*)). Similarly, Dexon alleges that (1) the service and new networking equipment are tied together and (2) customers are coerced. *See* Dkt. No. 1, ¶¶ 1, 4 ("Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over customers, especially small and medium business" with limited IT budgets for networking products "that have no choice but to give into Cisco's demands."); *see also* Dkt. No. 62 (Transcript) at 100:19-23 ("Cisco has created a market by its design where you can only get critical IT updates and patches from it, and it's also a monopolist in the market where it is trying to lock in additional purchases and prevent competitors."); *see also id.* at 101:7-11 (stating "the only

---

[16] The requirement that a plaintiff make out an economically coherent theory of antitrust liability applies just as much to the pleading stage, where, to "make a § 1 claim," a plaintiff must "identify[ ] facts that are suggestive enough to render a § 1 [violation] plausible," with sufficient "context" to "raise[] a suggestion" of unlawful anticompetitive conduct. *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 403 (3d Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

[17] As noted above, the Fifth Circuit has noted this odd use of the term "per se" is descriptive of a rule located between a *per se* and a rule of reason inquiry. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994).

reason a school district would pull out of this commitment is because it was afraid that it would lose the service on other pieces of networking equipment that Cisco had sold to the school district").

Dexon alleges Cisco possesses (3) substantial economic power over the tying product and (5) the alleged tie involves more than an insubstantial volume of commerce.[18] Dkt. No. 1 at 8-14 (alleging Cisco is a monopolist for both the Router and Ethernet Switch relevant product markets (Relevant Network Equipment Markets) and the after-market maintenance services on Cisco equipment (Relevant Service Market)).

Dexon alleges (4) the tie has an anticompetitive effect on the tied market, asserting the timing of Cisco's withholding service makes Cisco's conduct anticompetitive. Dkt. No. 24 at 22. Dexon further argues as follows:

> Cisco initially lured customers into buying both the products and service because of Cisco's assurance to the customers that they would receive the maintenance and service it had purchased without purchasing anything else, and customers would maintain their freedom to choose whichever manufacturer it sought for a subsequent purchase of Equipment. (Compl. ¶¶ 46, 50-51, 82); *see also, e.g., id.* at ¶¶ 7, 13 (regarding subsequently lost choices). Cisco's pre-purchase assurance was critical to customers' initial purchases given their limited budgets for IT equipment. (*Id.* ¶¶ 4, 46, 50-51, 82). Cisco subsequently reversed these assurances and demanded that (a) customers must buy new, supra-competitively priced equipment in order to receive the service, and (b) any purchases from a disfavored reseller including any purchases of competitive products would not suffice to restore the service. (*Id.* ¶¶ 4-7, 49-51). As in *Eastman Kodak*, it is the *timing* of withholding service that makes Cisco's conduct anticompetitive, because it is abusing its monopoly power in the Relevant Service Markets in order to force Relevant Product purchases and terms on customers that they would not have agreed to in the first place.

*Id.* at 22-23 (emphasis original). Accordingly, Dexon sufficiently alleges facts to support its tying claims.

---

[18] According to Dexon's response, "Cisco does not challenge the first element, nor that it possesses monopoly power in each of the Relevant Service Markets for purposes of the [third] element, nor does it challenge that a not insubstantial amount of interstate commerce was involved. . . ." Dkt. No. 24 at 21.

a.    **Economic sense and "timing"**

In attempting to distinguish *Kodak*, Cisco argues that "it makes no sense to allege that Cisco forced customers to purchase equipment in order to obtain service on *that equipment*." Dkt. No. 32 at 7 (emphasis original). Cisco argues the California Court in *Cisco I* similarly concluded that "the supposed tie makes no logical sense" because:

> SmartNet exists to maintain Cisco products. The maintenance service (the supposed tying product) is only desirable to consumers as an add-on to the underlying equipment (the supposed tied product). Because a consumer buys SmartNet for equipment she already has, Cisco cannot exploit control over the SmartNet market to force people to buy the underlying equipment.

*Cisco I*, 2021 WL 5848080, at *5.

First, it is not evident that the California Court ruled on a *Kodak* "lock-in" theory of tying liability. District Judge Breyer stated in a footnote it "is at least theoretically possible for a firm to harm competitors by locking customers into a costly long-term service plan and then requiring purchases in a tied equipment market that customers en masse (for some set of reasons) cannot refuse." *Id.* at *5, n. 2. But he then noted that "the conditions necessary" for such an arrangement were "far away from the facts alleged here." *Id.* Dexon claims it has now pleaded such conditions. *See, e.g.*, Dkt. No. 62 (Transcript) at 73:4-7 (stating an "important fact" that was not before the California Court "that is littered throughout these [new] examples but also pled more generally are limited IT budgets"); *see also id.* at 90:22-24 ("I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in"). Second, and more fundamentally, Dexon does not allege that the already owned network equipment is the tied product; rather, as explained above, Dexon alleges here that the equipment the customer already owns is the lock-in product while the *new* equipment is the tied product.

Cisco relatedly argues *Kodak* does not help Dexon because the alleged tying product in *Kodak* was parts and the tied product was service. *See* Dkt. No. 32 at 7; Dkt. No. 62 (Transcript) at 103:1-6 (Dexon's counsel acknowledged at oral argument that here the order of the tie is switched ("service then tied product") from that alleged in *Kodak*). However, *Kodak* does not require any specific order of tying, i.e., "product then tied service." And as noted above, the complaint sufficiently alleges that Cisco has threatened to withhold service on an entire installed base of products to extract supra-competitive purchases of specific tied products. *See also* Dkt. No. 1, ¶¶ 49, 52, 59, 67, 80. As Dexon's counsel explained during oral argument, a customer (like the Texas Bank) that only wants to renew SmartNet for its already installed base, per Cisco's new policy, could only be eligible for renewal if it bought more Cisco switches and routers.[19] Dkt. No. 62 (Transcript) at 91:21-92:1.

In sum, the Court finds Dexon has sufficiently alleged facts in the complaint from which the Court could infer that discovery would produce evidence to support a *per se* tying claim predicated on "lock-in" under at least a *Kodak* theory. The Court finds, at this stage of the proceeding, Cisco has not shown Dexon's antitrust theory fails to make economic sense.

**b.    Foreclosure and re-certification fee**

Cisco additionally argues that Dexon's tying claim fails "because Dexon never alleges any facts to support its conclusory assertions that Cisco used its supposed power in any market to foreclose sales of any competitor's equipment." Dkt. No. 22 at 17; *see also id.* at 19 (stating that "Dexon does not allege a single instance of Cisco threatening to withhold service from a customer that wanted to purchase another manufacturer's equipment"). In response, Dexon asserts Cisco

---

[19] The Court does not address any argument raised by Cisco during oral argument that such a claim should have been brought by the bank, for example, instead of by Dexon. Cisco did not brief the issue of whether Dexon is a proper plaintiff for purposes of antitrust standing.

improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this (*Kodak* lock-in) *per se* tying case. Dkt. No. 24 at 17; Dkt. No. 34 at 7. According to Dexon, the Supreme Court has distinguished between exclusive agreements, not at issue here, "and other types of potentially anticompetitive conduct, such as tying, which unlike exclusive dealing, directly coerces ultimate consumers." Dkt. No. 24 at 17 (citing *Brown Shoe v. United States*, 370 U.S. 294, 329-30 (1962) (stating the Supreme Court noted that foreclosure needed for exclusive dealing is greater than for tying)). To Dexon's knowledge, "no court has applied the substantial foreclosure requirement outside of the exclusive dealing context." *Id.* As explained below, Cisco has failed to show Dexon fails to allege the requisite level of foreclosure to survive a motion to dismiss.

During oral argument, both parties referenced "foreclosure." Whereas Cisco states Dexon must allege substantial foreclosure of competitors' sales, Dexon focuses first on the anticompetitive effect on customers. However, Dexon asserts it has also sufficiently alleged that Cisco's competitors are foreclosed when Cisco withholds service because "customers were duped by Cisco into using their IT budgets to maintain Cisco Relevant Product monopolies rather than purchasing from a Cisco competitor." Dkt. No. 24 at 24. During oral argument, for example, after going through the four new examples of "foreclosure," Dexon's counsel stated as follows:

> So to go back to this Slide 5 and these examples of foreclosure, the automobile dealership, an update went out. It rendered the switch inactive. Cisco at first honored . . . the SmartNet service package but then said, I'm not going to do it until you buy new switches. **The automobile dealership, again the limited IT budget, couldn't buy new switches, so it's stuck with dead switches until it's -- until its IT budget is refreshed and it could consider HP and the other vendors**.
>
> So this is how foreclosure occurs. It doesn't need to occur at, you know, the exact time, and Cisco's argument is essentially at the moment of the tie, they need to have been in the market for a competitive switch. That's not the law. The law is what is the practical effect of the tie of -- in the coerced -- in the coerced product market? **If you're forced to buy something new if you don't have any money that you**

**wouldn't have spent in the first place to buy the competitive product, competitors have been foreclose[ed].** That's what foreclosure looks like.

Dkt. No. 62 (Transcript) at 96:3-21 (emphasis added).

Cisco's counsel stated at oral argument that courts in this circuit have held that a tying claim requires that there be an allegation of foreclosure of sales that competitors otherwise would have made. Dkt. No. 62 (Transcript) at 85:12-17. In support of this proposition, Cisco cites – both in its briefs (Dkt. Nos. 22 and 32) and at oral argument (Dkt. No. 62 at 85:18-21) – the Fifth Circuit's decision in *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), *cert. denied*, 513 U.S. 1103 (1995). *See* Dkt. No. 22 at 19; *see also* Dkt. No. 62 (Transcript) at 85:18-20. Importantly, *Roy B. Taylor Sales* concerned a reversal of a jury finding based on a full record, which is procedurally different from Cisco's motion to dismiss. Just as importantly, the court's reasoning tends to support Dexon's argument that the law does not require plaintiffs to plead the same level of foreclosure in tying claims.

*Roy B. Taylor Sales* is a case "involving an exclusive dealing line-forcing arrangement" where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors. *Paul E. Volpp Tractor Parts, Inc. v. Caterpillar, Inc.*, 917 F. Supp. 1208, 1226 (W.D. Tenn. 1995). The case concerned product line restraints imposed on a dealer of hamburger patty machines and patty paper (Taylor) by its patty product manufacturer and supplier (Hollymatic). *Roy B. Taylor Sales*, 28 F.3d at 1380; *see also NIBCO Inc. v. Viega L.L.C.*, 354 F. Supp. 3d 566, 581 (M.D. Pa. 2018) (summarizing *Roy B. Taylor Sales* and finding it did not support the defendant's argument that the plaintiff's claim of *per se* tying must be dismissed for failure to show harm to competition). Hollymatic and Taylor had a contractual agreement that Taylor would use its "best efforts" to sell and service the full line of Hollymatic products. *Roy B. Taylor Sales*, 28 F.3d at 1381. Implicit in that agreement was that Taylor would not purchase patty paper from

any of Hollymatic's competitors. *Id.* After selling only Hollymatic patty paper for several years, Taylor began to purchase a substitute, and Hollymatic confronted Taylor about its purchases from Hollymatic's competitors. *Id.* When they could not come to an agreement over the amount of patty paper that Taylor would be required to purchase each month, Hollymatic severed its relationship with Taylor. *Id.* Taylor then brought suit against Hollymatic, alleging it unlawfully tied the sale of hamburger patty machines to patty paper. *Id.*

In its opinion, which was issued on appeal after a full trial record had been developed by the district court, the Fifth Circuit found that Taylor (the dealer) had not proven that the tying arrangement foreclosed consumer choice because consumers were free to look to other distributors and "purchase the two goods separately." *Id.* at 1382-84; *see also NIBCO*, 354 F. Supp. 3d at 581. The Fifth Circuit reversed the jury's finding of an unlawful tie and instead held in favor of the defendant manufacturer. *Roy B. Taylor Sales*, 28 F.3d at 1388.

In so ruling, the Fifth Circuit noted tying arrangements that threaten competition come in myriad industries, and cited *Kodak* as an example of a seller of machines conditioning the availability of parts on the purchase of repair services. *Id.* at 1383 & n.19 (citing *Kodak*, 504 U.S. 451). The Fifth Circuit stated the common ground is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id*. In *Roy B. Taylor Sales*, the claimed arrangement between Hollymatic and Taylor constituted a vertical nonprice restraint between a manufacturer and a dealer on goods that the dealer offered to customers independently. *Id.* at 1384.

The court in *Roy B. Taylor Sales* noted the situation was "analogous to others in which a manufacturer requires a *dealer* to carry one product in its line to receive another." *Id.* (emphasis

added). The court cited a Tenth Circuit case that explained how "traditional tying arrangements" and "typical line forcing situations" differ with respect to foreclosure:

> [W]here a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of [an] arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. In other more traditional tying arrangements there is an ultimate foreclosure of choice to the ultimate consumer. Thus, a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se. No such foreclosure occurs or is threatened in a typical line forcing situation such as that at bar.

*Id.* (quoting *Smith Mach. Co. v. Hesston Corp.*, 878 F.2d 1290, 1297 (10th Cir. 1989)) (internal citations omitted).

The claim in *Roy B. Taylor Sales* was not a *Kodak* "lock-in" theory of tying liability which would result in an ultimate foreclosure of choice to the ultimate consumer. Rather, the case involved "an exclusive dealing line-forcing arrangement" where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors. *Paul E. Volpp Tractor Parts*, 917 F. Supp. at 1226. According to the Fifth Circuit, such an arrangement did not threaten competition to the extent as tying arrangements that bind ultimate customers and thus did not warrant *per se* analysis. *Roy B. Taylor Sales*, 28 F.3d at 1385; *see also Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 490 (5th Cir. 2022) (noting "the well-established proposition that exclusive-dealing arrangements are not *per se* antitrust violations").

The court noted the alleged tie would nevertheless be illegal if it "had an adverse effect on competition." *Roy B. Taylor Sales*, 28 F.3d at 1385. Under the rule of reason, Taylor had to show that the tie "as it actually operate[d] in the market" harmed competition. *Id.* (quoting *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 29, 104 S. Ct. 1551, 1567, 80 L. Ed. 2d 2 (1984), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 126 S. Ct.

1281, 164 L. Ed. 2d 26 (2006)). The record in *Roy B. Taylor Sales* did not indicate that consumers continued to purchase Hollymatic patty paper at prices above the market. *Id.*

In this case, Dexon alleges a *Kodak* "lock-in" theory of *per se* tying liability. As noted by the Fifth Circuit in *Roy B. Taylor Sales*, the common ground to those types of tying arrangements is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* at 1383 (citing *Kodak*, 504 U.S. 451). As noted by the Fifth Circuit, a *per se* condemnation requires proof that the tying arrangement involved "the use of market power to force [consumers] to buy [goods] they would not otherwise purchase."[20] *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) (quoting *Jefferson Parish*, 466 U.S. at 26). Likewise, here, Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase.

Having found Dexon plausibly alleges such a theory, Cisco fails to persuasively show that such a theory of tying liability requires a showing of substantial market foreclosure of competitors' sales that it argues for in its briefing. In any event, the Court further finds Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4-5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when

---

[20] The *per se* rule obviates the need for full consideration of actual market conditions but does require a finding of "significant market power" in the tying market. *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994).

they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50-51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4-5, 26, 51, 103, 125).

Cisco briefly argues that Dexon's tying claims also fail because Dexon alleges that customers can avoid purchasing new equipment by instead paying a "re-certification fee," apparently arguing that because no new equipment is purchased, there is no tie. Dkt. No. 22 at 23. Dexon responds that under its allegations, the "re-certification fee" accomplishes the same end as the other anticompetitive ties, that is, customers are still forced to spend money on equipment they already own, limiting their ability to buy additional equipment from a competitor. Dkt. No. 24 at 25. Cisco's argument is not well developed, and the extent, effect, and details of any re-certification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile.

For all these reasons, the Court finds Dexon has plausibly stated a *per se* tying claim under Sherman Act § 1. The Court recommends this part of Cisco's motion be denied.

### E.    Monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V)

#### 1.    Parties' assertions

Dexon further alleges Cisco's tying and associated FUD tactics violate Sherman Act § 2. Regarding Dexon's monopolization claims, Cisco asserts Dexon fails to allege actionable exclusionary conduct. Dkt. No. 22 at 23-28.

#### 2.    Applicable law

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986). According to the Fifth Circuit, Sherman Act § 2, which prohibits

monopolies and attempted monopolies, "does not explicitly require a plaintiff to prove an injury to competition; the plaintiff must prove only the existence of monopoly power and the willful continued maintenance of that power." *Walker v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984). Injury to competition is presumed by proof of the elements of monopolization. *Id.*; *see also Major Mart, Inc. v. Mitchell Distrib. Co*., 46 F. Supp. 3d 639, 662 (S.D. Miss. 2014).

The Fifth Circuit recently addressed a § 2 monopolization claim and noted the first element is "possession of monopoly power." *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr*., 49 F.4th 520, 529 (5th Cir. 2022) (quoting *Eastman Kodak Co. v. Image Tech. Servs*., 504 U.S. 451, 481 (1992)). The second element is anticompetitive (or "exclusionary") conduct, which is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* (quoting *Kodak*, 504 U.S. at 482–83 (quotation omitted in *BRFHH*); also citing *United States v. Griffith*, 334 U.S. 100, 108 (1948) (similar)). Attempted monopolization is similar but allows for liability even if the monopoly never came to fruition. *Id.* (citing *Spectrum Sports v. McQuilla*n, 506 U.S. 447, 456 (1993) (A defendant commits attempted monopolization if it "(1) . . . has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.")).

**3.    Discussion**

Cisco does not challenge Dexon's pleading regarding the first element, that Cisco possesses monopoly power in each of the Relevant Markets. Cisco disputes the second element, the anticompetitive (or "exclusionary") conduct element. Dexon alleges two theories to establish anticompetitive conduct: tying and FUD tactics.

Dexon's allegations regarding Cisco's tying-related conduct and FUD strategies towards the end-users of its equipment are sufficient to defeat a motion to dismiss. As noted above, the

Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id*. The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. *Id.* at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id*. at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

Further, Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *See* Dkt. No. 1, ¶¶ 6-9, 64-68 (alleging Cisco uses FUD to dissuade customers from purchasing from resellers with lower prices and to accomplish its coercion strategies). The Third Circuit previously rejected a defendant's attempt to claim such conduct does not show anticompetitive conduct, specifically "in the context of a *Kodak* claim." *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue). For its part, Cisco's briefing does not specifically address Dexon's FUD's allegations.

Instead, Cisco first argues that the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." Dkt. No. 22 at 24. For the reasons explained with respect to Dexon's tying claims, Cisco's argument that Dexon fails to plausibly plead harm to competition is rejected. Further, Cisco does not address Fifth Circuit law holding that "injury to competition is presumed to follow from the conduct proscribed by § 2." *Walker*, 747 F.2d at 1013.

Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. Dkt. No. 22 at 24. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices does not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id.* at 24-28. None of these arguments are proper at this stage. Dexon does allege a mere change of distributor or refusal to deal dispute, and assuming the allegations are true, Cisco's tying and FUD strategies make economic sense, at least in terms of a *Kodak* claim, as long as those actions maintain or enhance Cisco's monopoly power as alleged. *See* Dkt. No. 24 at 27 (citing Dkt. No. 1, ¶¶ 84, 91, 98, 106, 112).

The Court, viewing Dexon's allegations collectively and in the light most favorable to Dexon, finds Dexon plausibly states monopolization and attempted monopolization claims against Cisco under Sherman Act § 2. The Court recommends this part of Cisco's motion be denied.

## F.    Antitrust injury for Counts I-VI

### 1.    Parties' assertions

Both Cisco and CDW assert Dexon fails to establish antitrust injury, which is a component

of antitrust standing. *BRFHH*, 49 F.4th at 525 (citing *Atl. Richfield Co. v. USA Petroleum Co*.

("*ARCO*"), 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Cisco asserts Dexon

cannot plead antitrust injury from the alleged tying conduct because Dexon does not plead any

injury resulting from reduced competition in the claimed Relevant Product Markets. Dkt. No. 22

at 29. CDW likewise argues none of Dexon's allegations establish injury to competition in the

relevant markets. Dkt. No. 28 at 19 (stating Dexon's focus on its own lost sales to CDW and other

Cisco resellers is misguided because the antitrust laws are designed to protect competition, not

competitors). Additionally, CDW states any supposed harm to competition in the relevant markets

would injure either end-customers (those purchasing products from Dexon or CDW) or from rival

original equipment manufacturers ("OEMs") who are allegedly foreclosed from selling their

equipment, but not Dexon, which is neither. *Id.*

### 2.    Applicable law

Antitrust injury is a component of antitrust standing. *BRFHH Shreveport, L.L.C. v. Willis-*

*Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022).

Antitrust standing, in turn, is a judicially-created set of threshold requirements that a private

plaintiff must show before a court can entertain its antitrust claims. *Id.* (citing *Assoc. Gen.*

*Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 & n.31

(1983)). The three antitrust standing requirements are "1) injury-in-fact, [i.e.,] an injury to the

plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff

status, which assures that other parties are not better situated to bring suit."[21] *Id.* (quoting *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citing *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009))). The second component of antitrust standing, antitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury should reflect "the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (citing *Brunswick,* 429 U.S. at 489).

### 3.   Discussion

Defendants both cite *Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) for the proposition that dismissal is appropriate if there is no allegation of an adverse effect on competitors. *See id.* at 468 (affirming dismissal for lack of antitrust injury and antitrust standing where there was no allegation "that the termination of the plaintiffs had any adverse effect on anyone else, either by increasing the price or decreasing the availability of the Chronicle to its subscribers or other readers or by damaging competitors or otherwise"). Under CDW's suggested interpretation of *Norris*, only through pleading that Dexon was an end-customer or a rival OEM can Dexon establish the requisite antitrust injury.

The Fifth Circuit has not held as a matter of law that antitrust standing is limited to competitors and consumers exclusively. *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*,

---

[21] These requirements, which supplement Article III standing requirements, ensure that successful antitrust claims only redress the types of harm that antitrust law was designed to prevent, rather than create a fortuitous windfall for all parties proximate to the defendant, regardless of whether they were injured by anticompetitive conduct. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983)).

No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *12 (W.D. Tex. Oct. 15, 2015). Rather, it has recognized that the Sherman Act is "comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices." *Id.* (quoting *American Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 Fed. Appx. 1, 7 (5th Cir. 2004) (quoting *Blue Shield v. McCready*, 457 U.S. 465, 472 (1982))). In *American Central*, the Fifth Circuit rejected the argument that the plaintiff lacked standing because it was a distributor, not a competitor. *Id.* The court held that "[c]ompetitor status is not required to establish standing" and "[r]elief for antitrust claims is not confined to consumers, or to purchasers, or to competitors, or to sellers." *Id.* (quoting *American Central*, 93 Fed. Appx. at 7).

As explained in *Universal Hospital*, the court in *Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, Civil Action No. 10–00124, 2010 WL 3488244 (E.D. La. Aug.26, 2010) rejected the argument that the antitrust requirement is met only when an injury is inflicted on a business consumer or competitor of a defendant as an "inaccurate" reading of *Norris*:

> Such a reading of *Norris* is inaccurate. It drastically oversimplifies the question of whether the defendants' activities resulted in antitrust injury. In that case, the Fifth Circuit was commenting less on the dynamics of anticompetitive conduct and more on which parties are most likely to bring suit under the federal antitrust laws. Thus, it was focused on the third element of the standing injury-the issue of whether the plaintiff is a proper party to an antitrust claim. *See Norris*, 500 F.3d at 466 (noting that consumers and competitors are appropriate parties to bring antitrust claims because they are often the only parties injured by the harm to competition caused by antitrust violations). The Fifth Circuit was not stating a bright-line rule for gauging the occurrence of an antitrust injury. While it is typically consumers and competitors who suffer as a result of calculated anticompetitive conduct, this fact alone does not reflexively manifest an antitrust injury.

*Id.* (quoting *Vaughn*, 2010 WL 3488244 at *12).

This Court also addressed *Norris i*n *TravelPass* and held that even if the Court were to accept the defendants' argument that TravelPass was not a competitor, that "would not be determinative of the issue." *TravelPass Grp., L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-153-

RWS-CMC, 2019 WL 5691996, at *23 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS-CMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019). Similarly, here, the Court does not find this argument persuasive.

Both Defendants further contend that Dexon has not alleged antitrust injury because Dexon does not allege injury to or reduced competition in the Relevant Product Markets. Again, Defendants' argument is unpersuasive.

The Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Torrey v. Infectious Diseases Soc'y of Am*., No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *8 (E.D. Tex. Sept. 27, 2018) (citing *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc*., 123 F.3d 301, 305 (5th Cir. 1997) ("Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability.")). "And in 1984, th[e] court explained, albeit in a motion for rehearing, that the antitrust laws do not require a plaintiff to establish a market-wide injury to competition as an element of standing."[22] *Doctor's Hosp.,* 123 F.3d at 305 (citing *Walker v. U–Haul Co.,* 747 F.2d 1011, 1016 (5th Cir.), *modifying,* 734 F.2d 1068 (5th Cir.1984)). Injury to competition then, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claims to survive a motion to dismiss.[23] *TravelPass*, 2019 WL 5691996,

---

[22] In 2015, the Fifth Circuit stated in a footnote that the antitrust injury requirement of antitrust standing is sometimes confused with "injury to competition[,] . . . which is often a component of substantive liability." *Waggoner v. Denbury Onshore, L.L.C.*, 612 Fed. Appx. 734, 736 n. 3 (5th Cir. 2015) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)). The Fifth Circuit in *Waggoner* stated that in the standing context, injury "should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition." *Id.* Recently, the Fifth Circuit again cited *Doctor's Hospital* for the same proposition. *Pulse Network, L.L.C. v. Visa, Inc*., 30 F.4th 480, 493 n. 18 (5th Cir. 2022) (citing *Doctor's Hosp.*, 123 F.3d at 305 (explaining "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace")).

[23] The California Court found no injury based on its finding of no competitive harm. As noted above, Dexon's new allegations plausibly plead competitive harm; moreover, Defendants have not adequately addressed the Fifth Circuit's cases distinguishing between antitrust injury and injury to competition.

at *24 (citing *Games People Play, Inc. v. Nike, Inc.*, No. 1:14-CV-321, 2015 WL 13657672, at *5 (E.D. Tex. Feb. 13, 2015) (citing *Doctor's Hosp.*, 123 F.3d at 305)); *see also Torrey*, 2018 WL 10124894, at *8.

As noted above, antitrust injury does require that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89 (1977). In finding Dexon has sufficiently shown antitrust injury, the Court finds *Pulse Network* instructive. In that case, the Fifth Circuit held Pulse had not shown antitrust injury as to its first theory (PAVD), but it had shown antitrust injury as to its second and third theories (FANF and volume-based agreements). *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491-95 (5th Cir. 2022). In its FANF theory, Pulse alleged the FANF pricing structure used by Visa caused merchants to use its debit network less, decreasing Pulse's revenue. *Id.* at 491. According to Pulse, "Visa uses its market dominance to foist on merchants a high fixed fee they wouldn't ordinarily accept" and "then uses the revenues from that unavoidable upfront fee to artificially lower its per-transaction fees, which effectively forecloses rivals like Pulse from competing." *Id.* In arguing there was no antitrust injury, Visa argued that Pulse was "really harmed only by the increased competition created by FANF (i.e., cheaper per-transaction fees), rather than some anticompetitive aspect of the pricing structure." *Id.* The Fifth Circuit held as follows:

> Pulse claims more than price competition is afoot, though. After the Durbin Amendment loosened Visa's grip on the debit network market, Visa began shedding merchants to Pulse and other networks because its pricing wasn't competitive on a per-transaction basis. Instead of improving its product or competing on price, however, VISA began charging the FANF to merchants—and then using some of those revenues to reduce per-transaction fees. This integrated fee structure, argues Pulse, forces merchants to pay a higher total cost (fixed plus per-transaction fees) than before, and yet Visa's market share and profits have recovered.

This alleged scheme inflicts antitrust injury on Pulse. Under Pulse's theory, it doesn't lose customers to Visa in a fair fight over per-transaction fees. Rather, Pulse loses customers because Visa abuses its dominance in the debit card market. Merchants have no choice but to pay Visa's high fixed monthly fee. They recoup that expense by routing more transactions through Visa's network, which charges lower per-transaction fees than competitors. But Visa can achieve that only by leveraging the upfront fees to artificially deflate its per-transaction fees. We must assume this pricing structure violates the antitrust laws. *See Sanger Ins. Agency* [*v. HUB Intern, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)]; *Doctor's Hosp.*, 123 F.3d at 306. When we do, the link between Pulse's injury and Visa's alleged anticompetitive conduct becomes plain. Pulse is squeezed out of the market because Visa exploits its dominance to impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees. That is textbook antitrust injury. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor ... suffers a distinct injury if it is prevented from selling its product.").

*Id.*

Similar to CDW (Dkt. No. 28 at 19), Visa quoted the Supreme Court's decision in *ARCO*, 495 U.S. 328, for the proposition that antitrust injury does not arise unless a private party is affected by an *anticompetitive* aspect of the defendant's conduct. *Pulse Network*, 30 F.4th at 492. The Fifth Circuit explained that in *ARCO*, the antitrust injury was absent because the plaintiff competitor was not harmed (and instead was benefited) by the anticompetitive aspects of the alleged antitrust violation. *Id.* (further noting *ARCO* discussed predatory pricing in the context of antitrust claims targeting the low prices set by a price-fixing agreement). In *Pulse Network*, Pulse was "injured precisely by the anticompetitive aspects of Visa's conduct, *i.e.*, the integrated FANF structure that excludes Pulse from the market." *Id.* Additionally, Pulse was not challenging FANF because it imposes low or below-cost pricing; rather, it argued that "FANF abuses Visa's market power, specifically by imposing supra-competitive prices on merchants while manipulating prices in a way that excludes competitors from the market." *Id.* at 493.

The Fifth Circuit stated the "Supreme Court has time and again reminded us that analysis 'rest[ing] on formalistic distinctions rather than actual market realities are generally disfavored in

antitrust law.'" *Id.* (quoting *Ohio v. Am. Express Co*., 201 L. Ed. 2d 678, 138 S. Ct. 2274, 2285 (2018) (citation omitted in *Pulse Network*)). The Fifth Circuit would not separate the FANF into separate components when assessing antitrust injury, noting that "Pulse's claimed injury stems directly from the combined effect of those two components—the fixed fee allowing Visa to subsidize its per-transaction fee, imposing supra-competitive overall costs on merchants while excluding competitors from the market."[24] *Id*.

Here, for purposes of this analysis, the Court assumes a violation of the antitrust laws. *See Sanger Ins. Agency v. HUB Intern., Ltd*., 802 F.3d 732, 738 (5th Cir. 2015) (stating in the context of exclusive dealing that "[i]n analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation" (citing *Doctor's Hosp*., 123 F.3d at 306)). At this stage of the litigation, viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury.

The alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp.*, 123 F.3d at 305;[25] *see also Pulse Network*, 30 F.4th at 491 (finding Pulse's incremental exclusion from the relevant market because

---

[24] With regard to the volume-based agreements, which Pulse alleged constituted "exclusive-dealing or quasi-exclusive-dealing agreements" which Visa used to suppress competition and reduce Pulse's market share in PINless transactions, the Fifth Circuit similarly found the district court erred in ruling Pulse lacked antitrust standing to challenge those agreements. *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 494-95 & n.24 (5th Cir. 2022) (holding that Visa's argument "that the agreements merely amount to 'non-predatory price competition'" to be "a merits question" not appropriately resolved on a motion to dismiss.).

[25] In *Doctor's Hospital*, when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc*., 123 F.3d 301, 305 (5th Cir. 1997).

of defendant's alleged anticompetitive conduct "is textbook antitrust injury"); *see also Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor. . . suffers a distinct injury if it is prevented from selling its product.")). The Court finds Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommends this part of Defendants' motions be denied.

## G.    Texas Free Enterprise and Antitrust Act (Count VI)

The Texas Free Enterprise and Antitrust Act ("TFEAA") provides, among other things, that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." *Constr. Cost Data, L.L.C. v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *13 (S.D. Tex. Apr. 24, 2017), *report and recommendation adopted*, No. 4:16-CV-114, 2017 WL 2271491 (S.D. Tex. May 22, 2017) (citing TEX. BUS. & COM. CODE § 15.05(b)). The Texas legislature has directed that the provisions of the Texas Free Enterprise and Antitrust Act are to be construed in harmony with federal judicial interpretation of comparable federal antitrust statutes. *See* TEX. BUS. & COM. CODE ANN. § 15.04 (West). Dexon asserts it has alleged Texas-specific conduct in support of all of its allegations that also state a claim under the TFEAA.

For the reasons outlined above, Dexon's claims under the TFEAA should not be dismissed. The Court recommends this part of Defendants' motions be denied.

## H.    Statute of Limitations concerning Dexon's pre-2018 claims against CDW

## 1.    Parties' assertions

In its motion, CDW asserts the statute of limitations precludes Dexon's pre-2018 claims. According to CDW, because Dexon filed its complaint on April 27, 2022, claims against CDW based on injuries allegedly incurred before April 27, 2018 ("pre-2018 claims") are time-barred.

Dkt. No. 28 at 20. CDW asserts Dexon does not and cannot argue that the statute of limitations should be tolled because Dexon's allegations of a public pattern of conduct by Cisco belie any notion that any part of Cisco's conduct was "secret." *Id.* Dexon responds that CDW is alleged to have taken an action in further of the Cisco-CDW conspiracy in March 2021, which is "clearly within the statute of limitations," and discovery is needed "to determine how long" the conspiracy has been in effect. Dkt. No. 37 at 22.

### 2.    Applicable law

The statute of limitations for antitrust claims is four years. 15 U.S.C. § 15b; *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest II*"), 998 F.3d 190, 196 (5th Cir. 2021). "Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research Inc*., 401 U.S. 321, 338 (1971). "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date. . . ." *Id.* at 339.

"Where the violation is final at its impact, for example, where the plaintiff's business is immediately and permanently destroyed, or where an actionable wrong is by its nature permanent at initiation without further acts, then the acts causing damage are unrepeated, and suit must be brought within the limitations period and upon the initial act." *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126–27 (5th Cir. 1975). However, under the continuing conspiracy theory, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." *Zenith*, 401 U.S. at 338 ("[I]f a plaintiff feels the adverse impact of an

antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date. . . ."); *see also Poster Exchange*, 517 F.2d at 124-25.

To toll the statute of limitations, the plaintiff must show "some act of the defendants during the limitations period [that injured plaintiff's business.]" *Rx.com, Inc. v. Medco Health Sols., Inc*., No. 5:04-CV-227-DF, 2008 WL 11449354, at *6 (E.D. Tex. Mar. 11, 2008), *aff'd sub nom. Rx.com v. Medco Health Sols., Inc.*, 322 Fed. Appx. 394 (5th Cir. 2009) (quoting *Poster Exchange*, 517 F.2d at 128-29 (Where plaintiff complained that defendant excluded it from participation in the standard accessory industry, the Fifth Circuit held that plaintiff failed to demonstrate that it had been refused access to standard accessories within the limitation period, and remanded to the district court to determine "whether there was. . . a mere absence of dealing or whether there was some specific act or word precluding [plaintiff] from obtaining supplies."); also citing *Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc*., 677 F.2d 1045, 1051 (5th Cir. 1982) ("a cause of action accrue[s] whenever the defendant commits an overt act in furtherance of an antitrust conspiracy."); also citing *Bell v. Dow Chemical Co*., 847 F.2d 1179, 1187 (5th Cir. 1988); also citing *Charlotte Telecasters, Inc. v. Jefferson-Pilot Corp*., 546 F.2d 570, 572 (4th Cir. 1976) ("[E]ven when the plaintiff charges a continual refusal to deal, the statute of limitations commences to run from the last overt act causing injury to the plaintiff's business.")). "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Id.* (quoting *Poster Exchange*, 517 F.2d at 127-28) (other citation omitted).

**3.    Discussion**

CDW's statute of limitations argument is premature. Arguing that a claim is time-barred under the statute of limitations is an affirmative defense. *Dollery v. Post Acute Med. Mgmt., L.L.C.*,

No. 6:18-CV-00104, 2022 WL 161333, at *1 (S.D. Tex. Jan. 18, 2022) (citing FED. R. CIV. P. 8(c)(1)). As a general rule, then, the statute of limitations is normally "an issue that must be resolved through discovery and summary judgment or trial." *Id.* (quoting *Frame v. City of Arlington*, 657 F.3d 215, 240 (5th Cir. 2011) (en banc)). This is because "a Rule 12(b)(6) motion typically cannot rely on evidence outside the complaint." *Id.* (quoting *C&C Inv. Props., L.L.C. v. Trustmark Nat'l Bank*, 838 F.3d 655, 660 (5th Cir. 2016)) (other citation omitted). Accordingly, dismissal at the 12(b)(6) stage is proper only "where it is evident from the [complaint] that the action is barred and the [complaint] fail[s] to raise some basis for tolling." *Jaso v. The Coca Cola Co.*, 435 Fed. Appx. 346, 351 (5th Cir. 2011) (quoting *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir.2003)); *Quest II*, 998 F.3d at 196 ("[D]ismissal for failure to state a claim based on the statute of limitations defense should be granted only when the plaintiff's potential rejoinder to the affirmative defense was foreclosed by the allegations in the complaint." (quoting *Jaso*, 435 Fed. Appx. at 352 (internal quotation marks omitted in *Quest II*))).

With only the complaint to rely on, the Court concludes it is not evident that Dexon's pre-2018 claims are time-barred. Dexon's arguments "at best raise fact questions not suitable for disposition under Rule 12(b)(6)." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 256 (5th Cir. 2021) (citing *Quest II*, 998 F.3d at 200 (reversing 12(b)(6) dismissal on statute-of-limitations grounds because Defendants failed to conclusively establish that Plaintiffs should have discovered their injury through a diligent inquiry); cf. *Abdul-Alim Amin v. Universal Life Ins. Co. of Memphis*, 706 F.2d 638, 640 (5th Cir. 1983) ("While a statute-of-limitations defense may be raised in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such a motion should not be granted unless 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief.'" (quoting *Mann v. Adams Realty Co.*, 556 F.2d 288, 293 (5th Cir. 1977)))). The Court recommends this part of CDW's motion be denied without prejudice.

## V.  RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant Cisco Systems, Inc.'s Motion to Dismiss Under Rule 12(b)(6) (Dkt. No. 22) be **DENIED,** with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. It is further

**RECOMMENDED** that Defendant CDW Corporation's Motion to Dismiss the Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 28) be **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**.

<u>Objections</u>

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that

such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

       SIGNED this the 7th day of February, 2023.


_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE