**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| DEXON COMPUTER, INC., | § | |
| | § | |
| Plaintiff | § | |
| | § | CASE NO. 5:22-CV-00053-RWS-JBB |
| v. | § | |
| | § | |
| CISCO SYSTEMS, INC. AND CDW | § | |
| CORPORATION, | § | |
| | § | |
| Defendants. | § | |
| | § | |

## ORDER

Before the Court is Defendants' Objection to the Order Denying Cisco's Motion to Transfer (Docket No. 96), Defendant Cisco's Objection to the Report and Recommendation Denying Cisco's Motion to Dismiss (Docket No. 119), and Defendant CDW's Objections to the February 7, 2023 Report and Recommendation (Docket No. 120). The objections have been fully briefed (Docket Nos. 102, 121, 122), and the Court has heard oral argument regarding them. Docket No. 130.

## BACKGROUND

On April 27, 2022, Plaintiff Dexon filed the above-captioned antitrust case in the Eastern District of Texas (the "Texas Lawsuit"). Plaintiff alleges Defendant Cisco is a monopolist in several worldwide and U.S. markets related to networking equipment and services for the internet and locks in customers who require maintenance with Cisco's SmartNet program to make supracompetitive purchases of routers and ethernet switches. *See, e.g.*, Docket No. 1 (Original Complaint), ¶¶ 23–49. Plaintiff claims that Cisco employed FUD (fear, uncertainty, and doubt) tactics, especially in Texas, to foreclose competitive purchases of any product and maintain

supracompetitive pricing for its products. *Id.*, ¶ 67. According to Plaintiff, in carrying out its scheme, Cisco conspired with Defendant CDW to sell Cisco equipment in the Relevant Networking Markets to maintain its supracompetitive pricing in those Markets and exclude other resellers from making sales in the Relevant Networking Equipment Markets to end-user customers in violation of federal and state antitrust laws. *Id.*, ¶¶ 56–57.

Plaintiff asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id.* at ¶¶ 87–100. Plaintiff also asserts claims under Section 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under Section 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets, and for unlawful attempted monopolization of the Relevant Product Markets against Cisco and under the Texas Free Enterprise and Antitrust Act against Cisco and CDW. *Id.*, ¶¶ 87–128. Plaintiff seeks injunctive relief, damages, and costs in connection with such violations. *Id.*, ¶ 137.

## I.    *California Lawsuit*

Almost two years before Plaintiff filed its current case, Cisco filed suit against Dexon in the Northern District of California. *Cisco Systems, Inc., et al. v. Dexon Computer, Inc.*, Case No. 3:20-cv-4926 (N.D. Cal. filed July 22, 2020) [hereinafter "California Lawsuit"]. In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false designation of origin, and associated state law claims. California Lawsuit, Docket No. 32. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law. *Id.*

On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Docket No. 50; *see also* Texas Lawsuit, Docket No. 21-2. Dexon asserted various antitrust counterclaims among other trademark and tort counterclaims. *Id.* On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc*. (*Cisco I*), No. 20-cv-04926-CRB, 2021 WL 5848080, at *1, *9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Docket No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Docket No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims. *See Cisco Sys., Inc. v. Dexon Computer, Inc*. (*Cisco II*), No. 20-cv-04926-CRB, 2022 WL 797015, at *1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at *4, *8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Dexon's Third Amended Counterclaims"). California Lawsuit, Docket No. 107. Once again, Dexon chose not to re-plead any antitrust claims. *See id.*; *see also* Texas Lawsuit, Docket No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule 12(b)(6). *See* California Lawsuit, Docket No. 117; *see also* Texas Lawsuit, Docket No. 21-7.

That same day, Dexon filed its Original Complaint in this Court, asserting antitrust causes of action. As it did in the California Lawsuit, Dexon brings against Cisco a *per se* tying claim under § 1 of the Sherman Act (Docket No. 1, Count III) and monopolization claims under § 2 of

the Sherman Act (Docket No. 1, Counts IV, V). On June 21, 2022, the California Court entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.* (*Cisco III*), No. 20-CV-04926-CRB, 2022 WL 2222962, at *1 (N.D. Cal. June 21, 2022).

## II.    Cisco's Motion to Transfer

On June 23, 2022, Cisco filed its motion to transfer, requesting the case be transferred to the Northern District of California pursuant to the first-to-file rule. Docket No. 21.  Cisco argues most of the antitrust claims that Dexon asserts in this matter are nearly identical to the counterclaims that the Northern District of California dismissed in the California Lawsuit almost nine months earlier. *Id.* at 3–4. Cisco further asserts the factual allegations in the present complaint are materially the same as the allegations contained in Dexon's California Counterclaims which were later amended without the antitrust allegations. *Id.* at 4. Cisco contends the two pleadings are substantially similar, and "comity and sound administration of justice demand that Dexon's complaint be transferred." Docket No. 31 at 2. CDW filed a notice of joinder to Cisco's motion, joining in, and adopting as its own, the arguments made in Cisco's motion to transfer. Docket No. 27.

On December 22, 2022, the Magistrate Judge entered an order denying Cisco's motion to transfer. Docket No. 94 [hereinafter "Order"]. After setting forth the law applicable to the first-to-file rule (*id.* at 5–7) and the parties' assertions (*id*. at 7–8), the Order stated a "survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California

suit." *Id.* at 8. Defendants have filed an objection (Docket No. 96), and Dexon has filed a response to the objection (Docket No. 102).

### III.    Defendants' Motions to Dismiss

Cisco filed a motion to dismiss asserting Dexon's present claims are precluded by true res judicata or claim preclusion. *See* Docket No. 22 at 12–13. Cisco further asserts Dexon's antitrust claims fail on the merits. Specifically, Cisco asserts as follows: (1) Dexon fails to allege an actionable conspiracy claim and parallel state law claim (Counts I–II, VI) because Dexon does not allege any actionable agreement; (2) Dexon fails to allege an actionable tying claim and parallel state law claim (Counts III, VI) because Dexon does not allege any foreclosure; (3) Dexon fails to allege an actionable monopolization claim and parallel state law claim (Counts IV–VI) because Dexon fails to allege any exclusionary conduct; and (4) Dexon lacks antitrust injury (Counts I–VI).

CDW filed its own motion to dismiss in which it joins in and adopts as its own the arguments and assertions made by Cisco and also focuses on the facts most relevant to Dexon's claims against it. Docket No. 28 at 1, n. 1. Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. *Id.* at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

On the merits, CDW contends Dexon's Sherman Act (and parallel state law) claims against CDW (Counts I, II) should be dismissed for the following reasons: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to allege specific intent by CDW to monopolize. CDW further

asserts Dexon fails to establish an antitrust injury. Finally, CDW argues Dexon's pre-2018 claims are time-barred.

The Magistrate Judge issued a Report and Recommendation, recommending Defendant Cisco's Motion to Dismiss (Docket No. 22) be denied, with the part of the motion seeking dismissal under true res judicata being denied without prejudice. Docket No. 107 [hereinafter "R&R"] at 81. The R&R further recommended Defendant CDW's Motion to Dismiss (Docket No. 28) be denied, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being denied without prejudice. *Id.* As to CDW's specific intent to monopolize, the Magistrate Judge recommended that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, within thirty days from the date of entry of any such Order Adopting, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize. *Id.* at 44. Dexon has not filed objections to the R&R. Both Cisco and CDW have filed objections to the R&R. Docket Nos. 119, 120. Dexon has filed responses to the Defendants' objections. Docket Nos. 121, 122.

## LEGAL STANDARD

### I.      Standard of Review

Defendants' objection to the Magistrate Judge's Order is governed by Rule 72(a), which provides, in pertinent part, that "[t]he district judge . . . must . . . modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

A district court conducts a *de novo* review of any portion of a magistrate judge's report and recommendation to which any party files an objection. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3); *Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000). After conducting a *de novo* review,

the district court may accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); Fᴇᴅ. R. Cɪᴠ. P. 72(b)(3).

## II.    First-to-File Rule

The first-to-file rule is a discretionary doctrine resting on "principles of comity and sound judicial administration." *Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at *4 (E.D. Tex. Jan. 6, 2023) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)). It has long been recognized that "the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *Id.* (quoting *Save Power*, 121 F.3d at 950 (quoting *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985))). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* (quoting *W. Gulf Maritime Ass'n*, 751 F.2d at 729). As applied, the first-to-file rule is "forward-looking," seeking to preserve judicial resources and avoid inconsistent results by ensuring that "substantially overlap[ping]" issues are decided in the same federal forum. *Id.* (quoting *Cadle*, 174 F.3d at 603–04).

Application of the first-to-file rule does not require that the cases at issue be identical or that all of the same parties be involved in both actions. *Id.* (citing *Save Power*, 121 F.3d at 950–51). Instead, to decide whether substantial overlap exists, courts have looked at factors such as whether the core issue in each case is the same or if much of the proof adduced would likely be identical. *Id.* (citing *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (citing *W. Gulf Maritime Ass'n*, 751 F.2d at 729; *Mann Mfg., Inc. v. Hortex Inc.*, 439 F.2d

403, 407 (5th Cir. 1971))). When the overlap between claims is less than complete, courts consider several additional factors, including the extent of the overlap, the likelihood of conflict, and the "comparative advantage and interest of each forum in resolving the dispute." *Id*. (citing *Sweet Little Mexico*, 665 F.3d at 678) (internal quotations omitted). These additional factors are applied on a "case by case" basis. *Id*. (internal quotations omitted).

### III.     Res Judicata, Generally

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Clyce v. Farley*, 836 Fed. Appx. 262, 267 (5th Cir. 2020). "The rule of res judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1087 (5th Cir. 2022). "True res judicata bars the litigation of claims that either have been litigated or should have been raised in an earlier suit, while collateral estoppel precludes relitigation of only those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action." *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 505–06 (N.D. Tex. 2021), *appeal dismissed*, No. 21-10580, 2021 WL 8776378 (5th Cir. Dec. 28, 2021) (internal citations and quotations omitted).

Res judicata is an affirmative defense principally raised in a party's responsive pleading. *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) (citing Fed. R. Civ. P. 8(c)(1)) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including . . . res judicata."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570

n.2 (5th Cir. 2005) ("[G]enerally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense."). "Although courts have considered res judicata and related preclusion principles on a motion to dismiss under Rule 12(b)(6), the Fifth Circuit has held that generally a res judicata contention cannot be brought in a motion to dismiss." *Parker v. Buckley Madole, P.C.*, No. 4:17-CV-00307-ALM-CAN, 2018 WL 1704079, at *4 (E.D. Tex. Jan. 11, 2018), *report and recommendation adopted*, No. 4:17-CV-307, 2018 WL 1625670 (E.D. Tex. Apr. 4, 2018) (citing *Segatto v. JPMorgan Chase Bank, N.A.*, No. 4:16-CV-00712-ALM, 2016 WL 7664306, at *3 (E.D. Tex. Dec. 16, 2016), *report and recommendation adopted*, No. 4:16-CV-712, 2017 WL 67944 (E.D. Tex. Jan. 6, 2017) (Mazzant, J.) (citing *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Test Masters*, 428 F.3d at 570 n.2)). Claim preclusion is generally an affirmative defense best resolved at summary judgment or trial. *Seven Networks, L.L.C. v. Motorola Mobility L.L.C.*, No. 3:21-CV-01036-N, 2022 WL 426589, at *2 (N.D. Tex. Feb. 10, 2022).

However, the Fifth Circuit has held that "[d]ismissal under Rule 12(b)(6) on res judicata grounds is appropriate when the elements of *res judicata* are apparent on the face of the pleadings." *Stevens*, 17 F.4th at 571 (quoting *Murry v. Gen. Servs. Admin.*, 553 Fed. Appx. 362, 364 (5th Cir. 2014) (per curiam) (unpublished) (citing *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994))); *see also Kansa*, 20 F.3d at 1366 ("[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate."). "With respect to a specific affirmative defense such as res judicata, the rule seems to be that if the facts are admitted or are not controverted or are conclusively established so that nothing further can be developed by a trial of the issue, the matter must be disposed of upon a motion to dismiss." *Madison v. Health Care Servs. Corp.*, No. W-20-CV-00835-ADA-DTG, 2022

WL 14225447, at *2 (W.D. Tex. Oct. 24, 2022), *report and recommendation adopted*, No. 6:20-CV-00835-ADA-DTG, 2022 WL 17732718 (W.D. Tex. Dec. 9, 2022) (quoting *Larter & Sons, Inc. v. Dinkler Hotels Co*., 199 F.2d 854, 855 (5th Cir. 1952)).

### IV.   Claim Preclusion (True Res Judicata)

Claim preclusion, or true res judicata, is a "venerable legal canon" that "insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits." *Clyce*, 836 Fed. Appx. at 267–68. Claim preclusion applies where (1) the parties to both actions are identical or are in privity; (2) the first judgment is rendered by a court of competent jurisdiction; (3) the first action resulted in a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Id.* at 268.

The Fifth Circuit uses the transactional test to determine whether two suits involve the same claim or cause of action as required by the fourth element above. *Warren v. Mortg. Elec. Registration Sys., Inc*., 616 Fed. Appx. 735, 738 (5th Cir. 2015). This test requires a court to consider whether the two cases are based on "the same nucleus of operative facts." *Id*. "The nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted, defines the claim." *Id.* If both cases are based on the same nucleus of operative facts, "the prior judgment's preclusive effect extends to all rights the original plaintiff had with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.*

### V.   Issue Preclusion (Collateral Estoppel)

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action" and thus "'prevent[s] repetitious litigation of what is essentially the same dispute,'" in addition to "'conserving judicial resources, [] maintaining

consistency, and [] avoiding oppression or harassment of the adverse party.'" *Hacienda Records, L.P. v. Ramos*, 718 Fed. Appx. 223, 228 (5th Cir. 2018) (per curiam) (internal quotations and citations omitted). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 788 F. Supp. 2d 523, 532 (S.D. Tex. 2011) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 328 (1979)). CDW's arguments here concern defensive non-mutual collateral estoppel.

Under Fifth Circuit law, collateral estoppel or issue preclusion requires that: (1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair. *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citing *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions*, 751 F.3d 684, 689 (5th Cir. 2014)). Courts do not consider special circumstances when "both parties were involved" in the prior suit. *ETC Sunoco Holdings, L.L.C. v. United States*, 36 F.4th 646, 649 (5th Cir. 2022).

## VI.     Rule 12(b)(6) Pleading Standard

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the

complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.'" *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## DISCUSSION

### I.      Cisco's Motion to Transfer

The Court now reviews for clear error the Magistrate Judge's Order (Docket No. 94) denying the motion to transfer in light of Defendants' objections (Docket No. 96) to the Order.

The issue is whether to apply the first-to-file rule here, where there are no antitrust claims pending in the California Lawsuit. In the December 22, 2022 Order, the Magistrate Judge pointed out that Cisco and Dexon both rely upon *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir.1999). Order at 11. Courts have recognized that *Cadle* stands for the proposition that there must be two actions "pending *at the same time*." *Olaoye v. Wells Fargo Bank NA*, No. 3:12-CV-4873-M-BH, 2013 WL 5422888, at *1 (N.D. Tex. Sept. 27, 2013) (emphasis in original) (citing *Akins v. Worley Catastrophe Response, L.L.C.*, 921 F.Supp.2d 593, 598 (E.D. La. 2013); *J2 Global Communications, Inc. v. Protus IP Solutions, Inc.*, 2008 WL 5378010, *3 n. 3 (E.D. Tex. Dec.23, 2008)). Pointing out that neither party disputes that requirement, the Magistrate Judge stated the relevant question is whether the co-pending actions must also have co-pending claims that are substantially similar. Order at 11.

According to Cisco's reply in support of its motion to transfer, although Dexon's antitrust counterclaims are no longer pending in the California Lawsuit, "Dexon ignores that the *case* in which it filed its antitrust counterclaims *is* pending—to be sure, its counterclaims have been dismissed, but the case continues." Docket. No. 31 at 1 (emphasis in original). However, according to the Magistrate Judge, a "survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California suit." Order at 8.

In so finding, the Magistrate Judge found instructive *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd*., Case No. 2:20-CV-00003-JRG, 2020 WL 6889173 (E.D. Tex. Nov. 24, 2020). In that case, the SIMO plaintiffs filed suit in the Eastern District of Texas, alleging misappropriation of trade secrets by the uCloudlink defendants. *SIMO Holdings*, 2020 WL 6889173 at *1. Previously, SIMO had filed trade secret counterclaims against Hong Kong uCloudlink in a separate action in the Northern District of California. *Id.* However, the California court dismissed those counterclaims with prejudice on September 12, 2019, but the case remained pending. *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd*., Case No. 2:20-cv-0003 [hereinafter "*SIMO* Texas Case"], Docket No. 27-1 (E.D. Tex. July 8, 2020). In the Texas case, Defendant Hong Kong uCloudlink moved to transfer the plaintiffs' trade secret claims to California under the first-to-file rule and 28 U.S.C. § 1404. *SIMO Holdings*, 2020 WL 6889173 at *4–5.

The procedural posture here tracks *SIMO Holdings*. The *SIMO Holdings* California court initially dismissed SIMO's trade secret claims without prejudice, giving SIMO leave to amend and re-plead with more specificity. *SIMO* Texas Case, Docket No. 27 at 4–5. "SIMO re-pled these trade secret claims, focusing on a conspiracy between Wang Bin and uCloudlink. Again, the California court dismissed them, this time with prejudice, finding 'they do not establish a plausible allegation of a conspiracy.'" *Id.* (emphasis in original). Hong Kong uCloudlink argued that SIMO's trade secret claims in the Texas case, to the extent they were not dismissed, should be transferred to California under the first-to-file rule. *Id.* at 9 ("Similarly, there is substantial overlap between the trade secret claims brought here and the trade secret claims disposed of by the California court. And the California action is indisputably the first-filed action with respect to these same trade secret claims."). Like Dexon, the SIMO plaintiffs opposed transfer of the trade secret

**Page 14 of 66**

claims, asserting the first-to-file rule was inapplicable because the "trade secret counterclaims were dismissed in the California Action." *SIMO* Texas Case, Docket No. 38 at 1–2 (E.D. Tex. Sept. 9, 2020). Thus, the plaintiffs argued there were "no overlapping pending claims in California and therefore no risk of duplication." *Id*. at 2. In its reply, Hong Kong uCloudlink argued, similar to Cisco here, that the plaintiffs, not liking the resolution in California, brought the same trade secret claims in Texas. *SIMO* Texas Case, Docket No. 43 at 2 (E.D. Tex. Sept. 16, 2020). According to Hong Kong uCloudlink, "SIMO's forum shopping and attempted re-litigation are the very concerns underlying the first-to-file rule." *Id*. The *Simo Holdings* Court addressed the issue, holding as follows:

> Hong Kong uCloudlink moved for the transfer of Plaintiffs' trade secret claims to California on the basis that "there is substantial overlap between the trade secret claims brought [in the Eastern District of Texas] and the trade secret claims disposed of by the California court." . . . In response, Plaintiffs point out that the California Action is no longer pending, and thus the first-to-file rule is inapplicable. (Dkt. No. 38 at 1–2). As Hong Kong uCloudlink admits in its Motion to Transfer, the trade secret claims were disposed of by the California court. The first-to-file rule only applies in instances where there are concurrent, pending proceedings in different federal courts, and moreover, the Court responding to the motion has discretion to apply the rule. *See Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) ("[T]here are principles ... which govern in situations involving the contemporaneous exercise of concurrent jurisdictions ...") (emphasis added); *see also Cadle Co.*, 174 F.3d at 603 ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it ..."). Accordingly, the Court is not compelled to transfer the trade secret claims under the first-to-file rule and does not do so here.

*SIMO Holdings*, 2020 WL 6889173, at *4.

Although the California Lawsuit is still pending, Dexon's antitrust claims are no longer pending in California. Thus, the California Lawsuit does not contain a co-pending legal action that is sufficiently similar to the claims contained in the current case to justify invoking the first-to-file rule and transferring this suit to California. Like *SIMO Holdings*, the Magistrate Judge held the Court is not compelled to transfer the antitrust claims under the first-to-file rule. Order at 10.

In their objections, Defendants assert *SIMO Holdings* does not support the Order's construction of the first-to-file rule because *SIMO Holdings* did not substantively rule on the precise issue before this Court. *See* Docket No. 21 at 3. Defendants acknowledge that *SIMO Holdings* held the first-to-file rule was inapplicable in a situation where the counterclaims (but not the entire case) had been dismissed in the first-filed action. *See id.* at 3–4. The Magistrate Judge noted that Hong Kong uCloudlink had filed a motion for reconsideration, asserting the court's decision was based on an incorrect premise (*SIMO* Texas Case, Docket No. 68 at 1 (E.D. Tex. Jan. 25, 2021) because other claims remained pending in the California case. Order at 10, n. 6. Notably, the Magistrate Judge further pointed out that Hong Kong uCloudlink argued in urging reconsideration that the overlap between the Texas case and the California case extended beyond the trade secret claims and attached examples of the pleadings from the two cases in an attempt to demonstrate substantial overlap, including a reference to SIMO's live answer and counterclaims in the California case. *Id.*

In their objection, Defendants state the *SIMO Holdings* Court denied reconsideration because the movant's argument that "the California case remains pending" came too late; thus, Defendants assert the *SIMO Holdings* Court did not rule on the merits. Docket No. 96 at 4. However, Defendants do not address the Magistrate Judge's larger point as raised in the footnote and throughout the December 22, 2022 Order. Namely, the proper point of comparison for purposes of determining substantial similarity is between the presently pending claims in California and Dexon's antitrust claims.[1] Indeed, nowhere in their objections do Defendants argue

---

[1] Although not raised in Defendants' objections, Cisco also cited *Young v. L'Oreal USA, Inc.,* 526 F.Supp.3d 700, 706 (N.D. Cal. 2021), and *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*, No. 3:15-CV-3648-B, 2016 WL 3688631 (N.D. Tex. July 11, 2016) in support of their motion to transfer arguments. But those cases do not address the scenario here. *See* Order at 11–12.

their presently pending claims in California are substantially similar to Dexon's antitrust claims in this case.

In their objections, Defendants assert, as they did in their prior briefing, that *Cadle* supports their position. Defendants contend *Cadle* makes clear that when the first-filed case is still pending, avoiding inconsistent rulings concerning issues already decided by other courts "is among the concerns that the first-to-file rule addresses: as the Fifth Circuit explained, the first-to-file rule avoids the possibility of a (future) ruling that either 'conflict[s] with' or 'rehash[es] an issue already decided' by the first-filed court." Docket No. 96 at 2 (quoting *Cadle*, 174 F.3d at 604). According to Defendants, "Dexon's antitrust claims overlap with (indeed, are virtually identical to) those it brought in the Northern District of California. Accordingly, [Defendants argue] this Court will be required to determine the legal sufficiency of antitrust allegations that the California court has already dismissed for failure to state a claim." *Id.*

In the December 22, 2022 Order, the Magistrate Judge held as follows:

> Here, there are no risks of inconsistent judgments seeing as the first-filed antitrust counterclaims were dismissed without prejudice. Although the California court issued a substantive ruling, it also allowed Dexon leave to amend. Dexon's amended counterclaims did not include the antitrust claims that are now alleged in this case. Those counterclaims were not part of the operative complaint which was eventually dismissed with prejudice in California. Because there are no longer two pending antitrust "actions," there is little risk of duplicative work or unnecessary burden on the judiciary in refusing to transfer.

Order at 12. According to Defendants' objection, the Magistrate Judge erred in concluding "there are no risks of inconsistent judgments" because the first-filed antitrust counterclaims were dismissed without prejudice. Order at 12. Specifically, Defendants assert as follows:

> Not only did the California court dismiss Dexon's antitrust claims (and characterize those it filed here as "duplicative"), but it also stated that Dexon's third-amended counterclaims would be its "last." *See* Mot. To Transfer, Dkt. 21 at 3–6; Order 4 n.4. Allowing Dexon to evade these rulings would "trench[] on the authority of [a] sister court." *Cadle*, 174 F.3d at 606.

To the extent the Order relied on the fact that there is no technically preclusive judgment in the earlier filed action, as its reference (at 12) to dismissal "without prejudice" suggests, that too is incorrect—because Dexon failed to re-assert its antitrust counterclaims in three successive amendments, the later dismissal with prejudice applies to its antitrust counterclaims as well. *See* Mot. To Dismiss, Dkt. 22 at 11–13. More importantly, it is beside the point. Transfer is not limited to circumstances where preclusion applies. *See, e.g., Cadle*, 174 F.3d at 603–04 (distinguishing preclusion and the first-to-file rule).

The Order's statement (at 12) that there is "little risk of duplicative work or unnecessary burden" from allowing this case to proceed is also clear error. Cisco has already moved to dismiss the same claims twice in different courts; this Court will have to address a motion to dismiss hardly different from one that the California court already granted; and the parties are engaged in discovery on claims the California court has held are legally insufficient. Moreover, Dexon's illegal conduct—the basis for Cisco's claims in the California court—is a defense to Dexon's antitrust claims. Cisco should not be forced to litigate those intertwined questions in two different courts, and Dexon should be barred from changing the locus of that controversy.

Docket No. 96 at 5.

Defendants' objection to the December 22, 2022 Order reiterates the same arguments Cisco previously made but without addressing the Magistrate Judge's reasoning indicating the first-to-file rule does not fit here. As suggested by the Magistrate Judge, Defendants' argument fails to address that the first-to-file rule is a "forward-looking doctrine" used to "maximize" "the values of economy, consistency, and comity."[2] *Cadle*, 174 F.3d at 604. And Defendants' citations

---

[2] In a footnote, the Magistrate Judge stated as follows:

> Cisco appears to acknowledge this by reframing the first-to-file rule as a tool to prevent this Court from issuing rulings that are inconsistent with the reasoning expressed in the dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 21 at 11–13. Broadly expanding the first-to-file rule to look *backward* as Cisco urges is not the appropriate solution for that concern. As explained at the hearing, this Court will not be a "super appellate court" to the California Court. Dkt. No. 62 at 74:6–22.

Order at 14, n. 8.

to *Cadle* in their objections actually address the Fifth Circuit's decision declining to add a jurisdictional requirement to the first-to-file rule—not any statement that the first-to-file rule functions as a backward-looking doctrine. *See* Docket No. 96 at 2 (citing *Cadle*, 174 F.3d at 604). Moreover, it bears noting that the portion of *Cadle* that Defendants cite, entitled "The Relationship Between the First–To–File Rule and Collateral Estoppel," distinguishes the forward-looking first-to-file rule from the backward-looking doctrine of collateral estoppel. *Id.* (citing *Cadle*, 174 F.3d at 603–04).

Defendants also fail to address the Magistrate Judge's determination that the proper analysis to determine substantial similarity is to compare (i) Cisco's currently pending IP claims against Dexon in California and (ii) Dexon's present antitrust claims in this Court. According to Dexon's response to Defendants' objection, the first-to-file rule does not apply when, as here, "the allegedly substantially similar claims are not pending before the first-filed court." Docket No. 102 at 1. The Court agrees.

The Magistrate Judge correctly found that the proper comparison for application of the forward-looking first-to-file rule is between Cisco's presently pending IP claims in California and Dexon's antitrust claims in this Court. *See United States v. Texas*, No. EP-21-CV-173-KC, 2022 WL 499861, at *1 (W.D. Tex. Jan. 11, 2022) ("Defendants argue that the issues presented substantially overlap with those in *Texas v. Biden* . . . However, Defendants base that argument on the content of the original Complaint in *Texas v. Biden* . . . As discussed, that Complaint is no longer operative, as Texas has filed an Amended Complaint in *Texas v. Biden* that challenges a different set of federal government actions. Because the allegations in the case before the Northern District have changed, Defendants' Motion . . . is DENIED as moot."); *see also Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at *5 (E.D. Tex. Jan.

6, 2023) ("Encore's false advertising declaratory claim pending in this Court (and for that matter, Copperweld's Lanham Act and unfair competition counterclaims) do not substantially overlap with the antitrust claims pending in the Alabama action."); *see also L-3 Commc'n Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL 89659, at *2 (N.D. Tex. Jan. 8, 2008).

This Court has stated the factors relevant to whether substantial overlap exists include whether "the core issue" in each case is the same and whether "much of the proof adduced . . . would likely be identical."[3] *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019) (citing *Sweet Little Mexico*, 665 F.3d at 678 (citation omitted in *TravelPass*) (alterations in original)). "Where the overlap between two suits is less than complete, the judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Id.* (quoting *Stannard v. Nat'l Indoor RV Centers, L.L.C.*, No. 4:18-CV-00366, 2018 WL 3608560, at *1 (E.D. Tex. July 27, 2018) (quoting *Save Power*, 121 F.3d at 951).

The Magistrate Judge analyzed each of the relevant factors and found that there was no substantial overlap. After comparing Cisco's still-pending claims in California and the Sherman Antitrust claims currently alleged by Dexon in this Court, the Magistrate Judge noted as follows:

> In the California Lawsuit, Cisco alleges claims of trademark infringement, trademark counterfeiting, false designation of origin, and associated state law

---

[3] In *TravelPass*, although both pending cases contained similar allegations regarding the existence of an unlawful agreement between the five hotel companies in violation of antitrust laws, the Court agreed with the Magistrate Judge that the cases did not substantially overlap. While the cases were related, there are many significant differences (different claimants, claims, allegations, defenses, defendants, witnesses and damages) between them. *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019).

claims, asserting that Dexon allegedly "engaged in schemes to traffic counterfeit Cisco products." *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 541 F. Supp. 3d 1009, 1013 (N.D. Cal. June 1, 2021). In the current Texas Lawsuit, Dexon alleges five claims under the Sherman Antitrust Act and one claim under the Texas Free Enterprise and Antitrust Act, including allegations of a conspiracy between Cisco and CDW to monopolize and to suppress inter-brand and intra-brand competition from entities like Dexon.

Order at 13. The Magistrate Judge stated the "core issues" in the two forums are not the same, and the "proof adduced" will not be identical. *Id.* at 14 (citing *Sweet Little Mexico*, 665 F.3d at 678). The Magistrate Judge concluded that "Cisco has not shown how any ruling by this Court will affect the California Lawsuit, which concerns different issues, much less the risk of piecemeal litigation or inconsistent outcomes." *Id.* (citing *Cadle*, 174 F.3d at 604; *BNSF Ry. Co. v. OOCL (USA), Inc*., 667 F. Supp. 2d 703, 709 (N.D. Tex. 2009)).

In large part, Defendants object to the Magistrate Judge's interpretation of the first-to-file rule but do not expressly object to the Magistrate Judge's finding of a lack of substantial similarity between the claims pending in the instant case and the claims pending in California. *See* Docket No. 96 at 1–4. Defendants otherwise resort to policy arguments. *See id.* at 4–5. In making those policy arguments, Defendants cite only *Cadle*. *See id.* at 4–5 (citing no further case law other than *Cadle*, 174 F.3d at 603-04, 606). But instead of citing *Cadle* for any instructive rule in this instance, Defendants cite *Cadle* to highlight the principles of economy, consistency and comity underlying the first-to-file rule and collateral estoppel doctrine (both of which *Cadle* discusses). *See id.*

The Court does not minimize—or ignore—those important policy considerations but agrees with the Magistrate Judge that the cases do not substantially overlap, and application of the first-to-file rule is inappropriate. Dexon's antitrust claims pending in this Court do not substantially overlap with the claims currently pending in California. And hearing Dexon's antitrust claims in this case does not threaten to undermine the principles of comity and judicial economy underlying

the first-to-file rule. *See W. Gulf Maritime Ass'n*, 751 F.2d at 728 (recognizing that the first-to-file rule requires the federal courts "to exercise care to avoid interference with each other's affairs"). Accordingly, Defendants' Objection (Docket No. 96) to the Magistrate Judge's Order is **OVERRULED**.

## II.     Defendants' Motions to Dismiss

The Court has reviewed the pleadings, motions to dismiss, R&R, objections to the motions to dismiss, and relevant briefing. Based on the Court's review of the unobjected to-portions of the R&R, the Court is of the opinion the unobjected-to findings and conclusions of the Magistrate Judge's R&R (including, but not limited to, those related to CDW's specific intent to monopolize) are correct and are hereby **ADOPTED** as the opinion of the District Court.

The Court now conducts a *de novo* review of the objected-to portions of the Magistrate Judge's Report recommending to deny Defendants' motions to dismiss.

### A.     *Claim Preclusion (True Res Judicata)*

**Report and Recommendation.** In the R&R, the Magistrate Judge found Cisco's true res judicata arguments are premature at the Rule 12(b)(6) stage; thus, the Magistrate Judge recommended the Court deny the part of Cisco's motion for dismissal on true res judicata grounds without prejudice to refiling. R&R at 22–23 (citing *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434-DAE-ML, 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021), *report and recommendation adopted as modified*, No. 1:20-CV-434-DAE, 2021 WL 8442028 (W.D. Tex. July 2, 2021); also citing *Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018) (finding that "Plaintiffs have a plausible claim and res judicata would be better addressed at a later stage in the proceeding")); *see also* R&R at 26. According to the Magistrate

Judge, even if the Court were to address the applicability of true res judicata at this early stage, "the Court would have serious concerns as to whether Cisco, on its current briefing, could show the third and fourth elements for true res judicata." *Id.* at 23.

Regarding the third element, requiring final judgment on the merits, the Magistrate Judge noted the California Court dismissed Dexon's initial set of counterclaims (which included its California antitrust counterclaims) with leave to amend and that Dexon's next amended counterclaims, which were eventually dismissed with prejudice, did not include any antitrust allegations. R&R at 23. The Magistrate Judge was not persuaded the California Court's dismissal was a final adjudication on the merits with preclusive effect. The Magistrate Judge discussed *Eldridge v. Kohls Dep't Stores, Inc.*, No. CIV-20-158-R, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), the case relied upon by Cisco in its motion to dismiss, stating the unique circumstances in that case limits its application to the instant case where Dexon added new claims, legal theories, and "non-trivial factual allegations" that were not alleged in the California Lawsuit. R&R at 24.

Regarding the fourth element, whether the same claim or cause of action is involved in both suits, the Magistrate Judge listed the new claims and facts alleged in this lawsuit which were not alleged in the California Lawsuit and held "Cisco fails to show that the claims here arise out of the same nucleus of operative facts as [Dexon's] initial counterclaims in California." *Id.* at 25.

**Cisco's assertions.** In its objections, Cisco states the Court can decide true res judicata[4] at the dismissal stage because the R&R took judicial notice of the filings in the California Lawsuit (R&R at 15, n.3) and "all of the relevant facts are contained in the record before [the court] and are uncontroverted." Docket No. 119 at 2 (citing *R&R Motorsports, L.L.C. v. Textron Specialized*

---

[4] Cisco often uses the term "claim splitting" in its briefing even though that doctrine is not wholly equivalent to claim preclusion. The R&R pointed out that Cisco fundamentally relies on claim preclusion (R&R at 21 n. 8), and Cisco did not object to that finding.

*Vehicles, Inc.*, 2022 WL 4379515, at *2 (E.D. La. Sept. 22, 2022) (brackets in original) (granting 12(b)(6) motion on res judicata grounds); also citing *McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264–65 (5th Cir. 2018) (per curiam) (affirming 12(b)(6) dismissal on res judicata grounds)). According to Cisco, *Anderson*, 958 F.3d at 314–15, wherein the Fifth Circuit affirmed a dismissal based on true res judicata, does not support the R&R's conclusion that "Dexon can prolong this case simply by objecting." Docket No. 119 at 2.

Substantively, Cisco asserts the California Court's earlier dismissal of Dexon's antitrust counterclaims with leave to amend satisfies the third element (the finality requirement) for claim preclusion.[5] Relying for the first time in its objections on a Third Circuit case, *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272 (3d Cir. 2016), Cisco asserts that the California Court's decision in *Cisco I*, 2021 WL 5848080, has preclusive effect because Dexon did not re-assert its antitrust counterclaims when granted leave to do so. Docket No. 119 at 2.

Regarding the fourth element, Cisco states Dexon's complaint in this case arises out of the same nucleus of operative facts as the California counterclaims. *Id*. at 3. According to Cisco, although the California counterclaims did not include allegations about the Texas bank, energy

---

[5] In its objections, Cisco states the R&R misunderstands "Cisco's argument for finality of the California court's rulings: those rulings are preclusive not only because Dexon failed to amend its antitrust counterclaims when given the chance . . . but also because the California court dismissed Dexon's remaining counterclaims with*out* leave to amend . . ." Docket No. 119 at 1 (emphasis in original).

The R&R did not misunderstand Cisco's argument. The R&R cited it, providing the following summary of Cisco's finality argument:

> "The California Court eventually dismissed with prejudice Dexon's amended counterclaims. Cisco claims that final dismissal with prejudice meets the finality requirement of claim preclusion because Dexon could have, but chose not to, replead its initial set of antitrust counterclaims. Dkt. No. 32 at 1–2."

R&R at 23.

company, or car dealership, "that conduct is of a piece with the conduct that Dexon did allege, pre-dates the California court's ruling, and could have been asserted there." *Id.* at 4.

*De novo* **review.** The Court agrees with the R&R that dismissal on claim preclusion grounds at this stage would be premature and that the part of the motion seeking dismissal under true res judicata should thus be denied without prejudice. Here, Cisco's argument that Dexon's claims are barred by true res judicata is inappropriate at this early stage of the case. *See Madison*, 2022 WL 14225447, at \*2. Looking to the pleadings and viewing them in the light most favorable to Dexon, a true res judicata defense does not appear "clearly on the face of the pleadings to warrant dismissal under 12(b)(6)." *See id.* The Court finds Dexon has a plausible claim and true res judicata would be better addressed at a later stage in the proceeding. *See Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at \*9 (E.D. Tex. Jan. 8, 2018).

Cisco's claim preclusion defense, as currently raised at this early stage of the proceeding, also lacks merit. It is not clear that *Cisco I* satisfies the finality requirement, even considering the reasoning—which Cisco cites for the very first time in its objections—provided by the Third Circuit in *Hoffman*, 837 F.3d at 272. Discussing *Hoffman*, the Third Circuit recently explained that claim preclusion's requirement of a "judgment on the merits" is "better understood in terms of its functional equivalent: whether a dismissal is with prejudice." *Smith v. Kershentsef*, 843 Fed. Appx. 447, 449 (3d Cir. 2021) (quoting *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020)). Thus, "[a] dismissal with prejudice operates as an adjudication on the merits, so it ordinarily precludes future claims." *Id.* (quoting *Papera*, 948 F.3d at 611 (internal quotation marks omitted in *Smith*)). On the other hand, a dismissal without prejudice does not operate as an adjudication on the merits and therefore does not have a claim-preclusive effect. *Id.*

In determining whether an order was a final judgment for jurisdictional purposes, the Third Circuit in *Hoffman* held a plaintiff can convert a dismissal "without prejudice" into a final order by "declar[ing] his intention to stand on his complaint." *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 279 (3d Cir. 2016). However, in *Hoffman*, the order dismissing without prejudice was self-effectuating and automatically converted to a dismissal with prejudice when the appellant did not file an amended complaint within the mandated deadline.[6] *Smith*, 843 Fed. Appx. at 450, n. 4 (citing *Hoffman*, 837 F.3d at 279–80); *see also id.* at 449-50 (citing *Weber v. McGrogan*, 939 F.3d 232, 240 (3d Cir. 2019) (noting "a 'self-effectuating' order is one that directs a party to take some action to cure a defective complaint by a defined date and provides express notice that it will then automatically produce a final order of dismissal when the time to amend runs out")). In *Smith*, the Third Circuit could not read the district court's dismissal of Smith's FDCPA claim as having ripened into a dismissal with prejudice. *Id.* at 450.

In *Cisco I*, the California Court dismissed Dexon's antitrust counterclaims with leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-CV-04926-CRB, 2021 WL 5848080, at *9 (N.D. Cal. Dec. 9, 2021) ("Dexon may file an amended answer and counterclaims within 30 days of the date of this order."). Cisco has not shown any express intent from Dexon (or the California Court) that would convert the California Court's dismissal with leave to amend to some final judgment equivalent to a dismissal with prejudice. *See Weber*, 939 F.3d at 240 ("while it

---

[6] The Court further notes both actions at issue in *Hoffman* had been brought before the same court. *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 280 (3d Cir. 2016). The Court has the authority to *sua sponte* dismiss cases on the basis of claim preclusion or res judicata when both claims are brought before it. *See Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) ("Dismissal by the court sua sponte on res judicata grounds, however, is permissible in the interest of judicial economy where both actions were brought before the same court."); *see also McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264-65 (5th Cir. 2018) (explaining the court's ability to dismiss a case *sua sponte* on res judicata grounds for purposes of judicial economy). Here, Dexon's cases have not been brought before the same court.

provided thirty days' leave to file an amended complaint, it lacked any language converting the dismissal to a final order at the end of the period. And . . . Weber did not submit a clear and unequivocal declaration of intent to 'stand on her complaint'").

Cisco has also not established the fourth element essential for claim preclusion at this time. Under the "same claim" inquiry, the critical issue is whether the two actions under consideration are based on the same nucleus of operative facts. *Test Masters*, 428 F.3d at 571. "What grouping of facts constitutes a 'transaction' or a 'series of transactions' must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Tillman v. Hammond's Transportation, L.L.C.*, No. CV 20-1656, 2021 WL 1733995, at *3 (E.D. La. May 3, 2021) (quoting *Test Masters*, 428 F.3d at 571 (citing *Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004))).

At the hearing on Defendants' motions, Dexon's counsel focused on the new allegations regarding the Cisco/CDW conspiracy. *See, e.g.,* Docket No. 62 (Transcript) at 66:20-67:13 (citing Docket No. 1, ¶ 61) (new allegations regarding the Cisco/CDW conspiracy); *see also id.* at 67:14-68:4; 72:14-73:24 (citing Docket No. 1, ¶ 3 (new allegations regarding the Texas bank), ¶ 7 (new allegations regarding the Texas energy company), ¶ 51 (new allegations regarding the Texas automobile dealership), ¶¶ 65-67 (new allegations regarding the Texas school district); ¶¶ 69-77 (detailed allegations of global and U.S. IP phones); and ¶ 4 (more specific allegations regarding limited IP budgets)). Comparing the factual predicate of the antitrust claims asserted here with the counterclaims that were at one time pending in California, the Court is not convinced the claims arise out of the same transaction or series of transactions. *See Students for Fair Admissions, Inc.*

*v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1088–89 (5th Cir. 2022) (explaining the transactional test applied here focuses on the facts out of which the claims arise). Accordingly, Cisco's objections to the R&R regarding claim preclusion are **OVERRULED**.

### B.    Issue Preclusion (Collateral Estoppel)

Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. Docket No. 28 at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

**Report and Recommendation.** In the R&R, the Magistrate Judge noted issue preclusion requires that the issues in the two suits be identical. R&R at 28. For an issue to be identical, both the facts and the "legal standard used to assess them" must be identical. *Id.* (citing *Hammervold v. Blank*, 3 F.4th 803, 810–11 (5th Cir. 2021) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 n.1 (5th Cir. 1991))). The Magistrate Judge held the facts, and the legal standard used to assess the facts, are not identical in both the California Lawsuit and this lawsuit. *Id.* at 29. Therefore, the Magistrate Judge recommended the Court deny CDW's motion to dismiss under collateral estoppel or issue preclusion. *Id.*

**CDW's assertions.** In its objections, CDW asserts the R&R "gives too much weight to Dexon's argument" that a *per se* tying claim and conspiracy claims are entirely different, as well as "Dexon's conclusory allegations relating to loss of Interbrand competition." Docket No. 120 at 8. According to CDW, the legal standards for assessing both harm to competition and antitrust injury are identical in tying claims and conspiracy claims, and Dexon already had an opportunity to litigate "these two common elements in California." *Id.* Additionally, CDW argues, as it did in

its motion to dismiss, that the only "new" factual allegations raised in this lawsuit—relating to loss of interbrand competition—are "entirely conclusory . . . and should be disregarded . . ." *Id.*

***De novo* review.** Dexon's California Counterclaims addressed tying rather than an "inter-corporate conspiracy that gives rise to two new claims against CDW, separate and apart from Dexon's claims against Cisco for tying." R&R at 26 (quoting Docket No. 37 at 19–20). The word "conspiracy" (or any similar derivation) does not appear in Dexon's California counterclaims, "whereas the term appears thirty-six times in the Complaint" in the Texas Lawsuit. *Id.* at 26–27 (quoting Docket No. 37 at 19). Focusing on a "host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy" which have been alleged under new causes of action in this case, Dexon asserts, and the Magistrate Judge agreed, that the issues in both cases are not identical. *Id.*

The Court, having reviewed *de novo* the parties' arguments, the relevant case law, the R&R, CDW's objections, and Dexon's response to CDW's objections, finds issue preclusion (or collateral estoppel) does not apply. Dexon pleads factual allegations here, not found in the California Lawsuit, to allege CDW and Cisco entered into a conspiracy that violated §§ 1 and 2 of the Sherman Act. *See, e.g.*, Docket No. 1, ¶¶ 56–58, 60–63, 87–100. As one example, although Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end. R&R at 28. Additionally, the Court is not convinced that the issues before the California Court (*i.e.*, Dexon's allegations that Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment; that Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon; or that Cisco pressured a "value added reseller" (CDW) to stop doing business with Dexon)

were fully and vigorously litigated in the California Lawsuit and necessary to the judgment in that action.  Accordingly,  CDW's  objections  to  the  R&R  regarding  issue  preclusion  are **OVERRULED**.

> ### C.      *Rule 12(b)(6) Pleading Standard Regarding Dexon's Antitrust Claims*
>
> #### 1)      **Dexon's conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)**

To the extent they overlap, the Court addresses Defendants' objections under this section (even if some of the arguments might also apply to Dexon's other claims against Cisco alone).

**Defendants' motions, generally.**  In their motions to dismiss, with regard to Dexon's conspiracy claims asserted against them, Cisco and CDW separately argue as follows: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to establish an antitrust injury.

**Report and Recommendation, generally.**  In the R&R, the Magistrate Judge addressed the first two arguments in the context of Dexon's Sherman Act § 1 claim (Count I) and then addressed CDW's separate argument specific to Dexon's Sherman Act § 2 conspiracy claim (Count II), namely whether Dexon fails to allege specific intent by CDW to monopolize. Because Cisco asserts Dexon's failure to allege antitrust injury applies to Counts I–VI (all of which have been asserted against Cisco), the Magistrate Judge addressed antitrust injury following the Magistrate Judge's discussion of Counts III, IV, and V against Cisco.

Regarding Dexon's conspiracy claims against Cisco and CDW, the Magistrate Judge found Dexon sufficiently alleges an agreement between Cisco and CDW and does not involve a "mere unilateral change of distributors" as urged by Cisco; thus, the alleged agreement is not *per se* legal. R&R at 33. Although the Magistrate Judge noted the sufficiency of Dexon's allegations of competitive harm is a closer call, on the whole, the Magistrate Judge concluded that Dexon's

allegations, in combination with the specific examples provided in the complaint, are sufficient to survive a motion to dismiss (other than Dexon's allegation that CDW had specific intent to monopolize). *Id.*

The Magistrate Judge found Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim. *Id.* at 42–44. Rather than recommend dismissal of Dexon's conspiracy to monopolize claim against CDW, the Magistrate Judge recommended Dexon be given an opportunity to amend. Accordingly, the Magistrate Judge recommended this part of CDW's motion to dismiss be denied without prejudice to refiling and that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize.  *Id.* at 44.

Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. *Id.* at 77.

**Defendants' objections, generally.** In its objections, CDW identifies the three arguments it raised in its motion and argues the R&R erred in not agreeing with those arguments: (1) Dexon's failure to plausibly allege an anticompetitive agreement between Cisco and CDW; (2) Dexon's failure to plausibly allege harm to competition; and (3) Dexon's failure to allege antitrust injury. Docket No. 120 at 4.  In both its second and third objections, CDW asserts Dexon's complaint is devoid of factual allegations to explain how the alleged conspiracy harmed competition. *Id*. at 2–3. According to CDW, Dexon relies on conclusory allegations of "loss of interbrand" and "intrabrand" competition but does not plausibly explain how interbrand competition was harmed. *Id*. at 2. Specifically, CDW asserts Dexon never alleges it was prevented from selling its secondary

Cisco equipment to end-customers; thus, Dexon was not foreclosed from selling Cisco products which would result in harm to competition. *Id.* at 3.

In its objections, Cisco similarly asserts, as it did in its underlying briefing, that Dexon does not allege an anticompetitive agreement between Cisco and CDW. Docket No. 119 at 6–7. Additionally, Cisco states the R&R "errs in devising a theory supporting Dexon's conspiracy claim that Dexon neither pleaded nor argued," namely, that because Dexon pleads Cisco and CDW have market power, competitive harm can be inferred. *Id.* at 6. Finally, Cisco argues Dexon has failed to allege antitrust injury. According to Cisco, "Dexon has not alleged any harm to competition because the gravamen of its claims is that it was denied sales of *Cisco* products, not products manufactured by Cisco's competitors." *Id.* at 8 (emphasis in original) (further stating "Dexon cannot show that its injuries flow from that which makes conspiracy, tying, or monopolization unlawful, and it lacks antitrust injury").

**Applicable law.** To establish a violation of § 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (citation omitted). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* at 373–74 (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))).

To establish concerted action, the plaintiff must present "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve

an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc*., 496 F.3d 403,

409 (5th Cir. 2007) (quoting *Monsanto,* 465 U.S. at 768). In other words, "[t]here must be evidence

that tends to exclude the possibility of independent action." *Id*. Whether an action violates § 1 of

the Sherman Act depends on whether it is adjudged an *unreasonable* restraint. *Nw. Wholesale*

*Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S. Ct. 2613, 2616, 86 L.

Ed. 2d 202 (1985) (emphasis in original).

Under Sherman Act § 2, a conspiracy to monopolize can be established only by proof of

(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy

to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect

upon a substantial amount of interstate commerce. *N. Mississippi Commc'ns, Inc. v. Jones*, 792

F.2d 1330, 1335 (5th Cir. 1986).

Antitrust cases are not subject to a heightened pleading standard. *Torrey v. Infectious*

*Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *7 (E.D. Tex. Sept. 27,

2018) (citing *Wampler v. Sw. Bell Tel. Co*., 597 F.3d 741, 744 (5th Cir. 2010))*.* At this stage in the

litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face."

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No.

5:17-CV-1295-RCL, 2022 WL 980791, at *6 (W.D. Tex. Mar. 31, 2022) (quoting *Twombly*, 550

U.S. at 570). "'[E]nough data must be pleaded so that each element of the alleged antitrust violation

can be properly identified.'" *David B. Turner Builders L.L.C. v. Weyerhaeuser Co*., No.

3:21-CV-309-KHJ-LGI, 2021 WL 5869183, at *2 (S.D. Miss. Dec. 10, 2021).

> ### (a)      *Whether Dexon plausibly alleges a competition-harming agreement between Cisco and CDW*

**Defendants' motions.** In its motion, Cisco states Count I (§ 1 of the Sherman Act), Count

II (§ 2 of the Sherman Act), and Count VI (Texas Free Enterprise and Antitrust Act) each depend

on allegations that Cisco entered into an unlawful agreement with CDW. Cisco argues Dexon's claim that "Cisco and CDW conspired to exclude Dexon" from the Relevant Networking Equipment Market fails because Dexon has not plausibly alleged any competition-harming agreement between Cisco and CDW. Docket No. 22 at 13–14. Specifically, Cisco asserts Dexon has not properly alleged any unlawful agreement to replace Dexon with CDW as a seller of Cisco products. *Id*. at 14. CDW similarly argues Dexon fails to plausibly allege any direct evidence of an anticompetitive agreement between Cisco and CDW. Docket No. 28 at 13. Whether considered individually or as a whole, CDW argues "Dexon's allegations are more consistent with CDW's independent actions and its individual interest than with a conspiracy." *Id*.

**Report and Recommendation.** The Magistrate Judge considered whether Dexon plausibly alleges an agreement between Cisco and CDW, and separately, whether Dexon's allegations plausibly raise the suggestion of an unlawful agreement. Specifically, the Magistrate Judge found Dexon sufficiently alleges "the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco," and the complaint does not allege a "mere unilateral change of distributors" or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network;" thus, the alleged agreement is not *per se* legal. R&R at 33, 35, 38.

The Magistrate Judge further considered whether Dexon plausibly alleges competitive harm and concluded the allegations regarding CDW, combined with the allegations regarding Cisco as a monopolist, allow the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42. After distinguishing the allegations in this case from those involved in *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245

(5th Cir. 1975), and other dealer termination/substitution cases, the Magistrate Judge stated as follows:

> Further, case law supports the view that a monopolist manufacturer who conspires with a large distributor to exclude a lower-priced distributor can survive a motion to dismiss. *See Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) ("A seller with considerable market power in the interbrand market—whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold."). The court in *Graphic Prods.* explained that "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price" and in that scenario, vertical restraints "may enable a manufacturer to retain monopoly profits arising from an Interbrand competitive advantage." *Id*. Dexon alleges this precise scenario: a Cisco-CDW conspiracy enabling Cisco to maintain its monopoly profits. The Third Circuit Court of Appeals similarly found a well-pled conspiracy alleging a dominant insurer conspired with a dominant hospital to exclude a smaller rival due to allegations of increased prices and decreased competition for the co-conspirators' services. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010).

R&R at 37–38. According to the Magistrate Judge, Dexon's allegations of interbrand harm and intrabrand harm (which were not pleaded with this level of specificity in the California Lawsuit) explain how the alleged conspiracy harms competition and mirrors the allegations contained in *Graphic Prods.* and *West Penn*. *Id*. at 39.

The Magistrate Judge also found instructive *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), wherein the court found the plaintiffs' allegations sufficient to state a plausible Sherman Act § 1 claim against PoolCorp, the country's largest distributor of Pool Products, and the Manufacturer Defendants, the three largest manufacturers of Pool Products in the country, even though the complaint did not allege that PoolCorp possessed any specific share of the Pool Products Distribution Market. *Id.* at 40–41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 373, 383, 399). The court held the allegations that the Manufacturer Defendants

had "substantial market clout" combined with the "market power" of the distributor "allow[ed] the Court to draw the reasonable inference" that the conspiracy was "capable of causing substantial harm to competition." *Id.* at 41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398). The Magistrate Judge also noted the court in *In re Pool Prods.* pointed out the Fifth Circuit has stated that the reason for looking at market power is to determine "whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market." *Id.* (quoting *In re Pool Prods.*, 940 F. Supp. 2d at 398 (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001)); also citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether an *arrangement* has the potential for genuine adverse effects on competition. . . .") (emphasis added in *In re Pool Prods.*))).

The Magistrate Judge stated Dexon has alleged facts sufficient to create a reasonable inference of Cisco's market power in the relevant markets. R&R at 41 (citing Docket No. 1, ¶¶ 1 ("Cisco is a monopolist . . ."); 24 ("On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry . . . Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceed 40% or more with its closest competitors half its size, in markets with high barriers to entry."); 29 ("Upon information and belief, Cisco consistently possessed a share of the Relevant Service Market in excess of 90% . . .")). The Magistrate Judge further stated Dexon has pleaded factual content that allows the Court to draw the reasonable inference that CDW has "substantial clout in the industry." *Id.* at 41–42 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398; also citing Docket No. 1, ¶ 56 (alleging CDW's 2020 annual revenue was $18.47 billion

compared to Cisco's $49.8 billion in the same time period); also citing *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc*., No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) ("At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." (quoting *Scooter Store, Inc. v. Spinlife.Com*., 777 F.Supp.2d 1102, 1117 (S.D. Ohio 2011)))). Considering the allegations regarding CDW, combined with Dexon's allegations regarding Cisco as a monopolist, the Magistrate Judge concluded the complaint allows the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42.

**Defendants' objections.** In their objections, Defendants take issue with these findings. Among other things, both Cisco and CDW argue CDW's decision not to sell Cisco equipment to its direct competitor does not raise the suggestion of an unlawful agreement between Cisco and CDW. Docket No. 119 at 6 (stating CDW had every incentive to compete with Dexon for sales and CDW's alleged sale of Cisco products to a Pennsylvania hospital could have been independent action); Docket No. 120 at 5 (stating Cisco has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon)). According to Cisco and CDW, any agreement would be *per se* legal under *Burdett Sound*, 515 F.2d 1245 and *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc*., 123 F.3d 301 (5th Cir. 1997) [hereinafter *Doctor's Hospital*]. Docket No. 119 at 7; Docket No. 120 at 5. Consideration of these arguments dovetails into the related issue of whether Dexon has plausibly alleged harm to competition. Thus, the Court considers the issues together.

**De novo** **review.** As an initial matter, the Court agrees with the Magistrate Judge that Dexon sufficiently shows the existence of an agreement between Cisco and CDW as distinct from independent action. Dexon alleges Cisco conspired with one of its favored distributors, CDW, "to

help it exclude resellers like Dexon and maintain its network equipment monopolies." Docket No. 1, ¶ 13. The complaint provides a specific example of an alleged conspiracy involving a Pennsylvania hospital system. *Id.*, ¶¶ 58–63. There are two aspects to Dexon's conspiracy allegations.

First, Dexon alleges Cisco and CDW coordinated their communications and actions for the Pennsylvania hospital system, which awarded a contract to Dexon to purchase Ethernet switches and routers. *Id.*, ¶ 59. According to the complaint, when Cisco learned that the hospital system awarded the order to Dexon, it threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics." *Id.* "Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." *Id.*, ¶ 60. Dexon alleges the "sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system in that the customer would keep its service for all of its Networking Equipment." *Id.* Dexon alleges "Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon." *Id.*

Second, Dexon alleges that as part of the conspiracy, CDW agreed not to sell Networking Equipment to Dexon. *Id.*, ¶ 62. Specifically, Dexon alleges that as part of the conspiracy, which continues through the present day, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id.* According to Dexon, "when the CDW representative previously assigned

to Dexon refused to comply with" Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, "CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* According to Dexon, pursuant to the conspiracy, "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon alleges Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW's website for ethernet switches, it pulls up 1,440 selections for Cisco with no other ethernet switch competitor with more than 250 selections. *Id.*, ¶ 61.

Contrary to CDW's suggestion otherwise, the Court finds Dexon's complaint states facts that raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. *See* Docket No. 120 at 4 (citing *Twombly*, 550 U.S. at 557). As pointed out by the Magistrate Judge, the Fifth Circuit recently decided *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022), a case which supports Dexon. R&R at 36, n. 12.

In that case, the Fifth Circuit reiterated that tacit agreements are still agreements. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision *or from an agreement, tacit or express*." (emphasis added and quotation omitted in *BRFHH*))). According to the Fifth Circuit, threat and accession is one way to form a tacit agreement. *Id.* (discussing *Monsanto*, 465 U.S. at 765, wherein the Supreme Court held that evidence of A's threat to B, coupled with B's subsequent buckling to the pressure, could constitute "substantial direct evidence" of an agreement for § 1 purposes.). The Fifth Circuit had elaborated on a threat-and-accession theory, *id.* (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220–22 (5th Cir. 2001); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331–33 (5th Cir. 2015);

*Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763–64 (5th Cir. 2002); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844–45 (5th Cir. 2015)), making it clear that a threat itself is not enough. Rather, A's threat can give rise to an agreement with B only if B actually gives in and does what A wants—and only if B gives in because of A's threat. *Id.* (citing *Viazis*, 314 F.3d at 764).

In *BRFHH*, the Fifth Circuit, addressing a threat-and-accession case for the first time at the Rule 12(b)(6) stage, stated as follows:

> A plaintiff proceeding on a threat-and-accession theory must plausibly allege three things: first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat. That third requirement is often the hardest to satisfy. It's not enough to allege that B's behavior was "merely consistent with" caving to the threat. *See Twombly*, 550 U.S. at 557, 127 S.Ct. 1955. The plaintiff must do more, providing "allegations plausibly suggesting" that B acted in response to the threat rather than out of its own self-interest. *See ibid.*; *Viazis*, 314 F.3d at 764 (affirming a district court's grant of judgment as a matter of law on the ground that the plaintiff hadn't shown the defendant acted "in response to [the relevant] threats" rather than "based on an independent evaluation of its best interests" after "ignor[ing] the threats"); *Abraham & Veneklasen*, 776 F.3d at 333 (similar).

*Id.*

In its complaint, Dexon plausibly alleges Cisco threatened CDW to stop selling Networking Equipment and associated services to Dexon and that CDW subsequently did what Cisco demanded it do. It is not enough to allege that CDW's behavior was "merely consistent with" caving to the threat. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 557). Rather, Dexon must provide "allegations plausibly suggesting" that CDW acted in response to the threat rather than out of its own self-interest.[7] *Id.* (citations omitted).

---

[7] In its motion, CDW points out that Dexon and CDW are competitors and argues it has "clear unilateral incentives not to supply its rivals." Docket No. 28 at 14. CDW further contends the fact that it displays Cisco's products prominently on its website demonstrates CDW's efforts to

At this stage of the litigation, the Court finds Dexon has provided allegations plausibly suggesting that CDW acted in response to Cisco's alleged demand. Dexon alleges CDW removed the CDW representative previously assigned to Dexon to a different region and account when the representative "refused to comply with . . . Cisco's demand." Docket No. 1, ¶ 62. According to Dexon, CDW did this "so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* As further factual support for CDW's behavior, Dexon alleges "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.*

Even without a threat-and-accession theory, the Court finds, similar to the Magistrate Judge, that Dexon has sufficiently alleged the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)." R&R at 35–36 (quoting Docket No. 34 at 4–5 (citing Docket No. 1, ¶¶ 56–63, 87–100)).  Accepting as true all well-pleaded facts in the complaint and viewing those facts as a whole in the light most favorable to Dexon, the Court finds Dexon has plausibly alleged an agreement between Cisco and CDW.

That brings the Court to the next issue: whether Dexon has alleged a competition-harming agreement between Cisco and CDW. According to Defendants, any alleged agreement between Cisco and CDW is not anticompetitive because Cisco as manufacturer has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon). Docket No. 120 at 5. In its motion to dismiss, Cisco asserts any alleged agreement

---

compete with rival distributors like Dexon and does not suggest an anticompetitive agreement with Cisco "to do anything, much less restrain trade." *Id*. at 15.

between Cisco and CDW that CDW would not sell Cisco equipment to Dexon would be *per se* lawful under Fifth Circuit law.  Docket No. 22 at 16 (citing *Burdett Sound*, 515 F.2d at 1245; also citing *Doctor's Hospital*, 123 F.3d at 301). According to Cisco, it does not violate antitrust law for Cisco to encourage end-users to purchase Cisco equipment from one reseller rather than another. Cisco contends that in either event, the customer is purchasing Cisco equipment; thus, the alleged conduct does not affect the market opportunities of other equipment manufacturers (the competitors in the markets that Dexon alleges). *Id*. at 15.

As noted in the R&R, *Burdett Sound* states that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." R&R at 36 (citing *Burdett Sound*, 515 F.2d at 1249). As explained by the Fifth Circuit in that case, it is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *Id.* (citing *Burdett Sound*, 515 F.2d at 1248 (citations omitted in R&R)). The Magistrate Judge explained Dexon does not present claims based on a "mere unilateral change of distributors," *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *Id.* at 37 (citing *Burdett Sound*, 515 F.2d at 1248). Instead, according to the Magistrate Judge, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (which provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets).  *Id.*

In its objections, CDW states this is "a dealer termination case" "exactly" like *Burdett Sound*. Docket No. 120 at 5 ("Dexon alleges it was prevented from effectively reselling Cisco equipment by Cisco (the manufacturer) and replaced with CDW (the new reseller)."). According

to CDW, under *Burdett Sound*, "any loss of *intrabrand* competition—*i.e.*, the loss of Dexon as a Cisco reseller—is immaterial because the purpose of the antitrust laws is to promote *interbrand* competition." *Id.* (emphasis in original). CDW argues this is true "even when the new dealer and the manufacturer agree before the termination of the old dealer." *Id*. (quoting *Doctor's Hospital*, 123 F.3d at 307).

Based on *Burdett Sound* and *Doctor's Hospital*, Defendants ask the Court to find any agreement between Cisco and CDW would be *per se* legal because this case is nothing more than a dealer termination/substitution case. Not only are Defendants incorrect on the applicability of *Burdett Sound*, but a review of *Doctor's Hospital* also shows—through proper analysis under the rule of reason—why this case is distinguishable from the dealer termination/substitution cases.

First, *Burdett Sound* supports the general proposition that <u>without a showing of an actual adverse effect on competition market-wide</u>, it is not a violation of antitrust laws "for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor." *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) (citing *Burdett Sound*, 515 F.2d at 1249). This does not mean that a manufacturer's or supplier's discretion as to whom it will sell is unlimited. *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977). As explained in *Burdett Sound*, a refusal to deal becomes illegal under the Sherman Act when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of a monopoly. *Burdett Sound*, 515 F.2d at 1248 (citations omitted). In other words, if a refusal to deal is a device used to, among other things, acquire a monopoly or establish market dominance and drive out competitors, it is illegal. *Universal Brands*, 546 F.2d at 33 (citations omitted).

In *Burdett Sound*, the Fifth Circuit held the appellant had not presented an antitrust claim, noting the appellant alleged no horizontal conspiracy among competitors, no effort by either appellee to establish market dominance, no restrictive trade practices, and no anti-competitive intent or effect. *Burdett Sound*, 515 F.2d at 1248. Here, Dexon does not merely allege—without more—that Cisco substituted one distributor for another within the scope of *Burdett Sound*. Rather, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). R&R at 37 (citing Docket No. 1, ¶¶ 56, 60–61, 90–91). Dexon further alleges the alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices, reduced technology choices for customers, and Cisco's maintaining its monopoly in the relevant markets. *Id.* (citing Docket No. 1, ¶¶ 63, 100).

Second, *Burdett Sound* only addressed conduct designed to lessen intrabrand competition. *Nw. Power Prod., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 87 (5th Cir. 1978). Here, as explained more fully below, Dexon alleges the Cisco-CDW conspiracy restricted both interbrand competition (between Cisco and its competitors) and intrabrand competition (between Cisco resellers). Docket No. 1, ¶¶ 60–61, 90–91.

Defendants' reliance on *Doctor's Hospital* does not support their argument that any agreement between Cisco and CDW should be considered *per se* legal under *Burdett Sound.* In that case, Doctor's Hospital of Jefferson, Inc. ("DHJ") filed suit against a competing hospital and a preferred provider organization ("PPO"), which sold a mix of providers' products as a separate product and substituted one provider for DHJ allegedly at the insistence of a competing provider. *Doctor's Hospital*, 123 F.3d at 302, 308. The district court granted summary judgment to the defendants, reasoning that DHJ lacked standing to bring an antitrust suit against the defendants

because it had failed to demonstrate antitrust injury. *Id.* at 303. On appeal, the Fifth Circuit disagreed with the district court's analysis of the standing issue but affirmed the grant of summary judgment on other grounds, one of which being that DHJ failed to establish injury to competition as required for a Sherman Act § 1 claim. *Id.*

As their principal answer to each of DHJ's alleged harms to competition, the defendants argued on appeal that the case was governed by the "substitution of dealer cases" like *Burdett Sound*, 515 F.2d at 1249, "which hold that a manufacturer has a virtually absolute right to choose to whom it sells its goods." *Doctor's Hosp.*, 123 F.3d at 307. Rather than find the alleged agreement *per se* lawful, the Fifth Circuit applied the rule of reason and found DHJ had not presented evidence that affiliation with the PPO was necessary to compete in the marketplace or that DHJ's exclusion from the PPO "somehow reflected injury to competition generally." *Id.* at 309. Among other things, the court considered DHJ's allegation that it had been substantially weakened as a competitor because it lost PPO revenues and had been unfairly deprived of membership in a "premier managed care plan." *Id.* at 310. The court noted that while injury to a competitor can be some evidence of injury to competition, "the injuries to DHJ [were] insufficient under the circumstances to create a fact issue on injury to competition." *Id.*

Conducting that analysis here, the Court cannot say there are insufficient facts to state a claim and that it is implausible that Defendants engaged in a conspiracy, effectively restraining trade. An antitrust violation only occurs if the termination or substitution of a dealer produces an "unreasonable restraint of trade." *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir. 1979) (quoting *Burdett Sound*, 515 F.2d at 1248). *Continental T.V.* teaches that market considerations provide the "objective benchmarks" for distinguishing antitrust violations. *Id.* (citing *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977)). "The first step in

establishing an unreasonable restraint of trade is to show anticompetitive effect, either in the intrabrand or interbrand markets." *Id.* (quoting *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978)).

According to the Fifth Circuit, the question is whether the agreement caused anticompetitive effects or "created the potential for anticompetitive effects." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 712 (2021), (citing *Doctor's Hosp.*, 123 F.3d at 310; *Retractable Techs, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) ("noting that an antitrust plaintiff must show that a restraint 'had the potential to eliminate, or did in fact eliminate, competition'")). "Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods." *Id.* at 493. Such effects may be proved "indirectly," with "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 492–93 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

Deciding whether a plaintiff has plausibly alleged that a vertical agreement causes substantial anti-competitive harm requires an analysis of the defendants' role in the relevant market. *In re Pool Prods.*, 940 F. Supp. 2d at 397 (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207 (4th Cir. 2002)). Under the rule of reason, the plaintiff must plausibly allege that defendants have sufficient market power to restrain competition substantially in a relevant market.[8]

---

[8] Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement. *Jayco Sys., Inc. v. Savin Bus. Machines Corp.*, 777 F.2d 306, 317 (5th Cir. 1985) (citing *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir.1981) (explaining the first step of the analysis is to determine whether alleged conspiracy is vertical or horizontal)). Horizontal agreements affect *inter* brand competition, and because interbrand competition is "the primary concern of antitrust law," they are generally illegal *per se*. *Id.* (citing *Cont'l T. V., Inc.* 433 U.S. at 36). Vertical agreements, on the other hand, generally affect *intra* brand competition. *Id.* "Because interbrand competition can act as a check on intrabrand restrictions, [] and because intrabrand

*Id.* The Fifth Circuit has stated that an examination of anti-competitive harm "cannot stop without an inquiry into the market power of the defendants." *Nw. Power Prod.*, 576 F.2d at 90.

Notably, in *Northwest Power Products*, the Fifth Circuit pointed out in this regard that *Burdett Sound* indicated the evidence there showed "no effort by either (defendant) to establish market dominance." *Id.* (quoting *Burdett Sound*, 515 F.2d at 1248). In contrast, in *Cherokee Lab'ys, Inc. v. Rotary Drilling Servs., Inc.*, 383 F.2d 97 (5th Cir. 1967), a case involving interbrand as well as intrabrand competition, the Fifth Circuit held an anticompetitive effect existed when the new distributor, if effective in driving out the old, would become a monopolist. *Id.*

This case involves allegations of both interbrand and intrabrand competition, and Dexon has pleaded allegations of market dominance. As noted by the Magistrate Judge concerning intrabrand competition, the complaint alleges the Cisco-CDW conspiracy required customers to pay more for Cisco equipment from CDW and limited customers' choices for the services for Cisco products. R&R at 39. The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon." *Id.* (quoting Docket No. 1, ¶ 61). Dexon provides an example of this conspiracy involving a Pennsylvania hospital system wherein the hospital bought equipment from CDW at a higher price than had been negotiated with Dexon. *Id.* (citing Docket No. 1, ¶ 60). This conspiracy allegedly allows Cisco to maintain its monopoly position and its supra-competitive prices. *Id.*, (citing Docket No. 1, ¶¶ 90–93). According to the Magistrate Judge, not only do these interbrand and intrabrand allegations explain how the conspiracy harms competition, but they also mirror those in *Graphic Prods.*, 717 F.2d at 1572

---

restrictions in turn can increase interbrand competition in several ways, [] vertical agreements are generally considered not so pernicious as to warrant *per se* treatment." *Id.*

n. 20 and *West Penn*, 627 F.3d at 85. Relying further on *In re Pool Prods. Distribution Mkt.*
*Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), discussed above, the Magistrate Judge held
the alleged agreement between a monopolist and a favored distributor to exclude interbrand and
intrabrand competition states a claim.

In its objections, Cisco argues Dexon cannot plausibly allege harm to competition because
the vertical conspiracy alleged by Dexon "cannot conceivably prevent Cisco's *competitors* from
making sales—Dexon instead alleges that the conspiracy caused *it* to specifically lose sales of
*Cisco* equipment." Docket No. 119 at 6 (emphasis in original). In its objections, CDW argues
Dexon alleges "nothing more than a classic, lawful restriction on intrabrand competition to
promote interbrand competition, which is presumptively lawful under the Sherman Act." Docket
No. 120 at 7. Although CDW attempts to distinguish the *Graphic Prods.* and *West Penn* cases
relied upon by the Magistrate Judge,[9] Dexon argues in its response that both cases illustrate that
when a monopolist allegedly uses its power to foreclose interbrand and intrabrand competition
from an unfavored dealer, that is sufficient to state a claim under the Sherman Act. Docket No.
122 at 5. Dexon further points out CDW fails to meaningfully discuss the Magistrate Judge's
application of *In re Pool Prods.*, "which confirms the correct result." *Id*. Both Defendants fail to
address the critical fact that Cisco is an alleged monopolist that allegedly has the ability to control
price and exclude competition in the relevant markets.

---

[9] According to CDW, in both cases cited in the R&R (*Graphic Prods.* and *West Penn*), the
disfavored distributor was excluded from the market, affecting prices or output market-wide.
Docket No. 120 at 6. CDW contends Dexon does not allege it was excluded from selling its Cisco
products (or those of other OEMs) to end customers or that a few lost sales opportunities had a
market-wide effect. *Id.* The Magistrate Judge noted these arguments but found them insufficient
to grant Defendants' motion to dismiss in light of Dexon's well-pleaded complaint. R&R at 38–39.

The Fifth Circuit has held that "injury to a competitor can be some evidence of injury to the competition." *Doctor's Hospital*, 123 F.3d at 311; *see also West Penn*, 627 F.3d at 108 ("a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency. . . or the merits."). Here, the Court finds Dexon has sufficiently alleged indirect proof of anticompetitive effects with allegations of "market power plus some evidence that the challenged restraint harms competition." *Impax*, 994 F.3d at 492–93 (quoting *Am. Express Co.*, 138 S.Ct. at 2284). Dexon contends the Cisco-CDW conspiracy resulted in sales losses to Dexon and in improper losses of goodwill, "which has had the effect of lowering intra-brand and inter-brand competition to Cisco in the upstream market." Docket No. 24 at 19. Dexon states it provides price and quality competition to other Cisco resellers and provides an opportunity for Cisco's competitors to penetrate the Relevant Product Markets, but the alleged conspiracy between Cisco and CDW blocked competition from a "price cutting" distributor. *Id.* at 17–19 (citing Docket No. 1, ¶¶ 60–61, 90–92).

Dexon's complaint is neither vague nor speculative; it contains far more than a "bare assertion of conspiracy" or "conclusory allegation of agreement[.]" *Drs. Hosp. of Laredo v. Cigarroa*, No. SA-21-CV-01068-XR, 2022 WL 3567353, at *13 (W.D. Tex. Aug. 17, 2022) (quoting *Twombly*, 550 U.S. at 556–57). Upon *de novo* review, the Court finds Dexon's complaint plausibly alleges a restraint that is likely to result in an anticompetitive effect. Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

### (b)    *Whether Dexon sufficiently alleges antitrust injury*

**Report and Recommendation.** Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. R&R at 77. Specifically, the Magistrate

Judge noted the Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Id.* at 73 (citations omitted). According to the Magistrate Judge, injury to competition, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claims to survive a motion to dismiss. *Id.* (citing *TravelPass Grp., L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996, at *24 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS-CMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019)).

For purposes of the analysis, the Magistrate Judge assumed a violation of the antitrust laws. R&R at 76 (citing *Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) (stating in the context of exclusive dealing that "[i]n analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation" (citing *Doctor's Hospital*, 123 F.3d at 306 )). At this stage of the litigation, viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Magistrate Judge found Dexon has adequately claimed an antitrust injury. *Id.* According to the Magistrate Judge, the alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* (quoting *Doctor's Hospital*, 123 F.3d at 305) (other citations omitted).

In finding Dexon has sufficiently shown antitrust injury, the Magistrate Judge found *Pulse Network* instructive. In that case, the Fifth Circuit held Pulse had not shown antitrust injury as to its first theory (PAVD), but it had shown antitrust injury as to its second and third theories (FANF and volume-based agreements). *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491–95 (5th Cir. 2022). In its FANF theory, Pulse alleged the FANF pricing structure used by Visa caused

merchants to use its debit network less, decreasing Pulse's revenue. *Id*. at 491. According to Pulse, "Visa uses its market dominance to foist on merchants a high fixed fee they wouldn't ordinarily accept" and "then uses the revenues from that unavoidable upfront fee to artificially lower its per-transaction fees, which effectively forecloses rivals like Pulse from competing." *Id*. In arguing there was no antitrust injury, Visa argued that Pulse was "really harmed only by the increased competition created by FANF (i.e., cheaper per-transaction fees), rather than some anticompetitive aspect of the pricing structure." *Id*. The Fifth Circuit held as follows:

> Pulse claims more than price competition is afoot, though. After the Durbin Amendment loosened Visa's grip on the debit network market, Visa began shedding merchants to Pulse and other networks because its pricing wasn't competitive on a per-transaction basis. Instead of improving its product or competing on price, however, VISA began charging the FANF to merchants—and then using some of those revenues to reduce per-transaction fees. This integrated fee structure, argues Pulse, forces merchants to pay a higher total cost (fixed plus per-transaction fees) than before, and yet Visa's market share and profits have recovered.

> This alleged scheme inflicts antitrust injury on Pulse. Under Pulse's theory, it doesn't lose customers to Visa in a fair fight over per-transaction fees. Rather, Pulse loses customers because Visa abuses its dominance in the debit card market. Merchants have no choice but to pay Visa's high fixed monthly fee. They recoup that expense by routing more transactions through Visa's network, which charges lower per-transaction fees than competitors. But Visa can achieve that only by leveraging the upfront fees to artificially deflate its per-transaction fees. We must assume this pricing structure violates the antitrust laws. *See Sanger Ins. Agency* [*v. HUB Intern, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)]; *Doctor's Hosp.*, 123 F.3d at 306. When we do, the link between Pulse's injury and Visa's alleged anticompetitive conduct becomes plain. Pulse is squeezed out of the market because Visa exploits its dominance to impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees. That is textbook antitrust injury. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor . . . suffers a distinct injury if it is prevented from selling its product.").

*Id*. at 74–75.

**Defendants' objections.** CDW contends, along with Cisco, that Dexon did not sustain an antitrust injury. In its objections, Cisco argues that to the extent Dexon alleges it lost sales to

Cisco-authorized resellers like CDW, those losses result from competition, not the lack thereof. Docket No. 119 at 8. CDW argues Dexon lacks antitrust injury because "it does not allege it has been prevented from selling its products to customers." Docket No. 120 at 7. Attempting to distinguish *Pulse Network*, CDW states that case involved allegations that the defendant "manipulat[ed] prices in a way that excludes competitors from the market." *Id.* (quoting *Pulse Network*, 30 F.4th at 493). According to CDW, Dexon does not allege it has been excluded from anything. *Id.*

The Magistrate Judge stated that antitrust injury requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." R&R at 74 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89 (1977)). In *Doctor's Hospital*, the Fifth Circuit held that when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hospital*, 123 F.3d at 305.

The R&R explains that when "viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury." *Id.* at 76. According to the Magistrate Judge, "[t]he alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* (citing *Doctor's Hospital*, 123 F.3d at 305; *Pulse Network*, 30 F.4th at 491 (finding Pulse's incremental exclusion from the relevant market because of defendant's alleged anticompetitive

conduct "is textbook antitrust injury"); *Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor. . . suffers a distinct injury if it is prevented from selling its product.")).

Defendants object to the R&R's finding as to antitrust injury, focusing narrowly on whether Dexon was excluded from the market. In its response to Cisco's objections, Dexon states it has alleged Cisco's conduct was specifically designed to maintain its dominance over its smaller competitors and also that Dexon's reputation as a trusted multi-vendor reseller has been harmed by Defendants' conduct. Docket No. 121 at 8. As the R&R points out, Dexon's allegations of antitrust injury include, among other allegations, the following:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

R&R at 14; *see also id.* at 15.

An antitrust plaintiff must present plausible allegations establishing an antitrust injury in its complaint. *Corrente v. Charles Schwab Corp*., Case No. 4:22-CV-00470, 2023 WL 2244680, at *6 (E.D. Tex. Feb. 24, 2023) (citing *In re Pool Prods.*, 940 F. Supp. 2d at 399). That said, the adequacy of a plaintiff's contentions regarding a transaction's effect on competition is often a fact-intensive inquiry that requires discovery. *Id*. (citing *Sanger*, 802 F.3d at 738 ("noting that antitrust injury and other standing issues 'may present disputed issues of fact'"); *Pfizer Inc. v. Johnson & Johnson*, 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) ("noting that 'the adequacy of a plaintiff's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial'")). For this reason, "the existence of an antitrust injury

is not typically resolved through motions to dismiss." *Id.* (quoting *TravelPass*, 2019 WL 5691996, at *22 n. 25). Indeed, in assessing whether a plaintiff has adequately alleged an antitrust injury, the Court must assume that an antitrust violation has occurred. *Id.* (citing *Sanger*, 802 F.3d at 738). Similar to the court in *Corrente*, the Court finds on *de novo* review that Dexon has adequately pleaded an antitrust injury. *Id.* Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

> **2)    Dexon's *per se* tying claim against Cisco under Sherman Act § 1 (Count III) and monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V)**

**Cisco's assertions regarding Dexon's *per se* tying claim.** Cisco asserts Dexon's tying claim under Sherman Act § 1 (Count III) fails for three reasons, two of which relate to the California Court's earlier dismissal of Dexon's California Counterclaims with leave to amend. R&R at Docket No. 22 at 17–23. Cisco first asserts Dexon never alleges any facts to support its conclusory allegations that Cisco used its market power to foreclose sales of any competitor's equipment and cites the California Court's dismissal of Dexon's tying claim for failure to allege "Cisco's competitors are impacted." *Id.* at 17–21 (citing *Cisco I*, 2021 WL 5848080, at *4). Cisco next asserts Dexon has not plausibly alleged any tie between service and equipment. *Id.* at 21–22. Again, Cisco references the California Court's decision, noting the California Court found the supposed tie "makes no logical sense." *Id.* at 21 (citing *Cisco I*, 2021 WL 5848080, at *5). Finally, unrelated to the California Court's decision, Cisco argues Dexon's allegations state that customers can pay a "'re-certification fee" to forego the purchase of new equipment as a condition of obtaining SmartNet service, and that is not a tying claim. *Id.* at 22–23.

Dexon makes at least two arguments in response to Cisco's motion, both of which would distinguish the reasoning provided by the California Court based on the factual allegations

contained in Dexon's California Counterclaims. First, Dexon disputes that it is required to plead "substantial foreclosure" in the tied product market. Docket No. 24 at 17. Dexon asserts Cisco improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this *per se* tying claim. *Id.*

Second, unlike in the California Lawsuit, here Dexon says "lock-in" is key to its *per se* tying claim. Apparently relying on a *Kodak* "lock-in" theory of tying, Dexon states it alleges Cisco has threatened to withhold service on an entire installed base of products "to extract supra-competitive purchases of specific tied products." Docket No. 34 at 8. Pursuant to this theory, Dexon states it has sufficiently alleged anticompetitive effects in the tied product markets by providing "detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding considering of competitive alternatives." Docket No. 24 at 23; *see also id.* at 22–23 (further stating Cisco "takes advantage" of "locked-in customers" who had been assured they would receive maintenance and service without purchasing anything else, "forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process"). According to Dexon, as in *Kodak,* it is the timing of the withholding service that makes Cisco's conduct anticompetitive. *Id.* at 22.

**Cisco's assertions regarding Dexon's monopolization/attempted monopolization claims.** Regarding Dexon's monopolization/attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V), Cisco asserts Dexon fails to allege actionable exclusionary conduct. Docket No. 22 at 23–28. Cisco argues the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents

Cisco's equipment-manufacturing competitors from making sales." *Id*. at 24. Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. *Id*. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices do not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id*. at 24–28.

**Report and Recommendation.** In the R&R, the Magistrate Judge discusses at length the "lock-in" tying arrangement expressed in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). *See* R&R at 48, 52–65. The Magistrate Judge found Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying, explaining the installed networking equipment already purchased is the alleged "lock-in" product; SmartNet service is the alleged tying product; and new networking equipment in the Relevant Products Markets is the alleged tied product. *Id*. at 55 (citing *Lee v. Life Ins. Co. of N. Am*., 23 F.3d 14, 17 (1st Cir. 1994)); *see also id.* at 55–56 (citing Docket No. 1, ¶¶ 45–46, 67, 102; also citing Docket No. 1 at 15 ("Cisco locks in customers who required maintenance with SmartNet, and then uses SmartNet as a hammer to force supracompetitive purchases of routers and ethernet switches.")).

The Magistrate Judge noted the parties' arguments reflect differences in how the parties view Dexon's tying claim. Dexon alleges a *Kodak* "lock-in" theory of tying liability, arguing it does not need to allege substantial foreclosure to competitors because that is only applicable to exclusive dealing claims. R&R at 52. Having found Dexon plausibly alleges a *Kodak* theory of *per se* tying liability, *id*. at 52–58, and that Cisco has not shown Dexon's theory fails to make economic sense, *id*. at 58–60, the Magistrate Judge stated Dexon has sufficiently alleged a tying

arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase. *Id.* at 60–65.

The Magistrate Judge found Cisco fails to persuasively show that such a theory of tying liability requires a showing of substantial market foreclosure of competitors' sales that it argues for in its briefing. *Id.* at 65. Even so, the Magistrate Judge further found Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Among other things, the Magistrate Judge noted Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. *Id.* (citing Docket No. 24 at 23 (citing Docket No. 1, ¶¶ 4–5, 51)).

Regarding Cisco's argument that Dexon's tying claims also fail because Dexon alleges that customers can avoid purchasing new equipment by instead paying a "re-certification fee" (apparently arguing that because no new equipment is purchased, there is no tie), the Magistrate Judge stated "Cisco's argument is not well developed, and the extent, effect, and details of any re-certification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id*. at 66. For all these reasons, the Magistrate Judge concluded Dexon has plausibly stated a *per se* tying claim against Cisco under Sherman Act § 1.

The Magistrate Judge, viewing Dexon's allegations collectively and in the light most favorable to Dexon, further found Dexon plausibly states monopolization and attempted monopolization claims against Cisco under Sherman Act § 2. *Id*. at 69. Specifically, the Magistrate Judge held as follows:

> Cisco does not challenge Dexon's pleading regarding the first element, that Cisco possesses monopoly power in each of the Relevant Markets. Cisco disputes the

second element, the anticompetitive (or "exclusionary") conduct element. Dexon alleges two theories to establish anticompetitive conduct: tying and FUD tactics.

Dexon's allegations regarding Cisco's tying-related conduct and FUD strategies towards the end-users of its equipment are sufficient to defeat a motion to dismiss. As noted above, the Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id*. The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. Id. at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id*. at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

Further, Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *See* Dkt. No. 1, ¶¶ 6–9, 64–68 (alleging Cisco uses FUD to dissuade customers from purchasing from resellers with lower prices and to accomplish its coercion strategies). The Third Circuit previously rejected a defendant's attempt to claim such conduct does not show anticompetitive conduct, specifically "in the context of a *Kodak* claim." *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue). For its part, Cisco's briefing does not specifically address Dexon's FUD[] allegations.

Instead, Cisco first argues that the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." Dkt. No. 22 at 24. For the reasons explained with respect to Dexon's tying claims, Cisco's argument that Dexon fails to plausibly plead harm to competition is rejected. Further, Cisco does not address Fifth Circuit law holding that "injury to competition is presumed to follow from the conduct proscribed by § 2." *Walker* [*v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984)].

Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. Dkt. No. 22 at 24. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted

to maintain its monopoly position by having distributors charge higher prices does not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id*. at 24–28. None of these arguments are proper at this stage. Dexon does allege a mere change of distributor or refusal to deal dispute, and assuming the allegations are true, Cisco's tying and FUD strategies make economic sense, at least in terms of a *Kodak* claim, as long as those actions maintain or enhance Cisco's monopoly power as alleged. *See* Dkt. No. 24 at 27 (citing Dkt. No. 1, ¶¶ 84, 91, 98, 106, 112).

*Id*. at 67–69.

The Magistrate Judge recommended the Court deny Cisco's motion to dismiss Dexon's *per se* tying claim against Cisco under Sherman Act § 1 and Dexon's monopolization and attempted monopolization claims against Cisco under Sherman Act § 2.

**Cisco's objections.** In its objections, Cisco asserts Dexon's failure to allege that Cisco's conduct hindered competitors from making sales is fatal to Dexon's claims. Docket No. 119 at 4. Relying on *Cisco I*, Cisco argues Dexon's claims require allegations of foreclosure—"that is, that Cisco's conduct prevented Cisco's competitors from making sales in the relevant markets." *Id*. (citing *Cisco I*, 2021 WL 5848080, at *4–5). Asserting the R&R conflicts with the ruling of the California Court, Cisco asserts the Magistrate Judge fails to "distinguish" *Cisco I* on the tying claim on the ground that Dexon's complaint relies on a *Kodak* lock-in theory of tying. According to Cisco, Dexon's California Counterclaims pleaded this theory, and the California Court rejected the theory. *Id*. at 4–5. Cisco further asserts the R&R cites no case supporting its holding that a plaintiff need not allege harm to competition in the relevant market, and it ignores relevant cases cited by Cisco. *Id*. at 5 (citing *Chawla v. Shell Oil Co*., 75 F. Supp. 2d 626, 641 (S.D. Tex. 1999) ("*Kodak* . . . does not excuse failure of a plaintiff to allege an effect on competition in the tied product's market.")).

Cisco reiterates its arguments as expressed in its underlying briefing that Dexon fails to allege foreclosure. In its objections, Cisco asserts the R&R cites no case holding that a plaintiff

can state a monopolization claim without alleging foreclosure. *Id.* Cisco argues Dexon's tying and monopolization/attempted monopolization claims fail because Dexon "does not allege that any customer wanted to buy networking equipment or IP phones made by Cisco's competitors and that Cisco prevented them from doing so." *Id.* (citing *Cisco I*, 2021 WL 5848080, at *4–5).

Finally, Cisco asserts Dexon does not allege a tie with regard to its *Kodak* lock-in theory. *Id.* at 7. According to Cisco, the R&R "has no meaningful response" to Cisco's argument regarding the "re-certification fee." *Id.* Cisco further contends, as it did in its motion to dismiss, that Dexon's antitrust claims do not make economic sense and must be dismissed. *Id*. at 7–8.

***De novo* review.** The R&R considered Dexon's complaint in detail and properly found that the Court must accept as true all well-pleaded facts in the complaint and view those facts in the light most favorable to Dexon. R&R at 19. In doing so, the Magistrate Judge found that Cisco is a monopolist in the Relevant Networking Equipment Markets (*id*. at 41), the Relevant IP Phone Markets (*id*.), (together the "Relevant Product Markets"), and the Relevant Service Markets (collectively the "Relevant Markets"). *Id.* at 41–42. The Magistrate Judge also found that Dexon properly stated claims under §§ 1 and 2 of the Sherman Act as well as under the Texas Free Enterprise Act due to Dexon's allegations regarding Cisco's alleged tying-related conduct and use of fear, uncertainty and doubt ("FUD") strategies. Cisco's objections to the R&R's recommended findings of fact and conclusions of law regarding Counts III, IV, and V do not specifically challenge the majority of the Magistrate Judge's findings and conclusions, except for Cisco's assertions as outlined above and which the Court summarizes as follows:

- The R&R conflicts with *Cisco I* because the California Court considered and rejected a *Kodak* "lock-in" theory of tying liability, stated the "supposed tie makes no logical sense," and also held Dexon's monopolization claims fail because the "theory for why Cisco took action against Dexon makes little economic sense."

- The R&R errs with regard to Dexon's tying and monopolization claims because it did not find foreclosure (i.e., that Cisco's conduct affected the sales of Cisco's competitors).

- The R&R did not correctly determine a tie as required to allege a *Kodak* "lock-in" theory, and the R&R has "no meaningful response" to Cisco's arguments regarding Dexon's allegations of "re-certification fee."

Although many of the arguments rehash Cisco's earlier assertions without meaningfully engaging in the analysis contained in the R&R, the Court considers each in turn, finding each one without merit. Throughout its objections, Cisco challenges the R&R's finding of *per se* tying on the basis that it conflicts with the California Court's prior ruling on Dexon's California Counterclaims. According to Cisco, the California Court specifically rejected a "lock-in" theory of *per se* tying liability, citing *Kodak*. Docket No. 119 at 3–4. Cisco argues the California Court held that "this reverse-*Kodak* theory" "makes no logical sense" because no consumer wants Cisco service unless it wants Cisco equipment in the first place. *Id.* at 7.

The Magistrate Judge was clear that he would only revisit specific findings of the California Court to the extent there was a compelling reason to do so, "such as a difference in controlling law, citation to prior rulings of this Court, or substantive factual allegations not pleaded in the California Court." R&R at 17. The R&R also makes clear there are four new examples of alleged anticompetitive conduct involving tying in this complaint which were not alleged in Dexon's California Counterclaims (Texas bank, automotive dealership, energy company, and school district), and the "IT budget phenomenon" was also absent from the California Lawsuit. *Id.* at 52–53. As the R&R explains, Dexon states the "lock-in combined with the limited IT budget" brings Dexon's allegations in this case in line with *Kodak*. *Id.* at 53 (quoting Docket No. 62 (Transcript) at 102:18–20).

**Page 61 of 66**

Additionally, in addressing whether Dexon's *Kodak* "lock-in" tying claim makes economic

sense as alleged in this case, the Magistrate Judge specifically considered whether the California

Court had substantively ruled on a *Kodak* "lock-in" theory of tying liability in *Cisco I. Id.* at 59.

Although the California Court stated in a footnote that it "is at least theoretically possible for a

firm to harm competitors by locking customers into a costly long-term service plan and then

requiring purchases in a tied equipment market that customers en masse (for some set of reasons)

cannot refuse," the California Court also noted the "the conditions necessary" for such an

arrangement were "far away from the facts alleged here." *Id.* (quoting *Cisco I*, 2021 WL 5848080,

at *5, n.2). The Magistrate Judge found the California Court had not ruled on a *Kodak* "lock-in"

theory of tying liability, especially considering the new substantive factual allegations pleaded in

this case. *Id.* (citing Docket No. 62 (Transcript) at 73:4–7 (stating an "important fact" that was not

before the California Court "that is littered throughout these [new] examples but also pled more

generally are limited IT budgets"); also citing *id*. at 90:22–24 ("I just did a search, the only

allegation on budget that we made in California was why a customer might buy SmartNet in

general. It was not about lock-in")). The Court finds no conflict between the R&R and the

substantive rulings of the California Court in *Cisco I.*

      Cisco argues Dexon's claims do not make economic sense without addressing the

Magistrate Judge's extensive discussion that they do make economic sense in the context of a

*Kodak* "lock-in" theory of tying liability. *Id.* at 59–60. As the R&R explains, "fundamentally,

Dexon does not allege [as Cisco contends] that the <u>already owned network equipment</u> is the tied

product; rather, as explained above, Dexon alleges here that the equipment the customer already

owns is the lock-in product while the <u>new equipment</u> is the tied product." *Id*. at 59 (emphasis

added). In addition, "the complaint sufficiently alleges that Cisco has threatened to withhold

service on an entire installed base of products to extract supra-competitive purchases of specific tied products." *Id.*

In its objections, Cisco reiterates, with regard to the *per se* tying claims, its argument regarding Dexon's allegation that some customers can pay a recertification fee to receive SmartNet service. However, as the R&R explained, "Cisco's argument is not well developed, and the extent, effect, and details of any recertification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id*. at 66. Cisco's assertions regarding Dexon's allegation of a "re-certification fee" do not invalidate the sufficiency of other allegations contained in the complaint which properly raise a *Kodak* "lock-in" theory of tying that makes economic sense. For example, in Dexon's response to Cisco's objections, Dexon points out "the R&R correctly observed that in the case of the Texas Bank, it could only be eligible for SmartNet renewal if it bought more Cisco switches and routers. Docket No. 121 at 7 (citing R&R at 60).

In its objections, Cisco incorrectly describes the R&R as concluding a "plaintiff need not allege harm to competition in the relevant market," arguing the R&R ignores that *Kodak* does not excuse the failure of a plaintiff to allege an effect on competition in the tied product's market. Docket No. 119 at 4.  Instead, the R&R states as follows: "[a]s explained below, Cisco has failed to show Dexon fails to allege the requisite level of foreclosure to survive a motion to dismiss." R&R at 61.

The R&R points out Dexon's allegations of four new examples of "foreclosure." *Id*. at 61–62. The R&R then explains why the Fifth Circuit's decision *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), *cert. denied*, 513 U.S. 1103 (1995), a case relied upon by Cisco, is procedurally different from Cisco's motion to dismiss and also "tends to support Dexon's argument that the law does not require plaintiffs to plead the same level of foreclosure in

tying claims." *Id.* at 62; *see also id.* at 64 ("The claim in *Roy B. Taylor Sales* was not a *Kodak* 'lock-in' theory of tying liability which would result in an ultimate foreclosure of choice to the ultimate consumer. Rather, the case involved 'an exclusive dealing line-forcing arrangement' where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors."). The Magistrate Judge concluded as follows:

> In this case, Dexon alleges a *Kodak* "lock-in" theory of *per se* tying liability. As noted by the Fifth Circuit in *Roy B. Taylor Sales*, the common ground to those types of tying arrangements is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* at 1383 (citing *Kodak*, 504 U.S. 451). As noted by the Fifth Circuit, a *per se* condemnation requires proof that the tying arrangement involved "the use of market power to force [consumers] to buy [goods] they would not otherwise purchase." *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) . . . . Likewise, here, Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase.

*Id.* at 65 (internal footnote omitted).

Although disagreeing with Cisco that "substantial" market foreclosure of competitors' sales is necessary for a *Kodak* "lock-in" theory of *per se* tying liability, the Magistrate Judge held Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. *Id.* Specifically, the Magistrate Judge concluded as follows:

> Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4–5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50–51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4–5, 26, 51, 103, 125).

*Id.* at 65–66.

Upon *de novo* review, the Court agrees with the Magistrate Judge that Dexon sufficiently alleges *per se* tying under § 1 that results in competitive foreclosure due to unwanted and forced purchases from an alleged monopolist. The Court also finds Dexon has sufficiently alleged that Cisco engages in anticompetitive or exclusionary conduct for purposes of its monopolization and attempted monopolization claims under § 2.  Accordingly, Cisco's objections to Dexon's *per se* tying and monopolization/attempted monopolization claims are **OVERRULED**.

## CONCLUSION

For the reasons set forth above, the Court does not find clearly erroneous or contrary to law the Magistrate Judge's December 22, 2022 Order (Docket No. 94) denying Defendant Cisco Systems, Inc.'s Motion to Transfer (Docket No. 21). Accordingly, it is

**ORDERED** that Defendants Cisco Systems, Inc. and CDW Corporation's Objection to the Order Denying Cisco's Motion to Transfer (Docket No. 96) is **OVERRULED**.

For the reasons set forth above, the Court is of the opinion the findings and conclusions of the Magistrate Judge's Report and Recommendation (Docket No. 107) are correct, and the Defendants' Objections (Docket Nos. 119, 120) are without merit as to the ultimate findings of the Magistrate Judge. Accordingly, it is

**ORDERED** that the Report and Recommendation of the United States Magistrate Judge (Docket No. 107) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that Defendant Cisco's Objections to the Report and Recommendation (Docket No. 119) and Defendant CDW's Objections to the Report and Recommendation (Docket No. 120) are **OVERRULED**. It is further

**ORDERED** that Defendant Cisco's Motion to Dismiss (Docket No. 22) is **DENIED**, with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that Defendant CDW Corporation's Motion to Dismiss (Docket No. 28) is **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that within thirty (30) days from the date of entry of this Order, Dexon shall replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize.

**So ORDERED and SIGNED this 31st day of March, 2023.**


ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE