## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | |
|---|---|
| DEXON COMPUTER, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| ) | **JURY TRIAL DEMANDED** |
| v. ) | |
| ) | |
| CISCO SYSTEMS, INC. and ) | |
| CDW CORPORATION, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT CISCO SYSTEMS, INC.'S
## ANSWER TO PLAINTIFF'S AMENDED COMPLAINT
## AND AFFIRMATIVE DEFENSES

As to those allegations and claims concerning, related to, or supporting Counts I, II, III, IV, V, and VI of the Amended  Complaint filed by Plaintiff Dexon Computer, Inc. ("Dexon") against Defendants Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW"), Cisco answers as follows:

### GENERAL DENIAL

Except as expressly admitted herein, Cisco denies each allegation and characterization contained in the Complaint, including any allegations and characterizations contained in headings.  The numbered paragraphs in this Answer correspond to the numbered paragraphs in the Complaint.  Cisco denies any allegation, averment, contention, or statement in the Complaint not specifically and unequivocally admitted herein.

## I.    INTRODUCTION

1.     Cisco is a monopolist threatening and coercing customers into buying overpriced networking equipment because of the market power Cisco holds over customers, especially small and medium businesses that have no choice but to give into Cisco's demands. Specifically, after customers pay for necessary network equipment maintenance and service, Cisco changes its course of conduct and demands that customers must buy new overpriced equipment in order to avoid a technologically compromised network, and foreclosing its networking equipment competitors in the process.

*Denied.*

2.     Upon information and belief these tactics have been employed by Cisco across the country, but Cisco has carried out these tactics extensively in Texas. Dexon is aware of at least five examples, involving millions of dollars in equipment sales, in Texas in order to keep networking prices high and to foreclose competition from competing providers of networking equipment. For these reasons, Dexon seeks relief before this Court.

*Denied.*

3.     As one example, a Texas-based bank bought Ethernet switches and routers (types of networking products discussed below), as well as a maintenance and service package for that equipment under a program called SmartNet. When the SmartNet service package came up for renewal, the customer sought only to renew the package, but Cisco demanded that it must also buy new Ethernet switches and routers to be eligible for the renewal. The customer did not want or need any new networking equipment, but had no choice other than to give into Cisco's demand to obtain and keep the maintenance and support it needed. This requirement expanded Cisco's grip over the customer due to the additional networking equipment the customer was forced to purchase. Cisco has been able to maintain its supra-competitive prices for its networking equipment, foreclose networking equipment competitors which customers would consider in the absence of Cisco's conduct, and decrease the amount of revenue and profits Cisco's networking equipment competitors have to fund innovation and new product offerings.

*Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 3 related to the unidentified bank's transactions with entities other than Cisco or its motives and preferences.  Cisco denies the remaining allegations in Paragraph 3.*

4.     Cisco's conduct is especially oppressive and greatly injures competition for networking products because Cisco's conduct applies to small and medium businesses with limited IT budgets for networking products necessary for their network infrastructures. As explained in further detail below, purchases of networking products are often spaced out by several years between purchases due to the lifespan of these products and the large amount of capital expenditures needed for such products. As a result, when Cisco forces customers to purchase overpriced equipment through its coercive tactics, Cisco forecloses its network equipment competitors for at least the lifespan of the products customers were forced to purchase.

*Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 4 related to unidentified end users' unidentified purchases of unidentified products. Cisco admits that some customers might wait years before upgrading or updating some networking products, but Cisco denies that is true for all customers or as a general proposition. Cisco denies the remaining allegations in Paragraph 4.*

5.      In addition, through Cisco's coercion, it has forced customers to pay a higher price for networking equipment they had already purchased through a "re-certification fee," by threatening not to service that equipment unless customers pay the additional equipment fees. When customers pay that re-certification fee, customers' limited budgets are restrained further, because the money spent on that fee cannot be spent with Cisco's networking competitors if customers could choose a product on a merits. Thus, any claim by Cisco that its conduct does not foreclose its network equipment competitors ignores how purchases of networking equipment are made and the limited opportunities that competitors have to meaningfully expand their market share; instead, Cisco is able to maintain and increase its market share and supra-competitive pricing by unlawfully constraining the opportunities of its competitors.

*Admitted that Cisco offers recertification to end users.  Cisco lacks information or knowledge sufficient to admit or deny the allegations contained in Paragraph 5 related to unidentified end users' "budgets" for unidentified products.  Cisco denies the remaining allegations in Paragraph 5.*

6.      Cisco considers certain resellers selling both Cisco networking equipment and the networking equipment of Cisco's competitors to be a prime competitive threat to its networking equipment monopolies. Through its improper conduct, by its business practices, Cisco has coerced customers not to purchase from these customers' desired resellers. Cisco has successfully employed a strategy of "fear, uncertainty and doubt," or "FUD," wrongly claiming to customers that unfavored resellers sell "bootleg", "unauthorized", or goods with "malware" or "spyware" to dissuade purchases from these resellers of other manufacturers, including Cisco's competitors. In the process, Cisco has further foreclosed its networking equipment competitors who by and large have never cracked single digit market shares and has allowed Cisco to maintain market power and monopoly shares for decades.

*Denied.*

7.      Another instance of Texas-based coercion illustrates Cisco's FUD strategy. An energy company headquartered in Texas bought Ethernet switches and routers from Dexon, and also bought a multi-year SmartNet maintenance and service package through one of Cisco's preferred dealers. The Ethernet switches and router purchases from Dexon were known and approved by Cisco at the time of these purchases. After providing the promised maintenance and service support to the customer for several years, Cisco then changed its course of conduct and demanded that the customer purchase new Ethernet switches and routers from a vendor other than Dexon to continue receiving the SmartNet maintenance and service. The customer informed Dexon that it still desired to buy networking equipment from Dexon now and in the future, due to the attractive pricing and competitive options Dexon is able to provide, but it could no longer do so because Cisco's new position was that Cisco no longer provide the maintenance support

3

the customer needed. As a result, Cisco's networking equipment competitors selling through Dexon or any other reseller have been foreclosed, ███████████████████, for at least the lifespan of the products and services Cisco forced the customer to purchase, and the customer has been forced to restrict its choices and ability to make future purchasing decisions on the merits.

*Admitted on information and belief that Dexon has transacted with the energy company referred to in Paragraph 7, and that this customer obtained a SmartNet service contract. Cisco lacks knowledge or information sufficient to admit or deny the allegations contained in Paragraph 7 related to correspondence between Dexon and the unidentified nonparty. Cisco denies the remaining allegations in Paragraph 7.*

8.      Cisco's anticompetitive conduct also impacted a local Texas emergency 911-center which had purchased networking equipment from Dexon. In the midst of a five-year SmartNet service package the 911-center had purchased from Cisco, Cisco told the Texas emergency 911-center it needed to purchase new routers and Ethernet switches from a non-Dexon vendor when the customer checked on its account for purposes of a service issue if it wanted to receive the service it was due under its SmartNet service package. Cisco had never notified the customer of a cancellation of the SmartNet service package in the absence of a new equipment purchase. The 911-center cannot afford new equipment, and thus continues to face Cisco's threat that it will not receive the previously paid for service unless it chooses a different vendor for new product purchases, even if that means human lives are put at risk due to a network support issue. This FUD based strategy intends to and successfully: (1) forecloses Cisco's networking equipment competitors from reaching customers through resellers like Dexon, and (2) forces customers to pay more for products that it sought to purchase from less expensive resellers like Dexon.

*Admitted on information and belief that the customer referred to in Paragraph 8 obtained a SmartNet service contract, that Cisco notified the customer that Dexon is an unauthorized reseller, and that certain of its equipment might not be eligible for service under the terms of applicable service agreements. Cisco denies the remaining allegations in Paragraph 8.*

9.      Cisco's conduct violates both Sections 1 and 2 of the Sherman Act, by using its near-virtual monopoly position in the relevant aftermarket for the maintenance and service of its network equipment in order to foreclose customers from buying from competitors in the equipment market and allowing Cisco to maintain supra-competitive prices in relevant product markets in which Cisco is still a monopolist, but faces more prospective competition. Cisco is a monopolist that uses whatever means necessary to keep the prices for its networking products as high as possible to the detriment of its customers.

*Denied.*

10.     Cisco's use of its "service arm," which upon information and belief is entirely separate in terms of personnel, expertise, profitability, process, and corporate structure from its "products arm," to maintain and maximize profitability in its products arm, must stop.

*Cisco admits that it has both a product and services business.  Cisco denies the remaining allegations in Paragraph 10.*

11.      Any claim by Cisco that it is merely controlling its distribution channel and has the incentive to keep its prices as competitive as possible ignores that it is a monopolist in several markets and its improper conduct maintains its supra-competitive pricing and forecloses its networking equipment competitors. Cisco's threats to withhold service in no way serves anyone other than Cisco, and making such threats because Dexon and other multi-vendor resellers have been deemed a competitive problem for Cisco.

*Denied.*

12.      It was not always this way. Dexon is a company that has been servicing its customers for decades, providing timely and reliable services as well as selling network equipment to meet the budgets of hospitals, emergency services providers, public service organizations, and many other small and medium businesses, including those providing essential services before and during the COVID-19 pandemic. Cisco even previously sent one of its representatives to Dexon to aid it in its sales efforts and familiarity with its products. For at least four years prior to 2015, Dexon had access to Cisco's online database in which it could arrange for maintenance service on behalf of it and Cisco's customers. This served to everyone's benefit, as Dexon kept its customers happy while Cisco earned customers' loyalty to its product line.

*Admitted that Dexon has previously accessed a Cisco service portal.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 characterizing Dexon's business history.  Cisco also lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 12 related to a meeting with Dexon involving unidentified "representatives" at an unidentified location on an unidentified date.  Cisco denies the remaining allegations in Paragraph 12.*

13.      But by at least 2015, Cisco deemed resellers like Dexon a competitive threat to its product monopolies. Upon information and belief, Cisco learned that Dexon had been able to convert customers of Cisco networking equipment to customers of its competitors' networking equipment, such as from Juniper. Even for customers that did not convert from Cisco to one of its competitors, resellers like Dexon put pressure on Cisco to lower prices and improve its service (including shipping lead times, where Cisco has been especially lagging). To put an end to these competitive threats, Cisco engaged in the discussed multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control. In the process, Cisco has constrained its network equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets. As discussed below, Cisco even recruited and agreed with one of its favored distributors, CDW, to help it exclude resellers like Dexon and maintain its network equipment monopolies.

*Denied.*

5

14.     The Court must hold Cisco accountable for these anticompetitive acts that are crippling small and medium businesses and Cisco competitors, including Dexon.

*Denied.*

## II.     THE PARTIES

15.     Plaintiff Dexon Computer, Inc. ("Dexon") is a Minnesota corporation with its principal place of business at 9201 E. Bloomington Freeway, Suite BB, Bloomington, Minnesota 55420.

*Admitted on information and belief.*

16.     On information and belief, Defendant Cisco Systems, Inc. (Cisco) is a Delaware corporation with its principal place of business at 170 W. Tasman Drive, San Jose, California 95134 and has been served and has answered herein.

*Admitted that Cisco is a Delaware corporation with corporate headquarters at the above-provided address.  Paragraph 16 otherwise states a legal conclusion as to which no response is required.*

17.     On information and belief, Defendant CDW Corporation (CDW) is a Delaware corporation with its principal place of business at 200 North Milwaukee Ave, Vernon Hills, IL 60061 and has been served with process.

*Admitted that CDW is a Delaware corporation and that Paragraph 17 identifies its listed registered agent.  Paragraph 17 is directed to CDW, and Cisco lacks knowledge or information sufficient to admit or deny the allegations regarding the location of CDW's "principal place of business" or whether it "has been served," which is itself a legal conclusion as to which no response is required.*

## III.     JURISDICTION

18.     Dexon brings this case under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages, costs, and attorney's fees for injuries sustained by Dexon because of Cisco's and CDW's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.

*Paragraph 18 states a legal conclusion as to which no response is required.*

19.     This Court has jurisdiction over Dexon's antitrust claims under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a) and 22.

*Paragraph 19 states a legal conclusion as to which no response is required.*

20.     This Court also has jurisdiction over Dexon's claims pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between Dexon, Cisco, and CDW, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

*Paragraph 19 states a legal conclusion as to which no response is required.*

21.    Venue is appropriate in this district under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, because Cisco and CDW transact business in this district, and has served countless customers within this District that utilize networking equipment, and many of the actions and activities complained of in this Complaint occurred and are occurring in the State of Texas.

*Paragraph 19 states a legal conclusion as to which no response is required.  To the extent a response is required, Cisco denies that venue is proper.  See Ex. A at 2; Ex. B at 2; Ex. C at 1 (demonstrating that Dexon had no good-faith basis for its original allegation that "many of the actions and activities complained of in this Complaint occurred and are occurring in this District," which Dexon has since amended to "in the State of Texas").*

22.    Indeed, Cisco has two offices in Dallas, and offices in San Antonio, Houston and Lubbock, Texas. CDW has an office in Plano, Texas. Given the extensive business the Defendants do in the State, there is sufficient basis for personal jurisdiction over the Defendants.

*Admitted that Cisco has offices in the locations described.  Admitted on information and belief that CDW has an office in Plano, Texas.  Paragraph 16 otherwise states a legal conclusion as to which no response is required.*

### IV.    FACTS

23.    Cisco is dominant in several Worldwide and US markets related to networking equipment and services for the Internet. Cisco offers products and related services in the core technologies of routing and switching, along with more advanced technologies in areas such as home networking, IP telephony, optical networking, security, storage area networking, and wireless technology. On information and belief, Cisco contracts for the manufacture of a majority of its products overseas to keep costs of manufacture at a minimum.

*Admitted that Cisco provides enterprise and consumer products relating to Internet networking, IP telephony, optical networking, security, storage, and wireless technologies.  Cisco denies the remaining allegations in Paragraph 23.*

24.    On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry as explained below. Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceeded 40% or more with its closest competitors half its size, in markets with high barriers to entry.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 24 asserting a "share" of "networking products" and "IP phones" – terms that Dexon does not define or explain in Paragraph 24.  Cisco denies the remaining allegations in Paragraph 24.*

**Cisco is Using Its Monopoly In After Market Maintenance Services to Force Subsequent Supracompetitive Network Equipment Purchases**

*Denied.*

**A.      Cisco is a Monopolist For After-Market Maintenance Services On Cisco Equipment**

*Denied.*

25.      Customers of networking equipment may require maintenance and service to ensure the proper functioning of their equipment. Only Cisco can provide full maintenance and support on its router and Ethernet switch products. These maintenance services include onsite visits from certified engineers, software updates, technical assistance center ("TAC") access, online resources, and hardware replacement services. Without such maintenance services, customers cannot address critical performance issues and address service problems that can be catastrophic to their businesses.

*Admitted that customers of networking equipment might seek maintenance or service to improve or repair the performance of that equipment, and that such maintenance or service can include – among other options – Cisco-supported onsite service, software updates, access to the Technical Assistance Center, and other online resources, in addition to hardware replacement.  Cisco denies the remaining allegations in Paragraph 25.*

26.      Customers without the budget to justify maintenance services provided by Cisco rely on third-party maintenance and service providers to provide hardware maintenance and support (for instance for a power supply or fan issue), but because of Cisco's policies described herein, cannot provide software maintenance and support. Thus, Cisco is able to maintain a price premium for its maintenance services, including its SmartNet service packages. As Cisco highlights in its SmartNet sales materials, "no Third Party Maintenance Provider can provide [customers] with an apples-to-apples match with what Cisco's SmartNet provides," and "a Third Party Maintenance Provider is not authorized to provide [customers] with Cisco bug fixes, patches and updates." These "bug fixes, patches and updates" can be essential to the efficient, effective, and full operation of Cisco's hardware – they cannot be replicated and there are no reasonably interchangeable substitutes for such services.

*Admitted that some consumers use third-party maintenance and service providers, that Cisco issues some proprietary software updates made available to consumers of certain products, and that Cisco's proprietary software can optimize the performance of certain products.  Cisco otherwise lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 26 relating to the business practices of unidentified third parties.  Supposedly quoted documents speak for themselves; Cisco denies any characterization of those materials.  Cisco denies the remaining allegations in Paragraph 26.*

27.      Although end users are not required to purchase SmartNet service packages for their Cisco products, they are effectively compelled do so, because the service packages offered are

integral to the products' functionality. Without SmartNet service, end users will not receive important software bug fixes, patches, and updates (collectively, "updates") that permit Cisco products to serve their intended functions. These updates are designed to repair malfunctions or defects in the software or to combat security vulnerabilities. Consumers who do not update the software on their Cisco products are potentially exposed to security and operational risks. In addition, without the software updates, their Cisco products may not function properly.

*Admitted that end users are not required to purchase "SmartNet service packages" as described in Paragraph 27, and that out-of-date software can present security or operational risks or impair proper functioning of certain networking equipment.  Cisco denies the remaining allegations in Paragraph 27.*

28.     Because Cisco products run on proprietary operating system software that is essential for the products to function, these updates can be obtained only from Cisco. While customary and routine in the technology industry for manufacturers, such as Apple, Hewlett Packard Enterprise, and Microsoft, to make updates available to their consumers for free, Cisco, in contrast, provides updates only to consumers who purchase SmartNet service packages. Upon information and belief, Cisco does not routinely inform customers at the time of initial purchase of these stifling limitations.

*Admitted that Cisco possesses proprietary software that can optimize the functionality of certain products, including – but not limited to – security patches (addressing some critical vulnerabilities) that Cisco may make available for free to some consumers of certain products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 28 relating to the business practices of third parties listed in Paragraph 28.  Cisco denies the remaining allegations in Paragraph 28.*

29.     Thus, the aforementioned services constitute a Relevant After-Market for Maintenance Services on Cisco Equipment (hereinafter the "Relevant Service Market") in which Cisco is a monopolist, and no other competitive service provider has reached a double-digit share. Upon information and belief, Cisco consistently has possessed a share of the Relevant Service Market in excess of 90%, and because it dictates that only it can provide certain critical services, Cisco has erected its own high barriers to entry to prevent any meaningful penetration of its dominance by any competitive service vendor. Cisco has thus admitted that SmartNet pricing is far more expensive than that of third-party providers. The geographic market for the Relevant Service Market is (i) the United States and (ii) the world, determined by the geographic scope of customers and the extent to which they require maintenance services in the US only or worldwide. In the case of the former, customers look to service providers located in the US, whereas in the latter case, customers will require vendors with an international team and associated capabilities.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 29 relating to supposed "share" calculations for which Dexon provides no supporting factual material.  Paragraph 29 states legal conclusions as to which no response is required.  To the extent a response is required, denied.*

9

30.     The Relevant Service Market is separate and distinct from the Relevant Markets for
routers, Ethernet switches, and IP phones discussed below. Customers can and do purchase Cisco
networking equipment without maintenance services, and the pricing for networking equipment
is entirely independent and separate from SmartNet service package pricing. Moreover, upon
information and belief, Cisco's customers in these separate markets (1) deal with different Cisco
personnel teams (e.g., TAC support vs. sales managers), (2) purchase the products and services
at different times/schedules based on different needs, and (3) work with different engineers
because engineers on the service and maintenance team are often different than the engineers on
the product manufacturing and sales teams. In addition, upon information and belief, Cisco's
tracks and monitors the profitability of its "service arm" separately from its "products arm,"
despite its current anticompetitive efforts for one unit to support the profitability of the other
unit.

*Admitted that end users can interact with different personnel at Cisco (or other businesses)
depending on their needs, and that Cisco separately reports financial metrics related to sales of
services and products.  Cisco lacks knowledge or information sufficient to admit or deny the
allegations in Paragraph 30 relating to the motivations of unidentified customers as referenced
in Paragraph 30.  Paragraph 30 states legal conclusions as to which no response is required.
To the extent a response is required, Cisco denies the remaining allegations in Paragraph 30.*

## B.     Cisco is Also A Monopolist In the Router and Ethernet Switch Relevant Markets

*Denied.*

31.     Ethernet switches are a relevant product market. Ethernet switches are devices that
control data flow within a network to enable network components to communicate efficiently.
They are the fundamental building blocks of modern local area networks, deployed in virtually
every modern business and government office. While Ethernet switches are differentiated across
vendors and customer types, there is no adequate substitute technology that provides the same
function and value within a network infrastructure.

*Admitted that Ethernet switches can control data flow within a network to enable network
components to communicate efficiently and thereby serve an important function in modern local
area networks (including where deployed in businesses and government offices).  Paragraph 31
states legal conclusions as to which no response is required.  To the extent a response is
required, Cisco denies the remaining allegations in Paragraph 31.*

32.     Ethernet switches are durable, high fixed cost goods with extended longevity; consumers
of these Ethernet switches commonly intend to use them for many years. Transitioning from
Cisco Ethernet switches to Ethernet switches made by another manufacturer is an expensive
process, requiring the replacement of significant amounts of hardware and the retraining of
personnel.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in
Paragraph 32 relating to unidentified consumers referenced in Paragraph 32, including their
motivations and business practices.  Cisco denies the remaining allegations in Paragraph 32.*

33.     Buyers of Ethernet switches would not be able to turn to routers or other alternative technologies in response to a monopolist's price increase above the competitive level.

*Paragraph 33 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

34.     The geographic markets for the sale of Ethernet switches are (i) the United States and (ii) the world. The global market for Ethernet switches includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for Ethernet switches and narrower U.S.-only market for Ethernet switches. A monopolist of Ethernet switches in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of Ethernet switches globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices above competitive levels both globally and in the United States.

*Paragraph 34 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 34.*

35.     Cisco has monopoly power in the U.S. and global markets for Ethernet switches, consistently holding shares above 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's Ethernet switch market shares are commonly at least five times its closest Ethernet switch competitors in the US, as well as commonly five times its closest Ethernet switch competitors globally. Cisco has managed to maintain its market dominance for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 35 relating to supposed "share" calculations for which Dexon provides no supporting factual material.  Paragraph 35 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 35.*

36.     Routers have been a technology that is complementary to, and not a substitute for, Ethernet switches, and also constitute their own relevant product market. While Ethernet switches connect components to create a network, routers allow for communication between networks. The two types of devices generally operate at different logical levels in a network: Ethernet switches transfer information in the data link layer using physical addresses for network components, whereas routers transfer packets in the Network or IP layer using virtual addresses. As technology has evolved, Ethernet switch manufacturers have begun to incorporate certain routing technologies into a single combined product. This confirms that routers are complements for Ethernet switches and not substitutes.

*Admitted that routers and Ethernet switches can be used as different products (although they need not be used for different purposes), that Ethernet switches can transfer information using*

*physical addresses for network components, that routers can transfer packets using virtual or logical or IP addresses, and that some technologies include elements of both Ethernet switches and routers. Paragraph 36 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 36.*

37. Buyers of routers would not be able to turn to Ethernet switches or other alternative technologies in response to a monopolist's price increase above the competitive level.

*Paragraph 37 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

38. The geographic markets for the sale of routers are (i) the United States and (ii) the world. The global market for routers includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is substantial industry recognition of both a global market for routers and a narrower U.S.-only market for routers. A monopolist of routers in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of routers globally would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for routers above competitive levels both globally and in the United States.

*Admitted that some router manufacturers sell products worldwide. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 38 relating to supposed "substantial industry recognition," a phrase Dexon does not define or substantiate with any factual material. Paragraph 38 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 38.*

39. Cisco has monopoly power in the U.S. and global markets for routers, consistently holding a share in excess of 60% in both markets, and protected by high barriers to entry as discussed below. Cisco's router market shares are roughly at least five times its closest router competitors in the US, as well as five times its closest router competitors globally. Cisco has managed to maintain its market dominance on routers for at least twenty years, with global and U.S. market shares commonly exceeding 60%, and often above 70%.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 39 relating to supposed "share" calculations for which Dexon provides no supporting factual material. Paragraph 39 states legal conclusions as to which no response is required. To the extent a response is required, Cisco denies the remaining allegations in Paragraph 39.*

40. The Relevant Router and Switch Markets are both characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. To begin with, the costs to develop router software and hardware as well as switch software and hardware are substantial, requiring tens of millions of dollars for initial development, and then hundreds of millions more to tailor the product to specific customer needs and to build an effective sales network.

*Admitted that Cisco has devoted millions of dollars to the research and development of its routers and Ethernet switches and related business.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 40 relating to research and development costs third parties have incurred.  Paragraph 40 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 40.*

41.     Another barrier to entry for the Relevant Router and Switch Markets lies in customers' long purchase cycles when replacing or upgrading their network components to the next technology. For example, it took approximately 15 years for customers to widely deploy 10+ Gigabit Ethernet switches to replace 1 Gigabit Ethernet switches. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

*Admitted that some customers did not switch from "1 Gigabit Ethernet switches" to "10+ Gigabit Ethernet switches" for several years.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 41 relating to how many years, approximately, it took for unidentified customers referenced in Paragraph 41 generally to "widely deploy 10+ Gigabit Ethernet switches."  Cisco denies the remaining allegations in Paragraph 41.*

42.     As Cisco publicly promotes (e.g., https://blogs.cisco.com/internet-of-things/ciscoranked-1-again-in-industrial-networking), it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to Ethernet switches and routers. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new Ethernet switch or router entrant may need to offer a full line of network components.

*Cisco's public materials speak for themselves; Cisco denies any characterization of those materials.  Paragraph 42 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 42.*

43.     Cisco's practice of holding customers hostage through their SmartNet service packages also creates a particularly pernicious barrier to entry. Any customer wishing to preserve the value of its SmartNet package would not be able to viably consider router or Ethernet switch purchases from competitive vendors to Cisco if the customers are under duress that in the absence of a Cisco purchase their maintenance service may not be provided. Even if a customer were willing to risk a period without maintenance, purchasing replacement routers or Ethernet switches from a Cisco competitor means risking the value of the SmartNet package for which the customer has already paid during the remaining service period.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 43 relating to how an unidentified customer would make decisions in a hypothetical situation that does not accurately describe Cisco's conduct.  Cisco denies the remaining allegations in Paragraph 43.*

44.     To summarize, Cisco has monopoly power in the following relevant markets: the Relevant Service Market (both globally and limited to the U.S.), the Relevant Router Market (both globally and limited to the U.S.), and the Relevant Switch Market (both globally and limited to the U.S.). Hereinafter the Relevant Router and Switch Markets are referred to collectively as the "Relevant Network Equipment Markets." As explained below, Cisco is also attempting to monopolize the IP Phone Markets, which will be referred to as the Relevant IP Phone Markets. Hereinafter the Relevant Network Equipment Markets and the Relevant IP Phone Markets are referred to collectively as the "Relevant Product Markets." Upon information and belief, Cisco may be engaging in the same coercive tactics with respect to other Relevant Product Markets, such as optics, access points, and network management software, and should that prove to be the case Dexon will make that apparent in the course of litigation.

*Paragraph 44 summarizes Dexon's own allegations; Cisco repeats and incorporates the foregoing responses.  Paragraph 44 states legal conclusions as to which no response is required. To the extent a response is required, denied.*

## C.      Cisco Locks In Customers Who Require Maintenance With SmartNet, and Then Uses SmartNet As A Hammer To Force Supracompetitive Purchases of Routers and Ethernet Switches

*Denied.*

45.     Customers seek to find the best economic and performance deal for networking equipment regardless of when it is purchased. Either around the time of such an equipment purchase or at a different time, customers may also consider purchasing a SmartNet service package for several different types of networking equipment. Upon information and belief, the larger a particular deployment and the more legacy Cisco equipment the customer has in its network, the more likely customers will require a SmartNet package for one or more aspects of their network at any time.

*Admitted that some customers generally seek quality performance and the best economic transaction when purchasing networking equipment, and that some customers using Cisco equipment might consider acquiring SmartNet service for some equipment.  Cisco otherwise lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 45 relating to how unidentified customers referenced in Paragraph 45 make purchasing and business decisions.  Cisco denies the remaining allegations in Paragraph 45.*

46.     For those customers that do or might require a SmartNet service package, the objective is to secure maintenance services for networking equipment that already is or will be in use for the customers' networks. To satisfy themselves that this will be the case, SmartNet customers will provide Cisco with the precise serial numbers, part numbers, products, and customer information for which the purchased SmartNet service package will apply. Cisco specifically approves the service package with this information, including in scenarios where Cisco can see that customer is purchasing the SmartNet service package through a secondary reseller which does not have a direct purchasing relationship with Cisco.

*Admitted that certain customers desire SmartNet service for networking equipment they purchase, that some customers provide equipment serial numbers to receive some service, and that Cisco uses this information – among other information – to provide some services to certain customers, including customers that have purchased equipment through certain resellers.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 46 relating to how unidentified customers referenced in Paragraph 46 make purchasing and business decisions.  Cisco denies the remaining allegations in Paragraph 46.*

47.     Indeed, Cisco has full knowledge that its standard sellers or partners sell an extremely large volume of SmartNet service packages to secondary market sellers such as Dexon. In fact, Cisco's Technical Assistance Center has and will alter or change serial numbers in order to approve and thereby receive payment for SmartNet service packages relating to secondary market equipment. Cisco willfully turns a blind eye to such transactions because they are extremely profitable for Cisco.

*Denied.*

48.     Upon information and belief, Cisco receives a payment from customers pursuant to this SmartNet approval process at or around the time of the SmartNet purchases.

*Admitted that Cisco receives some compensation from certain customers for some services at the time of purchase.  Cisco denies the remaining allegations in Paragraph 48.*

49.     Customers expect to receive the service they paid for from Cisco for anywhere from months to years into the purchased SmartNet service package. As explained below, parties such as Dexon would facilitate such service through Cisco's service team that would keep customers happy with both companies. But since at least 2015 through the present, Cisco has suddenly claimed at some point after customers purchased a SmartNet service package that the SmartNet service packages were no longer valid in the absence of a new purchase of Cisco equipment, including at least routers and/or Ethernet switches. Alternatively, Cisco forced customers to pay a "re-certification" fee for previously purchased networking equipment so that SmartNet service would not be withheld, as Cisco threatened. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process for the equipment and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. Given that customers are locked into the Cisco installed base of products, they have little choice other than to accede to Cisco's demands.

*Admitted that Cisco offers a recertification program to end users.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 49 relating to how unidentified customers referenced in Paragraph 49 make purchasing and business decisions or their expectations.  Cisco denies the remaining allegations in Paragraph 49.*

50.     Given the Cisco approval process associated with customers' SmartNet purchases, customers had no reasonable expectation when they bought the SmartNet service package that Cisco would subsequently claim that entirely new, unwanted networking equipment or a "recertification" fee for the equipment would be required. This is especially true given that Cisco

has unique access to customers for the months or years after it purchased the service packages, and customers received the service for which they had paid during that period. Cisco changed its course of conduct not because of enforcement of a consistent policy, but rather because it newly disapproved, after approving previously, customers' purchase of networking equipment and SmartNet service.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 50 relating to how unidentified customers referenced in Paragraph 50 make purchasing and business decisions or their expectations.  Cisco denies the remaining allegations in Paragraph 50.*

51.     Another example from Texas, in addition to those above, represents an iteration of how this has occurred in the marketplace. A Texas based automobile dealership purchased Ethernet switches through Dexon as well as a SmartNet service package through another vendor, all with the knowledge and approval of Cisco. Pursuant to the SmartNet service package, Cisco first provided maintenance services and support for the Ethernet switches, including with software updates. However, one of Cisco's software updates had a critical flaw that, when deployed by Cisco, rendered the Ethernet switches useless (or "bricked" as known in the industry). At first, Cisco replaced the Ethernet switches pursuant to the SmartNet service package, but Cisco then claimed it would not replace other defective Ethernet switches or complete any maintenance unless the customer bought entirely new Ethernet switches from a vendor other than Dexon. Because the customer could not afford new Ethernet switches, due to a limited IT budget, the customer was forced to deal with a network disruption on its own and without any ability to switch to a competing network equipment provider. Because the customer relied on Cisco's original assurance that the customer would receive the service and maintenance for which it had paid, when Cisco changed its position, it robbed the customer of the ability to make a free choice about its equipment manufacturer and reseller. Due to Cisco's conduct, the customer eventually cut off its relationship with Dexon entirely.  Thus, both Cisco's competitors in the Relevant Networking Products were improperly foreclosed, because the customer is under a new impression that any use of its products or services will put any Cisco service in jeopardy.

*Admitted on information and belief that Dexon sold networking equipment to the auto dealership referred to in Paragraph 51, and that Cisco provided maintenance services to this end user for some of its networking equipment.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 51 relating to the end user's motivations and business decisions.  Paragraph 51 states a legal conclusion as to which no response is required.  To the extent a response is required, and as to the other allegations in Paragraph 51, denied.*

52.     Upon information and belief, these examples are part of an overall course of conduct by Cisco to hold up its SmartNet customers, at least since 2015. As explained below through Dexon's experience, upon information and belief, there has been an enterprise-wide effort at Cisco to use SmartNet service packages in this way to be sure that customers purchase networking equipment at supra-competitive prices to pad Cisco's profits as well as the commissions of its sales representatives. Dexon is aware of at least one of its customers that has threatened legal action against Cisco for these tactics, but Cisco does not care, as Cisco's continued profiteering from this conduct as a monopolist in the Relevant Service Market and

Relevant Networking Markets far outweighs the costs it would face for defending itself in litigation.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 52 relating to an unnamed legal matter of which Dexon is aware.  Paragraph 52 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 52.*

53.     Cisco draws an economic benefit from these coercion tactics to SmartNet customers because, upon information and belief, its margins are far higher for sales made through channels that have higher resale prices. For instance, if Cisco can maintain the supra-competitive prices it charges to favored VARs, such as CDW, by coercing customers to use that distribution channel, Cisco can maintain its overall profitability. For this reason, as part of Cisco's anticompetitive strategy, it has sought to limit the number of resellers who compete for each customer, even though such competition benefits customers. Conversely, if VARs can negotiate lower pricing from Cisco because customers have a variety of distribution options unimpacted by coercion, then Cisco's overall profitability goes down. Cisco's sales representatives also earn higher commissions for sales in the Relevant Product Markets made through coercion, on the backs of their customers.

*Denied.*

54.     There is a substantial amount of commerce involved in the Relevant Product Markets for which Cisco is forcing supracompetitive purchases. Each year, Cisco sells billions of dollars of Ethernet switches and routers, both in the US and worldwide.

*Admitted that Cisco's revenues related to the sale of Ethernet switches and routers have surpassed $1 billion in certain years.  Paragraph 54 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

55.     Cisco also attempts to leverage its exclusive control of essential software updates and services for Cisco products to functionally incapacitate select secondary market products. Cisco provides services and updates to its products via SmartNet service packages. End users acquire these packages in order to obtain those services.

*Admitted that Cisco makes available SmartNet service packages for purchase as to certain networking equipment, and that Cisco also provides product updates to customers for certain products.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 55 relating to the motivations of unidentified "end users" generally.  Cisco denies the remaining allegations in Paragraph 55.*

**D.      Cisco Recruits CDW to Aid It In Its Plan, and Cisco's Coercion Strategy Expands to IP Phones**

*Denied.*

17

56.     One of Cisco's favored resellers is CDW, headquartered in Illinois, with revenue of $18.47 billion in fiscal year 2020 (compared with Cisco's $49.8 billion in the same time period). Upon information and belief, CDW sells Cisco equipment in the Relevant Networking Markets. Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets. Conversely, resellers like Dexon provide attractive service and pricing to customers that puts pressure on Cisco to charge lower prices to its favored resellers.

*Admitted that Cisco's reported revenue in its fiscal year 2020 was approximately $49 billion, and that CDW sells Cisco-manufactured Ethernet switches and routers among many other products (including from other manufacturers).  Cisco lacks knowledge or information sufficient to admit or deny the amount of CDW revenue during Cisco's fiscal year 2020 (which is not concurrent with the calendar year).  The remaining allegations in Paragraph 56 state legal conclusions as to which no response is required.  To the extent a response is required, denied.*

57.     Once Cisco deemed Dexon a competitive threat, it also determined that CDW could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options for its customers. To this end, Cisco and CDW conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers.

*Denied.*

58.     Dexon's attempt to sell Relevant Networking Equipment to a hospital system in Pennsylvania provides an example of how the conspiracy works. For several years, Dexon had provided routers, Ethernet switches, line cards, access points and modules to the hospital. The customer was open to purchasing products from manufacturers apart from Cisco, and valued the fact that Dexon provided those options, because it led to better pricing and service.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 58 relating to Dexon's historical business (relating to events in 2015 or earlier) with the unidentified hospital.  Paragraph 58 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

59.     Pleased with the products and service Dexon had provided, the hospital decided to make a significant investment in routers and Ethernet switches, and the deal would have been worth a significant amount of business for Dexon (on top of the prior business with Dexon which was already significant). Upon learning that the hospital had selected Cisco for the purchase and had awarded the order to Dexon, Cisco threatened the customer that if it did not cancel the order for the new purchase of hardware and associated SmartNet service with Dexon, that not only would Cisco not honor the contemplated new SmartNet service package, but Cisco also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics which the customer had been receiving service and support from Cisco for years. This tactic worked, and the customer did not go through with the contemplated deal with Dexon, and never made another purchase from Dexon again.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 59 relating to the motivations and business decisions of the unidentified hospital as it relates to events taking place in 2015. Cisco denies Dexon's characterization of the events that transpired between it, Cisco, and the hospital.*

60.     Cisco's agreement with CDW to exclude Dexon from at least the Relevant Networking Equipment Market facilitated this outcome, which restricted both inter-brand competition (between Cisco and its competitors in the Relevant Network Markets) and intra-brand competition (between Cisco resellers). Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment. The sales representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the "savior" to the hospital system so that the customer could keep its service for all of its Networking Equipment, when in fact the intention and purpose of the scheme was to exclude resellers like Dexon, so that the customer would pay more for the equipment with CDW as the sole supplier. Upon information and belief, the Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon.

*Admitted on information and belief that CDW made a sale to the unidentified hospital, and that the unidentified hospital obtained SmartNet service for the products that CDW sold. Paragraph 60 states legal conclusions as to which no response is required. To the extent a response is required, denied.*

61.     This Cisco-CDW conspiracy has limited intra-brand competition between resellers selling Cisco Networking Equipment in the Relevant Markets, because its purpose and effect is to prevent end user customers' from having access to Dexon which offers top quality service at more aggressive pricing than other resellers. The conspiracy also had the dual effect of limiting interbrand competition between Cisco and its competitors in the Relevant Networking Equipment Markets, because not all resellers prioritize or promote competitive products in the Relevant Networking Equipment Market in the same way. As an example, on CDW's website, when one completes a search for "Ethernet switches," it pulls up 1,440 selections for Cisco with no other Ethernet switch competitor with more than 250 selections (and most below 100). Upon information and belief, this is because CDW believes it will receive favorable treatment by Cisco by showing so many of its offerings and portraying its competitors as more limited. By contrast, Dexon has earned the respect and trust of its customers precisely because it does not prioritize any particular brand or make assumptions about what a customer wants, and merely seeks to guide the customer to the best option. Thus, when Cisco conspired with CDW, Cisco knew that it would tilt the competitive playing field in its favor, limiting the opportunities of its competitors to make sales through resellers like Dexon which does not favor any particular Network Equipment competitor.

*CDW's public materials speak for themselves; Cisco denies any characterization of those materials. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 61 relating to the "respect and trust" Dexon has from unidentified customers referenced in Paragraph 61. Paragraph 61 states legal conclusions as to which no response is*

*required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 61.*

62.     The conspiracy between Cisco and CDW continues through the present day. Upon information and belief, as part of their conspiracy to exclude Dexon, Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed. Confirming this agreement, upon information and belief, when the CDW representative previously assigned to Dexon refused to comply with the Cisco's demand, CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy. This worked. Pursuant to the conspiracy, no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021.

*Admitted that Cisco notified CDW that Dexon is not an authorized reseller of Cisco products. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 62 relating to the status of the business relationship between CDW and Dexon through the present.  Paragraph 62 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 62.*

63.     The Cisco-CDW conspiracy has foreclosed a substantial amount of interstate commerce to Dexon by virtue of the Pennsylvania Health System alone, but upon information and belief, millions of dollars of purchases across the country have been foreclosed to Dexon due to the Cisco-CDW conspiracy.

*Paragraph 63 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

64.     Dexon believes that several such instances with Cisco's favored resellers occurred, but rather than hearing about representatives that were willing to stick up for customers' right to the best deal, Cisco successfully coerced such resellers to limit or withdraw their business from Dexon.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 64 about what Dexon believes.  To the extent there are additional allegations in Paragraph 64, Cisco denies the remaining allegations in Paragraph 64.*

### **CDW Has Had A Specific Intent to Maintain Cisco's Monopolies**

*Denied.*

█     For at least the past 15 years, CDW has made the intentional and strategic decision that it wants to be the leading reseller of Cisco networking products. As a result, CDW has continuously sought to maintain its "Cisco Gold Certified Partner" status and has closely collaborated with Cisco to avoid competitive threats from Cisco's smaller competitors. In doing so, CDW knows that it is helping maintain Cisco's monopoly positions in at least the Relevant Markets. As a CDW employee revealingly noted in an internal email, ████████████████

███████████████████████████████████████████
███████████████████████████████████████████
█████████████████ This was all welcomed and sought by
CDW. ████████████████████████████████████

████████████████████████████████████. *Quoted
materials speak for themselves; Cisco denies any characterization of those materials.*
█████████████████████████ *Paragraph 65 states legal conclusions as to which no
response is required.  To the extent a response is required, Cisco denies the remaining
allegations in Paragraph 65.*

█████ CDW's decision to seek Cisco's favor does not come without strings attached. For
instance, ████████████████████████████████████████ Fully aware of
its monopoly power in the Relevant Markets, █████████████████████████
█████████████████████████

*Paragraph 66 states legal conclusions as to which no response is required.  To the extent a
response is required, Cisco denies the allegations in Paragraph 66.*

67.   Both of these phenomena—CDW's welcoming of Cisco's favoritism and Cisco's
████████████████—aid the maintenance of Cisco's monopolies in the Relevant
Markets. Cisco and CDW are both large, sophisticated entities that know precisely what they are
doing, particularly with each other. CDW knowingly entered this business relationship with the
goal of not just maintaining Cisco's monopolies, but expanding them, as it believed it would be
rewarded for doing so. Indeed, ████████████████████████████████
████████████████████████████.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph
67 relating to CDW's corporate intent.  Paragraph 67 states legal conclusions as to which no
response is required.  To the extent a response is required, Cisco denies the remaining
allegations in Paragraph 67.*

█████ CDW has profited from helping maintain Cisco's monopolies. ███████████
████████████████████████████████████████.

███████████████████████████████████████████████████████████

*Cisco denies the remaining allegations in Paragraph 68.*

69.     Given these facts governing the Defendants' relationship, it is hardly surprising that Cisco sought out CDW's assistance to foreclose a reseller like Dexon. Cisco's internal analyses show that ██████████████████████████████████████████████████████████

███████████████████████████████████████. Thus, when CDW displaced Dexon at the Pennsylvania Health System, CDW knew that it was helping Cisco maintain its dominance and its supra-competitive pricing, depriving a customer of the competition Dexon provided.

*Purported internal materials produced in discovery speak for themselves (to the extent the documents Paragraph 69 describes without identification exist); Cisco denies any characterization of those materials.  Paragraph 69 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 69.*

70.     In light of the foregoing, through the Cisco-CDW conspiracy, CDW intended to and did help maintain and expand Cisco's monopolies in the Relevant Markets.

*Paragraph 70 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the allegations in Paragraph 70.*

### Cisco's Expansion of FUD

*Denied.*

71.     Upon seeing how successful this FUD and coercion campaign worked for the Relevant Networking Equipment Markets, Cisco expanded its sights to IP Phones. Once again in Texas, an Independent School District awarded Dexon a multi-year exclusive contract to provide IP phones to the District, after several years of successful dealings with Dexon. Dexon was awarded the most recent business after an exhaustive RFP process, in which Dexon was rated the clear winner for every criterion being considered by the School Board. Indeed, several of the evaluation criteria related to the reputation and quality of Dexon's goods and services, which would include the products of several IP phone manufacturers. As a result, the School Board approved the award of the contract to Dexon for thousands of IP phones. Upon information and belief, Cisco threatened the School District that if it did not cancel the order from Dexon, it would not service the other Networking Equipment already purchased by the District. Once again, this coercion worked, and the customer was forced to cancel its order with Dexon, and upon information and belief, the District paid more for the same exact equipment from another reseller.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 71 concerning Dexon's business relationship with the unidentified school district, or*

*the school district's RFP process and related decision-making, or its subsequent purchase history.  Cisco denies the remaining allegations in Paragraph 71.*

72.     As a result, upon information and belief, not only was the Texas School District forced to spend more for an RFP that was already completed and approved, but it forecloses any competitive product purchase that would have been considered from Dexon due to the successful execution of FUD.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 72 concerning the unidentified school district's purchase history.  Cisco denies the remaining allegations in Paragraph 72.*

73.     Upon information and belief, these FUD tactics are not isolated instances of misconduct but rather a standard coercion tactic used by Cisco, especially in Texas, when it seeks to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. Because customers are forced to rely on Cisco to service its installed base of networking equipment, the FUD tactic can be used with respect to any new purchase a customer is considering for which Cisco offers a purchase option. In the above example for a Texas School District, there is simply no plausible reason the School would be forced to withdraw from its preferred business partner in the absence of FUD from Cisco.

*Denied.*

74.     As another example of FUD, Cisco recently claimed to a Maryland customer that line cards sold by Dexon suffered from "malware," even though there is no software associated with the sale of line cards. Cisco is essentially immune from any criticism it may receive from customers due to these false statements because it knows that customers still require so many of its services.

*Denied.*

75.     While not quite as dominant in IP phones as it is in other types of networking equipment, Cisco still maintains in excess of a 40% share of the global and US based IP phone markets, and has possessed in excess of a 60% share of enterprise Unified Communications (UC) purchases which include IP phones. Cisco has shipped more than 100 million IP phones to more than 200,000 customers worldwide, with 95% penetration in Fortune 500 companies. Like other markets in which it is dominant, Cisco's next closest competitors in these IP phone markets are a fraction of its size, possessing shares at least 20% lower than that of Cisco.

*Admitted that Cisco has manufactured millions of IP phones sold to customers around the world. Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 75 relating to shares of "IP phones" because Dexon has not identified the sources of its information so that Cisco may verify the figures (nor does it identify "Cisco's next closest competitors" for verification).  Cisco denies the remaining allegations in Paragraph 75.*

76.     Thus, through the above tactics, Cisco has attempted to and likely succeeded in monopolizing the Global and US Relevant Markets for IP Phones (hereinafter "Relevant IP Phone Markets"). While landlines, or analog phone systems, carry voice signals over copper wires, VoIP technology transmits voice traffic over the internet in the form of data packets. IP phones need only a live broadband connection to make and receive calls, and thus have eliminated the need for expensive landline rentals.

*Admitted that landline telephones are sometimes known as analog phone systems and can carry voice signals over copper wires, that "VoIP technology" transmits audio as data packets, and that "IP phones" can make and receive calls using a broadband Internet connection. Paragraph 76 states a legal conclusion as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegation in Paragraph 76.*

77.     Additionally, IP phones offer far greater geographical flexibility for users than landline phones. Landlines are tethered to the wired office phone, yet IP phones allow you to have a virtual local presence anywhere in the world. IP phones are also easily scalable, allowing a company to remove or add new users with ease, and gives users the ability to have a phone with them via their own smartphone or computer via software.

*Admitted that landline telephones are tethered to a physical phone and jack, that IP phones and similar technologies can enable end users to "have a phone with them via their own smartphone or computer via software," and that this can provide "greater geographical flexibility" than "landline phones."  Cisco denies the remaining allegations in Paragraph 77.*

78.     IP phones can offer more features at a lower cost than landlines as well, such as video conferencing. IP phones can integrate voice, messaging, presence and cloud sharing and more into one single platform. There are likely several sub-segments to the Relevant IP phone markets, such as UC communications, that will be identified in the course of discovery.

*Admitted that some IP phones and similar technologies can offer more features (including videotelephony, messaging, and cloud services at a lower cost than some landline phones. Paragraph 78 states a legal conclusion as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 78.*

79.     Buyers of IP phones would not be able to turn to landlines or other alternative technologies in response to a monopolist's price increase above the competitive level.

*Denied.*

80.     The geographic markets for the sale of IP phones are (i) the United States and (ii) the world. The global market for IP phones includes manufacturers with product portfolios that are worldwide in scope and multinational customers that have a demand for such global capability. There is industry recognition of both a global market for IP phones and a narrower U.S.-only market for IP phones. A monopolist of IP phones in the United States would be able to raise prices profitably over competitive levels. Correspondingly, a monopolist of IP phones globally

would be able to raise prices profitably over competitive levels. In fact, Cisco itself has been able to maintain prices for IP phones above competitive levels both globally and in the United States.

*Paragraph 80 states legal conclusions as to which no response is required.  To the extent a response is required, denied.*

81.     The Relevant IP Phone Markets are characterized by high barriers to entry and expansion. There are several factors that contribute to these high entry and expansion barriers for potential new entrants and existing competitors. The costs to develop IP phone software and hardware are substantial, likely at least tens of millions of dollars, and requires millions more to build the capability to install in large national and multinational corporations.

*Admitted that Cisco has devoted millions of dollars to the research and development of its IP phones and related or similar technologies.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 81 relating to research and development costs third parties have incurred.  Paragraph 81 states legal conclusions as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 81.*

82.     Another barrier to entry for the Relevant IP Phone markets is customers' long purchase cycles when replacing or upgrading their phones to the next technology. These circumstances mean that competitors have limited opportunities to significantly expand their market share and take market share from competitors.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 76 relating to the motivations, business decisions, and purchasing decisions of unidentified customers as a general group.  Cisco denies the remaining allegations in Paragraph 82.*

83.     As Cisco publicly promotes, it is the number one vendor for major network components often required by customers for their enterprise infrastructures – such as for wireless LAN and telepresence – in addition to IP phones. Thus, a further barrier to entry is created by the simple fact of Cisco's dominance. Given the relatively high transaction costs for customers, and the presence of bundled offerings, any new IP phone entrant may need to offer a full line of network components.

*Cisco's public materials speak for themselves; Cisco denies any characterization of those materials.  Cisco denies the remaining allegations in Paragraph 83.*

### E.     The Anticompetitive Effects of Cisco's Conduct Are Overwhelming

*Denied.*

84.     Upon information and belief, the instances described above are not isolated instances of pressure, but rather part of an overall effort to force customers to only be able to access networking equipment, IP phones and service through the most expensive avenues, while foreclosing Cisco's equipment competitors. As explained, Cisco was not always hostile to a

channel that sought to give customers the best deals, likely because that process aided Cisco's overall effort to be known as the most ubiquitous networking equipment provider regardless of the channel the networking equipment reached the customer. But that changed sometime around 2015, when Cisco apparently decided that padding its own profit margins and keeping its sales representatives satisfied was more important than servicing all of its customers.

*Denied.*

85.     In some cases, Cisco was able to force customers to pay a "re-certification" fee associated with the reinstatement of its SmartNet service associated with previously purchased networking products. Upon information and belief, Cisco simply accepted this payment without doing any type of "re-certification" process or other associated service and reactivated the SmartNet service package simply because the customer paid more money for the networking equipment. There is no "business justification" to this, and Cisco practices are merely designed to shift economic welfare from customers to itself.

*Admitted that Cisco offers a recertification program to end users.  Paragraph 85 states a legal conclusion as to which no response is required.  To the extent a response is required, Cisco denies the remaining allegations in Paragraph 85.*

86.     The inevitable effect of this overall course of conduct is to drive supra-competitive prices in the Relevant Product Markets and hinder the ability for customers to find alternatives. While in theory customers could divert purchases in the Relevant Product Markets to Cisco's competitors, because of Cisco's installed base for so many of its customers is a large portion of their networks, it is practically difficult for many customers to make a wholesale change, or to even do so over an extended period of time given the infrequency of new purchases. As the above examples make clear, many customers are left with no practical choice other than to purchase unwanted and overpriced equipment in the Relevant Product Markets on Cisco's terms or face a greater risk of a technical compromise.

*Paragraph 86 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

87.     Indeed, in the case of a Texas-based 911 operator, the essential and critical services that everyday Americans rely upon are at risk due to Cisco's bullying tactics. There is no justification that can be advanced to accept this needless risk to human safety.

*Admitted on information and belief that Dexon sold unauthorized networking equipment to a 911 operator in Texas, depriving the 911 operator of authorized equipment, and vendors of authorized equipment a potential sale.  Cisco denies the remaining allegations in Paragraph 87.*

88.     Cisco's conduct also has a direct impact on its competitors in the Relevant Product Markets, because in the presence of such pressure, customers are not free to make a product choice on the merits but rather are forced to acquiesce to Cisco's pressure. Because of the inherently connected and complementary nature of the products in the Relevant Product Markets, customers cannot afford to risk the services it needs that only Cisco provides. In this

environment, Cisco competitors in the Relevant Product Markets have less revenue than they should to bolster next generation innovation, and potential competitors have less incentive and ability to overcome the barriers Cisco has erected and viably enter the Relevant Product Markets.

*Denied.*

## F.   Dexon Has Suffered An Antitrust Injury

*Denied.*

89.    Cisco's overall course of conduct is specifically designed (i) to foreclose or otherwise eliminate distribution options through which customers can purchase from manufacturers competitive to Cisco, and (ii) to eliminate the option a customer would have to secure such a product for a lower price that puts upstream pressure on Cisco to lower its own prices should customers opt for a Cisco product. Dexon's injury illustrates both of these phenomenon. As illustrated above, Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 89 related to Dexon's business.  Paragraph 89 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

90.    Cisco's conduct is designed to harm resellers like Dexon precisely because of the benefits to customers that Dexon has provided for decades, which run counter to Cisco's profit motives. Cisco is a quintessential monopolist that knows that it can earn more profit by limiting supply and forcing customers into more expensive, exclusive channels. If Cisco can force ultimate customers to purchase from these channels, then there is less need and ability for Cisco's preferred dealers to negotiate for price reductions or quality improvements that would impact Cisco's bottom line. The coercion and other conduct at issue in this case allows Cisco's monopoly power to not only be maintained, but grown, and Dexon's losses are a direct byproduct of this phenomenon.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 90 related to Dexon's business.  Paragraph 90 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

91.    Dexon has also sustained losses to its goodwill and reputation in the marketplace by virtue of Cisco's conduct. Because of Cisco's monopoly position in both the Relevant Service Market and the Relevant Product Markets, it has been immune to customer dissatisfaction with its conduct and has attempted to shift the problem of its own creation to Dexon. Namely, rather than respond to customer feedback and attempt to win purchases by virtue of better service or

terms, Cisco has attempted to portray Dexon as an unworthy sales partner who is the cause of the customers' problems. But this is not the case, as Dexon has spent decades building trust and goodwill with its customers, even to the benefit of Cisco. But now that Cisco's priority is to bully and intimidate any company that stands in the way of its maximum profit, Dexon is being painted in a different light.

*Admitted that Cisco has notified certain customers of the fact that Dexon is not an authorized reseller of Cisco products.  Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 91 related to Dexon's business.  Paragraph 91 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

92.     Dexon's reputation has been unjustifiably harmed due to Cisco's antitrust violations in the United States and in Texas specifically. Dexon lost a major award for IP phones from a public school district, was forced to sustain losses so that a 911 operator could continue to serve citizens, was forced to stop doing business with an automobile chain and foreclosed its ability to fully serve an energy company, all because of Cisco's FUD and associated coercive tactics. Texans should be able to benefit from the competitive options and service that Dexon offers, but instead Cisco has employed anticompetitive tactics specific to the State to deprive its businesses and public entities of those benefits.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 92 related to Dexon's business.  Paragraph 92 also states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

## V.     CLAIMS FOR RELIEF

### A.     Count I (Sherman Act Section 1)

### Conspiracy in Unreasonable Restraint of Trade Against Cisco and CDW

93.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 93, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

94.     Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

*Paragraph 94 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

95.    The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery.

*Paragraph 95 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

96.    The goal and effect of the conspiracy was to limit both inter-brand and intra-brand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products over Cisco's competitors. In addition, Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit interbrand and intra-brand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 90 relating to what Dexon has prided itself upon.  Cisco denies the remaining allegations in Paragraph 96.*

97.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

*Paragraph 97 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

98.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 98 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

99.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 99 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**B.    Count II (Sherman Act Section 2)**

**Conspiracy To Monopolize Against Cisco and CDW**

100.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 100, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

101.    Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

*Paragraph 101 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

102.    The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Networking Equipment Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

*Paragraph 102 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

103.    Another goal and effect of the conspiracy was to limit both inter-brand and intrabrand competition in at least the Relevant Networking Equipment Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products. Dexon has prided itself on being a value-driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intrabrand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 103 relating to what Dexon has prided itself upon.  Cisco denies the remaining allegations in Paragraph 103.*

104.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets. This conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly positions in all of these product markets, and potentially others.

*Paragraph 104 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

105.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 105 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

106.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in at least the Relevant Networking Equipment Markets, harm innovation associated with the products offered in the Relevant Networking Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 106 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

## C.    Count III (Sherman Act Section 1)

## Per Se Tying In the Relevant Product Markets Against Cisco

107.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 107, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

108.    Cisco is a monopolist in the Relevant Service Markets and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

*Paragraph 108 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

109.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Market. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain

and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

*Paragraph 109 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

110.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

*Denied.*

111.    A substantial amount of commerce has been affected in the Relevant Product Markets (the tied markets) due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

*Paragraph 111 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

112.    Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Neither does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 112 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

113.    Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 113 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

114.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the

Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 114 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

### D.     Count IV (Sherman Act Section 2)

**Unlawful Monopolization of the Relevant Networking Equipment Markets Against Cisco**

115.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 115, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

116.     Cisco's conduct constitutes the intentional and unlawful maintenance of monopoly power in each of the Relevant Network Equipment Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

*Paragraph 116 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

117.     For the purpose of maintaining its monopoly power, Cisco committed numerous acts, including: a. Coercing purchases in the Relevant Network Equipment Markets by withholding service in the Relevant Service Markets; b. Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and c. Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill losses, and stunted overall competition in the Relevant Network Equipment Markets and likely other Markets.

*Denied.*

118.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Network Equipment Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Network Equipment Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco, not to that of customers or competition on the merits.
*Paragraph 118 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

119.    Cisco's conduct has injured competition in the Relevant Network Equipment Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 119 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

120.    Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Network Equipment Markets, harm innovation associated with the products offered in the Relevant Network Equipment Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 120 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**E.    Count V (Sherman Act Section 2)**

**Unlawful Attempted Monopolization of the Relevant Product Markets Against Cisco**

121.    Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 121, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

122.    Cisco acted with a specific intent to monopolize and destroy competition in the Relevant Product Markets. Cisco devised and implemented an overall plan to force customers to pay supra-competitive prices in the Relevant Product Markets, with the associated destruction of competition in the Relevant Product Markets.

*Paragraph 122 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

123.    Cisco willfully engaged in a course of anticompetitive conduct to obtain a monopoly in the Relevant Product Markets, including: a. Coercing purchases in the Relevant Product Markets by withholding service in the Relevant Service Markets; b. Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supracompetitive through Cisco's most expensive channels; c. Interfering with the proper award of at least one major RFP to Dexon, and denigrating Dexon for the purpose of securing a direct sales relationship with an important Texas public entity; and d. Upon information and belief, engaging in related FUD tactics similar to the above which resulted in additional revenue and goodwill losses, and stunted overall competition in the Relevant Product Markets and other Markets.
*Paragraph 123 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

124.     Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 124 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

125.     Throughout the time Cisco engaged in this anticompetitive conduct, it had a dangerous probability of succeeding in gaining a monopoly in and controlling each of the Relevant Product Markets and continuing to maintain supra-competitive prices and exclude its competitors.

*Paragraph 125 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

126.     Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 120 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

127.     Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 126 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

**F.     Count VI (Violation of the Texas Free Enterprise & Antitrust Act, Against Cisco and CDW)**

128.     Dexon repeats and realleges each of the allegations set forth in the preceding paragraphs as if fully set forth herein.

*In response to Paragraph 128, which repeats and realleges the allegations in the preceding paragraphs, Cisco repeats and incorporates the foregoing responses.  To the extent a further response is required, denied.*

129.    Upon information and belief, Cisco's overall anticompetitive scheme was directed and executed within Texas and has a direct impact upon Texas-based small and medium businesses.

*Paragraph 129 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

130.    Cisco is a monopolist in the Relevant Service Market and has used its SmartNet service packages in that Market as a tying product. Namely, after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted by customers but favored by Cisco. Cisco conditions its continued service for SmartNet on the purchase of new equipment in the Relevant Product Markets, and upon information and belief, other products that will be confirmed in discovery.

*Paragraph 130 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

131.    The Relevant Service Market is distinct from the Relevant Product Markets because they are fundamentally different offerings that are created, marketed, sold, and accounted for by providers and customers differently. Driven by budgets and unique customer needs, customers can and have bought products in the Relevant Product Markets without associated service in the Relevant Service Markets. Indeed, Cisco's conduct at issue in this case confirms that Cisco's near absolute monopoly in the Relevant Service Market can be used as a coercive weapon to maintain and further expand its monopolies in the Relevant Product Markets, because customers often have separate demand for service on the one hand and new networking equipment on the other.

*Paragraph 131 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

132.    Cisco effectuates this unreasonable restraint of trade by forcing a sale agreement between customers and a provider of Cisco branded merchandise in the Relevant Product Markets. Cisco also effectuates this coercion through its direct relationship with customers through the SmartNet service package, in which customers are forced to interact with Cisco to request the service they were previously promised by Cisco.

*Paragraph 132 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

133.    A substantial amount of commerce has been affected in the Relevant Product Markets due to Cisco's conduct, as a single forced purchase in the Relevant Product Markets has constituted tens or hundreds of thousands of dollars. This is unsurprising, as the total amount of commerce in the Relevant Product Markets is billions of dollars.

*Paragraph 133 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

134.   Cisco does not have a legitimate business purpose for its anticompetitive conduct. Any claimed procompetitive benefit is pretextual in light of the fact that Cisco has demanded and received additional compensation for the same services it had already been providing, without providing anything additional to customers. Cisco's conduct does not result in any greater ability to reduce costs in producing or innovating offerings in the Relevant Product Markets that it sells to customers that could result in reduced prices, higher quality, or greater availability to customers. Nor does Cisco's conduct reduce barriers to other vendors' entry, or otherwise result in greater competition in the Relevant Product Markets. The only "benefit" that flows from Cisco's conduct is a reduction in competition, and that benefit inures only to Cisco's advantage, not to that of customers or competition on the merits.

*Paragraph 134 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

135.   Cisco's conduct has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 135 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

136.   Cisco's conduct has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 136 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

137.   Cisco has entered into a conspiracy with CDW whereby Cisco would coordinate with CDW to ensure that CDW would receive sales of products and services to customers that previously had been directly served by Dexon. In addition, CDW agreed not to supply products and service packages to Dexon, and potentially other resellers.

*Paragraph 137 states a legal conclusion as to which no response is required. To the extent a response is required, denied.*

138.   The products and services to which this conspiracy applied are at least those encompassed by the Relevant Service Markets and Relevant Product Markets, and potentially others as will be confirmed in discovery. Cisco pursued this conspiracy with the intended and realized purpose of protecting its monopolies in at least the Relevant Networking Equipment Markets.

*Paragraph 138 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

139.    Another goal and effect of the conspiracy was to limit both inter-brand and intrabrand competition in the Relevant Product Markets. As discussed above, Dexon does not favor or preference any manufacturer of networking equipment and has converted customers from Cisco products to their competitors' products. Conversely, Cisco views CDW as a reseller that is more likely to aggressively market its products. In addition, Dexon has prided itself on being a value driving reseller that brings customers greater benefits, in terms of service and price, than others who carry Cisco. Thus, the dual impact of the conspiracy was to limit inter-brand and intra-brand competition for Cisco's networking products.

*Cisco lacks knowledge or information sufficient to admit or deny the allegations in Paragraph 139 relating to what Dexon has prided itself upon.  Cisco denies the remaining allegations in Paragraph 139.*

140.    As discussed, Cisco is a monopolist in the Relevant Networking Equipment Markets and is dominant in the Relevant IP Phone Markets. The Cisco-CDW conspiracy limits inter-brand and inter-brand competition, allowing Cisco to maintain its monopoly and dominant positions in all of these product markets, and potentially others.

*Paragraph 140 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

141.    The Cisco-CDW conspiracy has injured competition in the Relevant Product Markets, suppressed Dexon's sales in those markets and the products of other competitors, diminished Dexon's and future sales opportunities, and increased Dexon's operating costs.

*Paragraph 141 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

142.    The Cisco-CDW conspiracy has and will continue to maintain supra-competitive prices to customers in the Relevant Product Markets, harm innovation associated with the products offered in the Relevant Product Markets, and otherwise deprive customers of their ability to make an unfettered choice of technology on the merits.

*Paragraph 142 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

143.    The above conduct has harmed competition and resulted in losses to Dexon in Texas.

*Paragraph 143 states a legal conclusion as to which no response is required.  To the extent a response is required, denied.*

## VI.    PRAYER FOR RELIEF

Dexon Computer, Inc. prays for judgment and relief against Defendants Cisco and CDW as
follows:

a.    An Order directing the termination of the anticompetitive conduct in violation of
Sections 1 and 2 of the Sherman Act (15 U.S.C. § 1-2) and the Texas Free
Enterprise & Antitrust Act;

b.    Treble damages (including lost profits), in an amount to be determined at trial and
that cannot now be adequately quantified before relevant discovery;

d.    Awarding Dexon's costs of suit herein, including its attorneys' fees incurred in
asserting antitrust claims;

i.    An award of punitive damages in an amount sufficient to punish Defendants, to
make an example of them to the community, and to deter them from such conduct
as to Dexon or others in the future;

j.    For equitable remedial efforts by Defendants sufficient to rehabilitate Dexon's
damaged reputation;

k.    For orders restraining Cisco and CDW from engaging in similar conduct in the
future; and

p.    Such other and further relief as this Court deems just and equitable.

*This paragraph describes Dexon's own pleading (and relief sought) and requires no response.
To the extent a response is required, denied.*

## VII.    DEMAND FOR JURY TRIAL

Dexon demands a trial by jury on all issues so triable.

*This paragraph describes Dexon's own pleadings and requires no response.  To the extent a
response is required, denied.*

## <u>AFFIRMATIVE AND OTHER DEFENSES</u>

Without assuming any burden of proof that it would not otherwise bear, Cisco reasserts,

without limitation, all defenses raised in its Motion To Dismiss and other filings, whether or not

separately re-pleaded herein.  Cisco also asserts the following affirmative and other defenses.  In

listing the defenses below, Cisco does not knowingly or intentionally waive any defenses,

including arguments about which issues fall within Dexon's burden of proof.  Cisco also reserves the right to rely on any affirmative or other defense or claim that may subsequently come to light, and expressly reserves the right to amend its Answer to assert such additional defenses or claims.

## FIRST AFFIRMATIVE DEFENSE

The statute of limitations bars Dexon's claims.  On information and belief, the events relating to the Pennsylvania hospital giving rise to Dexon's conspiracy claims occurred by no later than 2015.  Other of the conduct that Dexon alleges concerns customer interactions and transactions occurring more than four years before Dexon filed the Complaint.  Accordingly, 15 U.S.C. § 15b and Texas Business and Commerce Code § 15.25 bar Dexon's claims.

## SECOND AFFIRMATIVE DEFENSE

Dexon's claims fail because venue is improper.  On information and belief, none of the specific customer transactions alleged in the Complaint took place in the Eastern District of Texas.  Each of the Maryland business, the Pennsylvania hospital, the energy company, the auto dealership, the bank, the school, and the 911-operator are headquartered outside of the District and, on information and belief, engaged with Dexon outside of the District.  *See* Ex. A at 2; Ex. B at 2; Ex. C at 1.  Venue is also improper for the reasons described in Cisco's Motion To Transfer (Dkt. 21), incorporated here, along with all related briefing (including Dkts. 31, 96).

## THIRD AFFIRMATIVE DEFENSE

Dexon's claims fail because it has failed to state a claim for which relief can be granted.  Without limitation or prejudice to identifying additional deficiencies in the course of discovery, Cisco incorporates the deficiencies addressed in its Motion To Dismiss (Dkt. 22), along with all related briefing (including Dkts. 32, 119).

### FOURTH AFFIRMATIVE DEFENSE

Dexon's claim that Cisco's conduct was exclusionary fails because there are procompetitive justifications and legitimate business justifications for the alleged conduct.

### FIFTH AFFIRMATIVE DEFENSE

Dexon's claims fail because Cisco's conduct did not harm competition and consumers.

### SIXTH AFFIRMATIVE DEFENSE

Dexon is not entitled to relief because it has not sustained any antitrust injury proximately caused by Cisco.

### SEVENTH AFFIRMATIVE DEFENSE

The doctrine of laches bars Dexon's claims for injunctive or other equitable relief.

### EIGHTH AFFIRMATIVE DEFENSE

The doctrine of unclean hands bars Dexon's claims for injunctive or other equitable relief.

### NINTH AFFIRMATIVE DEFENSE

Dexon's claims fail because the alleged conduct was not the proximate cause of its asserted damages.

### TENTH AFFIRMATIVE DEFENSE

Dexon is entitled to no damages by reason of its failure to mitigate, minimize, or avoid the damages alleged.

### ELEVENTH AFFIRMATIVE DEFENSE

Dexon's claims fail on res judicata (or claim preclusion) grounds.

### TWELFTH AFFIRMATIVE DEFENSE

The doctrine of collateral estoppel (or issue preclusion) bars Dexon's claims.

## **JURY DEMAND**

Cisco demands a trial by jury on all issues so triable.


Dated: May 12, 2023                                    Respectfully submitted,


                                                      /s/ Deron R. Dacus

RICHARD J. NELSON (*pro hac vice*)                    DERON R. DACUS (Bar No. 00790553)
LOUIS P. FEUCHTBAUM (*pro hac vice*)                  THE DACUS FIRM, PC
SIDEMAN & BANCROFT LLP                                821 ESE Loop 323, Suite 430
One Embarcadero Center Twenty-                        Tyler, TX 75701
Second Floor                                          (903) 705-1177
San Francisco, CA 94111-3711                          ddacus@dacusfirm.com
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com                               AARON M. PANNER (*pro hac vice*)
                                                      ANDREW E. GOLDSMITH (*pro hac vice*)
                                                      KELLOGG, HANSEN, TODD,
                                                      FIGEL & FREDERICK, P.L.L.C.
                                                      1615 M Street, N.W., Suite 400
                                                      Washington, D.C. 20036
                                                      (202) 326-7900
                                                      apanner@kellogghansen.com
                                                      agoldsmith@kellogghansen.com

                                                      *Counsel for Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on May 12, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).   Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus