**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

|  |  |  |
|---|---|---|
| DEXON COMPUTER, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) | |
| v. | ) | |
| | ) | |
| CISCO SYSTEMS, INC. | ) | |
| & CDW CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**CISCO SYSTEMS, INC.'S FEDERAL RULE OF CIVIL PROCEDURE 56
<u>MOTION FOR SUMMARY JUDGMENT AS TO ALL CLAIMS</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .......................................................................................................1

STATEMENT OF ISSUES ..........................................................................................3

STATEMENT OF UNDISPUTED MATERIAL FACTS ...........................................3

     A.    Cisco's Networking Business ..................................................................3

     B.    Dexon's Unauthorized "Cisco" Sales ....................................................7

     C.    Cisco Applies Its Usual and Disclosed Policies as to Dexon ...............10

LEGAL STANDARD..................................................................................................13

ARGUMENT ..............................................................................................................13

I.     DEXON CANNOT SHOW THAT CISCO ENGAGED IN UNLAWFUL
ANTICOMPETITIVE CONDUCT (COUNTS I-VI) .......................................15

     A.    Cisco's SMARTnet Limitations Are Lawful – Not Tying ...................15

     B.    Notifying Customers About Cisco's Policies – and Enforcing
Them According to As-Disclosed Terms – Is Not Exclusionary
Conduct ................................................................................................20

     C.    Operating an Authorized Distribution Channel Is Lawful – Not
Conspiracy ...........................................................................................26

II.    DEXON LACKS ANTITRUST INJURY (COUNTS I-VI) ............................27

CONCLUSION............................................................................................................30

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422 (5th Cir. 1981) ................................26

*Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343
    (5th Cir. 1980)................................................................................................28

*Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns,
    Inc.*, 108 F.3d 1147 (9th Cir. 1997) ...............................................22

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)........................................27

*Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272
    (5th Cir. 2014).................................................................................................13

*Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033 (5th Cir. 1981).....................17

*Brantley v. NBC Universal, Inc.*, 675 F.3d 1192 (9th Cir. 2012) ..................................18

*Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83 (5th Cir. 1994) ..................18

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993).........24

*Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975) .............................26

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................13, 19

*Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x 244
    (5th Cir. 2019).................................................................................................24

*Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203 (5th Cir. 1969) ...........................4

*Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284 (5th Cir. 1988) .......22

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997) ...............15

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984) ..........4

*Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321 (5th Cir. 1974) ...........15

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992) ...................18, 19

*Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937 (5th Cir. 1984)............4

*Geiserman v. McDonald*, 893 F.2d 787 (5th Cir. 1990)...............................................13

*Graphic Prods. Distribs., Inc. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983)...........30

*H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239 (5th Cir. 1978) ........................................29

*Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499 (E.D. Tex. 1987)........................................15

*Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.*, 2012 WL 1155218
    (E.D. Va. Apr. 5, 2012), *aff'd*, 748 F.3d 160 (4th Cir. 2014) ........................................4

*Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587
    (5th Cir. 1993)........................................................................................................27

*Norris v. Hearst Tr.*, 500 F.3d 454 (5th Cir. 2007)........................................................28

*O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721 (E.D. Tex. 2000)..........................................19

*Olympia Co. v. Celotex Corp.*, 771 F.2d 888 (5th Cir. 1985)..........................................27

*Parsons v. Ford Motor Co.*, 669 F.2d 308 (5th Cir. 1982)..........................................26

*Pool Prods. Distrib. Mkt. Antitrust Litig., In re*, 940 F. Supp. 2d 367
    (E.D. La. 2013) ..........................................................................................................30

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412 (5th Cir. 2010).....................18

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ..............................17

*Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016) .........20, 22, 26

*Scott v. Galusha*, 890 S.W.2d 945 (Tex. Ct. App. 1994)........................................27

*Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450 (5th Cir. 2021)....................................17

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ..........................................15

*Sports Ctr., Inc. v. Riddell, Inc.*, 673 F.2d 786 (5th Cir. 1982) ..............................................26

*Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*,
    33 F.4th 747 (5th Cir. 2022) ..........................................................................................21

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) .......................17, 22, 24

*Stephens v. Rhone-Poulenc, Inc.*, 1999 WL 548635 (5th Cir. July 8, 1999)..................................4

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*,
    200 F.3d 307 (5th Cir. 2000) ..........................................................................................15

*Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000)..................................................25

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233
    (5th Cir. 1996)....................................................................................................17, 19

*United States v. Syufy Enters.*, 903 F.2d 659 (9th Cir. 1990) ............................................................4

*Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30 (5th Cir. 1977) ...................................26

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004).................................................................................................................................15

*Walker v. U-Haul Co. of Miss.*, 747 F.2d 1011 (5th Cir. 1984) .....................................................29

*West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) ............................27

**STATUTES AND RULES**

Sherman Act, 15 U.S.C. § 1 *et seq.*:

§ 2, 15 U.S.C. § 2..............................................................................................................22

15 U.S.C. § 15b................................................................................................................................27

Tex. Bus. & Com. Code § 15.25(a) ................................................................................................27

Fed. R. Civ. P.:

Rule 56 ...............................................................................................................................13

Rule 56(a)...........................................................................................................................13

**INTRODUCTION**

Cisco Systems, Inc. ("Cisco") is a highly innovative technology manufacturer that faces competition in every one of its business lines. Like many of its competitors, Cisco does not sell directly to most consumers, instead investing in a network of authorized distributors to ensure that end users are well supported. Like its competitors, Cisco also offers a service package ("SMARTnet"), which is available for equipment that end users purchase from authorized resellers or upon payment of a recertification fee for equipment obtained outside this channel.

Dexon Computer, Inc. ("Dexon") is a reseller of networking products; like hundreds if not thousands of unauthorized resellers, it sells "gray market" Cisco products acquired outside authorized channels. Cisco has sued Dexon for trademark and copyright infringement in another court; here, Dexon has brought antitrust claims. But this is no antitrust case. Dexon can present no evidence that Cisco's conduct prevented any of Cisco's OEM rivals from competing, or claim that Cisco charges higher prices than those of its OEM rivals, or assert that prices are increasing in the alleged equipment markets, or claim that Cisco's conduct has eliminated a *single* competitor or reseller (authorized or unauthorized). On the contrary, ███████████████ ███████████████. Moreover, Dexon concedes that Cisco's distribution *policies* – establishing an authorized distribution channel, and limiting warranties and automatic eligibility for SMARTnet to goods sold through authorized channels – are not anticompetitive.

Instead, Dexon alleged that the way in which Cisco implements its policies somehow harmed competition. But despite massive discovery, Dexon has no evidence to support its claims. All Dexon can prove is that Cisco tells some customers – Dexon has identified no more than ten out of thousands of end users that have bought Cisco equipment from Dexon – three facts: (1) Dexon is not an authorized reseller; (2) Cisco cannot guarantee the provenance or quality of the networking equipment that Dexon sells; and (3) SMARTnet is unavailable for

equipment that Dexon sells (absent payment of a recertification fee).  Armed with that truthful information, some customers still decide to buy from Dexon, while others choose to buy from an authorized Cisco reseller.  Cisco does not stop Dexon from selling Cisco equipment (Dexon claims that ██% of its sales are Cisco), let alone equipment from other OEMs (Dexon had its best year on record in 2022).

All of Dexon's antitrust claims fail as a matter of law for two reasons:

*First*, there is no evidence that Cisco engaged in *any* unlawful conduct.  ████████ ████████████████████████████████████████████████████.  There is no evidence that Cisco ever forced a single customer to purchase new equipment as a condition of obtaining SMARTnet service under a valid existing SMARTnet contract (the basis for Dexon's "tying" claim), much less that Cisco had a practice of doing so.  There is no evidence that Cisco ever made any false statements to customers (the basis for Dexon's "FUD" claim), much less that any false statements were systematic or had any market-wide effect.  Assuming that Dexon's new and undisclosed liability theories are in the case, its expert's complaints about Cisco's software audits – which are infrequent and authorized by contract – are not evidence that Cisco precluded competitors' sales.  And there is *zero* evidence that Cisco's distributor relationship with CDW is anything but an ordinary vertical resale arrangement with no conceivable anticompetitive impact – there is no unlawful "conspiracy" in restraint of trade or to monopolize any market.

*Second*, all of Dexon's claims fail because it has not sustained an antitrust injury.  There is a fatal disconnect between Dexon's theory of liability – that Cisco has monopolized, tied, and conspired to harm competition in equipment markets where Cisco competes against other OEMs – and the injury Dexon asserts, which is limited to Dexon's supposed lost sales of *Cisco* equipment.  ████████████████████████████████████████████████ ████████████████████.  And even if Dexon found it harder to compete against other

Cisco resellers – a claim it cannot make seriously as 2022 was its best year on record – that says nothing about diminished competition among thousands of Cisco resellers generally.  In fact, Dexon offers no evidence that competition was reduced at any level of any market.  This is a textbook case of a single business complaining about harm to itself, *not* harm to competition.

## STATEMENT OF ISSUES

(1)      *Is there a genuine dispute of material fact as to whether Cisco unlawfully engaged in tying, exclusionary conduct, or an anticompetitive conspiracy?*

(2)      *Can Dexon establish antitrust injury when it has no evidence of any injury stemming from conduct causing market-wide harm to competition at any level of any market?*

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.      Cisco's Networking Business

**1.**      Cisco invests billions annually in R&D to improve the quality of its offerings.[1] Among other products, Cisco manufactures networking equipment, including Ethernet switches, routers, and IP phones.[2]  Cisco's manufacturing competitors – other OEMs – are some of the world's largest companies, including Hewlett Packard Enterprise ("HPE"), Juniper Networks, Dell, and China-based Huawei.[3] ██████████████████████████

████████████████████████████████████████████████

---

[1] Cisco's most recent Form 10-K discloses more than $5 billion in annual R&D spending each of the last three years.  *See* Ex. 1 (Cisco Systems, Inc.'s 2022 Form 10-K) at 43.

[2] *See* Ex. 2 (Dexon Maness Rep.) at ¶¶ 22-23.

[3] *See id.* ¶ 16; *see also* Ex. 3 (Defs. Ugone Rebuttal) at 17 (Tbl. 2), 19 (Tbl. 3), 21 (Tbl. 4) (identifying dozens of Cisco OEM competitors that also make these products).

█████████████████████████████████████████████ [5]

**2.**    Cisco competes to sell its networking gear through policies and practices that protect its customers and brand reputation.[6]  Two such policies are implicated here:

**a.**    *First*, rather than sell equipment direct to most customers, Cisco manages a broad distribution channel of authorized distributors and resellers, which sell direct to consumers or to



—————————————
[4]
███████████████████████) *with* Ex. 2 (Maness Rep.) at ¶¶ 61-62 █████████████; *see also* Ex. 4 (Maness Tr.) at 160:14-16 ███████████████████████.
███████████████████████. *See* Ex. 4 (Maness Tr.) at 158:1-159:8; *see also* Ex. 2 (Maness Rep.) at ¶¶ 18, 62 & n.112.  But in calculating "enterprise voice" shares, he relied on ████████████, *see* Ex. 4 (Maness Tr.) at 161:1-11, ████████████████████████████████████████, *see* Ex. 5 (CISCO00000218) at 2 ███████████, *see also* Ex. 6 (Reeder Tr.) at 128:3-129:1 ██████████████████████████████████████████████

███████████████████████ Ex. 4 (Maness Tr.) at 159:10-160:12.

Dexon's claim fails on those grounds alone.  *See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 490 (5th Cir. 1984) (requiring proof of a "legally significant share of the market").

[5] *See* Ex. 2 (Dexon Maness Rep.) at Ex. 3 (switches), Ex. 4 (routers), Ex. 5 ("enterprise voice"). These shares are insufficient to prove monopoly power, as a matter of law.  *See Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937, 939-40 (5th Cir. 1984) (per curiam) (52% share "is an insufficient basis as a matter of law to conclude that [party] violated the antitrust laws" as "monopolization is rarely found when the defendant's share of the relevant market is below 70%"); *Stephens v. Rhone-Poulenc, Inc.*, 1999 WL 548635, at *3 (5th Cir. July 8, 1999) (per curiam) (judgment noted at 189 F.3d 469) (similar); *Cliff Food Stores, Inc. v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969) (same).

Further, the fact that Cisco's shares are *falling* should preclude a finding of monopoly power as a matter of law.  *See Domed Stadium Hotel*, 732 F.2d at 487 (monopolization claim requires showing of power and "capacity" to "exclude competition"); *see also United States v. Syufy Enters.*, 903 F.2d 659, 665-66 (9th Cir. 1990) ("In evaluating monopoly power, it is not market share that counts, but the ability to *maintain* market share."); *Kolon Indus., Inc. v. E.I. du Pont De Nemours & Co.*, 2012 WL 1155218, at *12 (E.D. Va. Apr. 5, 2012) (summary judgment appropriate where defendant's market share decreased from 59% to 55%, which showed no "power to control prices and exclude competition"), *aff'd*, 748 F.3d 160 (4th Cir. 2014).  These are critical defects in all of Dexon's claims.

[6] For a discussion of brand reputation, *see* Ex. 7 (Defs. LaMagna Rep.) at ¶¶ 18, 32-33; Ex. 8 (Defs. Ugone Rep.) at ¶¶ 93-94, 98-99.

intermediary resellers.[7]  This is standard among other OEMs;[8] HPE and Juniper have similar

programs.[9]  Cisco has more than 8,000 authorized resellers.[10]  Cisco does not require its

authorized resellers to sell only Cisco equipment.[11]  For example, CDW – one of 8,000+

authorized Cisco resellers (and one of 50+ "Gold" partners)[12] – generates a greater proportion of

its sales from non-Cisco equipment than Dexon.[13]  However, like other OEMs – e.g., Juniper[14] –

Cisco requires that its authorized resellers not sell counterfeit or "gray market" equipment

obtained from outside the authorized channel.[15]  Cisco also requires that its U.S. authorized

resellers not resell to other resellers for further price markup and re-resale to end users.[16]

      **b.**     *Second*, Cisco offers end users several optional service packages, including

---

[7] *See* Ex. 9 (Cisco, "Direct Partner Policy," CISCO00793820) at 1; *see also* Ex. 2 (Dexon Maness Rep.) at ¶¶ 25-26; Ex. 8 (Defs. Ugone Rep.) at ¶ 62.  It is undisputed that Cisco has invested hundreds of millions of dollars in setting up and maintaining its distribution channel.  *See* Ex. 8 (Ugone Rep.) at ¶ 69.

[8] *See id.* ¶¶ 70-78.

[9] *See, e.g.*, Ex. 10 (HPE Aruba, "Aruba Partner Programs") at 1; Ex. 11 (Juniper Networks, "Juniper Partner Advantage") at 9-10, 17.

[10] *See* Ex. 2 (Dexon Maness Rep.) at ¶ 27; Ex. 12 (Cisco, "Connect with a Cisco Partner") at 1.

[11] *See* Ex. 8 (Defs. Ugone Rep.) at ¶ 63.  Cisco's partner agreements and policies are in the record. *See generally* Ex. 9 ("Direct Partner Policy," CISCO00793820); Ex. 13 ("Indirect Channel Partner Agreement," CISCO00793824); Ex. 116 ("Systems Integrator Agreement," CDW-DXN-00000060). Nothing requires OEM or vendor exclusivity.  Dexon's economist agreed.  *See* Ex. 4 (Maness Tr.) at 161:13-162:2▮▮▮▮▮▮▮▮▮▮.

[12] Dexon's economist cited a source – *see* Ex. 2 (Maness Rep.) at ¶ 29 & n.33 – that lists 60 of Cisco's "gold" partners.  *See generally* Ex. 14 (Cloudtango, "List of Cisco Gold Partners").

[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 2 (Maness Rep.) at Ex. 6. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Ex. 3 (Defs. Ugone Rebuttal) at 116 (Fig. 13).

[14] Defendants' economist discussed other OEMs' similar policies.  *See* Ex. 8 (Defs. Ugone Rep.) at ¶¶ 71, 76, 78.  For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

[15] *See* Ex. 8 (Defs. Ugone Rep.) at ¶ 64; Ex. 13 ("Indirect Channel Partner Agreement," CISCO00793824) at 006; Ex. 116 ("Systems Integrator Agreement," CDW-DXN-00000060) at 064-065. "Gray market" refers to any equipment (whether genuine or counterfeit) that is sold outside of authorized distribution channels.  Such equipment, even if genuine, is not eligible for warranty protection and often lacks necessary software licenses.  *See* Ex. 8 (Defs. Ugone Rep.) at ¶ 86 & Fig. 2; *see also id.* ¶¶ 58-60. This is an industry term.  *See., e.g.*, Ex. 44 (Juniper, "Juniper Networks Gray Market Product Reinstatement Policy") at 1.

[16] *See* Ex. 13 ("Indirect Channel Partner Agreement," CISCO00793824) at 006.

SMARTnet.[17]  Customers do not need to purchase SMARTnet; networking equipment will work

without it,[18] and there are multiple service alternatives (including from non-Cisco third parties).[19]

SMARTnet entitles the end user to certain priority service and replacement equipment; for

example, under certain coverage, Cisco guarantees two-hour delivery of a replacement product.[20]

However, as Cisco discloses in SMARTnet contracts and in multiple statements on its website –

at least half a dozen different public pages – equipment procured from unauthorized resellers is

ineligible for SMARTnet unless it is certified and licensed.[21]  End users that obtain gray market

---

[17] *See* Ex. 2 (Dexon Maness Rep.) at ¶ 19 ███████████████████████████████████
█████ ¶ 39 ████████████████████████████████████████████████████████; Ex. 8
(Defs. Ugone Rep.) at ¶¶ 82-83 (similar).
[18] Dexon witnesses consistently agreed.  *See* Ex. 16 (DeToy Tr.) at 93:8-22; Ex. 17 (Graber Tr.)
at 166:16-167:7; Ex. 18 (Lang Tr.) at 91:7-20; Ex. 19 (Malaska Tr.) at 68:13-16; Ex. 20 (Olson Tr.)
at 81:21-82:3; Ex. 21 (O'Neil Tr.) at 53:8-54:12; Ex. 22 (Ripley Tr.) at 57:12-58:8; Ex. 23 (Roush Tr.)
at 106:5-107:5; Ex. 24 (Sletten Tr.) at 151:22-152:2; Ex. 25 (Tate Tr.) at 93:1-14; Ex. 26 (Valenzuela Tr.)
at 78:7-11; Ex. 27 (Wickert Tr.) at 63:2-20.
   So did multiple nonparty customers.  *See* Ex. 28 (Brennan, Cold Storage, Tr.) at 103:23-104:11,
116:7-9; Ex. 29 (Kizer, Lubbock 911, Tr.) at 25:22-26:4; *see also* Ex. 30 (Le, Park Place, Tr.) at 115:3-19
████████████████████████████████████████████████████████████████████████████████.
   Cisco confirmed this is the case.  *See* Ex. 31 (Clark Tr.) at 92:22-93:8; Ex. 32 (Cisco Resp. to
Dexon's Second Set of Interrogs.) at No. 7; *see also* Ex. 8 (Ugone Rep.) at ¶ 80 & n.162.
   So did Dexon's economist.  *See* Ex. 2 (Maness Rep.) at ¶ 78 ████████████████████████████
████████████████████████████████████████████████████████████████████████████████████
█████████████████████████
[19] Dexon's economist agreed.  *See id.* ¶ 40.  So did Dexon's witnesses.  *See* Ex. 16 (DeToy Tr.)
at 108:11-15; Ex. 17 (Graber Tr.) at 168:9-20; Ex. 33 (Kaas Tr.) at 95:7-20; Ex. 20 (Olson Tr.) at 88:19-
90:8; Ex. 21 (O'Neil Tr.) at 64:20-66:17; Ex. 22 (Ripley Tr.) at 75:2-15; Ex. 25 (Tate Tr.) at 104:17-
106:6; Ex. 27 (Wickert Tr.) at 71:12-22; *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 7 ████████
████████████████████████████████████████████████████████████████████████████.
   ████████████████████████  *See* Ex. 35 (Dexon email to Targa, TARGA000688.1).
████████████████████████████ Dkt. 240 at 3 (emphasis added). ████████████████████████
████████████████████████████████████████████████. *See* Ex. 29 (Kizer, Lubbock 911, Tr.)
at 121:9-16; Ex. 30 (Le, Park Place, Tr.) at 121:17-122:7; Ex. 36 (TARGA000158.2) at 2 ████████████
[20] *See* Ex. 31 (Clark, Cisco, Tr.) at 49:12-25; Ex. 8 (Defs. Ugone Rep.) at ¶¶ 82-83.
[21] *See* Ex. 37 (Cisco, "Cisco Non-Entitlement Policy") at 8-9; Ex. 38 (Cisco, "Buy Right – Buy
Authorized Cisco") at 1-2; Ex. 39 (Cisco, "Cisco Hardware Inspection and Software Relicensing Program")
at 1; Ex. 40 (Cisco, "Purchase of Cisco Products from Unauthorized Resellers Due to Stock Shortages
and/or Long Lead Time Issues") at 2; Ex. 41 (Cisco, "Hardware and Software Warranty Information")

Cisco gear can pay a recertification fee, whereupon Cisco will inspect the equipment.[22]  If it is genuine Cisco gear (and otherwise in good working order) and the user has the necessary software licenses, then it is eligible for SMARTnet;[23] if it is not genuine Cisco gear, then it is ineligible for SMARTnet.[24]  Limitations like these are industry standard among other OEMs.[25]

## B.  Dexon's Unauthorized "Cisco" Sales

**1.**  Dexon is an unauthorized reseller of Cisco equipment,[26] describing itself as one of hundreds of similar unauthorized resellers.[27]  Dexon gave evidence that it was formerly an authorized Cisco reseller but decided to leave the program voluntarily.[28]  Today, approximately ███% of Dexon's sales are Cisco equipment;[29] Dexon does not encourage its customers to purchase non-Cisco equipment.[30]  Three additional facts about Dexon's business are relevant:

---

at 9; Ex. 42 (Cisco, "Network Integrity Begins with the Purchase") at 1; Ex. 43 (Cisco, "Third Party Maintenance Services and Purchase of Cisco Products Outside the Authorized Channel") at 2.

[22] Defendants' economist explained Cisco's recertification policy.  *See* Ex. 8 (Ugone Rep.) at ¶¶ 85, 114-115.  So did Dexon's economist.  *See* Ex. 2 (Maness Rep.) at ¶ 32 (similar).

[23] *See supra* note 21; *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 8 ███████████████.

[24] *See* Ex. 39 (Cisco, "Cisco Hardware Inspection and Software Relicensing Program") at 1-2.

[25] Defendants' economist discusses other OEMs' similar policies.  *See* Ex. 8 (Ugone Rep.) at ¶¶ 88-92.  For example, Juniper's policy states:  "Products purchased from the Gray Market <u>are not eligible for Juniper warranty services</u>, regardless of what an unauthorized reseller may advertise."  Ex. 44 (Juniper, "Juniper Networks Gray Market Product Reinstatement Policy") at 1 (emphasis added).

[26] *See* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 1; Ex. 21 (O'Neil, Dexon, Tr.) at 72:11-13.

[27] *See* Ex. 45 (Kaas, Dexon, N.D. Cal. Decl.) at ¶ 9.  Dexon's witnesses agreed there are many other resellers like it, potentially thousands.  *See* Ex. 19 (Malaska Tr.) at 59:7-60:9; Ex. 20 (Olson Tr.) at 86:4-15, 235:16-236:5; Ex. 23 (Roush Tr.) at 101:11-22, 190:6-19; Ex. 26 (Valenzuela Tr.) at 205:16-20; *see also* Ex. 21 (O'Neil Tr.) at 69:22-70:19, 71:11-72:3; Ex. 22 (Ripley Tr.) at 70:14-21; Ex. 25 (Tate Tr.) at 101:5-14; Ex. 46 (Tveitbakk Tr.) at 61:13-16; Ex. 27 (Wickert Tr.) at 65:2-67:8.

[28] *See* Ex. 21 (O'Neil Tr.) at 144:16-22 ████████████████████████████████; *see also* Ex. 47 (Dexon Am. Resp. to Cisco Interrogs.) at No. 8 (████████████████████████); Ex. 48 (Dexon Resp. to CDW RFAs) at Nos. 3 & 4 (████████████████████████).

[29] *See supra* note 13.

[30] Dexon's economist opined that ██████████████████████████████████████████████ Ex. 2 (Maness Rep.) at ¶ 33 n.49.  ████████████████.  *See* Ex. 16 (DeToy Tr.) at 103:14-19; Ex. 17 (Graber Tr.) at 64:12-15; Ex. 33 (Kaas Tr.) at 91:17-92:6; Ex. 21 (O'Neil Tr.) at 49:20-22; Ex. 22 (Ripley Tr.) at 49:20-50:4; Ex. 23 (Roush Tr.) at 38:13-16; Ex. 27 (Wickert Tr.) at 69:10-70:2.

a.      *First*, Dexon sometimes procures Cisco equipment for re-resale from authorized Cisco resellers by registering itself (Dexon) as the end user without disclosing that Dexon intends to resell to a different end user after marking up the gear.[31]  Other times, Dexon procures equipment from other unauthorized resellers.[32]  Among the thousands of unauthorized resellers that Dexon uses are ███████████████ (such as ██████████████ ██████████████)[33] and a company called ██████, [34] which ███ ████████████████████████████████████████ ████████████[35] ████████████████████████████████ ████████████████████████████ ████████████[36] ██████████████████████[37]  Once Dexon has this gear, it sells it at a markup[38] (describing

---

[31] *See* Ex. 17 (Graber Tr.) at 426:4-429:9; Ex. 113 (DEXON 0596868) at 868-869 ████████████████████████████ ████████████████████████████████

[32] *See* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 21; Ex. 48 (Dexon Resp. to CDW RFAs) at No. 8.
[33] *See* Ex. 49 (excerpt of DEXON 0476850) (listing suppliers and vendors ██████████████ ██████████████████████ from January 2011 through October 2022).
[34] *See* Ex. 50 (excerpt of DEXON 0476850); Ex. 17 (Graber, Dexon, Tr.) at 186:9-15.  Dexon's procurement leader testified that ██████████████████████████████████████████, *see* Ex. 17 (Graber Tr.) at 183:22-184:2, ██████████████████████████ *see* Ex. 51 ██████████████ (DEXON 0705369) at 1 ████████████); *see also id.* at 21 ██████████████████; *cf.* Ex. 17 (Graber Tr.) at 137:1-21 ████████████████████████████. ████████████████████ *See* Ex. 17 (Graber Tr.) at 203:4-204:4; *see also id.* at 195:3-12 (██████████████████████████).
[35] *See* Ex. 52 ██████████████ ████████████████) at 1.
[36] *See* Ex. 17 (Graber Tr.) at 179:2-180:13, 215:20-22, 225:6-226:17; *see also* Ex. 7 (Defs. LaMagna Rep.) at ¶ 115.
[37] *See* Ex. 17 (Graber Tr.) at 226:21-227:4.
[38] *See id.* at 73:10-19.

itself as a "█████████"[39]), ████████████████████████████████████████[40]

    **b.**    *Second*, Dexon has no mandatory policies to test the provenance or quality of all Cisco equipment that it purchases for resale.[41] ████████████████████████

████████████████████████████████████"[42] ████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████[45] █████████████

████████████████████████████████████████████[46] ████████

████████████████████████████████[47]

    **c.**    *Third*, when a Dexon customer wants SMARTnet coverage – most do not, according to Dexon[48] – ██████████████████████████████████

█████████████.[49] Specifically, Dexon ███████████████████████

██████████████████████████████████████████

---

[39] *See* Ex. 53 (Roush N.D. Cal. Decl.) at ¶ 3.

[40] *See* Ex. 33 (Kaas Tr.) at 327:14-328:15; Ex. 25 (Tate Tr.) at 149:12-150:4 ██████████████████████████; Ex. 27 (Wickert Tr.) at 115:6-116:13 (██████████████████████); *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 22 (████████████████████████).

[41] *See* Ex. 33 (Kaas Tr.) at 82:7-84:2, 263:1-264:8 (testimony from Dexon's product tester).

[42] *See* Ex. 17 (Graber Tr.) at 227:6-12; Ex. 54 (Sletten Tr.) at 349:13-22.

[43] *See* Ex. 33 (Kaas Tr.) at 56:21-58:16 (testimony from Dexon's product tester).

[44] *See* Ex. 23 (Roush Tr.) at 180:13-15. ██████████████████████████████ *See* Ex. 16 (DeToy Tr.) at 84:8-13; Ex. 18 (Lang Tr.) at 112:15-18; Ex. 22 (Ripley Tr.) at 69:11-17.

[45] *See* Ex. 16 (DeToy Tr.) at 86:22-87:4; Ex. 17 (Graber Tr.) at 227:13-17, 234:1-7; Ex. 23 (Roush Tr.) at 164:6-11, 174:13-175:2.

[46] *See* Ex. 23 (Roush Tr.) at 317:18-318:15; Ex. 46 (Tveitbakk Tr.) at 155:8-156:5.

[47] *See* Ex. 21 (O'Neil Tr.) at 172:5-13; Ex. 33 (Kaas Tr.) at 234:9-21; *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 20 ███████████████████████). *See supra* notes 18-19; *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 6 (███████████████████████).

[49] *See* Ex. 23 (Roush Tr.) at 246:19-250:12.



███████████████████████████████████████████ [50] ███████████████████

███████████████████████████████████████████████ ,[51] ███████████████

███████████████████████████████████████ [52]

**2.**    These practices create all sorts of headaches. ███████████████████

███████████████████████████████████████ [53] – ████████████████████████

████████████████████████████████████████████████████████████

██████████ .[54]  And many customers – including several at issue (Lubbock 911, Park Place, and

Targa) – have reported performance problems with the equipment that Dexon has sold.[55] ████████

████████████████████████████████████████████████████████████████

██████████████████████████████ .[56]

**C.    Cisco Applies Its Usual and Disclosed Policies as to Dexon**

**1.**    On occasion, Cisco will learn from a customer that it has bought or is considering

---

[50] *See id.*; *see also, e.g.*, Ex. 55 (DEXON_0705668) (████████████████████████████
████ ); Ex. 56 (DEXON_0549955) (████████████████████████████████████████
████████████████████████████████████████████████ ) (brackets and first
ellipsis added).
[51] *See, e.g.*, Ex. 57 (DEXON_0045083); Ex. 58 (DEXON_0246675); Ex. 59 (DEXON_0319124);
Ex. 60 (DEXON_0201718); Ex. 61 (TARGA000617.1).
[52] *See* Ex. 23 (Roush Tr.) at 254:11-15, 255:19-256:2; Ex. 58 (DEXON_0246675).
[53] *See* Ex. 33 (Kaas Tr.) at 212:19-213:5; Ex. 18 (Lang Tr.) at 164:7-165:6; Ex. 21 (O'Neil Tr.)
at 163:19-165:4; Ex. 46 (Tveitbakk Tr.) at 131:9-132:7.
[54] *See* Ex. 62 (DEXON_0431047) at 071; Ex. 7 (Defs. LaMagna Rep.) at ¶ 120.
[55] *See, e.g.*, Ex. 29 (Kizer, Lubbock 911, Tr.) at 86:3-87:8; Ex. 30 (Le, Park Place, Tr.) at 106:6-
112:22; Ex. 63 (TARGA000440.1) at 1 (████████████████████████████████████ ).
[56] *See, e.g.*, Ex. 64 (DEXON_0464843) at 844 (██████████████████████████████████
███████████████████ ); Ex. 65 (DEXON_0466295) at 295 (████████████████
████████████ ); Ex. 66 (TARGA000324.1) at 3 (████████████████████
███████████ ); *compare generally* Ex. 67 (DEXON_0214286) (████████████
████████████████████████ ) *with* Ex. 68 (DEXON_0214332) (█████████████
████████████████████████████████████ ).

purchasing Cisco equipment from Dexon.[57]  Cisco informs such customers that:  (a) Dexon is not

an authorized Cisco reseller; (b) Cisco cannot guarantee the provenance or authenticity of the

gear Dexon sells; and (c) equipment purchased from an unauthorized reseller is not automatically

eligible for SMARTnet.[58]  Each statement mirrors disclosures on Cisco's website.[59]

      2.      Sometimes this matters to Dexon's customers, sometimes not.[60]  Three of the

at-issue customers – Lubbock 911, Park Place, and Targa – continued purchasing Cisco gear

from Dexon even after Cisco provided the foregoing notice.[61]  Two of the at-issue customers –

both of which submitted sworn affidavits[62] – decided not to purchase from Dexon because both

---

[57] *See, e.g.*, Ex. 69 (Martz, West Penn, Decl.) at ¶ 10 ████████████████████████████████
████████████████████████████████████████████████████████████████████ .

[58] *See, e.g.*, Ex. 70 (DEXON_0214169) at 171-172 (████████████████████████████████████).

[59] *See supra* note 21.

[60] *See* Ex. 47 (Dexon Am. Resp. to Cisco Interrogs.) at No. 1 (██████████████████████████

██████████████████████████); *see id.* at No. 2 (██████████████████████████████████████

██████████); *see also* Ex. 2 (Maness Rep.) at ¶ 109 (██████████████████████████████████

████████████████████████████████████████████████████ .

  As to TBK Bank, ██████████████████████████████████████ *See* Ex. 21 (O'Neil Tr.) at 105:9-107:14 (Dexon CEO

testifying that Olson is Dexon's account manager for TBK Bank); Ex. 20 (Olson Tr.) at 91:2-94:16,

101:6-15 (████████████████████████████████████), 146:20-147:17 (no

knowledge of TBK Bank ceasing business ████████████████████████████████████████);

Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 12 (admitting this allegation concerns ████████████

████████████████████████████████████).

  " Ex. 71 (████████████████████████████) at 001.

[61] For <u>Lubbock 911</u>, *see* Ex. 2 (Dexon Maness Rep.) at ¶ 98 ("Despite Cisco's warning, Lubbock 911

completed the purchase with Dexon.") (citing Ex. 72 (CISCO00023544) at 546); *see also* Ex. 73

(DEXON_0476848) (██████████████████████████████████████████████████).

  For <u>Park Place</u>, *compare* Ex. 65 (DEXON_0466295) at 295 (June 2019 notice from Cisco to Park

Place) *with* Ex. 74 (DEXON_0476848) (████████████████████████████████████████████████

████████); *see also* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 15 (admitting Dexon continued

selling to Park Place after the alleged Cisco conduct).

  For <u>Targa</u>, *compare* Ex. 75 (TARGA0000458.1) at 1 (November 2015 notice from Cisco to Targa)

*with* Ex. 76 (DEXON_0476848) (████████████████████████████████████████████████)

*and* Ex. 77 (TARGA000165) (██████████████████████████████████████████); *see also*

Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 13 (████████████████████████████████████████

████████).

[62] *See* Ex. 69 (Martz Decl.) (West Penn); Ex. 78 (Jacob Decl.) (FBISD).

wanted to buy from an authorized reseller (and had believed that Dexon was such a reseller):

    **a.**    *West Penn Hospital.* In 2015, West Penn requested bids on Cisco switches, specifying that it wanted new and authorized gear eligible for SMARTnet.[63] Dexon won the bid.[64] But when West Penn tried to register the equipment for SMARTnet, it learned that Dexon is an unauthorized reseller.[65] Because West Penn did not want to deal with an unauthorized reseller, it asked CDW – which had the second-lowest bid – to fulfill the order.[66] ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[67]

    **b.**    *Fort Bend Independent School District.* In 2019, FBISD issued an RFP for IP phones, and Dexon won the bid.[68] FBISD notified Cisco, which disclosed that Dexon is not an authorized reseller.[69] ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮.[70] The school district decided to cancel the Dexon contract because it wanted an

---

[63] *See* Ex. 69 (Martz Decl.) at ¶ 8 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮; *see also* Ex. 25 (Tate, Dexon, Tr.) at 149:7-19.
[64] *See* Ex. 69 (Martz Decl.) at ¶ 9; Ex. 79 (DEXON  0375483) at 485 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).
[65] *See* Ex. 69 (Martz Decl.) at ¶ 10.
[66] *See id.* at ¶ 11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮).
[67] *See* Ex. 80 (CDW-DXN-0032804) at 804; Ex. 81 (CDW-DXN-00032853) at 853-855. ▮▮▮▮

▮▮▮▮▮*See* Ex. 25 (Tate Tr.) at 158:10-13. ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮. *See id.* at 245:10-18.
[68] *See* Ex. 78 (Jacob Decl.) at ¶ 8; Ex. 82 (DEXON_0015570) at 570 (FBISD notifying Dexon).
[69] *See* Ex. 78 (Jacob Decl.) at ¶¶ 9-10; Ex. 83 (DEXON  0583352) at 353 (FBISD notice to Dexon).
[70] *See* Ex. 78 (Jacob Decl.) at ¶ 13. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮*See* Ex. 84 (FBISD_0000641) at 644 ("Dexon Timeline of Events"); *see also* Ex. 85 (FBISD  2981) at 981 (showing FBISD's research); Ex. 86 (FBISD  1425) at 425-426 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

authorized reseller.[71] ███████████████████████.[72]

**3.**    Overall, Dexon has grown by ██% ████████████

████████████████████████████████████████

████████████████████████████████████████.[74]

## LEGAL STANDARD

Federal Rule 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the movant has made a showing to "demonstrate the absence of a genuine issue of material fact," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), "the summary judgment procedure requires the non-movant to go beyond the pleadings and support [its] contentions with some evidence," *Geiserman v. McDonald*, 893 F.2d 787, 794 (5th Cir. 1990). "Summary judgment is appropriate if the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Bluebonnet Hotel Ventures, L.L.C. v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014) (cleaned up).

## ARGUMENT

Cisco, like competing equipment manufacturers, relies on a network of authorized distributors and resellers to ensure that its end customers purchase genuine Cisco products that are high quality and fully supported. Equipment purchased from authorized resellers comes with warranty protection and is automatically eligible for extended service and warranty protection under SMARTnet. By the same token, equipment purchased outside of authorized channels is

---

[71] *See* Ex. 78 (Jacob Decl.) at ¶¶ 11-12, 15; *see also* Ex. 84 (FBISD_0000641) (FBISD timeline) at 643-644 (highlighting in original as prepared by FBISD); Ex. 86 (FBISD_1425) at 425-426.
[72] *See* Ex. 78 (Jacob Decl.) at ¶¶ 14, 16.
[73] *See* Ex. 2 (Dexon Maness Rep.) at ¶ 126; Ex. 4 (Maness Tr.) at 217:11-19.
[74] *See* Ex. 3 (Defs. Ugone Rebuttal) at Ex. 9 (tabulating Dexon's total sales over a decade).

not covered by Cisco's warranty and is not automatically eligible for SMARTnet without recertification.  There is no dispute about the existence of these policies or that they are well disclosed.  And there also is no dispute about whether these policies are anticompetitive.  ████

████████████████████████████████████████████████.[75]

Given that it is admittedly lawful for Cisco to control its distribution network in this way, what is left of Dexon's case?  After months of discovery, scores of depositions, and Cisco's production of documents and data totaling millions of pages, Dexon's claims boil down to this: Dexon's gray market sales of Cisco-branded equipment allegedly compete with sales of Cisco's authorized resellers, and Cisco takes actions – apart from the implementation of its lawful distribution policies – to discourage customers from dealing with Dexon.  How?  The allegations that Dexon disclosed during the discovery period are limited to:  (1) tying of purchases of new equipment to the provision of SMARTnet service; and (2) "FUD" statements intended to instill doubt in customers about Dexon.  As a late entry, its expert added two additional theories:  (3) using software audits as leverage to encourage customers to make additional purchases of Cisco equipment from authorized sellers; and (4) engaging in "bait-and-switch" tactics by allowing customers to purchase SMARTnet contracts on equipment that Dexon sells, only for Cisco to deny service later.  Dexon also claims that (5) Cisco unlawfully conspired with CDW, though it is unclear what aspect of any agreement Dexon is challenging.

With respect to all of the foregoing conduct, Dexon's case fails because it cannot show

---

[75] *See* Ex. 4 (Maness Tr.) at 66:6-67:1 (████████████████████ ████████████████), 79:8-80:5 (████████████████████████████████████ ████████████████, 81:10-82:14 ████████ ████████████████████, 82:16-83:11 ████████████████████████████ ████████, 88:7-13 ████████████.

that the alleged conduct actually occurred or that any conduct that did occur was unlawful (Part I *infra*).  Moreover, it cannot show that Dexon suffered any antitrust injury from conduct that caused market-wide harm to market-wide competition (Part II *infra*).  The Court should accordingly grant the Motion and award Cisco summary judgment as to all claims.[76]

## I.      DEXON CANNOT SHOW THAT CISCO ENGAGED IN UNLAWFUL ANTICOMPETITIVE CONDUCT (COUNTS I-VI)

Cisco is entitled to summary judgment because Dexon cannot proffer evidence to show that Cisco engaged in unlawful tying (Point A *infra*),[77] exclusionary conduct in support of a monopoly (Point B *infra*),[78] or a conspiracy in restraint of trade (Point C *infra*).[79]

### A.      Cisco's SMARTnet Limitations Are Lawful – Not Tying

#### 1.      *Cisco has not withheld SMARTnet service to coerce new equipment purchases.*

Cisco is entitled to summary judgment on the tying claim because there is no evidence that Cisco conditions the sale of SMARTnet contracts (or the provision of service under such contracts) on the purchase of additional or unwanted Cisco equipment.  A tying claim requires a showing that "customers are forced to purchase products they do not want or need, or are forced to purchase

---

[76] Dexon's case is legally and factually deficient in many additional ways, including its inability to proffer evidence that Cisco has monopoly power in any well-defined antitrust market.  *See supra* note 5. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* Ex. 87 (Dexon Maness Reply) at ¶¶ 32, 40, 43.

[77] Counts III and VI concern the supposed tying.  Dexon must show the conduct was coercive or anticompetitive.  *See Klo-Zik Co. v. Gen. Motors Corp.*, 677 F. Supp. 499, 505-06 (E.D. Tex. 1987); *see also Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974).

[78] Counts IV-VI concern the supposed actual and attempted monopoly maintenance.  Dexon must show the conduct was anticompetitive.  *See Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("[T]he possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*."); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) (for "attempted monopolization a plaintiff must prove . . . anticompetitive conduct").

[79] Counts I-II and VI concern the supposed conspiracy.  Dexon must show an unreasonable restraint of trade.  *See Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 307 (5th Cir. 1997); *see also Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (claim alleging conspiracy to monopolize requires showing anticompetitive acts with "an effect upon a substantial amount of interstate commerce").

them on coerced terms." Dkt. 149 ("MTD Order") at 57.  Dexon's allegation was that "Cisco has threatened to withhold service on an entire installed base of products to extract supra-competitive purchases of specific tied products."  *Id.* at 62-63.  No evidence supports that claim.

In its responses to Cisco's interrogatories, Dexon identified specific customers that were allegedly subjected to Cisco's supposed tying conduct.[80]  But there is no evidence that Cisco ever conditioned the provision of service under a valid SMARTnet contract on the purchase of additional equipment as to any of those customers (or any others).  On the contrary, all evidence developed in discovery contradicts Dexon's assertion:

- <u>FBISD</u>:  A knowledgeable FBISD employee submitted a sworn declaration (consistent with the school district's as-produced timeline of events), stating that "Cisco did not threaten to withhold service on other networking equipment in our network if FBISD did not cancel the contract with Dexon."[81]

- <u>Lubbock 911</u>:  ███████████████████████████████████[82]

- <u>Park Place</u>:  A█████████████████████████████████████████████████████████[83]

- <u>Targa</u>:  █████████████████████████████████████████████[84]

- <u>West Penn</u>:  A knowledgeable witness submitted a sworn declaration, stating "I told [Dexon] that [West Penn] wanted to buy new, authorized Cisco equipment, as it was my understanding that [West Penn] would not be able to get SMARTnet service unless [West Penn] bought Cisco-authorized equipment, which made sense to me as an end user."[85]

Dexon's tying claim thus fails for want of its most fundamental element – evidence that Cisco

---

[80] *See* Ex. 47 (Dexon Am. Resp. to Cisco Interrogs.) at Nos. 2 & 4.  █████████████████████
████████████████████████.  *See supra* note 60.  In any event, Dexon has no evidence that Cisco ever withheld SMARTnet service from TBK Bank. *See* Ex. 20 (Olson Tr.) at 122:4-9 (█████████████████████████████████████████).

[81] Ex. 78 (Jacob Decl.) at ¶ 14.

[82] Ex. 29 (Kizer Tr.) at 70:11-71:3.

[83] Ex. 30 (Le Tr.) at 87:11-19.

[84] *See supra* note 61.

[85] Ex. 69 (Martz Decl.) at ¶ 8.

used market power in one market to coerce unwanted purchases in another. *See Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 456 (5th Cir. 2021); *see also Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) ("[A]ctual coercion is an indispensable element of a tie-in charge.  A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce his retailer to buy its full line of products.  An antitrust violation occurs only if it goes beyond persuasion and *coerces or forces* its customer to buy the tied product in order to obtain the tying product.") (emphasis added).

2.    ***Cisco lawfully and openly limits SMARTnet to equipment purchased from authorized resellers.***  Dexon has not alleged that Cisco's <u>policy</u> of limiting automatic eligibility for SMARTnet coverage to genuine Cisco equipment purchased from authorized sellers is unlawful.  Nor could it.  This policy is industry standard,[86] and ███████████████████

████████████████████████████████████████████."[87]  The Fifth Circuit has held that a defendant that transparently discloses contractual restrictions – such as Cisco's policy of limiting SMARTnet coverage for equipment purchased from unauthorized resellers – has not engaged in tying.  *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("[P]ower derived from contractual agreements . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (cleaned up); *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (same).

Moreover, this Court suggested that permitting SMARTnet coverage even for equipment sold by unauthorized sellers upon payment of a fee for recertification – to verify it is genuine and

---

[86] *See supra* note 25.  *See also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999) ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2.").

[87] Ex. 4 (Maness Tr.) at 82:16-83:11; *see also id.* at 81:12-82:14 ██████████████████

████████████████████████████████).

undamaged – could be enough to overcome Dexon's tying claim.  *See* MTD Order at 57; *see also Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) ("enhancing the price of the [alleged] tying product" – here, SMARTnet with a recertification fee – is not tying). It is undisputed following discovery that Cisco permits SMARTnet coverage even for such equipment upon payment of a recertification fee.[88]  Dexon's economist conceded the point: "█████ ██████████████████████████████████████████████████████████."[89]  Dexon even acknowledged that Cisco has provided SMARTnet to Dexon's customers following recertification.[90]  Giving customers this option precludes Dexon's tying claim.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1199 (9th Cir. 2012) ("enhancing the price of the tying product" – here, SMARTnet pricing via recertification fees – is not tying).[91]

      3.     ***This is not a "Kodak lock-in" claim.***  There is likewise no claim here that mirrors the tying claim in *Kodak*.  As this Court explained – consistent with how the Fifth Circuit and this District have repeatedly explained the case – in *Kodak* the manufacturer initially sold expensive equipment without restricting customers' ability to obtain service from independent service providers; after customers were "locked in," the manufacturer changed its policy and forced customers to obtain needed service from the manufacturer by conditioning the sale of replacement parts (the tying product) on the purchase of service (the tied product) from the manufacturer; this scheme allegedly worked because the manufacturer targeted unsophisticated

---

[88] *See supra* notes 22-23.

[89] Ex. 2 (Maness Rep.) at ¶ 32.

[90] *See* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 8.

[91] Moreover, this particular contractual limit is indisputably procompetitive.  *See Breaux Bros.*, 21 F.3d at 89; *see also PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010).

████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████.  *See* Ex. 8 (Ugone Rep.) at ¶¶ 10, 115(b).

████████.  *See* Ex. 4 (Maness Tr.) at 125:19-126:7; *see also supra* note 86.

purchasers who had been locked into Kodak-brand copiers before the unexpected change in policy. *See* MTD Order at 60-64; *see also United Farmers*, 89 F.3d at 237-38; *O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721, 735-36 (E.D. Tex. 2000) (granting summary judgment).

Discovery revealed that this case is nothing like *Kodak*. *See O'Dell*, 122 F. Supp. 2d at 735-36 (no *Kodak* claim absent evidence of coercion, high information costs, price discrimination against unsophisticated customers, and lock-in); *see also United Farmers*, 89 F.3d at 238. Cisco does not condition sale of SMARTnet on purchases of new equipment, and it does not condition the sale of equipment on the purchase of SMARTnet. Moreover, Cisco openly discloses in SMARTnet contracts and on its website that Cisco will not provide SMARTnet to cover equipment from unauthorized resellers absent recertification.[92] Dexon presents no evidence that customers are unaware of this policy or that it would be difficult for customers to learn of it.[93] It also is undisputed that Cisco's gear will work without SMARTnet.[94] Dexon's witnesses and economist also conceded that Cisco equipment will interoperate with non-Cisco equipment in a single network,[95] so there is no consumer lock-in to a single manufacturer. And there is no evidence that Cisco ever changed its SMARTnet or warranty policy – let alone did so unexpectedly – or that it price discriminates against unsophisticated customers. All these facts

---

[92] *See supra* note 21.

[93] E.g., West Penn attested that it knew about this limit on SMARTnet *before* buying equipment. *See* Ex. 69 (Martz Decl.) at ¶ 8. More than half a dozen disclosures across Cisco's website or in its SMARTnet terms clarify this policy. *See supra* note 21. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 2
(Maness Rep.) at ¶ 98 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[94] *See supra* note 18; *see also* Ex. 43 (Cisco, "Third Party Maintenance Services and Purchase of Cisco Products Outside the Authorized Channel") at 2. In response to an interrogatory asking it to identify "each fact" and any "Document" supporting the allegation that consumers are "effectively compelled" to purchase SMARTnet, Dexon identified no facts, documents, or customers. *See* Ex. 88 (Dexon Resp. to Cisco Sixth Set of Interrogs.) at No. 34. Its claim should fail on that basis. *See Celotex*, 477 U.S. at 320 (noting non-movant's failure to identify responsive facts in "answering interrogatories").

[95] *See* Ex. 3 (Defs. Ugone Rebuttal) at ¶ 62(b) (collecting Dexon testimony); Ex. 4 (Maness Tr.) at 163:18-164:1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

are missing here, and the absence of even one forecloses a *Kodak* claim.

### B.   Notifying Customers About Cisco's Policies – and Enforcing Them According to As-Disclosed Terms – Is Not Exclusionary Conduct

1.   ***FUD-Based Claims***:  The centerpiece of Dexon's monopolization case – its claim that Cisco employs "FUD tactics" to preserve its supposed monopoly – is unsupported by evidence and squarely foreclosed by Fifth Circuit precedent.  For statements to customers to qualify as even *potentially* exclusionary conduct, they must clear a very high bar: "the statements at issue must be (1) clearly false; (2) clearly material; (3) clearly likely to induce unreasonable reliance; (4) made to unsophisticated parties; (5) continued for long periods; and (6) not readily cured by rivals."  *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 896 (5th Cir. 2016).  Dexon does not even come close.

To start, Dexon has no evidence that Cisco ever made a false statement to a customer, let alone that it did so systematically or over "long periods."  Dexon cannot dispute that the information Cisco provided to the customers disclosed in discovery – FBISD,[96] Lubbock 911,[97] Park Place,[98] Targa,[99] West Penn[100] – was accurate:  Dexon is not authorized,[101] and Cisco

---

[96] *See* Ex. 89 (CISCO00011665) at 666.001 (Cisco letter to FBISD stating Dexon is not "authorized" and that Cisco "can offer no assurance as to the authenticity, provenance, or quality of those products").

[97] *See* Ex. 70 (DEXON_0214169) at 171 (correspondence from Cisco stating the same).

[98] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Ex. 65 (DEXON_0466295) at 295.  There is no evidence that Cisco thereafter sent Park Place any anticompetitive "FUD" about Dexon. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *See* Ex. 90 (DEXON_0414610) at 610. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮  *See* Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 15.

[99] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮  *See* Ex. 91 (TARGA000474) at 1-2. *See* Ex. 92 (CDW-DXN-00032534) at 535 ▮▮▮▮▮▮▮▮▮▮▮▮

[101] *See supra* note 28 (citing Dexon's RFA responses and testimony from Dexon's CEO).

cannot guarantee the provenance of its equipment (nor, by its own admissions, can Dexon).[102]

████████████████████████████████████████████████████████████[103]

Other required factors are likewise absent:  Dexon has no evidence that it (or any other reseller) is unable to provide corrective information to customers.  On the contrary, in every instance that Dexon disclosed in discovery and identified in its expert reports, Dexon provided counter-information to the customer *after* Cisco provided its notice.[104]

Nor can Dexon proffer evidence suggesting that the five customers – a large school district (FBISD), a municipal communications entity (Lubbock 911), a large business (Park Place) acquired by a Fortune 500 firm (Asbury Automotive), a Fortune 500 energy company (Targa), and a regional healthcare system (West Penn) – are unsophisticated.  *See*, *e.g.*, *Springboards to Educ., Inc. v. Pharr-San Juan-Alamo Indep. Sch. Dist.*, 33 F.4th 747, 750 (5th Cir. 2022) (school districts are sophisticated buyers).  On the contrary, each of these disclosed customers has an IT department staffed by IT professionals who made procurement decisions.[105]

---

[102] *See supra* note 47; Ex. 34 (Dexon Resp. to Cisco RFAs) at No. 20 ████████████████████ ████████████████.").

[103] *See* Ex. 4 (Maness Tr.) at 191:17-192:1. █████████████████████████████████████████ ████████████████████" *See* Ex. 112 (Mosteller Tr.) at 117:17-19. ██████████████████████████. *See id.* at 325:16-18.

[104] For West Penn, *compare* Ex. 92 (CDW-DXN-00032534) at 535 (Cisco provides notice on July 16, 2015) *with* Ex. 93 (DEXON_0057112) at 113 (████████████████████████████████) *and* Ex. 79 (DEXON_0375483) at 485 (████████████████████████████████████████).
   For Park Place, *see* Ex. 64 (DEXON_0464843) at 844 (█████████████████████████████████; ██████████████████████████████); Ex. 90 (DEXON_0414610) at 610-611 (██████████████████ ███████████████████████████████).
   For FBISD, *see* Ex. 94 (DEXON_0015631) █████████████████████████████████████████); Ex. 95 (DEXON_0015863) at 893-895 ████████████████████████████████████████████████ ████████████████████████████████████████).
   For Lubbock 911, *compare* Ex. 70 (DEXON_0214169) at 171 (████████████████████████████ ████████) *with* Ex. 96 (DEXON_0214307) at 307-308 (█████████████████████████████████ █████) *and* Ex. 97 (DEXON_0214224) (████████████████████████████████████████████).
   For Targa, *see* Ex. 91 (TARGA000474) at 1-2 (██████████████████████████████████████ ██████████████████████████████.

[105] *See* Ex. 78 (Jacob Decl.) at ¶ 2 (FBISD); Ex. 69 (Martz Decl.) at ¶¶ 2-3 (West Penn); Ex. 30

Nor can Dexon show reliance: whatever choice customers made, there is no evidence that they relied on any false information – the only evidence is that customers made choices with eyes open. *See Am. Pro. Testing Serv., Inc. v. Harcourt Brace Jovanovich Legal & Pro. Publ'ns, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1997) (Section 2 claim fails as a matter of law absent evidence that consumers were "clearly likely to rely" on the false statements) (cleaned up). Further, a majority of the customers that Dexon disclosed in discovery continued purchasing from Dexon despite Cisco's notice,[106] belying any showing of reliance.

Fifth Circuit law protects the ability to communicate to customers because such communications are central to the competitive process. Even untrue statements are protected. *See Retractable*, 842 F.3d at 888-89, 894-95 (collecting cases; spreading even *false* information is "a slim, and here nonexistent, reed for a § 2 claim"); *Stearns*, 170 F.3d at 524 (even "wrong, misleading, or debatable" claims made to customers "are all arguments on the merits, indicative of competition"); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 296 & n.46 (5th Cir. 1988) ("[p]roduct information is crucial to a competitive market" that "may enhance, not reduce, competition and consumer welfare"). This is, accordingly, a clear case: Dexon has no evidence of false statements, let alone a pattern of clearly false statements capable of a sustained impact on competition, and so its "FUD" claim fails.

2.    ***Audit-Based Claims***: Dexon adds nothing through its new theory – introduced for the first time by its expert after fact discovery had closed[107] – regarding Cisco's software audits under its EULA. ████████████████████████

---

(Le Tr.) at 17:3-22 (Park Place); Ex. 29 (Kizer Tr.) at 17:1-18:3 (Lubbock 911); Ex. 98 (TARGA000004) at 1-2 (████████████████████████);
Ex. 99 (TARGA000008) at 1 (████████████████████████).

[106] *See supra* note 61; *see also supra* note 70 (████████████████████████).

[107] *See* Dkt. 316 (Defs.' Rule 37 Motion); *see also* Ex. 2 (Maness Rep.) at ¶¶ 84-90.

█████████████████████████████████████████ .[108] ████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████[109] It

likewise is undisputed that this EULA audit term is standard across networking OEMs.[110]

Dexon has a single example of a Dexon customer subject to audit:[111] ████████ , a

financial institution with billions of dollars in assets under management.[112]  After a software

audit found that ████████████████████ – a finding Dexon does not dispute[113] –

███ and Cisco agreed that Cisco would forgive the resulting fee as part of █████ plan to

buy more Cisco gear.[114]  Dexon has no explanation for how this example (or ████████████

███████████████████████████████████████████[115])

harmed competition.[116]  Indeed, ██████ *still* buys some Cisco gear from Dexon post-audit.[117]

---

[108] ███████████████████████████████████████████ . *See* Ex. 4 (Maness Tr.) at 59:5-10.

[109] *Id.* at 88:7-13; *see also id.* at 103:9-20 (requiring ██████████████████████████
██████████████████████ . *See* Ex. 112 (Mosteller Tr.) at 178:15-21, 179:16-19. ██████ *See* Ex. 3 (Defs. Ugone Rebuttal) at ¶¶ 108-109 (comparing OEMs, noting similar terms).

[111] ████████████████ *see* Ex. 4 (Maness Tr.) at 107:16-108:13), ████████████████████
██████████ – all sophisticated entities – ████████████████████ , without evidence that any forwent a competitive sale because of an audit. *See id.* at 107:8-10 (██████ sophisticated), 108:18-109:7 (████████████████████ ), 111:17-112:2 (██ reasonably sophisticated), 113:11-114:1 (█████ sophisticated in this space). ██████ *See id.* at 95:2-6.

[112] *See* Ex. 3 (Defs. Ugone Rebuttal) at ¶ 113 (████████████████ ).

[113] *See* Ex. 4 (Maness Tr.) at 97:12-20.

[114] *See* Ex. 100 (CISCO00035052) at 003-004. ███████████████████████████
█████████████████ *See* Ex. 101 (DEXON_0461401).

[115] *See* Ex. 4 (Maness Tr.) at 59:12-18.

[116] ████████████████████████████ *See id.* at 106:11-14. ██████
*See* Ex. 2 (Dexon Maness Rep.) at ¶ 86 ███████████████████████
████████████ ; Ex. 102 (DEXON_0476848) (██████████████████
████████████████████████ .

Furthermore, agreeing to forgo fees to which a seller is entitled as part of a negotiated sale constitutes discounting – a reduction in the price of the goods and services sold to the customer.[118]  Discounts are categorically lawful *unless* they are predatory – that is, the prices are below an appropriate measure of cost *and* the seller is able to recoup the loss through high-priced sales later – something Dexon does not (and could not) show.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-24 (1993); *Stearns*, 170 F.3d at 527-28 ("The Supreme Court has expressed extreme skepticism of predatory pricing claims.  The central difficulty with such actions is that the conduct alleged is difficult to distinguish from conduct that benefits consumers. . . .  Accordingly, the standard for inferring an impermissible predatory pricing scheme is high."); *Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x 244, 245, 248 (5th Cir. 2019) (per curiam) (price discounting as part of negotiated transaction to buy more goods is not exclusionary).  Dexon does not and cannot claim that any of the few fee-forgiveness arrangements it has described run afoul of the governing legal standard.

3.    ***"Bait-and-Switch" Allegations***:  ███████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████.  Dexon, however, presents no evidence to support its allegations, which have no legal force in any event.

*First*, there is no evidence that Cisco knowingly permits customers to purchase SMARTnet contracts to cover equipment sold outside authorized channels.  ██████████████

███████████████████████████████████████.[119]  Cisco instead publicizes

---

[118] *See* Ex. 4 (Maness Tr.) at 103:9-20 (███████████████████████████████████).
[119] *See id.* at 197:12-198:4; Ex. 2 (Maness Rep.) at ¶ 104.  ███████████████████████████
███████████████████████████████████████.  *See* Ex. 30 (Le Tr.) at 88:2-15 (██████████
███████████████████████).

that equipment purchased from unauthorized sellers is *not* eligible for SMARTnet coverage without recertification.[120]  And while Dexon has sold SMARTnet contracts to cover Cisco equipment, it ████████████████████████████████████████████████████████████████

███████████████████████████████████.[121]  There is no evidence that ████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████[122]████████████████████████████████████████████

███████████████████████████[123]████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████[124]

    *Second*, Dexon's allegations have no legal force because there is no evidence that such situations have affected competitors' equipment sales.[125]  On the contrary, Dexon's theory appears to be that this conduct allows Cisco to sell additional SMARTnet contracts – not additional equipment (corresponding to the alleged markets).[126]  Further, Dexon presents zero evidence that the few instances it identifies had any market-wide effect.  For both reasons, Cisco's supposed conduct cannot constitute *exclusionary* conduct as a matter of law.  *See Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 477-78 (5th Cir. 2000) (rejecting similar claim – about

---

[120] *See supra* note 21.

[121] *See supra* notes 49-50; *see also* Ex. 103 (DEXON_0051641) at 641-642.

[122] *See, e.g.*, Ex. 104 (DEXON_0004662) at 662; Ex. 105 (DEXON_0386709) at 709; Ex. 114 (DEXON_0032987) at 987; Ex. 115 (DEXON_0277661) at 661.

[123] *See* Ex. 106 (DEXON_0389143) at 143 (██████████████████████████████████");
Ex. 107 (DEXON_0033188) at 189 (███████ ").

[124] *See supra* note 52. ██████████████████████████████████.  *See* Ex. 4 (Maness Tr.) at 194:12-21 (acknowledging Cisco's written policy), 210:15-22 (███████████████████).

[126] ████████████████████████████████████████████████████████.
██████████████████████████████████████████████████████ *See* Ex. 4 (Maness Tr.) at 210:5-8.

supposed "sham pricing" – as a matter of law and explaining that exclusionary conduct "driv[es] competitors from the market" and thereby makes a "significant contribution" to maintaining power); *see also Retractable*, 842 F.3d at 891 (requiring foreclosure of rivals for Section 2).

## C.  Operating an Authorized Distribution Channel Is Lawful – Not Conspiracy

It is undisputed that Cisco maintains an industry-standard distribution network – in which CDW is one of more than 8,000 authorized resellers and several dozen "gold" partners – and that maintaining such a channel is not anticompetitive, as Dexon's economist conceded.[127]  *See, e.g., Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1248-49 (5th Cir. 1975) ("It is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself.").[128]

[129]  Antitrust law privileges such distribution management.  *See Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977).

To overcome this precedent, Dexon alleged that Cisco abused its lawful distribution network by agreeing with CDW to coerce customers away from Dexon and toward CDW.  *See* MTD Order at 37, 42-43, 46.  But even if persuading a customer to deal with one reseller rather

---

[127] *See supra* notes 10, 75; Ex. 4 (Maness Tr.) at 66:6-13.

*See* Ex. 112 (Mosteller Tr.) at 69:20-70:20, 82:17-83:3, 116:9-18.

[128] This precedent reflects economic logic:  Cisco's incentive is to sell its products to distributors at a profit for Cisco and then rely on competition among 8,000+ authorized resellers to keep end-user prices low, increasing end-user demand for Cisco's products relative to HPE and other OEMs.  *See Abadir & Co. v. First Miss. Corp.*, 651 F.2d 422, 427 (5th Cir. 1981).

[129] *See supra* note 75.  The Fifth Circuit has also repeatedly confirmed that a manufacturer can lawfully enforce policies – like those Cisco and its many OEM rivals employ, *see supra* note 14 – that prohibit distributors from making suspected unauthorized sales.  *See Sports Ctr., Inc. v. Riddell, Inc.*, 673 F.2d 786, 791-92 (5th Cir. 1982); *Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 (5th Cir. 1982).

than another were suspect – and it is not – Dexon cannot prove that it happened.[130]  It has just

two examples of customers supposedly steered away from Dexon toward CDW:[131]



To be sure, as part of its agreement to be an authorized reseller, CDW agrees not to sell Cisco

equipment to unauthorized resellers for re-resale.  But such restrictions are standard in the

industry, and Dexon does not claim that Cisco's policy is unlawful.  *See Matrix Essentials, Inc.*

*v. Emporium Drug Mart, Inc., of Lafayette*, 988 F.2d 587, 594 (5th Cir. 1993).

## II.    DEXON LACKS ANTITRUST INJURY (COUNTS I-VI)

All of Dexon's claims fail because it cannot establish a triable question of fact as to

antitrust injury.[135]  As this Court explained, antitrust injury "is of the type the antitrust laws were

intended to prevent and flows from that which makes defendants' acts unlawful."  MTD Order

at 52 (cleaned up); *see Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990).

---

[130] The allegation in *West Penn Allegheny Health System, Inc. v. UPMC*, 627 F.3d 85 (3d Cir. 2010) (decided on a motion to dismiss), was that the area's dominant hospital agreed it would rebuff other insurance networks if, in exchange, the dominant insurer would target the dominant hospital's closest rival.  *See id.* at 93-94.  There is no similar dyad here:  Cisco has more than 8,000 authorized resellers.

[131] Further, the four-year statute of limitations for antitrust claims bars the conspiracy counts – *see* 15 U.S.C. § 15b; *see also* Tex. Bus. & Com. Code § 15.25(a) –

.  *See* Ex. 2 (Maness Rep.) at ¶ 100 (disclosing the latter).

[132] *See* Ex. 69 (Martz Decl.) at ¶¶ 7-12; *see also* Ex. 108 (Dexon Am. Resp. to CDW Interrogs.) at Nos. 1-2, 4-5 & 7-9 (                                                          ).

[133] *See* Ex. 109 (DEXON_0491421) at 421 (                                                ).

[134] *See* Ex. 110 (Tapper Tr.) at 230:10-231:19; Ex. 111 (CISCO00046569) at 2.

[135] *See Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 891 (5th Cir. 1985); *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. Ct. App. 1994).

Accordingly, to establish antitrust injury, a plaintiff must show that conduct causing harm to competition also harmed the plaintiff. *See Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007). Discovery revealed Dexon has not sustained such an injury.

 ***No Harm to Interbrand Competition***: Dexon alleged that Cisco's conduct – FUD and tying – is unlawful because it prevents customers from leaving Cisco in favor of other OEMs in the alleged equipment markets.[136] Dexon cannot show such antitrust injury without showing it lost sales of other OEMs' equipment by virtue of conduct that causes market-wide harm.[137]

 Dexon's only claimed injury following discovery, however, is that it should have sold even <u>more Cisco equipment</u>.[138] That supposed injury does not flow from harm to competition between Cisco and other OEMs, and so it is not antitrust injury given Dexon's theory of liability. *See Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 353-54 (5th Cir. 1980). Indeed, and despite voluminous discovery, Dexon identified *zero* lost sales of non-Cisco networking equipment. None of its witnesses – not one – was aware of any instance in which Cisco interfered with Dexon's actual or attempted sales of another OEM's equipment,[139] e.g.:



---

[136] *See* Am. Compl. (Dkt. 175) at ¶¶ 113, 119, 126, 135.

[137] Indeed, that is how Dexon pleaded "Antitrust Injury." *See id.* ¶ 89.

[138] *See* Ex. 2 (Dexon Maness Rep.) at ¶¶ 131, 134-135.

[139] ████████████. *See* Ex. 16 (DeToy Tr.) at 264:4-9; Ex. 17 (Graber Tr.) at 168:4-8; Ex. 33 (Kaas Tr.) at 204:5-10; Ex. 18 (Lang Tr.) at 126:22-127:7; Ex. 19 (Malaska Tr.) at 109:12-16; Ex. 20 (Olson Tr.) at 157:15-18; Ex. 21 (O'Neil Tr.) at 102:8-17; Ex. 22 (Ripley Tr.) at 175:20-176:1; Ex. 23 (Roush Tr.) at 100:15-17; Ex. 22 (Sletten Tr.) at 158:17-159:10; Ex. 25 (Tate Tr.) at 260:12-261:14; Ex. 46 (Tveitbakk Tr.) at 86:3-7; Ex. 26 (Valenzuela Tr.) at 206:7-16; Ex. 27 (Wickert Tr.) at 178:13-21.

The Fifth Circuit's decision in *Walker v. U-Haul Co. of Mississippi*, 747 F.2d 1011 (5th Cir. 1984), demonstrates why Dexon's complaint about lost sales of Cisco equipment is insufficient.  A former U-Haul dealer claimed U-Haul terminated it to monopolize the market for truck rentals where U-Haul competed against "Hertz, Ryder, and other competitors." *Id.* at 1014. The Fifth Circuit acknowledged that U-Haul had decimated the plaintiff's business (not the case here as Dexon is growing), but that was not enough for antitrust injury. *See id.* at 1015. Critically, the now-former U-Haul dealer had "made no mention in the lower court of how U-Haul's termination of a single agent for its own services ([plaintiff]) was intended to or would in fact affect the competing services that might be offered by other truck and trailer renters, the interbrand, as opposed to the intrabrand, market." *Id.*  Dexon is no different.[140]

**No Harm to Intrabrand Competition**:  Dexon also has no evidence that any injury it suffered reflects harm to competition among the thousands of resellers of Cisco equipment. There are more than 8,000 authorized Cisco resellers and hundreds (if not thousands) of unauthorized Cisco resellers competing to resell Cisco equipment.[141] ██████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[142]  *See H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) (injury to a single distributor insufficient).  All Dexon can point to is sales it lost because Cisco revealed (truthfully) that Dexon is unauthorized.  But those customers left Dexon because they preferred to buy

---

[140] To survive Cisco's motion to dismiss, Dexon relied on its allegation that Cisco targets Dexon because it does not favor Cisco equipment.  *See* Compl. (Dkt. 1) at ¶ 61; *see also* Dkt. 24 at 4, 29 (Dexon's opposition brief).  But discovery showed the opposite: ████████████████████████
███████████████████████████████████████████████  *See supra* note 30.
      *See supra* notes 10, 27.
[142] *See* Ex. 4 (Maness Tr.) at 170:3-10 ██████████████████████████████████
██████████████████████████████████████████████████████████████████████.

authorized.[143]  Such informed trade-offs reflect competition, not lack of it.

Discovery thus established that this case is nothing like *Graphic Products Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983) (*cited in* MTD Order at 34-35),[144] in which the plaintiff adduced evidence that the defendant manufacturer used territorial restraints to give some distributors exclusive access to defined U.S. geographies (giving the manufacturer exclusive distribution in geographies it had chosen for itself).  *See id.* at 1564, 1569, 1571. Cisco neither divides U.S. territories nor requires its 8,000+ authorized resellers to sell Cisco products exclusively.[145]  Further, in *Graphic Products Distributors*, the defendant admitted that its distribution system had "completely eliminated intrabrand competition."  *Id.* at 1574 (noting the defendant "did not contest this point at trial").  That was decisive because, "[t]o the extent that intrabrand competition continues after the imposition of intrabrand restraints, the effects of the intrabrand restraints on competition may be *de minimis*.  Situations in which intrabrand competition continues to be vigorous differ dramatically from those where the effect of the intrabrand restraint is to shut off all intrabrand competition."  *Id.* at 1574 & n.25.  Dexon makes no claim that competition for the resale of Cisco products is anything less than vigorous, nor could it.[146]  Cisco urges customers to buy from authorized dealers, but the choice is theirs. Dexon can adduce no evidence to the contrary.

## CONCLUSION

For the foregoing reasons, Cisco respectfully requests that the Court grant the Motion.

---

[143] *See supra* notes 65-66, 71 (citing to sworn customer affidavits and an FBISD-created timeline).

[144] Nor is the district court's decision in *In re Pool Products Distribution Market Antitrust Litigation*, 940 F. Supp. 2d 367 (E.D. La. 2013) (*cited in* MTD Order at 35-36), applicable following discovery here. The plaintiffs there alleged a conspiracy of manufacturers effectively agreeing to sell to just one distributor.  *See id.* at 373-74, 391, 396.  Here, there is no claim that Cisco requires reseller exclusivity.

[145] *See supra* note 11; *see also* Ex. 4 (Maness Tr.) at 161:17-162:2.

[146] *See supra* notes 10, 27, 143.

Dated:  September 25, 2023                    Respectfully submitted,

_____
/s/ Deron R. Dacus

DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
LESLIE V. POPE (*pro hac vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
lpope@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Counsel for Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record, who are deemed to have consented to electronic service, are being served on September 25, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).


*/s/ Deron R. Dacus*
_____