**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| | § | |
| **v.** | § | **Case No. 5:22-cv-53-RWS-JBB** |
| | § | **SEALED** |
| **CISCO SYSTEMS, INC. and CDW** | § | |
| **CORPORATION** | § | |

---

### ORDER

---

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motion is pending before the Court:

> **Defendants' Rule 37 Motion Regarding Undisclosed Nonparty Witnesses and Liability Theory (Dkt. No. 316).**

Having considered the relevant briefing, Defendants' motion is **DENIED**. As explained herein, part of the information at issue did not need to be disclosed, and to the extent information needed to be disclosed, exclusion is not warranted under the four-factor test.

### I. BACKGROUND

On September 8, 2023, Defendants filed their current Rule 37 motion, requesting the Court to (1) prohibit Dexon from using in any motion, at any hearing, or at trial any information related to (a) the "new theory of liability for its Section 2 claim" based on Cisco's audits of end-customers' compliance with licensing agreements, and (b) twenty newly disclosed nonparty customers that were allegedly harmed by Defendants' conduct; and (2) strike those liability and damages opinions from Dexon's expert reports. According to Defendants, Dexon should not be allowed to rely on

this information because it was "never before mentioned in Dexon's prior initial disclosures or discovery responses." Dkt. No. 316 at 7.

## II. APPLICABLE LAW

Federal Rule 26(a) states that "a party must, without awaiting a discovery request, provide to the other parties . . . the name . . . of each individual likely to have discoverable information – along with the subjects of that information – that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i). Furthermore, a party has a duty to supplement disclosures, "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. . . . " *Realtime Data L.L.C. v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 6257472, at *1 (E.D. Tex. Nov. 15, 2018) (quoting FED. R. CIV. P. 26(e)(1)(A)).

The Court's Discovery Order requires the parties to identify "the legal theories and, in general, the factual bases of the disclosing party's claims or defenses," and "the name, address, and telephone number of persons having knowledge of relevant facts, a brief statement of each identified person's connection with the case, and a brief, fair summary of the substance of the information known by any such person." Dkt. No. 65, ¶ 1(c)-(d). The Discovery Order further provides: "After disclosure is made pursuant to this order, each party is under a duty to supplement or correct its disclosures immediately if the party obtains information on the basis of which it knows that the information disclosed was either incomplete or incorrect when made, or is no longer complete or true." *Id*., ¶ 9.

Federal Rule 37 sets the consequences of untimely or insufficient disclosure by a party: "[T]he party is not allowed to use that information or witness to supply evidence on a motion, at a

hearing, or at trial, unless the failure was substantially justified or is harmless." *CEATS, Inc. v. TicketNetwork, Inc*., Civil Action No. 2:15-CV-01470-JRG-RSP, 2018 WL 453732, at *3 (E.D. Tex. Jan. 17, 2018) (quoting FED. R. CIV. P. 37(c)(1)). Rule 37 also "empowers the courts to impose sanctions for failures to obey discovery orders." *Estech Sys., Inc. v. Target Corp*., No. 2:20-CV-00123-JRG-RSP, 2021 WL 5154220, at *3 (E.D. Tex. July 21, 2021) (quoting *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co*., 685 F.3d 486, 488 (5th Cir. 2012)).

Four factors guide the Court's exercise of discretion in evaluating whether to exclude evidence under Rule 37. *Id*. (citing *CQ, Inc. v. TXU Min. Co., L.P*., 565 F.3d 268, 280 (5th Cir. 2009)). These factors are: "(1) [the untimely party's] explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to [the objecting party] in allowing the evidence, and (4) the availability of a continuance." *Id*.

## III. DISCUSSION

### A. Background

On September 22, 2022, Dexon served Defendants with its initial disclosures pursuant to Rule 26(a)(1) and the Court's Discovery Order. Regarding "the legal theories" at issue, Dexon referred to its original complaint (Dkt. No. 1) and the parties' Joint Conference Report (Dkt. No. 50). Dexon identified three theories of liability: "FUD tactics," tying, and conspiracy. Dkt. No. 316, Ex. A (Dexon's Initial Disclosures) at 1-2; *see also* Dkt. No. 50 at 4. In its initial disclosures, Dexon did not identify any customers as "persons having knowledge of relevant facts." Dkt. No. 316, Ex. A (Dexon's Initial Disclosures) at 2. With respect to computation of damages, Dexon disclosed the following:

> The partial production of financial data by CDW to date is relevant to the damages claimed by Dexon in this action, and a detailed computation of damages will be provided upon designation of experts in accordance with the Court's Docket Control Order. In general, Dexon will be claiming damages in [the] form of lost

profits due to the anticompetitive conspiracy of Cisco and CDW, as well as the monopolistic actions of Cisco.

Dkt. No. 231 (June 1, 2023 Order) at 3 (quoting Dkt. No. 155-2).

On September 29, 2022, Cisco propounded an interrogatory requesting that Dexon identify all lost sales it claims, as well as the associated revenue and profit. Like its initial disclosures, Dexon's interrogatory response stated that damages will be the subject of expert discovery. *Id.*

On October 24, 2022, Dexon supplemented its disclosures, identifying five customer witnesses: Fort Bend Independent School District ("FBISD"), Lubbock Emergency Communication District ("Lubbock"), Asbury Automotive Group / Park Place Dealerships ("Park Place"), Targa Resources ("Targa"), and West Penn Allegheny Health System ("West Penn"). Dkt. No. 316, Ex. B (Dexon's Supplemental Disclosures) at 6-7. On March 17, 2023, Dexon again amended, adding the University of Maryland Medical System as a "person[] having knowledge of relevant facts." Dkt. No. 316, Ex. C (Dexon's Second Amended Disclosures) at 6-7. Also on March 17, 2023, Dexon first disclosed claimed damages: lost revenue or profits from alleged lost sales to FBISD, Lubbock, Park Place, Targa, and West Penn.[1] *See id.* at 9-10.

Seeking more detail regarding Dexon's claimed damages, Cisco filed a motion requesting the Court order Dexon to supplement its initial and supplemental damages disclosures to provide a "detailed computation" of the lost profits it seeks in this case, including the amount of knowable lost profits, Dexon's method for computing those claimed damages, and supporting evidentiary materials (if any). Dkt. No. 141. After conducting a hearing, the Court denied Cisco's motion on

---

[1] Defendants propounded interrogatories to probe these disclosures. *See* Dkt. No. 316, Ex. F (Dexon's Amended Responses to Cisco's First Set of Interrogatories to Cisco's Interrogatory No. 1), Ex. G (Dexon's Responses to Cisco's Fifth Set of Interrogatories), and Ex. H (Dexon's Amended Responses to CDW's First Set of Interrogatories). Defendants also "tested Dexon's reliance on each of Dexon's disclosed customers in nonparty discovery." Dkt. No. 316 at 4 and Ex. I (Jacob Declaration), Ex. J (Lubbock Deposition Excerpt), Ex. L (Park Place Deposition Excerpt), Exs. M and N (Targa-produced documents), Ex. O (STRAGISTICS_0000001), and Ex. P (Martz Declaration).

June 1, 2023, finding Dexon's initial and supplemental damages disclosures sufficient for the stage of the case, "subject to Dexon's continued obligation under Rule 26 to supplement its responses." Dkt. No. 231.

In the Order, the Court noted Cisco's concern that it would suffer prejudice if Dexon's future expert report on damages included information that Cisco would not have known to explore during discovery. *See id.* at 4 (citing Dkt. No. 224 (Transcript) at 65:1-67:16). However, the Court noted it would "address any issue on that front, if it develops, at the appropriate time in the case." *Id.*

On June 21, 2023 – the final day of fact discovery – Dexon served its Fourth Supplemental Initial Disclosures. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 1. Dexon continued to reference the Joint Conference Report and complaint without referencing any additional legal theories, damages, or new customer witnesses "having knowledge of relevant facts." Dkt. No. 316, Ex. D (Dexon's Fourth Supplemental Disclosures) at 1-2, 7-8, 13-14. However, Dexon identified the following party witnesses as individuals having knowledge of relevant facts relating to Dexon's theories and claims: (i) Adam Tapper (Cisco's account manager who handled the Fresenius account); (ii) Naser Samaenah (Cisco's leader in customer engagement and software compliance); and (iii) Chuck Williams (Cisco's brand protection leader), all previously disclosed by Cisco. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 1. Dexon also identified Tim Roush, a Dexon employee who managed the Arvest account that was subject to a customer audit. *Id.*

On July 29, 2023, more than one month after the close of fact discovery, Dexon served its opening expert report of its economist, Robert S. Maness, Ph.D. In his report, Dr. Maness opines that Cisco exploits its partner agreements and end-user license agreements ("EULA") to audit its partners and customers and enforce its distribution strategy. Dkt. No. 336-1 (Reichenberg Decl.)

at Ex. 8 (Maness Report), ¶¶ 84-92. As examples of Cisco's alleged misuse of its software program, Dr. Maness highlights audits performed on several Cisco end-users, including <u>Arvest (a former Dexon customer), Boston Scientific, Trustwave, Capital One, and Scottrade</u>. *Id.* (emphasis added to delineate these as five of the twenty newly disclosed customers at issue). In discussing these audits, Dr. Maness relied almost exclusively on documents produced by Cisco. *Id.* Dr. Maness also identified <u>Eastern Virginia Medical Schools</u> ("EVMS") in a section on Cisco "bait and switch," opining "Cisco's conduct with EVMS, including its audits and SMARTnet policies, had the effect of removing competition from Dexon for Cisco sales at this customer." *Id.*, ¶¶ 108-110 (emphasis added to delineate this as one of the twenty newly disclosed customers at issue).

Dr. Maness also relied upon CDW's sales data, which was requested in June 2022 and produced in June 2023, to identify "overlapping customers" between CDW and Dexon to quantify lost profit damages resulting from Cisco and CDW's conspiracy ("conspiracy lost profit" damages).[2] *Id.*, ¶ 136 n. 271 & Ex. 8B (using customer level sales data for Allegheny Health Network (West Penn in Dexon's data), <u>Amneal Pharmaceutical, Baptist Health, Blue Cross & Blue Shield of South Carolina, Brunswick Boat Group, Cambium Learn NG Inc., Ericsson NC, EZE Castle Software LLC., Fresenius Kabi USA, LLC., NCS Pearson, Inc., OL N Corporation, Pathfinder International, Pearson Inc., Springfield Clinic LLP, and Stericycle</u> to calculate conspiracy lost profits from January 2015 – April 2018 ($2,387,180) and from May 2018 – May

---

[2] Dr. Maness further opines Cisco's actions have "harmed Dexon's reputation in the marketplace," and "Cisco's and CDW's actions have likely materially reduced Dexon's sales of not only Cisco routers, Ethernet switches, and enterprise voice products, but all Cisco products it sells." Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 8 (Maness Report), ¶ 129. Dr. Maness calculates the impact of lost sales of products inside and outside the relevant product markets and refers to these as "consequential sales." *Id.* He separately calculates lost profits on lost SMARTnet sales. *Id.*, ¶ 135.

Defendants have filed a separate Rule 37 Motion Regarding Undisclosed Damages (Dkt. No. 328), regarding this issue, which will be addressed separately.

2022 ($1,713,122)) (emphasis added to delineate these as the remaining fourteen of the twenty newly disclosed customers at issue).

## B.     Defendants' assertions

Defendants assert Dr. Maness has presented (1) a new theory of liability for Dexon's § 2 claim based on Cisco's audits of end-customers' compliance with licensing agreements ("customer audits"); and (2) liability and damages opinions based on twenty newly disclosed customers that allegedly were harmed by the Defendants' conduct. Dkt. No. 316 at 1. Regarding the latter, Dr. Maness opined that (1) six nonparties (Arvest Bank, Boston Scientific, Capital One, Scottrade, Trustwave Holdings, and Eastern Virginia Medical School) were subject to customer audits, and (2) Dexon suffered "conspiracy" damages related to lost sales from not only West Penn, but also fourteen other nonparties (Amneal Pharmaceutical; Baptist Health; Blue Cross and Blue Shield of South Carolina; Brunswick Boat Group; Cambium Learn NG Inc.; Ericsson NC; EZE Castle Software LLC; Dexon customer Fresenius Kabi; NCS Pearson, Inc.; OL N Corporation; Pathfinder International; Pearson, Inc.; Springfield Clinic LLP; and Stericycle) that supposedly diverted sales from Dexon to CDW. According to Defendants, neither the new customer audit theory, which Dr. Maness discusses separately from "FUD," tying, and the alleged conspiracy, nor any of the twenty new customers appears in any of Dexon's amended and supplemented disclosures – including the list of persons with "knowledge" of the claims – or damages disclosures. Dkt. No. 316 at 7-8 (stating eighteen of the new customers never appeared in any written discovery response at all).

Pursuant to Federal Rule of Civil Procedure 37, Cisco asserts the Court should bar Dexon from relying on any facts or theories related to Cisco's customer audits and any facts or theories related to the twenty new customers that were not disclosed in Dexon's Rule 26 disclosures during the fact discovery period. *Id.* at 9-12. Cisco argues Dexon's failure to disclose was neither

substantially justified nor harmless. *Id.* at 12-15. Asserting the expansive discovery conducted in this case to date has been based on the allegations of Cisco's alleged conspiracy with CDW, "FUD" campaign, and "tying" of SMARTnet service contracts to help maintain or attempt to attain monopolies in the relevant markets, Defendants state Dexon's failure to timely disclose the new "audit" theory of liability and twenty nonparty customers that were allegedly harmed by Defendants' conduct has prejudiced Defendants "by foreclosing the opportunity to take discovery – from third parties and from Dexon – to test these fact-intensive contentions." *Id.* at 1.

**C.    Analysis**

**1.    Customer audits and the six undisclosed nonparties associated with Cisco's audits**

**a.    Whether Dexon violated its disclosure obligations**

Defendants assert Dexon violated Rule 26(a)(1)(A)(i) by failing to disclose "each individual likely to have discoverable information" (the new nonparties) "along with the subjects of that information" (the new liability theory). Dkt. No. 316 at 10. Defendants further assert Dexon violated its obligations under the Court's Discovery Order, which required Dexon to identify during fact discovery "the legal theories" and "factual bases" of its claims (the new liability theory) and all "persons having knowledge of relevant facts" relating to Dexon's claims (the new nonparties). *Id.* (citing Dkt. No. 65, ¶ 1(c)-(d)).

Dexon persuasively shows the customer audits do not constitute a new theory of liability (requiring disclosure) because the audits are a type of "FUD," which Dexon has alleged since the beginning of this case. Dkt. No. 336 at 4; *see also id.* at 1 (stating Cisco's customer audits show "the weaponization of end-user audit agreements to force customers to commit to future purchases with Cisco"). To start, the customer audits fall within Dexon's various disclosed theories regarding Cisco's alleged anticompetitive tactics and are consistent with Dexon's pleadings. *See*, *e.g.*, Dkt.

No. 175 (Am. Compl.), ¶ 66 (alleging Cisco requires CDW to submit to internal audits to ensure it is meeting Cisco's program criteria, and as a monopolist in the Relevant Markets, "changed its requirements to force distributors like CDW to pay for these audits themselves, whereas Cisco had paid for the audits previously"). The allegation that Cisco uses audits to identify customer purchases from unauthorized sources—and potentially resolve any failed audits by securing a commitment to buy equipment from authorized distributors—is not so disconnected from other "FUD" tactics (that Defendants characterize as "badmouthing" Dexon to potential customers) that warrant treating "audits" as an entirely new and distinct legal theory.

Moreover, information relating to the "audit theory" was extensively explored in discovery, further suggesting the parties understood it was part of Dexon's allegations. Cisco itself disclosed Mr. Naser Samaenah, the witness in charge of Cisco's customer audits. Dkt. No. 336 at 1. Defendants do not dispute that "the documents and customers referenced in Dexon's expert report (which Defendants had the opportunity to submit rebuttal and reply reports to) were all previously produced—and were produced by Defendants themselves." *Id.* Some two-to-four fact witnesses and one of Dexon's experts were questioned regarding Cisco's audits during their depositions. *See id*. at 4-5.

For these reasons, Defendants' argument that the audits have "nothing to do with telling customers about the consequences of purchasing from a reseller that is not authorized (i.e., the 'FUD' theory)," Dkt. No. 344 at 3, is unpersuasive. It is true that Dexon's expert discusses "Customer Audits" and "FUD Conduct" as distinct categories of alleged anticompetitive conduct in his report, but his decision to format the report that way does not outweigh the above analysis. As such, Dexon has not failed to disclose its "customer audit theory."

Even if the customer audits were considered a distinct theory of liability from FUD, the above background shows the audit issue was extensively explored during the discovery process, including being addressed in the expert reports of both Dexon and Defendants. *See* Dkt. No. 336 at 4-6 (identifying the numerous instances during discovery where the audit issue arose). Under Rule 26(e)(1)(A), supplementation is not necessarily required if the additional information has otherwise been made known to the other parties through the discovery process.[3]

Regardless of the "safe harbor" in Rule 26(e), Defendants assert the Court should apply Rule 37(c) penalties based on Dexon's violation of the Court's Discovery Order. Dkt. No. 316 at 9 & n. 7. According to Defendants, the Discovery Order does not have "Rule 26's safe harbor for information that has 'otherwise been made known' to an adversary." Dkt. No. 344 at 2 (citing *Estech Sys., Inc. v. Target Corp.*, No. 2:20-CV-00123-JRG-RSP, 2021 WL 5154220, at *6 (E.D. Tex. July 21, 2021) (stating "[t]he Discovery Order in this case imposes an affirmative duty to update Rule 26(a) disclosures unlike permissive Rule 26(e)(1)(A)")). Defendants take *Estech's* analysis too far by arguing that the Court's standard discovery order prevents parties from relying on the safe harbor provision of Rule 26(e)(1)(A), regardless of the discovery dispute at issue.

In *Estech*, the court considered whether to strike Estech's CEO, George Platt, from Estech's trial witness list because of Estech's failure to name Mr. Platt in its initial Rule 26(a) disclosures. *Estech*, 2021 WL 5154220, at *6 (noting Estech offered no explanation for its delay in failing to disclose the witness until its pretrial disclosures). The court rejected one of Estech's

---

[3] The federal rules include a duty to supplement prior disclosures "in a timely manner" if they are incomplete and "if the additional . . . information has not otherwise been made known to the other parties during the discovery process or in writing." *Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 362 (5th Cir. 2018) (quoting FED. R. CIV. P. 26(e)). In other words, an initial disclosure may be considered supplemented if the "additional or corrective information" is "made known to the other parties during the discovery process or in writing. . . ." *Realtime Data L.L.C. v. EchoStar Corp.*, No. 6:17-CV-00084-JDL, 2018 WL 6257472, at *3 (E.D. Tex. Nov. 15, 2018) (quoting FED. R. CIV. P. 26(e)(1)(A)). Courts also recognize that eventual disclosure of information through subsequent discovery may render a potential violation of the initial disclosure requirements harmless and not prejudice the defendant—therefore, not requiring the exclusion of evidence under Rule 37(c)(1). *Id.* (citing cases).

arguments, that because the defendants had deposed Mr. Platt, Estech "was absolved of all obligations to amend its Rule 26(a) disclosures" due to the safe harbor provision in Rule 26(e)(1)(A). *Id.* The court stated Estech misunderstood its duties under the court's Discovery Order, *id.* at *3, *6, and distinguished *Better Mouse Co., L.L.C. v. SteelSeries ApS*, No. 2:14-cv-198-RSP, 2016 WL 7665908 (E.D. Tex. Jan. 7, 2016), relied upon by Estech, wherein the court used the "safe harbor" provision in Rule 26(e)(1)(A) rather than the court's discovery order.[4]

In distinguishing *Better Mouse*, the *Estech* opinion specifically characterizes that case as "address[ing] whether specific expert opinions were disclosed, which is not relevant on whether Estech has a duty to update its Rule 26 disclosures." *Estech*, 2021 WL 5154220, at *6 n. 7. Further, the *Estech* order notes that Mr. Platt was "so evasive that the full scope of the topics and facts that Estech now contends Mr. Platt is (or should obviously have been) knowledgeable about was not made clear." *Id.* at *7. Thus, an implicit holding in *Estech* was that Estech did not show discovery provided fair notice to the defendants to trigger Rule 26(e)(1)(A)'s safe harbor provision in the first place.

Unlike in *Estech*, the Court is not considering whether to strike trial witnesses based on Dexon's failure to timely disclose those witnesses as persons having knowledge of relevant facts.[5] And there is nothing like Estech's CEO's evasive deposition at issue here. Instead, the issue is

---

[4] In *Better Mouse*, the plaintiff argued the court should exclude the defendant's experts' testimony on non-infringing alternatives and design-arounds because the defendant did not disclose its intent to rely on a software-based design-around in its response to the plaintiff's interrogatories. *Better Mouse Co., L.L.C. v. SteelSeries ApS*, No. 2:14-cv-198-RSP, 2016 WL 7665908, at *1 (E.D. Tex. Jan. 7, 2016). The court found Rule 37 required the exclusion, in part, of the testimony on software-based design-arounds but did not require exclusion of their testimony on software-based non-infringing alternatives. *Id.* Additionally, even though the defendant did not identify the basis for differentiating the Kana mouse from other mice in its interrogatory responses, the court declined to exclude testimony that the Kana mouse is not representative of other mice because "the differences between the Kana mouse and the other mice were explored in numerous depositions during discovery." *Id.* at *2 (citing FED. R. CIV. P. 26(e)).

[5] None of these customers are witnesses that Dexon intends to call at trial. Dkt. No. 336 at 2.

whether the Court should strike specific categories of information contained in Dexon's expert reports. This case is therefore somewhat closer to the reasoning in *Better Mouse* that allowed a party's expert to opine on a subject that was discussed in discovery, even though that party did not supplement its interrogatory response to reference that subject.

b. **Assuming a disclosure violation, whether the Rule 37(c) factors weigh in favor of exclusion**

Even assuming that the audit theory was a distinct liability theory that required Dexon to update its Rule 26(a) disclosures to specifically identify the audited customers (Arvest Bank, Boston Scientific, Capital One, Scottrade, Trustwave Holdings, and Eastern Virginia Medical School) as "persons having knowledge of relevant facts," the Rule 37(c) factors do not weigh in favor of exclusion.

As noted above, in determining whether a "violation of Rule 26 requiring disclosure . . . is harmless, such that the evidence may be used at trial despite non-disclosure, the trial court's discretion is to be guided by the consideration of four factors: (1) the importance of the evidence or witness' testimony; (2) the prejudice to the opposing party of allowing the evidence in; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness or evidence." *ResMan, L.L.C. v. Karya Prop. Mgmt., L.L.C.*, No. 4:19-CV-00402, 2020 WL 5884820, at *2 (E.D. Tex. Oct. 1, 2020) (citation omitted) (noting the factors relate to witnesses and evidence—not pleadings, claims, or violations of Rule 26(a)(1)(A)(iii) (regarding damages disclosure) but finding the factors persuasive and applying a modified version in evaluating a motion to strike the plaintiff's claim for lost profit damages).

Explanation: Dexon does not explain its reasoning behind the nondisclosure of the audited customers, other than to point out it did identify the individuals that are likely to have knowledge regarding Cisco's customer audits (specifically, Mr. Samaenah and Mr. Williams). Defendants'

complaint is therefore best understood to be that Dexon should have identified the relevant customers at issue, not just Cisco's employees that had knowledge of the events. Because this is an issue of whether Dexon's disclosure was sufficient rather than completely lacking, this factor weighs at most slightly in favor of exclusion of the customers.

Importance: The evidence of Cisco's audits and the customers subjected to those audits is important to Dexon's anticompetitive claims against Cisco. Defendants do not persuasively contest Dexon's claim that the evidence is "essential to proving the extent of Cisco's unlawful practices," *see* Dkt. No. 348 at 4, other than to argue that Dexon did not need to expressly rely on the audit theory and evidence to survive Defendants' motion to dismiss, *see* Dkt. No. 316 at 12-13. Defendants do not present any reasoning or authority for the proposition that specific theories or evidence not mentioned in response to a motion to dismiss should be viewed as "unimportant" to the plaintiff's case during Rule 37 exclusions disputes. The Court finds this factor weighs heavily in favor of considering any nondisclosure harmless.

Prejudice: The factor measuring the amount of resulting prejudice to Defendants if the Court allows the disclosure to continue to trial weighs in favor of considering any nondisclosure harmless. According to Dexon, the information came from *Defendants'* own disclosures, testimony, and data productions. Dkt. No. 336 at 8. As detailed above, in his July 28, 2023 report, Dexon's expert Dr. Maness discussed Cisco's customer audits and the six nonparties alleged to have been subjected to the audits. Defendants had the opportunity to respond to, rebut, and challenge the expert's discussions and did so, as evidenced by the rebuttal and reply reports of Defendants' expert Dr. Ugone. Defendants also thoroughly examined Dr. Maness on these subjects during his deposition. Defendants are not prejudiced by having to address Dr. Maness's opinions regarding Cisco's customer audits as an aspect of the alleged anticompetitive tactics to control the

marketplace. Defendants argue they could have marshaled "additional factual evidence" to rebut Dexon's allegations had its disclosure been more complete. Dkt. No. 344 at 4. While that is necessarily true because *any* further Rule 26 disclosure could have provided an opportunity for the opposing side to take additional discovery, the issues here were explored during discovery providing Defendants with ample factual and expert ammunition—thus, there is no surprise or ambush here.

Continuance: Because no party seeks a continuance, that factor is neutral. *See* Dkt. No. 316 at 14 (Defendants' stating the schedule is already extremely compressed and it is not possible to redo party and nonparty discovery in the time available); Dkt. No. 336 at 9 ("Dexon agrees with Defendants that a continuance is not needed since the parties have in their possession the evidence needed to defend and prosecute the claims and defenses advanced by the parties.").

In short, there is no basis under Rule 37 for exclusion of the customer audit theory or the six customers alleged to have been subjected to Cisco audits.

## 2. The fourteen overlapping customers

Defendants assert Dexon never identified the fourteen overlapping customers referenced by Dr. Maness in his calculation of conspiracy lost profit damages as "harmed" customers in any of its disclosures – including its damages disclosures – or its responses to CDW and Cisco's interrogatory responses, which directly sought this information. *See*, *e.g.*, Dkt. No. 316, Ex. F (Dexon's Amended Responses to Cisco's First Set of Interrogatories) (identifying FBISD, Lubbock, Park Place, Targa, West Penn, and a new customer (TBK Bank) in response to Cisco's Interrogatory No. 1 regarding "each sale of any Product(s) in the Relevant Markets that You claim to have lost because of Cisco's allegedly anticompetitive conduct, including (a) the potential customer"); Ex. H (Dexon's Amended Responses to CDW's First Set of Interrogatories)

(identifying only West Penn in response to CDW's Interrogatory No. 8 regarding all "opportunities for sales to End Users by Dexon, including supporting Documents and Communications as requested in the definitions above, that You contend were lost as a result of the alleged conspiracy").

Dr. Maness references CDW and Dexon's sales to the overlapping customers in his chart calculating conspiracy lost profits from January 2015 – May 2022. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 8 (Maness Report), Ex. 8B. Regarding disclosure under Rule 26, the Court is not convinced Dexon was required to disclose those customers as persons having knowledge of relevant facts relating to Dexon's antitrust claims here. This, after all, concerns Dexon's claim for lost profits, where Dexon identified party employees with knowledge of the relevant facts and further information was needed from Defendants to identify all the relevant customers. However, Dexon's failure to supplement its interrogatory responses is a different matter. Dexon should have supplemented its responses as soon as Dexon identified the relevant customers, or at least given an indication that further customers that fit specific criteria would be named once identified. The interrogatory responses, as written, do not fairly indicate that Dexon was waiting for additional discovery or expert reports to add additional customers.

Finding a discovery violation, the Court considers whether exclusion is warranted under the Rule 37(c) factors for determining whether a failure to supplement was substantially justified or harmless. Regarding its explanation, Dexon suggests it did not need to supplement to include the overlapping customers because the partes were not able to identify the overlapping customers until May 2023, and CDW did not produce the sales data from them until a week before fact

discovery closed.[6] According to Dexon, one of the overlapping customers, Fresenius Kabi, was also specifically discussed at the deposition of Adam Tapper (a Cisco employee who managed the Fresenius account), and was the topic of a Jabber conversation in which Mr. Tapper bragged about the "huge undertaking" to have Dexon "booted" from the account, which Dexon cited in its motion for spoliation sanctions; thus, Defendants were aware of that customer during discovery. Dkt. No. 336 at 1-2.

Despite these facts, it is not at all clear that Defendants were aware of Dexon's use of the overlapping customers (as extrapolated from both CDW's data and Dexon's data) until Dr. Maness relied on those customers to "illustrate" Dexon's conspiracy lost profit damages. Dexon merely claims that its reference to these customers "is for purposes of illustrating damages – because Dexon does not rely upon the grand majority of these customers for purposes of establishing liability, there was no basis for Dexon to list them in response to Defendants' interrogatories." *Id.* at 6. However, there is a basis: Defendants served interrogatories requesting this information. Dexon cannot respond to an interrogatory identifying only certain customers—without indicating its answer is incomplete—then later claim its response was only "exemplary" when its expert identifies additional customers that were responsive to the interrogatories. As explained above, because these fourteen customers are relied upon by Dr. Maness as part of his conspiracy lost profit damages calculations, and because Defendants requested information regarding Dexon's lost

---

[6] At the outset of this case, in June 2022, Dexon requested from CDW "[d]ata showing the profits and revenues earned by CDW for all customers which purchased from Dexon at any time, including but not limited to any such customers for which CDW's yearly revenue was greater for any year after 2015 than for any year before 2015." Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 5. According to Dexon, CDW never objected to this request and instead informed Dexon that it could not extrapolate such data because it did not have information regarding which customers also purchased from Dexon. In May 2023, Dexon re-raised this issue with CDW and, in two separate emails, requested data for twenty-three customers. Dkt. No. 336 at 4-5. In response, CDW represented that it would "endeavor" to produce data for the customers identified by Dexon by May 31, 2023. *Id.* at 5. This data, which consisted of thousands of entries for the above-customers, was produced on June 14, 2023—a week before the close of discovery. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 7.

profits claims, Dexon should have supplemented.[7] While the timing and subject of the relevant discovery somewhat mitigates Dexon's failure to supplement, on the whole, this factor weighs in favor of exclusion.

However, the Court finds the fourteen customers important to Dexon's damages. Despite Defendants' suggestion that the overlapping customers are unimportant because Dexon states only Fresenuius and (unchallenged) West Penn relate to the "liability" element of the alleged conspiracy,[8] Dkt. No. 336 at 6, the customers are important because they are presented in Dr. Maness's report as part of his model to estimate Dexon's conspiracy lost profit damages. If the Court excludes these customers, Dexon could not recover the amount claimed for conspiracy lost profit damages. The claim is essential to allowing the jury to consider the evidence and award an amount reasonable for the harm allegedly suffered by Dexon. *ResMan, L.L.C. v. Karya Prop. Mgmt., L.L.C.*, No. 4:19-CV-00402, 2020 WL 5884820, at *2 (E.D. Tex. Oct. 1, 2020). The Court finds this favor weighs heavily in favor of non-exclusion. *Id.*

Again, neither party requests a continuance.[9] The final factor concerns the amount of resulting prejudice to Defendants if the Court allows the disclosure to continue to trial. In Dr. Maness's deposition, Defendants questioned Dr. Maness about his opinions regarding conspiracy damages. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 12 (Maness Dep.) at 273:21-274:12 (testifying that "but for the concerted activity between CDW and Cisco," for the customers that he identified in calculating conspiracy lost profits, "Dexon would have been able to at least maintain

---

[7] In the Court's June 1, 2023 Order, the Court acknowledged Cisco's concern that Dexon's expert report on damages might include information that Cisco would not have known to explore during discovery and specifically referenced the continuing duty to supplement.

[8] In Defendants' words, Dexon has no evidence that Cisco "steered these undisclosed customers to CDW." Dkt. No. 344 at 4, n. 6.

[9] Defendants point out that reopening document and deposition discovery for twenty nonparties and Dexon salespeople including "Russell M." would be impracticable under the current case schedule. Dkt. No. 344 at 5.

the same levels relative to CDW that it had prior to the termination of those customer relationships"), 274:13-286:11 (explaining the list of "overlapping customers" was determined by Dr. Maness using data provided by CDW and comparing that data to the Dexon data and further confirming that Amneal, Blue Cross/Blue Shield, EZE Castle Software, NCS Pearson, OL N Corporation, Pathfinder, Pearson, and Springfield do not have overlapping sales during the relevant period while West Penn, Brunswick, Cambium Learning, Ericsson NC, Fresenius Kabi, and Stericycle do have overlapping sales of relevant products during the period).

In his rebuttal and reply reports, Dr. Ugone addresses Dr. Maness's calculation of damages associated with the alleged Cisco-CDW conspiracy.[10] Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 9 (Ugone Rebuttal Report), ¶¶ 156, 165-67 (specifically addressing Dr. Maness's calculations of lost sales on Cisco products for the following six customers: West Penn, Fresenius Kabi, Brunswick Boat Group, Cambium Learning NG Inc., Ericsson NC., and Stericycle); Ex. 10 (Ugone Reply Report), ¶ 31 (discussing Fresenius Kabi, Brunswick, and Baptist Health which were included as line items in Dr. Maness's Exhibit 8B where Dr. Maness calculates alleged conspiracy lost profits).

Despite the ability to respond through expert testimony, Defendants state they could have marshaled additional *factual* evidence relevant to the issue, but Dexon's failure to disclose prevented Defendants from issuing nonparty document and deposition subpoenas and shielded Dexon from party discovery about the undisclosed customers.[11] Dkt. No. 344 at 4. Defendants'

---

[10] In his deposition, Dr. Ugone was asked if he was missing anything he wished he had to evaluate Dr. Maness's "conspiracy-related damages with regard to the Cisco/CDW conduct." Dr. Ugone testified that if he had additional information as to Dexon's capacity he could have made an even stronger critique, but he was "happy where I am" in terms of the information he received to evaluate Dexon's claim of conspiracy damages. Dkt. No. 336-1 (Reichenberg Decl.), at Ex 11 (Ugone Dep.) at 175:22-178:4.

[11] For example, Defendants assert the account for "Cambium Learning," one of the undisclosed customers, belongs to a Dexon salesperson named "Russell M.," whom Dexon has not identified or made available for deposition. Dkt. No.

complaint is unpersuasive, especially considering the timing of Defendants' motion and considering that Defendants have been able to gather significant factual evidence concerning West Penn and Fresenius—whom Dexon relies on to establish liability.

Defendants were aware of the issue of overlapping customers based upon Dexon's request for information regarding same and CDW's subsequent production of data for the requested customers.[12] While fact discovery was still ongoing, Cisco expressed its concern that Dexon's future expert report on damages might include information previously unknown to Cisco. In its June 1, 2023 Order, the Court indicated it would address that issue at the appropriate time if warranted. However, Cisco did not raise the current issue until September 8, 2023, five weeks after Dexon served Dr. Maness's report. Putting aside the timing of the motion, Dr. Maness's reliance on the overlapping customers for purposes of computing conspiracy lost profits was explored in Dr. Maness's deposition on September 13, 2023.

Considering Defendants were able to explore the additional customers in depositions, that Dr. Ugone was able to address those customers and Dr. Maness's conspiracy lost profit damages opinions in Dr. Ugone's rebuttal and reply reports, and that much of the information regarding overlapping customers came from and can be verified by Defendants themselves, any violation alleged by Defendants based on Dexon's failure to supplement its interrogatory responses would cause Defendants minimal, if any, prejudice. *See Realtime Data*, 2018 WL 6257472, at *4 ("As Defendants obtained, or at a minimum has access to, the information regarding Plaintiff's reasonable royalty demanded by Defendants, any violation alleged by Defendants would be

---

344 at 5 (further stating Dexon did not produce all purchase orders or customer receipts for these transactions or emails about them).

[12] Additionally, in mid-May 2023, Mr. Tapper testified at length about his Fresenius account and his efforts to successfully remove Dexon as its preferred reseller. Dkt. No. 336-1 (Reichenberg Decl.) at Ex. 2 (Tapper Dep.) at 126:7-128:23; 166:16-168:4; 183:13-191:3; 195:10-270:7.

harmless and cause Defendants minimal, if any, prejudice. Thus, *even if* this Court were to find a discovery violation occurred (a question it does not seek to answer in this Order), the Fifth Circuit standard would not suggest exclusion of evidence as the appropriate remedy."); *Better Mouse*, 2016 WL 7665908, at *2 (finding no Rule 26 violation where the expert was testifying on an issue not identified in interrogatory responses because the issue was "explored in numerous depositions during discovery"); *see also ZiiLabs Inc., Ltd. v. Samsung Elecs. Co.*, No. 2:14-CV-203-JRG-RSP, 2015 WL 8293585, at *3 (E.D. Tex. Dec. 8, 2015) (finding no Rule 26 violation in the plaintiff's failure to supplement an interrogatory response where the communication at issue was explored in the deposition of the plaintiff and other witnesses). This factor weighs in favor of considering any nondisclosure harmless.

Having considered the Rule 37 factors, the Court finds Dexon's failure to supplement its interrogatory responses to disclose the fourteen overlapping customers (Amneal Pharmaceutical; Baptist Health; Blue Cross and Blue Shield of South Carolina; Brunswick Boat Group; Cambium Learn NG Inc.; Ericsson NC; EZE Castle Software LLC; Fresenius Kabi; NCS Pearson, Inc.; OL N Corporation; Pathfinder International; Pearson, Inc.; Springfield Clinic LLP; and Stericycle) is harmless. FED. R. CIV. P. 37(c)(1). Thus, Defendants' motion is denied.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED** that Defendants' Rule 37 Motion Regarding Undisclosed Nonparty Witnesses and Liability Theory (Dkt. No. 316) is **DENIED.**

SIGNED this the 20th day of November, 2023.

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE