# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| | § | |
| **v.** | § | **Case No. 5:22-cv-53-RWS-JBB** |
| | § | **SEALED** |
| **CISCO SYSTEMS, INC. and CDW** | § | |
| **CORPORATION** | § | |

## ORDER ON VARIOUS MOTIONS

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. For the reasons explained before, the Court rules on the following motions:

> Dexon Computer, Inc.'s Motion for Spoliation Sanctions Against Cisco Systems, Inc. (Dkt. No. 150) is **denied without prejudice** to raising the issue with Judge Schroeder at trial, outside the presence of the jury, consistent with the instructions in this order;
>
> Dexon Computer, Inc.'s Supplement to its Motion for Spoliation Sanctions Against Cisco Systems, Inc. (Dkt. No. 403) is **granted**;
>
> Cisco Systems, Inc.'s Motion for Leave to File Motion for Sanctions Regarding Hidden and Unproduced Email Records (Dkt. No. 423) is **granted**; and
>
> Cisco Systems, Inc.'s Motion for Sanctions Regarding Hidden and Unproduced Email Records (Dkt. No. 424) is **denied**.

## I.  Dexon's Motion for Spoliation Sanctions Against Cisco Systems, Inc. (Dkt. No. 150)

The Court heard argument on May 24, 2023 and gave leave for Dexon to supplement the issue following discovery; in total the parties submitted nine briefs concerning this issue. Having considered the submitted information, Dexon's motion is **denied without prejudice.** Specifically, the Court denies Dexon's request for the Court to issue adverse jury instructions pursuant to Federal Rule of Civil Procedure 37(e)(2)(B), and alternatively, to issue a curative jury instruction under Rule 37(e)(1), without prejudice to revisiting the issue during trial if Cisco opens the door by introducing testimony or argument concerning Cisco's level of awareness of Dexon before Jabber was deprecated in November 2020.[1]

### A.  Background

The instant dispute starts nearly two years before Dexon filed its current case against Cisco and CDW, when Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California asserting various trademark, counterfeiting, and business torts on July 22, 2020. *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon Computer, Inc*., No. 3a:20-cv-4926 (the "California Lawsuit," filed July 22, 2020). Around four months later, Cisco deprecated its primary instant messaging communications platform, "Jabber," as Cisco transitioned fully to the WebEx platform (before Jabber's deprecation, employees could use Jabber, WebEx, or both).[2] No Jabber

---

[1] Given Cisco employees' extensive use of Jabber, the examples of Jabber messages that were saved which discuss Dexon, and deposition testimony where Cisco employees acknowledge Dexon could have been discussed in missing Jabber messages, the record strongly suggests that Jabber messages that discussed Dexon were destroyed. While Dexon does not show sanctions are warranted by failing to establish that Cisco had a duty to preserve many of those messages or that the loss of the messages was intentional, it would be unfair to allow Cisco to benefit from the loss of such relevant information by arguing, for example, that Cisco had a specific level (e.g., low) of awareness of Dexon or similar statements that could have been clearly challenged had the Jabber messages been saved and produced. The Court will also issue a corresponding *liminie* order addressing this issue.

[2] Dexon provided unrebutted evidence showing the widespread use of Jabber. *See* Dkt. No. 150 at 2-3 (citing Exs. 3, 4). For example, from January 2019 to June 2020, Cisco employees sent an average of 10 million instant messages on Jabber, per month, across an average of 40,000 active users.

messages (or "chats") were created after its deprecation, and because Cisco's implementation of Jabber was "auto-purge" by default, the only messages that were preserved were those that a user manually selected to save the chat during that messaging session.

Around eight months later, on July 29, 2021, Dexon filed an amended answer in that lawsuit that not only denied Cisco's allegations but also included various antitrust counterclaims against Cisco. Those antitrust counterclaims were eventually dismissed; however, on April 27, 2022, Dexon filed similar, but distinct, antitrust claims in this Court (*see* Dkt. Nos. 107, 149), creating the instant lawsuit. Dexon now requests spoliation sanctions, asserting Cisco took "no steps to back up or otherwise preserve the data" related to its employees' use of Jabber or Cisco's decision to deprecate that platform. Dkt. No. 150 at 1.[3] Dexon requests an adverse jury instruction under Rule 37(e)(2)(B), or a curative jury instruction under Rule 37(e)(1), along with reasonable attorneys' fees in bringing the motion. Cisco responds that Dexon's request is improper because (1) Cisco's actions concerning Jabber did not violate any duty to preserve because there was no such duty until Dexon filed the instant lawsuit on April 27, 2022; (2) Dexon did not suffer prejudice considering Cisco produced WebEx chats; and (3) Dexon fails to show Cisco engaged in bad faith in transitioning its employees from the Jabber platform (which was set to auto-purge by default) to WebEx (which was set to auto-save for three years by default).

---

[3] In its opening brief, Dexon also requested sanctions based on Cisco's policy of "automatically purging any WebEx data older than three years" unless the employees were subject to legal holds (which turns off the auto-purge feature). Dkt. No. 150 at 1, 6, 9-10. Cisco explained that it has produced "more than 2,000 WebEx chat threads" from its ESI custodians including chats for each of the 17 custodians "dating back as far as sensible hold would have reached." Dkt. No. 164 at 1, 4-6. Dexon did not contest those statements, and Dexon appears to have dropped its contentions related to WebEx, instead focusing nearly exclusively on Jabber. *See, e.g.*, Dkt. Nos. 173, 204, Dkt. No. 224, Tr. at 156:23-202:12; *see also* Dkt. No. 403 at 2, 4, 7 (conceding that Cisco took preservation steps with respect to WebEx). To the extent Dexon is still requesting sanctions based on WebEx, that request is denied as well.

## B.     Legal Standards

Allegations of spoliation, including the destruction of evidence in pending or reasonably foreseeable litigation, are addressed in federal courts through the inherent power to regulate the litigation process, if the conduct occurs before a case is filed or if, for another reason, there is no statute or rule that adequately addresses the conduct. *Coastal Bridge Co., L.L.C. v. Heatec, Inc*., 833 Fed. Appx. 565, 573 (5th Cir. 2020) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). If a party *intentionally* destroys evidence, the trial court may exercise its discretion to impose sanctions on the responsible party. *Id.* (emphasis original) (citation omitted). It is insufficient to show that a party acted negligently, rather than intentionally, in spoliating the evidence. *Id.* at 573-74 (citations omitted).

Federal Rule of Civil Procedure 37(e) provides sanctions against a party for the failure to preserve electronically stored information ("ESI"). Rule 37(e) provides as follows:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> (A) presume that the lost information was unfavorable to the party;
> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
> (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e).

"To apply Rule 37(e) sanctions, a court must determine that the following four predicate elements exist: (1) there is ESI that should have been preserved; (2) that ESI has been lost; (3) the ESI was lost because of a party's failure to take reasonable steps to preserve it; and (4) the ESI

cannot be restored or replaced" through additional discovery. *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, No. 3:19-CV-2025-K-BN, 2023 WL 2699511, at *8 (N.D. Tex. Feb. 15, 2023) (quoting *Cleary v. Am. Airlines, Inc.*, No. 4:21-cv-184-O, 2022 WL 5320126, at *7 (N.D. Tex. July 22, 2022) (cleaned up in *Adler*)).

If these four predicate elements exist, the court then turns to the matter of possible remedies under Rules 37(e)(1) or 37(e)(2), which "have different requirements before sanctions can be imposed and can lead to different sanctions." *Id.* at *9 (quoting *Richard v. Inland Dredging Co., L.L.C.*, No. 6:15-0654, 2016 WL 5477750, at *3 (W.D. La. Sept. 29, 2016)). Rule 37(e)(2) essentially imposes a bad-faith requirement before the court may dismiss a case due to destruction of electronic evidence. *United Healthcare Servs., Inc. v. Next Health L.L.C.*, No. 3:17-CV-0243-X-BT, 2023 WL 2589237, at *5 (N.D. Tex. Mar. 21, 2023). If the court does not find that the spoliating party acted with an intent to deprive, but determines that the loss of ESI prejudiced another party, courts may then impose under Rule 37(e)(1) lesser sanctions in the form of measures no greater than necessary to cure the prejudice. *Adler*, 2023 WL 2699511, at *9 (citing *Castro v. Wal-Mart Real Est. Bus. Tr.*, No. SA-21-CV-00702-XR, 2022 WL 17544339, at *3 (W.D. Tex. Dec. 8, 2022) (citing FED. R. CIV. P. 37(e))) (internal quotations omitted).

## C.  Analysis

As noted above, Cisco argues that Rule 37 sanctions are inappropriate because there was no duty to preserve the Jabber chats before its deprecation in November 2020, and even if spoliation was established, Dexon cannot show the spoliation caused Dexon prejudice as required for a curative instruction under Rule 37(e)(1) or that Cisco spoliated the Jabber chats with bad intent as required for an adverse instruction under Rule 37(e)(2).

### 1. Was there a duty to preserve?

Dexon does not challenge, and this Order does not address, Cisco's *general* perseveration controls and duties concerning a heavily used chat platform that Cisco set to delete messages absent user interaction. Instead, Dexon asserts that Cisco had a duty to preserve Jabber messages from relevant employees from the time it anticipated litigation with Dexon. Dkt. No. 173 at 2. Dexon contends that Cisco's duty to preserve attached as early as 2017 (due to Cisco's privilege log entries showing Cisco "anticipated litigation against Dexon" in 2017) but "at the very latest" on July 22, 2020, when Cisco filed its lawsuit against Dexon in California. Dkt. No. 173 at 2-3.

Neither event shows Cisco should have reasonably anticipated it would be involved in <u>this</u> (antitrust) litigation with Dexon, however. Cisco's "duty to preserve evidence comes into being when the party has notice that the evidence *is relevant to the litigation* or should have known that the evidence may be relevant." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) (emphasis added); *see also Falkins v. Goings*, No. CV 21-1749, 2022 WL 17414295, at *3 (E.D. La. Dec. 5, 2022) (explaining that Rule 37(e) "does not create a new duty; instead, it is based on a common law duty to preserve relevant information when litigation is reasonably foreseeable, so courts should consider whether and when the duty to preserve arose"). For a party to make a determination that evidence may be relevant to "the litigation," it necessarily follows the party has some understanding of the litigation in question. Yet Dexon never attempts to explain how Cisco's privilege log entries in 2017-19 or Cisco's filing of its *counterfeiting* lawsuit show why Cisco should have been on notice to preserve Jabber messages relevant to anticipated *antitrust* litigation. The earliest event in the record putting Cisco on such notice was when Dexon filed its antitrust counterclaims in the California lawsuit in July 2021. But by then, Jabber had been deprecated for eight months, and Rule 37 "does not apply when information is lost before a duty to preserve arises." FED. R. CIV. P. 37(e), advisory committee notes, 2015 amendments.

While Dexon cites cases for the broad proposition that prior lawsuits between parties "can provide sufficient notice to trigger a party's duty to preserve," *see* Dkt. No. 173 at 3, those cases addressed the situation where follow-on litigation concerned the same evidence or issues in both litigations. Dexon had ample opportunity to show the at-issue Jabber messages were relevant to both litigations but never attempted to do so, even in a conclusory manner, and the Court cannot make that connection on Dexon's behalf. The closest Dexon comes is to assert that "prior to the initiation of the California Action, Cisco should have known that documents and communications referencing and/or concerning Dexon would be relevant." Dkt. No. 403 at 6. By that reasoning, a party would be under a duty to preserve all communications that mention a potential adversary, regardless of the specifics of the anticipated litigation or the communication's relevance to that litigation. Dexon provides no authority for that expansive application of Rule 37(e), which is at odds with the advisory comments of Rule 37 that instruct a court to "consider the extent to which a party was on notice that litigation was likely *and that the information would be relevant*." Fed. R. Civ. P. 37(e), advisory committee notes, 2015 amendments (emphasis provided). As Cisco succinctly stated in its second brief on the issue,

> Critically, Dexon makes no argument that the claims Cisco filed in the California lawsuit should have put Cisco on notice that Dexon would, a year later, bring antitrust claims related to Cisco's distribution channel. But without such notice, Dexon has no basis for any spoliation claim.

Dkt. No. 179 at 4. Because Jabber had been deprecated for eight months before Cisco had a duty to preserve, Rule 37(e) is not available to address the destroyed Jabber messages.

### 2.      Was Dexon prejudiced from the loss of the ESI?

Even if Cisco had a duty to preserve, Dexon's request for a curative jury instruction under Rule 37(e)(1) requires "finding prejudice to [Dexon] from loss of the information." Cisco asserts Dexon has not suffered prejudice because it has "produced many emails and chats" from Cisco

employees that would be cumulative to any missing Jabber chats. *See* Dkt. No. 179 at 5. Dexon argues it has been prejudiced because its case against Cisco "would have [been] strengthened" with additional "unique" evidence likely found in the Jabber chats, and, in support, provides an example from a produced Jabber chat where a Cisco employee explained the "huge undertaking" to get Dexon "booted from all future business" while stating the "grey market wsa [sic: was] driving our prices down." *See* Dkt. No. 403 at 9 (citing Dkt. No. 150-16).

The loss of additional, but cumulative, relevant evidence is typically not by itself sufficient to show prejudice warranting sanctions. *See, e.g.*, *Coastal Bridge Co., L.L.C. v. Heatec, Inc.*, 833 Fed. Appx, 565, 575 (5th Cir. 2020) ("[a] party suffers prejudice where it cannot present 'evidence essential to its underlying claim'"); *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) ("Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice."). Dexon does not dispute it has chats and emails (including Jabber messages) that support its case. Cisco's ESI production includes thousands of WebEx chats from identified ESI custodians and broad email searches for the word "Dexon" across over a hundred thousand email repositories. Given this extensive production, which includes documents that support Dexon's claims, Dexon's bare assertion that more evidence would have strengthened its case or speculation that the Jabber messages would produce "unique" evidence is not sufficient to warrant spoliation sanctions. *See* FED. R. CIV. P. 37(e)(1) Committee Notes (explaining a court may determine the lack of prejudice in cases where the "abundance of preserved information [appears] sufficient to meet the needs of all parties").

### 3. Was there bad faith?

Assuming Cisco had a duty to preserve, Dexon's request for an adverse instruction under Rule 37(e)(2) also requires a "finding that the party acted with the intent to deprive another party of the information's use in the litigation." The parties spent most of the briefing addressing this "bad faith" element. Dexon states (i) Cisco is a multi-billion-dollar company that owns the very communication platform it destroyed; (ii) Cisco is no stranger to litigation and is aware of its preservation obligations; and (iii) Cisco intentionally destroyed all Jabber data in its possession, notwithstanding its pending (California) litigation against Dexon. Dkt. No. 173 at 4. According to Cisco, Dexon has not proven Cisco "plotted to intentionally destroy chats," "let alone that Cisco did so in order to deprive Dexon of chats helpful to claims that it would bring years later." Dkt. No. 164 at 2.

Considering the production that Cisco did make, it is one step too far to conclude that Cisco allowed for the destruction of Jabber messages with the intent to deprive Dexon from obtaining critical evidence. To make that finding, one would need to conclude that Cisco had the time and foresight to engage in a fairly sophisticated ploy: Cisco—at the time it was anticipating its *counterfeiting* suit against Dexon—foresaw that *antitrust* litigation was probable and determined that Jabber chats, but not WebEx chats or emails, would be too damaging to disclose to Dexon; Cisco then allowed for the destruction of most, but not all, Jabber chats — but left the decision of which Jabber chats to preserve to the discretion of its employees who may or may not have been anticipating any litigation. That questionable theory is undercut by Cisco's efforts to migrate its employees to WebEx (with its stronger preservation safeguards) and by the production of saved Jabber chats that were left that support Dexon's case. If Cisco had the intent to use Jabber's self-deleting feature to deny relevant information to Dexon, it would have encouraged users to stay on Jabber and not provide an option to save chats.

A simpler theory is that Cisco allowed its employees to use multiple forms of communication and installed *one* of those platforms without proper safeguards to retain those chats in the instances when Cisco had a duty to preserve relevant evidence. While the Court does not condone such a course of action, Dexon fails to show bad faith needed for an adverse instruction in this case. Further, though the deleted Jabber chats likely would have contained information relevant to this litigation given Jabber's widespread use, the starting date for Cisco's duty to preserve the chats is disputed as explained above. Even under Dexon's theory that Cisco's duty started at or shortly before Cisco filed its California Lawsuit against Dexon, many of the relevant employees were placed on litigation holds that added preservation controls to their other forms of communication. The more reasoned conclusion is that the failure to include the Jabber chats in these controls was at most negligent, possibly due in part to the ongoing transition to WebEx, rather than an intent to deprive Dexon from obtaining critical antitrust-related evidence.

Despite the lack of bad faith evidence related to the deprecation of Jabber, Dexon identified a troubling example of Cisco fostering the mistaken belief that Cisco did not have the ability to preserve the Jabber chats while Jabber was still in use. Cisco initially opposed Dexon's motion by arguing that Jabber was an "ephemeral" program where the messages were not saved (presumably providing a reason why Cisco's preservation controls did not capture Jabber messages from relevant employees, even those on litigation holds). Dkt. No. 164 at 2 (Cisco stating that "Jabber messages disappeared shortly after being sent (similar to other popular ephemeral messaging applications)."). Cisco's support was an affidavit from its Director in Workforce Collaboration, which stated "Jabber was an ephemeral messaging application. By default, messages sent over Jabber were not retained. Instead, messages sent and received on the Jabber application were automatically and instantaneously deleted when the user closed the chat window or Jabber

application." Dkt. No. 164-1, ¶4. Nowhere in that affidavit is there a statement that Jabber messages could be retained or how that was accomplished. *Id.*, ¶¶1-8. Cisco reiterated the ephemeral nature of Jabber in its surreply. Dkt. No. 179 at 2, n.3 (Cisco stating that Jabber messages "disappeared automatically" and citing deposition testimony that states "No data is retained from Jabber.").

Despite this description of Jabber, three Cisco employees explained in their depositions that Jabber data *could* be saved, contradicting Cisco's position.[4] *See* Dkt. No. 204 at 2-4. One of the witnesses confirmed a specific document that has been often cited in this litigation *was* a Jabber chat, despite both parties previously referring to it as a WebEx chat to the Court.[5]

Following these depositions, Cisco's third brief on the subject finally provided the accurate description of how Jabber operated. In that brief, Cisco cites the same paragraph 4 of its Director in Workforce Collaboration quoted above, but now explains that paragraph means that "Jabber messages remained in a user's application window as long as the window was open, and would be automatically deleted when the window closed*, unless the user elected to save the message.*" Dkt. No. 212 at 1 (emphasis added). Cisco unpersuasively argues this accurate description of Jabber is not inconsistent with the provided affidavit (and Cisco's earlier position) that "messages sent and received on the Jabber application were automatically and instantaneously deleted when the user closed the chat window or Jabber application." *See* Dkt. No. 212 at 1. The issue is not whether the accurate description of how Jabber works could somehow be found by a strained reading of the

---

[4] Making matters worse, several Cisco employees confirmed in their deposition they used Jabber before its deprecation contradicting their employee custodial questionnaires Cisco provided to Dexon. *See* Dkt. No. 204 at 3-4.

[5] Dexon attached a produced Jabber chat as Exhibit 15 to its opening motion, and mistakenly referred to it as a WebEx chat due to Cisco's description that Jabber chats automatically disappeared. *See* Dkt. No. 15 at 4; Dkt. No. 204 at 3, n.2. Instead of correcting Dexon's mistaken belief, Cisco's response likewise incorrectly refers to that document as a "WebEx" chat. *See* Dkt. No. 164 at 13-14, n.8.

affidavit — the issue is understanding why the affidavit did not fairly describe Jabber in the first place.

Cisco has <u>twice</u> been warned to avoid using its superior knowledge of how its own ESI systems work to gain a tactical advantage in this litigation. *See* Dkt. No. 114 (2/8/23 Hearing Transcript) at 19:15-21, 20:11-14 ("I tried to be clear last September that, when you do object, you need to work with Dexon. We are not going to play a hide-the-ball game . . . ."). It is troubling to see evidence of similar conduct. Nevertheless, Cisco remains fundamentally correct that these issues do not address Cisco's intent in *the pre-litigation* destruction of Jabber messages. *See* Dkt. No. 212 at 1. Resolving the inconsistencies concerning the functionality of Jabber needlessly prolonged this dispute, but had Cisco provided the accurate description of Jabber earlier, the outcome of Dexon's motion would have remained the same (though the journey may have involved less briefing and fewer deposition questions). Because the record does not show evidence that Cisco destroyed Jabber messages with the intent to deprive Dexon of their use, Dexon's request for an adverse instruction under Rule 37(e)(2) is denied.

*     *     *

For the above reasons, the Court grants Dexon's Motion to Supplement its Motion for Spoliation Sanctions (Dkt. No. 403) but ultimately denies Dexon's underlying Motion for Spoliation Sanctions (Dkt. No. 150), without prejudice. Dexon may revisit the issue during trial if Cisco opens the door by introducing testimony or argument concerning Cisco's level of awareness of Dexon before Jabber was deprecated in November 2020.

## II. Cisco's Motion for Sanctions Regarding Hidden and Unproduced Email Records (Dkt. No. 424)

Cisco recently filed its own motion for leave to file its motion for sanctions regarding hidden and unproduced email records (Dkt. No. 423) and the underlying motion (Dkt. No. 424). Dexon opposes the motion and requests its fees for having to respond. Dkt. No. 434 at 2, 13-14.

### A. Background

The underlying motion focuses on non-Dexon email accounts used by Dexon employee Mr. Timothy Roush that are pertinent to Dexon's "bait and switch" theory, which Cisco describes as follows:

> Dexon asserts that Cisco uses "bait and switch" tactics in its sales of SMARTnet. *See* Dkt. 175 (Amended Complaint) at ¶¶ 45-49; Ex. A (Maness Rep. Excerpt) at ¶¶ 103-105; Dkt. 355 ("Dexon MSJ Opp.") at 13. The claim is that Cisco knowingly allows Dexon's customers to purchase SMARTnet contracts for Dexon-sold gear, after which Cisco pockets the money and waits for a customer to file a service claim when the Dexon-sold gear breaks. At that point, according to Dexon, Cisco informs the customer of its public SMARTnet policy, which bars coverage of equipment sold by unauthorized resellers like Dexon (absent recertification).

Dkt. No. 424 at 1.

The parties fully briefed the merits of the underlying motion. Cisco argues that recent deposition testimony in the California Lawsuit shows a Dexon employee (Mr. Roush) used a "hidden" non-Dexon email account (@HBY) to impersonate an authorized reseller when purchasing SMARTnet contracts, thus negating Dexon's bait and switch theory.[6] Cisco requests that Dexon "shall not be permitted to assert in words or substance that Cisco engaged in a 'bait and switch' as to SMARTnet" at trial and requests an instruction that the jury "may consider the

---

[6] Cisco previously discovered Mr. Roush used a different non-Dexon email account for the same purpose, @NGS. Dexon produced the NGS emails earlier in the case but did not disclose the existence of the @HBY emails or produce them (aside from one "stray") in this case.

fact that Dexon withheld from production an entire secret email account that it used to pose as and impersonate an authorized reseller so that it can under false pretenses obtain SMARTnet contracts and buy Cisco-brand equipment from an authorized distributor." *See* Dkt. No. 424-1.

In its opening brief, Cisco argued at least six points that support its request: (1) Dexon falsely told the Court in summary judgment response (filed October 16, 2023) that an end customer obtained a SMARTnet contract "from Cisco itself," when the truth is Dexon sold the contract to the customer; (2) Dexon's employee Mr. Roush testified at his June 12, 2023 deposition that he has used a third party email address from "NGS" to purchase SMARTnet contracts, despite the fact Dexon had never produced @NGS emails (Dexon later produced the emails on June 30); (3) Cisco deposed NGS's founder in the California Lawsuit on November 15 and learned that he provided Mr. Roush not only an @NGS email address but also an @HBY email address for several months in fall of 2022 to make SMARTnet purchases; (4) Dexon has not produced any @HBY emails other than one "stray" email; (5) the "stray" email was sent to a Cisco employee, Mr. Armin Cao, that was part of a "scheme" to "manufacturer 'character evidence'" for Dexon's case against Cisco; and (6) Dexon committed a number of various bad actions that, while not related to points (1)-(5), confirm Dexon's "bad faith."[7]

---

[7] Cisco cites statements from Mr. Roush's June 12, 2023, deposition, including (1) an admission that he lied to a customer concerning whether Dexon owned an Oklahoma warehouse, (2) that Dexon engages in the process of "blind shipping" where equipment is shipped to customers directly from non-Dexon entities who use a label to make it appear that the equipment came from Dexon; (3) an admission that Mr. Roush sent Dexon promotional information to "hundreds or thousands" of customers without knowing if the information in the email was true; and (4) testimony that indicates Mr. Roush made false or unsupported statements in his affidavit filed in the California Lawsuit concerning whether Dexon created and maintained a "do not buy" list to identify and avoid dealing with third parties who were allegedly known to traffic in counterfeit goods. Dkt. No. 424 at 8-9.

Dexon responds with other portions of Mr. Roush's transcript purportedly clarifying the Oklahoma warehouse and promotional email issues, and also asserts that the "existence of [the do not buy] list is not in dispute and [it] was produced in this case." Dkt. No. 434 at 8. Dexon contends Cisco's decision to commit pages to discussing these issues and the other "irrelevant and incomplete exchanges [from Mr. Roush's deposition] is baffling and reveals an appalling attempt to bolster its anemic Motion with non-sequitur" conduct. *Id*.

Points (1), (2), and (5), if genuinely prejudicial, could have been brought to the Court's attention months ago, and points (1), (5), and (6) appear to have little to do with Cisco's request to remove the "bait and switch" or "tying" theory from the case due to the withheld @HBY emails. Given that, one may ask why the motion was filed now, in its current form. Dexon provides its theory in its response:

> Defendant Cisco Systems, Inc.'s latest Rule 37 motion—its third in as many months—is plainly designed to distract Plaintiff Dexon Computer, Inc. from preparing for Trial. This time, Cisco waited until the week of Thanksgiving to manufacture a new discovery dispute based upon an email account that Cisco purportedly learned about a week prior in its separate litigation brought against Dexon in California. Cisco refused to engage in a good faith meet and confer with Dexon and, instead, filed this Motion less than one day after first raising it with Dexon, without providing Dexon with the opportunity to investigate the purported issue and provide a meaningful response.

Dkt. No. 434 at 1.

Dexon contends that the meet and confer was truncated and did not cover several of the points raised in the filed motion, such as the accusation that Dexon manufactured evidence, Dkt. No. 434 at 11-13, and then addresses each point raised by Cisco by providing either a detailed rebuttal or an assertion that Cisco's allegations are not relevant to its requested relief. *See generally* Dkt. No. 434. Disparaging the "kitchen sink" nature of Cisco's motion, Dexon asserts "the facts and circumstances surrounding this Motion make clear that Cisco believes that it will have achieved the aim of its strategy regardless of whether the Court grants or denies the instant Motion. Namely, Cisco seeks to intimidate and unnecessarily burden its opponent in the weeks before Trial." *Id.* at 6, 11. Dexon requests Cisco be ordered to "reimburse Dexon for the fees associated with responding to the instant Motion." *Id.* at 2.

In its reply, Cisco drops or deemphasizes[8] many of the allegations in its initial motion and focuses on the @HBY email issue: specifically, that Cisco only recently learned that Mr. Roush used an @HBY email address in the fall of 2022 to purchase SMARTnet contracts, despite stating at his deposition that he only used @NGS emails for such SMARTnet purchases, and that Dexon has not produced the @HBY emails despite earlier representing to the Court and Cisco that Dexon had produced all relevant emails from such "hidden" email addresses. Dkt. No. 439 at 1-4.

## B. Analysis

The record does not support a finding of sanctions regarding the @HBY emails. It is true Mr. Roush's deposition testimony is inconsistent with the testimony of NGS's founder in the California Lawsuit. In June 2023, Mr. Roush testified that he was aware of using only "NGS" to acquire SMARTnet and he used "the NGS email account" to acquire all the SMARTnet purchases, specifically agreeing that:

- He is not "aware of any other vendors that Dexon uses to get SmartNet coverage other than NGS." Dkt. No. 424 at 2 (citing Ex. C, Roush Dep. Tr., at 59:15-60:11).

- Third-party NGS gave him an "@NGS" email account to purchase SMARTnet contracts from TD Syntex, an authorized reseller Cisco, and that he used that email for "[f]our or five years."[9] *Id.* at 3 (citing Ex. C, Roush Dep. Tr., at 245:7-250:17).

---

[8] Cisco mentions the allegation that Dexon manufactured evidence in a single sentence and corresponding footnote. Dkt. No. 439 at 2 & n.3. These allegations, if true, are serious. And Dexon's response to the issue partially—but not fully—clears the smoke described in Cisco's motion. However, the record is far too undeveloped to support a finding that Dexon manufactured evidence and even if true, has very little to do with Cisco's request to eliminate Dexon's "bait and switch" claim from the case because Dexon hid emails and/or failed to produce the @HBY emails.

[9] Mr. Roush testified he had NGS emails on his Dexon computer, and Dexon produced NGS emails two and a half weeks later.

- "[E]very SmartNet order" that he places for Dexon uses "*the* NGS email account." *Id.* at 4 (citing Ex. C, Roush Dep. Tr., at 250:9-12) (emphasis added).

But the founder of NGS explained that NGS lost its status as an authorized reseller in September 2022, so it could no longer purchase SMARTnet from TD Syntex. Dkt. No. 424 at 5 (citing Ex. F, NGS Dep. Tr. at 265:2-267:17). The NGS founder then directed a friend to register a new company, HBY, as a Cisco-authorized reseller in October 2022. *Id*. (citing Ex. F, NGS Dep. Tr. at 268:14-269:13). The NGS founder then sent an "@HBY" email address to Mr. Roush so that Mr. Roush could continue to purchase SMARTnet contracts, now using the @HBY email account. *Id.* at 5-6 (citing Ex. F, NGS Dep. Tr. at 269:2-7, 276:18-277:13). The NGS founder testified Mr. Roush had access to the @HBY email address "[m]aybe for three, four months" in the fall of 2022. *Id.* at 6 (citing Ex. F, NGS Dep. Tr. at 294:12-14).

The above inconsistent deposition testimony does not equivocally show Mr. Roush was "hiding" the less used @HBY account. Mr. Roush admitted to using an @NGS email account for four to five years to purchase SMARTnet, and the same NGS founder gave him an email for the exact same purpose to use for 3-4 months of that time frame. Cisco fails to provide any explanation as to why it would be in Dexon (or Mr. Roush's) benefit to hide the shortly-lived email account while providing access to the longer-lived email account. Nor does Cisco ever argue the @HBY emails would contain unique evidence not found in the @NGS emails—the record instead strongly suggests @HBY emails would be cumulative to @NGS emails because both were created at the direction of the NGS cofounder, given to Mr. Roush, and used to purchase SMARTnet contracts from TD Syntex. Critically, what appears to be most important is that Dexon employees used a non-Dexon email account to purchase SMARTnet—a fact that Cisco can establish without seeing the actual content of the @HBY (or @NGS emails).

In these regards, the missing @HBY emails are *less* supportive of sanctions than the missing Jabber chats discussed above. And like the Jabber issue, there's a simpler explanation than bad faith—Mr. Roush was treating the HBY and NGS email accounts as the same during his deposition. That is not accurate—they are two different accounts—but given the years he used an @NGS email ID compared to the few months he used an @HBY email ID, and that the founder of NGS gave both email IDs to Mr. Roush for the same purpose, it is just as reasonable to believe that Mr. Roush failed to distinguish between them during his deposition rather than making the nefarious calculation that the @HBY emails were more damaging to Dexon's case so he would try to hide them while admitting to the existence of the NGS emails.

Likewise, Cisco's argument that Dexon made false statements concerning the completeness of its document production also does not support Cisco's request for sanctions. In opposing a motion to compel on April 12, 2023, Dexon told the Court that it had produced "all non-privileged documents that could be considered relevant," Dkt. No. 159 at 1, and told Cisco in a May 2023 email that "Cisco already has in its possession every relevant email that could possibly relate to the claims and alleged defenses in this action," Dkt. No. 186-2 at 2. Though the citation and context is not clear, Cisco also appears to claim that Dexon told Cisco in January 2023 that Dexon was not able to identify any other non-Dexon email addresses that Mr. Roush uses. Dkt. No. 424 at 4. Dexon had not produced the vast majority of NGS and HBY emails when it made these representations.

Dexon's statements were demonstrably false. But if they were made as part of an attempt to hide relevant emails, Dexon did a poor job: Dexon produced several emails referencing NGS accounts and at least one email referencing an HBY account, and then Mr. Roush admitted to using an NGS account for many years. After he did so, Dexon produced those @ NGS emails as well.

In its response, Dexon provides a plausible answer for these incorrect statements: it was not aware of the @HBY email account. Dkt. No. 434 at 9 (explaining that the @HBY email account was not created or maintained by Dexon and was not in active use until Dexon had finished its custodial collections in this case). Of course, Mr. Roush is Dexon's employee, and the issue of employees using non-Dexon accounts had been raised previously, so Dexon's professed lack of knowledge goes only so far to excuse Dexon's actions. But it goes far enough here to preclude a finding of intent to prejudicially deprive Cisco of relevant information.[10]

In addition, to show prejudice, Cisco appears to oversimplify Dexon's "bait and switch" theory to increase the relevance the @NGS and @HBY emails would otherwise have. Cisco argues that the @NGS and @HBY emails show Dexon had to impersonate other companies to acquire SMARTnet from Cisco. But Dexon's bait and switch theory does not strictly turn on Cisco knowing it is selling SMARTnet to an unauthorized reseller, but also encompasses issues related to Cisco's internal controls and authorization of SMARTnet contracts to service equipment purchased through independent resellers (and then Cisco's actions one that equipment needs service). *See* Dkt. No. 434 at 9-10. The @NGS (and @HBY) emails are relevant to this issue, but it is not clear they defeat the bait and switch theory altogether; to the extent Cisco felt otherwise, Cisco should have made that explicit argument in its summary judgment briefing.

## C.    Awarding Fees

Multiplying the proceedings unreasonably and vexatiously may result in the award of fees. *See, e.g.*, *Neal Techs., Inc. v. Unique Motorsports, Inc.*, No. 4:15-CV-00385, 2018 WL 3630128,

---

[10] Cisco states Dexon's actions were "at best negligent." Dkt. No. 439 at 2. That may be true, but the record never establishes Dexon's document collection efforts, which were substantial, were *more* than negligent either. And Cisco never shows that negligence justifies the request it seeks.

at *2 (E.D. Tex. July 31, 2018) (citing 28 U.S.C. § 1927). "The phrase 'unreasonably and vexatiously' describes conduct that, when viewed under an objective standard, is harassing or annoying, or evinces the intentional or reckless pursuit of a claim, defense or position that is, or should be known by the lawyer to be, unwarranted in fact or law, or is advanced for the primary purpose of obstructing the orderly process of the litigation." *Thomas v. Portfolio Recovery Assocs., LLC*, No. 420CV00317SDJCAN, 2020 WL 6935557, at *3 (E.D. Tex. Nov. 6, 2020), report and recommendation adopted, No. 4:20-CV-317-SDJ, 2020 WL 6889185 (E.D. Tex. Nov. 23, 2020).

Given the timing, lack of a substantial meet and confer, number of issues raised that are irrelevant to the requested relief, and that the requested relief is not proportionate to the harm (eliminating a theory from the case based on a few months of unproduced and by all expectations cumulative emails), the undersigned agrees with Dexon that the motion was filed, at least in part, for harassment. However, awarding fees is doubtful to deter such future behavior in this situation, and to be fair, Dexon's second supplemental brief in support of its sanctions motion concerning Jabber required Cisco to respond to issues that should not have been raised.[11] An award of fees to one side may be misinterpreted in this context or otherwise hinder counsels' ability to work together on the current pretrial tasks that require compromise and reasonableness. Accordingly, rather than fees, Cisco is required to have a hearing with the Court before filing any further motion before the start of trial. The hearing shall address the scope of the motion, the requested relief, and the sufficiency of Cisco's meet and confer with Dexon.

III.    **Conclusion**

Based on the foregoing, it is

---

[11] Following the May 24 Hearing on Dexon's motion for spoliation sanctions, the Court gave leave of Dexon to supplement based on information obtained in discovery. As Cisco explains, Dexon's supplement, Dkt. No. 403, spent many of its ten pages not on what Dexon learned in discovery post-hearing, but retreading events that should have been (and were) addressed in Dexon's prior briefing or the hearing on the issue. *See* Dkt. No. 431 at 3-4.

**ORDERED** that Dexon Computer, Inc.'s Motion for Spoliation Sanctions Against Cisco Systems, Inc. (Dkt. No. 150) is denied without prejudice to raising the issue with Judge Schroeder at trial, outside the presence of the jury, consistent with the instructions in this order; and Dexon Computer, Inc.'s Supplement to its Motion for Spoliation Sanctions Against Cisco Systems, Inc. (Dkt. No. 403) is granted. It is further

**ORDERED** that Cisco Systems, Inc.'s Motion for Sanctions Regarding Hidden and Unproduced Email Records (Dkt. No. 424) and Dexon's request for fees in opposing the motion are denied, and Cisco Systems, Inc.'s Motion for Leave to File Motion for Sanctions Regarding Hidden and Unproduced Email Records (Dkt. No. 423) is granted. It is further

**ORDERED** that Cisco may not file another motion without first scheduling a hearing with the Court consistent with the instructions above.

SIGNED this the 13th day of December, 2023.


_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE