**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| DEXON COMPUTER, INC. | § | |
|    Plaintiff, | § | |
| | § | Civil Action No. 5:22-cv-00053 |
| v. | § | |
| | § | |
| | § | |
| CISCO SYSTEMS, INC. and CDW | § | |
| CORPORATION, | § | |
|    Defendants. | § | |

## JOINT SUBMISSION OF PROPOSED JURY INSTRUCTIONS

Pursuant to the Court's Third Amended Docket Control Order (Dkt. 287), as well as the parties' joint notices – *see* Dkt. 420 & Dkt. 465 – Plaintiff Dexon Computer, Inc. ("Dexon") and Defendants Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW") jointly submit a consolidated set of proposed jury instructions as Exhibit A to this filing.

Proposed instructions in Exhibit A without highlighting are agreed-upon by the parties; material highlighted in green states Defendants' position or proposal on a disputed instruction or issue; material highlighted in yellow states Plaintiff's position or proposal on a disputed instruction or issue.

The parties have met and conferred and will continue to meet and confer on the proposed jury instructions as the issues are narrowed in this case.  The parties anticipate that additional proposals may be appropriate as trial approaches and proceeds and make this submission without waiver of their right to amend, supplement, or object as the evidence and positions develop at trial, and as the Court makes rulings on pending motions before it.

Dated: December 22, 2023

Respectfully submitted,

/s/ Jennifer H. Doan
Jennifer H. Doan
Texas Bar No. 08809050
Mariah L. Hornok
Texas Bar No. 24113074
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile:  (903) 255-0800
Email:  jdoan@haltomdoan.com
Email:  mhornok@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone:  (832) 239-3939
Fax:  (832) 239-3600
Email:  jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone:  (214) 969-4523
Fax:  (214) 969-5100
Email:  tdyork@jonesday.com

Danielle R. Leneck
(admitted *pro hac vice*)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Fax: (213) 243-2539
Email: dleneck@jonesday.com

*Attorneys for Defendant CDW Corporation*

/s/ Deron R. Dacus
DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
LESLIE V. POPE (*pro hac vice*)
KELLOGG, HANSEN, TODD,
   FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
lpope@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems, Inc.*

*/s/ David H. Reichenberg*
David H. Reichenberg (pro hac vice)
Matthew F. Bruno (pro hac vice)
Matthew Hayden (pro hac vice)

Manatt, Phelps, & Phillips LLP
7 Times Square
New York, NY 10036
dreichenberg@manatt.com
mbruno@manatt.com
mhayden@manatt.com
Phone:  (212) 790-4626
Facsimile: (212) 790-4500

William E. Davis, III
Texas State Bar No. 24047416
bdavis@davisfirm.com
THE DAVIS FIRM PC
213 N. Fredonia Street, Suite 230
Longview, Texas 75601
Telephone: (903) 230-9090
Facsimile: (903) 230-9661

*Attorneys for Plaintiff Dexon Computer, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record are being served on this 22nd day of December 2023 with a copy of this document via the ECF filing system.

*/s/ Deron R. Dacus*

# Exhibit A

MEMBERS OF THE JURY:

**1.      Preliminary Instructions**

The parties understand that the Court has its own form of preliminary instructions; accordingly, they have not proposed submissions in that regard.

**2.      Summary of Contentions**

[[Plaintiff's Proposal: Dexon contends that Cisco is a monopolist in several relevant markets related to networking equipment, communications equipment, and services for such equipment. Dexon has alleged that Cisco's conduct violates Sections 1 and 2 of the Sherman Act. Specifically, Dexon alleges that Cisco has tied the relevant services market to the relevant equipment markets (Section 1); Cisco has unlawfully monopolized and unlawfully maintained its monopoly power in the relevant equipment markets (Section 2); and Cisco has attempted to monopolize the relevant Enterprise Voice and relevant equipment markets (Section 2).

Dexon contends that Cisco used various kinds of anticompetitive conduct, including spreading fear, uncertainty, and doubt ("FUD") about Dexon to its customers and locking in customers who require maintenance on such equipment with Cisco's SmartNet program, forcing customers to make supracompetitive purchases of routers and Ethernet switches, and submitting customers to audits that are designed to foreclose competition from the independent channel. Dexon contends that Cisco's challenged conduct was not motivated by any legitimate business justification.]]

[[Defendants' Proposal: Cisco manufactures networking equipment, including Ethernet switches, routers, and IP phones.  It sells that equipment to authorized distributors and resellers, like CDW, which then sell direct to customers.  Dexon also resells Cisco networking equipment, but it is not one of Cisco's authorized distributors or resellers.

1

Plaintiff contends that Cisco and CDW have used various kinds of conduct – including tying (which we will discuss), disparaging Dexon, conducting customer software audits, and making agreements with each other – to unlawfully restrain competition, maintain a monopoly, attempt to maintain a monopoly, and conspire to maintain a monopoly in alleged relevant markets for the sale of Ethernet switches, routers, and IP phones throughout North America or the United States.  Dexon contends that Defendants do not have legitimate business reasons for the challenged conduct.

Defendants dispute Dexon's contentions.  Defendants dispute that Cisco has monopoly power in any alleged relevant markets for the sale of Ethernet switches, routers, or IP phones throughout North America or the United States.  Defendants also dispute that the challenged conduct is unlawful.  Defendants further contend that their actions were justified by legitimate business reasons and did not have anticompetitive effects on Dexon or market-wide effects on competition and customers throughout North America or the United States.]]

## 3.  General Instructions at the Close of Evidence

The parties understand that the Court has its own form of general instructions at the close of evidence; accordingly, they have not proposed submissions in that regard.

## 4.  Standard of Proof

As I told you at the beginning of this trial, in any legal action, facts must be proved by a required amount of evidence, known as the standard of proof.  As you evaluate the claims and defenses presented by the parties, you must keep in mind the applicable burden of proof.

The standard of proof here is that a showing must be made by a "preponderance of the evidence."  When a party has the burden of proving any element of a claim or defense by a preponderance of the evidence, that party bearing the burden must present evidence that persuades

you that the claim or defense is more likely than not true.  In other words, it must be more than 50% likely that a fact is true based on the evidence.

Dexon must prove every element of its claims by a preponderance of the evidence.

In determining whether a preponderance of the evidence proves any fact, you should – unless otherwise instructed – consider all the evidence, including the stipulations, the testimony of all witnesses regardless of who may have called them, and all exhibits received in evidence regardless of who may have produced them.[1]

**5.    Purpose of the Antitrust Laws**

[[Defendants' Proposal:  The purpose of the antitrust laws is to preserve competition and thereby protect consumers,[2] not to protect any one business competitor.[3]  In the context of a market that involves both manufacturers that make competing products and distributors or resellers that sell those products to consumers, the primary purpose of the antitrust laws is to protect competition among the manufacturers.[4]]]

---

[1] *See* Fifth Circuit Pattern Jury Instructions, § 3.2 (June 2020); *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308-RWS, ECF No. 161 ("*Red Lion* Jury Instructions"), at 7.

[2] *See* ABA Model Jury Instructions in Civil Antitrust Cases, § 1.A (2016) ("ABA Model Jury Instructions").

[3] *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of competition not competitors.") (cleaned up); *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (same).

[4] *See State Oil Co. v. Khan*, 522 U.S. 3, 15 (1997) ("Our analysis is also guided by our general view that the primary purpose of the antitrust laws is to protect interbrand competition."); *see also Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) ("The promotion of interbrand competition is important because the primary purpose of the antitrust laws is to protect this type of competition.") (cleaned up); *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 52 n.19 (1977) ("[W]hen interbrand competition exists . . . it provides a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product."); *Almeda Mall, Inc. v. Hous. Lighting & Power Co.*, 615 F.2d 343, 351-52 n.14 (5th Cir. 1980) ("Interbrand competition is the competition found among the manufacturers of the same generic product and is the primary concern of antitrust law.  Intrabrand competition is the competition between distributors of the product of a manufacturer, whether it

[[Plaintiff's Proposal:[5] Dexon claims that Cisco and CDW have violated the federal antitrust laws.  The purposes of the antitrust laws are to preserve and advance the system of free enterprise and open competition and to secure everyone an equal opportunity to engage in business, trade, and commerce.  This policy is the primary feature of the private free enterprise system.  The law promotes the concept that free competition produces the best allocation of economic resources, the lowest prices, the highest quality of product, the greatest output of products, and the greatest material progress.  However, it recognizes that in the natural operation of the economic system, some competitors are going to lose business while others prosper.  An act becomes unlawful when it constitutes an unreasonable restraint on interstate commerce.]]

## 6. Overview

Dexon asserts that Defendants have violated the following federal antitrust laws:  Section 1 of the Sherman Act, which prohibits a person or trade association from entering into contracts, combinations, and conspiracies that unreasonably restrain trade in interstate commerce; and Section 2 of the Sherman Act, which prohibits a person or trade association from unlawfully acquiring or maintaining monopoly power in a market in interstate commerce.  Dexon also seeks relief under the Texas Free Enterprise and Antitrust Act (the "Texas Act").  Like Sections 1 and 2 of the Sherman Act, the Texas Act prohibits a person or trade association from entering into

---

be at wholesale or retail level."); *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir. 1979) ("A reduction in intrabrand competition is not pernicious as long as there exists interbrand competition, which acts as a significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.") (cleaned up); *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977) ("[A] manufacturer has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself.").

[5] *See Red Lion* Jury Instructions, at 9-13; *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, No. 2:12-cv-103-J (N.D. Tex. Jul. 30, 2013); 15 U.S.C. § 1; 15 U.S.C. § 2; Tex. Bus. & Com. Code Ann. §§ 15.01–.52.

4

contracts, combinations, and conspiracies that unreasonably restrain trade and prohibit a person or trade association from abusing monopoly power in a market.

Dexon alleges six specific claims under these laws:  Count I – conspiracy in restraint of trade, in violation of Section 1 of the Sherman Act, against both Cisco and CDW; Count II – conspiracy to monopolize in violation of Section 2 of the Sherman Act, against both Cisco and CDW; Count III – tying in violation of Section 1 of the Sherman Act, against Cisco; Count IV – monopolization in violation of Section 2 of the Sherman Act, against Cisco; Count V – attempted monopolization in violation of Section 2 of the Sherman Act, against Cisco; and Count VI – violation of the Texas Act, against both Cisco and CDW.  I will first describe the elements of each of these claims.  I will then discuss the concepts of causation, injury, and damages, which apply to all claims.

**7.     Relevant Antitrust Market**

Dexon alleges that Cisco and CDW violated federal and state antitrust laws.  Each of Dexon's six claims requires Dexon to prove the existence of a relevant product and geographic market by a preponderance of the evidence.[6]  A relevant product and geographic market together

---

[6] *See R.D. Imps. Ryno Indus., Inc. v. Mazda Distribs. (Gulf), Inc.*, 807 F.2d 1222, 1224 (5th Cir. 1987) (Sherman Act Section 1 conspiracy); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 841-42 (5th Cir. 2002) (Sherman Act Section 1 tying); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489-90 (5th Cir. 1984) (Sherman Act Section 2 monopoly maintenance); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-59 (1993) (Sherman Act Section 2 attempted monopolization); *Dr.'s Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 311 (5th Cir. 1997) (Sherman Act Section 2 conspiracy to monopolize); *Coca-Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 689 (Tex. 2006) (regarding the Texas Free Enterprise & Antitrust Act:  "Because our own caselaw is limited, we rely heavily on the jurisprudence of the federal courts."); *see also Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*, 777 F.2d 306, 319 (5th Cir. 1985) ("Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2.  In addition, a showing of a relevant market is also necessary to assess anticompetitive effects in rule of reason analysis under § 1") (cleaned up).

is a "relevant market," an economic concept that I will explain further.

**7.1.**   Dexon alleges the existence of three product markets – for the sale of (i) Ethernet switches, (ii) routers, and (iii) [[IP phones]] [[Enterprise Voice]] – and geographic markets for those sales throughout North America or the United States.

Defining the relevant market is essential because you are required to decide whether [[Defendants unreasonably restrained trade and whether]] Cisco has monopoly power in a properly defined economic market.[7]   To make that assessment, you must be able to determine what, if any, economic forces restrain Defendants' ability to raise prices or to restrict the production level of Ethernet switches, routers, or [[IP phones]] [[Enterprise Voice]] throughout North America or the United States.[8]

Without a definition of the market in which allegedly anticompetitive conduct occurred, there is no way to measure Defendants' ability to lessen or destroy competition.[9]   The most likely and important force restraining Defendants is actual and potential competition from other firms and their products or services, including firms that act or could likely act as restraints on Defendants' power to set prices as they please because customers could switch to them if Defendants set their own prices too high or make output too low.[10]   All the firms and products or services that can exert such restraining force are within what is called the relevant market.[11]

---

[7] *See Red Lion* Jury Instructions, at 9-13.

[8] *See Red Lion* Jury Instructions, at 9-13.

[9] *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) ("Without a definition of the market there is no way to measure the defendant's ability to lessen or destroy competition.") (cleaned up); *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965) (similar).

[10] *See Red Lion* Jury Instructions, at 9-13.

[11] *See Red Lion* Jury Instructions, at 9-13.

There are two aspects you must consider in determining whether Dexon has met its burden to prove a relevant market by a preponderance of the evidence.  The first is the relevant product market.  The second is the relevant geographic market.  If you find that Dexon has failed to prove either, then you must find in Defendants' favor on all of Dexon's antitrust claims.[12]

**7.2.**   [[Defendants' Proposal:  A relevant product market means the set of products that customers view as reasonably interchangeable or substitutable with one another.[13]  Products need not be identical or precisely interchangeable as long as they are reasonable substitutes for customers.[14]]]

The relevant product market includes the products or services that a consumer believes are reasonable substitutes for each other.[15]  For example, if enough customers seeking to cover leftover food for storage consider multiple types of flexible wrapping material – such as aluminum foil, cellophane, or even plastic covers – to be reasonable alternatives, then all those products may be

---

[12] *See Red Lion* Jury Instructions, at 9-13.

[13] *See Domed Stadium Hotel*, 732 F.2d at 487 ("The Supreme Court, in the *du Pont* case, articulated the classic test for defining the relevant product market when it said commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade of commerce, monopolization of which may be illegal.") (cleaned up); *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., Inc.*, 714 F.2d 1384, 1393 (5th Cir. 1983) ("The relevant product market is composed of products that have reasonable interchangeability for the purposes for which they were produced – price, use and qualities considered.  The outer boundaries of the product market are drawn in terms of the presence of substitutes to which consumers will turn in response to price changes (cross-elasticity of demand), and the ability of other existing producers or new entrants to expand output from their present facilities or to build new capacity (elasticity of supply).") (cleaned up); *Dr.'s Hosp.*, 123 F.3d at 311 ("Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices.").

[14] *See Red Lion* Jury Instructions, at 9-13; *see also Dr.'s Hosp.*, 123 F.3d at 311 ("Critically, evidence must be offered demonstrating not just where consumers currently purchase the product, but where consumers could turn for alternative products or sources of the product if a competitor raises prices.  The possibilities for substitution must be considered.").

[15] *See Red Lion* Jury Instructions, at 9-13.

in the same relevant product market, such that there would not be a relevant product market for just aluminum foil without cellophane and plastic covers.[16]  This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers.

Dexon must carry its burden of proving separate relevant product markets – for the sales of Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]] – by reference to actual or likely consumer behavior.  One way for Dexon to prove a relevant product market is by proving that customers would not or could not switch from one product [[(e.g., an IP phone)]] to another [[(e.g., the Zoom app)]] were Defendants to impose a small but significant and non-transitory price increase above the competitive price – approximately 5% – on the former product.[17]  If you find that customers would switch and that the price increase therefore would not be profitable, then you must conclude that both products are in the relevant product market.[18]

Dexon claims that the proposed relevant markets include not just new equipment but also used equipment; Cisco disagrees that new and used equipment are in the same market.  [[Plaintiff's Proposal: In determining if Ethernet switches, routers, and Enterprise Voice are included in the relevant product market, you must use the same practical test as explained above.]]  [[Defendants' Proposal: If you find that a single company that controlled the sale of all new switches would not be able to raise prices by 5% above the competitive level so long as there are many sellers of used switches, then you should find that used switches are in the market.  If, on the other hand, you find that a single company that controlled the sale of all new switches would be able to raise prices by 5% above the competitive level even though there are many sellers of used switches, then you

---

[16] *See Red Lion* Jury Instructions, at 9-13.

[17] *See Red Lion* Jury Instructions, at 9-13; *see also* U.S. Dep't of Just. & FTC, Horizontal Merger Guidelines §§ 4.1.1, 4.1.2 (2010).

[18] *See Red Lion* Jury Instructions, at 9-13.

should find that used switches are in the market.  Similarly, if you find that a single company that controlled the sale of all new routers would not be able to raise prices by 5% above the competitive level so long as there are many sellers of used routers, then you should find that used routers are in the market, but if, on the other hand, a single company that controlled the sale of all new routers would be able to raise prices by 5% above the competitive level even though there are many sellers of used routers, then you should find that used routers are not in the market.  The same inquiry applies as well to the claimed market for IP Phones.  Dexon bears the burden of proving that used switches are in the same market as new switches.]]

[[Defendants' Proposal:  In assessing whether Dexon carried its burden of proof as to the existence of relevant product markets for each of Ethernet switches, routers, and IP phones, you may also consider each product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors – or the absence of proof as to such factors.[19]]]   [[Plaintiff's Proposal:  In evaluating whether various products or services providers are reasonably interchangeable or reasonable substitutes for each other under the price increase test I have given you, you may also consider:[20]

• consumers' views on whether the products are interchangeable;

• the relationship between the price of one product and sales of another;

• the presence or absence of specialized vendors;

---

[19] *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) ("The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors."); *Domed Stadium Hotel*, 732 F.2d at 487-88 (same); *see also Red Lion* Jury Instructions, at 9-13.

[20] *See Red Lion* Jury Instructions, at 9-13.

• the perceptions of either industry or the public as to whether the products are in separate markets;

• the views of Dexon and Defendants regarding who their respective competitors are; and

• the existence or absence of different customer groups or distribution channels.]]

If you find that Dexon has proven a relevant product market, then you should continue to evaluate the remainder of Dexon's claims.  However, if you find that Dexon has failed to prove a relevant product market by a preponderance of the evidence, then you must find in Defendants' favor on Dexon's federal and state antitrust claims.[21]

**7.3.**   Dexon must also prove by a preponderance of the evidence the geographic market in which Defendants face competition from other firms for sales in the three alleged product markets.[22]

The geographic dimension of a relevant market encompasses the area of competition in which market participants trade the particular product or its reasonably interchangeable substitutes.[23]

Dexon alleges that the relevant geographic market for the three proposed product markets – for the sale of Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]] – is the United States or North America.  You must determine whether Dexon has met its burden to demonstrate that its proposed geographic market is proper for each of the three alleged product markets.  In

---

[21] *See Red Lion* Jury Instructions, at 9-13.

[22] *See Domed Stadium Hotel*, 732 F.2d at 487 ("Before the fact-finder can evaluate the defendant's market power, however, it must define the relevant market.  The relevant market has both geographic dimensions and product dimensions.") (cleaned up).

[23] *See Hornsby Oil*, 714 F.2d at 1393 ("The geographic dimension of the relevant market encompasses the area of effective competition in which the particular product or its reasonably interchangeable substitutes are traded.") (cleaned up).

doing so you may consider several factors including the geographic area in which Defendants sell and where Defendants' customers are located; the geographic area to which customers turn for supply of the products; the geographic area to which customers have turned or seriously considered turning; transportation cost differences between areas; the geographic area that Defendants view as potential sources of competition; and whether governmental licensing requirements, taxes, or quotas limit competition in certain areas.[24]

If you find that Dexon has proven a relevant geographic market, then you should continue to evaluate the remainder of Dexon's claims.  However, if you find that Dexon has failed to prove a relevant geographic market, then you must find in Defendants' favor on Dexon's federal and state antitrust claims.[25]

## 8.    Sherman Act Section 1 Conspiracy[26]

Dexon alleges that Cisco and CDW violated Section 1 of the federal Sherman Act by conspiring to restrain trade.  This law prohibits conspiracies that unreasonably restrain trade. Dexon claims that Defendants participated in a conspiracy that unreasonably harmed competition and restrained trade in the alleged relevant markets throughout the United States or North America. Dexon bears the burden of proving, by a preponderance of the evidence, an agreement between Cisco and CDW that had the effect of unreasonably restraining trade in a relevant market.[27]

**8.1.**    To start, Dexon must prove by a preponderance of the evidence that Cisco and

---

[24] *See Red Lion* Jury Instructions, at 9-13.

[25] *See Red Lion* Jury Instructions, at 9-13.

[26] The parties agree that no instruction is necessary as to the "interstate commerce" element of a Sherman Act claim.

[27] *See Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 373 (5th Cir. 2014) ("To establish a violation of § 1 of the Sherman Act, [Plaintiff] must demonstrate that:  (1) [the Defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market.") (cleaned up); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass*

CDW knowingly entered into a conspiracy to restrain trade.[28]  A conspiracy is an agreement by two or more persons to accomplish some unlawful purpose or to accomplish a lawful purpose by unlawful means.  [[Defendants' Proposal: This requires Dexon to show through sufficient evidence that Cisco and CDW agreed to share a commitment to a common scheme.[29]]]  The evidence of a conspiracy may be direct or circumstantial.[30]

[[Defendants' Proposal: However, in evaluating whether there was such an agreement, an independent business decision by one of the Defendants is not sufficient evidence to show the existence of a conspiracy.[31]  Mere similarity of conduct does not by itself establish the existence

---

*Disc. Ctrs., Inc.*, 200 F.3d 307, 312 (5th Cir. 2000) ("To prevail on a Section 1 claim, plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market.").

[28] *See* ABA Model Jury Instructions, §§ 2.A.1, 2.A.4.

[29] *See* ABA Model Jury Instructions, § 2.A.1.

[30] *See Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) ("Concerted action may be shown by either direct evidence or circumstantial evidence."); *see also* ABA Model Jury Instructions, § 2.A.1.

[31] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 & 556 (2007) ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.  Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence.  An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict; proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action; and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.") (cleaned up); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("Antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.  Thus, in *Monsanto Co. v. Spray-Rite Service Corp.* we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.  To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently.") (cleaned up); *Metro Ford Truck Sales, Inc. v. Ford Motor Co.*, 145 F.3d 320, 325 (5th Cir. 1998) ("Independent action is not proscribed.  Even where a single firm's restraints directly affect prices and have the same economic effect as concerted action might have, there can be no liability under § 1 in the absence

of a conspiracy unless the evidence tends to exclude the possibility that the businesses were acting independently.[32]]]

[[Plaintiff's Proposal:[33] To establish the existence of a conspiracy, the evidence need not show that its members entered into any formal or written agreement, or that they met together, or that they directly stated what their object or purpose was, or the details of it, or the means by which they would accomplish their purpose.  The agreement itself may have been entirely unspoken. What the evidence must show to prove that a conspiracy existed is that the members of the conspiracy in some way came to an agreement to accomplish a common purpose.  It is the agreement to act together that constitutes the conspiracy.  Whether the agreement succeeds or fails does not matter.

A conspiracy may be formed without all parties coming to an agreement at the same time, such as where competitors, without previous agreement, separately accept invitations to participate in a plan to restrain trade.  The agreement may be shown if the proof establishes that the parties knowingly worked together to accomplish a common purpose.  It is not essential that all persons

_____

of a combination or agreement.") (cleaned up); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 293-94 (5th Cir. 1988) ("To survive summary judgment on the issue of conspiracy, the plaintiff must present evidence that tends to exclude both the possibility of conduct consistent with permissible competition and the possibility that the alleged conspirators acted independently.").

[32] *See generally Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984); *see also* ABA Model Jury Instructions, § 2.A.1

[33]   *See TravelPass Grp., LLC v. Caesars Ent. Corp.,* No. 5:18-CV-153-RWS-CMC (E.D. Tex. Mar. 30, 2021) Dkt. No. 715 at 23-24*; see also Monsanto Co. v. Spray-Rite Serv. Corp*., 465 U.S. 752 (1984); *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195-96 (2010); *Tunica Web Adver. v. Tunica Casino Operators Ass'n*, 496 F.3d 409-410 (5th Cir. 2007).

acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.

Direct proof of an agreement may not be available.  A conspiracy may be disclosed by the circumstances or by the acts of the members.  Therefore, you may infer the existence of an agreement from what you find the alleged members actually did as well as from the words they used.

It is not necessary that the evidence show that all of the means or methods claimed by Plaintiff were agreed upon to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy actually were members.  What the evidence must show is that the alleged conspiracy of two or more persons existed, that one or more of the means or methods alleged were used to carry out its purpose, and that Defendants knowingly became members of the conspiracy.]]

**8.2.**	Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable.  If you determine that Dexon has proven the existence of a contract, combination, or conspiracy between Cisco and CDW to restrain trade, then you must determine whether the restraint is unreasonable.  In making this determination, you must first determine whether Dexon has proven by a preponderance of the evidence that the challenged restraint has resulted in substantial harm to competition in a relevant product and geographic market.  If you find that Dexon has proven that the challenged restraint results in a substantial harm to competition in a relevant market, then you must consider whether the restraint produces countervailing competitive benefits.  If you find that it does, then you must balance the competitive harm against the competitive benefit.  The challenged restraint is illegal under Section 1 of the Sherman Act

14

only if you find that the competitive harm substantially outweighs the competitive benefit.[34]

**8.3.**   [[Defendants' Proposal: As I mentioned, Dexon must prove by a preponderance of the evidence that the agreement resulted in substantial harm to competition.[35]  To show that an agreement between Cisco and CDW resulted in substantial harm to competition, Dexon must prove that the agreement affected a substantial share of sales in a relevant market.  For this reason, Dexon must show that both Cisco and CDW have substantial market power in a relevant market.  If you find that Dexon failed to show that either Cisco or CDW has substantial market power in a relevant market, then you must find against Dexon and for Defendants on this claim.[36]]]

[[Plaintiff's Proposal:[37]  If you find the existence of a contract and/or combination and intent, then you should then determine whether that contract and/or combination presents an unreasonable restraint on trade in a relevant market.  In determining whether the conduct at issue unreasonably restrains trade, you should consider the cumulative effects of (or aggregate restraint or foreclosure caused by) Defendants' anticompetitive conduct.  In other words, you are

---

[34] *See* ABA Model Jury Instructions, § 1.C.1.

[35] *See Sports Ctr., Inc. v. Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir. 1982) ("Under the rule of reason, a crucial aspect of a plaintiff's case is a demonstration that the alleged conduct of the defendants had some market impact."); *see also Hornsby Oil*, 714 F.2d at 1392 ("Vertical non-price restraints are tested by the rule of reason. . . .  The rule of reason inquiry focuses on the competitive significance of a particular restraint, to be measured by reference to the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed, as well as the actual impact of this restraint on competition.") (cleaned up); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir. 1981) ("Since the alleged restrictions are vertical (and not directed at fixing prices), their legality is governed by the rule of reason.  In order to prevail under the rule of reason, a plaintiff must show that the defendants' conduct has an adverse effect on competition.") (cleaned up).

[36] *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 418-19 (5th Cir. 2010) ("To allege a vertical restraint claim sufficiently, a plaintiff must plausibly allege the defendant's market power."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210 (4th Cir. 2002).

[37] *See Retractable Technologies, Inc., and Thomas J. Shaw v. Becton Dickinson and Company*, 2012 WL 663454 (E.D.Tex.) Dkt. 196 at 14-16.

not limited to considering only the effects of Cisco's anticompetitive actions, if any, on competition but may also consider the cumulative effects of anticompetitive conduct by Cisco and CDW.  Nor do the agreements challenged need to foreclose Dexon from 100% of the market in order to have an anticompetitive effect; Dexon may have some access to the market but still be foreclosed or restricted from competing as it would in a market without any anticompetitive restraints.  You must determine, therefore, whether the restraints challenged in this case are unreasonable.

In making this determination, you must first determine whether Dexon has proven that the challenged restraints have resulted in or are likely to result in substantial harm to competition in the relevant markets.  For a Section 1 claim, it is not necessary for Dexon to prove that Cisco has monopoly power in the relevant markets.  A harmful effect on competition, or competitive harm, refers to a reduction in competition that results in the loss of some of the benefits of competition, which typically are lower prices, increased output, and higher product quality.  Therefore, in determining whether the challenged restraint has produced or is likely to produce competitive harm, you may look at the following factors: the effect of the restraint on prices, output, product quality and/or innovation, and service; the purpose and nature of the restraint; the nature and structure of the relevant markets, both before and after the restraint was imposed; the number of competitors in the market and level of competition among them; and whether Cisco possesses a significant market share.]]

**8.4.**   [[Defendants' Proposal: Substantial market power is the ability of a firm to raise prices without losing an appreciable amount of its business or otherwise to force a purchaser to do something that the purchaser would not do in a more competitive market.  To show that CDW and Cisco have market power, Dexon must prove that both CDW and Cisco have substantial shares of

properly defined relevant markets – here, Dexon alleges those markets are for the sale of Ethernet switches, routers, and IP phones throughout North America or the United States.  Ordinarily, a seller with less than 30 percent of a properly defined relevant market does not have market power.[38]]]

**8.5.**   [[Defendants' Proposal:  In addition to showing that both Cisco and CDW have market power in a relevant market, Dexon is also required to prove – again by a preponderance of the evidence – that the challenged agreement actually caused substantial harm to competition, which means that there must be a reduction in competition that results in high prices, lower output, or degraded quality in a relevant product market (here, for Ethernet switches, routers, or IP phones) in a relevant geographic market (here, North America or the United States) because of the effects of the alleged conspiracy.[39]  You may consider that a manufacturer's restrictions on its distribution channel and competition between distributors or resellers of that manufacturer's products – even if such restrictions exist – are generally lawful.[40]]]

**8.6.**   [[Defendants' Proposal:  Dexon does not meet its burden of proof as to its Section

---

[38] *See* ABA Model Jury Instructions, § 2.E.8.

[39] *See H&B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 246 ("The first step in establishing an unreasonable restraint of trade is to show anticompetitive effect, either in the intrabrand or interbrand markets."); *Viazis v. Am. Ass'n of Orthodontists*, 182 F. Supp. 2d 552, 569-70 (E.D. Tex. 2001) ("Finally, actual detrimental effects in a given market are typically shown by proving an increase in prices in such market or a reduction in output; reduction in output encompass changes in both quantity and quality of output."), *aff'd*, 314 F.3d 758 (5th Cir. 2002); *see also Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021).

[40] *See Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 397 (2d Cir. 1980) ("In the instant case, the jury was instructed to find [defendant manufacturer] liable solely on the basis of a purpose to restrict intrabrand competition, without any finding of either a purpose or effect related to interbrand competition.  This was reversible error.").

1 conspiracy claim by showing only harm to its own business.[41]  Nor can Dexon carry its burden of proof by proving only that Cisco and CDW agreed that CDW would replace Dexon as a reseller; without more, such an agreement would not violate the antitrust laws.[42]]]

**8.7.**    [[Defendants' Proposal:  If you find that Dexon has proven by a preponderance of the evidence that the challenged agreement resulted in substantial harm to competition in a relevant market, then you must next determine whether the restraint also benefits competition in other ways. If you find that the challenged agreement does result in competitive benefits, then you must consider whether the restraint was reasonably necessary to achieve the benefit.[43]  If Dexon proves that the same benefit could readily have been achieved by other, reasonably available alternative means that create substantially less harm to competition, then Defendants cannot use the benefit to justify the restraint.[44]]]

**8.8.**    If you find that the challenged restraint was reasonably necessary to achieve competitive benefits, then you should rule for Defendants and against Dexon on the Section 1 conspiracy claim, unless Dexon can prove that the competitive harm from the agreement substantially outweighs the competitive benefit.[45]

---

[41] *See Brunswick*, 429 U.S. at 488 ("The antitrust laws, however, were enacted for the protection of competition not competitors.") (cleaned up).

[42] *See Dr.'s Hosp.*, 123 F.3d at 307 ("Even where the dealer substitution occurs at the insistence of the new dealer, and even when the new dealer and the manufacturer agree before the termination of the old dealer that the substitution will occur, there is no antitrust violation."); *Nw. Power Prod., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 86 (5th Cir. 1978) ("A supplier may switch dealers and conspire with a new dealer to take the place of an established one.  Without more, the antitrust laws do not stand in their way."); *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1249 (5th Cir. 1975) ("A mere unilateral change of distributors is not an unusual business practice, nor is it a violation of the antitrust laws.").

[43] *See* ABA Model Jury Instructions, § 1.C.3.

[44] *See* ABA Model Jury Instructions, § 1.C.1.

[45] *See* ABA Model Jury Instructions, § 1.C.1.

9.      **Sherman Act Section 1 Tying**

9.1.      Dexon alleges that Cisco engaged in an unlawful tying arrangement.  A tying arrangement is one in which the seller (Cisco) will sell one product (referred to as the tying product) only on the condition that buyers also purchase a different product (referred to as the tied product) or at least agree that they will not purchase the tied product from a designated supplier or suppliers.  Another way to think of it is that "what you want to buy" is the tying product, but "what you are forced to buy in order to get what you want" is the tied product.[46]  In this case, Dexon claims that SMARTnet service is the tying product and Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]] are the tied product.[47]  Specifically, Dexon claims that Cisco provides SMARTnet service on a customer's existing Cisco-brand networking equipment only if the buyer also purchases additional, new Cisco-brand Ethernet switches, routers, or [[IP phones]] [[Enterprise Voice]] from a different source.

9.2.      [[Defendants' Proposal: Even if you find that Cisco employed a tying arrangement in this case, you must remember that not all tying arrangements are unlawful.[48]  The essential characteristic of an unlawful tying arrangement is a showing – by a preponderance of the evidence – that a seller exploits its market power over the tying product (here, allegedly, continued provision of SMARTnet service on equipment the customer already owns) to force or coerce buyers to purchase an alleged tied product (here, Cisco-brand Ethernet switches, routers, or IP phones) that

---

[46] *See* ABA Model Jury Instructions, § 2.E.1; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 461 (1992) ("A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier") (cleaned up).

[47] *See* ABA Model Jury Instructions, § 2.E.1.

[48] *See Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) ("Not all tying arrangements are illegal.").

buyers either did not want at all or might have preferred to purchase elsewhere if given a choice.[49]]]

[[Plaintiff's Proposal:  While not all tying arrangements are illegal[50], ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer of a tying product into purchasing a tied product on unfavorable terms.[51]]]

**9.3.**    To prevail on its tying claim, Dexon must prove by a preponderance of the evidence each of the following elements:  (a) provision of SMARTnet service is a relevant product market; (b) provision of SMARTnet service is a separate and distinct product from Cisco networking equipment; (c) Cisco has "market power" in the market for provision of SMARTnet service;[52] (d) Cisco will provide SMARTnet service for Cisco networking equipment a customer owns only on the condition that the buyer also purchases additional Cisco networking equipment; (e) such conditioning occurred and coerced an unwanted purchase of additional Cisco networking equipment; (f) the tying arrangement has an anticompetitive effect on the alleged relevant markets for Ethernet switches, routers, or [[IP phones]] [[Enterprise Voice]]; and (g) the tying arrangement affects a not insubstantial volume of commerce.[53]  If you find that the evidence is insufficient to

---

[49] *See Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 456 (5th Cir. 2021) ("Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made.") (cleaned up); *Ogden Food Serv. Corp. v. Mitchell*, 614 F.2d 1001, 1002 (5th Cir. 1980) ("The district court instructed the jury correctly:  coercion is an element of an illegal tie-in."); *see also* ABA Model Jury Instructions, § 2.E.2.

[50] *See Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) ("Not all tying arrangements are illegal.").

[51] *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises L.L.C.*, 532 F.3d 963, 971 (9th Cir. 2008).

[52] *See Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 43 (2006) (unlawful tying requires "proof of power in the relevant [tying product] market").

[53] *See United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th Cir. 1996) ("A tying arrangement is per se illegal when it has the following characteristics: (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power

prove any one of these elements, then you must find for Cisco and against Dexon on the tying claim.[54]

[[Defendants' Proposal:  It is not proper to instruct the jury on a separate or distinct claim that Dexon labels "a *Kodak* 'lock-in' claim."  Count III of the Complaint and the Amended Complaint allege a *per se* tying claim, and *Kodak* does not establish any new liability rule apart from pre-existing restrictions on unlawful tying.  Dexon does not identify a case instructing a jury – or a model instruction or even a *proposed* instruction – on a separate and distinct "*Kodak* claim" theory.]]

[[Plaintiff's Proposal:  Dexon's complaint asserts a distinct tying theory called a *Kodak* "lock-in" tying theory.[55] Specifically, Dexon alleges that Cisco locks in customers who require maintenance with SmartNet and then uses SmartNet to force supra-competitive purchases of routers and Ethernet switches.  *Kodak* involved three products: a "lock-in" product, a tying product, and a tied product.  Dexon alleges the same type of claim, where the installed

---

over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce."); *Bob Maxfield, Inc. v. Am. Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981) ("We have said that an illegal tying arrangement has four characteristics: (1) two separate products, the tying product and the tied product; (2) sufficient market power in the tying market to coerce purchase of the tied product; (3) involvement of a not insubstantial amount of interstate commerce in the tied market; and (4) anticompetitive effects in the tied market."); *Crossland v. Canteen Corp.*, 711 F.2d 714, 722 (5th Cir. 1983) ("In the absence of an anticompetitive effect in the tied market, there can be no tie."); *see also* ABA Model Jury Instructions, § 2.E.3; Report & Recommendation on Defendants' Motions To Dismiss (Dkt. 107) at 48-49.

[54] *See* ABA Model Jury Instructions, § 2.E.3.

[55] **Authority**: *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992); *see also Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 17 (1st Cir. 1994).

networking equipment already purchased is the "lock-in" product, the SmartNet service is the tying product, and networking products in the relevant product markets is the tied product.[56]

Elements of a *Kodak* "Lock-in" Claim[57]

- **First**, there is evidence of supra-competitive pricing;

- **Second**, the seller has a dominant share of the relevant aftermarket;

- **Third**, there is significant information costs that prevent life cycle pricing;

- **Fourth**, high switching costs exist that serve to "lock in" the seller's aftermarket customers; and

- **Fifth,** there was a unilateral policy change.]]

9.4.     To prove its tying claim, Dexon must prove that Cisco has market power in a relevant antitrust market for the provision of SMARTnet service on existing Cisco equipment.  As I instructed you earlier, to prove that Cisco has "market power" in a relevant antitrust market, Dexon must first prove the existence and contours of the relevant market.  Market power is the power to force or coerce a purchaser to do something that it would not do in a competitive market.  It is ordinarily found where a single seller has the ability to raise prices or reduce output without fear that it will lose an appreciable amount of customers in that market.

9.5.     [[Plaintiff's Proposal:[58] To determine whether each alleged tying product and tied

---

[56] ***See*** Dkt. No. 1, 45–46, 67.

[57] ***See*** Dkt. No. 107 at 56; *see also Avaya*, 838 F.3d at 402 (quoting Harrison Aire, Inc. v. Aerostar International, Inc., 423 F.3d 374, 384 (3d Cir. 2005)).

[58] *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354, 398 (3d Cir. 2016), Dkt. No. 1000, at 115; *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 19–22 (1984); *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 462 (1992) ("For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts.")

product are separate and distinct products, you should consider whether there would be demand for each of them if they were offered separately. You must make this determination for each one of the three tying claims. If a significant number of customers would want to purchase the tying product alone and post-warranty maintenance alone, then the two are separate products. On the other hand, if there is very little demand for one of the products by itself – that is, without the other product – then there are not two separate products for the purposes of the tying claim, even if they are sometimes offered separately.]]

To show that a tying arrangement exists between provision of SMARTnet service and the purchase of Cisco networking equipment, Dexon must show, by a preponderance of the evidence that Cisco coerced customers to purchase additional Cisco networking equipment (or not to buy networking equipment from another supplier) by threatening to refuse to provide SMARTnet service to those customers on existing equipment [[covered by a valid SMARTnet contract]].[59]

To prove coercion, Dexon must prove by a preponderance of the evidence that Cisco exploited control over the provision of SMARTnet service on customers' existing equipment to force customers to purchase additional networking equipment that the customer either did not want at all or might have preferred to purchase elsewhere on different terms, and that any appearance of choice was illusory.[60]  Mere sales pressure or persuasion is not coercion, nor is customers' preference to buy the tying product and tied product from the same source.[61]

---

[59] *See* ABA Model Jury Instructions, § 2.E.7.

[60] *See* ABA Model Jury Instructions, § 2.E.7.

[61] *See Bob Maxfield*, 637 F.2d at 1037 ("[A]ctual coercion is an indispensable element of a tie-in charge.  A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce his retailer to buy its full line of products.  An antitrust violation occurs only if it goes beyond persuasion and coerces or forces its customer to buy the tied product in order to obtain the tying product."); *see also* ABA Model Jury Instructions, § 2.E.7.

**9.6.**      To prove its tying claim, Dexon must also show that, through the alleged tying conduct, Cisco has affected a substantial amount of interstate commerce with respect to the sale of Ethernet switches, routers, or [[IP phones]] [[Enterprise Voice]] throughout North America or the United States.[62]

In determining whether Cisco has affected a substantial amount of commerce with respect to networking equipment – here Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]] – you should consider the total dollar amount in absolute terms of Cisco's sales of networking equipment that Cisco achieved by using the tying arrangement.[63]

If the dollar amount of Cisco's sales of networking equipment by virtue of the alleged tying arrangement was substantial, then you should next consider whether the tying arrangement caused a substantial adverse effect on competition with respect to networking equipment in any of the three relevant markets Dexon has alleged – Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]].[64]  If there was not a substantial adverse effect on competition with respect to the sale of products in a particular relevant market due to the tying arrangement, then you must find in favor of Cisco on the tying claim in that relevant market.[65]

**9.7.**      Cisco alleges that the conduct underlying Dexon's alleged tying claim is in fact justified.[66]  If you find that Dexon has proven all the elements of a tying claim as we just discussed,

---

[62] *See Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307, 1327 (5th Cir. 1976) ("Such an agreement violates the Sherman Act whenever the party imposing the tie has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a not insubstantial amount of interstate commerce is affected.") (cleaned up); ABA Model Jury Instructions, § 2.E.9.

[63] *See* ABA Model Jury Instructions, § 2.E.9.

[64] *See* ABA Model Jury Instructions, § 2.E.9.

[65] *See* ABA Model Jury Instructions, § 2.E.9.

[66] *See* ABA Model Jury Instructions, § 2.E.11.

then you should also consider whether Cisco has proven, by a preponderance of the evidence, a legitimate business justification for the alleged tying.[67]  Cisco has the burden of proof on this issue.[68]

In making this determination, you should consider whether the justification that Cisco offers is the real reason it imposed the alleged tying arrangement.[69]  You must also consider whether Cisco could reasonably have achieved its claimed objective through substantially less restrictive means.  Even if some type of constraint is necessary to promote a legitimate business interest, Cisco must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.[70]

In determining whether Cisco could have reasonably achieved its objective through less restrictive means, you may assess factors such as whether other means to achieve Cisco's objective were more or less expensive or difficult to administer, or more or less effective than the means Cisco chose.[71]  If you find that Cisco could reasonably have achieved its legitimate business purpose by using substantially less restrictive means, then you may find that there was no business justification.[72]  Dexon bears the burden of proving that Cisco could have used less restrictive means.  If you find that the alleged tying arrangement serves a legitimate business purpose of Cisco, and that there are not substantially less restrictive means reasonably available to achieve

---

[67] *See* ABA Model Jury Instructions, § 2.E.11.

[68] *See* ABA Model Jury Instructions, § 2.E.11.

[69] *See* ABA Model Jury Instructions, § 2.E.11.

[70] *See* ABA Model Jury Instructions, § 2.E.11.

[71] *See* ABA Model Jury Instructions, § 2.E.11.

[72] *See* ABA Model Jury Instructions, § 2.E.11.

that purpose, then you must find for Cisco and against Dexon on the tying claim.[73]

**10.    Sherman Act Section 2 Monopoly Maintenance**

**10.1.**    Dexon alleges that Cisco injured Dexon by unlawfully maintaining a monopoly in alleged relevant markets for the sales of Ethernet switches and routers throughout North America or the United States.  To prevail on this claim, Dexon must prove each of the following elements by a preponderance of the evidence:  (1) the alleged markets are relevant antitrust markets, as we discussed earlier; (2) Cisco possesses monopoly power in those alleged relevant markets; and (3) Cisco willfully maintained monopoly power in those alleged markets by engaging in anticompetitive conduct.[74]  If you find that Dexon has failed to prove any of these elements, then you must find for Cisco and against Dexon on this claim.  If you find that Dexon has proven each of these elements by a preponderance of the evidence, then you must consider whether Cisco's anticompetitive conduct caused Dexon injury of a type the antitrust laws are intended to prevent. I will instruct you on these additional elements of Dexon's claim later.[75]

**10.2.**    To prove its monopolization claim, Dexon must prove that Cisco has monopoly power in a relevant antitrust market.[76]  Monopoly power means the power to control prices, restrict output, and exclude competition in a relevant antitrust market.[77]  A firm is a monopolist if it can

---

[73] *See* ABA Model Jury Instructions, § 2.E.11.

[74] *See* ABA Model Jury Instructions, § 3.A.1.

[75] *See* ABA Model Jury Instructions, § 3.A.1.

[76] *See* ABA Model Jury Instructions, § 3.A.2.

[77] *See* ABA Model Jury Instructions, § 3.A.2; *see also Deauville Corp. v. Federated Dep't Stores, Inc.*, 756 F.2d 1183, 1188 (5th Cir. 1985) ("The monopoly power which is a component of the monopolization offense must include the power to exclude competition effectively:  Price and competition are so intimately entwined that any discussion of theory must treat them as one.  It is inconceivable that price could be controlled without power over competition.") (cleaned up).

profitably raise prices substantially above the competitive level for a significant period of time.[78] However, possession of monopoly power, in and of itself, is not unlawful.[79]  Finding the existence of monopoly power is a prerequisite to determining whether a business acquired or maintained it unlawfully.

There are two ways that an antitrust plaintiff like Dexon can try to prove that a defendant like Cisco possesses monopoly power:[80]

*First*, Dexon can try to adduce "direct proof" of monopoly power.  To make that showing, Dexon must prove by a preponderance of the evidence that Cisco has the ability to raise or maintain the prices it charges for goods above the competitive pricing level, i.e., the price that would prevail for a product in a competitive market.[81]  Dexon must prove that Cisco has the power to do so by itself.[82]  Dexon must also prove that Cisco has had this power to maintain prices above a competitive level for a significant period of time.[83]

For "direct proof" of monopoly power, Dexon must also prove that Cisco has the ability to exclude competition.[84]  For example, if Cisco attempted to maintain prices above competitive levels, but new competitors could enter a relevant market or existing competitors could expand their sales and take so much business that a price increase would be unprofitable, then Cisco does not have monopoly power.[85]  You may consider whether the evidence shows that the alleged

---

[78] *See* ABA Model Jury Instructions, § 3.A.2.

[79] *See* ABA Model Jury Instructions, § 3.A.2.

[80] *See Red Lion* Jury Instructions, at 13.

[81] *See Red Lion* Jury Instructions, at 13-14; ABA Model Jury Instructions, § 3.A.8.

[82] *See Red Lion* Jury Instructions, at 14; ABA Model Jury Instructions, § 3.A.8.

[83] *See Red Lion* Jury Instructions, at 14; ABA Model Jury Instructions, § 3.A.8.

[84] *See Red Lion* Jury Instructions, at 14; ABA Model Jury Instructions, § 3.A.8.

[85] *See Red Lion* Jury Instructions, at 14; ABA Model Jury Instructions, § 3.A.8.

relevant markets in which Cisco has competed during the time period at issue in this case had numerous competitors, or that Cisco faced increasing competition, such that Cisco could not or did not attempt to maintain prices above competitive levels.

The ability to earn high profit margins or a high rate of return does not necessarily mean that an antitrust defendant has monopoly power.[86]  Other factors may enable a company that does not have monopoly power to sell at higher prices or earn higher profit margins than its competitors, such as superior products, low costs, or superior branding.[87]  However, an ability to sell at higher prices or earn higher profit margins than other companies have earned for similar goods or services over a long period of time may be evidence of monopoly power.[88]  By contrast, evidence that Cisco would lose a substantial amount of sales if it raised prices substantially, or that Cisco's profit margins were low compared to its competitors, might be evidence that Cisco does not have monopoly power.[89]

*Second*, Dexon can try to prove monopoly power indirectly.[90]  The evidence presented by the parties includes discussion of Cisco's alleged market shares, market-share trends, barriers to entering the relevant markets, entry and exit by other companies, and the number and size of other competitors.[91]  If this "indirect proof" establishes that Cisco has the power to control prices and exclude competition in a relevant antitrust market, then you may conclude that Cisco has monopoly

---

[86] *See Red Lion* Jury Instructions, at 14; ABA Model Jury Instructions, § 3.A.8.

[87] *See Red Lion* Jury Instructions, at 14-15; ABA Model Jury Instructions, § 3.A.8.

[88] *See Red Lion* Jury Instructions, at 15; ABA Model Jury Instructions, § 3.A.8.

[89] *See Red Lion* Jury Instructions, at 15; ABA Model Jury Instructions, § 3.A.8.

[90] *See Red Lion* Jury Instructions, at 15.

[91] *See Red Lion* Jury Instructions, at 15; ABA Model Jury Instructions, § 3.A.7.

power in that market.[92]

The initial factor that you should consider is Cisco's share of the alleged relevant markets, assuming you find Dexon proved by a preponderance of the evidence that those markets exist and are defined properly.[93]  Based on the evidence that you have heard about Cisco's alleged market shares, you should determine Cisco's market share as a percentage of total sales in the relevant market.  Cisco must have a significant share of a properly defined relevant market in order to possess monopoly power.[94]

In evaluating whether the percentage of market share supports a finding of monopoly power, you also should consider other aspects of the relevant market, including market-share trends.[95]  An increasing market share might strengthen an inference that a company has monopoly power, particularly where that company has a high market share, while evidence that a company's share is decreasing shows that a company might not have monopoly power.[96]  [[Defendants' Proposal:  ==Showing that a defendant controls 50% of the market is, without more, insufficient evidence of monopoly power,[97] and monopolization is rarely found when the defendant's share of==

---

[92] *See Red Lion* Jury Instructions, at 15; ABA Model Jury Instructions, § 3.A.7.

[93] *See Red Lion* Jury Instructions, at 15-16; ABA Model Jury Instructions, § 3.A.7.

[94] *See Red Lion* Jury Instructions, at 15-16; ABA Model Jury Instructions, § 3.A.7.

[95] *See Red Lion* Jury Instructions, at 16-17; ABA Model Jury Instructions, § 3.A.7.

[96] *See Red Lion* Jury Instructions, at 16-17; ABA Model Jury Instructions, § 3.A.7.

[97] *See Stephens v. Rhone-Poulenc, Inc.*, 189 F.3d 469, at *3 (5th Cir. 1999) (per curiam); *Cliff Food Stores v. Kroger, Inc.*, 417 F.2d 203, 207 n.2 (5th Cir. 1969) ("It appears that something more than 50% of the market is a prerequisite to finding a monopoly."); *see also Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) (Posner, J.) ("Fifty percent is below any accepted benchmark for inferring monopoly power from market share."); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 532c (4th ed. 2020) ("[I]t would be rare indeed to find that a firm with half of a market could individually control price over any significant period.")

==the relevant market is below 70%.[98]==]]

You must also consider whether there are barriers to entry into the alleged relevant markets for sales of Ethernet switches and routers as well as barriers to expansion by existing competitors. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way; barriers to expansion make it difficult for existing competitors to expand their output in a meaningful and timely way.[99]  Evidence of low barriers to entry or expansion provide evidence that Cisco does not have monopoly power, regardless of Cisco's market share, because new competitors could enter easily or existing competitors could expand their sales if Cisco attempted to raise prices for a substantial period of time.[100]  By contrast, evidence of high barriers to entry and expansion along with high market share may support an inference that Cisco has monopoly power.[101]

The history of entry and exit in the alleged relevant markets may be helpful to consider.[102] Entry of new competitors or expansion of existing competitors may be evidence that Cisco lacks monopoly power.[103]  On the other hand, departures from the market, or the failure of firms to enter the market, particularly if prices and profit margins are relatively high, may support an inference that Cisco has monopoly power.[104]

---

[98] *See Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937, 939-40 (5th Cir. 1984) (per curiam) (52% share "is an insufficient basis as a matter of law to conclude that [party] violated the antitrust laws" as "monopolization is rarely found when the defendant's share of the relevant market is below 70%").

[99] *See Red Lion* Jury Instructions, at 17; ABA Model Jury Instructions, § 3.A.7.

[100] *See Red Lion* Jury Instructions, at 17; ABA Model Jury Instructions, § 3.A.7.

[101] *See Red Lion* Jury Instructions, at 17; ABA Model Jury Instructions, § 3.A.7.

[102] *See Red Lion* Jury Instructions, at 17.

[103] *See Red Lion* Jury Instructions, at 17; ABA Model Jury Instructions, § 3.A.7.

[104] *See Red Lion* Jury Instructions, at 17-18; ABA Model Jury Instructions, § 3.A.7.

If you find that Cisco has monopoly power in the alleged relevant markets for the sale of Ethernet switches or routers throughout North America or the United States – by either direct or indirect proof, as I have discussed those concepts – then you must consider the remaining elements of this claim.[105]  If you find that Cisco does not have monopoly power, then you must find for Cisco and against Dexon on this claim without proceeding further.[106]

**10.3.**   The next element Dexon must prove by a preponderance of the evidence is that Cisco willfully maintained monopoly power through anticompetitive acts or practices.[107]

Anticompetitive acts are acts, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating the efforts of other companies to compete for customers within the alleged relevant markets.[108]  Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.[109]  That includes conduct that harms the competitive process and thereby causes increased prices, decreased production levels, and reduced quality in the alleged relevant markets

---

[105] *See Red Lion* Jury Instructions, at 18; ABA Model Jury Instructions, § 3.A.7.

[106] *See Red Lion* Jury Instructions, at 18; ABA Model Jury Instructions, § 3.A.7.

[107] *See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("It is settled law that this offense requires, in addition to the possession of monopoly power in the relevant market, the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.") (cleaned up); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) ("A violation of section 2 of the Sherman Act is made out when it is shown that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident."); *Red Lion* Jury Instructions, at 18; ABA Model Jury Instructions, § 3.A.9.

[108] *See Red Lion* Jury Instructions, at 18; ABA Model Jury Instructions, § 3.A.9.

[109] *See Red Lion* Jury Instructions, at 18-19; ABA Model Jury Instructions, § 3.A.9.

for the sales of Ethernet switches and routers throughout North America or the United States.[110]

Mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.[111]   [[Defendants' Proposal:   The maintenance of monopoly power by supplying better products or services, possessing superior business skills, or because of luck, is not unlawful.[112]   A monopolist may compete aggressively without violating the antitrust laws, and a monopolist may charge monopoly prices without violating the antitrust laws.[113]   Even an act of pure malice by one business against another does not, without more, state a claim under the antitrust laws.[114]   A monopolist's conduct only becomes unlawful where it involves anticompetitive acts.[115]]]

The difference between anticompetitive conduct and conduct that has a legitimate business

---

[110] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

[111] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9; *see also Trinko*, 540 U.S. at 407 ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices – at least for a short period – is what attracts business acumen in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.") (cleaned up).

[112] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

[113] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9; *see also Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475-76 (5th Cir. 2000) ("Exclusionary conduct is conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power. . . .  However, not all unfair conduct – even by a monopolist and a fortiori by one who is not – fits within the prohibition of § 2.  Conduct must not only be inconsistent with competition on the merits, it must also have the potential for making a significant contribution to monopoly power.") (cleaned up).

[114] *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws; those laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.") (cleaned up).

[115] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

purpose can be difficult to determine.[116]  This is because all companies have a desire to increase their profits and increase their market share.[117]  These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals – or the achievement of these goals – unlawful, as long as a company does not use anticompetitive means to achieve these goals.[118]

In determining whether Cisco's conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to customers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.[119]

Anticompetitive conduct must represent something more than the conduct of business that is part of the normal competitive process or commercial success.  It must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason.]]

[[Plaintiff's Proposal:[120] Dexon must prove that Cisco engaged in anticompetitive or exclusionary conduct in order to acquire or willfully maintain monopoly power in the relevant market as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Anticompetitive acts are acts, other than competition on the merits, that have the effect of restraining competition or frustrating or foreclosing the efforts of other companies to compete for customers within the relevant market. In determining whether

---

[116] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

[117] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

[118] *See Red Lion* Jury Instructions, at 19; ABA Model Jury Instructions, § 3.A.9.

[119] *See Red Lion* Jury Instructions, at 20; ABA Model Jury Instructions, § 3.A.9.

[120] *See Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 522–23 (E.D. Tex. 2004); *see also, e.g., Verizon Commc'ns Corp. v. Law Offices of Curtis V. Trinko LLP*, 124 S. Ct. 872, 879 (2004); *United States v. Microsoft*, 253 F.3d 34, 58 (D.C. Cir. 2001).

Defendants' conduct was anticompetitive, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether conduct would make business sense apart from any effect it has on restricting competition or harming competitors.

Dexon asserts that Cisco engaged in the following anticompetitive acts, including, but not limited to[121]:

• Coercing purchasers in the relevant product markets by withholding service in the relevant service markets;

• Engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels;

• Engaging in audits for the purpose of excluding competition from the independent channel; and

• Engaging in related FUD tactics similar to the above, which resulted in additional revenue and goodwill losses and stunted overall competition in the relevant network equipment markets and likely other markets.

• [TO BE SUPPLEMENTED LATER WITH SPECIFIC DISCUSSIONS OF FUD AND AUDITS BASED ON THE COURT'S DECISIONS ON SUMMARY JUDGMENT MOTIONS]Dexon contends that these practices individually violate Section 2 of the Sherman Act and when taken together, they also demonstrate a pattern of anticompetitive and/or exclusionary conduct that is harmful to intrabrand and interbrand competition. However, even if you do not believe that an individual practice is anticompetitive in itself, you should consider Cisco's conduct as a whole and may find that, taken together, some or all of these actions demonstrate a pattern of

---

[121] Adapted from Dkt. 175.

34

anticompetitive conduct that has enabled Cisco to maintain, or prolong, its monopoly power.[122]

If you find that Dexon has failed to prove any of these elements, then you must find for Cisco and against Dexon on this claim. If you find that Dexon has proved each of these elements by a preponderance of the evidence, then you must find for Dexon and against Cisco on this claim.]]

[[Defendants' Proposal:  Making truthful statements about a competitor or rival to a customer is not anticompetitive conduct, even if made to an existing or prospective customer of the other.[123]  Statements that one competitor or rival makes about another are not anticompetitive unless the communications are false, not on the merits of the product at issue, and eliminate competition.[124]  In making this assessment, you may consider that statements Cisco made about Dexon to customers are not anticompetitive unless Dexon shows by a preponderance of the

---

[122] *See Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980); *Z-Tel Commc'ns, Inc. v. SBC Commc'ns, Inc.*, 331 F. Supp. 2d 513, 522–23 (E.D. Tex. 2004); *see also Covad Commc'n Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) ("[W]hether a particular allegation states a monopolization claim under the Sherman Act depends entirely upon the competitive significance of the conduct alleged, and not at all upon the number or detail of the allegations recited in the complaint."); *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002) ("'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties."); *Massimo Corp. v. Tyco Health Care Group, L.P.*, Final Jury Instructions (C.D. Cal. March 17, 2005).

[123] *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016); *Stearns*, 170 F.3d at 523-25.

[124] *See Red Lion* Jury Instructions, at 19-20; *see also Stearns*, 170 F.3d at 522-24 ("Exclusionary conduct under section 2 is the creation or maintenance of monopoly by means other than the competition on the merits embodied in the *Grinnell* standard. . . .  All of these arguments made by FMC to its potential customers may have been wrong, misleading, or debatable.  But they are all arguments on the merits, indicative of competition on the merits."); *Retractable*, 842 F.3d at 895 ("[A]bsent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie.").

evidence that the statements were clearly false, clearly material, clearly likely to induce unreasonable reliance, made to unsophisticated parties, continued for long periods, and not readily cured by Dexon.[125]  In general, one business is free to make a threat of a lawsuit against another as long as there is some objective basis underlying that threat of litigation; such conduct cannot be the basis for liability under the antitrust laws.[126]]]

[[Plaintiff's Proposal:[127] If you find that Dexon has proved Cisco has engaged in anticompetitive acts that have resulted in substantial harm to the relevant markets, then you must determine whether Cisco offered and proved, by a preponderance of the evidence, a procompetitive justification for its practices.  A procompetitive justification is valid if it relates directly or indirectly to the enhancement of consumer welfare: for example, the pursuit of efficiency and quality control or to offer a better product or lower prices.  Cisco contends that its business practices and policies in the relevant markets are procompetitive and beneficial to consumers.

In determining whether Cisco's business practices are procompetitive, you must decide whether it serves a legitimate business purpose of Cisco.  You must also consider whether the objectives of Cisco's business practices could reasonably have been realized through less restrictive means.  Even if some type of constraint is necessary to promote a legitimate business interest, Cisco must not adopt a constraint that is more restrictive than reasonably necessary to achieve that interest.

---

[125] *See Retractable*, 842 F.3d at 895.

[126] *See Prof'l Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) (litigation conduct is immune from antitrust scrutiny unless "objectively baseless"); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) ("threats of litigation [are] protected by petitioning immunity").

[127] *See* ABA Model Jury Instructions, § 2.E.11.

In determining whether Cisco's objective could reasonably have been achieved through other means, you may assess such factors as whether other means to achieve Cisco's objective were more or less expensive and more or less effective than the means chosen by Cisco.  If you find that Cisco could reasonably have achieved its legitimate business purpose by less restrictive means, then you may find that there was no business justification and find for Dexon.  If you find that the Cisco's business practices serve a legitimate business purpose, and that there are not less restrictive means reasonably available to achieve that purpose, then you must find for Cisco and against Dexon.]]

[[Defendants' Proposal:  Cisco contends that its conduct was based on legitimate business purposes.[128]  Conduct that is based on legitimate business reasons and that is on balance pro-consumer does not violate the antitrust laws, even if it is also motivated by the desire to harm competitors or does in fact harm competitors.[129]  A legitimate business purpose is one that benefits the actor regardless of any harmful effect on competitors, such as a purpose to promote quality, offer a better product or service, or increase short-term profits.[130]  When a particular business practice is adopted by competitors in the relevant market who do not possess market power, you may consider that strong evidence that the practice has a legitimate business purpose unrelated to the maintenance of a monopoly.[131]]]

---

[128] *See Red Lion* Jury Instructions, at 22.

[129] *See Red Lion* Jury Instructions, at 22.

[130] *See Red Lion* Jury Instructions, at 22.

[131] *See Stearns*, 170 F.3d at 522-24 (explaining the "key factor" to assess whether challenged conduct is exclusionary "is the proffered business justification for the act," and concluding that "attempts to generate sales by touting the virtues of [a product]" are "ordinary business practices typical of those used in a competitive market and do not constitute anti-competitive conduct") (cleaned up).

11.    **Sherman Act Section 2 Conspiracy To Monopolize**

Dexon alleges that Cisco and CDW engaged in a conspiracy to monopolize the markets for Ethernet switches and routers.  To carry its burden of proof, Dexon must show, by a preponderance of the evidence – for both Cisco and CDW – the following:[132]

11.1.    *First*, Dexon must prove by a preponderance of the evidence that both Cisco and CDW knowingly entered into an agreement or mutual understanding for the purpose of Cisco obtaining or maintaining monopoly power in the alleged relevant markets for the sale of Ethernet switches or routers in North America or the United States.[133]  The standards by which to assess whether Dexon has proven by a preponderance of the evidence a knowing agreement and a relevant market are the same as I discussed earlier,[134] as is the definition of monopoly power.[135]

11.2.    *Second*, Dexon must prove by a preponderance of the evidence that, at the time they entered into an agreement, both CDW and Cisco specifically intended that Cisco would obtain or maintain monopoly power in the alleged relevant markets for Ethernet switches or routers.[136]

---

[132] *See N. Miss. Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986) ("A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce."); *see also Futurevision Cable Sys. of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760, 777 (S.D. Miss. 1992) ("A claim for conspiracy to monopolize in violation of section 2 of the Sherman Act requires proof of the following elements:  (1) the existence of a combination or conspiracy; (2) an overt act in furtherance of a conspiracy; (3) a substantial amount of commerce affected; and (4) specific intent to monopolize."), *aff'd*, 986 F.2d 1418 (5th Cir. 1993); *see also* ABA Model Jury Instructions, § 3.E.1.

[133] *See N. Miss. Commc'ns*, 792 F.2d at 1335; *see also* ABA Model Jury Instructions, § 3.E.1.

[134] *See* ABA Model Jury Instructions, § 3.E.2.

[135] *See* ABA Model Jury Instructions, § 3.E.3.

[136] *See N. Miss. Commc'ns*, 792 F.2d at 1335 ("A specific intent to monopolize is an essential element."); *see also* ABA Model Jury Instructions, § 3.E.1.

Again, the standard for assessing whether Dexon has proven by a preponderance of the evidence a relevant market is the same as I discussed earlier, as is the definition of monopoly power.[137]

As to intent, Dexon must prove by a preponderance of the evidence that both Defendants had specific intent.  The concept of specific intent goes beyond the mere intent to do the act.[138] Dexon must prove by a preponderance of the evidence that the Defendants participated in the alleged conspiracy for the specific purpose of establishing or maintaining a Cisco monopoly in at least one of the relevant markets Dexon has alleged.[139]  [[Defendants' Proposal: In other words, you must decide whether the evidence shows that CDW entered into an agreement with Cisco having the conscious aim of engaging in anticompetitive conduct so that Cisco would acquire or maintain the power to control prices and exclude competition in the relevant markets (if you find they exist) for Ethernet switches or routers.[140]  You should be careful to distinguish between a lawful intent to compete vigorously, which may be accompanied by aggressive language, and a specific intent to monopolize by using anticompetitive conduct.[141]]]

There are several ways in which Dexon may prove that a Defendant had a specific intent to monopolize.  There may be evidence of direct statements of the Defendant's intent to use

---

[137] *See* ABA Model Jury Instructions, § 3.E.3.

[138] *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985) ("It is necessary to prove a specific intent to accomplish the forbidden objective – as Judge Hand explained, an intent which goes beyond the mere intent to do the act.") (cleaned up).

[139] *See In re Microsoft Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001) ("In the context of this case, what does 'specific intent' mean?  It signifies something more than willing, voluntary, and knowing participation in the illegal course of conduct that Defendant is alleged to have pursued.  It means participating in that course of conduct for the specific, shared purpose of maintaining the Defendant's monopolies.") (cleaned up), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002).

[140] *See* ABA Model Jury Instructions, § 3.E.4.

[141] *See* ABA Model Jury Instructions, § 3.E.4.

anticompetitive means to acquire monopoly power in the market.  Such proof of specific intent may be established by documents prepared by responsible officers or employees of the Defendant at the time of the agreement or by testimony concerning statements of responsible officers or employees of the Defendant.  Even if you decide that the evidence does not prove directly that that a defendant actually intended to exercise monopoly power by using anticompetitive conduct, specific intent may be inferred from what Defendant did.  [[Plaintiff's Proposal:[142] If the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties to the agreement was to exclude or destroy competition in the relevant market, that there was no legitimate business justification but the destruction or damage to competition and that this was plainly foreseeable by defendant, then you may (but are not required to) infer that Defendants specifically intended to acquire monopoly power by using anticompetitive conduct.]]

In determining whether both Defendants had a specific intent to monopolize, you should take into consideration the extent of competition both Defendants would face from producers of identical or equivalent goods and whether they had or probably could have acquired sufficient power, acting together, to control the prices or output of Ethernet switches or routers in North America or the United States.  If you find it is unlikely that Defendants could have achieved the power to exclude competition from an appreciable segment of that commerce across North America or the United States, then you may consider this as circumstantial evidence that neither of them had the required specific intent to monopolize.[143]

**11.3.**   *Third*, Dexon must prove by a preponderance of the evidence that each of the

---

[142] *See* ABA Model Jury Instructions, § 3.E.4.

[143] *See* ABA Model Jury Instructions, § 3.E.4.

Defendants committed at least one overt act in furtherance of the conspiracy to monopolize.[144]

**11.4.**   *Fourth*, Dexon must prove by a preponderance of the evidence that the alleged conspiracy affected a substantial amount of interstate commerce.[145]

## 12.   Sherman Act Section 2 Attempted Monopolization

Dexon alleges that Cisco attempted to attain an unlawful monopoly in the alleged relevant [[market]] [[markets]] for the sale of [[IP phones]] [[Ethernet switches, routers, and Enterprise Voice]] throughout North America or the United States.   To prevail on its claim of attempted monopolization, Dexon must prove each of the following elements by a preponderance of the evidence:   Cisco engaged in anticompetitive conduct; Cisco had a specific intent to achieve monopoly power in a relevant market; and there was a dangerous probability that Cisco would achieve its alleged goal of attaining monopoly power in the alleged relevant market.[146]

**12.1.**   It is not sufficient for Dexon to prove only that Cisco intended to monopolize the alleged relevant [[market]] [[markets]] for [[IP phones]] [[Ethernet switches, routers, or Enterprise Voice]].[147]   Dexon must show that Cisco engaged in anticompetitive conduct, coupled with an

---

[144] *See* ABA Model Jury Instructions, § 3.E.1.

[145] *See N. Miss. Commc'ns*, 792 F.2d at 1335 ("A conspiracy to monopolize can be established only by proof of an effect upon a substantial amount of interstate commerce.") (cleaned up).

[146] *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993) ("[I]t is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power."); *Domed Stadium Hotel*, 732 F.2d at 490 (same); *Taylor Pub. Co.*, 216 F.3d at 474 ("The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate ability to lessen or destroy competition in that market."); *Red Lion* Jury Instructions, at 27; *see also* ABA Model Jury Instructions, § 3.D.1.

[147] *See Red Lion* Jury Instructions, at 27; ABA Model Jury Instructions, § 3.D.2.

intent to monopolize and a dangerous probability that Cisco would succeed.[148]  You should refer to my prior instructions regarding anticompetitive conduct, which apply to this claim in full.[149]

    **12.2.**   The second element that Dexon must prove by a preponderance of the evidence is that Cisco had a specific intent to achieve monopoly power in a relevant market.[150]  In making that assessment, you should follow the guidelines that I discussed previously as to each concept of specific intent, monopoly power, and a relevant market.[151]  If you find Dexon has proven a relevant market,[152] then you must decide whether Dexon also proved by a preponderance of the evidence that Cisco had the specific intent to monopolize that market.[153]  It is not enough for Dexon to show that Cisco acted with the intent to gain sales in the alleged relevant market for [[IP phone]] [[Ethernet switches, routers, or Enterprise Voice]] sales throughout North America or the United States – every competitor seeks to do that.  Rather, you must decide if the evidence shows that Cisco acted with the conscious aim of acquiring the power to control prices and to exclude or destroy competition in the alleged relevant market for [[IP phone]] [[Ethernet switches, routers, or Enterprise Voice]] sales throughout North America or the United States.[154]

---

[148] *See Red Lion* Jury Instructions, at 27; ABA Model Jury Instructions, § 3.D.2.

[149] *See Red Lion* Jury Instructions, at 27; ABA Model Jury Instructions, § 3.D.2.

[150] *See Red Lion* Jury Instructions, at 27; ABA Model Jury Instructions, § 3.D.3.

[151] *See Red Lion* Jury Instructions, at 27-28; *see also* ABA Model Jury Instructions, § 3.D.3.

[152] *See Jayco Sys.*, 777 F.2d at 319 ("These elements can be subdivided further, and the subelement of most importance to the disposition of [Plaintiff's] remaining claims is that involving the relevant market.  This element is essential in both attempt and monopolization cases.").

[153] *See* ABA Model Jury Instructions, § 3.D.3.

[154] *See* ABA Model Jury Instructions, § 3.D.3; *see also Adjusters Replace-A-Car, Inc. v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 887 (5th Cir. 1984) ("The elements of an attempted monopolization under § 2 of the Sherman Act are:  (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt will be successful.  The intent must be to do more than compete vigorously; vigorous competition is precisely what the antitrust laws are

**12.3.**   If you find that Cisco had the specific intent to achieve a monopoly and engaged in significant anticompetitive conduct – and that there is [[a]] relevant market for the sale of [[IP phones]] [[Ethernet switches, routers, or Enterprise Voice]] throughout North America or the United States – then you must also determine whether Dexon has proven, by a preponderance of the evidence, that there was a dangerous probability that Cisco would succeed in achieving monopoly power if it continued to engage in the same or similar conduct.[155]

[[Defendants' Proposal: In determining whether there was a dangerous probability that Cisco would acquire the ability to control prices in the alleged relevant market for those IP phone sales, you should consider such factors as Cisco's market share, the trend in Cisco's market share, whether the barriers to entry into the market made it difficult for competitors to enter the market, whether barriers to expansion make it difficult for existing competitors to increase their sales in the market, and the likely effect of any anticompetitive conduct on Cisco's share of the alleged market.[156]

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Cisco would ultimately acquire monopoly power over the sale of IP phones in North America or the United States by engaging in the alleged conduct (if you find that

---

designed to foster.  Thus, a statement of intent to compete . . . even if perceived as a threat is not unlawful.  Such a manifestation of intent to triumph in the competitive market, in the absence of unfair, anticompetitive or predatory conduct, is not enough to establish an antitrust violation. Rather, the forbidden specific intent is that of acquiring and exercising the power to fix prices or to exclude competition.") (cleaned up).

[155] *See Red Lion* Jury Instructions, at 29; ABA Model Jury Instructions, § 3.D.4.

[156] *See Red Lion* Jury Instructions, at 29; ABA Model Jury Instructions, § 3.D.4; *see also Spectrum Sports*, 506 U.S. at 456 ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.").

alleged conduct was anticompetitive).[157]  A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a significant and real likelihood that Cisco would ultimately acquire monopoly power.[158]]]

**13.   Texas Free Enterprise & Antitrust Act**

Dexon alleges that Cisco and CDW violated a state antitrust law called the Texas Free Enterprise & Antitrust Act.  This law follows the federal Sherman Act.  Accordingly, to prove a violation of the Texas law, Dexon must prove by a preponderance of the evidence (1) one of the foregoing claims that Cisco and CDW (for the conspiracy claims) or Cisco (for the claims about Cisco's conduct alone) violated federal antitrust law;[159] and (2) that the unlawful conduct took place within the state of Texas or affected transactions taking place wholly or partly within the state of Texas.[160]

**14.   Dexon's Injury**

If you find that Defendants violated the foregoing antitrust laws by engaging in unlawful

---

[157] *See Red Lion* Jury Instructions, at 29; ABA Model Jury Instructions, § 3.D.4.

[158] *See Red Lion* Jury Instructions, at 29; ABA Model Jury Instructions, § 3.D.4.

[159] *See* Tex. Bus. & Com. Code § 15.04 (Texas Free Enterprise & Antitrust Act "shall be construed in harmony with federal judicial interpretations" of the Sherman Act); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 325 n.1 (5th Cir. 2015) ("Because the Texas Free Enterprise and Antitrust Act utilizes the same standards as the Sherman Act for establishing a violation, the Sherman Act analysis applies to Plaintiffs' state law claims as well."); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) ("Texas courts are statutorily instructed to interpret the [Texas Free Enterprise & Antitrust Act] in harmony with federal judicial interpretations of equivalent federal laws"); *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) ("Because plaintiffs have not plausibly alleged § 1 or § 2 [conspiracy] claims under the Sherman Act, their [Texas Free Enterprise & Antitrust Act] claims must be dismissed as well.").

[160] *See* Tex. Bus. & Com. Code § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce occurring wholly or partly within the State of Texas and to provide the benefits of that competition to consumers in the state.").

anticompetitive conduct, then you must decide whether Dexon is entitled to recover damages – this is a separate inquiry for which Dexon bears the burden of proof.  Dexon is entitled to recover for injury to its business or property only if it can establish separate elements of injury and causation, each by a preponderance of the evidence.[161]  If you find that Dexon has failed to prove such an injury as I am about to describe it, then you must find in Defendants' favor on Dexon's federal and state antitrust claims – even if Dexon proves by a preponderance of the evidence all the elements we have already discussed.

    **14.1.**  *First*, Dexon must prove by a preponderance of the evidence that, as a matter of fact and with a fair degree of certainty, Defendants' alleged illegal conduct was a material cause of an injury to Dexon.[162]  If you find that something other than the alleged antitrust violations primarily caused Dexon's injury, then you must find that Dexon has failed to prove it is entitled to recover damages.  It is important to understand that injury and amount of damage are different concepts and that you cannot consider the amount of damage unless and until you have concluded that Dexon established it was in fact injured.[163]

    **14.2.**  *Second*, Dexon must also prove by a preponderance of the evidence that its injury is the type that the antitrust laws were intended to prevent.[164]  I will now explain this concept,

---

[161] *See* ABA Model Jury Instructions, § 6.A.1; *see also Response of Carolina*, 537 F.2d at 1324 ("But damages must be linked causally with violation before they are recoverable.  This overlap is what prompted us to say in *Terrell* that in a private antitrust suit there is no neat dividing line between the issues of liability and damages.") (cleaned up).

[162] *See H&B Equip.*, 577 F.2d at 246 ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business, and must provide some indication of the amount of damage done."); *Red Lion* Jury Instructions, at 31.

[163] *See* ABA Model Jury Instructions, § 6.A.1.

[164] *See Brunswick*, 429 U.S. at 489 ("Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation."); *Red Lion* Jury Instructions,

which is known as "antitrust injury."  If the alleged illegal conduct harmed competition and that in turn injured Dexon, then Dexon's injuries are antitrust injuries.[165]  [[Defendants' Proposal: However, if heightened and more aggressive competition or acts that would benefit customers caused Dexon's injuries, then Dexon's injuries are not antitrust injuries and Dexon may not recover damages for those injuries under the antitrust laws.[166]]]

In assessing this separate element of antitrust injury, you should bear in mind that businesses might incur losses for many reasons that the antitrust laws do not prohibit.[167]  Neither federal nor state antitrust law permits an antitrust plaintiff like Dexon to recover damages for losses arising from conduct that benefits customers or from the competitive process itself.[168]  In the course of normal, lawful competition, some businesses may suffer economic losses or even go out of business.  An injury to a business is the "proximate result" of an antitrust violation only when the act or transaction constituting the violation directly and in natural and continuous sequence

---

at 31; *see also Walker v. U-Haul Co.*, 747 F.2d 1011, 1015 (5th Cir. 1984) ("The inquiry into antitrust injury addresses the question of damages and does not even begin until the court finds that a violation has been alleged and that the plaintiff has been injured by it.  The purpose of the inquiry is to determine whether and to what extent the plaintiff's injury flows from the kind of inefficiency to which the substantive law is directed.").

[165] *See Norris*, 500 F.3d at 465 ("Even a plaintiff injured in his business or property must, in order to sue for damages, show antitrust injury, that is, injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.") (cleaned up); *see also* ABA Model Jury Instructions, § 6.A.1.

[166] *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 339 (1990) ("Antitrust injury does not arise . . . until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct."); *see also* ABA Model Jury Instructions, § 6.A.1.

[167] *See* ABA Model Jury Instructions, § 6.A.1; *Red Lion* Jury Instructions, at 32; *see also Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 320 (5th Cir. 2009) ("The federal antitrust laws protect competition, not competitors.").

[168] *See* ABA Model Jury Instructions, § 6.A.1; *Red Lion* Jury Instructions, at 32; *see also Olympia Co. v. Celotex Corp.*, 771 F.2d 888, 891 (5th Cir. 1985) ("Injury is required in section 4 actions regardless of the nature of the underlying antitrust violation."); *Scott v. Galusha*, 890 S.W.2d 945, 950 (Tex. Ct. App. 1994), *writ denied*, Oct. 5, 1995.

produces, or contributes substantially to producing, the injury.  In other words, the Defendants' alleged violation of the antitrust laws must be a direct, substantial, and identifiable cause of the injury that Plaintiff claims to have suffered.  Proof of an antitrust violation does not necessarily mean the Plaintiff was injured.  The Plaintiff can recover only if the loss stems from a reduction in competition because of the Defendants' behavior.  There is no antitrust injury unless that behavior reduced competition, even if the behavior violates the antitrust law at issue.

Note that Dexon has alleged relevant markets for sales of Ethernet switches, routers, and [[IP phones]] [[Enterprise Voice]] throughout North America or the United States.  Accordingly, Dexon must show that any injury it suffered was the result of conduct that also harmed competition in the alleged relevant markets for sales of Ethernet switches, routers, [[or]] [[IP phones]] [[Enterprise Voice]] throughout North America or the United States.  The mere fact that Dexon lost sales is not proof of antitrust injury, and Dexon's loss of sales of Cisco equipment is insufficient to establish antitrust injury without proof that Dexon's loss of sales of Cisco equipment harmed competition among Cisco and its manufacturing competitors in the alleged relevant markets for sales of Ethernet switches, routers, [[or]] [[IP phones]] [[Enterprise Voice]] throughout North America or the United States.

## 15.    Damages

If Dexon has proven any of its antitrust claims by a preponderance of the evidence – as to a relevant market, a violation of antitrust law, an injury, and an antitrust injury – then you must determine the damages to which Dexon is entitled, if any.

**15.1.**    You should not interpret the fact that I am giving you instructions about damages as an indication I believe Dexon should or should not win this case.[169]  Defendants contend that

---

[169] *See Red Lion* Jury Instructions, at 33.

any profits or sales that Dexon lost occurred as result of other factors having nothing to do with the alleged antitrust violation, such as the exercise of consumer choice.  It is your task to decide first whether Defendants are liable per the foregoing instructions.  I am instructing you on damages only so you will have guidance in the event you decide Cisco or CDW is liable.[170]

If you reach a verdict for Defendants on the issue of liability, then you should not consider the issue of damages, and you may disregard the instructions that I am about to give as to damages specifically.[171]

**15.2.**   If you find Defendants are liable, then you must determine an amount that is fair compensation for Dexon's damages.  Antitrust damages are only compensatory, meaning their purpose is to put an injured plaintiff as near as possible in the position in which it would have been but for the alleged antitrust violation, if you find such a violation.[172]  The law does not permit you to award damages to punish a wrongdoer – what we sometimes refer to as punitive damages – or to award a damages amount in order to deter certain conduct in the future.[173]

You are permitted to make just and reasonable estimates in calculating Dexon's damages. You are not required to calculate damages with mathematical certainty or precision.  If Dexon establishes with reasonable probability the existence of an injury proximately caused by Defendants alleged antitrust violation, then you are permitted to make a just and reasonable estimate of the damages.  However, the amount of damages must have a reasonable basis in the evidence presented and must be based on reasonable and non-speculative assumptions and

---

[170] *See Red Lion* Jury Instructions, at 33.

[171] *See Red Lion* Jury Instructions, at 33; ABA Model Jury Instructions, § 6.B.1.

[172] *See Red Lion* Jury Instructions, at 33.

[173] *See* ABA Model Jury Instructions, § 6.B.1; *see also Red Lion* Jury Instructions, at 33-34.

estimates.[174]   Damages may not be based on guesswork or speculation.[175]   Dexon must present evidence that establishes the reasonableness of each of the assumptions upon which any damages calculation is based.[176]   [[Plaintiff's Proposal: <mark>However, so long as there is a reasonable basis in the evidence for a damages award, Dexon should not be denied a right to be fairly compensated just because damages cannot be determined with absolute mathematical certainty.[177]</mark>]]

**15.3.**   Dexon claims that Defendants harmed Dexon by causing it to lose profits on sales Dexon would have made but for the alleged antitrust violations.   Accordingly, if you find that Defendants committed an antitrust violation causing Dexon an antitrust injury, then you must calculate the profits, if any, that Dexon lost because of the alleged antitrust violation.   To calculate lost profits, you must calculate net profit, i.e., the amount by which Dexon's gross revenues would have exceeded all of the costs and expenses that would have been necessary to produce those revenues.[178]   Dexon bears the burden of proving by a preponderance of the evidence its lost profits on foregone sales that Dexon would have made, if any, but for the alleged antitrust violation.

**15.4.**   Dexon bears the burden of showing that its lost profits were caused by Defendants' antitrust violations, as opposed to other factors such as those that occur in the normal course of competitive business activity that have nothing to do with antitrust law violations.   Dexon thus

---

[174] *See Kestenbaum v. Falstaff Brewing Corp.*, 514 F.2d 690, 695 (5th Cir. 1975) ("We recognize that leniency should be permitted in showing damages in private antitrust actions, however, a damage assessment based wholly on speculation and guesswork is improper.").

[175] *See Red Lion* Jury Instructions, at 34; ABA Model Jury Instructions, § 6.B.3.

[176] *See* ABA Model Jury Instructions, § 6.B.3.

[177] *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016), Dkt. No. 1002 at 138; *see also* ABA Model Jury Instructions, § 6.B.3; see also *Reid Bros*, "a lightened burden of proof is imposed on a plaintiff seeking to prove antitrust damages once violations of the law have been established*." Reid Bros. Logging Co. v. Ketchikan Pulp Co*., 699 F.2d 1292, 1299 (9th Cir. 1983).

[178] *See* ABA Model Jury Instructions, § 6.B.8; *Red Lion* Jury Instructions, at 36.

bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes.[179]  For example, Dexon may not recover for lost profits if it lost those profits because of the superior product, business acumen, salesmanship, or lawful competition of a competitor.  Dexon also may not recover if it lost profits as a result of other causes that had nothing to do with Defendants' antitrust violations, increased competition from new competitors, changes in product technology, changes in market conditions, poor management, or missed opportunities.

If, however, you conclude that Dexon's lost profits were caused in whole by Defendants' antitrust violations, then you should award Dexon damages in the full amount of its lost profits.  If you conclude that Dexon's lost profits were caused only in part by Defendants' antitrust violations and in part by other factors, then you should award damages only for that portion of Dexon's lost profits caused by Defendants' antitrust violations.  Similarly, if you conclude that only some of Defendants' challenged actions were antitrust violations but some were not, then you should award damages only for profits you conclude Dexon lost due to those actions by Defendants' that were antitrust violations.

[[Defendants' Proposal:  If you find that Dexon's alleged injuries were caused by factors other than Defendants' alleged antitrust violation – for example, Defendants engaging in lawful conduct or conduct that is beneficial to customers – then you must return a verdict for Defendants.[180]]]  If you find that there is no reasonable basis to apportion Dexon's alleged injury

---

[179] *See Red Lion* Jury Instructions, at 35-36.

[180] *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 20 (5th Cir. 1974) ("There is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable the jury to fix the amount.  The rule which precludes recovery to uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong

between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all.[181]   However, if you find that Dexon was injured by Defendants' alleged antitrust violation, and there is a reasonable basis to apportion Dexon's alleged injury between lawful and unlawful causes, then you may award damages attributable to the unlawful causes.[182]

15.5.   Dexon's damages expert, Dr. Maness, calculated both non-conspiracy damages (monopolization, attempted monopolization, and tying) and conspiracy damages (conspiracy to restrain trade and conspiracy to monopolize).   Non-conspiracy damages are attributed to Cisco's conduct only, while conspiracy damages are attributed to both Defendants.

[[Defendants' Proposal: The Court should not deliver more than a page and a half of instructions "explain[ing]" Dexon's damages methodology based on what Dexon assumes it will elicit from Dr. Maness when he testifies (or even based on his actual testimony).   Dexon cites no authority for this kind of instruction, which is imbalanced – Dexon does not propose the Court summarize flaws in the damages "methodologies," as explained by Defendants' expert Dr. Ugone – and risks misleading the jury into believing that the Court endorses Dexon's approach or finds it explicable.   Dexon's proposal asks the Court to testify on behalf of the damages methodologies that Dexon proffers.   Defendants also disagree with the below recitation, not all of which is accurate or correct, even as an explanation of the methodologies.   Defendants respectfully request that, if the Court accepts Plaintiff's Proposal, then it allow Defendants to submit an instruction that will explain the methodologies' potential flaws.   To be clear, however, such dueling instructions

---

and only uncertain in respect of their amount."); *see also Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 995-98 (5th Cir. 1983).

[181] *See* ABA Model Jury Instructions, § 6.B.4; *Red Lion* Jury Instructions, at 35-36.

[182] *See* ABA Model Jury Instructions, § 6.B.4.

will not fully mitigate the prejudice of Dexon's proposal; the Court should not summarize either side's damages methodology.]]

[[Plaintiff's Proposal:[183] I will explain both of those methodologies below.

If you find that Cisco committed any or all of the following antitrust violations: monopolization, attempted monopolization, and tying, and that this violation caused injury to Dexon, you should calculate the amount of the profits that Dexon lost as a result of Cisco's antitrust violation.

You heard the testimony of Dexon's damages expert, Dr. Maness. As explained, Dr. Maness used a standard before and after measurement combined with a yardstick approach to calculate non-conspiracy damages. Using said methodology to measure non-conspiracy damages, Dexon has calculated the share of Dexon's sales comprised of non-Cisco equipment (Ethernet switches, routers, and enterprise voice products) before the alleged conduct and compare it to the non-Cisco share of Dexon's sales of the same equipment during the period of alleged conduct. Dr. Maness explained that Dexon's ability to sell non-Cisco equipment is a reasonable benchmark for the success it could have expected selling Cisco equipment but for the alleged conduct. Further, to quantify the harm to Dexon due to Cisco's alleged monopolization, Dr. Maness used the benchmark ratio to calculate Dexon's U.S. sales of Cisco Ethernet switches, routers, and enterprise voice products "but-for" Cisco's alleged monopolization. Finally, Dr. Maness subtracted Dexon's actual sales of Cisco products in the relevant markets from the but-for sales to calculate lost sales.

It is important to note that while Dexon alleges three separate non-conspiracy claims, it does not require Dexon to prove all three claims for Dexon to recover damages. Put a different

---

[183] *See* Maness Expert Report ¶ ¶ 135-137.

way, if you find that Dexon has prevailed on its monopolization claim and intent to monopolize claim, but not its tying claim, Dexon may still recover damages.

If you find that Defendants committed any or all of the following antitrust violations: conspiracy to monopolize or conspiracy to restrain trade, and that this violation caused injury to Dexon, you should calculate the amount of the profits that Dexon lost as a result of Defendants' antitrust violation.

You similarly heard the testimony of Dexon's damages expert, Dr. Maness. Dr. Maness used a standard benchmark method to calculate conspiracy damages. In order to calculate Dexon's sales but-for Cisco's and CDW's alleged conspiracy, Dr. Maness calculated the ratio of Dexon's sales to CDW's sales in the period where both are selling to a given customer. Then, for any month after a given customer has stopped purchasing from Dexon, Dexon's lost sales are calculated as a fraction of CDW's sales in the actual world based on this ratio.

As with non-conspiracy damages, it is important to note that while Dexon alleges two separate conspiracy claims, it does not require Dexon to prove both claims for Dexon to recover damages. Put a different way, if you find that Dexon has prevailed on its conspiracy to monopolize claim, but not its conspiracy to restrain trade claim, Dexon may still recover damages.]]

16.    **Statute of Limitations**

[[Plaintiff's Proposal:[184] Cisco has raised the statute of limitations as a defense to any injury arising from Cisco's business dealings with West Penn Hospital.

Statutes of limitations require that a person who believes themselves to have been injured by the wrongful act of another must bring suit to recover damages caused by that injury within a

---

[184] *See* Texas v. Allan Constr. Co., 851 F.2d 1526, 1535-36 (5th Cir. 1988).

certain period of time after that injury occurred. In this case, Dexon cannot recover for any injury which occurred prior to April 27, 2018, unless Dexon brings its claim within a relevant exception. Dexon is asking to recover for an injury which it claims began as early as 2015, a date earlier than April 27, 2018.]]

[[Defendants' Proposal:  The statute of limitations for the federal and state antitrust laws at issue is four years.[185]  Dexon filed this lawsuit on April 27, 2022.  Accordingly, the antitrust laws do not permit Dexon to recover damages for any injuries sustained prior to April 27, 2018.[186] If you find that Dexon suffered injuries spanning both before and after April 27, 2018, then you must apportion the damages between the two periods and you may award damages only for the portion of the injuries you find Dexon suffered on or after April 27, 2018.  When apportioning the damages between the two periods, you are to apply the same principles of apportionment that I explained earlier.  That is, you are permitted to make just and reasonable estimates in apportioning Dexon's damages.  However, the apportionment of damages must have a reasonable basis in the evidence.  If you find that you cannot apportion the damages between the two periods without relying on guesswork or speculation, then you may not award damages at all.[187]]]

[[Defendants' Proposal:  It would be improper to instruct the jury on exceptions to the statute of limitations.  Dexon's assertion that there was a "continuing violation" revives at most

---

[185] *See* 15 U.S.C. § 15b (Sherman Act); Tex. Bus. & Com. Code § 15.25(a) (Texas Free Enterprise & Antitrust Act).

[186] *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) ("The basic rule is that damages are recoverable under the federal antitrust acts only if suit therefore is commenced within four years after the cause of action accrued, . . . plus any additional number of years during which the statute of limitations was tolled.  Generally, a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.") (cleaned up); *see also* ABA Model Jury Instructions, § 7.A.1.

[187] *See* ABA Model Jury Instructions, § 7.A.1.

the timeliness of the *claim* and not the timeliness of *injuries* falling outside the limitations period, as a matter of law. *See Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 127 (5th Cir. 1975) (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971)); *see also Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1053-55 (5th Cir. 1982). As to "fraudulent concealment," Dexon *did not make this allegation* in its Complaint or its Amended Complaint despite knowledge that certain of its alleged injuries occurred before April 27, 2018, e.g., Dexon sued West Penn for damages before that date. *See* Wright & Miller, 5A Fed. Prac. & Proc. Civ. § 1298 (4th ed.) ("In fraudulent concealment cases, Rule 9(b) has been applied to require pleaders to articulate, among other things, the nature of the affirmative act constituting fraud, its concealment, and when it was discovered."); *see also Stringer v. Remington Arms Co., LLC*, 52 F.4th 660, 662-63 (5th Cir. 2022) (affirming dismissal with prejudice on the ground that "our court has previously found that Rule 9(b) applies in fraudulent concealment cases" and "Plaintiffs fail to meet Rule 9(b)'s requirements" in "their complaint" and because the "complaint fails to meet the pleading standards of Rule 9(b), . . . the district court was right to dismiss it"); *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 970-71 (5th Cir. 1981) (same). Further, the Dexon proposal below misstates the law as to both continuing violations and fraudulent concealment.]]

[[Plaintiff's Proposal:[188] Cisco has raised the statute of limitations as a defense to any injury arising from Cisco's business dealings with West Penn Hospital.

Statutes of limitations require that a person who believes themselves to have been injured by the wrongful act of another must bring suit to recover damages caused by that injury within a certain period of time after that injury occurred. In this case, Dexon cannot recover for any injury

---

[188] *See Texas v. Allan Constr. Co.,* 851 F.2d 1526, 1535-36 (5th Cir. 1988).

which occurred prior to April 27, 2018, unless Dexon brings its claim within a relevant exception. Dexon is asking to recover for an injury which it claims began as early as 2015, a date earlier than April 27, 2018.

I will instruct you on both of the exceptions that Dexon believes apply. Dexon may prove *either* of the exceptions' elements by a preponderance of the evidence to allow you to use Cisco's business dealings with West Penn Hospital in determining damages. Determining these issues determines how far back Dexon's claim can extend. Dexon does not need to prevail on *both* of these exceptions to recover damages. If, however, you find that Dexon has failed to prove that its claims fall within any of the exceptions, then you must find that the statute of limitations bars any claim by Dexon relating to West Penn Hospital that occurred prior to April 27, 2018.

As we will discuss later on, if you believe that Dexon can show that Cisco's conduct falls into *either* of these two categories, you will be instructed to consider Dexon's claims related to West Penn Hospital and award damages in light of that information.

## B.      Exceptions

### 1.      Continuing Violation[189]

Dexon is first asking to recover because Defendants' conduct resulted in a "continuing injury."  Under the "continuing injury" exception, each time a plaintiff is injured by a defendant, a new limitations period begins each time the plaintiff is injured by an overt act of a defendant that is part of the violation. This means that whenever a new injury occurs, the plaintiff may present the older injuries as evidence of harms that incurred within the statute of limitations period.

To prove a continuing injury, Dexon must show that:

---

[189] **Authority**: Adapted from *Rx.com, Inc. v. Medco Health Sols., Inc.*, 5:04-CV-227-DF, 2008 WL 11449354 (E.D. Tex. Mar. 11, 2008); *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 126-27 (5th Cir. 1975); *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982).

(1) Cisco's conduct was a new, overt and independent act, not merely a reaffirmation of a previous act; and

(2) Cisco's conduct inflicted new and accumulating injury on the plaintiff

In the antitrust context, the four-year statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business. The continuing violation exception says that a cause of action accrues each time a defendant commits an overt act in furtherance of an antitrust conspiracy or commits an act that by its very nature is a continuing antitrust violation.

An injury is not a "continuing injury" simply because the plaintiff personally feels the effects of the defendants' pre-statute of limitations conduct well into the future. Rather, the plaintiff must show that the defendant committed a new act (or acts) within the current statute of limitations that caused a continued harm to competition. Here, Dexon claims that the acts of Cisco and CDW in 2021 constitute new acts that resulted in an injury to Dexon.

**2.      Fraudulent Concealment**[190]

Dexon also asks to recover because Defendants engaged in "fraudulent concealment." Under the "fraudulent concealment" doctrine, a plaintiff may recover outside a statute of limitations window when a defendant has fraudulently concealed his wrongful conduct.

To prove fraudulent concealment, Dexon must show that:

(1) Either Defendant took affirmative acts to conceal the conduct complained of through actions to minimize suspicion and prevent inquiry; and

---

[190] **Authority**: Adapted from *Texas v. Allan Constr. Co.*, 851 F.2d at 1528; *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1169 (5th Cir.1979); *Greenhaw v. Lubbock Cnty. Beverage Ass'n*, 721 F.2d 1019, 1030 (5th Cir. 1983) (overruled in part on unrelated grounds); *In re Pool Prods. Distribut. Market Antitrust Litig.*, 940 F.Supp.2d 367 (E.D. La. 2013).

(2) That Dexon exercised due diligence, but failed to discover the facts earlier that form the basis of the claims.

An affirmative act is not satisfied if the defendant was simply silent. The defendant must take an active step towards deceiving the plaintiff. However, the acts that demonstrate fraudulent concealment do not need to be separate from the acts underlying the wrong itself. For example, in the antitrust context, covert price-setting sessions and secret agreements can all provide sufficient evidence for fraudulent concealment, even though those actions are also part of the antitrust violation.  Here, Dexon asserts that Defendants took acts to conceal the conspiracy from Dexon and West Penn and that Dexon exercised due diligence in bringing the claims when it did.

If you believe that Defendants engaged in fraudulent misconduct, you may award Dexon damages dating back to 2015.

**C.     Options**

Ladies and gentlemen of the jury, I understand that this is confusing to apply in practice. To help inform your decision, I will present you with three scenarios to help make things clearer:

- If you find that Defendants' conduct was neither a continuing violation, nor that Defendants engaged in fraudulent concealment, you may not consider Defendants' business dealings with West Penn Hospital as a basis to recover damages.

- If you find that Defendants' conduct was a continuing violation, but that Defendants did not engage in fraudulent concealment, you may use Defendants' business dealings with West Penn Hospital as support for Dexon's claim to support a recovery of damages for the four-year statute of limitations period from April 27, 2018 to April 27, 2022.

If you find that Defendants engaged in fraudulent concealment, regardless of whether Cisco's conduct was a continuing violation, you may use Defendants' business dealings with West Penn

Hospital as a basis to support a recovery of damages from 2015 through the present.]]

[[Defendants' Proposal:

**17.     What Dexon Is Not Challenging**

In making the foregoing assessments, you are instructed that this case involves a challenge to Defendants' alleged conduct, but not to Defendants' policies.[191]   Dexon's claims do not challenge Cisco's policies of maintaining an authorized network of distributors and resellers, prohibiting those distributors and resellers from reselling to unauthorized resellers for further resale, limiting SMARTnet to networking equipment purchased from authorized resellers or unauthorized resellers only following recertification and inspection of the equipment, or notifying customers of Cisco's publicly disclosed SMARTnet policies.  Dexon does not dispute that those policies are lawful and not anticompetitive.[192]]]

**18.     Closing Instructions**

The parties understand that the Court has its own form of closing instructions; accordingly, they have not proposed submissions in that regard.

---

[191] *See* Dexon MSJ Sur-reply (Dkt. 378) at 3 ("Dexon's case is not about Cisco's abstract policies . . .").

[192] *See* Cisco MSJ (Dkt. 326) at Ex. 4 (Maness Tr.) at 66:6-67:1 (no opinion that establishing an authorized distribution network of resellers is anticompetitive), 79:8-80:5 (no opinion that policy prohibiting authorized resellers from buying from or selling to unauthorized resellers for further resale is anticompetitive), 81:10-82:14 (no opinion that policy limiting manufacturer warranty to purchases from authorized resellers is anticompetitive), 82:16-83:11 (no opinion that policy stating products purchased from unauthorized resellers are not automatically eligible for SMARTnet is anticompetitive), 88:7-13 (policy in End User License Agreement ("EULA") permitting software audits "on its own would not be anticompetitive").