**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| DEXON COMPUTER, INC., | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 5:22-cv-00053-RWS-JBB |
| | ) |
| v. | ) |
| | ) |
| CISCO SYSTEMS, INC. and CDW | ) |
| CORPORATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANTS' RESPONSE TO DEXON COMPUTER, INC.'S**
**MOTIONS *IN LIMINE***

██████████████████████████████████████████████

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS..........................................................................................................i

TABLE OF AUTHORITIES .................................................................................................ii

I.      Dexon Motion No. 3 – Counterfeit Sales.........................................................1

II.     Dexon Motion No. 2 – Parallel Proceedings ...................................................9

III.    Dexon Motion No. 4 – Investigations.............................................................10

IV.    Dexon Motion No. 1 – Litigation Funding .....................................................13

V.     Dexon Motion No. 5 – Treble Damages..........................................................14

VI.    Dexon Motion No. 6 – Declarations ...............................................................14

CONCLUSION.....................................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Lab'ys. v. Sandoz, Inc.*, 743 F. Supp. 2d 762 (N.D. Ill. 2010) ......................................... 10

*Ballou v. Henri Studios, Inc.*, 656 F.2d 1147 (5th Cir. 1981) ........................................................ 6

*Cisco Sys., Inc. v. Dexon Comput., Inc.*, 2023 WL 6466384
(N.D. Cal. Oct. 3, 2023) ........................................................................................................ 9

*Cisco Sys., Inc. v. Dexon Comput., Inc.*, No. 20-cv-04926-CRB
(N.D. Cal. Dec. 15, 2023) ...................................................................................................... 9

*Downs v. River City Grp., LLC*, 2015 WL 631294 (D. Nev. Feb. 13, 2015) ............................... 9

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368
(S.D.N.Y. 2010) ...................................................................................................................... 8

*Fox v. Taylor Driving & Salvage Co.*, 694 F.2d 1349 (5th Cir. 1983) ....................................... 14

*Graef v. Chem. Leaman Corp.*, 106 F.3d 112 (5th Cir. 1997) ..................................................... 6

*H & B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239 (5th Cir. 1978) .............................. 3

*Huawei Technologies Co. v. T-Mobile US, Inc.*, 2017 WL 11638984
(E.D. Tex. Sept. 29, 2017) ............................................................................................. 12, 13

*Innovation Scis., LLC v. Amazon.com, Inc.*, 2020 WL 4884000
(E.D. Tex. Aug. 20, 2020) .................................................................................................... 10

*Intell. Ventures II LLC v. FedEx Corp.*, 2018 WL 10638138
(E.D. Tex. Apr. 26, 2018) .............................................................................................. 13, 14

*Jamar v. Jacobs Technology, Inc.*, 2012 WL 4815532 (N.D. Ala. Oct. 4, 2012) ........................ 5

*Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368
(5th Cir. 1977) ........................................................................................................................ 4

*Luv N' Care, Ltd. v. Groupo Rimar*, 2018 WL 11416995
(W.D. La. Mar. 27, 2018) ..................................................................................................... 14

*Luv N' Care v. Laurain*, 2021 WL 7907283 (E.D. La. Mar. 29, 2021) .................................. 5, 10

*Maxell, Ltd. v. Apple Inc.*, 2021 WL 3021253 (E.D. Tex. Feb. 26, 2021) .................................. 10

*Microsoft Corp. v. Comput. Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945
  (W.D.N.C. 2000) ......................................................................................................... 3

*Moss v. Ole S. Real Est., Inc.*, 933 F.2d 1300 (5th Cir. 1991) .................................... 12

*Parsons v. Ford Motor Co.*, 669 F.2d 308 (5th Cir. 1982) ......................................... 4

*Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*,
  2009 WL 290950 (W.D. Okla. Feb. 5, 2009) ................................................... 9

*Price v. PCS Nitrogen Fertilizer, LP*, 2010 WL 11538362
  (M.D. La. Feb. 17, 2010) ...................................................................................... 12

*Reinig v. RBS Citizens, N.A.*, 2017 WL 3706285 (W.D. Pa. Aug. 28, 2017) .............. 10

*ResMan, LLC v. Karya Prop. Mgmt., LLC*, 2020 WL 6271214
  (E.D. Tex. Oct. 26, 2020) ............................................................................. 5, 6, 12

*Roda Drilling Co. v. Siegal*, 2009 WL 1926269 (N.D. Okla. June 29, 2009) .............. 10

*Solofill, LLC v. Rivera*, 2018 U.S. Dist. LEXIS 116848 (C.D. Cal. May 16, 2018) .......... 10

*Sports Ctr., Inc. v. Riddell, Inc.*, 673 F.2d 786 (5th Cir. 1982) .................................. 4

*Smith v. Universal Servs., Inc.*, 454 F.2d 154 (5th Cir. 1972) ................................... 15

*Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) .............. 3

*TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2021 WL 6333018
  (E.D. Tex. Oct. 18, 2021) ...................................................................................... 12

*Tripkovich v. Ramirez*, 2015 WL 13544196 (E.D. La. June 30, 2015) ....................... 13

*United My Funds, LLC v. Perera*, 470 F. Supp. 3d 660 (E.D. Tex. 2020) .................. 12

*United States v. Babichenko*, 2022 WL 1396136 (D. Idaho May 3, 2022) .............. 6, 7

*United States v. Gluk*, 831 F.3d 608 (5th Cir. 2016) .................................................. 12

*United States v. Guerra*, 402 F. App'x 973 (5th Cir. 2010) ........................................ 6

*United States v. Jordan*, 364 F. Supp. 3d 665 (E.D. Tex. 2019) ............................... 13

*United States v. Ocwen Loan Servicing, LLC*, 2016 WL 1031157
(E.D. Tex. Mar. 15, 2016)................................................................. 13

*United States v. Powers*, 168 F.3d 741 (5th Cir. 1999) ..................... 6

*V5 Technologies v. Switch, Ltd.*, 334 F.R.D. 306 (D. Nev. 2019) ............... 13

**STATUTES AND RULES**

15 U.S.C. § 15(a) .................................................................... 3

Fed. R. Evid.:

      Rule 403 ..................................................... 5, 6, 9, 11, 13

      Rule 403, Advisory Committee Note.......................... 6

      Rule 404 ........................................................... 12

      Rule 703 ........................................................... 14

## I.  Dexon Motion No. 3 – Counterfeit Sales

***Overview***:  Dexon's motion seeks to exclude evidence concerning the procurement and sale of counterfeit "Cisco" equipment, including specific incidents in which Dexon has procured and sold counterfeit equipment.  As the Court noted in its Report and Recommendation on Dexon's motion to strike, however, evidence about counterfeit equipment, and Dexon's sales of counterfeit in particular, is relevant to several matters that Dexon itself put at issue.  *See* Dkt. 451 ("R&R") at 12 ("Cisco needs to raise some aspects of the counterfeiting issue because Dexon's claims in its complaint first raised the issue.").  Dexon touts the quality of the products it sells, challenges as anticompetitive "FUD" when Cisco truthfully informs customers that it cannot stand behind or vouch for the authenticity of Dexon's products, and attacks policies that exist to halt trafficking in counterfeit.  Each of Dexon's arguments – as to relevance, prejudice, and notice – fails.

***Relevance***:  Dexon briefly disputes relevance (at 8-9), but there are multiple independent reasons that evidence of Dexon's counterfeit sales is relevant:

*First*, Dexon put its practice of selling counterfeit equipment at issue by alleging it sells high-quality products while Cisco falsely tells customers that Dexon sells "bootleg" products.  *See* Am. Compl. ¶ 6.  Dexon's opening expert report likewise asserts that Dexon is a reputable purveyor of quality products, contrary to Cisco's claims.  *See*, *e.g.*, Ex. 1 (Maness Rep.) at ¶¶ 83, 93-96.  Dexon also put at issue its counterfeit sales to customers broadly – not just those in the complaint – by alleging Cisco engages in anticompetitive "FUD" when it tells customers that Cisco cannot vouch for the authenticity of Dexon's products.  Cisco needs to inform the jury that Cisco tells this to customers because Cisco knows Dexon has sold counterfeit to customers previously.  The information Cisco shares – and Cisco's belief in the truth of that information – cannot be divorced from Cisco's knowledge of Dexon's business practices.  *See* R&R at 12-13 ("Dexon's request would allow Dexon to claim Cisco falsely told end customers that Dexon sells 'bootleg'

equipment while preventing Cisco from offering its side of that story . . . .").

*Second*, Dexon put several of its specific sales of counterfeit equipment at issue by alleging that Cisco interfered with particular Dexon customers to whom Dexon sold counterfeit "Cisco" gear.  *See* Am. Compl. ¶ 7 (████████),[1] ¶ 51 (████████),[2] ¶¶ 58-60 (████████).[3]  Dexon even identified those same customers in its damages disclosure.[4]  *See* R&R at 7 n.3 (explaining that "evidence of *specific* instances of Dexon's alleged sale of counterfeit goods may go to Dexon's claim that Cisco falsely told customers that Dexon sells counterfeit products").

*Third*, Dexon repeatedly claims that Cisco has no "legitimate business purpose" for its conduct.  *See* Am. Compl. ¶¶ 112, 118, 124, 134.  But each policy at issue – the authorized reseller channel ("conspiracy"),[5] the SMARTnet rules ("tying"),[6] and sharing with customers truthful

---

[1] *See* Ex. 2 (████████ at 3.
[2] *See* Ex. 3 (████████; Ex. 4 (████████; Ex. 5 (CISCO00008604); *see also* Ex. 6 ████████
[3] *See* Ex. 7 (CISCO00035586); Ex. 8 (CISCO00003102).
[4] Dexon's damages disclosure identified only ████████  *See* Ex. 9 (Dexon's Second Am. Initial Disclosures) at 9-10.  Cisco determined that Dexon had sold counterfeit to three of those five.

[5] Cisco's partner agreement prohibits sale of "Non-Genuine Products," including products that "are produced with the intent to counterfeit or imitate a genuine Cisco product."  Ex. 10 (CISCO00793824). Defendants' expert economist opined in his opening report – in an opinion Dexon has never challenged – that this policy limits sales of "counterfeit" products because such sales harm consumers and Cisco's brand reputation, diminishing its competitiveness.  *See* Ex. 11 (Ugone Rep.) at ¶¶ 9, 52 & n.80, 53-54, 111(c).

[6] Cisco's public "non-entitlement" policy for SMARTnet states that "[n]on-[g]enuine" gear – including "any" product "produced with the intent to counterfeit or imitate a genuine Cisco Product" – is ineligible. Ex. 12.  Such disclosures are prominent on Cisco's website.  *See*, *e.g.*, Ex. 13 (Buy Right – Buy Authorized Cisco) (explaining that purchases from unauthorized resellers "may not be automatically eligible for Cisco support" and that these might be "Counterfeit Cisco products").  Defendants' expert economist opined – in another unchallenged opinion – that this policy is necessary for Cisco to offer SMARTnet at competitive prices.  *See*, *e.g.*, Ex. 11 (Ugone Rep.) at ¶ 10 ("[I]f Cisco did not verify that the gray market product was a genuine Cisco product, customers would be incentivized to purchase cheaper counterfeit products and then have them replaced at Cisco's expense."), ¶ 115(a) ("This would increase the costs incurred by Cisco to offer the SMARTnet service, some of which would be passed on to customers.").

information about Dexon ("FUD")[7] – helps to combat trafficking in counterfeit.[8]  And it is well established that such a legitimate business purpose suffices to defeat an antitrust claim.  *See* R&R at 7 ("Dexon fails to show actions allegedly taken to reduce counterfeiting cannot, as a matter of law, be raised as a procompetitive justification in this antitrust suit.").[9]  For example, in *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186 (2d Cir. 1992) – with Justice Marshall sitting by designation and writing for the court – the Second Circuit affirmed summary judgment for an antitrust defendant because the plaintiff "offered no evidence to cast doubt on the legitimate business justifications [defendant] proffers for its intrabrand restrictions," including that "its policy allows it to better identify and combat counterfeit."  *Id.* at 189-90.[10]

*Fourth*, Dexon put at issue its trafficking of counterfeit products to customers beyond those identified in the complaint by alleging that Defendants caused Dexon's supposed injury,[11] *and* by then proffering a damages theory that the conduct harmed Dexon's "███████████████████"

---

[7] The standard disclosure Cisco shares with customers (and that Dexon challenges as "FUD") states: "When products are not sold through Cisco's authorized sales channels, Cisco can offer no assurance as to the authenticity, provenance, or quality of those products."  *See, e.g.*, Ex. 14 (CISCO00442940).

[8] Dexon itself acknowledges (at 6) that "Defendants may need limited evidence that counterfeit is a high-level business concern" as part of the "business justification" for the policies at issue.

[9] *See also Microsoft Corp. v. Comput. Support Servs. of Carolina, Inc.*, 123 F. Supp. 2d 945, 952 (W.D.N.C. 2000) (striking antitrust counterclaims in part because claimant had no "right to acquire or distribute counterfeit, or black market, copies of Microsoft software").

[10] *See also Trans Sport*, 964 F.2d at 190 ("[I]ts no-transshipment policy and refusal to deal allow it to select only those retailers that are consistent with the quality and image it wishes to project for its products," which "valid business rationales are sufficient to establish a *prima facie* case for lawful conduct . . . even if profit maximization is its ultimate objective.").

[11] Dexon bears the burden of causation, i.e., proving that the alleged injury flows from Defendants' conduct and not Dexon's own business practices.  *See* 15 U.S.C. § 15(a) (requiring antitrust plaintiff to prove harm "by reason of" an antitrust violation); *see also H & B Equip. Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business, and must provide some indication of the amount of damage done."). ████████████████████████████
████████████████████.  *See, e.g.*, Ex. 15 (███████████████; Ex. 16 (████████████; Ex. 17 (███████████████); *see also* Ex. 18 ████████████████████████████████████████████████████████████████

and thereby ██████████████████████████████████████. Ex. 1 (Maness Rep.) at ¶¶ 7,

129. Dexon seeks damages for ████████████████████████████████████████

████████████████████████████████, *see id.* ¶¶ 128-135 – placing on Dexon the burden to

make a showing as to its reputation. Evidence that Dexon has lost sales because it has sold

counterfeit is therefore relevant to both causation and damages.

*Fifth*, Cisco has alleged a "legitimate business justifications" affirmative defense for which

Dexon's trafficking in counterfeit is relevant as a matter of law. *See*, *e.g.*, *Sports Ctr., Inc. v.*

*Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir. 1982) (manufacturer "was entitled to impose and enforce

a reasonable anti-bootlegging policy" in "combination with its legal right to terminate a retailer");

*Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 376 (5th Cir. 1977)

(antitrust defendant "is free to demonstrate that the [alleged] tie constitutes a necessary device for

controlling the quality of the end product sold to the consuming public").[12]

*Sixth*, Defendants must be permitted to impeach Dexon's witnesses as untruthful. For

example, if Steve O'Neil – Dexon's founder, CEO, and sole owner – testifies that Dexon is a

reliable company that sells genuine and authentic products, Cisco should be able to show on cross-

examination that Dexon has repeatedly sold counterfeit products and lacks adequate procedures to

avoid doing so. █████████████████████████████████████████████

███████████████████████████. *See* Ex. 19 █████████████████████. He██

████████████████████████████████████████████████████████████

██████████████████████████████████████. In other words, ██████

████████████████████████████████████████████. Dexon argues (at 6-8)

---

[12] *See also Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 (5th Cir. 1982) ("Neither Ford nor many of its dealers like bootlegging, and they therefore took proper steps to ensure against future manipulation of the fleet allocation system. Enforcement of the company's fleet allocation system policy is not equivalent to conspiracy.").

that evidence of its trafficking in counterfeit will likely undermine the credibility of its witnesses, but that is a further reason that exclusion of this evidence would unfairly prejudice Cisco.

The relevance of this evidence to these core issues distinguishes the cases Dexon cites (at 8-9). In *Luv N' Care v. Laurain*, 2021 WL 7907283 (E.D. La. Mar. 29, 2021), the defendant agreed not to refer to the plaintiff's products "as counterfeits . . . *because* [the defendant] has never asserted a counterfeit claim against [the plaintiff]" and the allegedly counterfeit products were not "any product at issue in this litigation." *Id.* at *3 (emphasis added). But the court permitted the defendant to show that the plaintiff had "*infringed* one or more of its intellectual property rights" – denying a motion in limine on that issue – because infringement was relevant and at issue in that case. *Id.* Here, Dexon specifically put at issue legal claims, theories, and even specific transactions concerning counterfeit; and Cisco has, from the start, made clear that its defense depended in part on showing that Dexon sells counterfeit Cisco equipment. In the other case Dexon cites, *Jamar v. Jacobs Technology, Inc.*, 2012 WL 4815532 (N.D. Ala. Oct. 4, 2012), the court precluded reference to "race-based harassment" because "plaintiff never asserted a harassment claim" and the persons who made supposedly "race-based comments" were "not involved in making any employment decisions." *Id.* at *2. By contrast, here Dexon has repeatedly put at issue business practices that target counterfeit and specific transactions in which Dexon distributed counterfeit "Cisco" products.

**Prejudice**: Dexon argues (at 6-9) that the foregoing evidence will prejudice Dexon because the jury will "label" it as a "counterfeiter" and attribute to Dexon a reputation for dishonesty.

But Rule 403 bars relevant evidence only upon a showing of "*unfair* prejudice" that "*substantially*" outweighs probative value – both components are required – which is a "high standard" in this District. *ResMan, LLC v. Karya Prop. Mgmt., LLC*, 2020 WL 6271214, at *3

(E.D. Tex. Oct. 26, 2020).[13]  There is ample evidence that Dexon does sell counterfeit;[14] for this

reason, Dexon cannot show that the evidence of its counterfeit sales is *unfairly* prejudicial, let

alone that any prejudice "substantially" outweighs the probative value of the evidence.  Dexon

merely asserts (at 8) that this evidence will "materially prejudice" its "legal claims."  But "all

probative evidence is by its very nature prejudicial."  *United States v. Powers*, 168 F.3d 741, 749

(5th Cir. 1999); *Graef v. Chem. Leaman Corp.*, 106 F.3d 112, 118 (5th Cir. 1997) ("Evidence is

not prejudicial merely because admitting it may sway the jury against a party.").  Prejudice that is

*unfair* arises from "an undue tendency to suggest decision on an improper basis."  Fed. R. Evid.

403, Advisory Committee Note; *accord Ballou v. Henri Studios, Inc.*, 656 F.2d 1147, 1155-56 (5th

Cir. 1981) (finding Rule 403 exclusion reversible error).[15]  Dexon makes no argument about that

type of prejudice, nor could it.  There is nothing "improper" about deciding that Cisco did not

violate the antitrust laws by enforcing anti-counterfeiting policies against an unauthorized reseller

that decided not to follow Cisco's anti-counterfeiting policies and sold counterfeit to customers.

Dexon's single case on this point (at 7) is not to the contrary.   In *United States v.*

---

[13] Dexon half-heartedly suggests (at 7) the issue might be juror confusion, arguing both that "[c]ounterfeiting is not an obscure concept" *and* "[c]ounterfeit is such a confusing and prejudicial concept." That is self-contradictory; in any event, there is no serious reason to think that the jury will be unable to understand what counterfeit means.

[14] *See infra* n.17 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮). Several of Dexon's witnesses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮. *See, e.g.*, Ex. 20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 6 ▮▮▮▮▮▮▮▮▮▮▮▮ ▮; Ex. 21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 22 ▮▮▮▮▮▮▮▮▮▮▮▮

[15] *See also United States v. Guerra*, 402 F. App'x 973, 975-76 (5th Cir. 2010) (stating "Rule 403 sets a high standard for exclusion" requiring "a genuine risk that the emotions of the jury will be excited to irrational behavior, *and* that this risk is disproportionate to the probative value of the offered evidence").

*Babichenko*, 2022 WL 1396136, at *1, *3 (D. Idaho May 3, 2022), the court denied as "foolishness" an objection to use of the word "counterfeit," calling the notion "impractical and awkward." Because of counterfeiting's relevance and despite potential prejudice or confusion, the court held it would "not order a ban on the term at trial." *Id.* (stating the "term" "counterfeit" could be "used sparingly" *because* there are "synonyms" that "[c]ounsel and witnesses should be comfortable using," including "non-genuine, inauthentic, fake, not real, knock-off, etc." while recognizing that "counterfeit" can be "part of witnesses' natural vocabulary").[16]

***Notice***:  Although Dexon argues (at 8) that it did not have sufficient notice of the counterfeit issue such that it could be "tested or disproved," this Court has held, to the contrary, that "Dexon had sufficient notice to prepare for and contest the defense," including because it "has been free to pursue discovery into these matters and has noticed the depositions of multiple Cisco witnesses who are responsible for the enforcement of Cisco's brand protection measures." R&R at 12.  Dexon had ample notice, both through its own claims and allegations as well as through Cisco's repeated disclosure that it would prove Dexon's claims fail and Cisco's defense succeeds because Dexon traffics in counterfeit.  Dexon also has taken nonparty discovery about counterfeit sales and proffered an anti-counterfeiting expert who opines at length on the issue (as to both Cisco's anti-counterfeiting policies and Dexon's sales of potentially counterfeit "Cisco" products).

Dexon asserts (at 8) that it is missing "detailed technical and operational Cisco evidence related to alleged counterfeits" – but never says what that evidence might be.  Dexon has not moved to compel on any missing counterfeit materials, nor has it met and conferred with Cisco as to what Dexon could plausibly be missing.  And for good reason: ████████████████████

---

[16] Dexon moves to exclude use of any "synonym" of counterfeit, despite alleging in its complaint that Cisco incorrectly claims Dexon sells "bootleg" products. *See* Am. Compl. ¶ 6.

████████████████████████████████████████ ████████████

████████████████████████████████████████" Dexon used all that discovery

and more in support of an anti-counterfeiting expert who opines that "Dexon Has Taken

Reasonable Efforts To Prevent Counterfeit" and that *Cisco's* anti-counterfeiting measures are

inadequate.[18]  *See* Ex. 29 (Mosteller Rep.) at Parts V-VI.

Dexon claims (at 8) that "there was no disclosure of expert testimony that a device, in any

specific instance, was a counterfeit device."  This is misdirection.  There is ample evidence from

ordinary-course business documents that Cisco determined that Dexon had sold counterfeit

"Cisco" equipment, and Cisco disclosed as knowledgeable fact witnesses Cisco product engineers

(whom Dexon deposed) competent to testify as to how those determinations were made.  *See*, *e.g.*,

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 376, 381-82 (S.D.N.Y. 2010)

(permitting employee to testify that items were counterfeit because he "inspected each [item] for

indicia of counterfeiting and supervised the preparation of the Authenticity Report," he had

"particularized knowledge . . . by virtue of his . . . position in the business," and his testimony was

helpful and "rationally based on his perceptions").  Furthermore, ████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 30 (LaMagna

---

[17] *See*, *e.g.*, Ex. 23 (CISCO00008602) (█████████████████████████████████); Ex. 24
(CISCO00009443) (████████████████████████████████); Ex. 25 (CISCO00010499)
(████ ██ ████ █ ████ █ ██████ █████████; Ex. 26 (CISCO00797018);
Ex. 27 (CISCO00797030); Ex. 28 (CISCO00797033) ███████████████████████████
██████.

[18] The heading for Dexon's motion also seeks (at 6) to exclude mention of "the process by which Cisco
determines whether a product is counterfeit."  But the motion does not explain why evidence concerning
that *process* is irrelevant – Dexon's expert put at issue the accuracy of Cisco's process – or unduly
prejudicial.  Further, the process by which Cisco detects counterfeit is relevant to its enforcement of anti-
counterfeiting policies, which Dexon concedes (at 6) are relevant to the "business justification" issues.

Rep.) at ¶ 117.  In all events, Dexon's position has nothing to do with Rule 403, which does not require a certain type or amount of expert evidence for admissibility; this is at most an argument about the weight and sufficiency of the evidence, which are determinations for the fact finder.

## II.   Dexon Motion No. 2 – Parallel Proceedings

With respect to Dexon's motion to preclude broadly any reference to prior litigation, Defendants seek to give the jury just two facts:  (1) Cisco sued Dexon before Dexon initiated this antitrust case; and (2) the court where Cisco brought its lawsuit has preliminarily enjoined Dexon from continuing to sell counterfeit "Cisco" equipment.[19]  This tailored context is highly relevant for the foregoing reasons,[20] and for responding to claims that Dexon put at issue.

For example, Dexon repeatedly claims Cisco knowingly approved Dexon-sold service contracts that Cisco would later refuse to honor.  *See, e.g.,* Am. Compl. ¶¶ 46, 108.  The fact that Cisco is suing Dexon – including for procuring and selling SMARTnet without Cisco's knowledge or authorization – is highly relevant to the (false) theory Dexon chose to put at issue.  *See Downs v. River City Grp., LLC*, 2015 WL 631294, at *2 (D. Nev. Feb. 13, 2015) (denying similar motion where other litigation was relevant to proving knowledge); *Ponca Tribe of Indians of Okla. v. Cont'l Carbon Co.*, 2009 WL 290950, at *2-3 (W.D. Okla. Feb. 5, 2009) (similar).

Further, Dexon's anti-counterfeiting expert claims that Cisco does not take sufficient action against resellers like Dexon that are suspected of selling counterfeit, e.g.:

- "Cisco's brand protection practices are directly at odds with its stated goal. . . . The stated goal is to protect the consumer from counterfeits, which, according to best practices, should be done by targeting resellers, distributors and manufacturers that are suspected of engaging in the sale or resale of counterfeit goods."

---

[19] *See Cisco Sys., Inc. v. Dexon Comput., Inc.*, 2023 WL 6466384, at *4, *7 (N.D. Cal. Oct. 3, 2023) (barring Dexon "from selling counterfeit Cisco products"); *see also Cisco Sys., Inc. v. Dexon Comput., Inc.*, No. 20-cv-04926-CRB (N.D. Cal. Dec. 15, 2023), at Dkt. 325 (denying motion to stay).

[20] Almost all of Dexon's argument on this motion is that evidence it traffics in counterfeit is "waived" (at 4) or irrelevant (at 5).  Defendants addressed those issues above and do not repeat them here.

- And, "the most logical and effective means of combatting counterfeit or threats to the brand are to first investigate the partner and/or reseller channels."

*See* Ex. 29 (Mosteller Rep.) at ¶¶ 16(a), 22. Dexon has thus opened the door but improperly seeks to preclude Defendants from responding with the relevant evidence, i.e., the fact that Cisco sued Dexon to stop it from selling counterfeit. *See Reinig v. RBS Citizens, N.A.*, 2017 WL 3706285, at *3 (W.D. Pa. Aug. 28, 2017) (permitting reference to *relevant* prior litigation probative of "policy or practice" at issue); *see also Innovation Scis., LLC v. Amazon.com, Inc.*, 2020 WL 4884000, at *1 (E.D. Tex. Aug. 20, 2020) (permitting reference to settlement licenses arising in "the context of prior litigation" that were "relevant" to claims and defenses at issue).

Dexon's cases establish the propriety of introducing this narrowly tailored information.[21] For example, Dexon cites (at 3) *Maxell, Ltd. v. Apple Inc.*, 2021 WL 3021253 (E.D. Tex. Feb. 26, 2021), in which this Court explained that, while "[e]vidence of prior verdicts can be prejudicial and must be treated with great care, . . . it is admissible if it is relevant to a material issue in the case and its use is limited to the purpose for which it is relevant." *Id.* at *6. Another in-District case that Dexon cites (at 8-9) *denied* a motion in limine to preclude evidence of prior litigation, holding the other litigation was "relevant to claims in this case and should not be excluded if presented in the proper context." *Luv N' Care*, 2021 WL 7907283, at *15.

## III. Dexon Motion No. 4 – Investigations

There are two aspects to this motion; both should be denied.

*First*, Dexon's issue heading (at 10) seeks to exclude evidence that Dexon ███████████

---

[21] Numerous other cases agree as to the preliminary injunction, specifically. *See*, *e.g.*, *Solofill, LLC v. Rivera*, 2018 U.S. Dist. LEXIS 116848, at *9 (C.D. Cal. May 16, 2018) (allowing reference to denial of a preliminary injunction); *Abbott Lab'ys v. Sandoz, Inc.*, 743 F. Supp. 2d 762, 787 (N.D. Ill. 2010) ("Evidence of the Court's preliminary injunction and product recall order are directly relevant to the issue of damages."); *Roda Drilling Co. v. Siegal*, 2009 WL 1926269, at *1 (N.D. Okla. June 29, 2009) (denying in part motion in limine, permitting "[c]oncise evidence" that the court entered a preliminary injunction).

████████████████████████████████████████████████████████████████████.[22]  But that evidence is directly relevant to Dexon's assertion that it makes good-faith efforts to avoid selling counterfeit.  ███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████."  *See* Ex. 29 ██████████████████████.  Dexon's brief does not explain why this evidence is irrelevant or even argue that it is unfairly prejudicial – waiving any Rule 403 argument as to this evidence and issue.[23]

*Second*, Dexon seeks to exclude (at 10-12) evidence that ████████████████████████████████████████████████████████████████████████.[24] ███████████████████████████████████████████████████████████████████████.  Further, ████████████████████

██████████████████████████████████████████████████████████████████████

████████████████████.[25]  The ███████████████████████ relevant to proving Cisco's knowledge of Dexon's business practices, which informs Cisco's decision to tell customers that Cisco cannot guarantee the provenance and quality of equipment that Dexon sells – i.e., the "FUD" claim that Dexon chose to bring – also as explained *supra.*  The ███████████████████ also proves Dexon is on notice that it has been suspected of trafficking in counterfeit "Cisco" products,

---

[22] Dexon's anti-counterfeiting expert nonetheless has an entire opinion called, "Dexon Has Taken Reasonable Efforts To Prevent Counterfeit."  *See* Ex. 29 (Mosteller Rep.) at Part VI.  Dexon's failure to send *any* alert to *anyone* when it learns about counterfeit is relevant to that opinion.

[23] Dexon also has waived any argument concerning evidence that it sells stolen products.  Despite including this in the header of its motion, Dexon makes *zero* argument disputing the relevance of such evidence or explaining why it would be *unduly* prejudicial. ████████████████████████████████ █████████████████████████████."  Ex. 19 (████████████████████.

[24] Dexon's witnesses testified about the FBI raid.  *See* Ex. 6 (Kaas Tr.) at 212:19-213:5; Ex. 31 (Lang Tr.) at 164:7-165:6; Ex. 19 (O'Neil Tr.) at 163:19-165:4; Ex. 22 (Tveitbakk Tr.) at 131:9-132:7.

[25] Discovery revealed evidence in Dexon's possession concerning ██████████████████████████ ██████████████████████████████████████████████████████████.  *See* Ex. 32 ████████████████████████████; *see also* Ex. 30 ██████████████████████████████████████████████████████████████████████ ████████████████████████████████████  *See* Ex. 33 ████████████████████.

belying its unfounded allegation that Cisco spreads false information regarding Dexon-sold products. Finally, this evidence also is relevant to Dexon's "bait-and-switch" claim – and Dexon's knowledge that Cisco does not knowingly approve its SMARTnet sales – as ████████████ ████████████████████████████████████████████████████████████ ████████. *See* Ex. 34 (████████████████████████.

Dexon posits (at 11) that this evidence will "unfairly prejudice Dexon" because it will suggest Dexon is "engaged in illegitimate activities." The jury may make that connection, but it is a consequence of how Dexon runs its business; it is not undue prejudice as a matter of law. *See ResMan*, 2020 WL 6271214, at *1, *3 (holding the prejudice "must be 'unfair'" and "*substantially outweighing*" of probative value).[26] Indeed, this Court has already held that evidence of ████ ████████████████████████ can be admissible in a civil antitrust trial. ████████████



The case Dexon cites (at 12) – *Huawei Technologies Co. v. T-Mobile US, Inc.*, 2017 WL 11638984 (E.D. Tex. Sept. 29, 2017) – is instructive. The district court there refused a blanket

---

[26] Dexon invokes Rule 404(b), which "is applied almost exclusively to criminal cases" and bars evidence in "the civil context . . . in extremely limited circumstances" that Dexon does not attempt to show here or otherwise seriously argue. *ResMan*, 2020 WL 6271214, at *1. Further, Rule 404(b)(2) expressly permits evidence of prior acts to show "knowledge" as well as "opportunity" and "plan." As to proving that Dexon sold counterfeit "on a particular occasion" – which is what Rule 404(b)(1) addresses – Defendants have direct evidence to make such a showing, as explained *supra*.

order like the one Dexon seeks because "the door may be opened" to relevance of prior investigations if the plaintiff "presents evidence or argument that [plaintiff] generally respects intellectual property rights." *Id.* at *2. That is exactly what Dexon has done by asserting it sells quality products – and that Cisco does a bait and switch – thereby already opening the door.

## IV. Dexon Motion No. 1 – Litigation Funding

Defendants seek a narrow allowance: if Dexon opens the door with a "David vs. Goliath" narrative – or claims that it is outmatched financially in litigating this case – then Defendants should be able to ask whether Dexon has litigation funding for this case specifically.[27] Dexon argues (at 1) the existence of litigation funding is irrelevant. Not so if Dexon opens the door, distinguishing every case it cites. *See United States v. Jordan*, 364 F. Supp. 3d 665, 668-69 (E.D. Tex. 2019) (describing the high bar for Rule 403 in such circumstances); *Tripkovich v. Ramirez*, 2015 WL 13544196, at *2 (E.D. La. June 30, 2015) (opening the door defeats Rule 403 motion).

Dexon contends (at 1) that legal privileges protect this information. That is incorrect as a matter of law. Dexon cites *United States v. Ocwen Loan Servicing, LLC*, 2016 WL 1031157 (E.D. Tex. Mar. 15, 2016), in which the district court held that "the names of the litigation funders are relevant." *Id.* at *5. The cases Dexon cites – including *V5 Technologies v. Switch, Ltd.*, 334 F.R.D. 306 (D. Nev. 2019) – concern "documents" (e.g., funding agreements), not asking about the existence of litigation funding if a party opens the door by asserting it is financially outmatched.

Dexon finally observes (at 2) that its motion comes from Chief Judge Gilstrap's standing order. True enough. But Dexon omits that the same standing order bars evidence or argument "concerning any party's overall financial size," *see* Ex. 35 (Standing Order), and that the Chief Judge has barred parties from "painting a David and Goliath scenario." *See*, *e.g.*, *Intell. Ventures*

---

[27] Defendants do not seek to introduce evidence concerning the amount of attorneys' fees or the details of any funding agreements – only whether Dexon is backed by litigation funding.

*II LLC v. FedEx Corp.*, 2018 WL 10638138, at *4 (E.D. Tex. Apr. 26, 2018). Defendants propose

the same balance here – if Dexon opens the door, then Defendants should be able to ask whether

Dexon is in fact financially outmatched.[28]

## V.     Dexon Motion No. 5 – Treble Damages

Dexon incorrectly asserts (at 12-13) that Defendants oppose this motion. They do not. *See*

Ex. 36 (counsel emails reflecting agreement). Dexon further incorrectly asserts (at 13) that

Defendants would not agree to this motion unless Dexon agreed to the "David vs. Goliath" motion.

Defendants instead suggested that this agreed-upon motion prohibit both referring to trebling *and*

suggesting that the potential damages are insignificant, which is irrelevant and prejudicial precisely

because the jury will not hear about trebling (the Court could still make such a ruling).

## VI.    Dexon Motion No. 6 – Declarations

Dexon's motion appears to suggest (at 13-14) that Defendants cannot even use two sworn

nonparty declarations to *cross examine* Dexon witnesses or its expert who discusses the incidents

at issue (and these declarations). Dexon cites no law that supports that dramatic relief; it cites only

Rule 703, which does not concern permissible cross-examination material.[29]

To start, Dexon does not seriously dispute that the declarations are relevant, nor could it.

The ████ declaration (*see* Ex. 37) and ████ declaration (*see* Ex. 38) contradict nearly every

---

[28] Dexon says (at 2-3) that the solution to the introduction of some unduly prejudicial material is not more unduly prejudicial material. Defendants agree: either the claim Dexon will make that it is financially outmatched is not unduly prejudicial, and neither is asking Dexon if it is backed by financers; or the claim Dexon will make that it is financially outmatched is unduly prejudicial and this Court should embrace the Chief Judge's approach by granting both this motion and Defendants' MIL No. V ("David vs. Goliath").

[29] The scope of Dexon's motion is unclear. Dexon correctly acknowledges (at 13) that the nonparty declarations at issue "may be considered by Dr. Ugone pursuant to FRE 703." *See Fox v. Taylor Driving & Salvage Co.*, 694 F.2d 1349, 1356 (5th Cir. 1983) (noting "[a]n expert is permitted to disclose hearsay for the limited purpose of explaining the basis for his expert opinion"). Courts extend Rule 703 to affidavits. *See Luv N' Care, Ltd. v. Groupo Rimar*, 2018 WL 11416995, at *2 (W.D. La. Mar. 27, 2018). Dexon's motion does not explain why Rule 703 would not permit admission of the declarations at issue here, let alone why that Rule might bear on use of the declarations for cross examination.

allegation Dexon makes as to those transactions, as Defendants' expert economist explained. *See*, *e.g.*, Ex. 39 (Ugone Rebuttal) at ¶ 133(a) (concerning ███████), ¶ 135(b) (concerning ███████). Defendants are entitled to cross examine Dexon witnesses and experts who offer testimony contrary to the sworn declarations precisely because they contradict Dexon's telling.

Dexon's entire argument (at 14) is that the declarations are unduly prejudicial, but it does not explain why. It merely observes that the content of the declarations contradicts Dexon's claims, which is not undue prejudice as a matter of law. *See Smith v. Universal Servs., Inc*., 454 F.2d 154, 157 (5th Cir. 1972) (" '[P]rejudicial' cannot be equated with 'harmful' in all cases; rather it connotes 'harmful,' plus 'non-probative.' "). Dexon specifically complains that the declarations "do not address" alleged threats or FUD. Setting aside that this goes to the weight to give the declarations, which is an issue for the factfinder, it is obviously possible that the sworn declarations – submitted under penalty of perjury – omit those events because they never took place.

Finally, Dexon has had and continues to have ample opportunity to respond to the nonparty declarations. Its expert considered both. *See* Ex. 40 (Maness Reply) at ¶¶ 93, 98. Defendants should be permitted to cross-examine Dexon's economist using the declarations he summarily rejected *because* they contradict his narrative. Dexon also has had ample opportunity to take discovery into the declarations, but it has declined to do so. As to the ███████ declaration – which Dexon has had since April 2023 – Dexon never took any discovery from ███████. And as to the ██████ declaration, Dexon still has not deposed Mr. Jacob despite stating that it would do so. *See* Ex. 41 (Hearing Tr.) at 129:21 ("We are going to be deposing Mr. Jacob of ████████.").

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that the Court grant the "Treble Damages" motion (with or without the suggested modification) and deny the remaining motions.

Dated: December 18, 2023

Respectfully submitted,

/s/ Jennifer H. Doan
Jennifer H. Doan
Texas Bar No. 08809050
Mariah L. Hornok
Texas Bar No. 24113074
HALTOM & DOAN
6500 Summerhill Road, Suite 100
Texarkana, TX 75503
Telephone: (903) 255-1000
Facsimile: (903) 255-0800
Email: jdoan@haltomdoan.com
Email: mhornok@haltomdoan.com

James A. Reeder, Jr.
Texas Bar No. 16695010
JONES DAY
717 Texas, Suite 3300
Houston, Texas 77002
Telephone: (832) 239-3939
Fax: (832) 239-3600
Email: jareeder@jonesday.com

Thomas D. York
Texas Bar No. 24095531
JONES DAY
2727 N. Harwood Street
Dallas, TX 75201
Telephone: (214) 969-4523
Fax: (214) 969-5100
Email: tdyork@jonesday.com

Danielle R. Leneck
(admitted *pro hac vice*)
JONES DAY
555 South Flower Street, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 489-3939
Fax: (213) 243-2539
Email: dleneck@jonesday.com

*Attorneys for Defendant CDW
Corporation*

/s/ Deron R. Dacus
DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
LESLIE V. POPE (*pro hac vice*)
KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
lpope@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems,
Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on December 18, 2023, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3). Any other counsel of record will be served by electronic mail, facsimile transmission, and/or first-class mail on this same date.

*/s/ Deron R. Dacus*
Deron R. Dacus

## CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL

The undersigned certifies that, pursuant to Local Rule CV-5(a)(7), the foregoing instrument designated as confidential in accordance with the previously signed Protective Order is authorized by the Court to be filed under seal, including pursuant to Docket No. 211.

*/s/ Deron R. Dacus*
Deron R. Dacus
