UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| DEXON COMPUTER, INC. | § § | |
| v. | § § | Case No. 5:22-cv-53-RWS-JBB<br>SEALED |
| CISCO SYSTEMS, INC. and CDW CORPORATION | § § § | |

## FINAL ORDER ON MOTIONS *IN LIMINE*

This is the final order ruling on the parties' motions *in limine* (Dkt. Nos. 418, 422, 425), amending the preliminary *limine* order (Dkt. No. 472) to include rulings based on the arguments at the January 4, 2023 pretrial conference.[1] To the extent the Court grants an *in limine* item, the parties are instructed to approach the bench before addressing the issue in front of the jury.

### DEFENDANTS' MOTIONS *IN LIMINE* (Dkt. No. 418)

**1) Preclude Dexon from asserting it employs practices to vet vendors**

**DENIED**.

Defendants argue that "Dexon should not be allowed to make any claims regarding procurement policies and practices that – if they exist – are reflected in database notes that Dexon refused to provide despite its obligation to do so." Dkt. No. 418 at 3. According to the briefing, deposition testimony showed Dexon employees maintained a Microsoft Access database that houses "procurement records and notes" concerning certain Dexon vendors. Some, but not all of the information in that database was turned over, including what Dexon describes as "reflect[ing] Dexon's records and notes regarding vendors to avoid purchasing equipment from." Dkt. No. 463

---

[1] Rulings on the following *in limine* items have been added or amended: Defendant's Motion *In Limine* Nos. 4, 5, 6, and 7 and Dexon's Motion *in Limine* Nos. 2, 3, 4, and 6. A *limine* order regarding the Jabber messages is added.

1

at 1. Dexon also claims that the produced documents were "cited and relied upon by both parties' brand protection experts," *id.*, which is consistent with the parties' positions in other pretrial motions. Nevertheless, Defendants argue that it would be "highly prejudicial for Dexon to make claims about its vendor vetting and procurement quality control after withholding the full database." Dkt. No. 418 at 5.

Dexon's quality control process was explored during discovery and addressed by both experts. Defendants do not identify what type of information they have, what time of information they claim is missing, and whether that missing information is unique. These facts make it impossible to grant Defendants' broad request to prevent Dexon from "making any claims regarding procurement policies that – *if they exist*" may exist in unproduced portions of the database. *See* Dkt. No. 418 at 3 (emphasis added). Further, the specific information contained in any vendor notes (or similar) is secondary to the main issue of Dexon's overall procurement policies. That is, the issue of whether Dexon had such quality controls is more relevant to the issues in this case than the content of the specific vendor issues, and there is no indication that Defendants do not have a fair idea of what Dexon claims its quality controls, including portions of the database.

**2)** **Preclude Dexon from stating, suggesting, or implying that Defendants' assertion of legal rights is relevant to Dexon's claims**

**DENIED**.

Dexon alleges that part of Cisco's anticompetitive conduct includes its spreading of fear, uncertainty, and doubt ("FUD") to end users about using unauthorized resellers like Dexon. Some of the evidence includes Cisco employees stating or suggesting end customers could face legal liability from Cisco for use (or continued use) of unauthorized, unlicensed, or counterfeit equipment.

Defendants argue that Dexon should not be able to assert that "Cisco 'threatens' customers with litigation" because it may "foment anti-Cisco bias" and is "irrelevant to Dexon's case, as a matter of law." Dkt. No. 418 at 4. Defendants do not explain how such evidence or argument could foment anti-Cisco bias, especially given that Cisco is seeking the ability to tell the jury that it has brought a suit against Dexon for violating IP rights. *See* Dexon's Motion *in Limine* No. 2. Dexon claims Cisco's implied or stated threats of litigation are part of its anticompetitive FUD conduct, and whether Dexon's actions are unlawful or fair business should not be decided on a motion *in limine*. And Defendants' arguments do not support their contention that such threats of litigation are "irrelevant . . . as a matter of law." Defendants' cited cases, which concern the fact-specific applications of the sham exception to the *Noerr-Pennington* doctrine, do not address the situation here – where threats of litigation are part of an alleged anticompetitive scheme concerning FUD and tying.

**3) Preclude Dexon from asserting that Defendants withheld testimony**

**DENIED AS MOOT**.

This concerns Dexon's inability, despite significant effort, to serve a deposition subpoena on third party Sean O'Brian, who formerly served as a lawyer in Cisco's Brand Protection Department. Dexon agrees Joint Motion *in Limine* No. 1 precludes Dexon from discussing this issue without first approaching the bench outside the presence of the jury. Dkt. No. 463 at 4.

**4) Preclude use of evidence concerning testimony of Armin Cao**

**DENIED.**

Defendants request the Court preclude Dexon from offering any evidence relating to or making any mention of Armin Cao (including Dexon's invoice to Mr. Cao (exhibit PX140)). Defendants assert this evidence is irrelevant for three reasons: (1) the transaction was an out-of-market sale, which Dexon has told the Court (in a motion on which Dexon prevailed) is irrelevant;

3

(2) from Mr. Cao's perspective, the purchase was not from Dexon but was from Optdex (Dexon's online alias); and (3) Dexon has collected minimal evidence about this event. According to Defendants, any minimal relevance from this transaction is substantially outweighed by the unfair prejudice.

Although denied, the Court advises Defendants to approach the bench if this issue becomes too much of a focus at trial. The Court further advises Dexon not to obstruct Defendants' ability to present any evidence necessary to show the full transaction.

5) **Preclude "David vs. Goliath" and similar narratives**

**GRANTED, as agreed** as to (1) any pejorative language regarding differences in the resources of the parties (including that Dexon is financially outmatched by Defendants in litigating this case); and (2) any facts that have nothing to do with the case (e.g., past M&A activity or unrelated layoffs), with the expectation that any exhibits that discuss M&A activity will be addressed by the parties.

The parties are precluded from any references to pejorative, inflammatory language intended to inflame the jury based solely on the differences in the size of the parties. However, considering this is an antitrust case involving an alleged monopolist, Dexon (and Defendants) may refer to the relative size of Cisco and CDW compared to Defendants' competitors. Rather than provide limited examples of such language, the Court advises the parties to meet-and-confer to identify appropriate adjective-based descriptions of Cisco or CDW and their competitors in line with this *limine* ruling.

6) **Preclude claims about harm to non-party resellers**

**DENIED**.

Defendants seek to preclude Dexon from offering evidence or making statements about non-Dexon transactions involving non-party resellers not before the Court and from whom Dexon

decided to take no discovery or make any disclosure. Dexon represents it will not argue broad harm to the independent channel in terms not found in Maness's reports or beyond the two examples of Park Place and Emerson. The Court is not convinced it would unfairly prejudice Defendants for Dexon to assert marketwide harm to non-party resellers consistent with these representations.

**7)    Preclude references to time-barred non-conspiracy transactions**

   **DENIED.**

Defendants' summary-judgment MIL is not the proper context, nor a sufficient showing, for the Court to exclude non-conspiracy claims based on limitations. *See Perez v. Superior Ct. of Guam*, No. CV 08-00007, 2011 WL 13209114, at *5 (D. Guam July 19, 2011) ("[T]he Court declines to rule on [Defendant's] statute of limitations argument, presented in the Motion <u>in Limine</u>, because it is procedurally improper."); *Ekweani v. Ameriprise Fin., Inc.*, No. CV-08-01101-PHX-FJM, 2010 WL 749648, at *2 (D. Ariz. Mar. 3, 2010), *aff'd*, 444 Fed. Appx. 968 (9th Cir. 2011) (noting "that it was highly unusual to raise a statute of limitations defense by way of a motion in limine[]" and that it was "a motion properly construed as one for summary judgment"). The Court is further not convinced that events prior to the limitations period are irrelevant for the lawsuit, even though they may not be recoverable. This issue is simply not amenable to a *limine* ruling.

The Court will revisit this if necessary in light of the joint briefing on clarification of the statute of limitations issue.

**8)    Preclude suggesting falsely that Cisco "approves" SMARTnet on Dexon-sold networking equipment**

   **GRANTED IN PART and DENIED IN PART.**

Dexon cannot argue that "Cisco itself" sold or that Cisco "directly sold" SMARTnet contracts that were sold through resellers. In other words, Dexon may not insinuate the end customer dealt directly and solely with Cisco when a reseller was also involved. Otherwise, the request is denied (i.e., Dexon may still argue or introduce evidence that the SMARTnet contracts were "approved" by Cisco, the contracts originated from Cisco, Cisco received payment for the contracts, or similar).

## DEXON'S MOTIONS *IN LIMINE* (Dkt. No. 422)

**1)** **Preclude presentation regarding funding of the litigation or regarding any comment on attorney-fee compensation including amounts or structure.**

**GRANTED.**

However, if Defendants believe that Dexon has opened the door by violating the guidance provided in response to Defendants' MIL No. 5 regarding the size difference between Dexon and Defendants, then Defendants may approach and request permission to inquire whether Dexon received litigation funding for this case specifically.

**2)** **Preclude presentation regarding either party's other litigations or arbitrations, including parallel proceedings in any other court, tribunal, or forum, including ADR proceedings and the *Cisco Systems, Inc. v. Dexon Computer, Inc.* actions in the Northern District of California, including Case Nos. 3:11-cv-01455-WHA, 3:20-cv-04926-CRB, and 3:23-mc-80191-CRB.**

**GRANTED IN PART and DENIED IN PART.**

With respect to Dexon's motion to preclude broadly any reference to prior litigation, Defendants state they seek to give the jury just two facts: (1) Cisco sued Dexon before Dexon initiated this antitrust case; and (2) the court where Cisco brought its lawsuit has preliminarily enjoined Dexon from continuing to sell counterfeit "Cisco" equipment. Dkt. No. 462 at 9.

Cisco may address the current Lanham-Act-based lawsuit in the U.S. District Court for the Northern District of California styled *Cisco Systems, Inc. and Cisco Technology, Inc. v. Dexon*

*Computer, Inc.*, No. 3:20-cv-4926 ("California Lawsuit"), but without mentioning Dexon is the defendant.[2] The fact that Cisco has sued a reseller is relevant to statements made by Dexon's anti-counterfeiting expert.

The Court finds any reference to the California Court's preliminary injunction prohibiting Dexon from selling counterfeit Cisco products would unfairly prejudice Dexon and confuse and mislead the jury; therefore, that part of the *in limine* request is granted. The Court also grants this *in limine* request as to all party's other litigations or arbitrations (other than generally referencing the California Lawsuit).

**3)** **Preclude presentation regarding specific allegations of stolen or counterfeit (or other synonyms such as fake, knock-off, etc.) Cisco products, including whether Dexon or other resellers have purchased or sold of alleged counterfeit Cisco products and the process by which Cisco determines whether a product is counterfeit**

**GRANTED IN PART and DENIED IN PART.**

The genesis of this dispute began with Cisco's Motion to Bar Obstruction of Discovery (Dkt. No. 206) and Dexon's cross-motion for Protective Order on Cisco's Attempt to Invoke Counterfeiting (Dkt. No. 215). Cisco wanted to pursue discovery related to Dexon's trafficking in alleged counterfeit Cisco products, and Dexon wanted to preclude discovery on that subject. The Cout ruled as follows:

> Cisco is not precluded from questioning [Defendant's witnesses at the noticed depositions] about alleged "counterfeit" products at this time. Dexon may file a motion to limit or preclude Cisco's (or CDW's) use of such evidence at the appropriate time in the case following a meet and confer. As advised during the hearing, the more closely aligned Cisco's questions are to the allegations raised in Dexon's Amended Complaint (*see, e.g.*, [Dexon alleging that] Cisco wrongly claimed that unfavored resellers sell "bootleg," "unauthorized," or "Cisco"

---

[2] In the event there is no evidence of specific counterfeiting allegations which were communicated to customers Dexon has identified in its affirmative case at trial (as explained in the ruling on Dexon's MIL No. 3 below), then Defendants may approach the bench regarding whether they can present argument and evidence as to the public California Lawsuit in order to defend against Dexon's allegations of general reputational harm.

equipment with "malware" or "spyware") (Dkt. No. 175, ¶ 6), the more likely the evidence is to remain in this case following evidentiary rulings during the pretrial conference.

Dkt. No. 217 at 1-2.

This issue has been extensively briefed and argued since that ruling, revealing significant nuance. Broadly speaking, Defendants wish to present several categories of counterfeiting evidence:

(1) General (i.e., non-Dexon specific) evidence of counterfeiting in the gray market. Defendants contend that one of their procompetitive justifications for the conduct that Dexon alleges is anticompetitive is to reduce counterfeiting.

(2) Evidence of specific instances of Dexon selling alleged counterfeit Cisco equipment to the customers that Dexon has identified in this case. Defendants contend this is responsive to issues Dexon first raised: that is, if Dexon identifies a customer that Dexon claims reduced its business with Dexon due to Defendants' anticompetitive conduct, Defendants should be able to respond by showing evidence suggesting the customer reduced business with Dexon because Dexon sold it counterfeit products.

(3) Evidence of specific instances wherein Dexon *bought or sold* alleged counterfeit networking equipment at *any time* (in other words, evidence that Dexon ever trafficked in alleged counterfeit equipment, without limitation). Defendants contend this is necessary to respond to Dexon's claim for damages from reputational harm in the market; *i.e.*, that one of the reasons for Dexon's alleged damage to its reputation is that it trafficked in suspect equipment.

(4) Evidence that Dexon bought equipment from vendors who have been determined to traffic, at least partially, in counterfeit goods (for example, evidence that Dexon has bought

equipment from a third-party vendor that either was found to traffic in counterfeit equipment or that Dexon itself suspected has trafficked in counterfeit equipment). Defendants contend this is necessary to respond to Dexon's claim that its quality control process insulates Dexon from counterfeiting problems in the gray market.

Further complicating matters is that determining whether a piece of networking equipment is counterfeit is not a defined, straightforward process. The parties have described various technical tests, each providing an indication of counterfeit but perhaps requiring further analysis depending on the required confidence level. The difficulty in determining whether a specific piece of equipment is in fact counterfeit is most relevant to categories (2) and (3) above. This complication is less important to categories (1) and (4), because the parties do not dispute that genuine and counterfeit Cisco equipment are trafficked in the gray market. Importantly, no one disputes the stigma a juror may place on a company that has been alleged to traffic in counterfeit goods.

Prior to the pretrial conference, Defendants argued they should be able to present the issue of counterfeiting without any limitation while Dexon argued the issue should be removed from the case entirely. The undersigned strongly suggested both extreme positions were unreasonable and ordered the parties to meet and confer once more to find common ground that would not result in a windfall for either side. Dkt. No. 472 at 5-6. Other than Dexon conceding that Cisco should be able to present the general issue of counterfeiting in the gray market (Category (1)), no other agreement was reached.

Based on the parties' arguments at the pretrial conference and extensive briefing on this matter, the Court rules as follows:

1. Dexon's prior request to preclude Defendants from presenting allegations of stolen or counterfeit concerns with the independent channel (or gray market) that are **not Dexon-specific**

is denied (Category (1)). Cisco has consistently argued from the outset of this case that reducing counterfeiting associated with the gray market is one of the procompetitive justifications for its general policies in establishing its authorized distribution channel. Therefore, explaining this issue is highly probative to Cisco's defense, and to the extent the presentation does not address specific instances of Dexon trafficking in alleged counterfeit equipment, does not risk unfair prejudice to Dexon. On the contrary, Cisco has never argued that it set up its authorized distribution channel because of Dexon specifically, so specific instances of Dexon's alleged sales of counterfeit are *not* highly probative to Cisco's procompetitive justifications and also run the risk of the jury unfairly punishing Dexon for those instances. This prejudice is particularly acute here, where there is no actual claim of counterfeiting in the case, the technical explanation of how to determine a counterfeit product will be limited to, at most, lay witnesses describing Cisco's internal tests, and the jury will never need to make a finding as to whether a product was counterfeit.

2. The Court denies Dexon's request to exclude any mention of "the process by which Cisco determines whether a product is counterfeit." Dexon's motion does not explain why evidence concerning that process is irrelevant or unduly prejudicial. The process by which Cisco detects counterfeit is relevant to its enforcement of anticounterfeiting policies, which Dexon now concedes (at Dkt. No. 422 at 6) are relevant to the "business justification" issues. The process is also relevant to explain how Cisco determined the authenticity of any equipment that may be allowed in points 3, 4, and 6 below.[3]

3. Dexon's request is denied as to any evidence or argument that concerns specific counterfeiting allegations that were communicated to customers that Dexon identifies in its

---

[3] Dexon has suggested that Rules 602, 701, and 703 may prevent Cisco's employees from providing certain aspects of this testimony. This MIL ruling that allows a Cisco employee with personal knowledge of the testing procedure to explain how Cisco determines a piece of equipment may be counterfeit should not be interpreted as addressing that issue, which will need to be evaluated regarding the specific witness and proffered testimony.

affirmative case. This is a subset of possible evidence related to Category (2). In other words, if Dexon identifies a specific customer interaction wherein Dexon says the customer was influenced by Defendants' alleged anticompetitive conduct, then Defendants shall be free to explain their view of that interaction. This specifically allows for (a) any communication to the customer, even if the communication states or insinuates that Dexon sold the customer equipment that was counterfeit, bootleg, inauthentic, or similar, and (b) any witness to explain the basis for that witness' statements to the customer.

Defendants may not present evidence that could not be a basis for the customer interaction or their employees' statements. For example, if Dexon argues Defendants' alleged anticompetitive conduct caused a customer to end its relationship with Dexon in 2018, that does not open the door for Defendants to show Cisco notified the customer in 2023 that some of the equipment Dexon sold pre-2018 was counterfeit. Similarly, if a Defendant's employee told the customer in 2018 that Dexon sells bootleg equipment, that witness can explain the basis for that statement based on her personal knowledge at the time she made the statement, but that does not allow Defendants to say that *other* employees were aware Dexon had sold counterfeit products. This ruling balances the need for Dexon to provide enough examples to factually and legally prove its case while also providing Defendants the ability to respond with their side of the story regarding those specific customer interactions. Dexon must identify the customer interactions it plans to raise in its affirmative case no later than January 10, 2024.

Defendants may not address specific instances of Dexon selling alleged counterfeit Cisco equipment to any other customer, even if it was one that Dexon identified as a potential example of anticompetitive conduct earlier in this case.[4]

4. Assuming that Dexon identifies a specific customer interaction where Defendants will have the ability to introduce evidence that Dexon sold alleged counterfeit Cisco equipment to that customer, the request is granted as to other instances where Dexon trafficked in allegedly counterfeit goods. In other words, pursuant to the balancing test in Federal Rule of Evidence 403, Cisco cannot bring up *other* instances of allegedly Dexon-sold counterfeit goods, as the probative value of those instances would be cumulative and substantially outweighed by the unfair prejudice to Dexon. However, if Dexon selects customer interactions in such a manner as to prevent Defendants from offering evidence suggesting Dexon previously sold alleged counterfeit equipment, Defendants may approach the bench to request permission to show there is public knowledge regarding Dexon's involvement with counterfeit goods. The Court suggested two possible sources of evidence at the pretrial conference: allowing Defendants to explain Cisco's Northern District of California case against Dexon (including describing Cisco's counterfeiting allegations against Dexon) and the Office of Inspector General Report containing statements concerning a Dexon-sold counterfeit product. The circumstances at trial will determine whether one, both, or some other public source should be raised before the jury.

This ruling allows Defendants to *proportionally* challenge Dexon's damages claim for reputational harm, which assumes that Dexon's reputation in the industry does not significantly

---

[4] Cisco strenuously argued that it should be able to respond to allegations in Dexon's complaint, wherein Dexon alleged that its relationship with a customer was harmed due to Defendants' anticompetitive conduct, but that, according to Cisco, Dexon has now abandoned because discovery has shown Dexon sold those customers counterfeit equipment. Besides the general premise that dropped allegations are typically not addressed at trial, the broader concern is that Cisco's answer *did not* raise a Dexon-specific counterfeiting defense to specific customer interactions, but only raised counterfeiting as part of its procompetitive justifications for its distribution model as a whole.

suffer from a counterfeiting concern. Specifically, Defendants should have the right to respond to Dexon's claim for reputational damages by the specific instances of counterfeiting allowed by point (3) above. If there are no specific instances, Defendants may approach to address limited examples of publicly known counterfeiting instances involving Dexon. Defendants' alternative view that they should be able to address any and all instances of alleged counterfeiting by Dexon because of its claim for reputational harm is substantially outweighed by a danger of unfair prejudice, misleading the jury, wasting time, and needlessly presenting cumulative evidence.[5]

5. Dexon's request is granted concerning stolen goods, which appears to refer to a single incident with unclear relevance to the case.

6. Defendants may request to raise issues relating to counterfeiting to impeach Dexon witnesses if they open the door. Dexon has indicated it will discuss its quality control processes, how it avoids buying from unreliable sources, and how it generally ensures high-quality products for its customers. Dexon also claims it will not refer to counterfeiting in its case in chief. That may be difficult now that Defendants will discuss the general counterfeiting concerns with the gray market. If Dexon contends its business practices sufficiently address those counterfeiting concerns, it has never bought or sold counterfeit products, or similar, then Defendants may approach the bench and request to impeach and present responsive evidence to show Dexon has purchased from vendors that are or were known/suspected to traffic in counterfeit goods, or similar responsive and proportional evidence.

---

[5] Defendants sought to introduce dozens of exhibits on this basis and left the impression that Defendants intended to introduce every instance of Dexon selling alleged counterfeit equipment, no matter the amount of equipment, whether the customer or public at large knew about the status of the equipment, or when the sale occurred. As the Court previously noted, this is not a counterfeiting case, nor does it need to be one. Dexon's claim that it is a reputable company does not give Defendants a license to bring up every instance of Dexon's alleged wrongdoing any more than Cisco's claim that it does not abuse its market position would allow Dexon to bring up every antitrust enforcement against Cisco, mergers of competitors, or layoffs (*see* Defendants' MIL No. 5).

7. Cisco should be clear in argument and soliciting witness testimony that Cisco had reason to believe that Dexon sold counterfeit goods based on its internal analysis and avoid any implication that the goods were legally determined to be counterfeit[6] or that Cisco retained an expert to offer that opinion.

4) **Preclude presentation regarding any governmental investigation of Dexon or products it sold, including any obligation to inform law enforcement, Cisco, or any other third party regarding suspected counterfeit product, any investigation or execution of a search warrant by the Federal Bureau of Investigations, any investigation by the Immigration and Customs Enforcement, or any allegation that Dexon has purchased stolen products**

    **GRANTED.**

    The minimal relevance of (mostly) non-public governmental investigations into Dexon relating to alleged counterfeit goods, including the FBI seizure in 2008 and more recent customs inspections, to the issue of Dexon's reputation in the market or other issues in this case is substantially outweighed by the unfair prejudice of that evidence. However, in the event there is no evidence of specific counterfeiting allegations that were communicated to customers Dexon has identified in its affirmative case at trial (as explained in the ruling on Dexon's MIL No. 3 above), then Defendants may approach the bench regarding whether they can present argument and evidence as to any public investigation to defend against Dexon's allegations of general reputational harm.

5) **Preclude presentation regarding treble damages under antitrust law**

    **GRANTED AS AGREED**.

6) **Preclude presentation (including disclosing to the jury) regarding the substance of declarations submitted by witnesses, except for impeachment of the declarant**

    **DENIED**.

---

[6] Cisco made it clear at the pretrial conference that it does not intend to refer to Dexon as a "counterfeiter."

Defendants may use the two third-party declarations of Jojo Jacob (FBISD) and Rayne Martz (West Penn), neither of whom will be called to testify at trial, in examining Defendants' economic expert Dr. Ugone. Defendants may publish any unobjectionable portions of the declarations to the jury during said examination. Defendants may also use the unobjectionable portions of the declarations to cross-examine Dexon's economic expert Dr. Maness.

## **JOINT MOTIONS *IN LIMINE* (Dkt. No. 425)**

The following are the motions *in limine* that the parties have agreed to and are hereby **ORDERED AS AGREED**:

1. The parties shall be precluded from introducing evidence, testimony, or argument regarding pretrial proceedings or issues including but not limited to discovery disputes, dispositive motion practice, or dropped claims or defenses (this does not preclude any instruction that may be given from the Court as a result of a ruling in this case or argument based on that instruction).

2. The parties shall be precluded from introducing evidence, testimony, or argument before the jury that relates only to equitable defenses or counterclaims (i.e., evidence that does not also serve another evidentiary purpose relevant to jury issues).

3. The parties shall be precluded from introducing any argument, evidence, testimony, insinuation, reference, or assertion regarding a witness' choice to testify in his or her native or chosen language (being any language other than English).

4. The parties shall be precluded from introducing evidence, testimony, or argument referring to the role or presence in the courtroom of jury consultants or shadow jurors, or the use of focus groups or mock proceedings to assist with trial preparation, jury selection, or trial.

5. The parties shall be precluded from introducing evidence, testimony, or argument suggesting that the Eastern District of Texas is an improper or inconvenient venue in which to try this case.

6. The parties shall be precluded from introducing evidence, testimony, or argument regarding treble damages under antitrust law.

### ADDITIONAL *LIMINE* ORDER

The order denying without prejudice Dexon's Motion for Spoliation Sanctions explained that while Cisco did not have a duty to preserve many of the Jabber messages that were lost when Cisco deprecated Jabber in November 2020, it would be unfair to allow Cisco to benefit from the loss of such relevant information. *See* Dkt. No. 453 at 2 & n.1. Accordingly, if Cisco opens the door by introducing testimony or argument concerning a subject that could have been clearly challenged had the Jabber messages been saved and produced, Dexon may approach the bench and ask for a curative instruction on the issue.

The undersigned does not anticipate a violation of this *limine* order because Dexon will need to show from existing discovery (e.g., deposition testimony about the Jabber messages and other Jabber messages) that missing messages would have "clearly challenged" the at-issue testimony or argument.

Accordingly, it is **ORDERED** that the parties, their witnesses and counsel shall not raise, discuss or argue the subject of any granted motion *in limine* before the venire panel or the jury without prior leave of the Court.

SIGNED this the 8th day of January, 2024.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE