UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § § | |
| **v.** | § § | Case No. 5:22-cv-53-RWS-JBB |
| **CISCO SYSTEMS, INC. and CDW CORPORATION** | § § § | |

## ORDER

The above-referenced cause of action was referred to the undersigned United States Magistrate Judge for pretrial purposes in accordance with 28 U.S.C. § 636. The following motion is pending before the Court:

**Defendants' Rule 37 Motion Regarding Undisclosed Damages (Dkt. No. 328).**

The Court, having carefully considered the relevant briefing, is of the opinion Defendants' motion should be **DENIED**.

## I. BACKGROUND

On September 25, 2023, Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW") (collectively, "Defendants") filed their current Rule 37 motion, requesting the Court (1) prohibit Dexon Computer, Inc. ("Dexon") from presenting evidence of an "undisclosed" damages theory (that Cisco's conduct caused general reputational harm to Dexon both inside and outside the alleged relevant markets) and (2) strike those portions of Dexon's expert reports. Dkt. No. 328 at 1-2.

## II. APPLICABLE LAW

Federal Rule 26(a) states that "a party must, without awaiting a discovery request, provide to the other parties . . . the name . . . of each individual likely to have discoverable information –

along with the subjects of that information – that the disclosing party may use to support its claims or defenses." FED. R. CIV. P. 26(a)(1)(A)(i); *see also* FED. R. CIV. P. 26(e)(1)(A) (requiring supplementation). The Court's Discovery Order further requires the parties to provide "a complete computation of any category of damages claimed by any party to the action, making available for inspection and copying as under Rule 34, the documents or other evidentiary material on which such computation is based, including materials bearing on the nature and extent of injuries suffered." Dkt. No. 65, ¶ 3(b); *see also id.*, ¶ 9 (requiring timely supplementation).

An expert required to provide a written report must include a "complete statement of all opinions the witness will express and the basis and reasons for them." *Firtiva Corp. v. Funimation Glob. Grp., L.L.C.*, Civil Action No. 2:21-CV-00111-JRG-RSP, 2022 WL 1792818, at *1 (E.D. Tex. June 1, 2022) (quoting FED. R. CIV. P. 26(a)(2)(B)(i)). Parties must provide their expert disclosures "at the times and in the sequence that the court orders." *Id*. (quoting FED. R. CIV. P. 26(a)(2)(D)).

Federal Rule 37 sets the consequences of untimely or insufficient disclosure by a party: "[T]he party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." *CEATS, Inc. v. TicketNetwork, Inc.*, Civil Action No. 2:15-CV-01470-JRG-RSP, 2018 WL 453732, at *3 (E.D. Tex. Jan. 17, 2018) (quoting FED. R. CIV. P. 37(c)(1)). Rule 37 also "empowers the courts to impose sanctions for failures to obey discovery orders." *Estech Sys., Inc. v. Target Corp.*, No. 2:20-CV-00123-JRG-RSP, 2021 WL 5154220, at *3 (E.D. Tex. July 21, 2021) (quoting *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012)).

Four factors guide the Court's exercise of discretion in evaluating whether to exclude evidence under Rule 37. *Id.* (citing *CQ, Inc. v. TXU Min. Co., L.P.*, 565 F.3d 268, 280 (5th Cir.

2009)). These factors are: "(1) [the untimely party's] explanation for its failure to disclose the evidence, (2) the importance of the evidence, (3) the potential prejudice to [the objecting party] in allowing the evidence, and (4) the availability of a continuance." *Id*.

### III. DISCUSSION

#### A. Background

On September 22, 2022, Dexon served Defendants with its initial disclosures pursuant to Rule 26(a)(1) and the Court's Discovery Order. On March 17, 2023, Dexon updated its damages disclosures. *See* Dkt. No. 328-3, Dexon's Second Amended Initial Disclosures. Dexon claimed the "productions of financial data by Cisco and CDW to date are relevant to the damages claimed by Dexon in this action, and a detailed computation of damages will be provided upon designation of experts in accordance with the Court's Docket Control Order. In general, Dexon will be claiming damages in form of lost profits due to the anticompetitive conspiracy of Cisco and CDW, as well as the monopolistic actions of Cisco." *Id*. at 9.

Regarding "the volume of lost sales and profits associated with the various instances of customer coercion referenced in the Complaint," Dexon claimed that Cisco had interfered with Dexon's sales of routers, switches, and IP phones to five specific customers –Lubbock Emergency Communication District ("Lubbock 911"), Targa Resources ("Targa"), Fort Bend Independent School District ("FBISD"), Park Place, and West Penn Allegheny Health System ("West Penn") – causing Dexon to lose sales. *Id*. at 9-10. Dexon estimated interference damages for three of the identified customers – claiming that it lost "at least hundreds of thousands of dollars" in sales from Targa, "more than $1.3 million in revenue and $312,000 in profit" from FBISD, and "at least $1.2 million in sales" from West Penn – and stated that it could not yet provide damages estimates for

the other two (Park Place and Lubbock).[1] *Id.* Dexon's disclosure stated these are "instances of anticompetitive conduct, of which Dexon happened to learn," and "do not represent Dexon's total damages from the alleged conduct in this case." *Id.* at 10; *see also id.* at 9 (stating Dexon was "continu[ing] to investigate[]the volume of lost sales and profits associated with the various instances of customer coercion referenced in the Complaint").

Seeking more detail regarding Dexon's claimed damages, on March 27, 2023, Cisco filed a motion requesting the Court order Dexon to supplement its initial and supplemental damages disclosures to provide a "detailed computation" of the lost profits it seeks in this case, including the amount of knowable lost profits, Dexon's method for computing those claimed damages, and supporting evidentiary materials (if any). Dkt. No. 141.

After conducting a hearing, the Court denied Cisco's motion on June 1, 2023, finding Dexon's initial and supplemental damages disclosures sufficient for the stage of the case, "subject to Dexon's continued obligation under Rule 26 to supplement its responses." Dkt. No. 231 at 4-5 ("By providing the general categories of claimed damages, in addition to the disclosure that such computation will rely upon the consultation of experts, Dexon had provided sufficient information to allow Defendants to 'independently analyze' their damages claim at this time.").

In the Order, the Court noted Cisco's concern that it would suffer prejudice if Dexon's future expert report on damages included information that Cisco would not have known to explore during discovery. *See id.* at 4 (citing Dkt. No. 224 (Transcript) at 65:1-67:16). However, the Court noted it would "address any issue on that front, if it develops, at the appropriate time in the case." *Id.*

---

[1] According to Defendants, Dexon's damages disclosure did not calculate lost profits other than for the FBISD sales. But its proffered expert derives a Dexon profit margin that, when applied to the disclosed lost revenues, yields net damages of approximately $1 million in lost profits.

4

On June 21, 2023 – the final day of fact discovery – Dexon served its Fourth Supplemental Initial Disclosures. Dexon did not change or supplement its damages disclosures. *See* Dkt. No. 328-4. On July 29, 2023, in accordance with the Docket Control Order, Dexon served upon Defendants the expert report of Dexon's damages expert, Robert S. Maness, Ph.D. ("Maness"). *See* Dkt. No. 328-5 (Maness Opening Report Excerpt) *see also* Dkt. No. 354-2. In quantifying lost profits due to monopolization (*id*., ¶¶ 128-35), Maness opines as follows:

> Cisco's actions have not only directly cost Dexon business as discussed, but by spreading FUD about the products sold by Dexon, **Defendants have harmed Dexon's reputation in the marketplace and made it more difficult to maintain its existing customers and earn new business. Consequently, Dexon's entire business has been harmed by alleged conduct. That is, Cisco's and CDW's actions have likely materially reduced Dexon's sales of not only Cisco routers, Ethernet switches, and enterprise voice products, but all Cisco products it sells.** As I discuss below, I calculate Dexon's lost sales of routers, Ethernet switches, and enterprise voice products. Additionally, I also calculate the impact of lost sales of products in the relevant market on sales and profits outside of the relevant product markets. I refer to these as "consequential sales."

*Id.*, ¶ 129 (emphasis added). Maness further opines as to (1) the harm to Dexon due to Cisco's alleged monopolization, arriving at Dexon's lost profits of $16.3 million (*id*., ¶ 133); (2) "consequential lost sales" of other Cisco products outside of the relevant markets, arriving at Dexon's lost profits from these "consequential sales" of $7.8 million (*id*., ¶ 134); and (3) lost profits on lost SMARTnet sales, arriving at $1.1 million in lost profits for lost SMARTnet sales (*id*., ¶ 135).

On September 9, 2023, Maness submitted a reply report confirming that Dexon's "monopolization damages model is not a customer-by-customer summation of lost sales." *See* Dkt. No. 328-6 (Maness Reply Report Excerpt), ¶ 132 ("However, as Dr. Ugone is aware, my monopolization damages model is not a customer-by-customer summation of lost sales, nor is a damages model required to be a customer-by-customer summation. As I noted in my Opening

5

Report, I use a standard before and after approach based on the share of Dexon's sales comprised of non-Cisco relevant equipment before and after the alleged conduct."). On September 13, 2023, counsel for Cisco questioned Maness as follows:

> Q. Okay. Now if the jury were to determine that Cisco's conduct directed towards FBISD was not wrongful and did not cause Dexon to lose sales, would that invalidate your calculation?
> * * *
> A. It would not invalidate my calculation.
>
> Q. And that's because the calculation that you do is not a customer-by-customer summation of lost sales. That's what you say in paragraph 132, right?
>
> A. Correct.

Dkt. No. 328-7 (Maness Deposition Excerpt) at 214:17-215:15.

**B. Parties' assertions**

Defendants assert Dexon's actual damages theories do not use, discuss, or rely upon the data that Dexon demanded Cisco produce at substantial burden and cost to Cisco (millions of pages of documents and more than 200 million lines of data production), and that Dexon alluded to in its damages disclosure (a customer-by-customer summation of lost profits from Cisco's purported interference with Dexon's sales of switches, routers, and IP phones to five specific customers). Dkt. No. 328 at 6, 8. In other words, Defendants claim Maness did not calculate monopolization damages based on any information that Dexon had previously disclosed (e.g., Maness did not calculate Dexon's lost revenue or profits purportedly caused by Cisco's alleged interference with specific customers; he did not opine on how much Dexon had lost from the five specific customers that Dexon had identified in its damages disclosures; and he did not tabulate lost profits from any customer). Defendants contend Maness advances "two entirely new theories for calculating Dexon's monopoly damages:" (1) that Cisco has "harmed Dexon's reputation in the marketplace and made it more difficult to maintain its existing customers and earn new business," Maness

6

Opening Report, ¶ 129;[2] and (2) that this reputational harm also undermined Dexon's ability to sell Cisco products outside the alleged relevant markets of switches, routers, and IP phones.[3] *Id.*, ¶ 134.

Defendants contend Dexon's failure to disclose was highly prejudicial. Dkt. No. 328 at 10-12. According to Defendants, Maness calculates that Dexon's damages from this reputational harm inside and outside the alleged relevant markets amount to approximately $23.5 million – "a more than 2,000% increase beyond the damages figures that Dexon had disclosed in its damages disclosure through the close of fact discovery." *Id.* at 6 (citing Maness Opening Report, Ex. 8C).

In response, Dexon challenges Defendants' premise that Maness "presents a new damages theory that was not previously disclosed:"

> Defendants' motion focuses on two words ("Dexon's reputation"), which are mentioned twice in Dexon's 139-paragraph economic expert report, in now claiming that Dexon's economic expert prepared a damages model based on "general reputational harm." A plain reading of Dexon's economic expert report simply does not support Defendants' interpretation. Dexon's expert, Robert S. Maness, Ph.D., did not prepare a damages report based on reputational harm, as Defendants insist throughout their motion. On the contrary, Dr. Maness' report reflects a commonly accepted "but-for" world damages model based on the "before-and-after" method that is focused on Defendants' anticompetitive and monopolistic conduct. A passing reference to Dexon's reputation does not change the substance of Dr. Maness' analysis, which is consistent with Dexon's disclosures and pleadings, as well as the Court's prior orders on Defendants' motion to dismiss, all of which expressly placed Defendants on notice of this exact theory of damages.
>
> Defendants also misunderstand Dr. Maness' consideration of "consequential sales"—this is not a damages model that is independent of the Relevant Market Products that Dexon's case focuses upon. Rather, Dr. Maness' use of consequential sales is intended to capture the full extent of loss to Dexon as a result of Defendants'

---

[2] Specifically, Maness opines that Cisco equipment formerly made up approximately 95.5% of Dexon's sales to hundreds or thousands of customers, but it now makes up approximately 91.3% of Dexon's sales. Maness Opening Report, ¶ 131. Dexon's proffered damages expert claims that, absent the alleged conduct, the proportion of Cisco sales would have remained at 95.5% through increased sales of Cisco equipment and calculates the profits Cisco owes Dexon from those lost sales. *Id.*

[3] Accordingly, Maness asserts that Dexon would have sold millions of dollars' worth of additional Cisco-branded equipment other than switches, routers, and IP phones and calculates lost profits from those sales, too. Maness Opening Report, ¶ 134.

7

> anticompetitive conduct. At the outset of this case, in compliance with the Court's E-Discovery Order, Dexon provided Defendants with all financial data that was relevant to the case (Dkt. No. 66, ¶ 8(b)(ii)), and these data included all of Dexon's sales because Defendants' conduct had an impact on the company as a whole. Despite having these data for almost a year and Defendants' own experts having a full opportunity to consider and respond to Dexon's damages calculation, Defendants now claim surprise, when nothing about its damages are new or improper. Simply put, Dexon's expert report is entirely consistent with the Court's previous Decision and Order, which denied Cisco's previous motion to compel damages disclosure and expressly recognized that Dexon's damages disclosure would be dependent on expert consultation. Because Dexon's expert report complies with its previous disclosures and the Court's prior order, Defendants' motion fails.

Dkt. No. 354 at 1-2. Assuming *arguendo* that Dexon's expert report did not comport with its prior disclosures and pleadings, Dexon argues the factors for sanctions under Rule 37(c) weigh heavily against the extreme relief that Defendants seek. *Id.* at 2.

### C. Analysis

**1. Dexon did not violate its disclosure obligations**

Defendants argue Dexon violated its disclosure obligations by waiting until after the end of fact discovery to reveal a new damages theory of reputational harm inside and outside the relevant markets affecting Dexon's "entire business." Dkt. No. 328 at 8. Relying on caselaw, Defendants assert Dexon should be precluded from relying on damages evidence and theories not included in Rule 26 disclosures. *Id.* (citing, among other cases, *Perez v. Tyczynski*, No. 5:21-CV-00109, 2023 WL 2020980, at *4-6 (S.D. Tex. Feb. 15, 2023) (precluding plaintiff from relying on damages evidence and theories not included in Rule 26 disclosures); *Jacked Up, L.L.C. v. Sara Lee Corp.*, No. 3:11-CV-3296-L, 2019 WL 1098992, at *9-11 (N.D. Tex. Mar. 8, 2019) (excluding new damages computation by plaintiff's expert because it was "inconsistent with" the damages disclosure plaintiff produced during discovery period), *aff'd*, 807 Fed. Appx. 344 (5th Cir. 2020);

*Am. Realty Tr., Inc. v. Matisse Partners, L.L.C.*, No. 3:00-CV-1801-G, 2002 WL 1489543, at *3-6 (N.D. Tex. July 10, 2002) (excluding undisclosed damages claim)).

The cases cited by Defendants are distinguishable. For example, in *Perez*, the plaintiff objected to discovery regarding his income, earnings, and financial support, repeatedly stating the information was irrelevant because "Plaintiff does not present a claim for lost wages at this time." *Perez*, 2023 WL 2020980, at *4; *see also id.* at *5 ("In each response, Plaintiff reiterated that Defendant's request was not within the scope of discovery because the information was not relevant, as he did not 'present a claim for lost wages at this time.' . . . Perhaps Plaintiff did not believe he was presenting a claim for lost wages at that time. But as soon as he determined that he was making such a claim, he had the obligation to affirmatively correct his disclosures to Defendant."). After applying the four factors, the court held pursuant to Rule 37 that the plaintiff would not be permitted to pursue a claim for lost wages at trial. *Id.* at *4-5.

Here, contrary to Defendants' assertions otherwise, Dexon has not affirmatively misled Cisco (or the Court) as to its damages theories by disclaiming the theories on which it relies. In its response to Cisco's March 27, 2023 motion to compel, Dexon stated it had detailed the extent of its lost profits damages based on information presently available and further stated Dexon's calculation of damages in this "multifaceted and complex antitrust" case would be "based upon expert opinion, which [would] be disclosed pursuant to the Court's Docket Control Order in July 2023." Dkt. No. 155 at 1-2. None of Dexon's statements in the motion practice before the Court contains the type of about face presented in *Perez*.

Unlike in *Jacked Up*, Maness's damages computation is not inconsistent with Dexon's Rule 26 disclosures. *See Jacked Up*, 2019 WL 1098992, at *9 ("The supplemental disclosures also provide different numbers on the key components of Schmitz's new computation: different year 1

9

locations; different growth rates; different distribution channels; and no mention of any of Jacked Up's purported existing distribution network. They also provide a different damage number.").

Defendants' reliance on *American Realty*, 2002 WL 1489543, is of no avail either. In that case, the court excluded the plaintiff's $30 million damage figure (which was disclosed for the first time nearly two weeks after the discovery deadline and for which the plaintiffs had not since complied with their discovery obligation to disclose the facts underlying the damages claim) because "the plaintiffs made a tactical decision to ambush the defendants by withholding their main claim for damages until after the close of discovery." *Id*. at *5. There was no comparable tactical decision to ambush Defendants here. Dexon's disclosures advised Defendants that its damages calculation would require the consultation of an expert and was based on financial information provided in discovery.

In hindsight, Dexon's amended disclosures could have been clearer, because they do suggest a customer by customer model. But Defendants have not persuasively shown that Dr. Maness's reference to Dexon's reputation converts his lost-profits damages model to a damages model based on reputation or that Dr. Maness's consideration of "consequential sales" reflects a new theory. Therefore, the Court does not find any disclosure violation in this case.

**2. Assuming a disclosure violation, the Rule 37(c) factors would not weigh in favor of exclusion**

Even assuming that there was a disclosure violation, the Rule 37(c) factors do not weigh in favor of exclusion. As noted above, in determining whether a "violation of Rule 26 requiring disclosure . . . is harmless, such that the evidence may be used at trial despite non-disclosure, the trial court's discretion is to be guided by the consideration of four factors: (1) the importance of the evidence or witness' testimony; (2) the prejudice to the opposing party of allowing the evidence in; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation,

if any, for the party's failure to identify the witness or evidence." *ResMan, L.L.C. v. Karya Prop. Mgmt., L.L.C.*, No. 4:19-CV-00402, 2020 WL 5884820, at *2 (E.D. Tex. Oct. 1, 2020) (citation omitted) (noting the factors relate to witnesses and evidence—not pleadings, claims, or violations of Rule 26(a)(1)(A)(iii) (regarding damages disclosure) but finding the factors persuasive and applying a modified version in evaluating a motion to strike the plaintiff's claim for lost profit damages).

To the extent there was any failure to timely disclose, Dexon has sufficiently explained said failure. According to Dexon, in complex matters like this one, it is common for damages calculations to be disclosed through experts, which was always Dexon's intent. Dexon further explains how what is reflected in Dr. Maness's report is consistent with Dexon's theory throughout this litigation.

The evidence regarding Dexon's claim for damages is undoubtedly significant. Dexon asserts Dr. Maness's economic model is critical to Dexon establishing its damages. Dkt. No. 385 at 4. The Court finds this factor weighs heavily in favor of considering any nondisclosure, to the extent there was nondisclosure, harmless.

The factor measuring the amount of resulting prejudice to Defendants if the Court allows the disclosure to continue to trial also weighs in favor of considering any nondisclosure harmless. According to Dexon, Dr. Maness's report does not focus on reputation harm in determining Dexon's lost-profit damages and was principally based on evidence of Defendants' alleged anticompetitive actions and Dexon's financial data – material which Defendants have had in their possession and were able to address in either expert rebuttal or reply reports. There is no indication Defendants were not able to adequately address the specific theories in Dr. Maness's reports.

In short, there is no basis under Rule 37 for exclusion of Dexon's damages theory.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED** that Defendants' Rule 37 Motion Regarding Undisclosed Damages (Dkt. No. 328) is **DENIED**.

SIGNED this the 8th day of January, 2024.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE