UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

| | |
|---|---|
| DEXON COMPUTER, INC., | )<br>)<br>) |
| Plaintiff, | ) Civil Action No. 5:22-cv-00053-RWS-JBB |
| v. | )<br>)<br>) |
| CISCO SYSTEMS, INC. and CDW CORPORATION, | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

**CISCO SYSTEMS, INC.'S OBJECTION TO**
**THE REPORT AND RECOMMENDATION REGARDING**
**<u>CISCO SYSTEM, INC.'S MOTION FOR SUMMARY JUDGMENT</u>**

**OBJECTION TO REPORT AND RECOMMENDATION**

Pursuant to Federal Rule of Civil Procedure 72(b)(2) and Local Rule CV-72(c), Defendant Cisco Systems, Inc. ("Cisco") respectfully objects to the Report and Recommendation (Dkt. 474, hereinafter "R&R") recommending denial of its Motion for Summary Judgment (Dkt. 326, hereinafter "Cisco MSJ") as to the claims that Plaintiff Dexon Computer, Inc. ("Dexon") brought under Section 2 of the Sherman Antitrust Act and corresponding Texas law. The R&R finds that Dexon established genuine disputes of material fact sufficient to proceed to trial on claims that Cisco unlawfully monopolized – or conspired and attempted to monopolize – three alleged equipment markets, for switches, routers, and IP phones. These claims should fail, and the motion should be granted, because Dexon presents no evidence of unlawful conduct (Part I *infra*) or antitrust injury arising from harm to competition (Part II *infra*) in those markets.

**I.     There Is No Genuine Dispute That Cisco Did Not Engage In Anticompetitive Conduct**

**1.     *Legal Standards*.**  The R&R correctly identifies two pertinent legal standards. *First*, each of Dexon's claims under Section 2 – for unlawful monopolization, attempted monopolization, and conspiracy to monopolize – requires Dexon to show that Cisco engaged in anticompetitive conduct in support of a monopoly. *See* R&R at 67 (conspiracy to monopolize), 128 (actual and attempted monopolization); *see also* Cisco MSJ at 15 & nn.78-79 (collecting cases).[1]  *Second*, "courts evaluate a defendant's allegedly exclusionary conduct separately" where, as here, an antitrust plaintiff claims that "interrelated schemes" – i.e., different types of conduct – together constitute unlawful exclusionary or anticompetitive conduct. R&R at 129.

**2.     *Objection*.**  The R&R erred in the application of those legal principles to find a

---

[1] The R&R says (at 94) that Cisco's argument as to the Section 2 conspiracy claim is "undeveloped," suggesting it has to do with the "interstate commerce element" of a Section 2 claim. Cisco's argument – which Dexon never disputed – is that a conspiracy to monopolize requires anticompetitive conduct.

1

genuine dispute of material fact as to whether Cisco engaged in anticompetitive conduct.

### a. Claimed "FUD" Cannot Support the Monopoly Claims

There is no dispute that Cisco provides customers only truthful information about its policies and Dexon's practices. *See* Cisco MSJ at 20-21. Dexon does not present evidence and the R&R does not find otherwise. That is legally dispositive of Dexon's "FUD" theory. The Fifth Circuit and this Court have repeatedly held that only spreading *clearly false* information can constitute anticompetitive conduct, and even then only under extreme circumstances that Dexon never attempted to show here despite bearing the burden to do so.[2] *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 896 (5th Cir. 2016); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir. 1999); *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308 (E.D. Tex. Mar. 30, 2018) Dkt. 247 at 40-43.

The R&R states that "Dexon readily distinguishes" these binding precedents on four grounds, *see* R&R at 136-138 – but each is incorrect:

*First*, the R&R says (at 136) that *Stearns* and *Retractable* involved only advertisements "out in the open and subject to corrective responsive advertising." That is simply incorrect: *Stearns* involved a defendant making "arguments" to municipalities "to convince" and "persuade buyers to favor their product prior to the actual bid" (not mass advertising), *see Stearns*, 170 F.3d at 522-25; *Retractable* involved the defendant applying a "false claim to customer-specific comparative spreadsheets" in addition to open advertising, *see Retractable*, 842 F.3d at 893-94.

---

[2] To illustrate, for such a claim to survive, the customers must be "unsophisticated." *Retractable*, 842 F.3d at 896. Dexon did not and could not make that showing. *See* Cisco MSJ at 21-22. The R&R says (at 135) that *Retractable* found "hospitals and group purchasing organizations" are "sophisticated parties." But each customer at issue here had an IT department familiar with networking equipment to make purchasing decisions; one customer was a hospital (through its IT department). There also is no genuine dispute of fact as to the reliance factor – Dexon did not show a single customer relied on Cisco's representations in making a purchasing decision – or as to Dexon's failure to show that Cisco communicated with particular customers over "long periods" as *Retractable* further requires. *See* Cisco MSJ at 20-22.

2

Indeed, in *Red Lion* this Court applied those precedents to "marketing materials sent directly to customers." *Red Lion*, Dkt. 247 at 40-43. Moreover, whether statements are made openly matters because an antitrust plaintiff can counter or correct, which *Retractable* recognizes as a part of competition. Here it is undisputed that Dexon learned of *every* claimed "FUD" statement to an at-issue customer. *See* Cisco MSJ at 21. The R&R asserts that Dexon "sometimes" countered, R&R at 136, but neither the R&R nor Dexon identify a *single* customer for which Dexon did not counter.

*Second*, the R&R says (at 137) that *Retractable* distinguished another Fifth Circuit case – *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983) – as an instance where "false and disparaging statements" could support an antitrust claim. But as the R&R recognizes, that case entailed "false" statements. There is no dispute that this case does not. Further, and as the R&R also recognizes, *Multiflex* involved false statements that eliminated the defendant's "only other competitor." Here by contrast, Dexon competes with *thousands* of resellers (authorized and unauthorized) – plus Cisco has multiple OEM competitors – as the R&R also finds. *See* R&R at 14-15, 39; *see also* Cisco MSJ at 7 & n.27. Even Dexon's expert conceded that Cisco's conduct has not eliminated a *single* unauthorized reseller from the market, which Dexon never disputed. *See* Cisco MSJ at 29. Finally, neither Dexon nor the R&R addresses that the Fifth Circuit subsequently and expressly disavowed any suggestion in *Multiflex* that an antitrust claim can survive without a showing of actual effects on competition. *See* Cisco MSJ Reply (Dkt. 366) at 10 n.17 (explaining subsequent history in *Deauville*).

*Third*, the R&R says (at 137) that "Dexon asserts (and presents evidence) that Cisco's FUD constitutes threats that are not indicative of competition on the merits." But there is no dispute that Cisco told customers only truthful information: Dexon is not authorized to sell Cisco equipment and Cisco cannot know from where Dexon obtains the equipment it resells – making it

3

ineligible for warranty and SMARTnet coverage absent recertification – even if Dexon sold the customer an invalid contract covering equipment that Dexon sold. The R&R refers (at 138) to Dexon's assertion that Cisco might "threaten" some unspecified "legal action," but Dexon merely shows that Cisco has informed a handful of customers (out of tens of thousands) that Cisco reserves its rights to protect its IP when end users obtain gear from unauthorized resellers and use it without licenses. That is accurate and not anticompetitive as a matter of law. *See Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983) ("threats of litigation [are] protected by petitioning immunity").

*Fourth*, the R&R says (at 138) that *Red Lion* is distinguishable because it held that statements to customers "without more" do not amount to anticompetitive conduct, whereas here "Dexon's antitrust claim is based on more" including that Cisco "implicitly threatens that Cisco will leverage its service monopoly to punish customers in the future." But the R&R identifies no threat of *anticompetitive* conduct: Dexon proffered no evidence of unlawful tying, and Cisco's policy restricting SMARTnet is admittedly lawful. To the extent this analysis commits the legal error of evaluating supposed "FUD" conduct (spreading information about Dexon) together with other conduct (such as service "tying" or the audits discussed below) it commits legal error. As the R&R explained, if challenged conduct (here "FUD" supposedly disparaging Dexon) is lawful on its own, it does not become unlawful because the defendant engaged in other (here, also lawful) conduct. *See Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 457 (2009) (rejecting attempt to "alchemize" lawful conduct into a "new form of antitrust liability" by combining acts).

The R&R relies (at 138) on an unpublished out-of-circuit decision – *Arista Networks, Inc. v. Cisco Systems, Inc.*, 2018 WL 12230167 (N.D. Cal. May 21, 2018) – but that case had nothing to do with "FUD." Indeed, the plaintiff in that case itself clarified "it is not arguing that Cisco

4

made disparaging statements." *Id.* at *12. The plaintiff instead complained that Cisco made statements that a once-open system was now closed, in support of an "open early, closed late" scheme. *Id.* The court noted that the alleged "anticompetitive harm stemming" from that conduct "does not rely on whether Cisco disparaged Arista" making the *Retractable* analysis (known as the *Harcourt Brace* analysis in the Ninth Circuit) "inapplicable." *Id.* at *13.

### b. Cisco's Resolution of Software Audits Cannot Support a Section 2 Claim

The R&R erred in finding that the "audit" theory can support a Section 2 claim.[3] Dexon identified just one of its customers that Cisco audited (Arvest). *See* Cisco MSJ at 22-23. Dexon failed to show how that could or did amount to anticompetitive conduct that maintained multiple alleged Cisco monopolies. *Cf.* R&R at 125 (rejecting evidence limited to "two examples" as being sufficient to show effect on competition). The R&R notes (at 143) that Dexon pointed to another company subject to an audit (Trustwave), but Dexon does not claim this was a Dexon customer. Nor has Dexon shown that a Cisco equipment rival – i.e., one of Cisco's competitors in the supposedly monopolized markets – has ever lost a sale because of a Cisco audit resolution.

The scant audit resolutions at issue (two for purposes of this motion) involve Cisco waiving, as part of a deal to sell the customer additional Cisco equipment, licensing fees the customer owed to Cisco for using its IP without a proper license. *See* Cisco MSJ at 22-24. In other words, the customer got a discount – the customer avoids paying license fees *and* buys more equipment – which is procompetitive. *See Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F. App'x 244, 245, 248 (5th Cir. 2019) (per curiam).

The R&R asserts (at 142) that there is a "genuine issue of material fact as to whether Cisco . . . forced its customers into settlement agreements that would prevent them from

---

[3] The R&R (at 130 n.58) states that "Dexon considers the audit issue as part of Dexon's FUD-based claims"; accordingly, the legal arguments above apply to this aspect of the Section 2 claims.

5

purchasing competitive products from competitors and the independent channel." But the R&R does not explain what *evidence* supports finding that those customers gave up the right to purchase competitive products (another OEM's gear) from anyone. All the R&R cites are audit terms requiring the customer to obtain the Cisco gear from an authorized reseller. *See* R&R at 141-142. That provides no support for the assertion that the audit resolution somehow stopped a rival OEM from selling non-Cisco equipment. Without such evidence, the audit resolutions cannot support Dexon's equipment-monopoly claims.

  c.  **Conduct "Similar" to Tying Cannot Support the Monopoly Claims**

The R&R found that Dexon could not show that "this record creates an inference that Cisco in fact engaged in the tying/bait and switch schemes in a manner that affected competition in the tied market." R&R at 125. It further found that Dexon had failed to show that the alleged tying and bait-and-switch caused Dexon to lose any sales ("Dexon already made the sale") or suffer any reputation harm: "reputational loss would only occur if Dexon had inaccurately told the customers that the sold Cisco equipment was not gray market." *Id.* at 127; *see also id.* at 130 (finding that "Dexon does not show harm from its tying allegations").

In light of these holdings, Dexon cannot support its Section 2 claims with assertions that Cisco leveraged its SMARTnet service by "coercing purchases in the relevant markets by withholding services in the relevant service market," R&R at 127 – i.e., the "tying" conduct. As the R&R recognizes (at 129), "settled principles of antitrust law" in the Fifth Circuit and sister circuits require that multiple "theories" of unlawful conduct proffered in support of a Section 2 claim "must be separately analyzed." *Retractable*, 842 F.3d at 891; *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366-67 (Fed. Cir. 1999).

After rejecting Dexon's effort to establish liability based on tying or bait-and-switch, the

R&R states that Dexon can "rely on evidence of similar conduct as part of an overall scheme that does harm Dexon." R&R at 130. Whatever probative value such evidence may have with respect to Dexon's claim, to the extent Dexon argues that it may advance tying or bait-and-switch to establish anticompetitive conduct under Section 2, that interpretation would render this aspect of the R&R legally erroneous. Cisco reserves the right to seek an instruction to ensure that the jury is not confused about the potential relevance of any such evidence.

## II.  There Is No Genuine Dispute That Dexon Did Not Sustain Any Antitrust Injury

**1.  *Legal Standards*.** Dexon claims Cisco unlawfully monopolized – or conspired and attempted to monopolize – equipment markets (for switches, routers, and IP phones) where Cisco has supposedly maintained share at the expense of interbrand OEM rivals (like Hewlett Packard, Juniper, and Dell). *See* R&R at 11 (discussing Cisco's OEM rivals). Accordingly, to show antitrust injury, as it must for each of its Section 2 claims, Dexon must establish that its injury flows from the harm Cisco supposedly inflicted on OEM competition in the interbrand equipment markets. *See also Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007).

**2.  *Objection*.** There is no genuine dispute that Dexon has not shown antitrust injury. Dexon adduced *zero* evidence of a single OEM that lost a single sale because of Cisco's alleged conduct, let alone that such competitive harm injured Dexon. *See* Cisco MSJ at 29. And *every* Dexon witness testified that Cisco had never interfered with Dexon's attempts to sell non-Cisco equipment. *See* Cisco MSJ at 28 & n.139. Accordingly, Dexon suffered no injury by virtue of Cisco engaging in anticompetitive conduct vis-à-vis its OEM rivals, i.e., that which makes the alleged Section 2 monopoly conduct unlawful. *See Almeda Mall, Inc. v. Houston Lighting & Power Co.*, 615 F.2d 343, 353-54 (5th Cir. 1980).

The R&R excuses this defect by citing (at 145) the Fifth Circuit's decision in *Walker v. U-*

*Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984), for the proposition that injury to competition is "presumed by proof of the elements of monopolization," and finding (at 146) that Dexon "sufficiently shows Defendants' alleged conduct caused it harm by preventing it from making sales." But the *Walker* Court explained that, "[t]o show antitrust injury, [an antitrust plaintiff] must establish that the injury to [its] business . . . flowed from or reflected the presumed anticompetitive effects result[ing] from [the defendant's] alleged monopolization of or attempt to monopolize" the alleged markets. *Id.* at 1015. And the Fifth Circuit held that such injury is absent where the "presumed anticompetitive effects" are *intrabrand* but the monopolization claim concerns an *interbrand* market, *see id.* at 1015-16 – exactly as here.

Dexon cannot show logically that Cisco harmed interbrand competition among OEMs and thereby injured Dexon. *See Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000) (antitrust claims must "make economic sense"). Dexon's damages theory is that, but for the alleged conduct, Dexon would have sold *even more Cisco equipment*. Dexon does not explain how Cisco prevented competition from other OEMs by stopping Dexon from selling even more Cisco gear. Nor does Dexon present evidence that it is unique among thousands of resellers in prioritizing non-Cisco sales. *See* Cisco MSJ at 5 n.13. These undisputed facts foreclose a showing of antitrust injury.[4]

## CONCLUSION

For the foregoing reasons, Cisco respectfully requests the Court sustain the Objection.

---

[4] If relevant, Dexon showed no harm to intrabrand competition either. There are hundreds if not thousands of unauthorized resellers of Cisco equipment along with thousands of authorized Cisco resellers; Dexon concedes that Cisco's challenged conduct has eliminated none of them. In these circumstances, customers have no restriction on choices for Cisco equipment; if some choose not to deal with Dexon, then that has no impact on competition. The R&R invokes (at 87) *Graphic Products Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560 (11th Cir. 1983), but there it was conceded that the defendant had used *territorial* restraints and thereby "completely eliminated intrabrand competition," *id.* at 1574, whereas here it is conceded that Cisco has not eliminated any of the thousands of competing resellers. *See* Cisco MSJ at 7.

Dated: January 11, 2024

Respectfully submitted,

/s/ Deron R. Dacus
DERON R. DACUS (Bar No. 00790553)
THE DACUS FIRM, PC
821 ESE Loop 323, Suite 430
Tyler, TX 75701
(903) 705-1177
ddacus@dacusfirm.com

AARON M. PANNER (*pro hac vice*)
ANDREW E. GOLDSMITH (*pro hac vice*)
LESLIE V. POPE (*pro hac vice*)
KELLOGG, HANSEN, TODD,
　FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
agoldsmith@kellogghansen.com
lpope@kellogghansen.com

RICHARD J. NELSON (*pro hac vice*)
LOUIS P. FEUCHTBAUM (*pro hac vice*)
SIDEMAN & BANCROFT LLP
One Embarcadero Center
Twenty-Second Floor
San Francisco, CA 94111-3711
(415) 392-1960
rnelson@sideman.com
lfeuchtbaum@sideman.com

*Attorneys for Defendant Cisco Systems, Inc.*

**CERTIFICATE OF SERVICE**

  I hereby certify that all counsel of record, who are deemed to have consented to electronic service are being served on January 11, 2024, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) and electronic mail.

                */s/ Deron R. Dacus*