**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION**

| | | |
|---|---|---|
| **DEXON COMPUTER, INC.** | § | |
| | § | |
| **v.** | § | **Case No. 5:22-cv-53-RWS-JBB** |
| | § | **SEALED** |
| **CISCO SYSTEMS, INC. and CDW** | § | |
| **CORPORATION** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

The above-referenced case was referred to the undersigned United States Magistrate Judge

for pretrial purposes in accordance with 28 U.S.C. § 636.  The following pending motions are

before the Court:

> **Defendant CDW Corporation's Motion to Dismiss Counts II and VI of the
> Amended Complaint (Dkt. No. 189);**

> **Defendant Cisco Systems, Inc.'s Federal Rule of Civil Procedure 56 Motion
> for Summary Judgment as to All Claims (Dkt. No. 326); and**

> **Defendant CDW Corporation's Motion for Summary Judgment (Dkt. No.
> 331).**

The Court, after considering the relevant briefing and hearing arguments of counsel November 2,

2023, recommends CDW's motion to dismiss be **DENIED** and Defendants' motions for summary

judgment be **GRANTED IN PART and DENIED IN PART**.  Specifically, the undersigned

recommends CDW's summary judgment motion be granted on the discrete issue of fraudulent

concealment but that, due to the necessary credibility determinations, the issue of CDW's specific

intent to monopolize be considered in light of a full factual record at trial.  The undersigned

recommends Defendants' summary judgment motions be granted as to Dexon's § 1 conspiracy

claim (Count I) and § 1 tying claim (Count III).  Otherwise, the Court recommends Defendants'

summary judgment motions (as to the § 2 claims) be denied.

1

Contents

I.    BACKGROUND ........................................................................................... 3

II.   LEGAL STANDARDS ................................................................................. 7

III.  SUMMARY JUDGMENT EVIDENCE ...................................................... 9

IV.   SHERMAN ACT........................................................................................ 52

V.    DEXON'S CONSPIRACY CLAIMS AGAINST CISCO AND CDW (COUNTS I-II, VI) 54

      A.    Statute of Limitations concerning Dexon's pre-2018 claims against CDW......... 54

1.    Continuing Conspiracy................................................................... 55

2.    Fraudulent Concealment ................................................................ 61

      B.    Dexon's Sherman Act § 1 and § 2 conspiracy claims against Cisco and CDW ... 66

1.    Applicable law............................................................................... 66

2.    Parties' assertions.......................................................................... 67

3.    Dexon's evidence it cites to show anticompetitive / unlawful conduct ........................ 69

4.    Section 1 analysis (Count I) ........................................................ 76

5.    Section 2 analysis (Count II)........................................................ 94

VI.   DEXON'S TYING AND MONOPOLY CLAIMS AGAINST CISCO (COUNTS III-VI) 104

      A.    Relevant background…………………………………………………...105

      B.    Tying claim against Cisco........................................................... 109

1.    Applicable law............................................................................. 110

2.    Cisco's assertions…………………………………………………...112

3.    Analysis ....................................................................................... 113

      C.    Monopolization and attempted monopolization claims against Cisco .............. 127

1.    Applicable law............................................................................. 127

2.    Parties' assertions, generally ...................................................... 128

3.    Dexon's evidence it cites in support of its "FUD-based"/audit claims........................ 130

4.    Analysis ....................................................................................... 133

VII.  ANTITRUST INJURY WITH RESPECT TO THE SURVIVING COUNTS ................. 143

      A.    Applicable law ........................................................................... 144

      B.    Analysis....................................................................................... 145

VIII. RECOMMENDATION.............................................................................. 149

# I.   BACKGROUND

## A.  Dexon's allegations

On April 27, 2022, Plaintiff Dexon Computer, Inc. ("Dexon") filed the above antitrust case against Defendants Cisco Systems, Inc. ("Cisco") and CDW Corporation ("CDW") (collectively, "Defendants").[1] In its amended complaint, Dexon alleges Cisco is a monopolist in several worldwide and U.S. markets related to networking equipment and services for Internet equipment. *See, e.g.*, Dkt. No. 175 ("Am. Compl."), ¶¶ 1-14, 23-24. Dexon alleges separate and distinct markets for (1) Ethernet switches and (2) routers (together, "Relevant Network Equipment Markets") and (3) IP phones ("Relevant IP Phones Markets") (collectively, "Relevant Product Markets"). *Id.*, ¶¶ 31-44. Dexon further alleges the aftermarket maintenance services on Cisco equipment constitutes a separate "Relevant Service Market" in which Cisco is a monopolist possessing a share in excess of 90%, with no other competitive service provider having reached a double-digit share. *Id.*, ¶¶ 25-30. According to Dexon, Cisco locks in customers who require maintenance on networking equipment with Cisco's SMARTnet program, forcing customers to make supracompetitive purchases of routers and Ethernet switches. *Id.*, ¶¶ 45-55.

Dexon resells network equipment manufactured by Cisco and Cisco competitors, and for at least four years prior to 2015, Dexon had access to Cisco's online database in which Dexon could arrange for maintenance service on behalf of it and Cisco's customers. *Id.*, ¶¶ 7-8, 11-12. Dexon alleges its business model allowed customers to replace Cisco networking equipment with

---

[1] By way of background, on July 22, 2020, almost two years before Dexon filed its current case, Cisco filed suit against Dexon in the U.S. District Court for the Northern District of California ("California Lawsuit"), alleging among other things that Dexon sells counterfeit Cisco products in violation of the Lanham Act and California state law. *See* Dkt. Nos. 94, 107, 149.

non-Cisco networking equipment and also "put pressure on Cisco to lower prices and improve its service" *Id.*, ¶ 13. Dexon alleges that by at least 2015, Cisco deemed multi-vendor resellers like Dexon a competitive threat. *Id.*

Dexon claims that Cisco thereafter engaged in a "multi-prong strategy, including to threaten customers not to do business with resellers like Dexon or else pay the consequences in the service market where Cisco has complete control." *Id.* "In the process, Cisco has constrained its network equipment competitors and thus customer choice and has maintained its supra-competitive pricing in several relevant product markets." *Id.* Specifically, Dexon claims that Cisco employed a strategy of "fear, uncertainty and doubt" ("FUD") tactics to foreclose competitive purchases and allow Cisco to maintain its "market power and monopoly shares" and to maintain supra-competitive prices for its products. *Id.*, ¶¶ 6-9, 71-83.

According to Dexon, in carrying out its scheme, Cisco determined that one of its "favored resellers," Defendant CDW, "could be an ally in its plan to foreclose resellers like Dexon from providing superior service, pricing, and competitive network equipment options." *Id.*, ¶¶ 56-57. Dexon alleges Cisco and CDW "conspired to exclude Dexon from making sales in at least the Relevant Networking Equipment Market to end user customers," providing a hospital system in Pennsylvania as an example of how the alleged conspiracy works. *Id.*, ¶¶ 57-60; *see also id.*, ¶ 13. Dexon alleges CDW sells Cisco equipment in the Relevant Networking Markets and had revenue of $18.47 billion in fiscal year 2020 (compared with Cisco's $49.8 billion in the same time period), and "Cisco favors CDW because CDW's resale prices in the Relevant Networking Markets allow Cisco to maintain its supra-competitive pricing in those Markets." *Id.*, ¶ 56; *see also id.*, ¶ 61 (alleging the Cisco-CDW conspiracy has limited intrabrand competition between resellers selling Cisco Networking Equipment and interbrand competition between Cisco and its competitors in the

Relevant Networking Equipment Markets and providing as an example an allegation that a search for "Ethernet switches" on CDW's website pulls up 1,440 selections for Cisco with no other Ethernet switch competitor). In response to the Court's March 31, 2023 Order on Defendants' motions to dismiss, Dkt. No. 149, Dexon's amended complaint adds six new paragraphs specifically regarding CDW's specific intent to monopolize. Dkt. No. 175, ¶¶ 65-70.

Dexon asserts the following specific claims against Defendants. In Count I, Dexon asserts the conspiracy between Cisco and CDW reflects an unreasonable restraint of trade under Section 1 of the Sherman Act, 15 U.S.C. § 1. *See, e.g.*, *id.*, ¶¶ 93-99. In Count II, Dexon alleges the agreement between Cisco and CDW reflects a conspiracy to monopolize that is unlawful under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id.*, ¶¶ 100-106. In Counts III through V, Dexon brings the following claims against Cisco: (1) § 1 claim for *per se* tying in the Relevant Product Markets (*id.*, ¶¶ 107-114); (2) § 2 claim for unlawful monopolization of the Relevant Networking Equipment Markets (*id.*, ¶¶ 115-120); and (3) § 2 claim for unlawful attempted monopolization of the Relevant Product Markets (*id.*, ¶¶ 121-127). Finally, in Count VI, Dexon asserts claims under the Texas Free Enterprise and Antitrust Act ("TFEAA") against both Cisco and CDW.[2] *Id.*, ¶¶ 128-143.

---

[2] Because the TFEAA is modeled after the Sherman Act, Texas courts interpret its provisions "in harmony with federal judicial interpretations of equivalent federal laws." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No. 5:17-CV-1295-RCL, 2022 WL 980791, at *9 (W.D. Tex. Mar. 31, 2022) (quoting *Apani Sw., Inc. v. Coca–Cola Enters., Inc.,* 300 F.3d 620 (5th Cir. 2002); also citing *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 687 (Tex. 1990) (interpreting § 15.05(a) in accordance with Sherman Act § 1); *Caller–Times Publ'g Co. v. Traid Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (interpreting Tᴇx. Bᴜs. & Cᴏᴍᴍ. Cᴏᴅᴇ § 15.05(b) in tandem with Sherman Act § 2)).

**B.  Defendants' motions**

**1.  CDW's motions**

In its refiled Rule 12(b)(6) motion to dismiss Counts II and VI, CDW asserts Dexon's amended complaint "suffers from the same pleading defect as its initial pleading: it fails to allege any facts to plausibly suggest CDW possessed a specific intent to further co-defendant [Cisco's] alleged monopolies in any relevant market, a required element of a conspiracy to monopolize claim under Section 2 of the Sherman Act." Dkt. No. 189 at 1. In its motion for summary judgment, CDW raises four main arguments, the third of which dovetails into the issue of whether Dexon has sufficiently pleaded specific facts that CDW had the specific intent to monopolize. Therefore, the Court considers the issues raised in CDW's motion to dismiss in conjunction with the discussion of CDW's motion for summary judgment. CDW's four main arguments in favor of summary judgment are as follows:

> (1) All of Dexon's federal and state law antitrust claims against CDW (Counts I, II, and VI) are barred by the four-year statute of limitations because neither Dexon nor its expert has identified sales Dexon lost from any customer due to alleged conspiratorial act after 2018. Dkt. No. 331 at 15-17.

> (2) Count 1 (Cisco-CDW conspiracy to unreasonably restrain trade in violation of § 1) fails because (a) the challenged end-customer limitation in the Systems Integrated Agreement between Cisco and CDW is presumptively permissible and desirable; and (b) there is no evidence that Cisco's reseller agreement caused marketwide harm. *Id.* at 18-26.

> (3) Count II (Cisco-CDW conspiracy to monopolize in violation of § 2) fails because there is no evidence that CDW maintains the "specific, shared purpose" to maintain any supposed monopoly held by Cisco.  *Id.* at 26-28.

> (4) All of Dexon's antitrust claims against CDW (Counts I, II, and VI) independently fail because there is no evidence that Dexon has suffered an antitrust injury and there is no evidence of any competitive harm to Dexon.

*Id.* at 28-30.

## 2. Cisco's motion

Cisco asserts two overarching issues in its summary judgment motion. First, Cisco argues Dexon cannot show that Cisco engaged in unlawful anticompetitive conduct, and Cisco is entitled to summary judgment as a matter of law on Counts I-VI. Dkt. No. 326 at 15-26. Second, Cisco argues Dexon lacks antitrust injury, and Cisco is entitled to summary judgment as a matter of law on Counts I-VI. *Id*. at 27-30. To the extent the issues overlap with those raised by CDW in its summary judgment motion, the Court considers the arguments together.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) motion to dismiss

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215, 219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

"'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)).

## B.  Summary judgment standard

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting FED. R. CIV. P. 56(a)). "A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013)). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *Id.* (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).

In general, summary judgment requires inferences to be drawn from the underlying facts to be viewed in the light most favorable to the nonmovant. *Acad. of Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.*, No. CV 18-399, 2023 WL 8185692, at *4 (E.D. La. Nov. 27, 2023). However, in the context of an antitrust conspiracy case, the Supreme Court has cautioned that "antitrust limits the range of permissible inferences from ambiguous evidence." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 312 (5th Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Without direct evidence of an unlawful conspiracy, the court must consider conspiracy claims under the stricter standard required for Sherman Act § 1 claims based on circumstantial evidence: whether the evidence in the record tends to exclude the possibility that the defendants acted independently. *Acad. of Allergy & Asthma*, 2023 WL 8185692, at *8 (citing *Matsushita*, 475 U.S. at 587–88).

# III. SUMMARY JUDGMENT EVIDENCE

## A.  Evidentiary issues

Dexon has proffered the expert testimony of Robert S. Maness, Ph.D. – a Senior Managing Director at Coherent Economics, an economic consulting firm – who submitted three reports: an opening report dated July 29, 2023 ("Maness Opening Report"); a rebuttal report dated August 19, 2023 ("Maness Rebuttal Report"); and a reply report dated September 9, 2023 ("Maness Reply Report"). Defendants have proffered the expert testimony of Keith R. Ugone, Ph.D. – a Senior Advisor at Analysis Group, an economics consulting firm – who also submitted three reports: an opening report dated July 28, 2023 ("Ugone Opening Report"); a rebuttal report dated August 19, 2023 ("Ugone Rebuttal Report"); and a reply report dated September 9, 2023 ("Ugone Reply Report").

Defendants have filed a Rule 37 motion to prohibit Dexon from presenting evidence of undisclosed damages theories (preceding from a claim that Cisco's conduct caused general reputational harm to Dexon both inside and outside the alleged relevant markets as opposed to Cisco's alleged interference with specific customer transactions) and to strike those portions of Dexon's expert reports. Dkt. No. 328. Additionally, two *Daubert* motions regarding Maness's and Ugone's damages opinions remain pending.[3]

---

[3] Defendants have filed a motion to limit the testimony of Maness, wherein Defendants assert Maness should not be permitted to testify about monopolization damages because he failed to employ the methodology required to show that Dexon's non-Cisco sales provide an appropriate benchmark for Dexon's Cisco sales or any other reliable or acceptable methodology. Dkt. No. 327 at 1. Dexon has filed a motion to limit the testimony of Ugone, requesting the Court exclude discrete portions of the Ugone Rebuttal Report wherein Ugone opines that Dexon's antitrust damages model must (a) reconstruct the but-for world in the absence of Cisco's anticompetitive conduct ("but-for world reconstruction opinion"), and (b) provide a breakdown of its damages segregated by each type of anticompetitive conduct ("damages-breakdown opinion"). Dkt. No. 329 at 1.

The pending motions need not be addressed for purposes of ruling on Defendants' present dispositive motions. This does not mean the challenges are without merit; rather, the Court's recommendations herein are not affected by the issues raised in the pending motions.

## B. Material facts[4]

### 2. The parties

#### a. Cisco

This case involves information technology ("IT") equipment, specifically, Ethernet switches and routers that are used to connect computers, laptops, printers, and other equipment to one another and to the Internet, and IP phones that are used for making telephone calls over the Internet. Am. Compl., ¶ 44; Dkt No. 331-24 (hereafter, Ugone Opening Report), ¶¶ 31, 32, 34. In the IT industry, most original equipment manufacturers ("OEMs") sell their equipment to end-customers through resellers. Dkt. No. 331-1, Declaration of John Coleman (hereafter, Coleman Decl.), ¶ 10; *see generally* Ugone Opening Report, ¶¶ 45, 46. Like other OEMs, Cisco relies on "authorized" distributors and resellers, or "channel partners," to identify and reach potential customers, provide information on available products, and make sales. Ugone Opening Report, ¶¶ 24, 45; *see also id.*, ¶ 6 (stating sales through channel partners account for 90% of Cisco's worldwide sales); *see also* Dkt. No. 331-67 (CISCO00157767).

Cisco has made substantial investments to improve and maintain the quality, security, and reliability of its products. Ugone Opening Report, ¶¶ 96, 97-98 (stating Cisco has invested at least

---

[4] The material facts set forth in this section represent the facts as discerned by the Court from the pleadings and the parties' respective evidentiary submissions, in light of the relevant summary judgment standard requiring the record be viewed in the light most favorable to the nonmoving party. Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts. *See Willmore-Cochran v. Wal-Mart Assocs., Inc.*, 919 F. Supp. 2d 1222, 1228 (N.D. Ala. 2013).

$5 billion in R&D every year from 2011 to 2022, resulting "in Cisco achieving a valuable brand name"). Cisco's manufacturing competitors – other OEMs – are some of the world's largest companies, including Hewlett Packard Enterprise ("HPE"), Juniper Networks, Dell, and China-based Huawei. Dkt. No. 331-27 (hereafter, Maness Opening Report), ¶ 16; *see also* Dkt. No. 331-25 (hereafter, Ugone Rebuttal Report) at 17 (Tbl. 2), 19 (Tbl. 3), 21 (Tbl. 4) (identifying dozens of Cisco OEM competitors that also make these products).

### b. CDW

CDW is a "multi-brand reseller of information technology solutions," with "about $23 billion in annual revenue and 15,000 employees." Ugone Opening Report, ¶ 25. CDW has been a non-exclusive Cisco channel partner for nearly a decade, has been a Gold Partner (the highest tier of channel partner accreditation in the United States for Cisco) for over five years, and has won Cisco's Global Partner of the Year Award. *Id.*

CDW's offering includes over 100,000 products manufactured by over 1,000 OEMs, including Adobe, Apple, Cisco, Dell, Google, Hewlett Packard Enterprise, IBM, Intel, Lenovo, Microsoft, Palo Alto Networks, Samsung, VMware, and a variety of emerging technology companies. Coleman Decl., ¶ 5; Ugone Opening Report, ¶ 26; *see also* Dkt. No. 331-52. Its offering includes thousands of Ethernet switches, routers, and IP phones manufactured by dozens of OEMs, including Arista, Asus, Brocade, Ciena, Cisco, D-Link, Extreme Networks, Fortinet, Juniper, Linksys, Netgear, Ruckus, TP-Link, and Ubiquiti. Dkt. No. 331-54 (CDW's Responses to Dexon's First Set of Interrogatories) at 16-18; Coleman Decl., ¶ 6.  To complement its offered hardware and software products, CDW offers its customers advice and assistance in designing and implementing IT solutions and other value-added services to meet its customers' specific needs. Dkt. No. 331-65 (CDW-DXN-0876188) at -90); *see also* Dkt. No. 331-34 (Krebill Dep. Tr.) at

31:6-10 ("[H]aving people work through some of the deal strategy, account strategy, certainly helping [customers] configure complex solutions."); Maness Opening Report, ¶¶ 27, 29.

CDW is one of more than 8,000 authorized Cisco resellers in the United States. Maness Opening Report, ¶ 27; Dkt. No. 331-29 (hereafter, LaMagna Opening Report), ¶ 19. A reseller can become a Value Added Reseller ("VAR")[5] by filling out an application on Cisco's website and accepting the Indirect Channel Partner Agreement. Ugone Opening Report, ¶ 65 ("The majority of Cisco's more than eight thousand channel partners in the United States are VARs."). Cisco's website explains that it takes just 30-45 minutes to submit an application. Dkt. No. 331-51 ("Get Started in the Cisco Channel Partner Program") at 4. As part of Cisco's Channel Certification Program, Cisco certifies some of its VARs as "Select," "Premier," or "Gold" based upon (a) the VAR's technical expertise in Cisco products and (b) the quality of end-user support offered by the VAR. Ugone Opening Report, ¶ 65. Cisco's Partner Program is flexibly structured to allow partners to participate in one or more roles, at whatever level fits their business. Coleman Decl., ¶ 11; *see also* Ugone Opening Report, ¶ 65 & n.113 (stating that in 2020, Cisco restructured its channel partner program such that Cisco's channel partners can choose from one or more of the following roles (Integrator, Provider, Developer, and Advisor) and further stating that within each role, partners can achieve the Select, Premier, or Gold level); Maness Opening Report, ¶ 27.

For each of its 1,000+ OEM partners, CDW is an "authorized" reseller,[6] meaning that CDW is authorized by the OEM to resell the OEM's equipment on the terms specified in the OEM's

---

[5] Cisco refers to its resellers as either Value Added Resellers ("VARs") or Direct Value Added Resellers ("DVARs"). Ugone Opening Report at 13, n. 23 & ¶ 61 ("Cisco's DVARs may purchase from Cisco directly."). Both VARs and DVARs purchase products from Cisco's Authorized Distributors, who in turn purchase products from Cisco. *Id.*

[6] Defendants frequently use the term "unauthorized resellers" to identify resellers that do not have a reseller agreement with the OEM, whereas Dexon uses the term "independent resellers." This order uses both terms interchangeably.

reseller agreement. Dkt. No. 331-54 (CDW's Responses to Dexon's First Set of Interrogatories) at 17 ("CDW is authorized to sell, or understands it is not restricted from selling, Ethernet switches, routers, and IP phones for each of the manufacturers identified on its website, www.cdw.com."); *see also* Coleman Decl., ¶¶ 12, 24. CDW has been an authorized reseller of Cisco equipment since at least 2007, when it entered into its Systems Integrator Agreement with Cisco. Coleman Decl., ¶ 12, Ex. D (Systems Integrator Agreement); *see also* Dkt. No. 331-35 (Coleman Dep. Tr.) at 87:18-88:10 (stating the Systems Integrator Agreement "basically gave [CDW] the authority to sell Cisco products to [its] customers"). In 2021, CDW sold approximately $2.8 billion of Cisco products and services in the United States, which accounted for approximately 11.4% of CDW's total net sales—meaning 89% of CDW's sales derived from non-Cisco equipment deals. Coleman Decl., ¶ 18; *see also* Coleman Dep. Tr. at 37:15-20. And most of CDW's sales were not networking products. *See* Dkt. No. 331-49 (CDW Corporation 2022 Annual Report (Form 10-K)) at 7.

To differentiate itself among authorized and unauthorized resellers and demonstrate its expertise to end customers, CDW invests in training and certification for its sales team, including technical specialists. *See* Dkt. No. 331-1 (Coleman Decl.), ¶ 21; *see also* Dkt. No. 331-35 (Coleman Dep. Tr.) at 74:16-75:7. These investments have qualified CDW for high- or highest-tier partner designations across multiple OEMs, including Dell EMC, Hewlett Packard Enterprise, IBM, Microsoft, NetApp, Nutanix, Palo Alto, and Samsung. Dkt. No. 331-49 (CDW Corporation 2022 Annual Report (Form 10-K)) at 5. As noted above, CDW is qualified as one of Cisco's 50+ "Gold" tier partners in the United States.[7] These investments help ensure that CDW's sales and

---

[7] While CDW does not know the exact number of Cisco Gold partners, Dexon's expert cited a source showing 60 Cisco Gold partners in the United States. Maness Opening Report, ¶ 29, n.33. Additionally, CDW has the highest level of partner certification from Dell, HPE, Juniper, LG Microsoft, Samsung, and others. Ugone Opening Report, ¶ 26.

technical support teams have the expertise and knowledge to provide advice on and meet an end customer's networking needs, whether that means equipping a small business or facilitating a large, multi-facility enterprise operation. Coleman Decl. at Ex. C.

### c. Dexon

Dexon is a self-described "middleman" retailer that sources its networking equipment products, including Cisco products, from "literally thousands of different suppliers." Ugone Opening Report, ¶ 27. In 2021, Dexon's revenue was roughly $14 million. *Id.*, ¶ 28. Dexon is an authorized reseller for several major manufacturers of networking equipment, including Arista, Extreme Networks, and Fortinet. Mannes Opening Report, ¶ 21.

In the early 2000s, Dexon was an authorized reseller of Cisco but decided to discontinue the relationship and has not attempted to become a Cisco-authorized reseller since 2004. Dkt. No. 356-2 (O'Neil Dep. Tr.) at 142:1-144:22 (discussing Dexon's decision to end its authorized reseller relationship with Cisco due to Cisco's unwillingness to allow Dexon to pursue a customer in California); *see also* Maness Opening Report, ¶ 21. Dexon is currently an unauthorized or "independent" Cisco reseller. Dkt. No. 331-55 (Dexon's Response to CDW's Requests for Admission 3, 4); Dkt. No. 331-45 (Casto Dep. Tr.) at 92:14-21 (stating Dexon does not have an authorized agreement or reseller contract with Cisco); *see also* Dkt. No. 331-40 (Tveitbakk Dep. Tr.) at 256:10-16 ("Q. And specifically, I believe you testified relating to that Cisco characterizes Dexon as an unauthorized reseller, that they are gray market, that they sell unauthorized equipment, and that their equipment isn't eligible for SMARTnet; is that right? A. Correct.").

According to Maness, independent resellers such as Dexon provide many benefits to end users such as: (a) price competition to Cisco's resellers, (b) a marketplace for the purchase and sale of used equipment, (c) less expensive networking options for redundancy purposes

particularly in cases where Cisco's resellers do not have supply, and (d) a "one-stop shop" in which different vendors' brands are featured without favoritism. Maness Opening Report, ¶¶ 33-34; Dkt. No. 356-13 (Sheh Dep. Tr.) at 23:2-24:20 (Dexon products provide value to customers as a less expensive alternative to Cisco products, and lower priced refurbished equipment also benefits customers by providing "lower costs" and backup equipment).

There are many resellers that operate outside OEM distribution channels and are not "authorized" but still buy and sell equipment.[8] Ugone Reply Report, ¶ 24 ("[T]here are more than 8,000 authorized resellers and hundreds of additional unauthorized resellers of Cisco equipment."); *see also* Dkt. No. 331-37 (Olson Dep. Tr.) at 235:16-236:2. ("Q. Are there any unauthorized Cisco resellers that you view to be a primary competitor to Dexon? A. Yes, there are. Q. And who are those unauthorized Cisco resellers? A. There are hundreds of them…."). Unauthorized resellers acquire OEM equipment from a variety of sources both inside and outside the OEM's authorized distribution channel (e.g., eBay). Maness Opening Report, ¶ 33; LaMagna Opening Report, ¶ 35; *see*, *e.g.*, Dkt. No. 331-32 (Graber Dep. Tr.) at 214:9-11.

Dexon purchases Cisco (and other OEMs') equipment from "thousands" of suppliers and other sources around the world. *See* Dkt. No. 331-44 (Roush Dep. Tr.) at 190:13-19; *see also* Dkt. No. 331-71 (DEXON_0428866) (email from Dexon's General Manager, Steve O'Neil, to a potential customer stating, "The pricing I quoted you was for new grey market equipment meaning

---

[8] Dexon asserts CDW concedes that there are "countless" independent resellers providing that pricing pressure (Dkt. No. 331 at 30 ("Cisco's countless unauthorized resellers"), and the record confirms that there are several hundred in independent trade group UNEDA alone. Dkt. No. 356 at 8 (citing Dkt. No. 356-15 (CISCO00554666) at 5 n.6 (April 2021 Cisco aftermarket analysis deck noting that the UNEDA alliance contains 300+ aftermarket dealers representing both small and large players in the independent channel)). According to Dexon, while Defendants attempt to portray these facts in a negative light because the independent channel threatens the supracompetitive profits they have made, Dexon asserts the reality is that independent resellers are filling an important marketwide need that Cisco's resellers do not satisfy. *Id.* (citing Maness Opening Report, ¶¶ 33-34).

that we source it from a non-US supplier. We get better pricing out of the US channel than by going through the US channel."). In the last decade, Dexon has used nearly 2,000 different suppliers to acquire Cisco hardware, and Dexon purchased Cisco equipment from over 1,100 individual eBay sellers between 2011 and 2022. LaMagna Opening Report, ¶ 26; *see also* Dkt. No. 331-73 (DEXON_0476849) (Dexon historical purchasing data). Dexon also has purchased Cisco equipment directly from Cisco's authorized resellers. Dkt. No. 331-47 (Ripley Dep. Tr.) at 40:22-41:2.

Dexon does not always disclose to customers that Dexon is an independent or unauthorized reseller when customers look to purchase Cisco products from Dexon. *See* Dkt. No. 326-35 (Kaas Dep. Tr.) at 327:14-328:15; Dkt. No. 326-25 (Roush Dep. Tr.) at 255:19-256:2 (stating he does not tell all of his customer accounts that Cisco might not honor the SMARTnet he sells because Dexon is an unauthorized reseller); Dkt. No. 326-27 (Tate Dep. Tr.) at 149:12-150:4 (discussing the ███ transaction); Dkt. No. 326-29 (Wickert Dep. Tr.) at 115:6-116:13 (discussing the ███ transaction); *see also* Dkt. No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 22 (stating that Dexon lacks sufficient knowledge or information as to whether "all of its customers" have been informed that Dexon is not a Cisco contractual channel partner).

Until 2021, Dexon was a regular CDW customer, purchasing both Cisco and non-Cisco products. Dkt. No. 331-9, Declaration of Frank Szymanski (hereafter, Szymanski Decl.), ¶¶ 4-6 (CDW account manager who first began working with the Dexon account, which was one of his largest accounts, around 2015 and who – until March 2021 – frequently worked directly with Cisco sales representatives to obtain authorizations for discounts extended to Dexon). However, in March 2021, Cisco employee Todd Kafka notified John Coleman, the Director of Cisco Acceleration at CDW, that CDW's Szymanski sent quotes of Cisco networking equipment

16

products to Dexon, who Kafka informed Coleman was a "reseller." Coleman Decl., ¶¶ 2, 27 & Ex. E. Coleman informed Szymanski that CDW's reseller agreement with Cisco does not authorize CDW to sell Cisco products to other resellers, and as a result, CDW could not sell Cisco equipment to Dexon. *Id.*, ¶ 27 & Ex. E.

Shortly thereafter, CDW notified Dexon that CDW could no longer sell Cisco equipment to Dexon. Szymanski Decl. at Ex. D; *see also* Coleman Decl., ¶ 27. CDW's sales of Cisco equipment to Dexon are not allowed under CDW's reseller agreement, unless Dexon either was the end customer itself or would own the equipment installed at an end customer's location. Coleman Decl., ¶ 23 & Ex. D; *see also* Szymanski Decl., ¶ 9. However, CDW continued to sell non-Cisco equipment to Dexon, through at least the filing of this lawsuit. Coleman Decl., ¶ 28; *see also* Dkt. No. 331-32 (Graber Dep. Tr.) at 378:7-10; Dkt. No. 331-74 (DEXON_0476849) (Dexon purchasing data listing CDW as a vendor for IT equipment after March 2021); Dkt. No. 331-75 (DEXON_0476850 (same)).

Overall, Dexon has grown by 50% since 2018 – the year Dexon's economist claims Cisco's alleged anticompetitive conduct increased – and 2022 was its best year on record, with its highest dollar volume of Cisco sales in the alleged relevant markets since 2011. *See* Maness Opening Report, ¶ 126; Dkt. No. 326-6 (Maness Dep. Tr.) at 217:11-19; Ugone Rebuttal Report at Ex. 9 (tabulating Dexon's total sales over a decade).

### 3. Cisco's alleged tying and FUD tactics

#### a. Maness's opinions, generally

On July 29, 2023, Dexon submitted the expert report of its economic expert, Robert S. Maness, Ph.D., in support of its antitrust claims and in support of its claim for damages. The following is a summary of Maness's opinions:

I have concluded that Cisco possesses monopoly power in the aftermarket for the maintenance and service of Cisco products, the market for Ethernet switches, and the market for routers, all of which I have determined to be relevant antitrust markets. I have also determined that Cisco has attempted to monopolize the enterprise voice market, a relevant antitrust market of which IP phones are a part. Cisco's conduct also demonstrates that it has attempted to tie its market power in the aftermarket for the maintenance and service of Cisco products to the relevant markets for Ethernet switches, routers, and enterprise to maintain or extend its monopoly power. Cisco's conduct has harmed intrabrand and interbrand competition and directly harmed third-party distributors like Dexon. In particular, Cisco has spread fear, uncertainty and doubt in the marketplace to steer customers away from third-party distributors like Dexon limiting intrabrand competition and insulating itself and its distributors from competition. Additionally, Cisco uses its monopoly power to perform invasive and costly customer audits, which often result in significant fines, or in lieu of fines, agreements to make substantial purchases from Cisco, locking in Cisco customers that may otherwise have moved to Cisco's competitors.

I have also determined that Cisco and CDW had the incentive to coordinate their conduct to the detriment of both intrabrand and interbrand competition based on their signed agreements and mutual investments. Cisco made "monstrous" investments in CDW that were only possible due to its long-term monopoly power in the relevant markets which led CDW to prioritize Cisco products. CDW also coordinated with Cisco to exclude third-party distributors from the relevant markets. This conduct harmed intrabrand and interbrand competition.

Finally, Cisco's individual conduct and the coordination between Cisco and CDW has not only harmed competition broadly, it has caused antitrust harm to Dexon amounting to $27.6 million. . . .

Maness Opening Report, ¶¶ 12-14 (internal numbering omitted).

Regarding Cisco's alleged "tying" and "bait and switch" tactics (Maness Opening Report, ¶¶ 81-82, 102-113), Maness states Cisco, through its partners, often allows SMARTnet coverage to be purchased for equipment that is not sold through authorized channels, then will later terminate, or threaten to terminate, the coverage once the critical infrastructure is in place, forcing the end customers to either pay significant licensing fees or to purchase new equipment. *Id.*, ¶ 103. Maness opines Cisco uses this bait and switch strategy – and the threats and coercion that accompany this strategy – to increase its sales of hardware and reduce competition from independent distributors. *Id.* Maness discusses Cisco's conduct with the ███████████

████████████████████████████████████████████████████

████████ (*id.*, ¶ 107), and ██████████████████████ (*id.*, ¶¶ 108-10) as examples of this bait and switch. Maness discusses ████████ (*id.*, ¶ 112) and ████████ (*id.*, ¶ 113) as examples of how Cisco uses its monopoly power in the aftermarket to exclude independent distributors and harm intrabrand competition.

Maness further asserts Cisco uses FUD tactics (*id.*, ¶¶ 83, 93-101) to spread fear, uncertainty, and doubt about independent distributors and the result further limits intrabrand competition and maintains supracompetitive prices. According to Maness, Cisco employs FUD to make end users feel uncertain about future product purchases with the purpose of discouraging end users from purchasing from independent distributors, regardless of the actual quality of Cisco goods that the independent distributor provides. *Id.*, ¶ 83. In other words, Cisco spreads FUD about independent distributors to keep customers from switching and to maintain its market power. *Id.*, ¶ 93 ("This FUD is filled with exaggeration and innuendo about dangers of products sold outside of authorized distribution channels, and typically involves boilerplate language prepared by Cisco's Brand Protection team. Cisco FUD often includes claims divorced from the facts and is a tactic regularly discussed by its employees."). Maness discusses Cisco's conduct with the ██ ██████████████████████████ (*id.*, ¶¶ 94-96), ████████ (*id.*, ¶ 97), ████████ (*id.*, ¶¶ 98-99), and ████████ (*id.*, ¶ 100) as illustrative examples of Cisco's FUD. Additionally, Maness opines Cisco exploits its partner agreements and end-user license agreements ("EULA") to audit its partners and customers and enforce its distribution strategy. *Id.*, ¶¶ 84-92.

Maness opines Cisco has harmed Dexon by abusing its EULA to audit customers, spreading FUD about Dexon, and using bait and switch tactics to harm Dexon's reputation in the

market. *Id.*, ¶ 128. According to Maness, Cisco's abuse of monopoly power directly cost Dexon major contracts ████████ and cost Dexon other long-term customers (e.g., ███████████████████ ████████, that "but-for Cisco's conduct, would likely still be purchasing from Dexon or purchasing more product that they currently are." *Id.* (further stating that by "allowing Dexon to source SMARTnet contracts, and then only years later, once the customers have heavily invested in Cisco products, terminating, or threatening to terminate contracts as unauthorized, Cisco further harmed Dexon's customer relationships ████████). Maness further opines Defendants' actions have harmed Dexon's entire business by harming Dexon's reputation in the marketplace, making it more difficult to maintain its existing customers and to earn new business. *Id.*, ¶ 129. Maness further opines Cisco harmed Dexon through its conspiracy with CDW. *Id.*, ¶ 136.

### b. Illustrative examples of both tying/bait and switch and FUD (and also conspiracy)

**i.** ██████████████████████████████████████

██████████ has been a CDW customer since at least 2005. Dkt. No. 331-14, Declaration of Brian Nakel (hereafter, Nakel Decl.), ¶ 4 (stating ██████████ historically purchased an annual average of ██████████ in IT products from CDW while Nakel was responsible for the account). In 2015, ██████████ solicited quotes from multiple IT equipment resellers, including CDW and Dexon, on Cisco switches, specifying that it wanted new and authorized gear eligible for SMARTnet. *See* Dkt. No. 326-71, Declaration of Rayne Martz, former Networking Expert for ████████████████████████████ (hereafter, Martz Decl.) ¶ 8 (stating the Dexon salesman assured Martz that Dexon would send only new, authorized Cisco equipment); *see also* Dkt. No. 326-27 (Tate, Dexon, Dep. Tr.)  at 149:7-19 (stating Martz asked for new Cisco equipment and further stating he did not tell Martz that Dexon was not an authorized reseller of Cisco equipment); *see also* Nakel Decl., ¶ 4 ("In 2015, ██████████ sought quotes for a variety of IT equipment from

CDW, including authorized Cisco equipment."). Dexon won the bid. *See* Martz Decl., ¶ 9; Dkt. No. 326-81 (DEXON_0375483) at 485 (Dexon's own contemporaneous narrative timeline of events relating to the ████████ transaction at issue).

When ████████ tried to register the equipment for SMARTnet, Cisco informed ████ ████ that Dexon was an unauthorized reseller. *See* Martz Decl., ¶ 10 (explaining that when he was trying to register Dexon-sold equipment for SMARTnet, Cisco informed his manager that the equipment was not authorized). By email dated July 3, 2015, Michael Babich, a Cisco account manager responsible for the ████████ account, informed ████████ that the Cisco appliance sold to ████████ was a "'grey market'/used product" and therefore did not have a valid software license, was not eligible for Cisco's warranty, and was not automatically eligible for SMARTnet coverage. Dkt. No. 356-17 (CDW-DXN-00028704) at -8705-06. Babich further recommended that ████████ not install the equipment from Dexon. *Id.* at -8705. Babich stated he would "work on putting together quotes and pricing should you decide to cancel the order with Dexon and buy the equipment thru an[] authorized reseller." *Id.* (further stating **"Dexon is not a member of the Cisco authorized reseller program and does not have a wholesaler agreement with Cisco."**) (emphasis original).

CDW's Nakel states he did not participate in any of these communications, nor did anyone else from CDW, but his understanding is that each of the statements in Babich's email were true. Nakel Decl., ¶ 7. Shortly thereafter, Nakel was contacted by Babich, who informed Nakel that ████████ purchased a Cisco appliance from Dexon that was previously registered to a company in Singapore. Nakel Decl., ¶ 6. Babich informed Nakel that ████████ had intended to buy new, authorized Cisco equipment in its purchases from Dexon and that ████████ was investigating whether to cancel the additional equipment it purchased from Dexon and repurchase the equipment

through a Cisco authorized reseller. *Id.* & Ex. A. Nakel worked with Cisco to provide two sets of special pricing to ███████ one for refurbished equipment and one for new equipment, "in the hopes that CDW could win ██████ business." Nakel Decl., ¶ 6.

Nakel was also made aware, through email correspondence that was forwarded to him, that Babich had informed ██████ that Dexon was not an authorized Cisco reseller. *Id.*, ¶ 7 & Ex. B. In an email dated July 13, 2015, Babich informed someone at ██████ that he had worked with CDW to put together "special pricing for the 4AC project." Nakel Decl., Ex. B (CDW-DXN-00028704). Babich forward the email to CDW with the message, "FYI." Nakel Decl., Ex. B (CDW-DXN-00028704). On July 16, 2015, Babich informed Nakel that some of the additional equipment from Dexon had been delivered to ██████ and that several of these items were also determined to have been sourced from non-authorized Cisco channels. Nakel Decl., ¶ 9 & Ex. C.

Maness states Cisco's efforts were effective, as ██████ cancelled part of its order with Dexon and made future purchases of Cisco equipment through CDW. Maness Opening Report, ¶ 107. According to Martz, someone from ██████ purchasing department reached out to CDW to replace the "questionable equipment" because CDW had the second lowest bid (after Dexon) for that equipment order. *See* Martz Decl., ¶ 11 ("I recall that AHN wanted to avoid the time and expense of soliciting quotes again when AHN had already received a reasonably priced offer from CDW."); *see also* Nakel Decl. at Ex. A. According to Nakel, ██████ considered whether to recertify the unauthorized or "grey market" equipment it purchased from Dexon. Nakel Decl., ¶ 9 & Ex. D. Nakel worked with Cisco to provide recertification and software licensing pricing for ██████. Nakel Decl., ¶ 9.

██████ ultimately decided to recertify some of the unauthorized equipment it acquired from Dexon and to relicense the software on that equipment through CDW. Nakel Decl., ¶ 10 &

Exs. E, F, G. CDW also sold ██████ certain Cisco equipment to replace unauthorized equipment it had intended to purchase from Dexon. *Id*., ¶ 11 & Ex. H. According to Nakel, the director of technology services at ██████ told Nakel on or around July 15, 2015 "that ██████ preferred to purchase equipment from an authorized Cisco partner rather than an unauthorized reseller like Dexon, even if the prices of the authorized equipment were higher." Nakel Decl., ¶ 11. Nakel states he did not agree with Cisco as part of any conspiracy to ensure that CDW would makes sales of IT products to ██████ instead of Dexon, or to take any action to exclude Dexon from making sales to any other end-customer, or to otherwise cause Dexon any harm. *Id*., ¶ 12 (stating he expected that if CDW did not make these sales to ██████, one of CDW's competitors would).

In internal emails dated July 22-23, 2015, Dexon's account manager, Jonathan Tate, previewed to colleagues that Dexon's botched sale was "going to get messy" (Dkt. No. 367-2 (DEXON_0057110) at 1) and that ██████ "want[ed] to cancel the order and never deal with us again." Dkt. No. 367-3 (DEXON_0057140) at 1. Tate later reported that CDW was selected as the authorized reseller who would recertify some of the gray market equipment Dexon sold to ██████ Dkt. No. 367-4 (DEXON_0058114) at 1–2. Then Dexon worked with CDW to pay for the recertification. Dkt. No. 367-5 (DEXON_0059046); Dkt. No. 367-6 (Tate Dep. Tr.) at 289:20–290:15.

After this event in 2015, ██████ made no further equipment purchases from Dexon. Martz Decl., ¶ 14; *see also* Nakel Decl. at Ex. E, Ex. F, & Ex. H. Cisco later determined that at

least one switch Dexon had sold to ████████ was counterfeit.[9] *See* Dkt. No. 326-82 (CDW-DXN-0032804) at 804; Dkt. No. 326-83 (CDW-DXN-00032853) at 853-855.

Dexon states Cisco also utilized "fear, uncertainty, and doubt" (FUD) tactics by threatening ████████ that it would not service any of the equipment it had previously purchased from independent resellers, and not just equipment that ████████ was considering for prospective purchase, if it completed the purchase with Dexon. Dkt. No. 356-17 (CDW-DXN00028704) at -8705 (July 3, 2015 email from Babich to ████████ indicating that none of ████████ purchases from Dexon would be eligible for SMARTnet if it went ahead with Dexon). Dexon argues the Cisco-CDW conspiracy was successful, both coercing ████████ to buy the same equipment for more money from CDW, and in the process, ████████ thanked CDW for its "assistance" despite being subject to a Cisco threat. Dkt. No. 356-19 (CDW-DXN-00028827) at -8828 (████████ to CDW: "I know that you did nothing to cause it, and I don't know all that you had done or **been asked to do by Cisco to clean it up**, and I probably don't want to know, but I want to say thank you [] for all of your efforts!") (emphasis added). According to Dexon, all of this conduct was pursuant to the Cisco-CDW conspiracy in which a threat to Cisco's and CDW's supracompetitive pricing was identified, and foreclosed pursuant to their conspiracy.

**ii.** ████████

In October 2018, a regional sales manager in Texas emailed Sean O'Brien at Cisco, stating as follows:

---

[9] Dexon's salesman testified that he did not ask Dexon's equipment tester to inspect the switches before Dexon sold them to ████. *See* Dkt. No. 326-27 (Tate Dep. Tr.) at 158:10-13. According to Tate, it appeared the switches had a "site ID" associated with a business address for a different end user (not ████████) located in Asia. *See id.* at 245:10-18.

Hi Sean, Can you comment on Dexon? I know we've had litigation with them in the past, and it appears we're at risk on a potential grey market deal with a customer in West Texas. I have not yet contacted the customer about this, but will do so once we have our homework done on them. Any insight on them would be much appreciated….

Dkt. No. 326-74 (CISCO00023545.001). O'Brien emailed the following response with attached "Cisco Letter to ███████████████████████:"

Thanks for reaching out on this. Your suspicions are correct; Dexon is a known gray market broker so the gear they sell is unauthorized and unlicensed.

I drafted a letter for the customer (attached) and addressed it to Robin Krisher (I can change to whomever you specify). You can send this to them and suggest a phone call follow up with us to talk through the contents, as well as, address any concerns they have.

Let me know if anything else is needed to make sure we win this deal.

*Id.* Despite Cisco's warning ██████████ that Dexon was not an authorized reseller and that Cisco goods sourced through Dexon "may not be genuine," ██████████ completed the purchase with Dexon. Maness Opening Report, ¶ 98 (citing CISCO00023546; DEXON_0207331). According to Maness, approximately eight months after ██████████ completed the purchase with Dexon, "once the Cisco equipment sourced through Dexon was established at ██████████ network, Cisco employed another round of FUD. . . ." Maness Opening Report, ¶ 98.

On May 24, 2019, Sean O'Brien with Cisco's Brand Protection – Legal Compliance team emailed Nathan Kizer and Robin Krisher at ██████████ *See*, *e.g.*, Dkt. No. 326-72 (DEXON_0214169). In the email and attached letter, O'Brien notified ██████████ that certain Cisco goods in its network were sold through one of Cisco's unauthorized resellers; Cisco could not guarantee the provenance or authenticity of those products; those products may not come with a valid software license which might affect access to warrant, support, or SMARTnet but noting Cisco has a software relicensing program; and that the company's use of any copyrighted materials

without Cisco's consent may result in the company's running afoul of Cisco's intellectual property

rights. *Id.* at -169-72. Krisher forwarded the message to another employee at ██████████ stating

"[t]his appears to be the bullying you were talking about. What is your suggestion in response to

this." *Id*. at -169; *see also* Dkt. No. 355-26.

        In a July 11, 2019 email from Cisco's Brand Protection Team to ██████████, Cisco noted

there had been no response from ██████████, reiterating that the items listed in the May 24, 2019

letter (attached) were not eligible for SMARTnet and/or service support and stating that Cisco

would terminate SMARTnet contracts for equipment supplied by Dexon on July 15, 2019. *Id.*; *see*

*also* Dkt. No. 355-25 (CISCO00442939) (stating ██████████ "is not authorized by Cisco to

utilize the software on the items;" that "use of [Cisco's] copyrighted materials may result in

██████████ running afoul of Cisco's intellectual property rights;" and that "Cisco expressly

reserve[d] all rights to pursue any and all available legal remedies").

        ██████████ disputed Cisco's claims, which led to Cisco canceling the SMARTnet service

contract for which ██████████ had previously paid, without a refund. Dkt. No. 355-27 (Kizer

Dep. Tr.) at 105:3-13 (no refund), 107:14-18 (cancelling SMARTnet). Nathan Kizer, the Executive

Director of ██████████, testified that "it could take quite some time" for ██████████ to have

the budget to recertify or repurchase the equipment. Maness Opening Report, ¶ 99 (citing Kizer

Dep. Tr. at 137:14-18).

        c.   **Illustrative examples of FUD**

    i.   ██████████████████████████████

        In November 2016, Dexon and ██████████████████████████") entered

into a contract for a few hundred Cisco IP Phones and accessories. *See* Dkt. No. 326-80,

Declaration of Jojo Jacob, Executive Director of Information Technology Services at ██████

(hereafter, Jacob Decl.) ¶ 5. In May 2019, ███ issued a Request for Quotes to replace its older models of IP Phones, and Dexon won the bid. *See id.*, ¶¶ 6, 8; Dkt. No. 326-84 (DEXON_0015570) at 570 (███ notifying Dexon). On June 19, 2019, ███ and Dexon executed a seven-figure, multi-year contract for the purchase of Cisco VoIP Phones. Dkt. No. 326-85 (DEXON_0583352) at 353 (August 9, 2019 letter from ███ to Dexon); *see also* Maness Opening Report, ¶ 94; *see also* Dkt. No. 355-20 (DEXON_0015899) ███ purchase order of Dexon equipment).

On June 20, 2019, someone on Jacob's team at ███ had a conversation with "Dan with Cisco." Dkt. No. 326-86 (███_0000641) at 643 ("Dexon Timeline of Events") (highlighting in original as prepared by ███).[10] During that conversation, Dan told ███ that Dexon was not an authorized reseller. *Id.*; *see also* Jacob Decl., ¶¶ 9-10 ("After Dexon won the bid, we learned for the first time that Dexon was not an authorized reseller of Cisco products. Members of my team had believed that Dexon was an authorized seller of Cisco products because it was listed as a vendor of Cisco products on BuyBoard, a platform for schools, municipalities, and other public entities. . . ."). ███ wanted IP Phones from an authorized reseller, and after learning that Dexon was not an authorized seller of Cisco products, Jacob's team amended solicitation templates for future solicitations to include a requirement that only authorized dealers could bid on requested equipment. *Id.*, ¶¶ 11-12.

On June 28, 2019, ███ received an email "from Dan (Cisco Rep.) about Dexon not being an authorized reseller." Dkt. No. 326-86 (FBISD_0000641) at -643. On July 9, 2019, ███ had an internal meeting with purchasing and legal to discuss the situation. *Id.* That same day, Dan

---

[10] ███ produced a timeline – created by ███ in response to Cisco's nonparty document subpoena and citing produced documents. *See* Dkt. No. 326-86 ███_0000641) at 644.

Roberts with Cisco emailed ███ a letter from "brand protection" to "provide supporting documentation that Dexon is misrepresenting themselves as an authorized reseller and any unlicensed Cisco branded hardware purchased from them could result in a significant liability to the district." Dkt. No. 355-21 (CISCO00003852) at 3 (noting the "tone of the letter [was] intentionally aligned to the strong relationship between Cisco and ███ Jacob replied and asked for Cisco's anticipated timeline to validate some Dexon-sold phones which were in ███'s possession, stating it would help ███ "plan ahead" if it knew whether the phones were "truly counterfeit, refurbished or new units legitimately purchased by a vendor from Cisco and resold to ███ *Id.* at 2 (stating "Cisco must acknowledge its fiduciary responsibility to address" the Dexon matter "with whatever resources necessary," including "removal of Dexon from Buyboard Texas as well as any other means by which Dexon is selling Cisco products without Cisco's expressed consent").  Jacob noted "this may be a long road and perhaps arduous process, but I believe a necessary step[] to ensure future bids (for us [sic] as well as others) are free from the same kind of chicanery." *Id.*

On July 11, 2019, ███ researched Dexon and found that it had been subject to federal investigation. Dkt. No. 326-86 (███_0000641) at -644; Jacob Decl., ¶ 13; *see also* Dkt. No. 326-87 ███_2981) at 2981 (showing ███'s research). On July 12, 2019, Roberts emailed Jacob with answers to his questions, including as follows regarding the requested "timeline:" "We've already determined all items in our letter are not licensed to ███ and they were not refurbished by Cisco or any authorized party. With respect to counterfeit inspection, a single device will likely only take a couple of days." Dkt. No. 355-64 (CISCO00035922) at 10. On July 16, 2019, ███ notified Roberts that ███ would be cancelling the Dexon contract. Dkt. No. 326-86 (███_0000641) at 644.

On July 18, 2019, ▮▮▮ canceled the IP Phone contract with Dexon. Jacob Decl., ¶ 13. That same day, Jacob asked Roberts via email where to send a "test phone" from its Dexon inventory to have it tested by Cisco to validate the hardware is Cisco hardware, and Roberts forwarded the email to Cisco's Sean O'Brien in Brand Protection and Legal – Compliance. Dkt. No. 355-64 (CISCO00035922) at 8. O'Brien responded that afternoon, stating a "sampling gives us a good indication of what we're dealing with but is not dispositive to the other units." *Id.* at 7. Roberts responded that ▮▮▮'s intentions were to identify if the phones were new and unlicensed, or if they were counterfeit, and that based on the findings regarding the test phone, Cisco and ▮▮▮ could discuss next steps to "get the whole lot into compliance." *Id.* at 6 (asking "Is that reasonable?").

On July 28, 2019, Jacob emailed Roberts, stating ▮▮▮ was "still waiting on direction from [Cisco] on validating the Cisco phones ▮▮▮ purchased from Dexon." Dkt. No. 355-22 (CISCO00003836) at 6. That same day, Roberts emailed O'Brien, noting he had not received a response regarding whether ▮▮▮ request for testing was reasonable. Dkt. No. 355-64 (CISCO00035922) at 6. In the event it was a reasonable approach, Roberts asked for the address where ▮▮▮ could send the phone(s). *Id.* The following day, O'Brien responded, noting "outside counsel [was] involved. . .  so we have a bit of delay in regards to responding on this matter." *Id.* at 5. After a phone conversation on July 30, 2019 where Roberts apparently "hung up on [O'Brien]," O'Brien emailed Roberts, stating he had left a voicemail and if there was any lack of clarity as to "next steps," Roberts was to schedule a Webex to "finalize any outstanding issues." *Id.* at 2.

29

In a July 30, 2019 internal email from Roberts to another employee at Cisco, Roberts stated the "challenges" continued with O'Brien. *Id.* Roberts asked for "the support needed to get my account's questions/concerns addressed," noting ███ was contacting him daily. *Id.*

On August 15, 2019, ███ received a letter from an attorney on behalf of Dexon. Dkt. No. 326-86 ███_0000641) at 645. On August 21, 2019, general counsel for ███ sent an email to O'Brien at Cisco, attaching the letter from Dexon. *Id.*; *see also* Dkt. No. 326-88 (FBISD_1425) at 1429 (stating ███ values its relationship with Cisco, and intends to honor its legal obligation" and further seeking to understand Cisco's position and "the courtesy of a reply" as to Dexon's letter from a "respected litigator" so that counsel for ███ could brief the District on the matter). Internally, ███s IT security specialist Jacob opined that even though Dexon said they sold hardware (not software), ███ needed software to run hardware and the "place for us to get software is Cisco (Permitted by your annual EA agreement which we pay a hefty amount), which means [w]e need to abide by Cisco's end user license agreement in order to access the software and keep the phones current with the latest patches."[11] Dkt. No. 326-88 ███_1425) at 1427.

---

[11] ███ employee Kar weighed in as follows:
I think the weeds and licenses, etc. are irrelevant here.

1) ███ wanted to procure "Cisco" equipment.
2) ███, competitively awarded to a "RESELLER" (Dexon) for that business
3) Cisco informed ███ that this is not an AUTHORIZED RESELLER and that the products (hardware)
"Dexon Computers is not a member of the Cisco authorized reseller program"
4) ███, being now forced to choose between the assurances of an UNAUTHORIZED reseller and the OEM (Original Equipment Manufacturer) should heed the advice of the OEM, return all purchases from Dexon and select an AUTHORIZED reseller

██████ purchased the IP phones from an authorized Cisco dealer named NetSync Network

Solutions. Jacob Decl., ¶ 15; *see also* Dkt. No. 355-22 (CISCO00003836) at 3 (October 2, 2019

email from Jacob to Roberts stating ██████ needed "some level of confirmation from Cisco which

acknowledges and hold[s] ████████ no-harm as well as [waives] any fees associated with

registration, true-up etc. associated with the Dexon phones that are currently in production" and

further stating ██████ "legal team advised that [Jacob] hold-off ordering any new phones until

we reach an agreement"). "Cisco relicensed the IP Phones that [it] had previously purchased from

Dexon at no cost to the school district." Jacob Decl., ¶ 16. Jacob states in his declaration that Cisco

never threatened to withhold any service from ██████ *Id.*, ¶ 14.

According to Maness, Cisco's conduct with ██████ provides an "illustrative example of

how [Cisco] leverages FUD to dissuade customers from transacting with independent distributors

like Dexon." Maness Opening Report, ¶ 94. Using ██████ as an example of how Cisco's FUD is

filled with exaggeration and innuendo about "dangers" of products sold by the independent

channels, Dexon asserts Cisco claimed, without any evidence, that the IP Phones that Dexon had

sold ██████ were "fraudulent," never providing backup to the customer despite its request for such.

Dkt. No. 355 at 8 (citing Dkt. No. 355-19 (CISCO00011626) (July 2019 email thread between a

---

This is a RISK issue, not a hair splitting issue of form letters, open-source code, etc. The physical
equipment could indeed be legit, but we have not assurances that it is not. . . .

Bottom line, the risk of ignoring the warning that we may have acquired counterfeit equipment is
too great of a risk considering this equipment will be placed into schools with children.

My $0.02.

Note: this is and continues to be a major problem for Cisco and other large OEMs:
https://www.google.com/search?client=firefox-b-1-d&q=counterfeit+cisco+hardware

Dkt. No. 326-88 (██████_1425) at 1426. Another ██████ employee responded, "Please be careful using the word
counterfeit. It is not ours to use." *Id.* at 1425. Kar replied, "Understood, will refrain (but it is Cisco's term)." *Id.* (citing
statements from Cisco's website).

Cisco account manager and Cisco's Brand Protection Team requesting "something that confirms this is fraudulent gear" with no further response)).

**ii.**  ▮▮▮▮▮▮▮▮

Maness opines Cisco's conduct with ▮▮▮▮▮▮▮ provides another illustrative example of how FUD is employed to direct customers away from Dexon. Maness Opening Report, ¶ 100. ▮▮▮▮▮▮▮▮ a manufacturer of pharmaceuticals and medical devices. *Id.* Like ▮▮▮▮▮▮ ▮▮▮▮▮▮ had been a CDW customer for many years, at least since 2015. Dkt. 331-76 (CDW-DXN-00899107). ▮▮▮▮▮▮▮ had also worked with Dexon since at least 2012. Maness Opening Report, ¶ 100.

Adam Tapper, the Cisco representative for ▮▮▮▮▮▮, testified that he was educated on what gray market meant to Cisco and that he would engage with Brand Protection personnel when an issue arose. Dkt. No. 355-13 (Tapper Dep. Tr.) at 134:24-138:25 (stating they usually copy and paste "specific verbiage" from Brand Protection to the customer so they know what it means to have gray market in their environment").  According to Tapper, in 2017, ▮▮▮▮▮▮ sought a quote for Cisco equipment from Dexon and several other resellers. *Id.* at 230:10-231:9. Cisco subsequently informed ▮▮▮▮▮▮ that Dexon was not an authorized reseller. Dkt. No. 331-72 (DEXON_0491421) (June 20, 2017 email from ▮▮▮▮▮▮ to Brian Usgaard (Dexon) asking if Dexon is a "[c]ertified Cisco re-seller" because a "Cisco rep is saying you aren't").

According to Maness, upon learning ▮▮▮▮▮▮ sourced Cisco gear through Dexon, and that it was considering awarding an additional purchase order to Dexon, Cisco sales representative Tapper set out to get Dexon "thrown out of the mix" and direct ▮▮▮▮▮▮ to source Cisco gear through a Cisco-authorized reseller. Maness Opening Report, ¶ 100 (citing Tapper Dep. Tr. at 199:19-22, 230:3-233:12, 237:2-7; also citing CISCO00046569). Maness opines the Cisco

sales representative spread uncertainty, claiming that "buying through Dexon could be detrimental to their ██████████ business by opening themselves up to unnecessary risks and vulnerabilities. . . ." *Id.*; *see also* Dkt. No. 355-13 (Tapper Dep. Tr.) at 197:4-19.

After ██████████ informed Cisco it "wasn't comfortable" purchasing Dexon's unauthorized gear, Cisco brought in a different authorized Cisco reseller, Netrix (along with CDW), to offer ██████████ a quote of authorized Cisco equipment. Tapper Dep. Tr. at 230:22-231:7, 234:5-9. Tapper testified he was excited about getting Dexon removed from the deal because he felt it was the right thing for the customer "to help ensure their protection long-term" and also help ensure the customer had proper access to Cisco software and updates in the future. *Id.* at 233:2-12. Even though CDW highlights that Cisco recommended another authorized reseller (Netrix, no CDW), Dkt. No. 367 at 10, Dexon asserts Cisco kept CDW apprised in real time of its efforts to get Dexon "booted" from ██████████ and also coordinated to try to get CDW the replacement sale. *See* Dkt. No. 377 at 9-10 (citing Dkt. No. 377-3 (CDW-DXN-00033580), at -33585 (June 21, 2017 email wherein Cisco's Tapper filled in CDW on the "DEXON thing" and told CDW that "Kevin McDonald is the one that thinks they are a 'legit' reseller. I have set them straight," to which CDW responded, "That is great news regarding getting to the bottom of that vendor. Thanks and we are on top of this"); also citing *id.* at -33580-83 (Cisco noted to CDW that ██████████ "will not be buying ANYTHING else from [Dexon] going forward [and the customer] does need a 3rd quote still" and CDW subsequently reporting to Cisco that it "got the [purchase order and] will be processing soon")).

██████████ ultimately did not make the 2017 purchase from Dexon. Maness states Cisco's FUD was effective because ██████████ made its last purchase with Dexon in September 2017. Maness Opening Report, ¶ 100. Approximately three weeks after Cisco allegedly

employed FUD with ███████ to disqualify Dexon, the Cisco sales representative discussed internally how gear that ███████ previously sourced through Dexon "was driving our prices down" and that with Dexon "booted from all future business," Cisco could grant ███████ smaller discounts moving forward. *Id.* (citing CISCO00046553 at 5). In later communications between Cisco and ███████, regarding a situation in which CDW was unable to source equipment for ███████ in a timely manner, ███████ stated its desire to "start checking other resellers like Dexon." *Id.* (citing CISCO00001787 at 2-3). In an email response dated April 5, 2021, Tapper addressed Dexon as a "grey-market reseller[]," stating it would be "putting the company at risk by procuring hardware that will never be in your companies name (you won't be able to put smartnet coverage on it. . .) and we won't have any way to validate its authenticity to see if it has been tampered with." Dkt. No. 355-23 (CISCO00001787) at 2-3.

### 4. Cisco's evidence regarding its policies

Cisco competes to sell its networking gear through policies and practices that protect its customers and brand reputation. *See*, *e.g.*, LaMagna Opening Report, ¶¶ 18, 32-33; Ugone Opening Report, ¶¶ 93-94, 98-99. In his first report dated July 28, 2023, Ugone opines the Cisco distribution policies and SMARTnet licensing policies that Dexon challenges are procompetitive.

### a. Cisco's distribution policies

### i. Cisco's distribution channel

As noted above, Cisco has more than 8,000 authorized resellers in the United States. Maness Opening Report, ¶ 27; Dkt. No. 326-14 ("Connect with a Cisco Partner") at 1; Ugone Opening Report, ¶ 62. According to Ugone, a manufacturer benefits from competition among its different resellers because competition between resellers drives product demand by maintaining prices paid by customers at the competitive level and providing incentives to maintain the

competitive quality of services offered by resellers. Ugone Opening Report, ¶ 47. Cisco has a strong interest in how distributors of its products present its brand to resellers as well as how resellers present its brand to customers, and what experience the customers have with the products they purchase. *Id.*, ¶ 51.

Cisco does not require its authorized resellers to sell only Cisco equipment.[12] *Id.*, ¶ 63 ("Cisco's channel partners sell Cisco products and products offered by Cisco's competitors. . . ."); *see also* Dkt. No. 326-6 (Maness Dep. Tr.) at 161:13-162:2 (regarding vendor exclusivity, "I know that's generally not the way Cisco operates"). For example, CDW – one of the 8,000+ authorized Cisco resellers (and one of 50+ "Gold" partners) – generates a greater proportion of its sales from non-Cisco equipment than Dexon.[13] However, like other OEMs – e.g., Juniper[14] – Cisco requires that its authorized resellers not sell counterfeit or "gray market" equipment obtained from outside the authorized channel. Ugone Opening Report, ¶ 64; Dkt. No. 326-15 ("Indirect Channel Partner Agreement," CISCO00793824) at 006; Dkt. No. 326-118 ("Systems Integrator Agreement," CDW-DXN-00000060) at 064-065. Cisco also requires that its U.S. authorized resellers not resell to other resellers for further price markup and re-resale to end users. Dkt. No. 326-15 ("Indirect Channel Partner Agreement," CISCO00793824) at 006. The sale of lower quality products by a

---

[12] Cisco's partner agreements and policies are in the record. *See generally* Dkt. No. 326-11 ("Direct Partner Policy," CISCO00793820); Dkt. No. 326-15 ("Indirect Channel Partner Agreement," CISCO00793824); Dkt. No. 326-118 ("Systems Integrator Agreement," CDW-DXN-00000060).

[13] Maness found that Dexon generates approximately 90% of its sales in the alleged markets from selling Cisco gear, not other brands. Maness Opening Report at Ex. 6. Defendants' economist Ugone compared that to CDW, which generates approximately ▮▮▮▮ its sales in the alleged markets from selling Cisco gear. *See* Ugone Rebuttal Report at 116 (Fig. 13).

[14] Defendants' economist discussed other OEMs' similar policies. *See* Ugone Opening Report, ¶¶ 71, 76, 78. For example, Juniper's policy states that ▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Dkt. No. 326-17 ("Juniper General Policies and ▮▮▮00000024) at 062.

reseller harms the manufacturer and its brand, as well as other resellers and consumers. Ugone
Opening Report, ¶ 55.

### ii.  Cisco's justification for its distribution policies prohibiting unauthorized resellers from selling gray market products and actions toward Dexon

#### *Brand Protection policies, generally*

"Gray market" refers to any equipment (whether genuine or counterfeit) that is sold outside
of authorized distribution channels. LaMagna Opening Report, ¶ 35 (explaining that gray market
goods are "goods that are sold outside of a brand owner's authorized channel" and further stating
that the "unauthorized transacting in genuine branded goods" creates a flow of these goods into
the so-called "gray market" and in addition to new genuine goods, goods sold on the gray market
can be "damaged, counterfeit, or stolen"); *see also* Ugone Opening Report, ¶ 57 ("the term 'gray
market' often is used to denote the situation where products are traded through resellers that are
not authorized by the OEM.").[15] Such equipment, even if genuine, is not eligible for warranty
protection and often lacks necessary software licenses. Ugone Opening Report, ¶ 86 (stating gray
market products are only eligible for SMARTnet if they go through both the inspection and
relicensing processes) & Fig. 2; *see also id.*, ¶¶ 58-60.

Ugone opines gray market products in the distribution chain pose risks to Cisco's
investments in its brand equity. Ugone Opening Report, ¶¶ 100-06. According to Ugone, Dexon's
claims that Cisco's conduct has restricted competition between Cisco's resellers ignores the
competitive benefits associated with Cisco's distribution policies. *Id.*, ¶¶ 107-09. Ugone opines
Cisco's distribution policies prohibiting resellers from participating in gray market transactions

---

[15] This is an industry term. *See*, *e.g.*, Dkt. No. 326-46 (Juniper, "Juniper Networks Gray Market Product Reinstatement
Policy") at 1.

are economically rational because they are motivated by Cisco's desire to protect its brand, benefit customers, and are procompetitive.[16] *Id.*, ¶ 110.

Richard LaMagna is Defendants' expert in brand protection and anti-counterfeiting. LaMagna helped develop "a highly successful international brand-protection and anti-counterfeiting team" at Microsoft. Dkt. No. 331-29 (hereafter, LaMagna Opening Report), ¶¶ 1, 3, 10, 57. In his report, LaMagna opines Cisco's policies (Brand Protection program) are similar to or consistent with the policies of other manufacturers of networking equipment, and programs like the one LaMagna developed at Microsoft.[17] *See, e.g.*, LaMagna Opening Report at 5, ¶¶ 52, 54, 73, 82-86. According to LaMagna, the Alliance for Gray Market and Counterfeit Abatement ("AGMA") recommends that companies, among other things, sign product distribution agreements that contain specific language protecting the brand, including provisions for auditing and enforcement; partner with law enforcement agencies and take enforcement action against

---

[16] According to Ugone, (1) gray market products harm consumers and pose risks to Cisco's brand because (a) they may be of lower quality than genuine Cisco products purchased from authorized channel partners and (b) they reduce the incentives of authorized channel partners to make investments that improve the quality of service offered to customers; (2) gray market products can increase Cisco's costs, some of which may be passed through to customers; and (3) a company's incentives to make investments that improve the quality of its products depends in part on the extent to which the quality improvements increase the company's total sales and provide a return on the investment made, and sales of counterfeit products (some gray market products are counterfeit) lower the sales of genuine Cisco products, which in turn may harm customers by reducing Cisco's incentives to make investments that improve the quality of its products. Ugone Opening Report, ¶ 111.

[17] In his opening report, LaMagna (1) explains the business justifications and purposes of brand protection programs, Dkt. No. 331-29 (LaMagna Opening Report), ¶¶ 15, 31-53; (2) analyzes Cisco's brand protection policies and practices, which include agreements with channel partners, counterfeit-detection tools, and educational and enforcement efforts, and concludes Cisco's brand protection policies and practices are "consistent with brand-protection best practices, aligning with the multifaceted brand-protection program [LaMagna] designed at Microsoft and the practices of other networking-equipment manufacturers," *id.*, ¶¶ 15, 54-86; and (3) analyzes Dexon's purported "anticounterfeiting measures" and concludes those measures are "inadequate" to "prevent Dexon from supplying customers with counterfeit 'Cisco' products." *Id.*, ¶¶ 15, 87-124.

In its December 18, 2023 Order granting in part and denying in part Dexon Computer Inc.'s *Daubert* Motion to Exclude Opinions of Richard LaMagna (Dkt. No. 330), the Court excluded LaMagna's opinions to the extent they opine that Cisco's brand protection practices are consistent with the practices of other manufacturers of networking equipment. Dkt. No. 459 at 19.

counterfeiting using civil remedies; and develop and implement anti-counterfeiting education, training, and communications programs for end users, channel distribution partners, and service and sales employees. *Id.*, ¶ 56. LaMagna opines "Cisco's robust Brand Protection Program combines channel partner agreements with support and training for law enforcement, civil enforcement efforts, public and confidential counterfeit detection techniques, and education of partners and the public." *Id.*, ¶ 55; *see also id.*, ¶ 58 ("Cisco's Brand Protection program includes each of the components previously described. Indeed, it is one of the finest programs I have encountered in my 23 years working on brand-protection and anti-counterfeiting issues.").

### *Cisco's justification of its application of Cisco's brand protection policies toward Dexon*

In his opening report, LaMagna opines that Dexon's practices related to the procurement and inspection of purported "Cisco" equipment are inadequate to detect and avoid the trafficking of counterfeit equipment.[18] LaMagna Opening Report, ¶ 87. LaMagna opines that the inadequacy of Dexon's anti-counterfeiting measures to protect against the sale of counterfeit products is bolstered by LaMagna's review of the evidence showing that – despite Dexon's anti-counterfeiting measures – Dexon has never detected a counterfeit "Cisco" product and has sold counterfeit networking equipment repeatedly. *See, e.g., id.*, ¶¶ 88, 117. LaMagna then recites testimony came from Dexon employees, including O'Neil's testimony regarding the FBI's 2008 raid of Dexon's

---

[18] LaMagna explains that Dexon's procurement practices exacerbate the risk that Dexon will buy counterfeit products. *See* LaMagna Opening Report, ¶¶ 96-109. According to LaMagna, Dexon purchases "Cisco" branded networking equipment from hundreds of different eBay and Amazon vendors, and does not consistently take any steps to vet those vendors, and Dexon's "haphazard approach to vendors" "creates an unacceptable risk that Dexon will procure counterfeit products." *See id.*, ¶¶ 102-108. As an example, LaMagna states Dexon has bought from companies (including an eBay account), one of which was associated with an individual who pleaded guilty to selling hundreds of millions of dollars of counterfeit equipment. *See id.*, ¶ 108. LaMagna further explains that Dexon does not consistently inspect "Cisco" products before sending those products to customers. *See id.*, ¶¶ 110-116. In many cases, Dexon never takes physical possession of the product. Instead, "Dexon 'blind' or 'drop' ships products directly from its suppliers to Dexon's customers." *Id.*, ¶ 110.

offices wherein the FBI found counterfeit products. *Id.*, ¶¶ 118-20. LaMagna also relies on Cisco's own determination that Dexon had sold counterfeit "Cisco" products to customers. *See*, *e.g.*, *id.*, ¶ 121 (citing examples from 2015-2019); *see also* Dkt. No. 330-3 (LaMagna Reply Report), ¶ 71 (stating his opinions are based on his training and experience, as well as information he received during August 2023 interviews with "Cisco product-authentication specialists Michael Heidecker and Fookwai Ho").[19]

LaMagna opines a fatal flaw in Dexon's anti-counterfeiting approach is that, even if Dexon adopted more consistent and robust practices, it still would lack visibility into and control over the procurement and inspection practices of its own gray market suppliers." *Id.*, ¶ 115. Dexon sometimes procures Cisco equipment for re-resale from authorized Cisco resellers by registering itself (Dexon) as the end user without disclosing that Dexon intends to resell to a different end user after marking up the gear.  Dkt. No. 326-115 (DEXON_0596868) at 868-869 (Dexon discussing that "CDW sees us as an enduser [sic]" and using that to "get the licenses CDW provides Dexon" to Dexon's own customers). Other times, Dexon procures equipment from other unauthorized resellers. *See* Dkt. No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 21; Dkt. No. 326-50 (Dexon Resp. to CDW RFAs) at No. 8. Among the thousands of unauthorized resellers that Dexon uses are hundreds of eBay accounts (such as stinkinengine, nastysfinest, cambodiatreasures, and

---

[19] Mosteller agrees with LaMagna that an important purpose of brand protection programs is to protect the brand "from being harmed by infringers and/or counterfeiters," because "[w]hen counterfeit products enter a particular channel, it can cause the brand to lose market space and revenue, damaging the brand's reputation in the process." Mosteller Rebuttal Report, ¶ 18. However, Mosteller opines (1) Cisco's brand protection practices are directly at odds with Cisco's stated goal and go beyond industry-accepted approaches by targeting its own end-users and consumers; (2) LaMagna's opinions fail to provide any analysis or discussion regarding the execution and implementation of Cisco's counterfeit detection practices; thus, it cannot be determined based on the record provided whether Cisco's counterfeit detection practices are consistent with industry standards and account for unknown variables; and (3) Dexon's anti-counterfeit detection practices are customary and appropriate under the circumstances based upon the information available to it, which is limited by Cisco. *Id.*, ¶ 16.

warehouse_boyz)[20] and a company called Pro Network,[21] which DOJ recently prosecuted as part of a "massive scheme to traffic in fraudulent and counterfeit Cisco networking equipment." *See* Dkt. No. 326-54 (DOJ, "CEO of Dozens of Companies Pleads Guilty to Massive Scheme to Traffic in Fraudulent and Counterfeit Cisco Networking Equipment," June 6, 2023) at 1.

Dexon has no mandatory policies to test the provenance or quality of all Cisco equipment that it purchases for resale. Dkt. No. 326-35 (Kaas Dep. Tr.) at 82:7-84:2 (testimony from Dexon's product tester noting it is the salesperson's responsibility to bring him a product to test and further stating he would not test a product if a salesperson fails to bring it to him), 263:1-264:8 (stating Dexon does not test new routers). Sometimes Dexon never possesses the equipment it resells because Dexon engages in "blind shipping."[22] Dkt. No. 326-19 (Graber Dep. Tr.) at 227:6-12; Dkt. No. 326-56 (Sletten Dep. Tr.) at 349:13-22. Dexon does not test blind-shipped equipment. Graber Dep. Tr. at 227:13-17, 234:1-7; Dkt. No. 326-18 (DeToy Dep. Tr.) at 86:22-87:4; Dkt. No. 326-

---

[20] *See* Dkt. No. 326-51 (excerpt of DEXON_0476850) (listing suppliers and vendors – including hundreds of eBay accounts – for Dexon purchases for further resale from January 2011 through October 2022).

[21] *See* Dkt. No. 326-52 (excerpt of DEXON_0476850); Graber Dep. Tr. (Cisco Ex. 17) at 186:9-15. Graber, Dexon's procurement leader, testified that Dexon eventually placed Pro Network on an internal "Do Not Buy" list, *see* Graber Dep. Tr. at 183:22-184:2, but according to Cisco, Pro Network appeared on the Dexon vendor list (not its Do Not Buy list) as of June 2023 when Dexon produced the list in this litigation. Dkt. No. 326 at 13 (citing Cisco Ex. 51 (DEXON_0705369) at 1 (listing "Pro Network" as a vendor not highlighted in red); *id.* at 21 (Dexon's own description of the vendor list's color coding); Graber Dep. Tr. at 137:1-21 (testifying that companies on the Do Not Buy list are highlighted in red)). According to Cisco, Graber also confirmed that Dexon had never included Pro Network's eBay account (called Smart Networks USA) on its Do Not Buy list – so Dexon continued buying from it. Graber Dep. Tr. at 203:4-204:4; *see also id.* at 195:3-12 (confirming Dexon has ordered gear from a Pro Network eBay account).

[22] According to Cisco, that means Dexon tells its suppliers to mail equipment to the customer directly but label the box to appear as though it comes from Dexon, without consistently informing customers of this practice. *See* Roush Dep. Tr. (Cisco Ex. 23) at 180:13-15 ("Q. Do your customers know when Dexon is blind-shipping them gear? A. I don't think so, no."). Dexon's witnesses explained that the purpose of its "blind shipping" is to prevent the customer from learning the source of the equipment. *See* DeToy Dep. Tr. (Cisco Ex. 16) at 84:8-13 ("It means to ship to our customers without the customer seeing where it came from."); Lang Dep. Tr. (Cisco Ex. 18) at 112:15-18 (agreeing that part of a blind drop is that the ultimate source of the equipment is not identified to the customer); Ripley Dep. Tr. (Cisco Ex. 22) at 69:11-17 ("Q. When you blind ship products would you want your customer to know the identity of the supplier? A. No. Q. Why not? A. It's a potential to lose a customer, competition.").

25 (Roush Dep. Tr.) at 164:6-11, 174:13-175:2, 317:18-318:15; *see also* Dkt. No. 326-48

(Tveitbakk Dep. Tr.) at 155:8-156:5. Dexon admits that it does not know if (or how much)

counterfeit has been sold. *See* Dkt. No. 326-23 (O'Neil Dep. Tr.) at 172:5-13 ("Q. Has Dexon ever

bought a counterfeit product? A. Not knowingly. Q. Has Dexon ever inadvertently bought a

counterfeit product? A. Allegedly. Q. What do you mean by 'allegedly?' A. Well, Cisco has

alleged we have. But we don't know for sure if those products are really counterfeit."); Dkt. No.

326-35 (Kaas Dep. Tr.) at 234:9-21 (stating it is possible that Dexon sold one particular counterfeit

switch); *see also* Dkt. No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 20 ("DENIED that Dexon

has sold 'purported' Cisco Networking Equipment that actually is not Cisco Networking

Equipment, but ADMITTED that Dexon cannot in all instances determine whether Cisco

Networking Equipment is counterfeit").

Katy Graber, Dexon's procurement leader, does not know where its suppliers obtain the

equipment that Dexon buys or whether Dexon's suppliers have been investigated for trafficking in

counterfeit. *See* Dkt. No. 326-19 (Graber Dep. Tr.) at 179:2-180:13 (stating she has not inspected

a vendor's books or records before using a vendor to procure product for Dexon and further stating

that in the cases of a local vendor where she might go on-site to their warehouses she does not

inspect their inventory for counterfeit), 215:20-22 ("Q. How do you find out where an eBay vendor

gets it networking equipment from? A. I don't."), 225:6-226:17. Graber acknowledged it is

possible Dexon has procured counterfeit equipment for further resale. *Id.* at 226:21-227:4.

Several years ago, the FBI raided Dexon's office and confiscated "Cisco" equipment. *See*

Kaas Dep. Tr. at 212:19-213:5; Dkt. No. 326-20 (Lang Dep. Tr.) at 164:7-165:6; O'Neil Dep. Tr.

at 163:19-165:4 (confirming that the FBI determined that some of the products taken from Dexon

were potentially counterfeit); Tveitbakk Dep. Tr. at 131:9-132:7; *see* Dkt. No. 326-64

(DEXON_0431047) at 071; LaMagna Opening Report, ¶ 120 ("According to documents from that investigation, 24 of the 28 supposedly 'Cisco' products that were provided to the FBI and Cisco were in fact determined to be counterfeit.").

Some customers at issue ███████████████████ have reported performance problems with the equipment that Dexon has sold. *See*, *e.g.*, Dkt. No. 326-31 (Kizer, ██████ Dep. Tr.) at 86:3-87:8; Dkt. No. 326-32 (Le, ████████, Dep. Tr.) at 106:6-112:22; Dkt. No. 326-65 (████000440.1) at 1 ████ email stating "Dexon has great pricing but we have had several issues with switches we purchased in the past with them. Please source all switches/routers from [DELETED NAME]."). Cisco subsequently determined that Dexon had sold each of these customers counterfeit equipment or gray market gear registered to another end user. *See*, *e.g.*, Dkt. No. 326-66 (DEXON_0464843) at 844 (December 2018 notice from Cisco to ████ that it had counterfeit in its network); Dkt. No. 326-67 (DEXON_0466295) at 295 (June 2019 notice from Cisco to ████ that it had counterfeit in its network); Dkt. No. 326-68 ████000324.1) at 3 (October 2022 notice from Cisco to ████ that it had counterfeit in its network); *compare generally* Dkt. No. 326-69 (DEXON_0214286) (May 31, 2019 internal email containing message sent from Dexon to ████ claiming "all hardware and software are registered to you") *with* Dkt. No. 326-70 (DEXON_0214332) (May 31, 2019 email from another unauthorized reseller, and Dexon's supplier for this ████ order, informing Dexon that the equipment sold to ████ is registered to a different customer – likely, a national laboratory).

There have been times Cisco informed Dexon customers they have Cisco products sold to them from an unauthorized Cisco reseller. According to Cisco, sometimes this matters to Dexon's

customers, sometimes not.[23] Three of the at-issue customers – ██████████
– continued purchasing Cisco gear from Dexon even after Cisco provided the foregoing notice.
*See* Maness Opening Report, ¶ 98 ("Despite Cisco's warning, ██████████ completed the
purchase with Dexon."); *see also* Dkt. No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 15
(admitting Dexon continued selling to ██████ after the alleged Cisco conduct); *see also id.*
(Dexon Resp. to Cisco RFAs) at No. 13 (admitting that Dexon continued selling to ████ after the
alleged conduct). Two of the at-issue customers discussed at length above – ██████ and ██████
both of which submitted sworn affidavits[24] – decided not to purchase from Dexon because both
wanted to buy from an authorized reseller (and had believed that Dexon was such a reseller).

### iii. Cisco's reseller agreement with CDW

Like many other OEMs, Cisco requires each of its 8,000+ authorized resellers (channel
partners) to comply with certain policies governing the resale of Cisco equipment. These
conditions are specified in Cisco's reseller agreements; for CDW, they are contained in a Systems
Integrator Agreement (SIA), addressed more fully below. Coleman Decl. at Ex. D (Systems
Integrator Agreement); *see also* LaMagna Opening Report, ¶¶ 59 (stating the agreements "are the

---

[23] *See* Dkt. No. 326-49 (Dexon Am. Resp. to Cisco Interrogs.) at No. 1 (when asked to identify all sales Dexon lost
because of Cisco's allegedly anticompetitive conduct, Dexon identified ██████████ *see id.* at No. 2 (same when asked to identify customers subject to tying); *see also* Maness
Opening Report, ¶ 109 (addressing exactly this consumer choice in the context of a customer that decided to use a
different vendor for gear with SMARTnet while staying with Dexon for gear that the customer would buy without
SMARTnet). As to ████. Dexon resells equipment to another unauthorized reseller called Stragistics, which
then re-resells to ██████ with a further markup. *See* O'Neil Dep. Tr. (Cisco Ex. 21) at 105:9-107:14 (Dexon CEO
testifying that Olson is Dexon's account manager for ██████); Olson Dep. Tr. (Cisco Ex. 20) at 91:2-94:16, 101:6-
19 (testifying that Dexon sold products and SMARTnet to Stragistics for further resale to TBK Bank), 146:20-147:17
(no knowledge of ██████ ceasing business with Stragistics or of Stragistics ceasing business with Dexon); Dkt.
No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 12 (admitting this allegation concerns a Stragistics customer, not a
Dexon customer directly). Dexon told Stragistics it could represent that the Dexon-sourced equipment is "authorized."
Dkt. No. 326-73 (STRAGISTICS_0000001) at 001.

[24] *See* Dkt. No. 326-71 (Martz Decl.) (██████); Dkt. No. 326-80 (Jacob Decl.) ██████.

foundation of an effective brand-protection program" and establish the relationship between a company and its channel partners, "enabling the company to monitor its supply chain to maintain product integrity" and further stating that to be effective, the agreements should be combined with policies limiting the tiers of channel partners), 60-65 (stating Cisco's Direct Value-Added Resellers (DVARs or Systems Integrators) are required to agree to Cisco's SIA, which requires DVARs located in the United States to support Cisco's Brand Protection program by, among other things, purchasing Cisco products and services only from authorized sources (either a Distributor or Cisco); committing not to buy or resell unauthorized or counterfeit Cisco products; certifying that the DVAR is acquiring Cisco products and services solely for resale to end users; keeping records that will allow Cisco to audit whether the DVAR is complying with its obligations under the SIA; and agreeing to procedures for addressing violations of the SIA (which can include revocation of the DVAR's status as a channel partner)).

CDW understands that these reseller restrictions are intended to protect both Cisco's brand and end customers by, among other things, preventing the sale of altered, damaged, or counterfeit Cisco equipment to end customers.[25] For example, a customer may be deceived into purchasing counterfeit or gray market products believing they are authentic, only to discover that the product is of lower quality, performs poorly, has security vulnerabilities, and is ineligible for the brand's warranty protections and technical support. *E.g.*, Dkt. No. 331-66 (CISCO00036882) (in report

---

[25] *See* Dkt. No. 331-35 (Coleman Dep. Tr.) at 185:6-187:22 (explaining CDW follows Cisco's reseller agreement and "it's a no-brainer not to pursue" an opportunity with an unauthorized Cisco reseller due to, among others, the "potential threats that exist" when products come from "an unknown source"); Dkt. No. 331-59 (CDW-DXN-00265433) ("I'd go out of my way to explain to the customer that Cisco is going to enormous steps to reduce risk for customers, partners and Cisco and is taking action against brokers & the sale of counterfeit products. The introduction of diverted or counterfeit product into customers networks could impact overall network performance and reliability as well as security."); Dkt. No. 331-56 (CDW-DXN-00422974) (describing the risk that gray market and counterfeit products pose to CDW and customers when Cisco resellers procure from unauthorized distributors).

titled "Report of Health and Safety Considerations For Counterfeit "Cisco" Products," describing how counterfeit Cisco products may not be properly manufactured, may not meet Cisco performance and quality standards, and may create security risks to customers); Dkt. No. 331-57 (CDW-DXN-00235974) at -84, -86 (indicating that a trusted supplier network, in part developed through reseller agreements, mitigates counterfeit risks); Ugone Opening Report, ¶ 58; LaMagna Opening Report, ¶ 38. This would negatively impact both Cisco's brand and CDW's relationship with its end customers.  Ugone Opening Report, ¶¶ 55, 103 ("The sale of lower quality products by a reseller harms the manufacturer and its brand, as well as other resellers and consumers . . . . When counterfeit products fail or do not perform as well as expected, consumers are likely to draw the conclusion that Cisco products are of low quality (when such an inference would not be justified). Failures of counterfeit products therefore pose risks to Cisco's brand."); *see also* Dkt. No. 331-36 (Kaas Dep. Tr.) at 156:11-15 ("I don't want to have counterfeit equipment going to my customers. I have accounts that I've had for 20, 25 years. I don't want to have problems with customers."); Dkt. No. 331-44 (Roush Dep. Tr.) at 125:3-125:9 ("[I]f you did that and you provided counterfeit hardware, your chances of having a customer stay with you, that's pretty much out the door. . . . It's not good to have products on the market that don't work like they're supposed to.").

Many other IT equipment OEMs, including Juniper, Microsoft, Dell, HP, Extreme Networks, Mitel, Avaya, and Ixia, have similar policies. *See*, *e.g.*, Dkt. No. 331-63 (CDW-DXN-00344349, at -351) (CDW/Juniper Direct Value Added Reseller Agreement); Dkt. No. 331-60 (CDW-DXN-00331181, at -83) (Ixia U.S. Reseller Agreement); Dkt. No. 331-64 (CDW-DXN-00532525, at -26) (HP Partner Terms); Dkt. No. 331-61 (CDW-DXN-00333410, at -11) (Mitel Networks Authorized Reseller Agreement); Dkt. No. 331-53 ("Reseller Terms of Sale," Dell) at

1A. For example, CDW is also an authorized reseller of networking equipment for Juniper Networks ("Juniper") and Extreme Networks ("Extreme"). As with Cisco, Juniper's reseller agreements require authorized resellers like CDW to sell only to end-customers; sales of Juniper equipment to other resellers are prohibited. Dkt. No. 331-63 (CDW-DXN-00344349, at -351) (CDW/Juniper Direct Value Added Reseller Agreement). CDW is likewise restricted from purchasing Juniper equipment "from any source other than Juniper." *Id.* Similarly, Extreme ███████████████████████████████████████████████████████████ ████████████████." Dkt. No. 331-70 ████████████████████████████

### b. Cisco's recertification and SMARTnet-related policies

Cisco offers end users several optional service packages, including SMART Net Total Care ("SMARTnet"). Maness Opening Report, ¶¶ 19 (describing SMARTnet as a Cisco technical support service that provides "extended and enhanced warranty protection, including rapid product replacement, access to Cisco's Technical Assistance Center. . ., software updates (including operating system updates), access to online 'self-help,' and onsite support"), 39 (acknowledging SMARTnet is purchased as an addition to Cisco's included standard warranty and alleging "the only way for a Cisco customer to officially access ongoing software supports and updates is through the purchase of SMARTnet (or equivalent) services"); Ugone Opening Report, ¶ 82 ("If customers need a higher level of support, they can purchase a higher-tier service plan called SMARTnet directly from Cisco or from a Cisco channel partner."). SMARTnet entitles the end user to certain priority service and replacement equipment; for example, under certain coverage, Cisco guarantees two-hour delivery of a replacement product. Dkt. No. 326-33 (Clark Dep. Tr.) at 49:12-25; Ugone Opening Report, ¶¶ 82-83. SMARTnet serves as a warranty extension and includes additional features. Ugone Opening Report, ¶ 83. Customers do not need to purchase

SMARTnet; networking equipment will work without it, and there are multiple service alternatives (including from non-Cisco third parties).

As Cisco discloses in SMARTnet contracts and in multiple statements on its website, equipment procured from unauthorized resellers is ineligible for SMARTnet unless it is certified and licensed. Ugone Opening Report, ¶ 86. End users that obtain gray market Cisco gear can pay a recertification fee, whereupon Cisco will inspect the equipment.[26] If it is genuine Cisco gear (and otherwise in good working order) and the user has the necessary software licenses, then it is eligible for SMARTnet;[27] if it is not genuine Cisco gear, then it is ineligible for SMARTnet. Limitations like these are industry standard among other OEMs. Ugone Opening Report, ¶¶ 88-92.

Ugone opines Cisco's recertification and SMARTnet policies for gray market products are economically rational, help protect Cisco's brand name, benefit customers, and are procompetitive. *Id.*, ¶ 115. Ugone states Juniper and Palo Alto have similar recertification processes for gray market products as Cisco. *Id.*, ¶ 116. For example, Juniper's policy states: "Products purchased from the Gray Market are not eligible for Juniper warranty services, regardless of what an unauthorized reseller may advertise." Dkt. No. 326-46 (Juniper, "Juniper Networks Gray Market Product Reinstatement Policy") at 1 (emphasis added).

---

[26] Defendants' economist explained Cisco's recertification policy. Ugone Opening Report, ¶¶ 85 (stating Cisco charges a fee of approximately $456 to $508 for the inspection), 114-15. So did Dexon's economist. Maness Opening Report, ¶ 32 (similar).

[27] *See* Dkt. No. 326-36 (Dexon Resp. to Cisco RFAs) at No. 8 (admitting Cisco has provided SMARTnet coverage to Dexon-sold equipment following recertification).

**5.  Cisco's alleged recruitment of and conspiracy with CDW**

**a.  Maness's opinions, generally**

Maness opines Cisco and CDW conspired to exclude independent distributors, harming

intrabrand competition. Maness Opening Report, ¶¶ 114-116. Maness opines Cisco's conduct has

harmed intrabrand competition (*id.*, ¶¶ 117-18), Cisco and CDW had the incentive to coordinate

and harm intrabrand competition (*id.*, ¶¶ 119-23), the exclusion of Dexon and other independent

distributors insulates Cisco and its partners from competition, increasing prices (*id.*, ¶ 124), and

Cisco's and CDW's conduct has impacted Dexon (*id.*, ¶¶ 125-26).

Maness opines Cisco and CDW had the incentive to coordinate and harm intrabrand

competition, noting that because Dexon does not have any relationship with Cisco and sells

products from other manufacturers, Dexon is able to offer "unbiased advice and provide its

customers the best equipment for their needs, regardless of brand." *Id.*, ¶ 119. According to

Maness, CDW, while able to sell networking equipment from non-Cisco sources, "because of its

agreement and relationship with Cisco, . . . has the incentive to steer customers towards Cisco

solutions and disfavor Cisco's competitors." *Id.*, ¶ 120.  Cisco's coordination with CDW "takes a

variety of forms:"

> One way Cisco incentivizes CDW to favor Cisco was through Cisco's funding of
> CDW employees to focus on selling Cisco products to CDW's customers. John T.
> Coleman, Director, Integration Management Office (and former Director, Cisco
> Acceleration at CDW) testified that while certain vendor partners would invest in
> brand managers at CDW, Cisco was the only vendor that had a director dedicated
> to brand "Acceleration." As director of Cisco Acceleration, Mr. Coleman was
> responsible for leading the Cisco business at CDW. Mr. Coleman highlighted that
> CDW and Cisco had "co-invested millions of dollars into building next-gen
> practices that will enable us to maintain relevance and drive Cisco solutions into
> our customer base" Mr. Coleman testified that in a given year, funding from Cisco
> in the form of memorandums of understanding ("MOUs") and joint marketing
> funds ("JMFs") could exceed ███████ in Cisco specific resources for CDW. This,
> when combined with CDW's investment in its own employees and resources
> focused on Cisco, could exceed ███████ per year in investments in Cisco
> specific resources. Between its agreements with Cisco and Cisco's significant

> investments in CDW, CDW has an incentive to sell Cisco products at the expense
> of its competitors, CDW did not and does not treat all vendors equally. Further, in
> making such investments in a large distributor such as CDW and incentivizing such
> a large distributor to favor its products, Cisco's actions raised competitors' costs to
> increase their market penetration and market share.

*Id.*, ¶ 120 (internal footnotes omitted). In other words, "Cisco's significant investment in CDW, well beyond that of its competitors, was facilitated by its longstanding monopoly power and associated monopoly profits, along with the SIPA gave CDW every incentive to coordinate with Cisco at the expensive of the growth of its competitors in the marketplace." *Id.*, ¶ 123.

### b. Relationships between the parties

### i. CDW's relationship with Cisco

The SIA entered into by Cisco and CDW in 2007 requires that CDW only purchase Cisco equipment directly from Cisco or from one of Cisco's authorized distributors and prohibits CDW from selling Cisco equipment obtained outside these authorized distribution channels. *See*, *e.g.*, Coleman Decl. at Ex. D (Systems Integrator Agreement); Dkt. No. 331-69 (CISCO00793824) (Cisco's template Indirect Channel Partner Agreement) ("Cisco authorizes Registered Partner to purchase and/or license Services and Products only from an Authorized Source, and to Resell and/or redistribute such Services and Products directly to End Users within the Territory."); Dkt. No. 331-68 (CISCO00793819) (Cisco's template Systems Integrator Agreement) ("Integrator acknowledges that the purchase and Resale of Non-Genuine or Unauthorized Cisco Products are not within the scope of this Agreement . . . ."). CDW must certify that it is purchasing Cisco products and services solely for resale to end customers (that is, CDW may not sell Cisco equipment to any other authorized or unauthorized reseller for further markup and resale). *See*, *e.g.*, Coleman Decl. at Ex. D (Systems Integrator Agreement); Dkt. No. 331-69 (CISCO00793824) (Cisco's template Indirect Channel Partner Agreement) ("Registered Partner

certifies that it is acquiring the Products and Services solely for Resale to End Users . . . ."); Dkt. No. 331-68 (CISCO00793819) (Cisco's template Systems Integrator Agreement) ("Integrator certifies that, except as set forth in Section 2.4 above, it is acquiring the Products and Services solely for Resale to End Users, in accordance with this Agreement."). Penalties for breaches of the SIA include termination of the reseller agreement. *See*, *e.g.*, Coleman Decl. at Ex. D (Systems Integrator Agreement); Dkt. No. 331-68 (CISCO00793819); Dkt. No. 331-69 (CISCO00793824). The SIA does not restrict the territories or end customers to which CDW may sell in the United States, nor does it impose any exclusivity requirements on CDW. To the contrary, CDW can (and does) sell competing equipment of other OEMs.

The CDW lead in charge of the Cisco relationship, John Coleman, was promoted to "Director of Cisco Acceleration" and was placed in that role at the direction of the CDW CEO, who wanted a "dedicated leader . . . responsible for only Cisco." Dkt. No. 356-3 (Coleman Dep. Tr.) at 29:24-32:4 (explaining the role of the newly created position and how "the role would be in place to help set the strategy and priorities of the Cisco business at CDW"). In his six years as the Cisco partner director working with CDW, Todd Kafka built a relationship with Coleman. Dkt. No. 356-26 (Kafka Dep. Tr.) at 53:8-10, 65:2-4 (testifying he moved into the CDW partner role in 2017), 79:19-23 (stating that over a period of six years, the partnership was better when Kafka left than when he started), 82:2-83:17. Kafka and Coleman talked several times a week, and in the beginning, talked about CDW's partnership with Cisco and vice versa and how they could effectively work together to mutually help their customers. *Id*. at 83:18-84:3. Kafka estimated that it was approximately one to two years after Kafka started as the Cisco partner director working with CDW that Coleman was assigned exclusively to Cisco. *Id*. at 82:24-83:2, 86:14-88:3 (stating CDW had created a similar role for Microsoft, another one of CDW's OEM partners). CDW had

a dedicated, "full-blown team" working with CDW, and it was beneficial to have an additional resource of one person like Coleman dedicated to the account to help. *Id.* at 89:15-24. Although Kafka was "one of [Coleman's] main contacts at Cisco," Coleman would work with "a wide swatch of people" at Cisco. *Id*. at 91:1-12.

According to Kafka, the approximate size of Cisco's partnership with CDW over a six year period was around           ' worth of Cisco business a year. *Id.* at 79:19-81:7. Kafka also confirmed that CDW is one of Cisco's largest, most strategic partners, and that six Cisco employees reported to Kafka for the purpose of increasing Cisco sales through CDW. *Id.* at 71:19-23, 109:16-111:7.

### ii.  CDW's relationship with Dexon

CDW is a company with        in 2021 Cisco sales, including the sale of Relevant Market products to small and medium businesses that, in CDW's words, represented a "lucrative" business opportunity. Dkt. No. 356-12 (CDW-DXN-00206222), at -6223 (Douglas E. Eckrote, CDW's Senior Vice President, states to the sales team regarding a Cisco-CDW GO BIG! Growth initiative designed to drive double-digit Small Business growth for 2018 and beyond: "Expanding our long standing relationship, this targeted programs looks at ways to share data and market to this lucrative customer base, empowering sellers to attack the opportunity like never before."). As noted above, until 2021, Dexon was a regular CDW customer, purchasing both Cisco and non-Cisco products. Dkt. No. 331-9 (Szymanski Decl.), ¶¶ 4-6 (CDW account manager who first began working with the Dexon account, which was one of his largest accounts, around 2015 and who – until March 2021 – frequently worked directly with Cisco sales representatives to obtain authorizations for discounts extended to Dexon).

According to Dexon, unbeknownst to Cisco, in approximately 2014, CDW internally identified Dexon as a "focus account" that would be an opportunity for further business. Dkt. No. 356-20 (Browne Dep. Tr.) at 138:2-140:4 (describing a business review deck where he lists Dexon as an account to focus on); Dkt. No. 356-21 (CDW-DXN-00042818), at -2825 ("listing Dexon as a "Reseller in the networking that is growing. Want to gain the companies infrastructure as the relationship grows"). Dexon asserts CDW's business relationship with Dexon thereafter was strong, resulting in over a million dollars in sales over the next six years. Maness Opening Report at Ex. 8B. CDW's Frank Szymanski testified that he believed that his sales to Dexon were in CDW's (as well as his) interests, as he was serving a market need. Dkt. No. 356-22 (Szymanski Dep. Tr.) at 94:5-19, 98:21-25 (confirming that he was using his "best efforts to get the best price on behalf of Dexon, and Cisco was approving them"). Szymanski had been doing business with Dexon without any problem, and there were Cisco reps who were aware of the business with Dexon. *Id.* at 150:15-151:19. According to Dexon, that all changed in mid-March 2021 when Coleman instructed Szymanski via email not to fulfill Dexon's orders. Dkt. No. 356-3 (Coleman Dep. Tr.) at 243:7-245:11 (noting that Coleman directed Szymanski not to sell to Dexon).

## IV. SHERMAN ACT

### A.  Sherman Act § 1

In Count I, Dexon alleges a Sherman Act § 1 violation against Cisco and CDW for conspiring to restrain trade. In Count III, Dexon alleges a Sherman Act § 1 violation against Cisco for illegal *per se* tying.

Section 1 of the Sherman Act provides as follows: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *Golden Bridge Tech., Inc. v. Motorola,*

*Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting 15 U.S.C. § 1). "Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints." *Id.* (citing *Leegin Creative Leather Prods. v. PSKS, Inc.,* 551 U.S. 877 (2007)). "Essential to every § 1 offense is concert of action between separate business entities. It is axiomatic that unilateral activity by a single firm cannot be reached via this section." *Spectrofuge Corp. v. Beckman Instruments, Inc.*, 575 F.2d 256, 286 (5th Cir. 1978) (collecting cases); *see also Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761 (1984).

## B.  Sherman Act § 2

In Count II, Dexon alleges a Sherman Act § 2 claim against Cisco and CDW for conspiracy to monopolize. In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for monopolization and attempted monopolization. Counts IV and V include similar allegations underlying Dexon's § 1 "tying" claim against Cisco,[28] as well as allegations of Cisco's use of audits and FUD (fear, uncertainty, and doubt) tactics to lock customers into purchases they do not want, foreclosing competitors in the process, and maintaining or enhancing Cisco's monopolies in each of the Relevant Product Markets.

Section 2 of the Sherman Act provides, in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. . . ." *See BRFHH Shreveport, L.L.C. v. Willis-Knighton Med.*

---

[28] Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization. *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354, 397 (3d Cir. 2016) (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 17.01, at 17–13 (4th ed. Supp. 2015); also citing 15 U.S.C. §§ 1–2).

*Ctr.*, 49 F.4th 520, 528 (5th Cir. 2022) 15 U.S.C. § 2. Unlike § 1, § 2 "covers both concerted and independent action." *BRFHH,* (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 190, 130 S.Ct. 2201, 176 L.Ed.2d 947 (2010)). Monopolization is harder to establish than the mere restraint of trade that suffices in the § 1 context. *Id.* at 528-29. That is because "[t]he mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place." *Id.* at 529 (quoting *Verizon Commc'ns Inc. v. Law Off. of Curtis v. Trinko, L.L.P.*, 540 U.S. 398, 407 (2004)).

## V.  DEXON'S CONSPIRACY CLAIMS AGAINST CISCO AND CDW (COUNTS I-II, VI)

### A.  Statute of Limitations concerning Dexon's pre-2018 claims against CDW

The statute of limitations for antitrust claims is four years, 15 U.S.C. § 15b, with both sides acknowledging the cut-off as April 27, 2018 (four years before Dexon's complaint). In his report, Maness calculated Dexon's sales but-for Cisco's and CDW's alleged conspiracy and found that Dexon lost $2.4 million in sales as a result of the Cisco-CDW conspiracy between January 2015 and April 2018 and $1.7 million in profits between May 2018 and May 2022. Maness Opening Report, ¶ 137. The pre-April 2018 damages result from Dexon's lost sales to (at least) two customers due to the Cisco-CDW coordination, ██████████ (in 2015) and ██████████████ (in 2017).[29] The parties have not clarified the exact makeup of the post-April 2018 damages, but they also include damages associated with CDW's decision to stop selling Cisco equipment to Dexon in 2021, pursuant to Cisco's reseller agreement.

---

[29] Though Maness's report identifies several other companies that Dexon allegedly lost sales to, CDW argues he conceded at his deposition that the lost sales to those companies were not due the conspiracy. Dkt. No. 331 at 16-17; Dkt. No. 367 at 1, n.1. Dexon does not appear to challenge that assertion, so CDW's argument is accepted for the purposes of this Report and Recommendation. Therefore, the Court will focus only on ████████ and ████████████

CDW argues that all of Dexon's damages claims are time barred. CDW argues that the
████████ and ████████████ lost sales cannot result in damages to Dexon because they occurred
before April 2018, and that Dexon does not identify any specific "injurious impact" from CDW's
decision to stop selling Cisco to Dexon in 2021 (that is, there is no evidence of any connection
between CDW's inability to sell Cisco equipment to Dexon and Dexon's claimed conspiracy
damages, such as lost sales to a specific customer). Dkt. No. 331 at 17; Dkt. No. 397 (Hearing
Transcript) at 10:14-24. Dexon responds that its claims are timely under the "continuing
conspiracy" and/or "fraudulent concealment" doctrines. Dkt. No. 356 at 12-14.

## 1. Continuing Conspiracy

The initial actions relating to ████████ and ████████████ would, under normal
circumstances, be the time of accrual in 2015 and 2017. *See Al George, Inc. v. Envirotech Corp.*,
939 F.2d 1271, 1273 (5th Cir. 1991). However, Dexon invokes the theory of "continuing
conspiracy" to argue that new causes of action continued to accrue, focusing on CDW's refusal to
sell to Dexon action in March 2021.

The "continuing violation" or "continuing conspiracy" doctrine is "easily understood at a
basic level," but "its application is exceedingly complex, and it applies differently across various
types of antitrust cases." *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679, 693
(E.D. Va. 2023). At base, the rule provides that "in the case of a 'continuing violation,' say, a
price–fixing conspiracy that brings about a series of unlawfully high priced sales over a period of
years, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to
the plaintiff, 'starts the statutory period running again, regardless of the plaintiff's knowledge of
the alleged illegality at much earlier times.'" *Id.* (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179,
189, 117 S. Ct. 1984, 1990–91, 138 L. Ed. 2d 373 (1997) (citing 2 Areeda ¶ 338b, at 145 rev. ed.

1995) (emphasis added in *CSX*)). In other words, each time a plaintiff is injured by an act of the

defendants a cause of action accrues to the plaintiff to recover the damages caused by that act and

that, as to those damages, the statute of limitations runs from the commission of the act. *Zenith*

*Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). According to the Fifth Circuit, "a

newly accruing claim for damages must be based on some injurious act actually occurring during

the limitations period, not merely the abatable but unabated inertial consequences of some pre-

limitations action." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 998

F.3d 190, 197-98 (5th Cir. 2021) (quoting *Poster Exch., Inc. v. Nat'l Screen Serv. Corp.*, 517 F.2d

117, 128 (5th Cir. 1975)).

The Fifth Circuit was "careful to sound two caveats" to this doctrine which the Fifth Circuit

in *Mangurian* summarized as follows:

> Read together, then, our two caveats amount to a restatement of the basic rule that
> a cause of action accrues each time a defendant commits an act that injures plaintiff.
> The first caveat emphasizes that where all the damages complained of necessarily
> result from a pre-limitations act by defendant, no new cause of action accrues for
> any subsequent acts committed by defendant within the limitations period because
> those acts do not injure plaintiff. The second caveat emphasizes that where a
> defendant commits an act injurious to plaintiff outside the limitations period, and
> damages continue to result from that act within the limitation period, no new cause
> of action accrues for the damages occurring within the limitations period because
> no act committed by the defendant within that period caused them.

*Imperial Point Colonnades Condo., Inc. v. Mangurian*, 549 F.2d 1029, 1035 (5th Cir. 1977).

CDW's refusal to sell to Dexon occurred within the limitations period and was made

pursuant to the alleged conspiracy between CDW and Cisco. The evidence of record shows that in

March of 2021, Cisco's Kafka notified CDW's Coleman that CDW's Szymanski sent quotes of

Cisco networking equipment products to Dexon, who Kafka informed Coleman was a "reseller,"

and as a result, CDW could not sell Cisco equipment to Dexon. Coleman Decl., ¶¶ 2, 27 & Ex. E.

In an email dated March 16, 2021, Coleman instructed Szymanski that he could no longer quote

or sell Cisco products to Dexon.[30] *Id.*, Ex. E at CDW-DXN-00032152; *see also* Dkt. No. 356-23

at -2153; *see also* Dkt. No. 356-3 (Coleman Dep. Tr.) at 243:2-245:11 (stating the purpose of his

March 16, 2021 email was to adhere to the CDW/Cisco SIA). Szymanski was "a little puzzled" by

the instruction from Kafka and Coleman, neither of whom Szymanski had met prior to Coleman's

instruction, because Szymanski had been selling to Dexon. Dkt. No. 356-22 (Szymanski Dep. Tr.)

at 152:10-20; 161:12-162:18; *see also* Dkt. No. 356-3 (Coleman Dep. Tr.) at 243:19-21. Even so,

Szymanski complied with the request; in doing so, Szymanski told Dexon a "white lie" — claiming

that he had to stop doing business with Dexon as a result of a job "re-assignment" to a different

position within CDW when there was "no new position." Szymanski Dep. Tr. at 175:9-25.

Coleman testified that he adhered to the CDW/Cisco Reseller Agreement by emailing

Szymanski to "cease and desist in terms of Cisco quoting and Cisco selling because that would be

a violation of our SIA agreement." Dkt. No. 356-3 (Coleman Dep. Tr.) at 244:2-245:16; *see also*

*id.* at 183:8-184:22 (discussing a different email wherein Coleman stated that CDW is prohibited

from buying from any unauthorized Cisco resellers and that CDW needed to "stay clear of any

behaviors that would put at risk [CDW's] partnership and certifications/specializations with Cisco"

and that the "financial risk is too massive" if CDW were to become unauthorized to sell Cisco

products); *see also id.* at 185:14-16 (stating it is "pretty clear" to Coleman that under the SIA

agreement, CDW is prohibited from selling to resellers). An internal CDW email dated March 19,

2021 email shows the "fallout" and pressure from Cisco regarding the issue of CDW's sales to

---

[30] In response, Szymanski stated "[t]hese are just quotes and I have quoted these very large quotes to them in the past and nothing has ever come about of it. If I need to engage a Cisco rep, I will as I have my Cisco reps that work with Dexon very well dialed into what we do with them. . . ." Coleman Decl., Ex. E at CDW-DXN-00032150.

Dexon. On March 19, 2021, CDW's Krebill forwarded emails regarding "Dexon Computer" to

Suzette Honas at CDW, stating as follows:

> FYI, there's been more fallout from this one.
>
> I talked to Todd [Kafka] (who owns the CDW/Cisco relationship) more about this last night. **He is getting slammed on this one, internally at Cisco, saying he needs to "get his partner in check"**
>
> He says that per everything Cisco can see, Dexon is an unauthorized buyer of Cisco products, and should be shut down. He also admits that there is some culpability at Cisco and Meraki since there had been some 0lPs approved, and he will be addressing those.
>
> * * *
>
> Thoughts?

Dkt. No. 356-23 (CDW-DXN-00032148) at -2148 (emphasis added).

CDW argues its decision to stop selling to Dexon does not save Dexon's claim because

that action is not new harm (i.e., no damages tied to that specific action), much less antitrust harm.

*See* Dkt. No. 367 at 2; *see also id.* at 10, Dkt. No. 397 (Hearing Transcript) at 13:2-5 ("So there's

no alleged act since 2018 for which Dexon claims damages that can constitute a continuation of

any prior conspiracy. . . ."); *see id.* at 58:12-19 ("Saying that it very likely led to increased prices

is not the same as saying there was some harm to the market as a result of something happening in

2021. . . . [N]or is there any evidence of market harm from that, so you can't have a continuing

violation that is an act without an injury, and this is no time for conjecture about that.").

But that's not a complete enough description of Maness's damages opinions. Dexon shows

Maness calculated damages due to the Cisco-CDW conspiracy, using ███████████ as well as other

customers for which Dexon and CDW both previously made sales as a baseline."[31] Dkt. No. 356 at 12 (citing Maness Opening Report, ¶¶ 136-37 (describing the methodology of analyzing CDW and Dexon's sales data for overlapping customers to calculate Dexon's sales but-for Cisco's and CDW's alleged conspiracy)). Dexon and CDW directly competed for these types of customers, and Maness opines that Dexon likely would have been able to maintain similar levels of sales it had, relative to CDW, in the absence of the Cisco-CDW conspiracy. *Id.* Dexon also has presented evidence showing the Cisco-CDW conspiracy has prevented Dexon from access to inventory that it would have been well-suited to offer to its customers as an option, enhancing consumer choice. Dkt. No. 356 at 11-12 (citing Maness Opening Report, ¶ 40 (discussing the options and cost savings available through independent resellers); ¶¶ 128-129 (explaining how Cisco's FUD cost Dexon major and long-term contracts through reputational harm)); *id.* at 11 (*comparing* Dkt. No. 356-7 (Krebill Dep. Tr.) at 88:20-89:13 (explaining how Cisco had previously not had a "deep focus on the small business customer" and how the goal was to "catch them up" in small business and to grow CDW's relationship with Cisco sales within Small Business so it was "more in line with how strong the partnership was throughout the rest of CDW"), *with* Maness Opening Report, ¶¶ 33, 33 n.51 (discussing the importance of an independent channel)).[32] Dexon further provides evidence suggesting that only purchases through a CDW sales representative, in which CDW can

---

[31] In its response, regarding ▮▮▮▮▮ specifically, Dexon argues its sale to ▮▮▮▮▮ would not have only resulted in those lost profits but would also have generated goodwill and reputational benefits in healthcare as well as comparable businesses in the region. Dkt. No. 356 at 11 (citing Maness Opening Report, ¶¶ 128-29 (explaining how Cisco's FUD cost Dexon major and long-term contracts through reputational harm)).

[32] Dexon asserts CDW admittedly struggled with penetrating small and medium businesses, whereas Dexon excels at servicing such business at efficient prices without pushing any particular vendor. Dkt. No. 356 at 11 (citing Maness Opening Report, ¶ 119) (describing Dexon's success at providing customers with a wide variety of brands that match their price points); also citing Dkt. No. 356-13 (Sheh Dep. Tr.) at 23:2-24:20, 58:23-59:6 (testifying that Dexon products provide value to customers looking for less expensive alternatives and citing the value of Dexon as a "one-stop-shop" that sells both Cisco and other brands equipment)).

secure customer specific discounts from Cisco, can result in the type of discounts that are typically needed to secure the business and meet a customer's needs. *Id*. at 12 (citing Dkt. No. 356-22 (Szymanski Dep. Tr.) at 106:24-108:3 (explaining the process Szymanski followed with Cisco to secure discounts on Dexon's behalf, including by marking as "high importance")); Dkt. No. 397 (Hearing Transcript) at 55:8-21 (arguing that Szymanski had been able to achieve price discounts on behalf of Dexon but when that working relationship was cut off, it results in lower choice for Dexon's customers and "arguably and very likely results in an increased price").

This record provides sufficient evidence to show Dexon's damages in the limitations period can be tied to a continuing conspiracy, including the act of CDW refusing to sell Cisco to Dexon starting in 2021. The Court rejects CDW's contention that Dexon must more specifically tie CDW's decision to stop selling to Dexon to a specific form of harm. Dexon presents evidence of an active conspiracy involving multiple intertwined acts causing various types of harm, and CDW does not provide persuasive argument or authority that Maness must tie specific acts to specific harms.[33]

Regarding CDW's argument that the decision to stop selling is not an antitrust injury, the Court will address the marketwide effects of the conspiracy more fully in the liability sections,

---

[33] *See, e.g.*, *CSX Transportation, Inc. v. Norfolk S. Ry. Co.*, 648 F. Supp. 3d 679 (E.D. Va. 2023). The *CSX* court noted that it did not "reject wholesale CSX's legal contention that a plaintiff providing evidence of an <u>active</u> conspiracy involving multiple intertwined overt acts causing various types and/or multiple instances of new and accumulating injury need not tie specific overt acts to specific forms of harm." *Id*. at 704 (emphasis original). According to the court, "as long as the plaintiff can demonstrate that the harm supporting a damages claim collectively flows from unlawful acts <u>committed during the limitations period</u>, all of the damages are recoverable." *Id.* (emphasis original) (citing *City of Vernon v. S. California Edison Co.*, 955 F.2d 1361, 1371 (9th Cir. 1992) (indicating in a case where the statute of limitations was not at issue that when "damages arise from a series of unlawful acts intertwined with one another," and "<u>causation</u> of damages has been established," the law does not require "strict disaggregation of damages among the various unlawful acts" (quoting *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1161 (7th Cir. 1983)))). However, the *CSX* court explained that when a decades-old conspiracy causes current harm that flows from time-barred acts and one or more recent overt acts, well-established antitrust law (including *Klehr*'s anti-bootstrapping rule) precludes a plaintiff from recovering the damages felt during the past four years that are consequences of conspiratorial or monopolistic acts committed years or decades earlier. *Id*. at 704-05 (citation omitted).

where the parties more sufficiently addressed it. For the purposes of statute of limitations, Dexon's

counsel's arguments are sufficient to rebut the passing arguments Cisco raises in the context of the

limitations issue. *See* Dkt. No. 397 (Hearing Transcript) at 46:9-50:16 (Dexon's counsel arguing

there is "undisputed market-wide harm" because of the alleged Cisco-CDW conspiracy because

CDW is not allowed under the SIA to deal with other independent resellers (i.e., ███████

further minimizing customer choice and access and increasing prices); *see also id.* at 44:9-14 ("In

the complaint, we allege there's a Dexon-specific conspiracy. That's all we had reason or ability

to know about. This conspiracy applies to every single independent reseller that might deal with

any authorized reseller. It is a global market-wide conspiracy that applies to not just CDW but

everybody else in the channel.").

In sum, Dexon has presented sufficient evidence of antitrust injury in the limitations period.

Therefore, the Court finds Dexon has raised a fact issue on its continuing conspiracy claim

sufficient to defeat the limitations defense. Although summary judgment as to Dexon's conspiracy

claims on the basis of limitations is inappropriate, some of CDW's assertions as to Dexon's pre-

2018 damages claims have merit.[34]

### 2. Fraudulent Concealment

Dexon also claims Defendants "fraudulently concealed the Cisco-CDW conspiracy, thus

tolling the statute of limitations, by engaging in affirmative acts of concealment" such as Cisco's

"purposely blind forwarding its FUD-driven correspondence with ███████ to its co-

---

[34] Notably, Dexon does not dispute that the commission of a separate new overt act generally does not permit the plaintiff to recover for the injury caused by old overt acts outside the limitations period, *see Klehr*, 521 U.S. at 189, and Dexon's counsel conceded at the November 2, 2023 hearing that in order to recover for damages prior to 2018 Dexon would need to show fraudulent concealment. Dkt. No. 397 (Hearing Transcript) at 56:4-11 (stating in response to the Court's question regarding damages for an event that happened outside the limitation period, "Dexon does need to show fraudulent concealment for ███████ but does not need to show fraudulent concealment arising post-2018).

conspirator." Dkt. No. 356 at 13. Dexon states it could not have discovered the facts that form the

basis of its conspiracy claims at the time of the ███████ incident, noting ███████ itself "was

kept in the dark as to the coordination occurring between the Defendants" and "there was no

reasonable way [before 2021 when it became apparent that Cisco may have forced CDW to stop

dealing with Dexon] that Dexon . . . would have been able to discover that the reason it lost the

order was because of Defendants' conspiracy." *Id*. at 14.

For fraudulent concealment, Dexon must prove (1) CDW "concealed the conduct

complained of" and (2) Dexon failed, "despite the exercise of due diligence on [its] part, to

discover the facts that form the basis of his claim." *In re Beef Indus. Antitrust Litig.*, 600 F.2d

1148, 1169 (5th Cir. 1979). As evidence, Dexon generally cites emails and deposition testimony

showing Cisco and CDW coordinated to have CDW replace Dexon for a ███████ contract, with

Cisco instructing CDW to remain silent (presumably from ███████ and possibly Dexon) about

the coordination.

### a.   Whether Dexon was required to plead fraudulent concealment

As a preliminary matter, at the summary judgment motion hearing, CDW argued that

Dexon failed to plead fraudulent concealment. Dkt. No. 397 (Hearing Transcript) at 58:25-59:5.

Given that argument was present in the motion to dismiss briefing but not in the summary judgment

briefing, the parties were ordered to submit supplemental briefs addressing issues relating to

CDW's pleading argument, "[1] such as whether Dexon needs to specifically plead fraudulent

concealment, [2] whether Dexon has pleaded fraudulent concealment, [3] whether Dexon should

be allowed to amend to plead fraudulent concealment, if necessary, etc." Dkt. No. 458 at 3, n.1

(numbering added).

CDW responds that (1) Dexon was required to plead fraudulent concealment because "the only customer incident alleged in the Complaint as a basis of its claims against CDW was ████ ████ (anonymized as 'a hospital system in Pennsylvania'), for which all of CDW's alleged conduct occurred in 2015," outside the limitations period (Dkt. No. 466 at 1); (2) Dexon's amended complaint does not plead fraudulent concealment or any supporting facts to support that theory (*id.* at 3); and (3) it would be prejudicial to allow Dexon to amend its complaint at this stage, which would require re-opening discovery to explore at least the issue of Dexon's diligence (*id.* at 4). Dexon argues it was not required to plead fraudulent concealment because CDW's statute of limitations defense was not apparent from the face of the complaint, but does not address points (2) and (3).

Both parties acknowledge the issue of whether Dexon was required to plead fraudulent concealment turns on whether Dexon's claims in the complaint called for some sort of tolling of the limitations. Dkt. No. 467 at 1 (CDW stating that "Dexon knew the only customer incident alleged in the Complaint as a basis of its claims against CDW was ████ (anonymized as 'a hospital system in Pennsylvania'), for which all of CDW's alleged conduct occurred in 2015. *See* Dkt. No. 48. Yet, despite knowing it would have to plead some basis for tolling the statute of limitations. But Dexon did not do so"); at 5 (Dexon stating that "Dexon was not required to plead fraudulent concealment in its Complaint because CDW's potential statute of limitations defense was not apparent from the face of the Complaint.").

CDW is correct that Dexon knew (or should have known) that to recover for an event in 2015, the statute of limitations would need to be tolled. On the other hand, the Court previously acknowledged during the motion to dismiss proceedings that there was some ambiguity as to how the statute of limitations would affect Dexon's conspiracy claims. Dkt. No. 107 at 78, 80-81.

Importantly, the purpose of the pleading requirement would be to allow the parties to explore the issue of fraudulent concealment in discovery. It's plain from the evidence (discussed below) that Dexon tried to determine the extent of the concealment, with respect to at least ███████, and Dexon represents that CDW was able to inquire about Dexon's diligence during a deposition of the Dexon employee who was responsible for the ████████ account. Dkt. No. 467 at 6. Further, CDW did not raise this pleading argument in its summary judgment briefing, did not object to Dexon's reliance on the summary judgment evidence in support of its fraudulent concealment claim, and did not object to Dexon's inclusion of fraudulent concealment in the Joint Pre-Trial Order. While this suggests CDW had adequate notice of the issue of fraudulent concealment (or possibly that leave to amend would be a suitable fix), it does not conclusively resolve the ambiguity as to whether Dexon was required to plead fraudulent concealment in this situation. As explained below, Dexon fails to marshal a factual dispute as to whether Defendants fraudulently concealed the conspiracy from Dexon; thus, the better course is to resolve this issue on the merits.

### b.  Whether the evidence shows a fact issue as to concealment

CDW argues that Dexon's cited evidence is insufficient because concealment requires more than "silence" by showing "some trick or contrivance tending to exclude suspicion and prevent inquiry." Dkt. No. 356 at 3.

Dexon relies on two sets of evidence that it argues are sufficient to show a factual dispute as to whether Defendants concealed. <u>First</u>, after Cisco's Michael Babich emailed ████████ to inform it that Dexon was an unauthorized reseller, Cisco forwarded the "FUD-driven correspondence with ████████" to CDW as an "FYI" without the customer copied. Dkt. No. 356-17, at -8704. At his deposition, Babich testified he did not know why he did not "cc" CDW on his July 16, 2015 email to Casteel at ████████. Dkt. No. 355-61 (Babich Dep. Tr.) at 193:15-17.

64

Second, in response to a request for a status update on the ███████ situation, Babich emailed CDW's Brian Nakel that ███████ had been sent gray market equipment and that Dexon buys from a partner in Germany, ending the email with an instruction that "This is all confidential." Dkt. No. 356-18, at -2534. Again, Babich was unable to provide any reason why he instructed his CDW colleague to keep the communication confidential. Dkt. No. 356-16 (Babich Dep. Tr.) at 191:2-12 (Q. "How do you – what do you mean by confidential in this context of [CDW-DXN-00032534]?" A. "I have no recollection what I meant by confidential in this exhibit here. Q. [D]o you consider all of your conversations with ███████ confidential. . .? A. I would say within the group of people, yes, it is confidential. This was a known thing going on in discussions.").

In its statement of material facts, Dexon cites Babich's deposition testimony to show he agreed to coordinate with CDW for the purpose of foreclosing Dexon from making the same sale. Dkt. No. 356 at 8-9 (citing Dkt. No. 356-16 (Babich Dep. Tr.) at 186:9-191:19, 197:15-198:25). Dexon further asserts the Cisco-CDW conspiracy was successful, coercing ███████ to buy the same equipment for more money from CDW, and in the process, ███████ thanked CDW for its "assistance" despite being subject to a Cisco threat. *Id.* at 9 (citing Dkt. No. 356-19 (CDW-DXN-00028827) at -8828 (███████ to CDW: "I know that you did nothing to cause it, **and I don't know all that you had done or been asked to do by Cisco to clean it up**, and I probably don't want to know, but I want to say thank you [] for all of your efforts!") (emphasis added)).

Notably missing from this evidence is any overt action taken on the part of CDW to keep Dexon in the dark or indication that CDW would have alerted Dexon to the conspiracy but for Cisco's instruction to keep silent. Dexon argues one can "infer from this evidence" that the plan was to hide the conspiracy. Dkt. No. 397 (Hearing Transcript) at 57:8-11; *see also id.* at 57:12-18 (stating blind forwarded correspondence was easily an "inference" of a contrivance/trick).

However, the only reasonable inference from CDW being told to keep silent is that CDW actually kept silent. But "[c]oncealment by defendant only by silence is not enough. [The defendant] must be guilty of some trick or contrivance tending to exclude suspicion and prevent inquiry." *Rx.com v. Medco Health Sols., Inc.*, 322 Fed. Appx. 394, 398 (5th Cir. 2009) (citations omitted). An agreement between co-conspirators to keep silent, without more, such as overt actions, contrivances, tricks, or at least an indication that one or more of the co-conspirators would have disclosed the conspiracy but for the agreement, is not enough to show fraudulent concealment. Otherwise, this fact pattern would swallow the rule that silence is not enough.

Accordingly, the Court recommends summary judgment be granted for CDW on this discrete issue.[35]

## B.  Dexon's Sherman Act § 1 and § 2 conspiracy claims against Cisco and CDW

### 1.  Applicable law

"To prevail on a Section 1 claim, plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Johnson v. Hospital Corp. of America*, 95 F.3d 383 (5th Cir. 1996). Additionally, the Supreme Court clarified in *Matsushita* that antitrust plaintiffs must prove they have suffered an injury stemming from the complained-of anti-competitive behavior. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 312 (5th Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)).

---

[35] For that reason, the Court does not address the second element of fraudulent concealment, whether Dexon showed due diligence.

Additionally, Cisco did not move for summary judgment on limitations. Although Cisco makes a passing reference to the four-year statute of limitations as a time-bar to Dexon's conspiracy claims, *see* Dkt. No. 326 at 27, n. 131 (noting ▮▮▮▮▮ left Dexon in 2015), Cisco does not specifically incorporate all of CDW's arguments and requests for relief like CDW did with its Notice of Joinder regarding Cisco's arguments and requests for relief. *See* Dkt. No. 332.

To determine whether a restraint is unreasonable, courts use either the "rule of reason" or the "per se rule." *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015). There are two types of contracts, combinations, and conspiracies in restraint of trade covered by § 1 of the Sherman Act: horizontal and vertical. *O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721, 730 (E.D. Tex. 2000). Horizontal combinations are cartels or agreements among competitors that restrain competition among enterprises at the same level of distribution. They are ordinarily illegal *per se*. *Id.* (citations omitted). "Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained." *Id.* (quoting *Muenster Butane, Inc. v. Stewart Company*, 651 F.2d 292, 295 (5th Cir.1981)). Vertical non-price restraints are tested under the rule of reason, which requires plaintiffs to prove that the restraint had an anticompetitive effect in the relevant market in order to prevail. *Id.* (citing *Continental T.V., Inc. v. GTE Sylvania, In*c., 433 U.S. 36, 58-59, 97 S.Ct. 2549, 2558 n. 19, 53 L.Ed.2d 568 (1977)).

Sherman Act § 2 makes it unlawful for any person or firm to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. The elements of a § 2 conspiracy to monopolize claim are "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

### 2. Parties' assertions

In its motion, Cisco asserts it is entitled to summary judgment on Dexon's conspiracy claims (Counts I-II and VI) because Dexon cannot prove anticompetitive effect. Dkt. No. 326 at

15 & n. 79 (unreasonable restraint of trade as to § 1 claim / anticompetitive acts with "an effect upon a substantial amount of interstate commerce" as to § 2 claim); Dkt. No. 366 at 6. As a general matter, Cisco argues in its summary judgment motion – as it did in its motion to dismiss – that operating an "industry-standard," authorized distribution channel – in which CDW is one of more than 8,000 authorized resellers – is not an anticompetitive, unlawful conspiracy. Dkt. No. 326 at 26-27 (citing *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245, 1248 (5th Cir. 1975) ("It is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself.")); *see also* Dkt. No. 22 at 13-14. According to Cisco, to overcome this precedent, Dexon alleges Cisco abused its lawful distribution network by agreeing with CDW to coerce customers away from Dexon and toward CDW. Dkt. No. 326 at 26. Cisco makes two specific assertions in response to Dexon's conspiracy claims: (1) Dexon has no evidence in support of its claims ("Dexon cannot prove that [persuading a customer to deal with one reseller rather than Dexon] happened."); and (2) to the extent CDW agreed not to sell Cisco equipment to unauthorized resellers for resale, such restrictions are standard in the industry and Dexon does not claim that Cisco's policy is unlawful. *Id.* at 27; *see also id.* at 26 (noting Maness agreed there is nothing anticompetitive about Cisco's "industry-standard policy that authorized resellers cannot engage in gray market transactions by selling to or buying from unauthorized resellers that want to re-sell after imposing price markups").

Similarly, CDW argues that Cisco's requirement that its authorized resellers (including CDW) sell only to end customers is a "classic vertical restriction that is both common in the IT equipment industry and identical to those previously upheld by the Fifth Circuit (including on summary judgment) due to its procompetitive benefits, namely, promotion of *interbrand* competition." Dkt. No. 331 at 14. CDW argues the end-customer limitation in the reseller

agreement is presumptively permissible and desirable. *Id.* at 19-23. Additionally, CDW argues

there is "zero evidence that this limitation has had any anticompetitive effect in any market." *Id.*

at 14; *see also id.* at 23 ("There is zero evidence that Cisco's reseller agreement caused marketwide

harm.").

In its response to both motions, Dexon states Cisco and CDW attempt to rebrand the alleged

conspiracy in this case as *merely* the operation of an "industry standard distribution channel" while

ignoring *all* the anticompetitive aspects of the alleged conspiracy, which include the following:

- CDW was forced to adhere to minimum purchase requirements by Cisco;

- Cisco successfully incentivized CDW to favor Cisco over its competitors, so that CDW's sales force would be rewarded to favor Cisco;

- As a result, it was the joint objective of Cisco and CDW to foreclose[e] Cisco's competitors from major accounts (Dkt. No. 355-61 (Babich Dep. Tr.) at 149:5-150:23; 168:14-185:21; 186:9-191:19; 192:9-202:7; 192:9-202:7 (testimony describing how timeline of Cisco working with CDW to persuade ███████ to cancel a deal with Dexon and in turn purchase products from CDW)); and

- CDW was expressly prohibited from dealing with all independent resellers, not just Dexon, which would serve to foreclose resellers that would "erode [Cisco's] profit margins and profoundly affect bottom-line profitability." *See* Dkt. No. 355-18 (LinkedIn page of Doug Abbott stating that in his role, he served to "[eradicate] . . . gray market operations [that] erode[d] profit margins and profoundly affect bottom line profitability.").

Dkt. No. 355 at 23. Dexon contends an agreement (conspiracy) "between a monopolist and a multi-

billion dollar company explicitly designed to expand those monopolies, limit consumer choice,

and protect monopoly profits is plainly anticompetitive." *Id.* at 23-24.

### 3. Dexon's evidence it cites to show anticompetitive / unlawful conduct

According to Dexon, despite the important benefits independent resellers like Dexon

provide to end users, *see* Maness Opening Report, ¶¶ 33-34, Cisco was aware that Dexon "[was]

driving our prices down" before Defendants' improper conduct eliminated that threat. Dkt. No.

356 at 8 (citing Dkt. No. 356-14 (CISCO00046553), at 5 (July 19, 2017 Jabber chat between Cisco

sales reps discussing how the "grey market" gear that ███████ previously sourced through Dexon

"was driving our prices down" and that "[Tapper with Cisco] just got Dexon booted from all future

business" which was a "huge undertaking")). Maness opines Cisco and CDW conspired to exclude

independent distributors, harming intrabrand competition. Maness Opening Report, ¶¶ 114-16

(stating Cisco would identify customers who were considering sourcing gear through Dexon and

work with CDW to provide alternative quotes for the same gear, along with threats and coercion

to limit competition from Dexon; providing an example of the Cisco Sales Rep FUD to get Dexon

"booted from all future business" with ██████, after which the Cisco Rep worked directly

with CDW to ensure that ██████ awarded CDW the purchase order; stating the Cisco Rep

discussed internally how gear previously sourced through Dexon was "driving our prices down";

discussing the coordination between CDW and Cisco with respect to ██████ and further

discussing how with respect to independent distributor ██████, Cisco and CDW "conspired to

exclude even the risk of additional intrabrand competition at their customer's expense"). Maness

opines Cisco's conduct has harmed intrabrand competition (*id.*, ¶¶ 117-18), Cisco and CDW had

the incentive to coordinate and harm intrabrand competition (*id.*, ¶¶ 119-23), the exclusion of

Dexon and other independent distributors insulates Cisco and its partners from competition,

increasing prices (*id.*, ¶ 124), and Cisco's and CDW's conduct has impacted Dexon (*id.*, ¶¶ 125-

26).

Specifically, Maness opines Cisco and CDW had the incentive to coordinate and harm

intrabrand competition, noting that because Dexon does not have any relationship with Cisco and

sells products from other manufacturers, Dexon is able to offer "unbiased advice and provide its

customers the best equipment for their needs, regardless of brand." *Id.*, ¶ 119. Dexon has presented

evidence that Cisco has provided several incentives to CDW, such as marketing development funds, funding employees, and training that were worth ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ to CDW. Dkt. No. 356-3 (Coleman Dep. Tr.) at 83:5-86:18 (explaining Coleman's statement in the February 19, 2019 email that most of the investments CDW makes "are done so with Cisco dollars" in the form of MOUs (memorandum of understanding) (which could have added up to ▮▮▮▮▮ in some years), JMF (joint marketing funds) (which could have added up to as high as ▮▮▮▮▮) (together with employees, could be in excess of ▮▮▮▮▮) and further stating that to build out a "collaboration practice" Cisco would invest "in the front end so that [CDW could] get expertise and certifications" and if CDW were "to hit those milestones," CDW would recoup the costs spent in building out that practice).

In an internal February 19, 2019 email from Coleman regarding "CDW Value Prop Info – Cisco," Coleman provided "various data points that collectively help to articulate the value that CDW brings to the Cisco relationship."   Dkt. No. 355-29 (CDW-DXN-00134482), at -83. Highlights include the following:

- Technical Breadth & Depth: CDW has hundreds of Cisco certified network/design/voice professionals and 60+ CCIE's that help customers get the solutions they need. CDW was the 1st Americas partner to earn the new Masters Specialization for Networking, and was the 1st Cisco partner to earn all 5 Masters specializations. . . . The amount of technical resources CDW has across all 4 Cisco Architectures, combined with hundreds of delivery engineers/consultants, reflects the importance of Cisco at CDW and the efforts we've put into understanding how to effectively design, procure, deploy and manage Cisco solutions — both existing and emerging — has allowed CDW to consistently outperform and take share.

- CDW & Cisco have co-invested ▮▮▮▮▮▮▮▮▮ into building next-gen practices that will enable us to maintain relevance and drive Cisco solutions into our customer base. . . .

- Deep executive alignment and relationships, built on years of successful partnering and mutual investment; participation on partner advisory boards, CPEE, POAB, SPAB, and consistent cadence to discuss strategic direction, practice buildout, and proactive plans to drive Cisco revenue across all architectures.

* * *

- Dedicated Cisco Lifecycle / Customer Experience Practice driving Cisco software and subscription sales. Customer Success Managers, Licensing Administrators and Business Development Managers assisting with landing new EA's and adoption services. CDW #1 Cisco partner in FY18 with 141 EA's.

- Adept at leveraging Cisco programs to drive profitability. . . .

- Relevance across Cisco's GES, Commercial & Public Sector sales teams — balanced growth. #1 Commercial Partner, #1 SLED Partner, #2 Enterprise Partner, #2 Public Sector Partner; Consistent recognition across all Cisco geos' and segments for our architectural excellence.

- 583 CDW engineers & project managers involved on Cisco projects (TTM) with assistance from 384 contractors from our partner network; Logged ███████████████, to ██████ different customers, worth ██████ (TTM)

- CDW heavily invested in Cisco solutions internally. . . .

*Id.* at -83 to -84. According to Coleman, these highlights collectively "tell a meaningful and compelling story around CDW's differentiation, and [CDW's] rich history of performance relays to customers a level of consistency, trust and reliability." *Id*. at -84. In response, CDW's Bob Kirby stated his goal was "to figure out what kind of value Cisco should place on the investments that CDW has made in Cisco and how that should translate into some kind of further discount beyond ██████."[36] *Id.* at -83.

---

[36] In response to Kirby's further question regarding all the investments CDW makes in Cisco annually, Coleman responded as follows:

> [T]he fact is that CDW doesn't make significant financial investments.....we leverage Cisco investments and earnings to justify things such as the Brand team, the Smartnet team, the Purchasing team, etc. Most of the 'investments' we make are done so with Cisco dollars in the form of MOU's, JMF, etc.
>
> I think we spin the story to highlight the *value we provide*, vs the *investments we make*. We take on significant financial risk, esp with NYC, as we extend credit, etc. We have built up an <u>army of Cisco resources based on the relevance and size and profitability of Cisco</u>. We've (with the use of CISCO investments) have built up practices (CX, DNA, SDA) and leverage the technical capabilities to create presales assessments, workshops, to help customers navigate new Cisco solutions.

Dexon asserts the Cisco-CDW conspiracy was specifically designed to expand Cisco's monopolies, by incentivizing CDW to push its "most profitable partner" and dissuade customers not to buy competitive products from independent sources. Dkt. No. 355-33 (CDW-DXN-00206222) at 1 (May 10, 2018 internal message to CDW sales team: "These are a part of a monstrous overall effort, with a goal to grow our Cisco business at a fast pace—which (as our most profitable partner) will inevitably put BIG $$s in your pockets!"). Dexon's economic expert Maness opines CDW, while able to sell networking equipment from non-Cisco sources, "because of its agreement and relationship with Cisco, . . . has the incentive to steer customers towards Cisco solutions and disfavor Cisco's competitors." Maness Opening Report, ¶ 120; *see also* Dkt. No. 356-26 (Kafka Dep. Tr.) at 115:7-134:25 (testifying regarding April 2020 email thread wherein Gabi Rubeck of CDW wrote, "As you know, every step we've taken in our partnership approach and pricing strategy over the course of the past several weeks has been based on the understanding of an emphasis on Cisco as our exclusive strategic partner" and also stating CDW interpreted a registration and conditions in an SDO as CDW could only include Cisco on the bid).

Maness states one way Cisco incentivizes CDW to favor Cisco is through Cisco's funding of CDW employees to focus on selling Cisco products to CDW's customers. Maness Opening Report, ¶ 120. John Coleman, the CDW lead in charge of the Cisco relationship, was promoted to "Director of Cisco Acceleration" at the direction of the CDW CEO, who wanted a "dedicated leader . . . responsible for only Cisco." Dkt. No. 356-3 (Coleman Dep. Tr.) at 29:24-32:4

---

So, I think we are on the same page but I want to be clear on how we spin this. We can say we've invested in resources and teams and technical expertise.....but so has every other Cisco Gold partner. . . .

Dkt. No. 355-29 ("CDW-DXN-00134482"), at -82 (italics original, underline added).

(explaining the role of the newly created position and how "the role would be in place to help set the strategy and priorities of the Cisco business at CDW"). None of Cisco's competitors had a similarly placed CDW Director in such a role. *Id*. at 32:7-14. The CDW CEO, as well as his direct reports, were given input about the Cisco-CDW relationship by Coleman's team, *id.* at 104:12-105:8 (example of the CDW CEO asking Coleman to provide details on the relationship ahead of a meeting with Cisco), and Coleman had regular executive meetings with the CDW CEO's direct report as well as their Cisco counterparts about the Cisco relationship. *Id.* at 46:9-47:5 (describing having regular "one-on-one" and quarterly executive meetings); *see also* Dkt. No. 356-26 (Kafka Dep. Tr.) at 53:8-10, 83:18-84:3 (testifying that in his six years as the Cisco partner director working with CDW, Kafka built a relationship with Coleman and further testifying that Kafka and Coleman talked several times a week).

According to Cisco's Kafka, the approximate size of Cisco's partnership with CDW over a six year period was around ██████████████' worth of Cisco business a year. Dkt. No. 356-26 (Kafka Dep. Tr.) at 79:19-81:7. Kafka also confirmed that CDW is one of Cisco's largest, most strategic partners, and that six Cisco employees reported to Kafka for the purpose of increasing Cisco sales through CDW. *Id.* at 71:19-23, 109:16-111:7. Kafka testified that Cisco and CDW collaborated on different programs trying to figure out how to grow their respective business. *Id.* at 157:4-9. When asked if Kafka's and Coleman's teams would specifically collaborate on "customer targets" or end user customers to which Cisco was trying to make sales, Kafka testified as follows:

> [F]rom a CDW perspective if they've got accounts that they're not successfully selling categories that Cisco plays in, that they would love to figure out how to expand into those categories, and they will -- and they will do that with Cisco and other OEMs. And from a Cisco perspective, if we've got accounts that we're not successful in and CDW is having success in that account with something, or another

partner is having success in that part with something, and there's an opportunity to have a joint discussion with a customer, Cisco teams would do that all day long.

*Id.* at 157:11-158:4.

Coleman highlighted that CDW and Cisco had "co-invested ███████████ into building next-gen practices that will enable us to maintain relevance and drive Cisco solutions into our customer base." Maness Opening Report, ¶ 121. Maness opines "Cisco's significant investment in CDW, well beyond that of its competitors, was facilitated by its longstanding monopoly power and associated monopoly profits, along with the SIPA gave CDW every incentive to coordinate with Cisco at the expensive of the growth of its competitors in the marketplace." *Id.*, ¶ 123. According to Maness, as a result of Cisco's "monstrous" investments in CDW, CDW encouraged its sales employees to push "its most profitable partner" and CDW employees were even rewarded for doing so, as their bonus compensation is tied to the profitability of the deals that they make. *Id.*, ¶ 121 (citing Krebill Dep. Tr. at 164:12-169:4, 26:20-28:10, and Ex. 6).

In an April 26, 2014 internal email, CDW manager Krebill stated "Thank you for your efforts . . . to secure $490K for Cisco's year end. This builds even more love with the FL Cisco team. We will enjoy this win, and the other ~$1.4M, when it invoices in May/June...great partner cred earned in the process." Dkt. No. 355-30 (CDW-DXN-00088517) at -17. During his deposition, Krebill testified that his purpose was to show that CDW's partnership with Cisco was growing. Dkt. No. 355-32 (Krebill Dep. Tr.) at 108:7-17. According to Maness, Krebill highlighted internally how his team was able to help Cisco "displace Dell as the incumbent OEM at a customer." Maness Opening Report, ¶ 121 (citing Krebill Dep. Tr. at 108:7-17 and Exs. 2 and 4).

Relying on Kafka's deposition and other evidence, Maness opines Cisco and CDW coordinated on specific customer targets and tracked the profitability of business on a regular basis. Maness Opening Report, ¶ 122. For example, Kafka testified that in order for CDW to produce a

75

top deal (UMass) of that size "there's going to be deep collaboration with [the OEM] for that opportunity with that specific customer." Dkt. No. 356-26 (Kafka Dep. Tr.) at 162:17-164:18 (further testifying regarding "East GES Results – through December" as an example tracking how, from one year to the next Cisco and CDW and successful selling of services); *see also id.* 193:8-11 ("I would expect an individual contributor account manager at CDW to be working proactively with a Cisco account manager on taking care of a customer's requirements."); *see also* Dkt. No. 355-34 (CDW-DXN-00349125) at -125 (January 23, 2017 email between Cisco and CDW covering a joint-sales meeting agenda and attaching a PowerPoint deck with sales targets, results, and initiatives).

### 4. Section 1 analysis (Count I)

#### a. Framing the issue ("pro-Cisco terms")

In their summary judgment briefing, Defendants do not challenge whether they engaged in a conspiracy, that is, they had an agreement with each other. Rather, concerning § 1, Defendants assert the restraints in the SIA[37] and their coordinated efforts to promote Cisco products are presumptively permissible and desirable. *See, e.g.*, Dkt. No. 367 at 4-5; Dkt. No. 366 at 6-7. Additionally, Defendants challenge whether the alleged conspiracy produced some anticompetitive effect / market impact. *See, e.g.*, Dkt. No. 367 at 7-8; Dkt. No. 366 at 7-9.

Thus, the relevant question is whether there is an anticompetitive effect of the so-called "pro-Cisco terms" ((i) favoring Cisco over its competitors including at major accounts, (ii) accepting millions in Cisco-specific resources to do so, (iii) purchasing a minimum amount of

---

[37] Like many other OEMs, Cisco requires each of its 8,000+ authorized resellers (channel partners) to comply with certain policies governing the resale of Cisco equipment. *See, e.g.*, Ugone Opening Report, ¶¶ 70-78; Dkt. No. 326-12. These conditions are specified in Cisco's reseller agreements; for CDW, they are contained in a Systems Integrator Agreement (SIA). Among other restrictions, the SIA requires CDW to only sell Cisco equipment to end customers, not other resellers.

Cisco equipment, and (iv) not selling to the independent channel, *see* Dkt. No. 377 at 1), all of which must be considered together, on competition. Dkt. No. 397 (Hearing Transcript) at 42:1-10; *see also id*. at 34:5-7, 36:25-37:7 (counsel for Dexon stating the terms themselves and the combined effect of all the terms (and how Cisco and CDW implemented those terms) are evidence of anticompetitive conduct); *see also id.* at 43:3-4 (Dexon arguing a conspiracy to expand monopolies is an unreasonable restraint). Dexon's counsel clarified at the hearing that the "pro-Cisco terms" are the restraints that were put on CDW pursuant to the conspiracy "either written or understood that had a market-wide impact." *Id.* at 103:23-104:3.

As an initial matter, each side's expert agrees restraints on a distribution channel can be procompetitive and permissible. Defendants' economic expert Ugone opines Cisco's distribution policies prohibiting resellers from participating in gray market transactions are economically rational because they are motivated by Cisco's desire to protect its brand, benefit customers, and are procompetitive. Ugone Opening Report, ¶ 110. During his deposition, Maness agreed there is nothing about the establishment of an authorized reseller network that would on its own raise anticompetitive concerns. Dkt. No. 331-30 (Maness Dep. Tr.) at 66:14-67:5 (agreeing there could be benefits of a manufacturer working with authorized resellers). However, although Maness agreed Cisco's distribution policies can be procompetitive in theory, he opines Cisco's actual conduct and the consequences resulting from Cisco's conduct have had an anticompetitive effect on intrabrand and interbrand competition. Dkt. No. 331-28 (Maness Reply Report), ¶¶ 63, 105, 71. Similarly, at the November 2, 2023 hearing, Dexon's counsel agreed that setting up an authorized distribution network in and of itself is not anticompetitive; yet, that is not what this case is about. Dkt. No. 397 (Hearing Transcript) at 104:16-19.

**b.  Whether the pro-Cisco terms are presumptively permissible and desirable**

Defendants' first argument is that the alleged conspiracy is a typical vertical agreement of the type that the Fifth Circuit has upheld as "permissible, and even desirable." *See*, *e.g.* Dkt. No. 331 at 19 (quoting *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 790-91 (5th Cir. 1982); also citing *Parsons v. Ford Motor Co.*, 669 F.2d 308, 313 n.7 (5th Cir. 1982)); Dkt. No. 326 at 26 (citing *Burdett Sound*). According to Dexon, rather than falling into the types of "ordinary" vertical agreements dealt with by the Fifth Circuit as urged by Defendants, "the pro-Cisco terms tilted the competitive playing field in monopolist Cisco's favor so that CDW could benefit from the supra-competitive prices it could then charge to customers." Dkt. No. 377 at 1.

At the motion to dismiss stage, the Court held neither Defendant showed the alleged agreement is "per se" lawful or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network." Dkt. No. 107 (February 7, 2023 R&R, adopted at Dkt. No. 149) at 38. The Court distinguished Dexon's allegations from those involved in *Burdett Sound* and other dealer termination/substitution cases, explaining as follows:

> The problem for Defendants is that Dexon does not merely allege that Cisco substituted one distributor for another within the scope of *Burdett Sound* and other dealer termination cases. To start, Cisco never had a direct supply relationship with Dexon to terminate. *See* Dkt. No. 274 at 16. But even if it had, Dexon does not present claims based on a "mere unilateral change of distributors" *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *See Burdett Sound*, 515 F.2d at 1248. Instead, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). Dkt. No. 1, ¶¶ 56, 60-61, 90-91. The alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices and reduced technology choices for customers. *Id.*; *see also id.*, ¶¶ 63, 100.

*Id.* at 37. (As to Defendants' second argument regarding marketwide harm, discussed below, the Court concluded the allegations regarding CDW, combined with the allegations regarding Cisco

as a monopolist, allow the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing "substantial harm to competition." Dkt. No. 149 at 34 (citing R&R at 42)).

In their motions for summary judgment, Defendants similarly focus on the end-customer limitation in the SIA to argue Cisco's relationship with CDW is presumptively permissible (Dkt. No. 326 at 26-27; Dkt. No. 331 at 18-23), before focusing more broadly in their replies on the other pro-Cisco terms Dexon identifies (Dkt. No. 366 at 6-7; Dkt. No. 367 at 4-5). In its reply, Cisco focuses on its operation of an authorized distribution channel, asserting it is "industry-standard and procompetitive." Dkt. No. 366 at 6. Through the briefing, Defendants asserted pro-Cisco terms, under Fifth Circuit precedent, are "permissible, and even desirable" because they tend to "promote interbrand competition" and create "efficiencies in [] distribution." *See, e.g.*, Dkt. No. 367 at 5-6 (quoting *Sports Center*, 673 F.2d at 790-91; also citing *Parsons*, 669 F.2d at 313 n.7 & *Burdett Sound*, 515 F.2d at 1248).

Two fundamental issues undercut Defendants' arguments that precedent requires holding Cisco's conspiracy with CDW to be *per se* legal. First, none of the cited cases deal with the combination of conduct (or restraints) that Dexon alleges (or put differently, Defendants do not cite a case that involves allegations of all the pro-Cisco terms). That is important, because the combined effect of the restraints must be considered. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. '* * * (T)he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'"). Second, the cases that Defendants rely on concluded that the at-issue conduct was not

illegal, in part, because the plaintiff could not show the restraint harmed competition (or had an "anticompetitive effect"). These cases are discussed below.

First, *Sports Center* involved Riddell's termination of a dealer agreement with Sports Center for Sports Center's violation of Riddell's "anti-bootlegging rule." *Sports Center*, 673 F.2d at 788-89. Sports Center alleged three defendants (Riddell, Judge Little, and Hale and Jones) conspired to damage its business in violation of Sherman Act § 1. *Id.* at 787. At the close of the plaintiff's evidence, the court directed a verdict for Judge Little and Hale and Jones, and at the conclusion of the case, the jury returned a verdict in favor of Riddell. *Id.* The Fifth Circuit affirmed on appeal. In so doing, the court noted Riddell's policy of discouraging sales by its dealers to anyone other than ultimate consumers ("Non-authorized sales practice" or "bootleg" ban). *Id.* at 788. In addressing the vertical restraint at issue in *Sports Center* under the rule of reason, the court noted that "[u]nless decidedly unreasonable, vertical restrictions upon product distribution are permissible and even desirable." *Id.* at 791. Viewing the post-trial record, the court found the record "devoid of evidence establishing [the required] anticompetitive effect." *Id.*

Similarly, in *Parsons*, the Fifth Circuit – in considering the district court's grant of summary judgment to Ford Motor Company in the context of Sherman Act § 1 conspiracy claim, addressed Ford Motor Company's alleged "policy prohibiting their dealers from selling to 'bootleggers' like" the plaintiff. *Parsons*, 669 F.2d at 310; *see also id.* at 311 (Ford argued that once it ascertained the fraudulent nature of plaintiff's business, it took reasonable steps to ensure that vehicles ordered from district fleet allocations were actually purchased by legitimate fleet end-users and further argued Parsons was only required to demonstrate he was a legitimate fleet buyer and there was no policy to prohibit sales to Parsons). The court held the plaintiff offered "very meager evidence of conspiracy." *Id.* at 313. According to the court, "[n]either Ford nor many of

its dealers like bootlegging, and they therefore took proper steps to ensure against future manipulation of the fleet allocation system." *Id.* (stating enforcement of the company's fleet allocation system policy was not equivalent to conspiracy). Notably, in the *Parsons* case, the plaintiff did not "wage an effective direct attack on Ford's fleet allocation system" or attack the manner in which the system was directed by Ford. *Id.* at 313, n. 7. The Fifth Circuit explained that in order to prevail in an attack on the allocation system under the rule of reason, the "plaintiff would be required to demonstrate that the system was unreasonable in view of 'the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable.'" *Id.* (quoting *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); also citing *National Auto Brokers v. General Motors Corp.*, 572 F.2d 953, 960 (2d Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 844, 59 L.Ed.2d 38 (1979)).

In contrast, Dexon attempts to show Defendants' actions were unreasonable under the rule of reason. Dexon argues the Cisco-CDW conspiracy was used to neutralize the entire independent channel, and the pro-Cisco terms led to constraining consumer choice and maintaining Cisco's monopoly prices. *See* Dkt. No. 377 at 6 (further stating *Sports Center* and *Parsons* did not address monopoly or improper efforts to maintain such a monopoly). Similarly, if Dexon identifies evidence creating a factual dispute as to whether the at-issue vertical restraints are "decidedly unreasonable," *Sports Center* and *Parsons* are distinguishable. Dexon's cited evidence does that, at least to the extent of defeating Defendants' "do not pass go" argument that their conduct is legal under existing precedent.

Regarding *Burdett Sound*, the Court previously explained that "*Burdett Sound* supports the general proposition that without a showing of an actual adverse effect on competition market-wide,

it is not a violation of antitrust laws 'for a manufacturer to terminate a distributor ... and to appoint an exclusive distributor.'" *Dexon Computer, Inc. v. Cisco Sys., Inc*., No. 5:22CV00053-RWS-JBB, 2023 WL 2730656, at *22 (E.D. Tex. Mar. 31, 2023) (citing *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc*., 129 F.3d 240, 244 (2d Cir. 1997) (citing *Burdett Sound*, 515 F.2d at 1249)). This does not mean that a manufacturer's discretion as to whom it will sell is unlimited. *Id.* (citing *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977)). Rather, as explained in *Burdett Sound*, a refusal to deal becomes illegal under the Sherman Act when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of a monopoly. *Id.* (citing *Burdett Sound*, 515 F.2d at 1248 (citations omitted in *Dexon*)). In other words, if a refusal to deal is a device used to, among other things, acquire a monopoly or establish market dominance and drive out competitors, it is illegal. *Id.* (citing *Universal Brands*, 546 F.2d at 33 (citations omitted in *Dexon*)).

In *Burdett Sound*, which only addressed conduct designed to lesson intrabrand competition, the Fifth Circuit held the appellant had not presented an antitrust claim, noting the appellant alleged no horizontal conspiracy among competitors, no effort by either appellee to establish market dominance, no restrictive trade practices, and no anticompetitive intent or effect. *Burdett Sound*, 515 F.2d at 1248. Here, Dexon alleges the Cisco-CDW conspiracy restricted both interbrand competition and intrabrand competition. After one year of discovery, Dexon proffers evidence it contends shows harm to both, but with the focus on intrabrand competition. *See, e.g.*, Dkt. No. 355 at 24-26. According to Dexon, while Cisco's documents confirm that the primary competitive threat monopolist Cisco sought to foreclose from the independent cannel has been intrabrand competition, the evidence also shows that an ancillary "benefit" Cisco achieved by constraining the independent channel was to foreclose a viable source of Cisco's competitors' equipment. *Id.*

82

at 25 (citing Maness opinions and documents showing Cisco's dissuading customers from buying

from Dexon, who Cisco knew was a multi-vendor reseller, and two documents showing Cisco's

use of its audits in the ▮▮▮▮▮ matter to secure a ▮▮▮▮▮ purchase of Cisco equipment after

being informed that ▮▮▮▮▮ wanted to purchase non-Cisco equipment).

For the above reasons, the cases Defendants cite above do not end the inquiry as to whether

the pro-Cisco terms are actionable.

### c. Whether the alleged conspiracy produced some anticompetitive effect / market impact under the rule of reason

Because Dexon's Sherman Act § 1 conspiracy claim involves a nonprice, vertical restraint

on trade, and because Dexon does not argue the actions taken by Defendants were *per se* unlawful,

Dexon bears the burden of demonstrating facts sufficient to demonstrate that the complained-of

actions unreasonably restrained trade contrary to the rule of reason,[38] which requires a plaintiff to

show that the defendants' activities caused an injury to competition. *Stewart Glass*, 200 F.3d at

312-13 (citation omitted). Dexon is required to take its "first step": "show [an] anticompetitive

effect, either in the intrabrand or interbrand markets."[39] *Graphic Prod. Distributors, Inc. v. ITEK*

---

[38] In *National Society of Professional Engineers v. United States*, 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978), the Supreme Court noted that unreasonableness under the rule of reason could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices." *Graphic Prod. Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1573 n. 23 (11th Cir. 1983).

[39] Under the burden-shifting framework of the rule of reason inquiry, if the plaintiff succeeds in showing anticompetitive effects, the burden shifts to the defendant to demonstrate that the restraint produced procompetitive benefits. *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir.), *cert. denied*, 142 S. Ct. 712, 211 L. Ed. 2d 400 (2021) (citation omitted). If the defendant successfully proves procompetitive benefits, then the plaintiff can demonstrate that any procompetitive effects could be achieved through less anticompetitive means. *Id.* Finally, if the plaintiff fails to demonstrate a less restrictive alternative way to achieve the procompetitive benefits, the court must balance the anticompetitive and procompetitive effects of the restraint. *Id.* (citing *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627 (5th Cir. 2002)). If the anticompetitive harms outweigh the procompetitive benefits, then the agreement is illegal. *Id.*

*Corp.*, 717 F.2d 1560, 1571 (11th Cir. 1983) (quoting *H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 246 (5th Cir.1978)).

Dexon proffers the following evidence in support: (1) Szymanski's inability in 2021 to sell to Dexon, an independent reseller which provides many marketwide benefits to end users, was a byproduct of the alleged conspiracy between CDW and Cisco (Maness Opening Report, ¶¶ 33 & n. 8, 125-26, 136-37); (2) Defendants' actions foreclosed enhanced consumer choice by not only forbidding CDW to cease doing business with Dexon, but also to cease doing business with other independent resellers (Dkt. No. 356-27 (CISC000154479) (Cisco's forbidding CDW's use of unauthorized reseller ▮▮▮▮▮▮▮▮▮▮)); and (3) Maness opines Cisco and CDW conspired to exclude independent distributors, harming intrabrand competition (Maness Opening Report, ¶¶ 114-116, 124 ("As these examples highlight, Cisco's conduct is directed at insulating its distribution network from competition from independent distributors like Dexon.")).[40]

Defendants first argue that Dexon has offered "zero evidence" of marketwide harm, anticompetitive effect, or market impact for either intrabrand competition or interbrand competition. Dkt. No. 331 at 23-25, 28-30; *see also* Dkt. No. 326 at 28-30 (similar).[41] For

---

[40] Among other things, Maness points out that CDW's SIA with Cisco explicitly limits intrabrand competition by prohibiting CDW from reselling to or purchasing from independent distributors. Maness Opening Report, ¶ 115. "Consequently, Cisco and CDW conduct ensured the exclusion of independent distributors even in situations where neither Cisco or CDW could make the at issue sales, harming both themselves and their customers." *Id.* According to Maness, "due to concerns over increased future competition, Cisco, at times in concert with CDW, was unwilling to even introduce customers to independent distributors in situations where parts were not available within authorized channels." *Id.*, ¶ 124 ("Such conduct is contrary to Cisco's interest but-for its effect in maintaining the attempted exclusion of independent distributors."). Maness discusses a March 2022 example of Cisco's prohibiting CDW from using an independent (unauthorized) reseller named ▮▮▮▮▮ to meet a customer's needs. *Id.*, ¶ 115.

[41] Defendants raise similar arguments (i.e., that there is no evidence of harm to competition) as part of their broader "Dexon [Has Not Suffered / Lacks] Antitrust Injury" portions of their motions. Dkt. No. 331 at 28-30, Dkt. No. 326 at 27-30. The arguments from those portions that concern whether there is evidence of marketwide harm to competition are addressed here; the more specific argument that Dexon itself has not suffered harm is addressed in Section VII.

interbrand competition, CDW argues that "[t]here is a complete absence of evidence that the Systems Integrator Agreement, or any sales support or incentive programs offered by Cisco, affected interbrand competition" because (1) Dexon's expert did not perform a "price analysis" that suggested "increased prices, decreased output, or lower quality goods" in any of the relevant markets and (2) Cisco's market share in Ethernet switches and routers decreased during the conspiracy period.

Regarding the first point, to be sure, the Fifth Circuit described "increased prices, decreased output, or lower quality goods" as examples of anticompetitive effects that harm consumers. *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492-93 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 712 (2021) (citations omitted). The Fifth Circuit further stated that such anticompetitive effects may be proved "indirectly," with "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 492–93 (quoting *Ohio v. Am. Express Co*., 138 S. Ct. 2274, 2284 (2018)). In *Ohio*, the Supreme Court stated plaintiffs can make the required showing either directly or indirectly – direct evidence of anticompetitive effects would be proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market, and indirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition. *Ohio*, 138 S. Ct. at 2284 (internal quotation marks and citations omitted). Thus, the fact that Maness did not perform a price analysis is not determinative of the issue.

Regarding the second reason, that Cisco's market share of several relevant products decreased during the conspiracy is relevant evidence in Defendants' favor, Dexon's expert counters that decrease is not inconsistent with monopoly power due to Cisco's large installed base (Maness Reply Report, ¶¶ 30-34), and factual disputes are resolved in the favor of the non-movant

on summary judgment.[42] Defendants have not offered authority or persuasive argument that antitrust claims against a monopolist necessarily fail if the monopolist has a decreasing market share in the relevant market.

For intrabrand competition, CDW cites precedent for the proposition that "[a] reduction in intrabrand competition will not suffice to demonstrate the requisite market impact." Dkt. No. 331 at 25 (citing *Hornsby Oil Co. v. Champion Spark Plug Co*., 714 F.2d 1384, 1394 (5th Cir. 1983)). That may be true, though as demonstrated through the Court's discussion below of *H&B* and *Graphic Products*, the level of proof necessary to show how intrabrand competition affects interbrand competition will depend on market realities, including whether the supplier, like Cisco, is a monopolist. *Graphic Prod.*, 717 F.2d at 1574 (considering GPD's evidence about the anticompetitive effects of the restrictions, bearing in mind the evidence concerning Itek's market power). Importantly, Dexon does not contest the general proposition that it will need to show a reduction in intrabrand competition to the point of affecting interbrand competition and argues it has evidence of both.

CDW then reiterates its mistaken position that a price analysis is required (Dkt. No. 331 at 24), and then uses the relative size of the parties to argue that there was no harm to intrabrand competition:

> Dexon admits that it accounts (at most) for approximately 0.05% of global Cisco sales. And of that tiniest of shares, Dexon identifies only six customers that switched from Dexon to CDW (in Dexon's expert's view) because of the alleged

---

[42] Maness opines Cisco has monopoly power in the asserted relevant markets for Ethernet switches, SD-Branch routing, and the aftermarket for maintenance and service of Cisco products. Maness Opening Report, ¶ 12. Maness further opines that "Cisco's market shares of over 50% in both the Ethernet switch and router markets are indicative of its possession of monopoly power in those markets." *Id*., ¶ 76. Maness further asserts that relevant markets have significant barriers to entry. *Id*., ¶¶ 53, 59.

conspiracy between Cisco and CDW, for only two of which Dexon points to any
CDW conduct. Those sales are statistically and legally insignificant.

*Id.* at 25 (footnotes omitted).

The focus on Dexon's size is somewhat misplaced. The relevant question is whether the
conspiracy had an effect on intraband competition, not just an effect on Dexon. Defendants do not
contest that many (if not all) of the pro-Cisco terms would have been applied to other unauthorized
resellers the same as they were applied to Dexon. Thus, the better analysis would be to address the
effect on the independent channel as a whole. Nevertheless, the relative size of the parties does
establish that Dexon would need to identify a factual dispute that the conspiracy harmed more than
Dexon itself or the fifteen customers Dexon identifies as overlapping with CDW. *See H&B Equip.
Co., Inc. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("Even adopting the view that
International Harvester reduced intrabrand competition by putting H&B out of business, H&B has
not proven the [anticompetitive] effect to be any other than de minimis.").

The concept of de minimis effect on competition is discussed in *H&B* and *Graphic
Products* (a case relied upon by Dexon and this Court at the motion to dismiss stage). *See* Dkt. No.
107 at 37-38, Dkt. No. 356 at 14, 17. Dkt. No. 331 at 25, 30. *Graphic Products* was an antitrust
case involving nonprice, vertical restraints on trade, wherein the defendant appealed from a jury
verdict in favor of the plaintiff in a suit brought under Sherman Act § 1. *Graphic Prod.*, 717 F.2d
at 1563. The court held GPD, after crossing the threshold of showing Itek's market power, was
required to establish that the interbrand market structure was such that intrabrand competition was
a critical source of competitive pressure on price, and hence of consumer welfare. *Id.* at 1573
(citation omitted). GPD was also required to show that the nature and effects of the restraint were
such as to be "substantially adverse" to market competition. *Id.*

According to the Eleventh Circuit, to the extent that intrabrand competition continues after imposition of intrabrand restraints, the effects of the intrabrand restraints on competition may be de minimis. *Id.* at 1574, n. 25. However, the court noted that situations in which intrabrand competition continues to be vigorous differ dramatically from situations like *Graphic Products* where the effect of the intrabrand restraint is to shut off all intrabrand competition. *Id.* (citing *Muenster*, 651 F.2d at 298 (defendant's efforts to restrict intrabrand competition largely ineffectual, intrabrand competition continued unabated); also citing *H&B Equipment*, 577 F.2d at 246 ("Rivalry from [the supplier's other dealers in the relevant market] makes this situation far different from the exclusive territorial arrangements which introduced the intrabrand competition concept into antitrust law.")). The Eleventh Circuit was convinced "there was sufficient evidence for the jury to find that intrabrand competition, in this context, was an important source of competitive pressure on price, and that Itek's system of territorial restraints—*which totally foreclosed intrabrand competition*—had substantially adverse effects on price competition and consumer welfare."[43] *Id.* (emphasis added).

Having considered the conflicting evidence presented at trial, the Eleventh Circuit could not say that the facts and inferences pointed so strongly in the direction of a finding that Itek's restraints were pro-competitive in purpose and effect that reasonable persons could not have arrived at a contrary verdict. *Id.* at 1578. Nor could the court say that, having passed the threshold

---

[43] The Eleventh Circuit then considered the record evidence concerning the possible positive effects of this system on interbrand competition. *Graphic Prod. Distributors, Inc. v. ITEK Corp.*, 717 F.2d 1560, 1575-76 (11th Cir. 1983) (noting that when the evidence supports a finding that vertical restrictions on intrabrand competition seek to and do enhance interbrand competition—in any of a variety of ways—the court has not hesitated to uphold them under the rule of reason). According to the court, merely offering a rationale for a vertical restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect. *Id.* at 1576.

of proving Itek's market power, the plaintiff failed to produce substantial evidence to support the jury's finding that the restraint had substantially adverse effects on competition, which competition was an important source of consumer welfare. *Id.* The court therefore affirmed the district court's refusal to grant Itek's judgment n.o.v. motion on the issue of liability. *Id.*

Unlike in *Graphic Products* wherein the Eleventh Circuit affirmed the district court's refusal to grant judgement n.o.v., the Fifth Circuit in *H&B* affirmed the district court's grant of a directed verdict for the defendant at the close of H&B's case because, among other reasons, H&B failed to prove at trial that any effect on reducing intrabrand competition was anything other than de minimis. *H&B Equipment*, 577 F.2d at 242. In the Fifth Circuit case, the evidence viewed in the light most favorable to H&B showed that manufacturer Harvester – after establishing a company store in direct competition with distributor H&B – "harassed H&B by delaying parts and warranty claims, undercut H&B in the marketplace by selling machines just above or even below dealer cost, continued to enforce customer restrictions by not allowing H&B to bid on government sales or sales to rental yards, and drove H&B into a loss position, forcing H&B to terminate in late 1973." *Id.* At trial, H&B sought to prove monopolization, a conspiracy to drive H&B out of business, customer restrictions, and unfair competition. *Id.* at 241-42. On appeal, the Fifth Circuit found H&B failed to show Harvester had achieved a monopoly because H&B introduced no statistics on the number and size of firms in the market, "and every hint the record gives indicates International Harvester's market position fell far short of being dominant." *Id.* at 242-43.

The Fifth Circuit then found H&B, which faced the threshold requirement under Sherman Act § 1 of identifying a co-conspirator who agreed with Harvester to inflict injury on H&B,[44] had failed to show a conspiracy. *Id.* at 243-45. However, in view of the court's caution to terminated distributors in *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), the Fifth Circuit noted that even if H&B had proved a conspiracy to eliminate it from the market, "it is doubtful H&B proved the anticompetitive effect necessary to establish a case for the jury under the rule of reason." *Id.* at 245. The Fifth Circuit stated Harvester's treatment of H&B, viewed as a dealer substitution, had no adverse effect on competition. *Id.* at 246. According to the court, even adopting the view that Harvester reduced intrabrand competition by putting H&B out of business, H&B had not proven the effect to be any other than de minimis. *Id.* (noting competition among brands appeared to be healthy and further noting that unlike the record in *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir.1975), H&B's evidence did not contain "substantial expert testimony that the manufacturer's dealers enjoyed a general shelter from competitive forces and all possessed discretion to raise their prices within a certain range and still make sales"). One federal court has stated the Fifth Circuit's explanation in *H&B* and the court's citation to *Coleman* indicate a threshold burden far more stringent than "not-insubstantial" or "more than de minimis." *Procaps S.A. v. Patheon Inc.*, 141 F. Supp. 3d 1246, 1279 (S.D. Fla. 2015), *aff'd*, 845 F.3d 1072 (11th Cir. 2016).

---

[44] As explained by the court, § 1 is both broader and narrower than § 2. *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 243 (5th Cir. 1978). Under § 1, a plaintiff need not show monopoly power. An unreasonably anticompetitive effect, or conduct presumed under the *per se* rubric to have that effect, is all that is required. *Id.* Section 1, however, unlike § 2, requires the existence of a "contract, combination, or conspiracy." *Id.* The assumption behind the statutory scheme is that anticompetitive conduct by firms lacking monopoly power threatens the sound operation of a free economy only when done in concert with others. *Id.*

With these principles in mind, the Court returns to Dexon's evidence of a reduction in intrabrand competition. Dexon attempts to make the required showing in a number of ways. First, it identifies the ████████ incident, where Cisco and CDW agreed not to deal with independent reseller ████, even though ████████ could have supplied a long-time CDW customer with Cisco equipment when CDW did not have the inventory. Dkt. No. 356 at 20 (citing Maness Reply Report, ¶¶ 101-02). Two of the reasons CDW declined to deal with ████████ were due to the "value of being a Gold certified partner" and the agreement not to deal with unauthorized users. Maness Opening Report, ¶¶ 115-16. Though this incident addresses a second independent reseller involving an admittedly small sale of 42 Cisco IP phones, it results in an inference that the Cisco-CDW conspiracy affects many other independent resellers and end customers. (That is not in legitimate dispute as neither Defendant ever argued the conspiracy treated Dexon different than other independent resellers.)

Dexon also claims that its lost sales concerning ████████ and ████████████ are further examples showing intrabrand harm. *See* Maness Opening Report, ¶ 114. Again, that is not without logic because there is no evidence or argument from Defendants that Cisco's efforts to control its distribution network singled out Dexon more so than other independent resellers.

However, the ████████ incident is the only evidence Dexon cites that the *Cisco-CDW* conspiracy affected another independent reseller. It may be a reasonable inference that certain aspects of the pro-Cisco terms affected most, if not all, of the independent channel (such as the end user agreement that Cisco requires compliance for all its authorized distributors). But there is minimal support for the inference that the pro-Cisco terms as implemented in the *Cisco-CDW* conspiracy affected significant numbers of independent resellers. Dexon does not even try to make the connection, other than unconnected evidence regarding CDW's size (total U.S. revenue in 2022

was $20.8 billion) (Maness Opening Report, ¶ 24), amount of Cisco sales ███████████) (*id.*, ¶ 29), or that CDW is important enough to be one of the 50-60 "Gold" distributors (*id.*) and to warrant dedicated employee support from Cisco (*id.*, ¶ 120). But the size of the market is likewise large and varied: there are approximately forty thousand "channel partners" (authorized resellers) worldwide and eight thousand "channel partners" in the United States, servicing 90% of Cisco's worldwide sales. Ugone Opening Report, ¶ 62; Ugone Rebuttal Report, ¶ 120.

Given the uncertainty of CDW's ability to affect the intrabrand market through the pro-Cisco terms, it is incumbent on Dexon to provide some evidence that supports an inference that the Cisco-CDW conspiracy was significant enough to affect intrabrand competition (to the point it effected interbrand competition). But again, the closest non-inferential piece of evidence Dexon provides is to cite ████████ and conclude that "[t]his example is illustrative because the restriction on CDW pursuant to the conspiracy would have applied to <u>every</u> such situation, in which customers could have benefitted from any of the 'countless' independent resellers that CDW previously acknowledged in its motion." Dkt. No. 377 at 7 (emphasis by Dexon). But that's the problem—there is nothing to indicate how often that situation (Cisco and CDW conspired to prevent the sale of an independent reseller) happened. Based on the record, it appears that, with respect to Dexon, it only happened twice since 2015. It is doubtful that something so infrequent would have a measurable effect on intrabrand competition here where there are several thousand authorized and unauthorized resellers.

Finally, Dexon claims the "market-wide effects of the Cisco-CDW conspiracy are obvious" and that the "common sense result of the Cisco-CDW conspiracy" is that it would have a "substantial negative impact on consumer choice." Dkt. No. 356 at 21. However, the size of the impact of the conspiracy is not obviously "substantial" for the reasons above. If it were, the

evidence to show that should not have been difficult to marshal. CDW (and Cisco) raised this issue

in its motion to dismiss, but the Court allowed discovery to proceed to support the allegations. Dkt.

No. 107 at 38-43 (noting the allegations concerning Cisco's monopoly power combined with

CDW's size "allows the Court to draw the reasonable inference that the Cisco-CDW agreement is

capable of causing substantial harm to competition"). After a year of discovery, Dexon reiterates

CDW's large size (without specifics concerning CDW's relative size compared to the other 50-60

Gold level Cisco channel partners), points to a handful of Dexon lost sales, and the potential lost

sale of 42 IP phones to ███████. Without a strong inference that CDW's implementation of the

pro-Cisco terms *alone* could affect a market that includes so many other authorized and

unauthorized resellers, these isolated incidents fail to show the conspiracy had a sufficient effect

on intrabrand competition to the point of harming interbrand competition.

This finding brings the discussion full circle to the cases Defendants cite above: *Sports

Center* and *Burdett Sound*. As explained, the vertical restraints in those cases were not actionable

because there was insufficient record evidence that the conspiracy actually harmed competition.

*See Sports Center*, 673 F.2d at 791 (finding the post-trial record "devoid of evidence establishing

[the required] anticompetitive effect"); *see also Burdett Sound*, 515 F.2d at 1248 (noting the

appellant alleged no horizontal conspiracy among competitors, no effort by either appellee to

establish market dominance, no restrictive trade practices, **and no anti-competitive intent or

effect**). Having conducted the required analysis, the Court finds Dexon is now in a similar position

as those plaintiffs, and the reasoning in those cases is significantly more applicable to the instant

dispute. *See also H&B Equipment*, 577 F.2d at 245 ("In view of this Court's caution to terminated

distributors in *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245 (5th Cir. 1975), we note that even

if H&B had proved a conspiracy to eliminate it from the market, it is doubtful H&B proved the

anticompetitive effect necessary to establish a case for the jury under the rule of reason."). For all of the above reasons, the undersigned recommends Defendants' summary judgment motions be granted as to Dexon's § 1 conspiracy claim (Count I).

### 5.  Section 2 analysis (Count II)

Sherman Act § 2 makes it unlawful for any person or firm to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. The elements of a § 2 conspiracy to monopolize claim are "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

The only specific argument Cisco makes concerning Dexon's § 2 conspiracy claim is in a footnote's parenthetical: "Dexon must show an unreasonable restraint of trade. [*S*]*ee also Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (claim alleging conspiracy to monopolize requires showing anticompetitive acts with 'an effect upon a substantial amount of interstate commerce')." Dkt. No. 326 at 15, n.79. This argument is undeveloped, but to the extent Cisco is challenging the interstate commerce element of § 2 as unmet, "[t]he commerce [i.e., the switches, router, IP phones, and service thereof] which is asserted to be restrained in this manner has a character that is undeniably interstate." *See United States v. Yellow Cab Co.*, 332 U.S. 218, 225, 67 S. Ct. 1560, 1564, 91 L. Ed. 2010 (1947) ("And s 2 of the Act makes it unlawful to conspire to monopolize 'any part' of interstate commerce, without specifying how large a part must be affected. Hence it is enough if some appreciable part of interstate commerce is the subject of a monopoly, a restraint or a conspiracy."), *overruled on other*

*grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984). Cisco's remaining conspiracy arguments are addressed in Section V.B.4 above or Section VII below.

CDW's motion for summary judgment on Dexon's § 2 conspiracy claim (Count II) centers almost exclusively on its argument that there is "no evidence that CDW had the specific intent to monopolize." Dkt. No. 331 at 26-28, Dkt. No. 367 at 8-9. For that reason, CDW's arguments will be addressed in tandem with its motion to dismiss Count II (Dkt. No. 189) which addresses the same specific intent issue.

### a. Parties' assertions, generally

In its refiled Rule 12(b)(6) motion to dismiss, CDW asserts Dexon's amended complaint "suffers from the same pleading defect as its initial pleading: it fails to allege any facts to plausibly suggest CDW possessed a specific intent to further co-defendant [Cisco's] alleged monopolies in any relevant market, a required element of a conspiracy to monopolize claim under Section 2 of the Sherman Act." Dkt. No. 189 at 1. In its motion for summary judgment, CDW asserts Count II (Cisco-CDW conspiracy to monopolize in violation of § 2) fails because there is no evidence that CDW maintains the "specific, shared purpose" to maintain any supposed monopoly held by Cisco. Dkt. No. 331 at 26-28. In response, Dexon asserts "a jury can easily find that CDW formed a specific intent to benefit from Cisco's monopolies as much as possible," Dkt. No. 356 at 24, pointing out the evidence regarding Cisco's various investments into CDW and the fact that CDW's CEO encouraged the creation of a "Cisco only" job role at CDW. *Id.* at 23.

### b. Analysis

### i. Dexon's amended complaint sufficiently pleads CDW's specific intent to monopolize

In ruling on CDW's motion to dismiss, the Court held that Dexon must show CDW intended to maintain Cisco's monopolies in the Relevant Markets against other network equipment

manufacturers. R&R (Dkt. No. 107) at 44. Although the Court found Dexon failed to plausibly allege that specific intent, the Court ordered Dexon to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the Report and Recommendation regarding CDW's specific intent to monopolize. Dkt. No. 149 at 66.

In six new paragraphs in its amended complaint, Dexon alleges CDW has had a specific intent to and did help maintain and expand Cisco's monopolies in the Relevant Markets. Dkt. No. 175 (Am. Compl.), ¶¶ 65-70. Specifically, Dexon alleges as follows:

> For at least the past 15 years, CDW has made the intentional and strategic decision that it wants to be the leading reseller of Cisco networking products. As a result, CDW has continuously sought to maintain its "Cisco Gold Certified Partner" status and has closely collaborated with Cisco to avoid competitive threats from Cisco's smaller competitors. In doing so, CDW knows that it is helping maintain Cisco's monopoly positions in at least the Relevant Markets. As a CDW employee revealingly noted in an internal email, "[w]e have built up <u>an army of Cisco resources based on the relevance and size and profitability of Cisco</u>. We've (with the use of CISCO investments) built up practices [] and leverage[d] the technical capabilities to create presales assessments, workshops, to help customers navigate new Cisco solutions" (emphasis added). As the Cisco relationship lead at CDW testified, CDW has expended millions of dollars of time in this "army of Cisco resources," and Cisco has further incentivized CDW to make Cisco sales with marketing development funds. This was all welcomed and sought by CDW. For instance, when Cisco announced that CDW had successfully renewed its Gold Certified Partner status in 2020, CDW celebrated.
>
> CDW's decision to seek Cisco's favor does not come without strings attached. For instance, Cisco has imposed minimum purchasing volume commitments on CDW, and requires CDW to submit to internal audits to ensure it is meeting Cisco's program criteria. Fully aware of its monopoly power in the Relevant Markets, Cisco at one point changed its requirements to force distributors like CDW to pay for these audits themselves, whereas Cisco had paid for the audits previously.
>
> Both of these phenomena—CDW's welcoming of Cisco's favoritism and Cisco's numerous program requirements—aid the maintenance of Cisco's monopolies in the Relevant Markets. Cisco and CDW are both large, sophisticated entities that know precisely what they are doing, particularly with each other. **CDW knowingly entered this business relationship with the goal of not just maintaining Cisco's monopolies, but expanding them, as it believed it would be rewarded for doing so.** Indeed, CDW's emails with Cisco reveal that through the companies'

coordinated behavior, Cisco has been able to ward off competitive threats from competitors in the Relevant Markets such as Extreme and Arista.

CDW has profited from helping maintain Cisco's monopolies. CDW has sold more than ███████████ of Cisco products in a given year, and has supported Cisco's goal to expand that number to ████████. CDW has also supported Cisco's desire to expand its subscription-based revenue, including for products like SmartNet.

Given these facts governing the Defendants' relationship, it is hardly surprising that Cisco sought out CDW's assistance to foreclose a reseller like Dexon. Cisco's internal analyses show that CDW has performed better financially for Cisco than Cisco's other resellers, at one point even remarking that CDW was the only Cisco major reseller that expanded its profits in a given year. CDW boasted the fact that it was the #1 or #2 reseller in several Cisco customer segments, such as Enterprise and Education. Thus, when CDW displaced Dexon at the Pennsylvania Health System, CDW knew that it was helping Cisco maintain its dominance and its supra-competitive pricing, depriving a customer of the competition Dexon provided.

*Id.*, ¶¶ 65-69 (underline original) (bold emphasis added) (internal numbering omitted).

Dexon's amended complaint adequately alleges the agreement between Cisco and CDW was knowingly entered into by CDW with the "goal" of maintaining and expanding Cisco's monopolies in the Relevant Markets and that CDW was rewarded for and profited from doing so. *See In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1159 (9th Cir. 2019) ("Moreover, the complaint adequately alleges that the interlocking NFL-Team and NFL-DirecTV agreements were designed to maintain market power, which is sufficient to allege defendants' specific intent. Accordingly, we conclude that the complaint adequately alleges a Section 2 violation.").

### ii.  **Dexon has presented evidence sufficient to create a fact issue as to CDW's specific intent to monopolize**

For similar reasons, CDW's summary judgment motion asserts there is "zero evidence that CDW ever had a specific intent to further any monopoly allegedly held by Cisco." Dkt. No. 331 at 14-15. According to CDW, there is no evidence that CDW maintains the "specific, shared purpose" to maintain any supposed monopoly held by Cisco. *Id*. at 27 (quoting *In re Microsoft*

*Corp. Antitrust Litig.*, 127 F. Supp. 2d 728, 731 (D. Md. 2001), *aff'd sub nom. Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002)). Relying on CDW's depositions and declarations (Coleman Decl., ¶¶ 28-29; Szymanski Decl., ¶ 13; Nakel Decl., ¶ 12) as evidence that CDW did not agree with Cisco as part of any conspiracy to exclude Dexon from the market, CDW argues it would make no economic sense for CDW to sustain Cisco's supposed monopoly because that would only raise the prices Cisco charges resellers like CDW. Dkt. No. 331 at 27-28. Thus, CDW contends it would make no economic sense for it to expand Cisco's market power over CDW itself. *Id.* at 28.

In its response, Dexon asserts CDW decided to share in and expand Cisco's monopoly profits by "pushing Cisco over its competitors at major accounts, assigning a senior position within CDW at the CEO's direction to monitor Cisco success when no Cisco competitor had such access, and encourage the 'lucrative' profits CDW's sales force would gain by favoring Cisco." Dkt. No. 377 at 8; *see also* Dkt. No. 397 (Hearing Transcript) at 50:5-52:20 (stating a jury could find that CDW's CEO's "carving out and creating a specific position for Cisco that [none] of its competitors had, encouraging its sales force" is "not against CDW's interests" because the "monopoly profits support commissions, it supports those promotional emails, and that is an intent to . . . share in the monopoly profits by CDW" and further stating that by pushing Cisco over Cisco's competitors such as Arista, Dell and Extreme, CDW showed an intent to keep Cisco dominant); *see also id*. at 53:8-16 (arguing Dkt. No. 356-10 is a "knowing sharing of supra-competitive prices" because if Cisco can sell its goods for supracompetitive profits, and then shares in the profits with CDW, it can more easily win deals with end customers who would want the dominant OEM supplier).

In its reply, CDW argues its employee dedicated to Cisco relations, occasional promotion of Cisco products over those of other manufacturers, and routine collaboration with Cisco to maximize Cisco sales merely establish that CDW sought to increase its own sales to end customers

by bargaining with Cisco, which is "perfectly normal commercial behavior, the type of behavior from which a court should be reluctant to infer conspiratorial conduct." Dkt. No. 367 at 9 (quoting *Microsoft*, 127 F. Supp. 2d at 732). CDW's arguments first necessitate a discussion of the summary judgment standard in antitrust cases.

As noted above, the Supreme Court has cautioned regarding the range of permissible inferences from ambiguous evidence in cases involving antitrust conspiracy claims. *Matsushita*, 475 U.S. at 588.[45] If antitrust conspiracy claims are implausible / "simply make[ ] no economic sense, [appellants] must come forward with more persuasive evidence to support their claim than otherwise would be necessary." *Stewart Glass*, 200 F.3d at 315 (quoting *Matsushita*, 475 U.S. at 587). The Supreme Court has "emphasized that courts should not permit factfinders to infer conspiracies when such inferences are implausible [make no economic sense], because the effect of such practices is often to deter procompetitive conduct," such as cutting prices to increase business. *Matsushita*, 475 U.S. at 587, 593-94. Thus, if CDW in this case "had no rational economic motive to conspire, and if [its] conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy." *Stewart Glass*, 200

---

[45] The decision in *Matsushita*, which contained both Sherman Act § 1 and § 2 claims, 475 U.S. at 579, did not state clearly whether the duty of the nonmoving party to come forward with additional evidence applies in antitrust cases generally or only to a smaller universe of antitrust conspiracy cases where, because of purely substantive considerations, an antitrust violation is "implausible." However, lower courts have largely confined *Matsushita* to cases involving conspiracy allegations. § 9:5. A pro-summary judgment antitrust landmark: *Matsushita Electric Industrial Co. v. Zenith Radio Co*., Summary Judgment: Federal Law and Practice § 9:5 (citing cases). Lower courts have cited *Matsushita* in conspiracy cases involving both Sherman Act § 1 and § 2 claims. *See TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1026–27 (10th Cir. 1992) ("Because the cable operators would have no rational motive to create such an environment, TVCN's allegations [regarding conspiracy to monopolize] do not provide an inference of specific intent to conspire to achieve the stated goal of the conspiracy. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 597 (1986); *see also Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc*., 200 F.3d 307, 315-16 (5th Cir. 2000) (granting summary judgment on §1 and § 2 conspiracy claims for failure to offer facts showing joint action).

F.3d at 315-16 (granting summary judgment on § 2 conspiracy claim for failure to offer facts showing joint action based on previous § 1 analysis demonstrating the same).

The case relied upon by CDW illustrates this point. *Microsoft* was one of sixty-four antitrust actions against Microsoft Corporation that had been consolidated by the Multi-District Litigation Panel. *Microsoft*, 127 F. Supp. 2d at 729. Unlike all the other cases, the plaintiffs in *Microsoft* named as defendants, in addition to Microsoft, three original equipment manufacturers (OEMs) and alleged the four defendants conspired with one another to restrain trade unreasonably and to maintain Microsoft's monopolies in various markets. *Id.* ("According to plaintiffs, this conduct consisted primarily of those defendants entering into a variety of restrictive agreements with Microsoft, including per-processor licensing fees, long-term distribution contracts, the bundling of Microsoft operating system software with Internet Explorer to exclude browser and Java competition, and the bundling of Microsoft operating system software and application software. . . . In addition, Microsoft and the three OEM defendants allegedly agreed not to alter the Windows 95 boot-up sequence, thereby giving Microsoft an unfair advantage over competing browser suppliers. . . . The overall purpose and effect of the restrictive agreements between Microsoft and the OEM defendants is alleged to be the preservation of Microsoft's monopolies in the operating system software market and in the word processing and spreadsheet software markets.").

In the context of the *Microsoft* case, which was decided on a motion to dismiss rather than at summary judgment, "specific intent" signified something more than "willing, voluntary, and knowing participation in the illegal course of conduct that Microsoft [was] alleged to have pursued" and meant "participating in that course of conduct for the specific, shared purpose of maintaining Microsoft's monopolies." *Id.* at 731. According to the court in *Microsoft*, the plaintiffs

must prove the OEM defendants, when confronted with Microsoft's demands, "stepped back and

concluded that maintaining Microsoft's monopolies was a goal that they themselves desired to

accomplish." *Id.* The defendants argued not only that the plaintiffs had failed to meet that

obligation, but also that the alleged conspiracy was "inherently implausible." *Id.* Relying on a Fifth

Circuit case *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 231 F.3d 1005, 1007

(5th Cir. 2000), which was later modified and superseded on denial of rehearing,[46] the plaintiffs

asserted their allegations that the OEM defendants benefitted from their "ready acquiescence to

Microsoft's monopolistic demands" made their charge of conspiracy plausible. *Id.* at 731-32.

The court in *Microsoft* held the plaintiffs had not stated any cognizable conspiracy claims,

explaining as follows:

> The fallacy in plaintiffs' contention is that although plausibility is necessary for an
> antitrust conspiracy claim, it is not sufficient. Cf. 6 Phillip E. Areeda, Antitrust Law
> ¶ 1412g (1986). Plaintiffs have suggested motives that, at least in theory, might
> have led the OEM defendants to accept, willingly and voluntarily, the imposition
> of Microsoft's restrictive agreements. Plaintiffs have not, however, identified any
> facts to support their conclusory assertion that the OEM defendants acted with
> specific intent, i.e., **that they decided that Microsoft's monopolies were in their
> own interest and something they affirmatively wanted to perpetuate.** Based
> upon plaintiffs' allegations, it is at least as likely that the OEM defendants simply
> chose to make the best of a bad situation in order not to be undercut by their
> competitors. In that regard, it is to be noted that plaintiffs allege that Microsoft
> imposed the same restrictive agreements upon all the OEMs with which it dealt.
> Thus, in accepting those restrictions, the OEM defendants are not alleged to have
> done anything different from any other OEM.

---

[46] In *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215 (5th Cir. 2001), a case involving a
Sherman Act § 1 claim, the Fifth Circuit stated courts will not draw inferences to support a claim that makes no
economic sense; such a claim will require unusually persuasive evidence to withstand summary judgment. *Id.* at 219-
20; *see also id.* at 220 (stating rational economic actors do not ordinarily conspire to injure themselves). However, the
Fifth Circuit recognized that "there can be sufficient evidence of a combination or conspiracy when one conspirator
lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by
another conspirator who has an anticompetitive motive," thereby making it "economically plausible" for that
conspirator to participate in concert. *Id.* at 222. The claim was remanded in *Spectators'* because although one of the
alleged conspirators, as a purchaser, did not have a rational economic interest in restraining competition in the market,
there was evidence presented to support a claim that the alleged conspirator was coerced and enticed to join the
conspiracy, such that it became economically plausible. *Id.*

\* \* \*

>To hold them liable for doing so would run afoul of the "fundamental antitrust concept that the alleged sins of sellers should not be visited on buyers because of the risk of chilling competition." *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 415 (D.D.C.1988).

*Id.* at 732-33 (emphasis added).

Unlike the OEMs in *Microsoft* who were not alleged to have done anything different from any other OEM, Dexon asserts there is evidence here that Cisco and CDW treated each other differently, with CDW actively pushing Cisco over Cisco's competitors. Dkt. No. 377 at 8. Moreover, Dexon presents sufficient evidence regarding why CDW would have been enticed into knowingly expanding or maintaining Cisco's market power. *See Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001).

As noted above, there is evidence suggesting Defendants worked together to "alleviate" the competitive threat at major accounts by Cisco competitors. Maness Opening Report, ¶¶ 120-21 (citing Krebill Dep. Tr. at 108:7-17 and Exs. 2 and 4); *see also* Dkt. No. 355-31 (CDW-DXN-0091092), at -93 (January 28, 2015 email thread detailing a 1.5 million dollar sales win in which CDW partnered and "worked closely" with Nimble and Cisco local reps and where Intermedix (a customer of CDW for over ten years) notified CDW that it would move forward with Nimble and Cisco (rather than incumbent Dell) in the "largest Nimble/CDW order to date" and would slowly replace all existing Dell storage); Maness Opening Report, ¶ 122 (citing Coleman Dep. Tr. at 138 and Ex. 11); *see also* Dkt. No. 355-35 (CDW-DXN-00148634), at -38 (noting CDW "partnered with Cisco" and worked hard over the past four years so that all of ███████ Cisco business ran through CDW, noting Arista was a "competitive threat" that CDW was working closely with Mark Downs and team to alleviate; and further noting CDW was "in lockstep with Cisco helping ████ ████ to define their strategy and educate them on Cisco's advantages over "other players").

As further evidence of CDW's specific intent to monopolize in tandem with Cisco, Dexon points out that Coleman agreed with the concept that with every sale for Cisco, the sale "is potentially increasing [Cisco's] market share" and potentially decreasing the market share of a Cisco competitor's market shares.[47] Dkt. No. 356-3 (Coleman Dep. Tr.) at 140:1-9. According to Maness, the impact of this conduct was to "raise[] [Cisco's] competitors' costs to increase their market penetration and market share." Maness Opening Report, ¶ 120 (discussing how investing into CDW and incentivizing such a large distributor to favor its products, Cisco raised competitors' costs to increase their market penetration and market share).

The following evidence, alone, would not be sufficient to show specific intent: evidence showing that CDW *knew* its actions were helping Cisco maintain its monopoly, evidence showing that CDW *benefitted* from Cisco maintaining its monopoly, or evidence showing that CDW pushed Cisco products over other OEMs. However, the evidence cited above, taken together and combined with the well-known dominant position Cisco has in the market, strongly suggests (if not outright states) that CDW wanted Cisco to obtain or maintain a dominant position (monopoly) relative to Cisco's competitors, in part to gain the current and near-term benefits from Cisco's investments in CDW. *See* parties' Proposed jury Instructions, Dkt. No. 469, ¶ 11.2 ("Dexon must prove by a preponderance of the evidence that the Defendants participated in the alleged conspiracy for the

---

[47] The CDW CEO as well as his direct reports were given input about the Cisco-CDW relationship by Coleman's team, Dkt. No. 356-3 (Coleman Dep. Tr.) at 104:12-105:8 (example of the CDW CEO asking Coleman to provide details on the relationship ahead of a meeting with Cisco), and Coleman had regular executive meetings with the CDW CEO's direct report as well as their Cisco counterparts about the Cisco relationship. *Id.* at 46:9-47:5 (describing having regular "one-on-one" and quarterly executive meetings). Thus, according to Dexon, Coleman's testimony that he was aware that Cisco's market share would rise and Cisco's competitors' shares would fall with CDW's favoritism of Cisco (*id.* at 140:1-8), was, at a minimum, done with the knowledge of CDW's most senior leadership.

specific purpose of establishing or maintaining a Cisco monopoly in at least one of the relevant markets Dexon has alleged.").

At the hearing (Dkt. No. 197 at 61:6-62:17) and in its briefing, CDW identifies compelling evidence and economic reasons why CDW simply wanted to sell Cisco products when it was more beneficial for CDW or its customers and that it would *not* be in CDW's interest to encourage a supplier monopoly. However, due to the necessary credibility determinations, the Court cannot agree with CDW that non-movant Dexon has failed to identify enough evidence to show a factual dispute requiring juror resolution. This issue should be considered in light of a full factual record at trial to determine if Dexon has introduced sufficient evidence to submit the question of intent to the jury.

The only other argument CDW raises with respect to § 2 (other than antitrust injury addressed below) is that there is not "any evidence that CDW performed overt acts in furtherance of such a conspiracy, defeating the claim's third element." Dkt. No. 331 at 28. This appears to refer to CDW's argument that it did not fraudulently conceal any conspiracy, which the Court agreed with, but which does not eliminate the conspiracy from the case as explained above in Section V.A.

## VI. DEXON'S TYING AND MONOPOLY CLAIMS AGAINST CISCO (COUNTS III-VI)

Dexon raises *Kodak* lock-in tying allegations (coercing purchases in the relevant markets by withholding service in the relevant service market) in Count III (§ 1 claim for *per se* unlawful tying) and as part of Counts IV and V (§ 2 claims for unlawful monopolization and attempted

monopolization).[48] Rather than address each of Dexon's claims systematically as to each count,
Cisco's motion challenges whether Dexon can show that Cisco engaged in any unlawful
anticompetitive conduct with regard to the various theories advanced by Dexon throughout its
various § 1 and § 2 claims. Dexon responded in the same manner. Before addressing each type of
claim, the Court provides some relevant background applicable to both the § 1 and § 2 claims
against Cisco.

## A.  Relevant background
### 1.  Review of the *Kodak* lock-in theory of tying

The antitrust theory in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S.
451, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) was that Kodak was engaging in illegal practices to
prevent independent service companies from competing with Kodak in the aftermarket for service
of Kodak-brand equipment. *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1048 (9th Cir.
2008). Kodak sold photocopier equipment, as well as maintenance service and replacement parts.
*Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 398 (3d Cir. 2016) (citing *Kodak*, 504 U.S.at
455). The parts were of proprietary design and were not interchangeable with other manufacturers'
parts. *Id.* (citing *Kodak*, 504 U.S. at 456–57). Kodak sold both parts and service, using different
contract arrangements to charge different prices to different customers. *Id.* (citing *Kodak*, 504 U.S.
at 457).

The dispute concerned Kodak's policy of selling machines and parts only to purchasers
who would also use Kodak to service their machines. *Schlotzsky's, Ltd. v. Sterling Purchasing &*

---

[48] In Counts IV and V, Dexon additionally asserts Cisco engaged in associated "pressure and bullying" / FUD-based
tactics, including customer audits, pursuant to its overall goal to force unwanted and supracompetitive purchases
through Cisco's most expensive channels which resulted in stunted overall competition in the relevant markets. Dkt.
No. 175, ¶¶ 117, 123.

*Nat. Distribution Co.*, 520 F.3d 393, 405 (5th Cir. 2008) (citing *Kodak*, 504 U.S. at 458). Kodak agreed with original equipment manufacturers that parts fitting Kodak equipment would only be sold to the Kodak company, limited the availability of used Kodak machines, and pressured companies not to sell Kodak parts to independent service providers. *Id.* The result of Kodak's efforts was that customers were forced to obtain service and repairs from Kodak because the independent service providers were unable to obtain parts. *Id.* Independent service providers sued Kodak, alleging that Kodak had violated § 1 and § 2 of the Sherman Act by tying the sales of parts and service together for Kodak machines. *Avaya*, 838 F.3d at 398-99 (citing *Kodak*, 504 U.S. at 458-59).

In concluding the plaintiffs had put forward a strong enough case to proceed to trial, the Supreme Court expounded a theory whereby high information and switching costs would allow the seller to exploit customers who had already purchased the equipment and were then "locked in" to the aftermarkets. *Avaya*, 838 F.3d at 399 (citing *Kodak*, 504 U.S. at 476). It explained that tying liability may exist in a single-brand aftermarket where the seller can exploit customers who have already purchased the equipment and cannot easily shift to another brand. *Id.*; *see also Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 977 (9th Cir. 2023). Whether a plaintiff has proven such a lock-in must be resolved "on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'" *Epic Games*, 67 F.4th at 977 (quoting *Kodak*, 504 U.S. at 467 (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925))).

Not only was that theory sufficient to support § 1 liability, but the Supreme Court also held it could support § 2 liability for unlawful monopolization. *Kodak*, 504 U.S. at 480–86. In that analysis, the Court incorporated the § 1 analysis but explained that a § 2 claim additionally requires showing the use of that monopoly power "to foreclose competition, to gain a competitive

advantage, or to destroy a competitor." *Avaya*, 838 F.3d at 400 (quoting *Kodak*, 504 U.S. at 482–

83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948))). Therefore, in defending against

a § 2 claim, the seller has the opportunity to justify its actions so that "[l]iability turns. . . on

whether 'valid business reasons' can explain [its] actions." *Id*. (quoting *Kodak*, 504 U.S. at 483

(quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Cor*p., 472 U.S. 585, 605 (1985))). The Court

did not consider the record in *Kodak* as sufficient to warrant summary judgment. *Id.* (citing *Kodak*,

504 U.S. at 483–86). Although the majority opinion did not mention either *per se* or rule of reason

in the analysis, *Kodak* was apparently decided under the *per se* rule.[49] *Kodak*, 504 U.S. at 503

(Scalia, J., dissenting).

## 2.  Review of Court's rulings at the motion to dismiss stage

In the February 7, 2023 R&R, the undersigned discussed at length the "lock-in" tying

arrangement expressed in *Kodak*. *See* Docket No. 107 (R&R) at 48, 52–65. The undersigned found

Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying,

explaining the installed networking equipment already purchased is the alleged "lock-in" product;

SMARTnet service is the alleged tying product; and new networking equipment in the Relevant

Products Markets is the alleged tied product. R&R at 55 (citing *Lee v. Life Ins. Co. of N. Am.*, 23

F.3d 14, 17 (1st Cir. 1994)). The undersigned explained as follows:

> In line with a "lock-in" tying claim under *Kodak*, Dexon alleges a change in policy.
> Dkt. No. 1, ¶ 1 ("after customers pay for necessary network equipment maintenance
> and service, Cisco changes its course of conduct and demands that customers must
> buy new overpriced equipment in order to avoid a technologically compromised
> network, and foreclosing its networking equipment competitors in the process");

---

[49] According to the Sixth Circuit Court of Appeals, the *per se*  and rule of reason analysis for tying arrangements have,
in effect, merged in recent years, with market power in the tying product market being an indispensable requirement
under either *per se* or rule of reason analysis.  *PSI Repair Servs., Inc. v. Honeywell, Inc*., 104 F.3d 811, 815 n. 2 (6th
Cir. 1997) (further noting the "merger of these two theories is apparent in the majority opinion in *Kodak*, which does
not even mention the terms 'per se' or 'rule of reason,' even though *Kodak* was technically a per se case").

*see also id.*, ¶ 102 ("after approving the terms under which customers would receive a SmartNet service package, Cisco would later use the SmartNet service package as a tying product in order to coerce new purchases in the Relevant Product Markets on terms that are unwanted or not needed by customers but favored by Cisco").

Other factors courts consider in assessing "lock-in" claims include "evidence of (1) supracompetitive pricing, (2) [the seller's] dominant share of the relevant aftermarket, (3) significant information costs that prevent[ ] lifecycle pricing, and (4) high 'switching costs' that serve[ ] to 'lock in' [the seller's] aftermarket customers." *Avaya* [*Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 402 (3d Cir. 2016)] (quoting *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374, 384 (3d Cir. 2005)). Dexon has allegations regarding these factors as well. According to the Third Circuit, "it is possible that those factors may support a theory of antitrust liability that is not necessarily predicated on lock-in exploitation." *Id.* at 404. However, any such alternative theory must satisfy the more general rule that an antitrust theory needs to "make[ ] . . . economic sense" and be supported by the evidence. *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986)).

*Id.* at 56-57.

Although disagreeing with Cisco that "substantial" market foreclosure of competitors' sales is necessary for a *Kodak* "lock-in" theory of *per se* tying liability, the undersigned held Dexon sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. *Id.* at 65. Specifically, the undersigned concluded as follows:

Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4–5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50–51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4–5, 26, 51, 103, 125).

*Id.* at 65–66. The undersigned concluded Dexon has plausibly stated a *per se* tying claim under Sherman Act § 1. *Id.* at 66.

108

The undersigned also concluded Dexon has plausibly stated monopolization and attempted monopolization claims under Sherman Act § 2. In so holding, the undersigned first explained Dexon's allegations of Cisco's tying-related conduct supported a § 2 claim:

> [T]he Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482– 83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id.* The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. *Id.* at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id.* at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

*Id*. at 67-68. The undersigned then stated Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *Id.* at 68 (citing *Avaya Inc., RP v. Telecom Labs, Inc*., 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue)).

**B.  Tying claim against Cisco**

In Count III, Dexon asserts a Sherman Act § 1 *per se* tying claim against Cisco, alleging Cisco, a monopolist in the aftermarket maintenance services on Cisco equipment (the "Relevant Services Market"), has used its SMARTnet services package in that Market as a tying product. Dkt. No. 175, ¶ 108. Dexon alleges "no other competitive service provider has reached a double-digit share" in the Relevant Services Market. *Id*., ¶¶ 29, 109. For purposes of the summary

109

judgment proceedings, Cisco does not contest that it is a monopolist in the Relevant Service Market.

### 1. Applicable law

Two types of restrictions on competition may be challenged: tying restraints and exclusive dealing arrangements. *Apani Sw., Inc. v. Coca-Cola Enterprises, Inc.*, 300 F.3d 620, 625 (5th Cir. 2002) (citing *Gulf Oil Corp. v. Copp Paving Co., Inc.*, 419 U.S. 186, 194, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974)). Tying restraints occur when a seller agrees to sell one product on the condition that the buyer also agrees to purchase a different, or tied product, or the buyer agrees that he will not purchase the same product from another supplier. *Id.* (citing *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc*., 677 F.2d 1045, 1048 n. 5 (5th Cir.1982)). Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization. *Avaya*, 838 F.3d at 397 (citing Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* § 17.01, at 17–13 (4th ed. Supp. 2015); also citing 15 U.S.C. §§ 1–2).

Not all tying arrangements are illegal. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises L.L.C.*, 532 F.3d 963, 971 (9th Cir. 2008). Rather, ties are prohibited where a seller "exploits," "controls," "forces," or "coerces" a buyer of a tying product into purchasing a tied product. *Id.* (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms."), *abrogated on other grounds by Illinois Tool Works Inc. v. Indep. Ink*, 547 U.S. 28 (2006)). The injury is reduced competition in the market for the tied product. *Id.* (citing *Jefferson Parish*, 466 U.S. at 12 ("When

such 'forcing' is present, competition on the merits in the market for the tied item is restrained and

the Sherman Act is violated.")).

Similarly, courts in this circuit have noted that while tying arrangements are often included

in the list of *per se* violations of the Sherman Act, not all tying arrangements are *per se* unlawful.[50]

*EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S,

2019 WL 3503240, at *18 (N.D. Tex. Aug. 1, 2019) (citing *N. Texas Specialty Physicians v.*

*F.T.C.*, 528 F.3d 346, 360 (5th Cir. 2008); also citing *Arizona v. Maricopa Cnty. Med. Soc.*, 457

U.S. 332, 344 n. 15 (1982)). To state a claim for *per se* tying in the Fifth Circuit, a plaintiff must

plausibly allege facts showing:

> (1) Two separate products (as opposed to components of a single product); (2) The
> two products are tied together or customers are coerced; (3) The supplier possesses
> substantial economic power over the tying product; (4) The tie has an
> anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial
> volume of commerce.

*Id.* (quoting *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 235 n.2 (5th

Cir. 1996) (citation omitted in *EuroTec*)).

Tying arrangements that do not meet the criteria for *per se* illegality are evaluated under

the rule of reason. *Honeywell Int'l Inc. v. MEK Chem. Corp.*, No. 3:17-CV-1390-M, 2018 WL

6737514, at *6 (N.D. Tex. July 5, 2018) (citing *United Farmers*, 89 F.3d at 235 n. 2). To state a

claim for a tying arrangement that is illegal under a rule of reason analysis, a plaintiff must

plausibly allege that the "tying arrangement had an actual adverse effect on competition in the tied

---

[50] The Fifth Circuit Court of Appeals has noted this odd use of the term "per se" is descriptive of a rule located between a *per se* and a rule of reason inquiry. *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1382 (5th Cir. 1994). According to the court, the best that can be said for it is that it reflects the intermediate danger tying arrangements pose to the market: unlike other *per se* illegal arrangements, "not every refusal to sell two products separately can be said to restrain competition." *Id.* (citation omitted). Rather, there must be proof "as a threshold matter . . . [of] a substantial potential for impact on competition in order to justify *per se* condemnation" of a tie." *Id.* (citation omitted).

product market." *Id.* (quoting *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 954 (E.D. La. 1996);

also citing *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 88 (5th Cir. 1994)).

### 2. Cisco's assertions

Cisco advances four arguments as to why summary judgment should be granted as to

Dexon's § 1 tying claims. <u>First</u>, Cisco asserts there is no evidence that Cisco conditions the sale of

SMARTnet contracts (or the provision of service under such contracts) on the purchase of

additional or unwanted Cisco equipment; thus, according to Cisco, Dexon's tying claims fail "for

want of its most fundamental element – evidence that Cisco used market power in one market to

coerce unwanted purchases in another." Dkt. No. 326 at 15-17.

<u>Second</u>, Cisco asserts it lawfully and openly limits SMARTnet to equipment purchased

from authorized resellers, and the Fifth Circuit has held that a defendant that transparently

discloses contractual restrictions – such as Cisco's policy of limiting SMARTnet coverage for

equipment purchased from unauthorized resellers – has not engaged in tying. *Id.* at 17 (citing

*United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996)

("[P]ower derived from contractual agreements . . . has nothing to do with market power, ultimate

consumers' welfare, or antitrust.") (cleaned up); also citing *Queen City Pizza, Inc. v. Domino's

Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (same)).

<u>Third</u>, Cisco asserts extensive discovery has revealed there is no claim here that mirrors

the lock-in tying claim in *Kodak*. *Id.* at 18-19 (citing *O'Dell v. Gen. Motors Corp.*, 122 F. Supp.

2d 721, 735 (E.D. Tex. 2000) (no *Kodak* claim absent evidence of coercion, high information costs,

price discrimination against unsophisticated customers, and lock-in)). Specifically with regard to

Dexon's "bait-and-switch" allegations, Cisco asserts there is no evidence the alleged bait and

switch "affected competitors' equipment sales. . . . On the contrary, Dexon's theory appears to be

that this conduct allows Cisco to sell additional SMARTnet contracts – not additional equipment (corresponding to the alleged markets)." *Id.* at 25. According to Cisco, "Dexon presents zero evidence that the few instances it identifies had any market-wide effect." *Id.*

Fourth, Cisco argues Dexon has no antitrust injury. *Id.* at 27-30.

### 3. Analysis

#### a. Whether there is evidence sufficient to create a genuine issue of material fact that Cisco used market power in the tying market to coerce purchase of the tied product

A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distribution Co*., 520 F.3d 393, 405 (5th Cir. 2008) (quoting *Kodak*, 504 U.S. at 461-62). In Cisco's first argument, Cisco asserts there is no evidence that Cisco conditions the sale of SMARTnet contracts (or the provision of service under such contracts) on the purchase of additional or unwanted Cisco equipment; thus, according to Cisco, Dexon's tying claims fail "for want of its most fundamental element – evidence that Cisco used market power in one market to coerce unwanted purchases in another." Dkt. No. 326 at 15-17. Relatedly, Cisco argues it cannot coerce customers to make any future purchases (or pay fees) based on SMARTnet because "Cisco gear works without SMARTnet." Dkt. No. 366 at 3.

Cisco cites *Bob Maxfield, Inc. v. Am. Motors Corp*., 637 F.2d 1033 (5th Cir. 1981) for the proposition that "actual coercion is an indispensable element of a tie-in charge" in the Fifth Circuit. Dkt. No. 326 at 17 (citing *Bob Maxfield*, 637 F.2d at 1037) ("A manufacturer may use strong persuasion, encouragement, or cajolery to the point of obnoxiousness to induce his retailer to buy its full line of products. An antitrust violation occurs only if it goes beyond persuasion and coerces

113

or forces its customer to buy the tied product in order to obtain the tying product.")). However, case law indicates Dexon need only show Cisco has sufficient market power in the tying market to coerce, along with sufficient evidence that the tie has an anticompetitive effect on the tied market, the latter of which seems to be the focus of much of Cisco's arguments.

Even the case relied upon by Cisco notes one of the four characteristics of an illegal tying arrangement is "**sufficient market power in the tying market to coerce** purchase of the tied product," along with involvement of a not insubstantial amount of interstate commerce in the tied market and anticompetitive effects in the tied market. *Bob Maxfield*, 637 F.2d at 1037 (emphasis added). This is similar to how the Supreme Court expressed a "lock-in" tying arrangement in *Kodak*:

> "[A]n agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States*, 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Such an arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

*Kodak*, 504 U.S. at 461–62. Under Fifth Circuit law, to establish that the tying arrangement is illegal *per se*, a plaintiff must show the defendant exerted sufficient control over the tying market to have a <u>likely</u> anticompetitive effect on the tied market. *See Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) (emphasis added) (noting plaintiffs could prevail in absence of showing market power if they proved an "unreasonable restraint of trade" under the rule of reason).

In other words, for a tying claim to suffer *per se* condemnation, a plaintiff must prove, among other elements, that the defendant possesses enough economic strength in the tying product market to coerce its customers into purchasing the tied product. *Rick-Mik Enterprises, Inc. v. Equilon Enterprises L.L.C.*, 532 F.3d 963, 971 (9th Cir. 2008). As the Supreme Court reiterated in

114

*Illinois Tool Works*, "the justification for the challenge [against ties] rested on <u>either an assumption</u> <u>or a showing</u> that the defendant's position of power in the market for the tying product was being used to restrain competition in the market for the tied product." *Id.* (quoting *Illinois Tool Works*, 547 U.S. at 34) (emphasis added). Thus, "in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Id.* (quoting *Illinois Tool Works*, 547 U.S. at 46). The necessary market power "is the power to force a purchaser to do something that he would not do in a competitive market" and can be "inferred from the seller's possession of a predominant share of the market." *Host Int'l, Inc. v. MarketPlace, PHL, L.L.C.*, 32 F.4th 242, 253 n. 13 (3d Cir. 2022) (quoting *Kodak*, 504 U.S. at 464) (quotations omitted in Host)).

Here, Cisco is not seriously disputing it has the necessary market power in the Relevant Service Market to coerce its customers into purchasing the tied product.[51] Rather, Cisco appears to dispute whether Dexon has produced sufficient evidence that Cisco exerted control over the tying market such that it had a likely anticompetitive effect on the tied market.

In support of its position that Dexon must show actual coercion, Cisco argues it cannot coerce customers to make any future purchases (or pay fees) based on SMARTnet because "Cisco gear works without SMARTnet." Dkt. No. 366 at 3; *see also* Dkt. No. 326 at 19 ("It also is undisputed that Cisco's gear will work without SMARTnet [and Dexon] conceded that Cisco equipment will interoperate with non-Cisco equipment in a single network. . . ."). However, whether Cisco gears works without SMARTnet is not determinative. It does not appear to be in dispute that hardware-based networking equipment will work, at least initially, without a service

---

[51] Maness opines Cisco has monopoly power in the asserted relevant markets for Ethernet switches, SD-Branch routing, and the aftermarket for maintenance and service of Cisco products. Maness Opening Report, ¶ 12. Maness further asserts that relevant markets have significant barriers to entry. *Id.*, ¶¶ 53, 59.

package like SMARTnet, and that there are third-party vendors that compete with Cisco in offering services for Cisco equipment. There also does not appear to be any dispute that Cisco equipment can work with non-Cisco equipment. These facts are consistent with Cisco's explanation, with supporting evidence, that sometimes Dexon's customers do not buy SMARTnet at all. *See* Dkt. No. 326 at 11 & n.60.

However, Cisco provides no authority for the broad argument that service on equipment and the underlying new Cisco equipment cannot be tied/tying products if the equipment can function, to some degree, without service and maintenance. SMARTnet is plainly very important to certain customers, as shown by the ███████ and ███████ examples. It would be a reasonable inference that many customers in critical industries who make large network equipment purchases demand such service, maintenance, support, and warranty for their networks. And Cisco itself emphasizes the important nature of SMARTnet. *See, e.g.*, Maness Opening Report, ¶ 39 ("Importantly, according to Cisco, the only way for a Cisco customer to officially access ongoing software support and updates is through the purchase of SMARTnet (or equivalent) services."); *see also* Dkt. No. 326-72 (2019 email to ███████ from Cisco, stating that without Cisco products from the authorized channel there is no valid Cisco license right to use Cisco's software and ███████s access to IOS updates, bug fixes, patches, warranty and TAC support, as well as service support such as SMARTnet would ultimately be impacted).

And there is at most a factual dispute as to whether third parties are a reasonable substitute for replacing SMARTnet. Dexon alleges Cisco has monopoly power both in the Relevant Product and Service Markets (Maness Opening Report, ¶ 12), calling into question that assumption. As Dexon points out, Maness opines that "Cisco's policies regarding third-party maintenance services

116

strictly limit the capabilities of non-Cisco affiliated providers to fully service its products."[52] *Id.*,
¶ 41. He concludes that third-party options are not a "reasonable substitute." *Id.*, ¶ 42.

With respect to coercion, Cisco also contends that "[g]iving customers th[e] option [to pay recertification fees] precludes Dexon's tying claim" by citing to *Breaux Bros. Farms*. Dkt. No. 326 at 18 (citing *Breaux Bros. Farms, Inc. v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994)); *see also* Dkt. No. 366 at 2. Cisco quotes *Breaux Bros. Farms* for the proposition that "'enhancing the price of the [alleged] tying product' – here, SMARTnet with a recertification fee – is not tying." *Id.* The recertification fee may factor in the analysis, but *Breaux Bros. Farms* does not stand for the proposition that increasing the cost of the tying product can never be part of a tying scheme. The court in *Breaux Bros. Farms* was simply quoting *Jefferson Parish Hospital* to start its discussion on tying: "[T]he law draws a distinction between exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other." *Breaux Bros. Farms*, 21 F.3d at 86 (citing *Jefferson Parish Hospital*, 466 U.S. at 14). The court then rejected the plaintiff's *per se* tying claim because it failed to show defendants had sufficient market power in the tying market. *Id.* at 86-87. That does not resemble the facts here, where Cisco is not disputing it has market power in the Relevant Service Market.

---

[52] According to Maness, a Cisco publication provides that "sourcing spare parts from a third-party maintenance provider may invalidate a customer's software license and make the customer ineligible for bug fixes and updates." Maness Opening Report, ¶ 41. "Because of this, customers of third-party maintenance plans might be at risk of audit by the original equipment manufacturer (OEM), with [Gartner's 'Magic Quadrant for Enterprise Wired and Wireless LAN Infrastructure'] identifying Cisco as an OEM that targets '…select customers to discover what Cisco deems violations of Cisco (IOS) licensing policy…" *Id.*, ¶¶ 16, 41. "Given the potential risks associated with third-party maintenance plans, customers are generally unable to fully substitute OEM maintenance services with those offered by third parties." *Id.*, ¶ 41.

**b. Whether Cisco's publication of its SMARTnet policies precludes Dexon's tying claim**

Cisco next asserts it openly discloses in SMARTnet contracts and on its website its policy that Cisco will not provide SMARTnet to cover equipment from unauthorized resellers absent recertification; therefore, under Fifth Circuit precedent, Cisco has not engaged in tying. Dkt. No. 326 at 17 (citing *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("[P]ower derived from contractual agreements . . . has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (cleaned up); also citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438 (3d Cir. 1997) (same)). According to Cisco, Dexon presents no evidence that customers are unaware of this policy or that it would be difficult for customers to learn of it, and there is no evidence that Cisco ever changed its SMARTnet or warranty policy. Dkt. No. 326 at 19.

The cases relied upon by Cisco are distinguishable. For example, in *Queen City Pizza*, the Third Circuit Court of Appeals considered a *Kodak*-style claim by a group of franchisees against Domino's Pizza, alleging that Domino's had used its monopoly power over the market for franchise rights and proprietary pizza dough to restrain trade in the market for approved pizza supplies. *Avaya*, 838 F.3d at 400–01 (citing *Queen City Pizza*, 124 F.3d at 434). The Third Circuit affirmed the district court's dismissal of the claims under Federal Rule of Civil Procedure 12(b)(6) because the court did not consider the contractual requirement for franchisees to purchase pizza ingredients from Domino's to implicate the concerns raised in *Kodak*. *Id.* (citing *Queen City Pizza*, 124 F.3d at 444). The court observed "that Domino's approved supplies and ingredients are fully interchangeable in all relevant respects with other pizza supplies" so that they were not unique in the way that Kodak parts were. *Id.* (citing *Queen City Pizza*, 124 F.3d at 440). The plaintiffs were not, therefore, forced to purchase approved supplies because of the uniqueness of any Domino's

118

goods, but instead only "because they [were] bound by contract to do so." *Id.* (quoting *Queen City Pizza*, 124 F.3d at 441). In distinguishing that contractual obligation from the *Kodak* situation, the court explained that, where the defendant's forcing power "stems not from the market, but from plaintiffs' contractual agreement. . . , no claim will lie." *Id.* (quoting *Queen City Pizza*, 124 F.3d at 443). "If Domino's . . . acted unreasonably when . . . it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws." *Id.* (quoting *Queen City Pizza*, 124 F.3d at 441).

Notably, the Third Circuit emphasized in *Queen City Pizza* that "[t]he *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies." *Id.* (quoting *Queen City Pizza*, 124 F.3d at 440). Because Kodak's change in policy against independent maintenance providers "was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision." *Id.* The Third Circuit thus characterized *Kodak* as concerned largely with the threat of unfair surprise for customers in the aftermarket, "a threat ameliorated if the aftermarket terms were made clear in a primary market contract." *Id.*

The issue in this case is not primarily one of contract law. Rather, pursuant to a *Kodak* lock-in theory of tying, Dexon asserts Cisco engaged in a "bait and switch tactic," namely that customers would rely on Cisco's approval and assurance that they would receive service due under a SMARTnet service agreement on "unauthorized" equipment, but then later Cisco would threaten to withdraw the service unless the customer agreed to buy new Cisco products at disadvantageous terms or buy exclusively from Cisco in the future. Dkt. No. 355 at 15-17. Dexon alleges a "bait and switch" which involves the timing of when Cisco decides to enforce its policy that unauthorized equipment is ineligible for SMARTnet service (no "SMARTnet on gray," as

119

described by a Cisco brand manager, Dkt. No. 355-17 (Abbott Dep. Tr.) at 178:15-16).
Specifically, Dexon alleges that despite its no SMARTnet on gray policy, Cisco nevertheless
accepts payment for SMARTnet contracts on gray market equipment, only to later enforce the
policy, for example, when a customer needs service on the gray market equipment.

Maness explains that Cisco ties its aftermarket support and services to its networking
equipment and then asserts that hardware sourced through independent distributors is ineligible
for software support. Maness Opening Report, ¶ 81. Maness further states Cisco conducts "bait
and switch tactics" by giving customers the misleading impression that SMARTnet contracts are
valid for equipment purchased through independent distributors. *Id*., ¶ 82. According to Maness,
Cisco does this by allowing customers to purchase such contracts and "have them for months or
years before Cisco informs the customer that the contracts were never valid to begin with." *Id.*
(stating the effect of this conduct is to coerce customers into making additional purchases after
they are drawn in by competitive offers from independent distributors and further stating the
conduct limits intrabrand competition and harms customers by reducing customer choice and
raising the costs of owning and maintaining Cisco equipment).

*Kodak* requires a showing of a lack of consumer awareness regarding aftermarket
restrictions. *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 979 (9th Cir. 2023) (citing *Kodak*, 504
U.S. at 477, n. 24). A change in policy is of course *one* way of doing so, but it is not the exclusive
means of doing so. *Id.* Here, there is a fact issue as to whether there is a threat of unfair surprise
for customers in the aftermarket, a threat ameliorated if the aftermarket terms were made clear in
a primary market contract. *Avaya*, 838 F.3d at 401.

Cisco's change in behavior puts customers who have made expensive equipment and
SMARTnet purchases on the assumption that the equipment is warrantied and will be serviced into

120

a difficult situation when Cisco later tells the users it will not provide service under the SMARTnet contract because the equipment is ineligible. Put simply, the "change" in policy is that Cisco ignores its policy at the time of equipment and SMARTnet purchase, but then enforces the policy after the customer pays and is "locked" into the Cisco ecosystem. This provides the leverage for Cisco to extract from the customer additional certification fees or commitments to buy Cisco equipment in the future. Dexon has proffered evidence supporting this theory. Dkt. No. 355 at 15-19 (citing evidence, specifically discussing the ███████ [53] ███████, a September 2015 email from Cisco SMARTnet renewal employee, Caerleigh Terasaki, wherein Terasaki stated (in response to a question about what to do with SMARTnet contracts via "grey market provider") that sometimes she would "let the customer run out their service with the grey market provider if they promise to buy Cisco services & product only from Cisco in the future"), and a Cisco brand manager's deposition testimony suggesting end users with gray market equipment were sometimes allowed to keep their SMARTnet service).

### c. Whether there is sufficient evidence (bait and switch) to establish a *Kodak* theory of lock-in tying

Cisco next argues there is insufficient evidence to establish a *Kodak* lock-in tying claim. Dkt. No. 326 at 18-19 (citing *O'Dell v. Gen. Motors Corp.*, 122 F. Supp. 2d 721, 735 (E.D. Tex. 2000) (no *Kodak* claim absent evidence of coercion, high information costs, price discrimination against unsophisticated customers, and lock-in)).

Cisco's strongest argument, weaved throughout all facets of its briefing, is that none of the evidence Dexon relies on shows Cisco successfully engaged in the alleged "bait and switch." Dkt.

---

[53] Dexon's briefing inadvertently states ███████" in several places on pp. 15-17 when the exhibits and discussion clearly reference ███████. *See* Dkt. No. 366 at 8, n.15; Dkt. No. 378 at 4, n.5.

No. 326 at 16 (discussing five customers); Dkt. No. 366 at 3 & n.5. Additionally, Cisco argues Dexon presents "zero evidence that the few instances it identifies had any market-wide effect." Docket No. 326 at 25 (stating there is no evidence that the alleged tying arrangement has affected competitors' equipment sales). As noted above, Dexon must present sufficient evidence of "bait and switch" to create a fact issue as to whether Cisco exerted sufficient control over the tying market (SMARTnet service) to have a likely anticompetitive effect on the tied market (new networking equipment in the Relevant Products Markets).

Cisco acknowledges that its SMARTnet renewal employee describes one option after discovering "SMARTnet on gray" is to "let the customer run out their service with the gray market provider if they promise to buy Cisco service and product only form Cisco in the future." However, Cisco points out that Maness agreed he is not aware of any example of that conduct happening. Dkt. No. 366 at 3 (citing Dkt. No. 326-6 at 196:4-198:4). Dexon's inability to identify this specific scenario being played out with more frequency (if at all) undercuts Dexon's tying claim. This is particularly true given the extensive discovery in this case, including SMARTnet data the Court ordered Cisco to produce based partly on the expectation that the data would shed light on this issue. *See* Dkt. No. 397 at 67:19-25, 131:12-132:2; Dkt. No. 111 at 5. If the evidence is not there, the evidence is not there.

The ▮▮▮▮▮▮▮ incident is evidence that Cisco at least tried the bait and switch.[54] According to Dexon, after providing SMARTnet service on the Dexon-provided equipment to ▮▮▮▮▮▮▮ for eight months, Cisco notified ▮▮▮▮▮▮▮ by letter on May 24, 2019, that the Dexon-sourced equipment was "unauthorized" and that SMARTnet coverage for the equipment

---

[54] Cisco argues that because of the way Dexon procured certain SMARTnet contracts, *see* Dkt. No. 418 at 14, it was not aware the at-issue equipment was unauthorized (i.e., gray market).

would be terminated unless it paid to have the equipment inspected and relicensed or purchased

new equipment to replace the unauthorized equipment. Dkt. No. 355-24. After Cisco again emailed

on July 11, 2019 regarding the basis for terminating ███████ SMARTnet contracts,

███████ emailed Cisco on July 12, 2019, pointing out that Cisco has been paid in full through

November 19, 2023 for the SMARTnet services it was providing and stating Cisco had no basis

for terminating the contract. Dkt. No. 355-50 (DEXON_0216366), at -370-71 (emphasis original).

Cisco stated in response to ███████'s email: "Without a resolution that involves both parties

participating in the inspection and relicensing of the devices at issue (or a replacement of the items

with authorized Cisco product), Cisco cannot vouch for the provenance, quality, nor authenticity

of the units. As such, any corresponding SMARTnet contracts will be terminated on or about . . .

July 15, 2019. . . and Cisco will review the situation [of payments made] for any applicable

proratable refunds." *Id*. at -370.

Further, Dexon's characterization of the ███████ incident is that Cisco threatened to

withhold SMARTnet service on equipment *already purchased* from Dexon. Dkt. No. 355 at 17-

18. Dexon asserts that because of Cisco's threat and associated change in policy on SMARTnet

service for previously purchased equipment, ███████ was forced into a position where it could

only meaningfully choose Cisco's designated reseller if it wanted to keep its SMARTnet service

from the monopolist. Dkt. No. 355 at 18 (citing July 3, 2015 email from Babich to ███████

(CDW-DXN-00028704), at -704-06)).[55] Dexon argues this is precisely a scenario in which Cisco

---

[55] When ███████ tried to register equipment it bought from Dexon for SMARTnet, Cisco informed ███████ that
Dexon was an unauthorized reseller. *See* Martz Decl., ¶ 10. In the email relied upon by Dexon, Babich, a Cisco account
manager responsible for the ███████ account, informed ███████ that the Cisco appliance sold to ███████ was
a "'grey market'/used product" and therefore did not have a valid software license, was not eligible for Cisco's

"force[d] the buyer[] into the purchase of [the tied] product that the buyers . . . might have preferred to purchase elsewhere on different terms." *Id.* (quoting *Medtronic AVE, Inc. v. Cordis Corp.*, 2004 WL 7322043, at *3 (E.D. Tex. Mar. 18, 2004) (quoting *Kodak*, 504 U.S. at 464 n. 9)). Those different terms were offered by Dexon: the offered products and services were "the same," but at indisputably lower prices. *Id.* (citing Dkt. No. 355-54 (CDW-DXN-00028709) (Cisco, working with CDW, provided two quotes for the project, one using refurbished products for $713,985; and one using new products for $820,669 to take the business (both more expensive than Dexon's quote))). Dexon asserts this threat was successful, as ███████ then purchased higher priced equipment from Cisco's alleged co-conspirator (CDW), in order to avoid a scenario in which ███ ███ would lose service on equipment for which it had already paid. Dkt. No. 355-52 (DEXON_0375485), at 1-2; Dkt. No. 355-53 (DEXON_0060438).

Cisco contests Dexon's description of ███████ on several fronts, not the least of which is a declaration from a former networking engineer from ███████, stating that he requested "new, authorized Cisco equipment" because he wanted SMARTnet and his "understanding" was that ███████ "would not be able to get SMARTnet" on unauthorized equipment, contradicting any claim that ███████ fell prey to a bait and switch. Dkt. No. 326-71, ¶ 8. However, Dexon has raised non-trivial concerns about that declaration, preventing the Court from accepting it as

---

warranty, and was not automatically eligible for SMARTnet coverage. Dkt. No. 355-55 (CDW-DXN-00028704), at -705-06. Babich further recommended that ███████ not install the equipment from Dexon. *Id.* at -705 (further stating "**Dexon is not a member of the Cisco authorized reseller program and does not have a wholesaler agreement with Cisco.**") (emphasis original). According to Maness, Babich attached Cisco's Brand Protection policy "which indicated none of the equipment would be eligible for SMARTnet, the implication being that any active SMARTnet on products purchased from Dexon was at risk." Maness Opening Report, ¶ 107. In another email dated July 13, 2015, Babich informed ███████ that he had worked with CDW to put together "special pricing for the 4AC project." Dkt. No. 355-55 (CDW-DXN-00028704), at -704. Maness states Cisco's efforts were effective, as ███████ cancelled part of its order with Dexon and made future purchases of Cisco equipment through CDW. Maness Opening Report, ¶ 107.

undisputed. Dkt. No. 355 at 18 (arguing "it is undisputed that [the networking engineer] was not involved in any correspondence in which Cisco threatened ███████ (Ex. 1, ¶98) and Cisco's threat through employee Mr. Babich is not discussed anywhere in the [the] declaration").

These two examples of ██████ and ██████ must be considered in light of the statements from Cisco employees stating key aspects of the bait and switch theory do happen.[56] However, they remain only two examples.

Despite extensive discovery, it is not readily apparent that this record creates an inference that Cisco in fact engaged in the tying/bait and switch schemes in a manner that affected competition in the tied market. One way of characterizing the record is that two Cisco employees described a fire that remains unseen, with Dexon identifying only isolated incidents of smoke from debatable sources. Even assuming that to be sufficient, Dexon cannot show antitrust injury in its *per se* tying theory under Count III.

### d. Whether there is sufficient evidence of antitrust injury

Antitrust injury requires that a plaintiff's injury be "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89 (1977). "The premise is that marketplace conduct can simultaneously impair and enhance competition. . . . So, we must isolate which aspect of the defendant's allegedly illegal conduct **adversely affected the plaintiff**." *Pulse*

---

[56] Dkt. No. 355-36 (CISCO00004358), at 3-4  (Cisco SMARTnet renewal employee stating that "[s]ometimes what I have done in these cases [of SMARTnet on gray] is let the customer run out their service with the grey market provider if they promise to buy Cisco services & product only from Cisco in the future"); *see also* Dkt. No. 355-17 (Abbott Dep. Tr.) at 136:20 – 138:12 (Cisco's senior brand protection leader explaining it was in his discretion whether to cancel SMARTnet after identifying a piece of gray market equipment covered by SMARTnet); *id.* at 178:8-17 (further explaining "this is not super unusual to have to deal with SmartNet" on sales by independent resellers in which a discussion came up whether to terminate SMARTnet).

*Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (citations omitted) (emphasis added). In its motion, Cisco argues that Dexon has not shown the conducts causing harm to competition also harmed Dexon. Dkt. No. 326 at 27-28; *see also* Dkt. No. 366 at 10 (Cisco's reply arguing that Dexon does not sufficiently show harm to itself).

In response, Dexon, like Cisco, focuses on Cisco's "interrelated conduct" relevant to all counts rather than discussing the *per se* tying allegations of Count III individually.  *See* Dkt. No. 355 at 24-27. Dexon then argues those interrelated schemes foreclosed intrabrand competition from independent resellers like Dexon, which challenged Cisco's ability to charge supracompetitive prices. *Id.* at 24. Tellingly, Dexon relies only on its conspiracy and FUD-based claims to make this argument, not raising any argument based on tying alone. *Id.* at 24-27; Dkt. No. 378 at 10. Dexon's argument that it did suffer an antitrust injury briefly mentions tying only one time, to say that "***customers*** discussed herein were harmed by Cisco's ties [and other conduct]." Dkt. No. 378 at 10 (emphasis added). Dexon never takes the next step to show how the harm to customers that came from the alleged tying conduct injured Dexon.

Under Dexon's theory, when Cisco uses its sudden enforcement of the no SMARTnet on gray policy to require Cisco purchases or pay recertification fees, the injury is inflicted on either other OEM manufacturers (who may lose sales) or on end customers (who may pay unexpected recertification fees or have reduced equipment choices). In the instances where customers promised to purchase future Cisco equipment, Dexon does show that promise harmed Dexon. That is not surprising because Dexon has not identified the customer, equipment, and vendor where that specific scenario completely played out. Even if one assumed that the promise to buy future Cisco equipment implicitly meant authorized Cisco equipment, meaning Dexon would not be eligible for that future sale, the tie only works on customers who want equipment to be serviced in the first

place, meaning they would not look to Dexon for that future sale regardless. Similarly, Dexon does not show how it was harmed when customers chose to pay recertification fees – Dexon already made the sale. One could argue that would hurt Dexon's reputation, but that reputational loss would only occur if Dexon had inaccurately told the customers that the sold Cisco equipment was not gray market. In other words, any reputation loss would flow from Dexon's mischaracterization of its equipment rather than Cisco's request for recertification fees. As explained below, Dexon's tying theory therefore stands in stark contrast to its § 2 conspiracy and § 2 monopolization and attempted monopolization claims where Dexon can show Defendants' conduct caused harm to Dexon (e.g., lost sales). For these reasons, the undersigned recommends granting summary judgment as to Dexon's § 1 tying claim (Count III) against Cisco.

## C.  Monopolization and attempted monopolization claims against Cisco

In Counts IV and V, Dexon asserts Sherman Act § 2 claims against Cisco for unlawful monopolization of the Relevant Network Equipment Markets (Dkt. No. 175, ¶¶ 115-20) and for unlawful attempted monopolization of the Relevant Product Markets (*id.*, ¶¶ 121-27). For both claims, Dexon alleges Cisco committed numerous acts, including (1) coercing purchases in the relevant markets by withholding service in the relevant service market; (2) engaging in associated pressure and bullying tactics pursuant to its overall goal to force unwanted and supra-competitive purchases through Cisco's most expensive channels; and (3) engaging in related FUD tactics which resulted in additional revenue and goodwill losses and stunted overall competition in the relevant markets. *Id.*, ¶¶ 117, 123.

### 1.  Applicable law

Section 2 of the Sherman Act condemns three actions: monopolization, attempt to monopolize, and conspiracy to monopolize. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d

1330, 1335 (5th Cir. 1986). The Fifth Circuit recently addressed a § 2 monopolization claim and noted the first element is "possession of monopoly power." *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 (5th Cir. 2022) (quoting *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992)). The second element is anticompetitive (or "exclusionary") conduct, which is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* (quoting *Kodak*, 504 U.S. at 482–83 (quotation omitted in *BRFHH*); also citing *United States v. Griffith*, 334 U.S. 100, 108 (1948) (similar)). Attempted monopolization is similar but allows for liability even if the monopoly never came to fruition. *Id.* (citing *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993) (A defendant commits attempted monopolization if it "(1) . . . has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.")).

### 2. Parties' assertions, generally

In its motion, Cisco moves for summary judgment only on the second element – anticompetitive (or "exclusionary") conduct. Although Cisco challenges the first element (possession of monopoly power) in passing in a few footnotes,[57] Cisco's counsel made clear at the November 2, 2023 hearing that Cisco is not seeking summary judgment on that ground. Dkt. No. 397 (Hearing Transcript) at 69:3-10; *id.* at 101:7-12 (Dexon's counsel agreeing there is no basis for summary judgment on the Enterprise Voice or other product markets; stating there is an issue

---

[57] *See* Dkt. No. 326 at 4, n. 4 & 15, n. 76 (arguing Dexon's inability to proffer evidence that Cisco has monopoly power in any well-defined market); *see also id.* at 4, n. 5 (citing, among other cases, *Exxon Corp. v. Berwick Bay Real Est. Partners*, 748 F.2d 937, 939-40 (5th Cir. 1984) (per curiam) (52% share "is an insufficient basis as a matter of law to conclude that [party] violated the antitrust laws" as "monopolization is rarely found when the defendant's share of the relevant market is below 70%")). According to Cisco, the fact that Cisco's shares are <u>falling</u> should preclude a finding of monopoly power as a matter of law. *Id.* at 4, n. 5 (emphasis original) (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir. 1984) (monopolization claim requires showing of power and "capacity" to "exclude competition")).

of fact on those questions; and stating the issue of near virtual service monopoly is not addressed

by Cisco's motion).

Dexon argues Cisco's interrelated schemes (ties, FUD tactics, customer audits foreclosing

choice, and Cisco-CDW conspiracy) are anticompetitive because they were designed to "thwart

competition from the independent channel." Dkt. No. 378 at 2; *see also id.* at 2-9 (stating Cisco

ignores the combined effects of its interrelated schemes, all of which "reinforce one another").

Although the character and effect of a conspiracy are not to be judged by viewing its separate parts

but only by looking at it as a whole, *see Continental Ore*, 370 U.S. at 699, courts evaluate a

defendant's allegedly exclusionary conduct separately. *United States v. Google L.L.C.*, No. 20-

CV-3010 (APM), 2023 WL 4999901, at *13 (D.D.C. Aug. 4, 2023) (citing *In re EpiPen*

*(Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir.

2022) (When "[r]eal-world monopolists ... engage in allegedly exclusionary conduct which does

not fit within a single paradigm[,] ... the courts disaggregate the exclusionary conduct into its

component parts before applying the relevant law."; "For the sake of accuracy, precision, and

analytical clarity, we must evaluate [the defendant's] allegedly exclusionary conduct separately.

Only then can we evaluate the evidence in totality to see if any synergistic effect saves [the

plaintiff's] case.") (internal quotation marks omitted in *Google*); also citing *RTI*, 842 F.3d at 891

(stating that a jury's finding of anticompetitive conduct that rested on "three types of 'deception'"

"must be separately analyzed in light of settled principles of antitrust law")); *see also Intergraph*

*Corp. v. Intel Corp.*, 195 F.3d 1346, 1366–67 (Fed. Cir. 1999) ("*Continental Ore* did not hold, as

Intergraph proposes, that the degrees of support for each legal theory should be added up. Each

legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant

facts.").

The Court has already addressed Cisco's alleged conspiracy with CDW and tying allegations. Having found Dexon does not show harm from its tying allegations above, Dexon may nevertheless rely on evidence of similar conduct as part of an overall scheme that does harm Dexon. In this section, the Court considers whether Dexon's evidence related to its so called "FUD-based claims" and "audit-based claims"[58] is sufficient to also support the § 2 claims. According to Cisco, notifying customers about Cisco's policies ("FUD-based claims") – and enforcing them according to as-disclosed terms ("audit-based claims") – is not exclusionary conduct. Dkt. No. 326 at 20.

### 3. Dexon's evidence it cites in support of its "FUD-based"/audit claims

Maness opines Cisco possesses monopoly power in the relevant markets for Ethernet switches and routers and has the potential to gain monopoly power in the enterprise voice market.[59] Maness Opening Report, ¶¶ 54-64, 76. Maness found that Cisco's share of sales has dropped to approximately 50% for each of Ethernet switches (formerly ███ in 2019), routers (formerly ███

---

[58] On November 20, 2023, the undersigned denied Defendants' Rule 37 Motion Regarding Undisclosed Nonparty Witnesses and Liability Theory (Dkt. No. 316). *See* Dkt. No. 413 at 9-10 (concluding, among other things, that Dexon has not failed to disclose its "customer audit theory" and further finding that, even if the customer audits were considered a distinct theory of liability from FUD, supplementation was not required because the audit issue was extensively explored during the discovery process and in the expert reports of both Dexon and Defendants). Defendants' Rule 72(a) objection to the November 20 Order (Dkt. No. 444) is pending before District Judge Schroeder.

Although Dexon considers the audit issue as part of Dexon's FUD-based claims, *see* Dkt. No. 397 (Hearing Transcript) at 116:21 (stating audit is a legal threat), to the extent the Court considers them separately herein, it is because that is the way Cisco briefed the issues.

[59] In a footnote in its motion, Cisco asserts Maness declined to define an "IP phone" market as Dexon alleged. Dkt. No. 326 at 4, n. 4 (*comparing* Am. Compl. (Dkt. No. 175) at ¶ 76 (alleging an "IP Phones" market) *with* Maness Opening Report, ¶¶ 61-62 (claiming an "enterprise voice" market); citing Dkt. No. 326-6 (Maness Dep. Tr.) at 160:14-16 (admitting he defined no IP phone market)). According to Cisco, Maness instead defined a concededly broader "enterprise voice" market that includes cloud-based technologies like Microsoft Teams. *Id.* (citing Maness Dep. Tr. at 158:1-159:8; also citing Maness Opening Report, ¶¶ 18 ("IP phones are an important part of the broader enterprise voice market."), 62 & n. 112).

in 2016), and enterprise voice sales (formerly ███ in 2020). Maness Report at Ex. 3 (switches),

Ex. 4 (routers), Ex. 5 ("enterprise voice").

Regarding FUD specifically, Dexon brand protection expert Mosteller explains that Cisco

weaponizes its Brand Protection team to facilitate more sales and generate greater profit, which is

contrary to the true role of brand protection. Mosteller Rebuttal Report, ¶¶ 34-35. Mosteller also

explains that Cisco's use of FUD at customers like ███ and ████████ been entirely

inconsistent with best practice to protect a company's brand, which should not be a profit-driven

exercise to foreclose other resellers. *Id.*, ¶¶ 44-50 (citing examples of Cisco's Brand Protection

team using FUD to scare customers away from buying Dexon equipment).

Dexon further asserts Cisco brand protection presentations openly discuss arming the Cisco

sales team with FUD. Dkt. No. 355-15 (CISCO00016916), at 9 ("Arm Cisco Sales w/ VOD, FUD,

etc..."); *id*. at 13 ("Develop formal FUD docs"). As Cisco employee Adam Tapper confirmed,

FUD typically involves boilerplate language drafted by Cisco's brand protection team. Tapper

Dep. Tr. at 134:13-135:18, 137:7-138:14 (Cisco's Brand Protection team worked with Cisco's

sales reps and provided boilerplate language that they would send to the customer.). Cisco account

managers sometimes rely on the brand protection team for information characterized as FUD by

Dexon to send to customers who might be considering a non-certified Cisco partner. *See* Dkt. No.

355-16 (CISCO00607455), at 3 (account manager asking brand protection whether they have

"compiled any 'FUD' (fear/ uncertainty/ doubt)" about an independent reseller that he could share

with his customer and the response being brand protection has "customer facing material to support

you on Cisco's policies and the risks of purchasing outside authorized channel" and further

instructing the account manager to be prepared to discuss the independent reseller's "service

alternative to SMARTnet"). Doug Abbott, Cisco's senior brand protection leader who considers

himself a "subject matter expert" on brand protection, testified that he was moved from Cisco's finance team to brand protection in May 2006 "as part of a heightened understanding within Cisco that gray-market operations erode profit margins and profoundly affect bottom-line profitability." Dkt. No. 355-17 (Abbott Dep. Tr.) at 62:1-64:11, 126:15–127:2; *see also id.* at 126:5-22 (describing how Cisco brand protection investigators have discretion and are "not limited" in how they can investigate a particular case); Dkt. No. 355-18 ("Abbott LinkedIn").

An internal Cisco presentation discusses the competitive threat from "third party maintainers," which refer to independent resellers, stating that because they offer lower prices, they "continue to pose a direct threat to the success of our business and disrupt our seller's efforts to sell Cisco Services." Dkt. No. 355-5 (CISCO00597473) at 3. According to Maness, this presentation explicitly recommends spreading FUD to compete with third-party maintainers, calling for "Social Media outreach leveraging additional customer assets that drive FUD on 3rd party maintenance." *Id.* at 5; *see also* Maness Opening Report, ¶ 101.

While acknowledging a CDW executive found FUD tactics to be inappropriate,[60] Dexon asserts Cisco employees engage in FUD on a regular basis. *E.g.*, Dkt. No. 355-10 (CISCO00135078) at 2 (May 30, 2017 email from Michael Babich with Cisco requesting a Cisco employee to "provide me any FUD you may have"); Dkt. No. 355-11 (CISCO00135578) at 2 (January 19, 2022 email from Babich, noting that a Cisco employee can "add some FUD"); Dkt. No. 355-12 (CISCO00136081) at 2 (December 11, 2020 email from Babich, stating as follows: "I will tell I [sic] have been selling for along time and that type of thing is nothing new. You can

---

[60] CDW executive John Coleman testified he does not think FUD is something CDW seeks to engage in. Dkt. No. 355-9 (Coleman April 27, 2023 Dep. Tr.) at 263:18-23.

throw FUD in that the customer knows you and Cisco will be here. We may not be pretty and [sic] but it just works.").

Cisco also has a department dedicated to leveraging customer audits to secure sales, led by Cisco witness Naser Samaenah. For example, Dexon asserts Cisco targeted ███████ with an audit to prevent ████ from purchasing from an independent seller and to prevent a loss of business to the independent channel. Dkt. No. 355-42 (CISCO00611723) at 102 (settlement letter from Cisco to ████ detailing Cisco equipment purchases necessary to close the audit); Dkt. No. 355-43 (CISCO00028739) at 4-6 (██████ audit findings). Similarly, Cisco used an audit with ██████████ to leverage a █████████ equipment purchase. Dkt. No. 355-44 (CISCO00027185); Dkt. No. 355-45 (CISCO00729024) (settlement letter between Cisco and ██████████, in which ████████████ agreed to purchase █████████ in new Cisco equipment over two years). After Cisco discovered that customer █████████ was considering purchasing from a Cisco competitor (from its authorized distributor), Cisco utilized an audit to prevent that competitive purchase and guarantee purchases from only Cisco within its authorized reseller channel. Dkt. No. 355-47 (CISCO00029459) (settlement letter between Cisco and ██████████, in which ████████ agreed to purchase █████████ in new Cisco equipment).

### 4. Analysis

#### a. Whether Dexon's FUD-based theory is unsupported by evidence and/or foreclosed by *RTI*

Cisco argues Dexon's "FUD-based" theory is "unsupported by evidence and squarely foreclosed by [the] Fifth Circuit" case *Retractable Techs., Inc. v. Becton Dickinson & Co.* (*RTI*), 842 F.3d 883 (5th Cir. 2016). Dkt. No. 326 at 20. Both assertions are without merit.

Predatory or anticompetitive conduct, which excludes competitors from a market, is "conduct, other than competition on the merits or restraints reasonably necessary to competition

on the merits, that reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power." *RTI*, 842 F.3d at 891 (quoting *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000) (citations, brackets, and quotations omitted in *RTI*)). Further, "'exclusionary' comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also (2) either does not further competition on the merits or does so in an unnecessarily restrictive way." *Id.* at 891-92 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985) (quoting 3 PHILLIP E. AREEDA & DONALD TURNER, ANTITRUST LAW 78 (1978))). To determine whether conduct is exclusionary, the court looks to the "proffered business justification for the act." *Id.* at 892 (quoting *Taylor*, 216 F.3d at 475). "If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Id.* (quoting *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999)).

Relying on *Stearns* and *RTI*, and a case from this Court applying those cases (*Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-308-RWS (E.D. Tex. Mar. 30, 2018), Dkt. No. 247), Cisco asserts Dexon's entire "FUD-based" theory – which Cisco characterizes as merely accurate "direct-to-consumer advertising of Cisco's policies" (Dkt. No. 366 at 5) – is foreclosed as a matter of law. According to Cisco, it accurately notified customers, including ███, ████████████████████████████████, about Cisco's policies (including that Dexon is not authorized and that Cisco cannot guarantee the provenance of its equipment), and "Dexon provided counter-information to the customer[s] *after* Cisco provided its notice." Dkt. No. 326 at 20-21 (emphasis original). Cisco further argues there is no evidence the customers relied on any false information; rather, a majority of the customers that Dexon disclosed in discovery continued purchasing from Dexon despite Cisco's notice, "belying any showing of reliance." *Id.* at 22. Thus,

according to Cisco, Dexon has no evidence of false statements, "let alone a pattern of clearly false statements capable of a sustained impact on competition, and so its 'FUD' claim fails." *Id.*

The Fifth Circuit's decision in *Stearns*, wherein the court held that the aggressive sales pitches by an airline boarding bridge manufacturer to municipal airport buyers was not actionable anticompetitive conduct as a matter of law, sets an extremely high bar for a claim that false advertising, <u>without more</u>, can support an antitrust claim. *RTI*, 842 F.3d at 894. The Fifth Circuit again clarified in *RTI* that there is an extremely high bar for a false-advertising antitrust claim, and "absent a demonstration that a competitor's false advertisements had the potential to eliminate, or did in fact eliminate, competition, an antitrust lawsuit will not lie." *Red Lion Med. Safety, Inc. v. Gen. Elec. Co*., No. 2:15-cv-308-RWS (E.D. Tex. Mar. 30, 2018), Dkt. No. 247 at 40 (quoting *RTI*, 842 F.3d at 894–95).

As explained by this Court in *Red Lion*, the Fifth Circuit in *RTI* recognized that "false advertising alone hardly ever operates in practice to threaten competition . . . because [it] simply sets the stage for competition in a different venue: the advertising market," and because "it will often be difficult to determine whether such false statements induced reliance by customers and produced anticompetitive effects, or whether the buyer attached little weight to the statements and instead regarded them as biased and self-serving." *Id.* (quoting *RTI*, 842 F.3d at 895). In cases where the relevant customers are sophisticated, the latter is more likely. *Id.* The customers at issue in *RTI* were sophisticated parties: hospitals and group purchasing organizations that used multidisciplinary committees which had experience with the competing products. *Id*. (citing *RTI*, 842 F.3d at 896).

The Fifth Circuit noted three circuit courts had "adopted the *de minimis* presumption [that false advertising has only a *de minimis* effect on competition], along with variations on a six-part

test that a plaintiff must satisfy to support an antitrust claim premised on false advertising." *RTI*, 842 F.3d at 895-96 (citations omitted) (noting that despite variations among the circuits, "the basic intent of each court is to create a sharp distinction between ordinary false advertising torts and a defendant's course of conduct that could actually exclude competition"). The court held RTI did not satisfy *Stearns* or any relevant test that circuit courts have devised to render false advertising claims cognizable under the antitrust laws. *Id.* at 897. Similarly, the Court in *Red Lion*, in ruling on the parties' **post-trial** motions, found the plaintiffs' "disparagement-based claim, which amount[ed] to Plaintiffs' claim regarding GE's marketing materials sent directly to customers, fail[ed] for lack of evidentiary support." *Red Lion*, No. 2:15-cv-308-RWS (E.D. Tex. Mar. 30, 2018), Dkt. No. 247 at 41.

Dexon readily distinguishes both *RTI* and *Stearns*. First, Dexon points out the advertisements in the *RTI* case (which were alleged to be in violation of the Lanham Act) were "out in the open and subject to corrective responsive advertising, rather than the customer-specific and private FUD at issue in this case." Dkt. No. 378 at 5. Here, Dexon has presented evidence of "direct communications from a monopolist's employees to customers specifically designed to thwart purchases [from] lower cost competitors." Dkt. No. 355 at 19. Unlike in *RTI*, Cisco's alleged FUD has been mostly private, leaving Dexon unable to effectively "counter with its own advertising." *Id.* According to Dexon, Cisco's FUD is often "incapable of being verified or disproven (e.g., that purchasing from Dexon 'may' put a customer's network at risk) and has been done by a monopolist that is the only company that is in a position to provide maintenance services that a customer may need (by Cisco's design)." *Id.* at 19-20 (emphasis original). It is true that sometimes customers would relay Cisco's FUD statements back to Dexon, allowing a response.

136

But even in those cases, Cisco does not adequately analogize advertising to personal and direct communication with customers.

Dexon further points out the Fifth Circuit in *RTI* distinguished its prior decision in *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983) because that case involved a conspiracy by Samuel Moore with three industry manufacturer-distributors to prevent Multiflex from accessing the channels of distribution. *RTI*, 842 F.3d at 895, n. 3 (citing *Multiflex*, 709 F.2d at 988). According to the court in *RTI*, this conduct would have excluded Multiflex—Samuel Moore's only other competitor—from the market by preventing Multiflex from reaching the end-users of its product because the end-users made their purchases of hydraulic hoses exclusively through the three manufacturer-distributors. *Id.* (citing *Multiflex*, 709 F.2d at 984, 988). Therefore, the "false and disparaging statements made by Samuel Moore to Multiflex's bankers and customers about the firm's solvency and product quality, *id.* at 991–92, 994 n.14, were anticompetitive because these statements were part and parcel of the conspiracy that threatened to cut off Multiflex—its only other competitor—from the channels of distribution." *Id.* However, in the *RTI* case, the defendant's false advertising had no comparable potential to eliminate competition. *Id.* Here, Dexon alleges Cisco engaged in a conspiracy designed to "thwart a channel of independent resellers," Dkt. No. 355 at 20, which Cisco viewed as a threat to its pricing.

Second, Dexon points out the defendant's challenged tactics/sales pitches in *Stearns*, although possibly "wrong, misleading, or debatable," were all "arguments on the merits, indicative of competition on the merits." *RTI*, 842 F.3d at 894 (quoting *Stearns*, 170 F.3d at 523–25). Whereas the defendant in *Stearns* competed on the merits, Dexon asserts (and presents evidence) that Cisco's FUD constitutes threats that are not indicative of competition on the merits. *See* Dkt. No. 378 at 1-2 ("When Cisco employs FUD, it is not extolling the virtues of its products (hence

CDW's disapproval of it), but rather it is using its service monopoly to threaten either legal action, or that it will not support their networks unless customers make the 'right' choice.").

Dexon also distinguishes *Red Lion*, both procedurally and on the merits. In that ruling following trial, the Court held that "a single statement from Plaintiffs' expert that the statements rendered customers less likely to secure Plaintiffs' services—without more—does not amount to evidence of harm or potential for harm to competition." *Red Lion*, No. 2:15-cv-308-RWS (E.D. Tex. Mar. 30, 2018), Dkt. No. 247 at 41. Here, Dexon's antitrust claim is based on more than just "marketing materials sent directly to customers." According to Dexon, Cisco "implicitly threatens that Cisco will leverage its service monopoly to punish customers in the future, either through litigation or service refusal." Dkt. No. 378 at 7.

In support, Dexon relies on *Arista Networks, Inc. v. Cisco Sys., Inc*., No. 16-cv-00923-BLF, 2018 WL 11230167 (N.D. Cal. May 21, 2018), a case in which the district court found that the *RTI* test (known as the *Harcourt Brace* test in the Ninth Circuit) did not apply because the issue was not about supposedly disparaging comments regarding a rival but rather direct communications to customers which "constituted a reversal of the purported open-CLI policy and amounted to exclusionary conduct." *Id*. at *12 -*13 ("Arista counters that *Harcourt Brace* is inapplicable because it is not arguing that Cisco made disparaging statements."). According to Dexon, Cisco uses references to litigation as an anticompetitive weapon to inflict FUD on its competition. Dkt. No. 378 at 6 (citing *Arista*, 2018 WL 11230167, at *13).

As explained by Dexon, Cisco's alleged FUD to preclude the independent channel includes statements (1) that sales from the independent channel are fraudulent (Dkt. No. 355-19 at 2, 355-21 (Cisco letter to ███████ stating "Dexon is misrepresenting themselves as an authorized reseller and any unlicensed Cisco branded hardware purchased from them could result in a significant

138

liability to the district"); (2) that sales from the independent channel "may not come with a valid software license or hardware warranty," or (3) that "use of [Cisco's] copyrighted materials may result in [customers such as ███████] running afoul of Cisco's intellectual property rights." (Dkt. No. 355-24, Dkt. No. 355-25). This type of effective threat of litigation was used at ████.

As Cisco's own emails to █████ illustrate, Dan Roberts, Jr. of Cisco claimed that "any unlicensed Cisco branded hardware purchased from [Dexon] could result in a significant liability to the district." Dkt. No. 355-21 (CISCO00003852). When asked about this threat at his deposition, Roberts confirmed that he would be speculating as to what he was thinking at the time, and he was not aware of any potential lawsuit that Cisco was contemplating bringing against █████ at the time. Dkt. No. 378-9 (Roberts Dep. Tr.) at 216:21–217:14. As urged by Dexon, "[t]hese are the types of threats and innuendo that is precisely not competition on the merits, but rather is being communicated solely to coerce the customer from making a decision on the merits." Dkt. No. 378 at 6.

Similar to the court in *Arista*, the Court does not find Dexon's FUD-based theory foreclosed by the test in *RTI*.  Nor does the Court find Dexon's FUD-based theory unsupported by evidence.

**b.  Whether Cisco's software audits are anticompetitive**

According to Maness, as part of Cisco's end-user license agreement ("EULA"), Cisco asserts the right to audit customers to ensure they follow Cisco's software license terms. Maness Opening Report, ¶ 84. Maness opines the audits can be "invasive and costly" for the customer, and for Cisco, "the audits are a means to limit intrabrand competition and generate additional revenue opportunities." *Id.* (providing as an example a February 2019 internal presentation titled "Software

Services Compliance Reviews," wherein Cisco highlights how customer "liability" identified in audit investigations can be leveraged to extract additional revenue).

Cisco argues its software audits are lawful because its industry-standard EULA authorized audits – "if a customer uses software beyond the scope of its license (a copyright violation), then it may owe fees." Dkt. No. 366 at 6. Cisco states Maness acknowledged that Cisco discloses to end users the information regarding Cisco's software audits under its EULA before the end users begin using Cisco software. Dkt. No. 326 at 22-23 (citing Dkt. No. 326-6 (Maness Dep. Tr.) at 59:5-10 (testifying it would be reasonable for customers to take into account the risk of a software audit in considering the cost of buying from Dexon)). According to Cisco, Maness also testified that the mere fact that Cisco can audit a customer on its own would not be anticompetitive. *Id*. at 23 (citing Dkt. No. 326-6 (Maness Dep. Tr.) at 88:7-13, 103:9-20). However, in other parts of his deposition, Maness made clear that what makes Cisco's audits anticompetitive is the manner and circumstances in which they are carried out. Dkt. No. 355-58 (Maness Dep. Tr.) at 88:15-18 ("Q: Okay. So it would be the manner of implementation of the audit that would potentially make it anticompetitive? A: Correct.").

Cisco argues discounts (agreeing to forgo fees to which a seller is entitled as part of a negotiated sale for additional equipment) are categorically lawful unless they are predatory – something Dexon does not show. Dkt. No. 326 at 24 (citing *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 223 (1993); also citing *Stearns*, 170 F.3d at 527-28 ("The Supreme Court has expressed extreme skepticism of predatory pricing claims. The central difficulty with such actions is that the conduct alleged is difficult to distinguish from conduct that benefits consumers. . . . Accordingly, the standard for inferring an impermissible predatory pricing scheme is high.")). In response, Dexon argues as follows:

Cisco is using the threat of legal action in order to extract exclusionary settlement terms that foreclose customers' ability to benefit from independent resellers and competitors. [Maness Opening Report, ¶¶ 84-92]. Thus, Cisco's practice is more akin to that of an anticompetitive settlement, in which the settlement terms themselves unreasonably restrict competition and harm consumers. *See FTC v. Actavis*, 133 S.Ct. 2223, 2234-35 (2013) (discussing settlement term in which a settling party agrees not to enter the market for an agreed upon period of time). As the Third Circuit appropriately noted, anticompetitive conduct "can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 (3d Cir. 2010). Here, there is no question that this practice did not benefit consumers at all, as Cisco itself acknowledged. (Reichenberg Decl. Ex. 58 ("CISCO00297821"), at 8) ("The idea that this could take somewhere between 3 months and 3 years has the customer very uncomfortable because of the IT labor constraints that they are under.") Rather, Cisco's documents show that this brand protection practice was used to gain sales that Cisco would not have made in the absence of its legal threat.

Dkt. No. 355 at 22.

In its reply, Cisco calls Dexon's argument based on *Actavis* – a case concerning a reverse-payment settlement – "nonsense" because such settlements bear no resemblance to giving a customer a discount on licensing fees owed as part of the customer's purchase of Cisco gear. Dkt. No. 366 at 6. Cisco asserts it "has never asked any customer facing an audit to agree to buy only Cisco or even only authorized gear in the future; and, of course, these sophisticated customers have the option of paying the licensing fees they owe." *Id.* Thus, according to Cisco, this is not an antitrust issue. *Id.*

In its surreply, Dexon states the plain terms of Cisco's audit settlement agreements confirm otherwise:



[In the ▮▮▮▮ settlement agreement:] ▮▮▮▮ commits to purchase <u>Cisco products and services</u> from the Cisco <u>authorized</u> reseller of its choice in the minimum amount of ▮▮▮▮ and per the schedule noted in Appendix E.

[In the ▮▮▮▮ settlement agreement:] ▮▮▮▮ will continue to work in good faith and in strong alignment with the Cisco Account Team to purchase <u>Cisco products, services, or solutions</u> ("Cisco Products") from the Cisco <u>authorized</u>

reseller of its choice in the minimum amount of ████████ on or before March 15, 2021 and per the schedule noted in Appendix D.

Dkt. No. 378 at 8 (citing Dkt. No. 355-42, 355-47) (emphasis added by Dexon). Cisco audit team lead Naser Samaenah confirmed that these settlement commitments referenced in the ordinary course were specific to Cisco products. Dkt. No. 378-8 (Samaenah Dep. Tr.) at 231:21-232:2.

According to Dexon's expert on brand protection and anti-counterfeiting, Denise Mosteller, these audits are not used to ensure compliance, but rather to leverage commitments out of customers to preserve Cisco's monopolies. Dkt. No. 355-14 (Mosteller Rebuttal Report), ¶ 39; Dkt. No. 355-46 (CISCO00728763) at 10, 15-17. Dexon has also presented evidence that Cisco employees have internally discussed the "disrupt[ion of] the business model" of the independent channel. Dkt. No. 355-7 (CISCO00726727) at 3 (June 1, 2020 email thread summarizing an achievement of the Software Compliance Program and audit process being that it is "significantly disrupting the business model of Grey market suppliers");[61] *see also* Dkt. No. 355-6 (Samaenah Dep. Tr.) at 187:6-188:4 (testifying this statement was summarizing the achievement of "creating that awareness in the market that Cisco is a software company" and that any products sold should be sold with a valid software license). According to Dexon, these facts further undermine any proffered justification and are not competition on the merits. Dkt. No. 378 at 8-9. The Court finds there is a genuine issue of material fact as to whether Cisco – through its audit process – forced its customers into settlement agreements that would prevent them from purchasing competitive products from competitors and the independent channel.

---

[61] Dexon further asserts the record confirms Cisco's internal awareness that there were several hundred in independent trade group UNEDA alone. Dkt. No. 355-8 (CISCO00554666) at slide 5, n.6 (UNEDA alliance contains 300+ aftermarket dealers representing both small and large players in the secondary market).

Finally, Cisco argues Dexon has only a single example of a Dexon customer (██████) subject to audit. Dkt. No. 326 at 23. According to Cisco, "Dexon has no explanation for how this example (or even the ███████' software audits that Cisco conducts annually out of tens of thousands of end users) harmed competition." *Id*. (noting ██████ still buys some Cisco gear from Dexon post-audit). In response, Dexon points out another example unaddressed by Cisco's motion, wherein "the audit was explicitly used to prevent the customer [███████] from purchasing from a Cisco competitor." Dkt. No. 355 at 22 (citing Dkt. No. 355-46, Dkt. No. 355-47  at 1-2) (Cisco withdrawing its legal claims in exchange for a purchase of a minimum of ██████ worth of only Cisco products). Based on this evidence, Maness opines Cisco's audits harmed intrabrand competition. Maness Opening Report, ¶¶ 117-18.

The Court, having carefully considered the above evidence in the light most favorable to Dexon and having drawn all reasonable inference therefrom, finds sufficient evidence to create a genuine issue of material fact as to exclusionary conduct with respect to Cisco's audits.

## VII.   ANTITRUST INJURY WITH RESPECT TO THE SURVIVING COUNTS

Cisco asserts that "[a]ll of Dexon's claims fail because it cannot establish a triable question of fact as to antitrust injury." Dkt. No. 326 at 27-30. CDW likewise argues all of Dexon's claims fail for the same reason. Dkt. No. 328 at 28-30. Defendants raise this argument as a global issue, rather than addressing Dexon's claims count-by-count. The undersigned agrees with Defendants that Dexon has not shown antitrust injury for its § 1 claims, for the reasons stated in those sections. However, Dexon readily shows a triable issue of fact as to antitrust injury on the remaining § 2 claims – Counts II, IV, V, and the corresponding portion of Count VI.

## A. Applicable law

Antitrust injury is a component of antitrust standing. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022). Antitrust standing, in turn, is a judicially-created set of threshold requirements that a private plaintiff must show before a court can entertain its antitrust claims. *Id*. (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 & n.31 (1983)). The three antitrust standing requirements are "1) injury-in-fact, [i.e.,] an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit."[62] *Id.* (quoting *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (citing *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009))).

The second component of antitrust standing, antitrust injury, requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and . . . flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The injury should reflect "the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." *Anago, Inc. v. Tecnol Med. Products, Inc.*, 976 F.2d 248, 249 (5th Cir. 1992) (citing *Brunswick,* 429 U.S. at 489).

---

[62] These requirements, which supplement Article III standing requirements, ensure that successful antitrust claims only redress the types of harm that antitrust law was designed to prevent, rather than create a fortuitous windfall for all parties proximate to the defendant, regardless of whether they were injured by anticompetitive conduct. *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 563 F. Supp. 3d 578, 589 (W.D. La. 2021), *aff'd*, 49 F.4th 520 (5th Cir. 2022) (citing *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 535 (1983)).

**B. Analysis**

The majority of Defendants' arguments addressing antitrust injury concern whether there is sufficient evidence of anticompetitive marketwide impact. *See*, *e.g.*, Dkt. No. 326 at 29-30 (Cisco arguing Dexon "has no evidence that any injury it suffered reflects harm to competition among the thousands of resellers of Cisco equipment."); Dkt. No. 331 at 29-30 (CDW arguing there is no evidence of "marketwide anticompetitive impacts on pricing, output, or quality," or that it forced any other competitor out of the market and claiming Dexon's claim for $13 million in lost sales is *de minimis* given that amount represents less than 1% of CDW's sales of Cisco equipment and approximately .05% of Cisco's total sales).

As explained with respect to Count I above, the undersigned agrees with CDW that Dexon does not provide evidence showing the Cisco-CDW conspiracy to restrain trade harmed competition. For that same reason, CDW is correct that Dexon does not show antitrust injury with respect to Count I. The undersigned also agrees with Cisco that focusing on the tying allegations of Count III, Dexon does not sufficiently show it suffered an antitrust injury resulting from that alleged conduct alone.

However, Counts II, IV, and V (concerning § 2 claims) are a different story. According to the Fifth Circuit, Sherman Act § 2, which prohibits monopolies and attempted monopolies, "does not explicitly require a plaintiff to prove an injury to competition; the plaintiff must prove only the existence of monopoly power and the willful continued maintenance of that power."  *Walker v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984). Injury to competition is presumed by proof of the elements of monopolization. *Id*.; *see also Major Mart, Inc. v. Mitchell Distrib. Co*., 46 F. Supp. 3d 639, 662 (S.D. Miss. 2014). Dexon has shown a fact issue as to whether CDW conspired with Cisco to monopolize the relevant markets. Proving Cisco's monopoly power in that

market and its willful maintenance of that power would be enough to establish injury to competition. *Walker*, 747 F.2d 1013.

That being said, the requirement of antitrust injury – that the injury to Dexon "flowed from" or reflected the presumed anticompetitive effects resulting from Defendants' alleged monopolization – is not inconsistent with the presumption of injury to competition in § 2 cases. *Walker*, 747 F.2d at 1015. Therefore, with respect to the surviving § 2 claims, the Court only considers Defendants' "antitrust injury" arguments which challenge whether Dexon has adduced evidence sufficient to raise a genuine dispute of material fact concerning the existence of such injury to Dexon. *See id.*

For surviving Counts II, IV, and V, Dexon sufficiently shows Defendants' alleged conduct caused it harm by preventing it from making sales and suffering goodwill and reputation losses.[63] Dkt. No. 355 at 14-15, 24-27; Dkt. No. 356 at 11, 24-26. Defendants' arguments to the contrary are unpersuasive.

Starting with CDW, CDW first argues that Dexon at most complains of "interfere[nce]" with sales at specific customers and that the specific customers Dexon identifies both "independently chose not to purchase from Dexon." Dkt. No. 331 at 29. But that shows only a factual dispute considering Dexon's countervailing evidence discussed throughout this Report. CDW's argument that the evidence merely shows that CDW "competed for, and won, customer sales that Dexon wanted" is CDW's own view, but the Court must consider the evidence in the light most favorable to Dexon. Dkt. No. 331 at 30.

---

[63] Defendants move to strike Dexon's claim for general reputation harm. Dkt. No. 328. The Court need not resolve that here because Dexon also shows it lost sales due to Defendants' alleged conduct.

CDW next argues "Dexon's sales of Cisco and non-Cisco products increased" during the alleged conspiracy, and relatedly, that Dexon was able to purchase Cisco equipment from other suppliers. Dkt. No. 331 at 28-29. However, the question is whether Dexon suffered harm, not whether that harm was so extensive that Dexon's total sales decreased. In any event, there is a factual dispute as to whether Dexon's sales decreased. Maness explains Cisco's sales also increased in the damages period, and thus as a relative measure, Dexon's sales were less. Maness Reply Report, ¶ 123.

CDW's final point, that the $13 million in lost sales due to the alleged conspiracy is too small to affect intrabrand competition, Dkt. No. 331 at 30, confuses harm to competition with harm to Dexon. The $13 million is the damages Dexon claims from the harm it suffered from the alleged monopolistic behavior, not the entirety of the marketwide harm. Importantly, Dexon's claim for damages is tied to its injuries that directly flow from what makes Defendants' conspiracy unlawful.

Turning to Cisco's arguments, Cisco first argues Dexon's real complaint is that it "should have sold even more Cisco equipment," which is not an injury that flows from harm to competition. Dkt. No. 326 at 28. Dexon persuasively responds, with supporting evidence, that Cisco's actions foreclosed intrabrand competition that would have challenged Cisco's ability to charge supracompetitive prices and that those actions harmed Dexon. *See* Dkt. No. 355 at 24.

Cisco's citation to *Walker* does not support its argument that Dexon's complaint about lost sales of Cisco equipment is insufficient. Dkt. No. 326 at 29. In *Walker*, the Fifth Circuit held that although the plaintiff had standing to withstand summary judgment (Walker alleged an injury that was both direct and measurable and that would not duplicate potential recoveries by U-Haul competitors), the plaintiff did not present sufficient evidence of antitrust injury:

> To demonstrate, in opposition to a motion for summary judgment, that his business injury flowed from this anticompetitive impact on that business, Walker must

submit some evidence from which the district court might conclude that U-Haul committed acts that furthered a monopolistic scheme to eliminate competitors and competing products from the retail rental market in Jackson, Mississippi. In the trial court, **Walker alleged vaguely that "for the purpose of monopolizing or attempting to monopolize the retail truck and trailer rental market in Jackson, Mississippi," U-Haul raised Walker's rent to a level that forced Walker to surrender his moving center dealership and vacate the premises. However, as discussed in our original opinion, Walker made no mention in the lower court of how U-Haul's termination of a single agent for its own services (Walker) was intended to or would in fact affect the competing services that might be offered by other truck and trailer renters, the interbrand, as opposed to the intrabrand, market. The termination of Walker as an agent for U-Haul eliminated only an intrabrand competitor. Neither in the complaint nor otherwise in the lower court has Walker set forth how U-Haul's acts furthered a monopolistic scheme to eliminate the competition of Ryder, Hertz, or other brands from the "retail truck and trailer rental market." Walker not only did not make sufficient allegations of a specific monopolistic scheme, but he also failed to adduce evidence sufficient to raise a genuine dispute of material fact concerning the existence of such a claim.** Walker has not therefore established a factual basis for the prerequisite of antitrust injury. Absent **some evidence** of this prerequisite to recovery in the affidavits or depositions filed in opposition to the motion for summary judgment, Walker has failed to demonstrate a basis from which a fact trier might conclude that he suffered antitrust injury. Finally, we reiterate the observations in our original opinion: Walker has failed to adduce sufficient evidence that U-Haul engaged in forbidden monopolizing conduct.

*Walker*, 747 F.2d at 1015–16 (internal footnotes omitted) (emphasis added). As explained above, while Cisco (and CDW) has marshalled strong factual narrative countering Dexon's examples of harm, the undersigned cannot conclude Defendants have shown an absence of a factual dispute on this issue as was the case in *Walker*.

Having considered and rejected Defendants' antitrust injury arguments regarding the remaining § 2 claims, the Court recommends Defendants' summary judgment motions on the § 2 conspiracy claims (Count II and any corresponding portion of Count VI) and Cisco's summary judgment motion on the § 2 monopolization and attempted monopolization claims (Counts IV and V and any corresponding portion of Count VI), which include evidence of bait and switch, FUD, and audits, be denied.

## VIII.   RECOMMENDATION

Based on the foregoing, it is

**RECOMMENDED** that Defendant CDW Corporation's Motion to Dismiss Counts II and VI of the Amended Complaint (Dkt. No. 189) be **DENIED** and that Defendant CDW Corporation's Motion for Summary Judgment (Dkt. No. 331) be **GRANTED IN PART and DENIED IN PART**. It is further

**RECOMMENDED** that Defendant Cisco Systems, Inc.'s Federal Rule of Civil Procedure 56 Motion for Summary Judgment as to All Claims (Dkt. No. 326) be **GRANTED IN PART and DENIED IN PART**.

Specifically, the undersigned recommends CDW's summary judgment motion be granted on the discrete issue of fraudulent concealment but that, due to the necessary credibility determinations, the issue of CDW's specific intent to monopolize be considered in light of a full factual record at trial. The undersigned recommends Defendants' summary judgment motions be granted as to Dexon's § 1 conspiracy claim (Count I and any corresponding portion of Count VI) and § 1 tying claim (Count III and any corresponding portion of Count VI). Otherwise, the Court recommends Defendants' summary judgment motions (as to the § 2 claims) be denied.

### Objections

Within fourteen (14) days after service of the magistrate judge's report, any party must serve and file specific written objections to the findings and recommendations of the magistrate judge.  28 U.S.C. § 636(b)(1)(C). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed

determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

SIGNED this the 30th day of December, 2023.

_____
J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE

150