**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

DEXON COMPUTER, INC.,             §
                                  §
              Plaintiff,          §
                                  §        CASE NO. 5:22-CV-00053-RWS-JBB
v.                                §
                                  §
CISCO SYSTEMS, INC. AND CDW       §
CORPORATION,                      §
                                  §
              Defendants.         §
                                  §

## <u>ORDER</u>

Before the Court are Plaintiff Dexon's Objections (Docket No. 503) and Defendant Cisco's

Objections (Docket No. 504) to the Magistrate Judge's Report and Recommendation (Docket No.

474, the "R&R"). The objections have been fully briefed. Docket Nos. 509, 510.

As an initial matter, after the R&R was entered, Plaintiff Dexon and Defendant CDW

reached a settlement agreement in principle (*see* Docket No. 496) and CDW filed an unopposed

motion to withdraw (Docket No. 511) the CDW-only portions of its motion to dismiss and motion

for summary judgment (Docket Nos. 189, 331). CDW does not request that the Court set aside,

abrogate, or vacate any portion of the R&R. Docket No. 511 at 2; Docket No. 511-1. Having

considered CDW's motion to withdraw, and because it is unopposed, CDW's motion to withdraw

(Docket No. 511) is **GRANTED** and the CDW-only portions of CDW's motion to dismiss and

motion for summary judgment (Docket Nos. 189, 331) are **WITHDRAWN** to the extent that they

have not been relied upon, adopted, incorporated, or argued by Cisco and subject to the parties'

agreement mentioned in Docket No. 511. Accordingly, this Order does not address the CDW-only

portions of CDW's motion to dismiss and motion for summary judgment, other than to provide context in its adoption of the R&R.

For the reasons set forth below, Dexon's Objections (Docket No. 503) and Cisco's Objections (Docket No. 504) are **OVERRULED**, the R&R (Docket No. 474) is **ADOPTED** as the opinion of the District Court, CDW's Motion to Dismiss (Docket No. 189) is **DENIED**, and Defendants' Motions for Summary Judgment (Docket Nos. 326, 331) are **GRANTED-IN-PART** and **DENIED-IN-PART** consistent with the R&R's recommendations. *See* Docket No. 474 at 149.

## BACKGROUND

Plaintiff Dexon filed this antitrust case in the U.S. District Court for the Eastern District of Texas, Texarkana Division. Plaintiff alleges Defendant Cisco is a monopolist in several worldwide and U.S. markets related to networking equipment and services for the Internet and locks in customers who require maintenance with Cisco's SMARTnet program to make supracompetitive purchases of routers and Ethernet switches. *See, e.g.*, Docket No. 1 (Original Complaint) ¶¶ 23–49. Plaintiff claims that Cisco employed fear, uncertainty, and doubt ("FUD") tactics to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. *Id.* ¶ 67. According to Plaintiff, in carrying out its scheme, Cisco conspired with Defendant CDW to sell Cisco equipment in the Relevant Networking Markets to maintain its supracompetitive pricing in those Markets and exclude other resellers from making sales in the Relevant Networking Equipment Markets to end-user customers in violation of federal and state antitrust laws. *Id.* ¶¶ 56–57.

Plaintiff asserts the agreement between Defendants Cisco and CDW reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of

the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g.*, *id*. ¶¶ 87–100. Plaintiff also asserts claims under Section 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under Section 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets and for unlawful attempted monopolization of the Relevant Product Markets against Cisco, and under the Texas Free Enterprise and Antitrust Act against Cisco and CDW. *Id.* ¶¶ 87–128. Plaintiff seeks injunctive relief, damages, and costs in connection with such violations.

The Magistrate Judge issued a 150-page R&R. Docket No. 474. After setting forth the legal standards and more than 40 pages of material facts as discerned from the parties' voluminous evidentiary submissions, R&R at 7–52, the Magistrate Judge provided the applicable law as to Sherman Act § 1 claims, noting that Dexon alleges in Count I a § 1 violation against Cisco and CDW for conspiring to restrain trade and in Count III a § 1 violation against Cisco for illegal *per se* tying. *Id.* at 52–53. The Magistrate Judge then provided the applicable law as to Sherman Act § 2 claims, noting Dexon alleges in Count II a Sherman Act § 2 claim against Cisco and CDW for conspiracy to monopolize and, in Counts IV and V, Sherman Act § 2 claims against Cisco for monopolization and attempted monopolization. *Id.* at 53–54.

The R&R recommends that CDW's motion to dismiss (Docket No. 189) be denied and Defendants' motions for summary judgment (Docket Nos. 326, 331) be granted-in-part and denied-in-part. Docket No. 474 at 149. Specifically, the R&R recommends CDW's summary judgment motion be granted on the discrete issue of fraudulent concealment but that, due to the necessary credibility determinations, the issue of CDW's specific intent to monopolize be considered in light of a full factual record at trial. The undersigned recommends Defendants' summary judgment motions be granted as to Dexon's § 1 conspiracy claim (Count I and any

corresponding portion of Count VI) and § 1 tying claim (Count III and any corresponding portion of Count VI). Otherwise, the R&R recommends Defendants' summary judgment motions (as to the § 2 claims) be denied. *Id.*

Both Dexon and Cisco have filed objections to the R&R (Docket Nos. 503, 504). The parties responded to each other's objections. Docket Nos. 509, 510.

## LEGAL STANDARD

### I.   Standard of Review

A district court conducts a *de novo* review of any portion of a magistrate judge's report and recommendation to which any party files an objection. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); *Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000). After conducting a *de novo* review, the district court may accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3).

### II.   Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). "A court considering a motion for summary judgment must consider all facts and evidence in the light most favorable to the nonmoving party." *Id.* (quoting *Haverda v. Hays Cty.*, 723 F.3d 586, 591 (5th Cir. 2013)). "However, to avoid summary judgment, the non-movant must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." *Id.* (quoting *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir. 2007)).

In general, summary judgment requires inferences drawn from the underlying facts to be viewed in the light most favorable to the nonmovant. *Acad. of Allergy & Asthma in Primary Care*

*v. Louisiana Health Serv. & Indem. Co.*, No. CV 18-399, 2023 WL 8185692, at *4 (E.D. La. Nov. 27, 2023). However, in the context of an antitrust conspiracy case, the Supreme Court has cautioned that "antitrust limits the range of permissible inferences from ambiguous evidence." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 312 (5th Cir. 2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Without direct evidence of an unlawful conspiracy, a court must consider conspiracy claims under the stricter standard required for Sherman Act § 1 claims based on circumstantial evidence: whether the evidence in the record tends to exclude the possibility that the defendants acted independently. *Acad. of Allergy & Asthma*, 2023 WL 8185692, at *8 (citing *Matsushita*, 475 U.S. at 587–88).

## DISCUSSION—*DE NOVO* REVIEW

### I.     Cisco's Objections

#### A.     *Whether there is a genuine issue of material fact as to whether Cisco engaged in anticompetitive conduct*

Cisco objects to the R&R's finding that a genuine issue of material fact exists as to whether Cisco engaged in anticompetitive conduct. Docket No. 504 at 1–2.

*First*, Cisco argues that the alleged FUD tactics cannot support Dexon's monopoly claims. *Id.* at 2. Cisco argues the R&R erred in interpreting *Stearns* and *Retractable* to only involve advertisements out in the open and subject to corrective responsive advertising. Docket No. 504 at 2 (citing *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883 (5th Cir. 2016)). But Cisco makes too much of *Stearns*'s discussion of "arguments" made to potential customers (*see Stearns*, 170 F.3d at 524–25), which has since been clarified by *Retractable* to relate more to false advertising than private communications to customers. *See Retractable*, 842 F.3d at 894–95. And Cisco fails to show that

the customer-specific and private communications to potential customers alleged as FUD here are similar enough to *Retractable*'s advertising materials with false information. *Id.*; R&R at 137 ("Cisco does not adequately analogize advertising to personal and direct communication with customers"). Indeed, the R&R correctly found that the private customer-specific communications, as alleged, do not strictly constitute a false advertising claim that is foreclosed from serving as alleged FUD to show antitrust conduct.

Cisco also contends that "neither the R&R nor Dexon identify a single customer for which Dexon did not counter" the alleged FUD. Docket No. 504 at 3. Cisco explains that "whether statements are made openly matters because an antitrust plaintiff can counter or correct, which *Retractable* recognizes as a part of competition." *Id.* But even assuming *arguendo* that Dexon has failed to identify a single customer for which Dexon did not counter, the R&R would still have correctly rejected Cisco's attempt to frame all of its customer-specific and private communications to potential customers as mere "direct-to-consumer advertising." *See* R&R at 134, 137. Otherwise, if Cisco's argument was accepted and all their customer-specific and private communications to potential customers could simply be categorized as advertising, that would impose too high a bar at summary judgment to support an allegation of FUD. Moreover, Dexon points to at least one instance of alleged FUD where Dexon argues that it was deprived of any opportunity to respond. *See* Docket No. 510 at 3 n.1.

Cisco argues that the alleged FUD cannot support the monopoly claims because Cisco provides customers only truthful information about its policies and Dexon's practices, and Dexon does not present evidence otherwise. *Id.* at 2–4. Cisco contends that threats of unspecified legal action cannot be anticompetitive as a matter of law. *Id.* at 4. But the alleged FUD is broader than just threats of unspecified legal action. *See, e.g.*, R&R at 32–33 (describing an example of

communications by Cisco that vaguely allude to risks, dangers, and vulnerabilities). And Dexon contests whether the alleged vague FUD statements are capable of being verified or disproven. *See* Docket No. 510 at 3. Even assuming the alleged FUD statements could be verified or disproven, the Court declines to take over the role of the factfinder at summary judgment, weigh the evidence, or find whether any vague statements by Cisco are true or false.[1]

Cisco further argues that if the R&R evaluates "supposed 'FUD' conduct (spreading information about Dexon) together with other conduct (such as service 'tying' or the audits discussed below) it commits legal error." Docket No. 504 at 4. However, the R&R does no such thing. Even assuming *arguendo* that (1) Cisco's legal argument is correct and (2) the R&R evaluates these types of conduct (FUD, audits, and bait-and-switch) together for the purpose of damages, the R&R does not necessarily evaluate them together for the purpose of liability. Moreover, Cisco's argument highlights that, even if the alleged FUD could not support Dexon's monopoly claims, the alleged (1) audit conduct and (2) bait-and-switch conduct would each independently provide additional reasons not to dispose of this case at summary judgment. Overall, the R&R correctly found that the alleged FUD can support Dexon's monopoly claims.[2]

---

[1] Cisco also discusses *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983), in relation to its argument. Docket No. 504 at 3. Cisco points out distinctions between *Multiflex* and the instant case. *Id.* But as Dexon points out, "Cisco does not address that the R&R discussed *Multiflex* for purposes of illustrating anticompetitive conduct taken as part of a conspiracy to eliminate a competitor." Docket No. 510 at 3. Instead, Cisco seemingly fails to challenge the R&R's finding that the alleged FUD statements by Cisco may not reflect competition on the merits if Dexon is correct that they do not extol the virtues of Cisco's products. *See* Docket No. 510 at 3–4 (discussing R&R at 137–38).

[2] It also bears noting that *Red Lion Med. Safety, Inc. v. Gen. Elec. Co.*, No. 2:15-cv-00308, Docket No. 247 (E.D. Tex. Mar. 30, 2018), which Cisco cites in support of its arguments, addresses post-trial motions, not the summary judgment standard.

*Second*, Cisco argues that its resolution of software audits cannot support a Sherman Act § 2 claim. Docket No. 504 at 5–6. Cisco describes the audits at issue as "scant" and argues that they cannot serve as evidence to support Dexon's monopoly claims. *Id.* But, even if they are scant, the R&R correctly found that those audits serve as evidence and that a genuine issue of material fact exists.

*Third*, Cisco argues that conduct allegedly similar to tying cannot support the monopoly claims. Docket No. 504 at 6–7. Cisco contends that these separate theories must be separately analyzed. *Id.* at 6. But even assuming Cisco's contention is correct, Cisco fails to show how the R&R errs by allowing Dexon to introduce evidence with probative value because it presumes that would cause separate theories of antitrust conduct to be improperly analyzed. *See id.* at 6–7. However, the Court acknowledges Cisco's reservation of its right to request a jury instruction on the issue. *See id.* at 7. And of course, Cisco may object to any proffered evidence at trial on the basis of relevance or confusion of the issues.

Accordingly, the R&R correctly found that a genuine issue of material fact exists as to whether Cisco engaged in anticompetitive conduct.

        B.    *Whether there is a genuine issue of material fact as to whether Dexon sustained any antitrust injury*

Cisco objects that there is no genuine issue of material fact that Dexon has not shown antitrust injury. Docket No. 504 at 7–8. Cisco contends that Dexon adduced no evidence of an interbrand original equipment manufacturer ("OEM") rival that lost a sale because of Cisco's alleged conduct or that such alleged competitive harm injured Dexon. *Id.* at 7. Cisco argues that Dexon cannot logically show Cisco harmed interbrand competition among OEM rivals and thereby injured Dexon because Dexon's damages theory is that, but for the alleged conduct, Dexon would have sold even more Cisco equipment. *Id.* at 8. Dexon responds, pointing out that it submitted

evidence and expert testimony to demonstrate harm to Dexon caused by Cisco's anticompetitive efforts to destroy the independent channel. Docket No. 510 at 6–7. Dexon also argues that Cisco's repeated claim that Dexon wanted to sell even more Cisco equipment does not address the R&R's finding that Dexon "persuasively respond[ed], with supporting evidence, that Cisco's actions foreclosed intrabrand competition that would have challenged Cisco's ability to charge supracompetitive prices and that those actions harmed Dexon." *Id.* at 7; R&R at 147. Here, the Court ultimately agrees with Dexon's arguments and the R&R's findings that (1) antitrust injury to the competition can be presumed[3] at this stage of the case by Dexon's raising of a genuine issue of material fact as to anticompetitive conduct under § 2 of the Sherman Act (*see* R&R at 145–46) and (2) that Dexon has shown a genuine issue of material fact exists as to whether the alleged anticompetitive conduct harmed Dexon (*see* R&R at 147–48).

## II. Dexon's Objections

### A. Whether the testimony of Dr. Maness creates a genuine issue of material fact as to marketwide harm

In its objections, Dexon argues the R&R improperly weighed the uncontroverted findings of marketwide harm by its economic expert, Dr. Maness. Docket No. 503 at 3. Dexon asserts that

---

[3] Cisco also contends that "the Fifth Circuit held that such [antitrust] injury is absent where the 'presumed anticompetitive effects' are *intrabrand* but the monopolization claim concerns an *interbrand* market . . . exactly as here." Docket No. 504 at 8 (citing *Walker v. U-Haul Co. of Mississippi*, 747 F.2d 1011, 1015–16 (5th Cir. 1984)). Cisco's citation seemingly focuses on a sentence that supports Cisco's interpretation of the case law. *See Walker*, 747 F.2d at 1015 ("Walker made no mention in the lower court of how U-Haul's termination of a single agent for its own services (Walker) was intended to or would in fact affect the competing services that might be offered by other truck and trailer renters, the interbrand, as opposed to the intrabrand, market."). In any event, Cisco fails at this time to sufficiently develop this argument or explain how it precludes the R&R's findings. Moreover, Dexon points to evidence related to the Arvest and Trustwave examples that raise a genuine issue of material fact as to whether interbrand (and intrabrand) anticompetitive effects harmed Dexon. Docket No. 510 at 5.

Dr. Maness found marketwide harm to the entire independent channel due to the Cisco-CDW

conspiracy. *Id.* at 2–3. According to Dexon, based on Dr. Maness's testimony, "a jury may

properly find that given CDW's undisputed favoritism of Cisco over its networking equipment

competitors as well as a conspiracy not to deal with the independent channel even when it would

benefit consumers, consumer choice was improperly limited in the relevant markets" and "the loss

of consumer choice is indisputably an anticompetitive harm." *Id.* at 3–4. Specifically, Dr. Maness

asserts as follows:

> 101. Dr. Ugone argues that Cisco's coordination with CDW does not limit
> intrabrand competition because "… Cisco's distribution policy of prohibiting its
> authorized resellers from participating in gray market transactions is
> procompetitive." As discussed in my Rebuttal Report, to the extent that Dr. Ugone
> claims that Cisco's distribution policies promote brand equity and maintain
> production quality, Dr. Ugone fails to provide any evidence to support his
> theoretical propositions. In reality, record evidence indicates that when Cisco
> prohibits CDW from working with independent distributors, Cisco and CDW
> directly limit consumer choice. As illustrated by its refusal to allow CDW to deal
> with Park Place, a third party service provider, Cisco's coordination with CDW
> hurts the end customer.

> 102. Dr. Ugone also asserts that when Cisco and CDW coordinate to take business
> away from independent distributors they do not harm intrabrand competition
> because "… providing alternative quotes to consumers enhances intrabrand
> competition instead of harming it." Dr. Ugone fails to acknowledge that when Cisco
> and CDW coordinate in an effort to displace independent distributors, they do not
> provide additional alternative quotes that enhance consumer choice. Rather, they
> provide a quote to replace the independent distributor's quote. That is, Cisco does
> not present CDW quotes as an additional option that a customer may consider
> against a quote from an independent distributor; Cisco provides CDW quotes in
> tandem with FUD as a means to communicate that CDW's quote is valid and the
> independent distributor's is not.

> 103. In critiquing my assessment of the impact that Cisco and CDW's coordination
> has on interbrand competition, Dr. Ugone asserts that "Cisco also provides financial
> support to other authorized partners (not just CDW) and Cisco's competitors
> provide financial support to CDW. Therefore, CDW works not only to sell Cisco
> products, but also to sell products from Cisco's competitors, sometimes displacing
> Cisco sales." But CDW has not provided any evidence that their favoritism of Cisco
> is balanced by its attempts to sell other competitors' products; in fact, CDW's own

witness denied that they make any attempts to achieve equal treatment of competitors.

Docket No. 378-10 [hereinafter Maness Reply Report] ¶¶ 101–03.

But, as Cisco points out in its response (*see* Docket No. 509 at 5), "conclusory statements by an expert are not competent evidence and are insufficient to support or defeat summary judgment." *See Smith v. Chrysler Grp., LLC*, 2017 WL 3482174, at *1 (E.D. Tex. Aug. 14, 2017). Here, Dexon's expert's assertion regarding the alleged Park Place example (*see* Maness Reply Report ¶ 101), without Dexon pointing to any supporting evidence, does not overcome summary judgment.

> B.     *Whether there is sufficient evidence to create a genuine issue of material fact that Dexon has suffered an antitrust injury due to Cisco's alleged tying*

In its objections, Dexon states it agrees with the R&R's findings that "Cisco's tying practices result in anticompetitive effects and harm to competition." Docket No. 503 at 4. However, Dexon disagrees with the R&R's finding that Dexon did not demonstrate it sustained an antitrust injury resulting from Cisco's alleged tying. *Id.* As an initial matter, the R&R did not find Cisco's tying practices result in anticompetitive effects and harm to competition as urged by Dexon. Rather, the R&R stated that, after extensive discovery, "it is not readily apparent that this record creates an inference that Cisco in fact engaged in the tying/[bait-and-switch] schemes in a manner that affected competition in the tied market." R&R at 125. Therefore, even assuming a sufficient showing of harm to competition in the tied market, the R&R recommended summary judgment be granted because Dexon could not show antitrust injury in its *per se* tying theory.

As noted by the R&R, Dexon's characterization of the West Penn incident is that Cisco threatened to withhold SMARTnet service on equipment already purchased from Dexon. R&R at 123 (citing Docket No. 355 at 17–18). According to Dexon, because of Cisco's threat and

associated change in policy on SMARTnet service for previously purchased equipment, West Penn was forced into a position where it could only meaningfully choose Cisco's designated reseller if it wanted to keep its SMARTnet service from the monopolist. *Id*. Even if this scenario fits the *Kodak* theory of tying by forcing buyer West Penn into the purchase of the tied product that West Penn might have preferred to purchase elsewhere on different terms, *see Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 n.9 (1992), the Court agrees with the R&R's suggestion that this evidence, considered with the Lubbock 911 incident[4] and statements from Cisco employees indicating aspects of the bait-and-switch theory do happen, is not enough to create a genuine issue of material fact that Cisco in fact engaged in the tying/bait-and-switch schemes in a manner that affected competition in the tied market.

Dexon does not dispute the Magistrate Judge's recitation of the elements of a *per se* tying claim in the Fifth Circuit:

> (1) Two separate products (as opposed to components of a single product); (2) The two products are tied together or customers are coerced; (3) The supplier possesses substantial economic power over the tying product; (4) The tie has an anticompetitive effect on the tied market; and (5) The tie affects a not insubstantial volume of commerce.

R&R at 111 (quoting *EuroTec Vertical Flight Sols., LLC. v. Safran Helicopter Engines S.A.A.*, No. 3:15-CV-3454-S, 2019 WL 3503240, at *18 (N.D. Tex. Aug. 1, 2019)). Nor does Dexon dispute that it must show anticompetitive effects in the tied market. *See Bob Maxfield, Inc. v. Am. Motors*

---

[4] In its objections, Dexon also attempts to show antitrust injury through evidence related to Lubbock 911's loss of choice. According to Dexon, Lubbock 911 was not able to consider Dexon or any other independent reseller until its budget refreshed, leading to a loss of choice **for Lubbock 911**. Docket No. 503 at 4 (stating that loss of choice also resulted in an antitrust injury to Dexon). However, as explained in the R&R, Dexon's arguments that "**customers** discussed herein were harmed by Cisco's ties [and other conduct]" (Docket. No. 378 at 10 (emphasis added by Magistrate Judge)) do not show how the harm to customers that came from the alleged tying conduct injured Dexon. R&R at 126. Dexon still fails to show how the alleged loss of choice (harm) to Lubbock 911 injured Dexon.

*Corp.*, 637 F.2d 1033, 1037 (5th Cir. 1981); *see also Kodak*, 504 U.S. at 461–62 (stating that a tying arrangement violates § 1 of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market).

Dexon's objections focus on the evidence outlined in the R&R regarding the West Penn incident, noting West Penn did not make the purchase from Dexon and instead made the purchase and subsequent purchases from CDW. Docket No. 503 at 4. According to Dexon, "[t]hese uncontroverted facts establish an antitrust injury to Dexon." *Id.* Dexon asserts the R&R reads Dexon's arguments too narrowly by finding that Dexon's arguments focus "on Cisco's 'interrelated conduct' relevant to all counts rather than discussing the *per se* tying allegations of Count III individually." *Id.* at 5; R&R at 126. Dexon contends that it detailed its financial injury from the West Penn incident in its opposition to Cisco's summary judgment motion and that the R&R detailed that West Penn wanted to cancel the order and never deal with Dexon again due to Cisco's conduct. Docket No. 503 at 5.

But Dexon's arguments as to West Penn do not address the R&R's main point—that, in contrast to Cisco's alleged conspiracy and FUD-based tactics, Dexon has not shown harm to Dexon related to Cisco's alleged ties. The Court agrees that Dexon has not sufficiently shown harm to itself resulting from an alleged tying arrangement that had a likely anticompetitive effect on the tied market. Therefore, the Court is of the opinion the findings and conclusions of the R&R are correct as to Dexon's Sherman Act § 1 claims.

## CONCLUSION

For the reasons set forth above, the Court is of the opinion that the findings and conclusions of the Magistrate Judge's Report and Recommendation are correct. Accordingly, it is

**ORDERED** that CDW's motion to withdraw (Docket No. 511) is **GRANTED**. It is further

**ORDERED** that the CDW-only portions of CDW's motion to dismiss and motion for summary judgment (Docket Nos. 189, 331) are **WITHDRAWN** to the extent that they have not been relied upon, adopted, incorporated, or argued by Cisco and subject to the parties' agreement mentioned in Docket No. 511. Accordingly, this Order does not address the CDW-only portions of CDW's motion to dismiss and motion for summary judgment, other than to provide context in its adoption of the R&R. It is further

**ORDERED** that Dexon's Objections (Docket No. 503) and Cisco's Objections (Docket No. 504) are **OVERRULED**. It is further

**ORDERED** that the Magistrate Judge's Report and Recommendation (Docket No. 474) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that CDW's Motion to Dismiss (Docket No. 189) is **DENIED**. It is further

**ORDERED** that Defendants' Motions for Summary Judgment (Docket Nos. 326, 331) are **GRANTED-IN-PART** and **DENIED-IN-PART** consistent with the R&R's recommendations (*see* Docket No. 474 at 149).

**So ORDERED and SIGNED this 17th day of January, 2024.**

ROBERT W. SCHROEDER III
UNITED STATES DISTRICT JUDGE